**Fried, Frank, Harris, Shriver & Jacobson LLP**

One New York Plaza
New York, New York 10004-1980
Tel: +1.212.859.8000
Fax: +1.212.859.4000
www.friedfrank.com

RECEIVED
AUG 01 2013
CHAMBERS OF
DEBRA FREEMAN
U.S.M.J.

**FRIED FRANK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/23/13_

Direct Line: 212-859-8966
Fax: 212-859-4000
James.Dabney@friedfrank.com

July 31, 2013

*The motion for a protective order
is denied for the reasons stated
on the record of the telephone conference
held August 23, 2013.*

**VIA FEDERAL EXPRESS**

The Honorable Debra C. Freeman
United States Magistrate Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

**SO ORDERED:   DATE: _8/23/13_**

_Debra Freeman_

**DEBRA FREEMAN**
**UNITED STATES MAGISTRATE JUDGE**

Re:   **Tiffany and Co. v. Costco Wholesale Corp.**
       **Civil Action No. 13-1401 (LTS) (DCF)**

Dear Magistrate Judge Freeman:

This office represents Costco Wholesale Corp. ("Costco").

Pursuant to Federal Rule of Civil Procedure 26(c), Costco respectfully moves for a protective order with respect to Plaintiffs' Document Request 15.a (see Exhibit 1). This request seeks personal identifying information for approximately 2,500 Costco members who purchased certain diamond rings in Costco retail stores between 2007 and 2012. We have had multiple meet and confer sessions with Plaintiffs' counsel but have been unable to resolve this issue. The subject of this motion is also one of the topics raised in Plaintiffs' counsel's letters to Your Honor dated July 8 and 15, 2013.

**Factual Background**

This case concerns certain diamond rings that were sold in Costco retail stores between 2007 and 2012. The rings at issue were stamped on their inner surfaces with their manufacturers' trademarks (see Exhibit 2); the rings were delivered to purchasers with Costco paperwork in beige gift boxes (see Exhibit 3); the rings were backed by a time-unlimited Costco return policy (see Exhibit 4); and the rings were made with a type of pronged setting that is commonly known as a "Tiffany" setting. *See, e.g., Webster's Third New Int'l Dictionary* 2392 (2002) (defining "tiffany" as meaning "*of a jewelry setting*: having long prongs to hold a gem").

Costco in-store jewelry case display signage has long included setting style names (*e.g.*, "Bezel"; "Illusion"; "Tiffany") in descriptions of jewelry items. For example, the sign reproduced in Exhibit 5 refers to a diamond clarity grade ("VS2"), a diamond color grade ("I"), a diamond shape ("ROUND"), a diamond cut ("BRILLIANT"), and a setting type ("TIFFANY").

Fried, Frank, Harris, Shriver & Jacobson LLP

The Honorable Debra C. Freeman
United States Magistrate Judge

July 31, 2013
Page 2

Tiffany and Co. has admitted through a senior officer that the diamond ring depicted in Exhibit 5 has what multiple dictionaries define as a "Tiffany" setting. *See* Exhibit 6 at 131:18-25.

Plaintiffs assert, however, that Exhibit 5 and similar Costco jewelry case signs supposedly misled Costco members to think that rings like the one depicted in Exhibit 2 were *manufactured* by Tiffany & Co. despite the absence of any reference to Tiffany & Co. on the rings themselves, their packaging, or their accompanying paperwork. In a press release issued on the day this action was commenced, Plaintiffs' counsel asserted to news media: "We now know there are at least hundreds if not thousands of Costco members who think they bought a Tiffany engagement ring at Costco, which they didn't." *See* Exhibit 7 (quoting attorney Jeffrey A. Mitchell).

Costco contends that Plaintiffs' counsel's statement quoted above was willfully false and supports a conclusion that this is an "exceptional" case for purposes of an award of attorneys' fees under 15 U.S.C. § 1117(a). Costco thus fully <u>supports</u> appropriate discovery of what factors prompted Costco members to make the diamond ring purchases that they did. The issue is not whether, but <u>how</u> to inquire into those factors. The goal should be to obtain scientifically valid data while minimizing disruption of Costco's relations with individual consumers who have given absolutely no indication of confusion or dissatisfaction despite the enormous media blitz that these Plaintiffs launched last February (see Exhibit 7).

The accompanying Declaration of Dr. Russell S. Winer ("Winer Decl.") explains that, given the relatively small size of the subject population, there can be only one valid poll of that population as a practical matter. In these circumstances, Costco respectfully submits that the Court should review and pre-approve any direct interviews of Costco members and require that any such interviews be conducted in accordance with generally accepted polling techniques as set forth in § 11.493 of the *Manual for Complex Litigation, Fourth* (2004) ("MCL").

**The Court Should Review and Pre-Approve**
**Any Direct Interviews of the Subject Costco Members**

It is Plaintiffs' burden to prove that "a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 160 (2d Cir. 2005). It is neither feasible nor practical for all 2,500+ Costco members who purchased the subject rings to be deposed or called as witnesses in this case. The only practical way to test whether a word in a Costco jewelry case sign (*see, e.g.,* Exhibit 5) deceived an appreciable number of Costco diamond ring purchasers is to conduct a poll; and because the subject population here is only about 2,500, there can only be one such poll as a practical matter. Winer Decl. ¶ 17.

To be valid, survey questions must be "clear and not leading"; a survey must be "conducted by qualified persons following proper interview procedures"; and a survey must be "con-

Fried, Frank, Harris, Shriver & Jacobson LLP

The Honorable Debra C. Freeman                    July 31, 2013
United States Magistrate Judge                    Page 3

ducted so as to ensure objectivity." MCL § 11.493 at 103. "An adversary party, of course, has the right to object to the form, manner, and content of questions put by interrogators to interviewees; and it would usually be more convenient and economical to have the Court rule on such objections before the poll is taken rather than at the full trial." *Am. Luggage Works, Inc. v. U.S. Trunk* Co., 158 F. Supp. 50, 54 (D. Mass. 1957) (Wyzanski, J.), *aff'd,* 259 F.2d 69 (1st Cir. 1958). The MCL similarly recommends that survey questionnaires, controls, and administration procedures be reviewed and approved in advance. MCL § 11.493 at 103.

In these circumstances, Costco respectfully submits that the Court should issue a protective order prohibiting direct interviews of Costco diamond ring purchasers except by an independent, neutral third party utilizing a court-approved questionnaire and following the generally accepted survey techniques set forth in MCL § 11.493. The Court may wish to consider appointing a special master under Federal Rule of Civil Procedure 53 to oversee the design and administration of any survey of Costco diamond ring purchasers.

The alternative apparently proposed by Plaintiffs – secret interviews of selected Costco members, conducted by partisan actors and with unfavorable results suppressed and treated as attorney work product – would violate first principles of survey research, would yield no data from which conclusions as to the subject buyer population as a whole could be drawn, and likely would preclude any subsequent administration of a scientifically valid inquiry into the factors (e.g., price, Costco's reputation, Costco's return policy, a word in a sign) that caused the buyer population to make the diamond ring purchases that they did. Winer Decl. ¶¶ 16-19.

Despite having publicly claimed to "know" that "at least hundreds if not thousands of Costco members . . . think they bought a Tiffany engagement ring at Costco" (see Exhibit 7), the Plaintiffs to date have failed to identify so much as one such person. Direct interrogation of Costco members by partisan actors would pose enormous risk of interference and damage to Costco customer relations. The Plaintiffs have every reason and incentive to try and undermine Costco's relations with its customers – as their Valentine's Day press release (see Exhibit 7) was plainly designed to do.

A proposed form of protective order accompanies this letter.

Respectfully yours,

James W. Dabney

Enclosures

cc:    Jeffrey A. Mitchell, Esq.

Exhibit 1

   c.  Communications or writings about the quality of Engagement Rings, either alone
       or as compared with the quality of engagement rings offered for sale by other
       manufacturers or companies; and
   d.  Press releases and other media related Communications.

**RESPONSE TO REQUEST NO. 14:**

   See objections to Request No. 14.


**REQUEST NO. 15:**

   Documents concerning each Purchaser of a Tiffany Marked Ring, including, but not
limited to:
   a.  The identity of each Purchaser;
   b.  Communications with any Purchaser, whether before or after the Lawsuit was
       filed;
   c.  Complaints, either formal or informal, received from any Purchaser; and
   d.  Refunds, credits, adjustments or accommodations issued or given to any
       Purchaser.

**RESPONSE TO REQUEST NO. 15:**

   See objections to Request No. 15.

   Insofar as the word "marked" is a vague and ambiguous truncation of the word "trade-

marked," Costco denies having advertised or sold any so-called "Tiffany Marked Rings."

Insofar as this falsely and objectionably worded request seeks documents concerning Costco

members who purchased certain unbranded diamond rings that had Tiffany settings, Costco will

produce business records that show (i) the text of Costco diamond ring display signs for diamond

rings as they existed from time to time since February 14, 2007; (ii) Costco monthly dollar and

unit sales of diamond rings since February 14, 2007; (iii) the Costco-assigned item numbers of

diamond rings sold since February 14, 2007; (iv) images of the items referred to in "(iii)"; (v)

returns of diamond rings sold since February 14, 2007, including stated reasons for the returns;

and (vi) a letter dated April 5, 2013, that Costco sent to certain members after Plaintiffs

publicized false and libelous statements concerning Costco and Costco members.

8

Exhibit 2





Exhibit 3



Exhibit 4



April 5, 2013

Dear Costco Member:

Our records indicate that you purchased a diamond ring at one of our Costco warehouses. We hope you have been fully satisfied with your purchase.

We are writing to you because a jewelry store chain, Tiffany & Co., recently filed a lawsuit against Costco, complaining about certain signs that were used to describe rings on display in Costco warehouses. The signs used the word "Tiffany" to indicate that a ring had a Tiffany-style pronged setting holding the diamond.

We do not believe that our signs were inaccurate; however, under our member satisfaction policy you have the right to return your ring to a Costco warehouse for a full refund if for any reason you are not satisfied.

At Costco, we strive every day to provide you with quality products at low prices. We value your business and we thank you for being a Costco member.

Sincerely,

Doug Schutt
Executive Vice President – Merchandising
Costco Wholesale

13C0804A 4/13

Exhibit 5

## Merriam-Webster Dictionary Definition

³**tiffany** \"\" *adj, usu cap* [after Charles L. *Tiffany* †1902 Am. jeweler] *of a jewelry setting* : having long prongs to hold a gem

## Random House Dictionary Definition

**Tif‧fany set‧ting,** *Jewelry.* a setting, as in a ring, in which the stone is held with prongs. [named after C. L. TIFFANY]

## GIA Dictionary Definition

**Tiffany head,** high, four- or six-prong head with V-shaped openings between the prongs: introduced in 1886 by Charles L. Tiffany for setting solitaires. Also called a Tiffany setting or Tiffany mount.

*Tiffany head*

**Tiffany mount,** see TIFFANY HEAD.

**Tiffany setting,** see TIFFANY HEAD.

## The Jewelers' Manual Definition

**Tiffany setting.** A *six-prong* setting, generally round in shape and flaring out slightly from the base to the top, having long, slender prongs that hold the stone. The term is sometimes applied to a *four-prong* setting. See section on mountings and settings.

## Springer Reference Dictionary Definition

**Tiffany setting;** a style of setting a transparent solitaire gemstone or diamond in a finger ring with six high prong head (frequently four prong) generally round in shape. Also called Tiffany head, Tiffany mount.

## JCK Dictionary Definition

**Tiffany setting.** A six-prong setting generally round in shape and flaring out from the base to the top, having long slender prongs that hold the stone. Sometimes applied to four prong settings as well.



Tiffany Settings.

Exhibit 6

1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK
   -------------------------------------------x
3  TIFFANY AND COMPANY and
   TIFFANY (NJ) LLC,:
4    ECF CASE,

5        Plaintiffs and Counter-Defendants,

6  -against-

7  COSTCO WHOLESALE CORPORATION,,

8        Defendant and Counter-Plaintiff.

9  13 Civ. 1041 (LTS)
   -------------------------------------------x
10

11
                      One New York Plaza
12                    New York, New York

13                    July 1, 2013
                      10:37 a.m.
14

15

16     VIDEOTAPED DEPOSITION of ANDREW HART in the

17  above-entitled action, held at the above time and

18  place, taken before KAREN E. RIGONI, CSR, RPR, a

19  Registered Professional Reporter and Notary Public

20  of the State of New York.

21

22

23     ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24           New York, New York 10022
                   212-750-6434
25                 Ref:  104203

```
 1                    ANDREW HART,

 2   called as a witness herein, having been first

 3   duly sworn, was examined and testified as follows:

 4

 5                    EXAMINATION

 6   BY MR. DABNEY:

 7        Q.   Please state your full name.

 8        A.   My name is Andrew Hart.

 9        Q.   What is your date of birth?

10        A.   February 28, 1968.

11        Q.   Where do you reside, Mr. Hart?

12        A.   In Campbell Hall, New York.

13        Q.   And you are a senior vice president

14   Diamonds and Gemstones of Tiffany & Co.,

15   correct?

16        A.   Yes.

17        Q.   And before you were senior vice

18   president Diamonds and Gemstones, you were vice

19   president Diamonds and Gemstones for Tiffany & Co.,

20   correct?

21        A.   Yes.

22        Q.   And you've been with Tiffany & Co. for

23   about 14 years since 1999, correct?

24        A.   Yes.

25        MR. DABNEY:   I'd like to have the reporter
```

```
 1                          HART
 2    that made this particular mounting?
 3        A.   No, I'm not.
 4        MR. DABNEY:  Now, your counsel also asked you
 5    a series of questions about a sign that I think
 6    you said you've never seen.  So I'm going to
 7    show you and I'd like the reporter to mark as
 8    Defendant's Exhibit 24 a photograph that we
 9    received from a -- a -- from your investigator,
10    Mr. Hart.
11                  (Whereupon, Hart Deposition
12                   Exhibit No. 24 was marked for
13                   identification.)
14    BY MR. DABNEY:
15        Q.   Mr. Hart, showing you what's been
16    marked as Defendant's Exhibit 24.  I believe you
17    testified you've never seen this photograph
18    before; is that right?
19        A.   That's right.
20        Q.   You've never seen it before?
21        A.   That's right.
22        Q.   And you've never seen this sign before?
23        A.   No.
24        Q.   Now, there are several words --
25    there's -- there's a number 605880.  You see
```

```
 1                    HART
 2   that?
 3        A.   Yes, I do.
 4        Q.   And then below that there are three
 5   lines of text.
 6        A.   Yes.
 7        Q.   Do you see that?  And then there's a
 8   price down at the bottom.
 9        A.   Yes.
10        Q.   Now, let's take a look at -- there's a
11   phrase there, round brilliant.  You see that?
12        A.   Yes.
13        Q.   That's referring to a cut, right?
14        A.   It's a shape and a cut.
15        Q.   A shape and a cut.  So brilliant is the
16   cut.
17        A.   That's right.
18        Q.   But the word cut isn't there, is it?
19        A.   No.
20        Q.   But you would say someone shopping for
21   a diamond ring, even though it doesn't say the
22   word cut, the word brilliant refers to a cut?
23        A.   It does.
24        Q.   Okay.  And then up above the word
25   brilliant, there's the abbreviation VS2.  You
```

1                         HART

2    see that?

3        A.    I do.

4        Q.    That is a clarity grade, right?

5        A.    It is.

6        Q.    You don't see the word clarity, do you?

7        A.    No.

8        Q.    But you would agree with me that in

9    this context of this sign, VS2 is referring to

10   clarity; you'd agree with that?

11       A.    I agree with that.

12       Q.    And then there's a letter I there.

13   That's a color grade, isn't it?

14       A.    It is.

15       Q.    And you would agree you don't see the

16   word color in this sign, do you?

17       A.    No.

18       Q.    But in the context of this sign, you'd

19   agree with me that I is referring to the color

20   of the -- the stone of the ring shown up in the

21   photograph there, right?

22       A.    That's what I assume, yes.

23       Q.    And there's the word diamond.  Would

24   you expect that that is referring to the kind of

25   stone that's there?

1                        **HART**

2        A.    Yes.

3        Q.    And then it says solitaire ring, and

4   would you agree with me that the ring that

5   appears up at the top would be considered a

6   diamond solitaire ring?

7        A.    Yes.

8        Q.    And there's the word platinum, and

9   would you agree with me that platinum would

10  describe the kind of metal that is likely in

11  that diamond solitaire ring?

12       A.    It appears that it could be platinum,

13  yes.

14       Q.    Well, it doesn't say metal, but

15  platinum you'd say probably is referring to

16  platinum metal; you'd agree with that?

17       A.    Yes.

18       Q.    So that leaves then the word Tiffany.

19  What in the context of this sign the word

20  Tiffany means?  You would agree with me,

21  wouldn't you, that the ring shown there has what

22  at least five dictionaries you've identified at

23  this deposition here today would define as a

24  Tiffany setting, wouldn't you?

25       A.    Yes.

Exhibit 7



TIFFANY & CO.
February 14, 2013

## Tiffany Files Against Costco for Trademark Infringement

### Tiffany protects customers and brand by seeking to halt sales of counterfeit diamond rings

NEW YORK, NY (February 14, 2013)--Moving to protect its customers and its brand, Tiffany and Company, wholly owned subsidiary of Tiffany & Co. (NYSE: TIF) today filed suit against Costco Wholesale Corporation to prevent further sales of counterfeit diamond engagement rings and for damages associated with prior sales. The suit was filed in the U.S. District Court for the Southern District of New York, and alleges trademark infringement, dilution, counterfeiting, unfair competition, injury to business reputation, false and deceptive business practices and false advertising.

In November, 2012, a customer alerted Tiffany to the sale of what was promoted on in-store signs as "Tiffany" diamond engagement rings at a Costco store in Huntington Beach, California. Tiffany immediately launched an investigation, and later learned that for many years  and without Tiffany's knowledge, Costco had apparently been selling different styles of rings that it has falsely identified on in-store signage as "Tiffany." The rings are not in fact Tiffany rings, nor are they manufactured by, approved by, licensed by, or otherwise in any way properly associated with Tiffany. In this way  Costco led its members to believe they were purchasing authentic Tiffany products at significant discounts, when in fact, that was simply not true.

"We now know that there are at least hundreds if not thousands of Costco members who think they bought a Tiffany engagement ring at Costco, which they didn't. Costco knew what it was doing when it used the Tiffany trademark to sell rings that had nothing to do with Tiffany. This is not the kind of behavior people expect from a company like Costco  and this case will shed a much needed light on this outrageous behavior," said Jeffrey Mitchell of Dickstein Shapiro, Tiffany's counsel in the case. "The Tiffany brand has been damaged. Costco members have been damaged, and Costco has profited from the sale of engagement rings by misrepresenting what they were. We will get to the bottom of what Costco was up to and why, and right a terrible wrong," Mitchell added.

For more than 175 years, the Tiffany trademarks have been applied to high quality goods, including in particular high-end jewelry. Authentic Tiffany jewelry is manufactured to strict specifications, and then subjected to rigorous quality control standards to assure the public about the provenance and quality of each Tiffany item. Tiffany diamond engagement rings are then backed by a lifetime guarantee. Additionally, to protect the brand  Tiffany fine jewelry is sold only in Tiffany retail stores by trained sales professionals, and is not distributed or sold at discount through other wholesale or retail establishments. In particular, Tiffany has never sold nor would it ever sell its fine jewelry through an off-price warehouse retailer like Costco, either directly or indirectly.

To protect the public, Tiffany maintains an aggressive and rigorous intellectual property program, and regularly takes actions against counterfeiters and infringers. "What's different here from many other cases of counterfeiting," notes Mitchell "is that here customers might be more easily taken in since Costco members expect authentic brand name merchandise at discount prices at Costco. Everyone knows that buying something on a street corner or over the internet from an unknown source is risky. Until now, no one would have thought it could be risky to buy brand name merchandise from Costco as well."

Tiffany & Co. operates jewelry stores and manufactures products through its subsidiary corporations. Its principal subsidiary is Tiffany and Company. The Company operates TIFFANY & CO. retail stores and boutiques in the Americas, Asia-Pacific, Japan, Europe and the United Arab Emirates and engages in direct selling through Internet  catalogue and business gift operations. For additional information, please visit www.tiffany.com.

Contact:
Linda Buckley
(212) 277-5900
linda.buckley@tiffany.com



EXHIBIT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

TIFFANY AND COMPANY and
TIFFANY (NJ) LLC,

             Plaintiffs and Counter-Defendants,

                – against –

COSTCO WHOLESALE CORPORATION,

             Defendant and Counter-Plaintiff.

-------------------------------------------------------------------- x

**ECF CASE**

13 Civ. 1041 (LTS)(DCF)

**PROTECTIVE ORDER**

This matter having been opened to the Court on the application of Costco Wholesale Corp. ("Costco") for a protective order under Federal Rule of Civil Procedure 26(c); and it appearing that the Plaintiffs have sought disclosure of personal identifying information for approximately 2,500 Costco members who purchased certain diamond rings in Costco retail stores between 2007 and 2012 (the "Subject Costco Purchasers"); and it further appearing that the Plaintiffs seek to interrogate Subject Costco Purchasers with respect to their purchase decisions; and it further appearing that direct interrogation of Subject Costco Purchasers by interested persons would expose Costco to significant harm and would not yield data from which reliable conclusions as to the population of Subject Costco Purchasers could be drawn; and it further appearing that the size of the population of Subject Costco Purchasers is such that only one valid poll of such persons can be conducted; and good cause otherwise appearing, it is hereby

      ORDERED, that Costco's motion for a protective order is GRANTED; and it is further

9076120

ORDERED, that any direct interrogation of the Subject Costco Purchasers shall be conducted under the supervision of the Court and in accordance with the principles set forth in § 11.493 of the *Manual for Complex Litigation, Fourth* ("MCL"); and it is further

ORDERED, that, if the parties are unable to agree on a protocol for the conduct of a poll of the Subject Costco Members, either party may apply to the Court for a ruling with respect to a protocol or the appointment of a special master to administer a poll of Subject Costco Members under the supervision of the Court; and it is further

ORDERED, that Costco shall not be required to disclose personal identifying information concerning Subject Costco Purchasers except to a qualified third party neutral administrator who is agreed to by the parties or approved by the Court to conduct a poll of a random sample of Subject Costco Members and to report the results of such poll to the Court and the parties.

DONE and ORDERED this __ day of August, 2013.

By: _____

2

9076120

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                   :

TIFFANY AND COMPANY and
TIFFANY (NJ) LLC,                      :              **ECF Case**
                                   :

      Plaintiffs and Counter-Defendants,   :      13 Civ. 1041 (LTS) (DCF)

              - against –           :

                                   :

COSTCO WHOLESALE CORPORATION,   :

      Defendant and Counter-Plaintiff.    :

------------------------------------------------------------------x

## <u>DECLARATION OF RUSSELL S. WINER</u>

I, RUSSELL S. WINER, declare as follows:

1.     I am currently the William Joyce Professor of Marketing and Chair of the Marketing Department at the Stern School of Business, New York University. I received my Ph.D. in Industrial Administration from Carnegie Mellon University in 1977.

2.     Prior to joining NYU, I have been on the faculties of the University of California at Berkeley, Vanderbilt University, and Columbia University. I have also been a visiting faculty member at the Massachusetts Institute of Technology, Stanford University, the Helsinki School of Economics, the University of Tokyo, École Nationale des Ponts et Chausées, Cranfield School of Management (U.K.), and Henley Management College (U.K.).

4.     I am the author of over 70 articles and four books in the area of marketing and marketing research.   Over the span of my career, I have made both methodological and substantive contributions to the field of marketing in the areas of pricing, advertising, consumer choice and decision-making, branding, and a number of other areas.

5.     I have been given a number of awards for my research including a lifetime achievement award in pricing and the inaugural long-term research contribution award from the INFORMS (Institute for Operations Research and the Management Sciences) Society of Marketing Science (ISMS).  Additionally, I was named as an inaugural ISMS fellow.  ISMS is the leading organization for marketing academics whose work involves quantitative modeling.

6.     I have extensive academic editorial experience.  I have been the editor of the *Journal of Marketing Research* (*JMR*) twice.  *JMR* is widely considered to be among the most prestigious two or three journals in the field of marketing.  The articles published in *JMR* utilize the entire spectrum of marketing research methodologies including sampling, survey design, and data analysis.  In addition, I have been on numerous editorial boards, acted as associate editor, and generally been involved with the peer review process both as a reviewer and editor for over 30 years.  Further information about my academic and professional qualifications is provided by my curriculum vitae in Exhibit 1.

7.     I understand that there exists a population of approximately 2,500 individuals who purchased diamond rings in Costco warehouse stores between 2007 and 2012 and who are alleged by the Plaintiffs to have made their purchases as a result of "confusion" allegedly caused by certain in-store jewelry case display signs (the "Subject Costco Purchasers").  I understand further that counsel for the Plaintiffs seek to contact Subject Costco Purchasers and interrogate

them concerning whether "confusion" – as distinct from price, value, Costco's reputation, Costco's return policy, or other factors – may have been the reason why Subject Costco Purchasers made diamond ring purchases at Costco.

8.    There are two generally accepted approaches to drawing inferences about a population or universe of individuals: taking a census or drawing a sample.

9.    A census is where every element of the universe is queried for the relevant topic. A census is rarely taken due to the expense and time involved and the low likelihood of contacting and gaining agreement for participation from every element of the universe. As a result, outside of government purposes (i.e. the decennial U.S. Census), censuses are usually limited to cases where the universe is very small (e.g., the population of nuclear reactor customers). Taking a census is, however, an acceptable approach to drawing inferences about a population since, technically, every member of the population is investigated.

10.    Far and away the most common approach to drawing inferences about a population is to take a sample or a subset of the population. The properties of data obtained from samples have been well-known for hundreds of years and have been recognized by United States courts. Section 11.493 of the *Manual for Complex Litigation, Fourth* (2004) (the "MCL") sets out general principles for conducting valid surveys of population samples.

11.    When a list of the names of the people in a population is available, the most common approach to developing a sample is by taking a random sample. While different random sampling methods can be used, the most straightforward approach is to take a simple random sample where every member of the population has the same non-zero probability of being drawn.

12.    Taking a simple random sample can easily be applied to the list of Subject Costco Purchasers. Unless a full census of the Subject Costco Purchasers were taken (with all responses recorded and appropriately neutral questioning utilized), use of a random sample would be essential to performing a scientifically valid test of whether any substantial part of the population of Subject Costco Purchasers made purchase decisions as a result of "confusion" or other factors.

13.    In addition, as described in the MCL, any valid survey of Subject Costco Members with respect to their purchase decisions would have to follow certain methods for collecting and analyzing data.

14.    In terms of collecting data, any survey instrument being must use appropriate screening questions to obscure the purpose of the survey; must use unbiased, non-suggestive, non-leading language in questions; and must be implemented using qualified neutral individuals (if using telephone or personal interviews) or technology (if using an online survey approach). Overall, the research must meet generally acceptable standards for objectivity.

15.    In addition, in terms of data analysis, someone qualified to analyze data using statistical methodology must be employed to develop the findings from the study.

16.    Serially calling a non-random subset of Subject Costco Purchasers would not yield data from which any conclusion as to the population of Subject Costco Purchasers as a whole could be drawn. Additionally, it is recognized in the field of market research that persons who question population samples should have no knowledge of the reason why the questions are being asked or the identity of the person sponsoring the inquiry, for otherwise there is high risk of bias being injected into the questioning leading to invalid results. In order for any survey of Subject Costco Purchasers to have any scientific validity, the respondents must be selected at

random and it must be known how many people were contacted, what questions were asked, and what all the responses were.

17.     Given the relatively small size of the population of Subject Costco Purchasers, that population can likely only be surveyed once.  If Subject Costco Purchasers were polled by one party to this litigation with respect to their diamond ring purchases, that poll would likely make it difficult or impossible for the other party to conduct its own poll because the purchasers would have been "tainted" by being informed about the nature of the investigation.  As a result, any questioning in a second poll of Subject Costco Purchasers would likely be biased by the first contact made in a first poll.

18.     Responding to surveys or any kind of interrogation creates what is called respondent "fatigue" which results in a much lower probability of a customer being willing to respond to a second further contact.  This is a further reason why, given its relatively small size, the population of Subject Costco Purchasers can likely only be surveyed once as a practical matter.

19.     For the reasons above, if the court permits direct interviews of Subject Costco Members with respect to their diamond ring purchases, I believe it is imperative that there be a single survey conducted utilizing an appropriately neutral, court-approved questionnaire and generally accepted sampling and statistical methodology to produce scientifically valid results.  For the same reasons, I believe that interested counsel's serially contacting Subject Costco Purchasers would not yield any valid data as to the population of Subject Costco Purchasers.

20.     I note that even if scientifically valid techniques were now to be used in polling a valid random sample of Subject Costco Purchasers with respect to diamond ring purchases made

as many as six years ago, such a poll would not necessarily yield valid data as to what the purchasers' beliefs were at the time of purchase.  For example, if Subject Costco Purchasers were aware of publicity surrounding this lawsuit, such awareness could make it impossible for respondents to separate in their minds what they know now from what they remember about a transaction that may have occurred as many as six years prior to the survey administration.

I, Russell S. Winer, hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:     July 31, 2013

Russell S. Winer

9064464

# EXHIBIT 1

**RUSSELL S. WINER**

William Joyce Professor of Marketing
Chairman, Department of Marketing
Stern School of Business, 40 W.4[th] Street
806 Tisch Hall
New York University
New York, NY 10012
rwiner@stern.nyu.edu
www.stern.nyu.edu/~rwiner
Twitter: @russwiner
Phone: +212.998.0540, Mobile +917.209.5711

**Curriculum Vitae**

July, 2013

## EDUCATION

| | |
|---|---|
| Ph.D., Industrial Administration | Carnegie Mellon University, 1977 |
| M.S., Industrial Administration | Carnegie Mellon University, 1975 |
| B.A., Economics | Union College, 1973 |

## HONORS

Phi Beta Kappa, 1973
American Marketing Association, Doctoral Consortium Fellow, 1975
American Marketing Association, Doctoral Dissertation Competition, Honorable Mention, 1977
Best Teacher Award, Vanderbilt Executive MBA Class of 1987
Best Teacher Award, UC-Berkeley Evening MBA Program, 1992
Lifetime Achievement Award, Fordham University Pricing Center, 2002
Direct Marketing Educational Foundation Robert B. Clarke Outstanding Educator, 2003
Inaugural Fellow of the INFORMS Society for Marketing Science, 2008
American Marketing Association/Irwin/McGraw-Hill Distinguished Marketing Educator Award
for Lifetime Achievement in Marketing, 2011

## PROFESSIONAL MEMBERSHIPS

American Economic Association, American Marketing Association, Association for Consumer
Research, European Marketing Academy, INFORMS, INFORMS Society for Marketing Science
(ISMS).

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 1977-1984 | Columbia University<br>Graduate School of Business<br>Assistant/Associate Professor |
| 1984-1988 | Vanderbilt University<br>Owen Graduate School of Management<br>Associate Professor<br>Director of the Doctoral Program (1986-8) |
| 1987 | Massachusetts Institute of Technology<br>Sloan School of Management<br>Visiting Associate Professor of Management Science |
| 1988-2002 | University of California at Berkeley<br>Haas School of Business<br>J. Gary Shansby Professor of Marketing Strategy<br>Marketing Group Chair (1988-92, 1994-2002)<br>Associate Dean for Academic Affairs and Faculty Chair<br>(1992-96, 1998-9) |
| 2000 | Stanford University<br>Graduate School of Business<br>Visiting Professor of Marketing |
| 2003-present | Stern School of Business<br>New York University<br>William Joyce Professor of Marketing<br>Deputy Dean (2003-6)<br>Chair, Marketing Department (2008- )<br>Academic Director, Stern Center for Measurable<br>Marketing (2006- ) |
| 2007-2009 | Executive Director<br>Marketing Science Institute<br>Cambridge, MA |
| 2009-present | Dean, Department of Business Administration<br>University of the People (www.uopeople.org) |

Visiting Scholar appointments:  Cranfield School of Management; Tokyo University; Stanford University Graduate School of Business.

Other MBA teaching: Helsinki School of Economics, École Nationale des Ponts et Chausées (Paris, Cochin India, Buenos Aires, Casablanca), Indian Institute of Planning and Management (Delhi, Hyderabad, Bangalore, Chennai), Indian School of Business (Hyderabad).

## MANAGEMENT DEVELOPMENT PROGRAMS

Executive teaching in Marketing Research, Planning, and Strategy for Columbia, Vanderbilt, the University of California, New York University, and various companies and organizations including the New York Telephone Company, South Central Bell, Chemical Bank, Tennessee Bankers Association, Sovran Bank, Young Presidents' Organization, Tennessee Valley Authority, Warner Brothers Records, Kaiser Permanente, Western Farm Credit Bank, Becton Dickinson Immunocytometry Systems, Southwestern Bell, Pacific Bell, Hungarian Marketing Association, Perkin-Elmer Applied Biosystems Division, Pratt & Whitney China Management Training Program, ESADE (Barcelona, Madrid), L'Oreal, General Electric, Peking University, Dell Computer (Round Rock, TX; Penang, Malaysia; Bratislava, Slovakia; Porto Alegre, Brazil; Bangalore, India), THINK Education (Mumbai), Korean Chamber of Commerce (KOCHAM).

## PROFESSIONAL ACTIVITIES

Editorial Boards:

*Journal of Marketing Research* (1989- , Editor: 1997-2000, 2005-06)
*Marketing Science* (1990-97, 2002- , Area Editor: 1992-97)
*Journal of Marketing* (1997- )
*International Journal of Research in Marketing* (Associate Editor: 2006- )
*Review of Marketing Science* (Co-editor: 2006-11)
*Marketing Letters* (2007- )
*Journal of Advertising Research* (2010- )
*Journal of Interactive Marketing* (1988-2005, Co-Editor: 2000-05, Editor Emeritus)
*Journal of Consumer Research* (1983-2002 , Associate Editor: 1993-96)

Professional Service: Past Secretary-Treasurer (1980-81) and Chairman (1984-85) of the Marketing College of The Institute of Management Sciences; Secretary of The Institute of Management Sciences (1987-89); Member, Combined Finance Committee of The Institute of Management Sciences (1989-90); Advisory Council for the TIMS College on Marketing (1993-95); TIMS Marketing Strategy Committee (1992-94); Publications Committee of the Association for Consumer Research (1988-89); Academic Trustee, Marketing Science Institute (1994-2000, 2006-7); Vice President for Publications, American Marketing Association (2004-8).

External Reviewer for Marketing Departments: University of Pennsylvania (Wharton), Carnegie Mellon University (Graduate School of Industrial Administration), Northwestern University (Kellogg), National University of Singapore, Columbia University, Boston College.

**BUSINESS EXPERIENCE**

Consulting: New York Telephone Company, American Airlines-Freight Marketing, National Particleboard Association, Long Island Lighting Company, Ogilvy and Mather, Dancer-Fitzgerald-Sample, Martin Marietta, Executive Programs-Columbia University, First American Bank, Kidder Peabody, Perkin-Elmer Applied Biosystems Division, ATX Technologies, Damovo do Brasil, various expert witness assignments.

Director/Advisor: Decidia, Revionics, Marketing Science Institute, Direct Marketing Educational Foundation, European School of Management and Technology (ESMT), DGA Security.

Past Director/Advisor: Roundtable Pizza, Manischewitz, Henley Management College (U.K.), American Marketing Association.

**PUBLICATIONS**

<u>Books</u>

Winer, Russell S. and Ravi Dhar (2011), *Marketing Management*, 4th ed., Upper Saddle River, NJ: Prentice Hall. Translated into Chinese, Italian.

Lehmann, Donald R. and Russell S. Winer (2008), *Analysis for Marketing Planning*, 7th ed., Burr Ridge, IL: Irwin. Translated into Japanese, Greek, and Chinese.

Winer, Russell S. (2006), *Pricing*, Cambridge, MA: Marketing Science Institute.

Lehmann, Donald R. and Russell S. Winer (2005), *Product Management*, 4th ed., Burr Ridge, IL: Irwin/McGraw-Hill. Translated into Chinese, Russian, and Spanish.

Neslin, Scott and Russell S. Winer (2013), *The History of Marketing Science* (working title), in development, to be published by now publishers, inc.

<u>Articles</u>

Winer, Russell S. and Huntley W.H. Zia (1975), "A Sequential Analysis Approach to Determining the Optimal Length of a Test Marketing Period," *Proceedings*, Canadian Association of Administrative Sciences.

Staelin, Richard and Russell S. Winer (1976), "A Unobservable Variables Model for Determining the Effect of Advertising on Consumer Purchases," *Proceedings*, Fall Conference of the American Marketing Association.

Winer, Russell S. (1976), "A Time-Varying Parameter View of the Sales-Advertising Relationship," *Proceedings*, Fall Conference of the American Marketing Association.

Avery, Robert, Andrew Mitchell, and Russell S. Winer (1976), "Issues in Modeling the Carryover Effects of Advertising," *Proceedings*, Fall Conference of the American Marketing Association.

Wildt, Albert R. and Russell S. Winer (1978), "Modeling Structural Shifts in Marketing Response: An Overview," *Proceedings*, Fall Conference of the American Marketing Association.

Elrod, Terry and Russell S. Winer (1979), "Estimating the Effects of Advertising on Individual Household Purchasing Behavior," *Proceedings*, Fall Conference of the American Marketing Association.

Farley, John U., Jerrold P. Katz, Donald R. Lehmann, and Russell S. Winer (1979), "Measurement and Parameter Stability in a Multi-Wave Consumer Panel," *Proceedings*, TIMS/ORSA Conference on Market Measurement held at Stanford University.

Elrod, Terry and Russell S. Winer (1979), "An Empirical Comparison of Aggregation Criteria for Developing Market Segments," *Proceedings*, TIMS/ORSA Conference on Market Measurement held at Stanford University.

Winer, Russell S. (1979), "An Analysis of the Time Varying Effects of Advertising: the Case of Lydia Pinkham," *Journal of Business*, 52 (October), 563-576.

Winer, Russell S. (1979), "On Family Versus Firm Level Analysis of the Effects of Advertising," *Decision Sciences*, 10 (October), 547-561.

Winer, Russell S. and Michael J. Ryan (1979), "Analyzing Cross-Classification Data: An Improved Method for Predicting Events," *Journal of Marketing Research*, 16 (November), 539-544.

Holbrook, Morris B., William L. Moore, and Russell S. Winer (1980), "Using 'Pick Any' Data to Represent Competitive Positions," *Proceedings*, TIMS/ORSA Conference on Market Measurement held at the University of Texas at Austin.

Winer, Russell S. (1980), "A Longitudinal Model to Decompose the Effects of an Advertising Stimulus on Family Consumption," *Management Science*, 26 (January), 78-85.

Winer, Russell S. (1980), "Estimation of a Longitudinal Model to Decompose the Effects of an Advertising Stimulus on Family Consumption," *Management Science*, 26 (May), 471-482.

Winer, Russell S. (1980), "Analysis of Advertising Experiments," *Journal of Advertising Research*, 20 (June), 25-32.

Winer, Russell S. (1981), "Attrition Bias in Econometric Models Estimated from Panel Data," *Proceedings*, Association for Consumer Research.

Farley, John U., Donald R. Lehmann, Russell S. Winer, and Jerrold P. Katz (1982), "Parameter Stationarity and 'Carryover Effects' in a Consumer Decision Process Model," *Journal of Consumer Research*, 8 (March), 465-471.

Holbrook, Morris B., William L. Moore, and Russell S. Winer (1982), "Constructing Joint Spaces from Pick-Any Data: A New Tool for Consumer Analysis," *Journal of Consumer Research*, 9 (June), 99-105.

Elrod, Terry and Russell S. Winer (1982), "An Empirical Comparison of Market Segmentation Criteria," *Journal of Marketing*, 46 (Fall), 65-74.

Lehmann, Donald R. and Russell S. Winer (1983), "An Examination of the Competitor Analysis Process," *Proceedings*, TIMS/ORSA Marketing Science Conference held at the University of Southern California.

Hulbert, James M., Donald R. Lehmann, and Russell S. Winer (1983), "Objective and Strategy Determination: Some Empirical Results," *Journal of Business Research*, 11, 427-438.

Winer, Russell S. (1983), "Attrition Bias in Econometric Models Estimated with Panel Data," *Journal of Marketing Research*, 20 (May), 177-186.

Wildt, Albert R. and Russell S. Winer (1983), "Modelling and Estimation in Changing Market Environments," *Journal of Business*, (July), 365-388.

Weinberg, Charles B. and Russell S. Winer (1983), "Working Wives and Major Family Expenditures: Update, Replication, and Extension," *Journal of Consumer Research*, 10 (September), 259-263.

Winer, Russell S. (1985), "A Price Vector Model of Demand for Consumer Durables: Preliminary Developments," *Marketing Science*, 4 (Winter), 74-90.

Winer, Russell S. (1985), "A Revised Behavioral Model of Consumer Durable Demand," *Journal of Economic Psychology*, 6 (June), 175-184.

Winer, Russell S. (1986), "A Reference Price Model of Demand for Frequently-Purchased Products," *Journal of Consumer Research*, 13 (September), 250-256. Reprinted in G.S. Carpenter, R. Glazer, and K. Nakamoto, eds., *Readings on Market-Driving Strategies*, (Reading, MA: Addison-Wesley), 1997.

Moore, William L. and Russell S. Winer (1987), "A Panel Data-Based Method for Merging Joint Space and Market Response Function Estimation," *Marketing Science*, 6 (Winter), 25-42 (with commentary).

Cooil, Bruce, Russell S. Winer, and David L. Rados (1987), "Cross-Validation for Prediction," *Journal of Marketing Research*, 24 (August), 271-279.

6

Farley, John U., Donald R. Lehmann, and Russell S. Winer (1987), "Stability of Membership in Market Segments Identified with a Disaggregate Consumption Model," *Journal of Business Research*, 15, 313-328.

Oliver, Richard L. and Russell S. Winer (1987), "A Framework for the Formation and Structure of Consumer Expectations: Review and Propositions," *Journal of Economic Psychology*, 8 (December), 469-499.

Glazer, Rashi, Joel H. Steckel, and Russell S. Winer (1987), "Group Process and Decision Performance in a Simulated Marketing Environment," *Journal of Business Research*, 15 (December), 545-557.

Winer, Russell S. (1988), "Behavioral Perspectives on Pricing: Buyers' Subjective Perceptions of Price Revisited," in T.M. Devinney, ed., *Issues in Pricing: Theory and Research*, Lexington, MA: Lexington Books, 35-57.

Glazer, Rashi, Joel H. Steckel, and Russell S. Winer (1989), "The Formation of Key Marketing Variable Expectations and their Impact on Firm Performance: Some Experimental Evidence," *Marketing Science*, 8 (Winter), 18-34.

Winer, Russell S. and William L. Moore (1989), "The Effects of Advertising and other Marketing Mix Variables on Brand Positioning," *Journal of Advertising Research*, 28 (February/March), 39-45.

Winer, Russell S. (1989), "A Multi-Stage Model of Choice Incorporating Reference Prices," *Marketing Letters*, 1 (December), 27-36.

Vanhonacker, Wilfried R. and Russell S. Winer (1990), "A Rational Random Behavior Model of Choice," *Applied Stochastic Models and Data Analysis*, 6 (March), 41-52.

Glazer, Rashi, Joel H. Steckel, and Russell S. Winer (1990), "Judgmental Forecasts of Key Marketing Variables: Rational vs. Adaptive Expectations," *International Journal of Forecasting*, 6 (July), 149-162.

Srinivasan, T.C. and Russell S. Winer (1990), "Empirical Modeling of Consumer Purchasing Behavior: A Review," *Review of Marketing*, Vol. 4, Chicago: American Marketing Association, 43-67.

Chaney, Paul K., Timothy M. Devinney, and Russell S. Winer (1991), "The Impact of New Product Introductions on the Market Value of Firms," *Journal of Business*, 64 (October), 573-610.

McAlister, Leigh, Rajendra Srivastava, Joel Horowitz, Morgan Jones, Wagner Kamakura, Jack Kulchitsky, Brian Ratchford, Gary Russell, Fareena Sultan, Tetsuo Yai, Doyle Weiss, and Russ Winer (1991), "Incorporating Choice Dynamics in Models of Consumer Behavior," *Marketing Letters*, 2 (August), 241-252.

Glazer, Rashi, Joel H. Steckel, and Russell S. Winer (1992), "Locally Rational Decision-Making: The Distracting Effect of Information on Managerial Performance," *Management Science*, 38 (February), 212-226.

Mayhew, Glenn E. and Russell S. Winer (1992), "An Empirical Analysis of Internal and External Reference Price Effects using Scanner Data," *Journal of Consumer Research*, 19 (June), 62-70.

Simonson, Itamar and Russell S. Winer (1992), "The Influence of Purchase Quantity and Display Format on Consumer Preference for Variety," *Journal of Consumer Research*, 19 (June), 133-138.

Sultan, Fareena and Russell S. Winer (1993), "Time Preferences for Products and Attributes for the Adoption of Technology-Driven Consumer Durable Innovations," *Journal of Economic Psychology*, 14, 587-613.

Winer, Russell S. (1993), "Using Single-Source Scanner Data as a Natural Experiment for Evaluating Advertising Effects," *Journal of Marketing Science* (Japanese), 2, 15-31.

Srinivasan, T.C. and Russell S. Winer (1994), "Using Neoclassical Consumer-Choice Theory to Produce a Market Map From Purchase Data," *Journal of Business and Economic Statistics*, 12 (January), 1-9.

Winer, Russell S., Randolph E. Bucklin, John Deighton, Tulin Erdem, Peter S. Fader, J. Jeffrey Inman, Hotaka Katahira, Kay Lemon, and Andrew Mitchell (1994), "When Worlds Collide: The Implications of Panel Data-Based Choice Models for Consumer Behavior," *Marketing Letters*, 5, 383-394.

Winer, Russell S. (1994), "The Annual Marketing Plan," in *AMA Management Handbook*, 3rd ed., edited by J. Hampton, New York: AMACOM Books, 2-42 - 2-47.

Kalyanaram, Gurumurthy and Russell S. Winer (1995), "Empirical Generalizations from Reference Price and Asymmetric Price Response Research," special issue of *Marketing Science* on empirical generalizations in marketing, 14 (part 2 of 2 in issue #3), G161-G169.

Kopalle, Praveen and Russell S. Winer (1996), "A Dynamic Model of Reference Price and Reference Quality," *Marketing Letters*, 7, Number 1, 41-52

Winer, Russell S. (1997), "Discounting and its Impact on Durables Buying Decisions," *Marketing Letters*, 8, Number 1, 109-118.

Winer, Russell S., John Deighton, Sunil Gupta, Eric J. Johnson, Barbara Mellers, Vicki G. Morwitz, Thomas O'Guinn, Arvind Rangaswamy, and Alan G. Sawyer (1997), "Choice in Computer-Mediated Environments," *Marketing Letters*, 8, Number 3, 287-96.

Stiving, Mark and Russell S. Winer (1997), "An Empirical Analysis of Price Endings with Scanner Data," *Journal of Consumer Research*, 24 (June), 57-67 .

Erdem, Tülin and Russell S. Winer (1999), "Econometric Modeling of Spatial Competition: A Multi-Category Analysis," *Journal of Econometrics*, 89, 159-175.

Winer, Russell S. (1999), "Experimentation in the 21st Century: The Importance of External Validity," *Journal of the Academy of Marketing Science*, 27 (Summer), 349-358 (with commentary). Reprinted in J. Fitchett and A. Davies, eds., *Consumer Research Methods* (New Delhi: Sage Publications), 2013.

Villas-Boas, J. Miguel and Russell S. Winer (1999), "Endogeneity in Brand Choice Models," *Management Science*, 45 (October), 1324-1338. **Winner of the inaugural 2009 ISMS Long-Term Impact award**.

Winer, Russell S. (1999), "Situation Analysis," in *The Technology Management Handbook*, edited by R. C. Dorf, Boca Raton, FL: CRC Press, 12-2 – 12-8.

Winer, Russell S. (2000), "Comment on 'The Historical Growth of Statistical Significance Testing in Psychology—And Its Future Prospects," *Educational and Psychological Measurement*, 60 (October), 693-6.

Winer, Russell S. (2000), "Comment on Leeflang and Wittink," *International Journal of Research in Marketing*, 17, 141-5.

Winer, Russell S. (2001), "A Framework for Customer Relationship Management," *California Management Review*, 43 (Summer), 89-105 (Finalist for Best Paper of 2001).

Ofir, Chezy and Russell S. Winer (2002), "Pricing: Economic and Behavioral Models," *Handbook of Marketing*, B. Weitz and R. Wensley, eds., London: Sage Publications Ltd, 267-81.

Lemon, Katherine M., Tiffany Barnett White, and Russell S. Winer (2002), "Dynamic Customer Relationship Management: Incorporating Future Considerations into the Service Retention Decision," *Journal of Marketing*, 66 (January), 1-14. **Winner of the Donald R. Lehmann award for the best paper published from a doctoral dissertation**.

Ilfeld, Johanna S. and Russell S. Winer (2002), "Generating Web Site Traffic: An Empirical Analysis of Web Site Visitation Behavior," *Journal of Advertising Research*, 42 (September/October), 49-61.

Winer, Russell S. (2004), "Customer Relationship Management on the Web," in *The Internet Encyclopedia*, H. Bidogli, ed., Hoboken, NJ: John Wiley & Sons, 315-325.

9

Feldman, David and Russell S. Winer (2004), "Separating Signaling Equilibria Under Random Relations Between Costs and Atributes: Continuum of Attributes," *Mathematical Social Sciences*, 48, 81-91.

Naik, Prasad A., Kalyan Raman, and Russell S. Winer (2005), "Planning Marketing-Mix Strategies in the Presence of Interaction Effects: Empirical and Equilibrium Analysis," *Marketing Science*, 24 (Winter), 25-34.

Albert, Terri and Russell S. Winer (2005), "Capturing Customers' Spare Change," *Harvard Business Review*, 83 (March), 28.

Steckel, Joel, Russ Winer, Randy Bucklin, Benedict Dellaert, Xavier Drèze, Gerald Häubl, Sandy Jap, John Little, Tom Meyvis, Alan Montgomery, Arvind Rangaswamy (2005), "Choice in Interactive Environments," *Marketing Letters*, 16 (December), 309-20.

Fligler, Ariel, Gila E. Fruchter, and Russell S. Winer (2006), "Optimal Product Line Design Using Genetic Algorithms," *Journal of Optimization Theory and Applications*, 131 (November), 227-244.

Petersen, J. Andrew, Leigh McAlister, David J. Reibstein, Russell S. Winer, V. Kumar, and Geoff Atkinson (2009), "Choosing the Right Metrics to Maximize Profitability and Shareholder Value," *Journal of Retailing*, 85, number 1, 95-111.

Winer, Russell S. (2009), "New Communications Approaches in Marketing: Issues and Research Directions," *Journal of Interactive Marketing*, 23 (May), 108-117.

Inman, J. Jeffrey, Russell S. Winer, and Rosellina Ferraro (2009), "The Interplay Between Category Characteristics, Customer Characteristics, and Customer Activities on In-Store Decision Making," *Journal of Marketing*, 73 (September), 19-29.

Lemon, Katherine N., Priya Raghubir, John Roberts, and Russell S. Winer (2010), "Why, When and How should the Effect of Marketing be Measured? A Stakeholder Perspective for Corporate Social Responsibility Metrics," *Journal of Public Policy & Marketing*, 29 (Spring), 66-77.

Lemon, Katherine N., John H. Roberts, Priya Raghubir, and Russell S. Winer (2011), "Measuring the Effects of Corporate Social Responsibility," *The Conference Board: Director Notes*, 3 (April), 1-13.

Winer, Russell S. (2012), "Behavioral Perspectives on Pricing Strategy," in V. Shankar and G. Carpenter, eds. *Handbook of Marketing Strategy*, (Cheltenham, U.K.: Edward Elgar), 248-260.

Yang, Sha, Mantian Hu, Russell S. Winer, Henry Assael, and Xiaohong Chen (2012), "An Empirical Study of Word-of-Mouth Generation and Consumption," *Marketing Science*, 31 (November-December), 952-963.

Winer, Russell S. (2013), "Pricing," forthcoming in R.S. Winer and S.A. Neslin, eds., *The History of Marketing Science*, (Boston: now publishers).

Bauer, Johannes, Philip Schmitt, Vicky G. Morwitz, and Russell S. Winer (2013), "Managerial Decision-Making in Customer Management: Adaptive, Fast, and Frugal?" forthcoming, *Journal of the Academy of Marketing Science*.

Winer, Russell S. (2013), "Advertising in 2020," Wharton Future of Advertising project.


Miscellaneous

Winer, Toby R. and Russell S. Winer (1987), "Integrating Strategic Planning Concepts into the Negotiating Process," *Planning for Higher Education*, 15, 1-4.

Winer, Russell S. (1988), "Global Marketing: The Debate Revisited, *The Owen Manager*, 9 (Spring), 12-15.

Winer, Russell S. (1997), book review of *Against the Gods: The Remarkable Story of Risk*, by Peter L. Bernstein, *Journal of Marketing*, 61 (July), 112-3.

Winer, Russell S. (1998), "Editorial," *Journal of Marketing Research*, 35 (February), iii-v.

Erdem, Tülin and Russell S. Winer (2002), "Introduction to Special Issue on Choice Modeling," *Marketing Letters*, 13 (August), 157-61.

Greenleaf, Eric A., Vicki G. Morwitz, and Russell S. Winer (2004), "Helping Hands," *STERNbusiness*, (Fall/Winter), 42-47.

Winer, Russell S. (2005), "From the Editor," *Journal of Marketing Research*, 42 (August), iii.

Winer, Russell S. (2006), "A New Reviewing System for the *Journal of Marketing Research*," *Journal of Marketing Research*, 43 (May), 135-6.

Winer, Russell S. (2007), "Editorial," *Review of Marketing Science*, Vol. 5, Article 1.

Lehmann, Donald R. and Russell S. Winer (2009), "Introduction to Special Issue on Organic Growth," *International Journal of Research in Marketing*, 26 (December), 261-2.

Winer, Russell S. (2011), "2009-2010 ISMS-MSI Practice Prize Competition: Special Section Introduction," *Marketing Science*, 30 (July-August), 565-7.

Fader, Peter S. and Russell S. Winer (2012), Introduction to Special Issue on "The Emergence and Impact of User Generated Content, " *Marketing Science*, 369-371.

Winer, Russell S. (2013), "2011-2012 Gary L. Lilien ISMS-MSI Practice Prize Competition: Special Section Introduction," *Marketing Science*, 32 (March-April), 191-193.

Work Submitted or in Progress

Vishal Narayan, Sha Yang, and Russell S. Winer, "Modeling the Interdependence of Seller Density and Cross-Category Consumer Expenditure," under third round review at *Marketing Science*.

Stephanie M. Tully and Russell S. Winer, "Are People Willing to Pay More for Socially Responsible Products: A Meta-Analysis," under review, *Journal of Retailing*.

David Feldman and Russell S. Winer, "Pricing Under Noisy Signalling," under review at the *Review of Quantitative Finance and Accounting*.

Russell S. Winer and Luca Petruzzellis, "Mass Customization."

NYU, Temple University teams, "Neuro 2: New Insights for Predicting Advertising Success," sponsored by the Advertising Research Foundation.

Othman Boujena, Wesley J. Johnston, and Russell S. Winer, "CRM and the Relationship between Marketing and Sales."

Cases

"Manischewitz," (2003)

"Rheingold Beer," (2003)

"DeBeers," (2004)

"NYC2012," (2004)

"Brooklyn Brewing," (2010)


**DOCTORAL STUDENT DISSERTATION COMMITTEES**
(in chronological order)

Terry Elrod
Horst Bender
Kapil Bawa

Srinivasan Ratneshwar
Connie Pechmann
T.C. Srinivasan (Chair)
Glenn Mayhew (Chair)
Sue O'Curry (Psychology)
Shi-jie Chang (Psychology)
Matt Nagler (Economics)
Lisa Ordóñez (Psychology)
Kay Lemon (Chair)
Mark Stiving (Chair)
Judi Strebel
Harish Chand (Economics)
Nick Lurie
Heather Honea (Co-chair)
Sharon Horsky (Chair)
Joseph Pancras
Vishal Narayan (Co-chair)
Jane Gu
Rachel Shacham
Isaac Dinner (Columbia)
Mandy Hu (Co-Chair)
Wenbo Wang (Co-Chair)
Sang Hee Bae (Co-Chair)
Beibei Lei (Information Systems)

**RESEARCH GRANTS**

Various small grants from the Marketing Science Institute

NSF Grant SES-9309812, "Endogeneity in Brand Choice Models," with Miguel Villas-Boas, $83,000

**COMMUNITY SERVICE**

Board member, Beth Jacob Congregation, Oakland, California (1990-2003); President (1993-5)
Board member, Conservative Synagogue of Fifth Avenue (2010- )
Board member, Piedmont (California) Soccer Club (1996-2000)
Referee for youth and high school soccer

13