G9KATIF1ps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

2    ------------------------------x

3    TIFFANY AND COMPANY, et al,

4            Plaintiffs,

5         v.                     13 CV 1041 (LTS)

6    COSTCO WHOLESALE CORPORATION,

7            Defendant.

8    ------------------------------x

                             New York, N.Y.
9                             September 20, 2016
                             9:55 a.m.

10

    Before:
11

                 HON. LAURA TAYLOR SWAIN,
12

                         District Judge
13

                 APPEARANCES
14

    BROWNE GEORGE ROSS LLP
15       Attorneys for Plaintiffs
    JEFFREY A. MITCHELL, ESQ.
16   JUDITH R. COHEN, ESQ.
    BRETT D. KATZ, ESQ.
17

    HUGHES HUBBARD
18       Attorneys for Defendant
    JAMES W. DABNEY, ESQ.
19   RICHARD M. KOEHL, ESQ.
    EMMA L. BARATTA, ESQ.
20

21

22

23

24

25

G9KATIF1ps

1          (In open court; jury present)

2          THE COURT:  Members of the jury, now that you have

3    been sworn, I will briefly tell you something about your duties

4    as jurors and give you some important background information

5    about the case and some instructions.  At the end of the trial,

6    I will give you more detailed instructions, and those

7    instructions will control your deliberations.

8          At the end of the presentation of the evidence and

9    after my final charge to you, it will be your duty to decide

10   from the evidence what the facts are.  As the jury, you and you

11   alone are the judges of the facts.  You will hear the evidence,

12   decide what the facts are, and then apply those facts to the

13   law which I will give you.  That is how you will reach your

14   verdict.  In doing so, you must follow the law that I give you

15   whether you agree with it or not.

16         You must not take anything that I may say or do during

17   the trial as indicating what your verdict should be.  Don't be

18   influenced by my taking notes or entering information into the

19   computer.  What I write down may have nothing to do with what

20   you will be concerned with at the trial.

21         I have mentioned earlier that certain issues have

22   already been decided by the Court and that your work in this

23   case will be concerned only with Tiffany's claims for monetary

24   recovery.  I will now give you some more detailed background

25   information and instruct you as to how the earlier

1    determinations of the Court affect your deliberations in this

2    case.

3         A federal statute known as the Lanham Act protects

4    rights to use trademarks.  The term "trademark" includes any

5    words, symbols, or devices that a person or company uses to

6    identify its products and to distinguish them from those sold

7    by others.  Once a company has established its rights in a

8    trademark, the right to use the trademark belongs to that

9    company exclusively and it becomes its property.

10        This is a civil case in which the plaintiff,

11   Tiffany -- as I explained before, it's actually two companies,

12   but I refer to both together as Tiffany -- brought claims that

13   the defendant Costco infringed Tiffany's federally registered

14   trademark in the word "Tiffany" and committed unfair

15   competition by using the word "Tiffany" in certain signage and

16   display cases selling diamond engagement rings and

17   counterfeited the Tiffany trademark by using it in that

18   signage.

19        I instruct you that Tiffany owns the federally

20   registered trademark "Tiffany" for use with jewelry products,

21   including engagement rings.  Tiffany has not authorized Costco

22   to use its trademark to describe Costco's rings.

23        In an earlier phase of the case, the Court found that

24   Tiffany has proven its federal and state law claims that Costco

25   infringed Tiffany's trademark and engaged in unfair

G9KATIF1ps

competition, and its federal claim that Costco counterfeited
the Tiffany trademark by displaying solitaire diamond ring
jewelry in its stores next to signage that included the word
"Tiffany" as a standalone term not combined with an immediately
following modifying word such as "setting," "set," or "style."
None of the rings that Costco sold using such signage had been
manufactured by Tiffany.

The Court also found and you are instructed to accept
for purposes of your determinations in this case that Costco's
use of the word "Tiffany" in its display case signage as a
standalone term, rather than as a combined term including an
immediately following modifier such as "setting," "set," or
"style," infringed Tiffany's federal trademark right and that
Tiffany is therefore entitled to seek a monetary award for such
infringement of its federal trademark rights.

The Court also determined that Costco had committed
trademark infringement and unfair competition under New York
State law.

The Court further found and you are instructed to
accept for purposes of your determinations in this case that
Costco's use of the Tiffany signage in the way that I have
described constituted counterfeiting of the Tiffany mark.

Tiffany is entitled to seek a monetary award as a
result of this counterfeiting.

In this trial, you as the jury will be responsible for

G9KATIF1ps

making determinations regarding the monetary award or awards if

any that Tiffany is entitled to recover as a result of Costco's

trademark infringement, unfair competition, and counterfeiting.

It is important to note that Tiffany did not make any

infringement or counterfeiting claims regarding any use by

Costco of the word "Tiffany" in a combined term incorporating

the word "setting," "set," or "style" or any similar

immediately following modifier.  Accordingly, you are not to

award damages based on any use by Costco of the word "Tiffany"

in a combined term incorporating the word "setting," "set,"

"style," or any similar immediately following modifier.

You will make your determinations based on the

evidence that is presented during this trial and the

instructions of law that I will give you at the end of the

trial.  In reaching your verdict, you will decide disputed

issues of fact.  I will decide all questions of law that arise

during the trial.  And before you retire to deliberate at the

close of the case, I will instruct you on the law that you must

follow and apply in deciding upon your verdict.

Since you will be called upon to decide the facts of

this case, you should give careful attention to the testimony

and evidence presented for your consideration, bearing in mind

that I will instruct you at the end of the trial concerning the

manner in which you should determine the credibility or

believability of each witness and the weight to be given to his

G9KATIF1ps

1    or her testimony.

2              You will decide what the facts are from the evidence

3    that will be presented here in court.  That evidence will

4    consist of the testimony of witnesses, documents, and other

5    things received into evidence as exhibits, and any facts on

6    which the lawyers agree or stipulate to, or that I instruct you

7    to accept.

8              Some of the witness testimony may be in the form of

9    depositions, videotapes, or transcripts that are read to you.

10   Deposition testimony is sworn testimony given before trial with

11   lawyers for both sides permitted to ask questions.  You are to

12   evaluate the weight and importance of deposition testimony

13   based on the same instructions that apply to the evaluation of

14   witness testimony that is given here in open court.

15             There are two kinds of evidence, direct and

16   circumstantial.  Direct evidence is testimony by a witness

17   about what that witness personally saw or heard or did.

18   Circumstantial evidence is indirect evidence -- that is, proof

19   of one or more facts from which you can find another fact.  You

20   may consider both direct and circumstantial evidence in

21   deciding this case.  The law permits you to give equal weight

22   to both or to none, for it is up to you to decide how much

23   weight if any to give to any evidence.

24             As the sole judges of the facts, you must determine

25   which of the witnesses you believe, what portion of their

G9KATIF1ps

1    testimony you accept, and what weight you attach to it.

2            At times during the trial I may sustain objections to

3    questions asked.  When that happens, I will not permit the

4    witness to answer, or, if the witness has already answered, I

5    will instruct that the answer be stricken from the record and

6    that you disregard it and dismiss it from your minds.

7            (Continued on next page)

1              THE COURT:  In reaching your decision, you may not

2      draw any inference from an unanswered question, nor may you

3      consider testimony that I have ordered stricken from the

4      record.  During the trial it is possible that I may ask

5      questions of a witness.  Do not assume that I have any opinion

6      about the subject matter of my questions.

7              The law requires that your decision be made solely

8      upon the evidence before you.  Some evidence may be admitted

9      for a limited purpose only.  If I instruct you that an item of

10     evidence has only been admitted for a limited purpose, you must

11     consider it only for that limited purpose.  The items that I

12     exclude from your consideration will be excluded because they

13     are not legally admissible as evidence.  The law does not,

14     however, require you to accept all of the evidence that I do

15     admit.  In determining what evidence you will accept, you must

16     make your own evaluation of the testimony given by each of the

17     witnesses and of the documents presented to you and determine

18     the weight you choose to give to each witness's testimony or to

19     an exhibit.  There's no magical formula by which you should

20     evaluate testimony or exhibits.  I will, however, give you some

21     guidelines for determining the credibility of witnesses at the

22     end of the case.  At this time, suffice it to say that you

23     bring with you to this courtroom all of the experience and

24     background of your lives.  You do not have to leave your common

25     sense outside the courtroom.  The same types of tests that you

1     use in your everyday dealings are the tests that you will apply

2     in your deliberations.  I urge you to pay strict attention to

3     the testimony of all witnesses, to consider what they say and

4     how they say it, to watch their demeanor as they testify and to

5     listen carefully to all of the testimony.

6            As I have explained, the questions and objections of

7     the attorneys are not evidence and neither is the testimony

8     that I instruct you to disregard.  The statements and arguments

9     of the attorneys during any part of the trial also are not

10    evidence.  Unless I specifically instruct you otherwise,

11    statements that I may make to you about the case are not

12    evidence.  Further, anything that you may see or hear when the

13    Court is not in session, even if what you see or hear is done

14    or said by one of the parties or by one of the witnesses, is

15    not evidence.  You may only consider what is admitted into

16    evidence here when court is in session and all of the parties

17    and jurors are present.

18           I will now caution you about certain principles

19    governing your conduct as jurors.  Do not talk or communicate

20    with each other about this case or about anyone who has

21    anything to do with it in any way, whether in person, by phone

22    or electronically until the end of the case when you go to the

23    jury room and decide on your verdict.  I am now instructing

24    each of you that you are not to discuss the case with anyone,

25    including attorneys you may know and including friends and

G9KFTIF2                    Trial

family, until you are excused as a juror in this case.  This

means that you may not use cell phones, smartphones or

computers or any other electronic devices, the internet, any

internet service, any text or instant messaging service, any

internet chat room, blog, website or social networking platform

such as Facebook, Linked-In, Twitter, YouTube, What's App or

any other technology to communicate to anyone any information

about this case or to conduct any research about this case.  In

other words, you cannot talk to anyone in person or on the

phone, correspond with anyone or electronically communicate

with anyone else about this case.  Anyone else includes members

of your family and your friends.

        If you become aware of another juror's violation of

these instructions, I expect that you will inform me

immediately, and you do that by writing a note and giving that

to Ms. Ng, who will pass it on to me.

        Do not let anyone talk to you about the case or about

anyone who has anything to do with it.  If someone should try

to talk to you, please report it to me immediately through

Ms. Ng, the deputy, again, by giving her a note.  You should

not, however, discuss with your fellow jurors either that fact

or any other fact that you feel necessary to bring to the

attention of the Court.  It should just go directly into the

note to Ms. Ng to me.

        Do not converse, whether in or out of the courtroom,

1    with any of the parties or their attorneys or any witnesses.

2    By this I mean not only do not converse about the case, but

3    don't converse at all, even to pass the time of day.  In no

4    other way can all parties be assured of the absolute

5    impartiality that they are entitled to expect from you as

6    jurors.  I have instructed all of the lawyers and the parties

7    that they are not to speak to you or even acknowledge you with

8    a "hello" or "good morning" outside the courtroom.  Therefore,

9    don't hold it against them if they ignore you or if they leave

10   an area that you are in.  They're simply following my

11   instructions.

12            The reason for this rule is simple.  Someone watching

13   from a distance might not hear what is said between an attorney

14   and a juror and even a pleasantry can create a misimpression.

15            Please assemble and leave from the jury room and

16   Ms. Ng will be showing you the jury room and giving you

17   specific instructions on that in a few minutes.  Don't wait

18   around the courtroom and if anyone is going to meet you, please

19   ask that person to wait outside the courtroom.  Do not read any

20   news stories or articles or internet reporting or commentary or

21   listen to any radio or television reports about the case or

22   about anyone who has anything to do with it.  Do not do any

23   research or investigation about the case on your own.  Do not

24   go to visit any place that you may hear described during the

25   trial and, in particular, do not go into any Costco stores

1   during the pendency of the trial and do not discuss Costco or

2   anyone or anything or anyone else having anything to do with

3   the trial with your family or anyone else.

4        You as jurors must decide this case based solely on

5   the evidence presented here within the four walls of the

6   courtroom.  This means that during trial you must not conduct

7   any independent research about the case, the matters in the

8   case and the individuals or corporations involved in the case.

9   In still other words, you should not consult dictionaries or

10  reference materials, search the internet, websites, blogs or

11  use any other electronic tools to obtain information about this

12  case or to help you decide the case.  Do not try to find out

13  information from any source outside the confines of this

14  courtroom.

15       If anyone you know comes into the courtroom inform me

16  of that fact at the next break by sending me a note through

17  Ms. Ng.  It is important that you do not receive information

18  regarding matters that go on in the courtroom when the jury is

19  not present.  The parties are entitled to have you personally

20  render a verdict in this case on the basis of your independent

21  evaluation of the evidence presented here in the courtroom.

22  Obviously, speaking to others about the case, including your

23  family, before you deliberate or exposing yourself to evidence

24  outside the courtroom would compromise your service and

25  fairness to the parties.

1         Please remember this is a civil case.  Those of you

2    who have sat on criminal cases will have heard of proof beyond

3    a reasonable doubt.  That requirement does not apply to a civil

4    case and you should put it entirely out of your mind.  In a

5    civil case, the burden is different and it is called proof by

6    the preponderance of the evidence.  I will instruct you fully

7    on the burden of proof at the conclusion of the trial.

8         Finally, I would like to summarize the stages of the

9    trial for you.  First, each party may, but doesn't have to,

10   make an opening statement.  An opening statement is neither

11   evidence nor argument.  It is an outline of what that party

12   intends to prove and it is offered to help you follow the

13   evidence.  Next, plaintiffs will present witnesses and the

14   defendant may cross-examine them.  Then if desired the

15   defendant will present witnesses and the plaintiffs may

16   cross-examine them.  Possibly I will permit the plaintiffs to

17   present additional witnesses to rebut the defendant's evidence.

18        From time to time during a trial it may become

19   necessary for me to talk with the lawyers out of the hearing of

20   the jury, either by having a conference at the bench when the

21   jury is present in the courtroom or outside the courtroom or by

22   calling a recess.  Please understand that while you're waiting

23   we are working.  During the trial the burden of proof of any

24   conference outside your hearing or viewing is not to keep

25   relevant information away from you, but to decide certain

G9KFTIF2                       Trial

1    procedural issues or how certain evidence is to be treated

2    under the rules of evidence and of course to avoid confusion

3    and error.  We will, of course, do what we can to keep the

4    number and length of these conferences to a minimum and I may

5    not always grant an attorney's request for a conference.  Do

6    not consider my granting or denying a request for a conference

7    as any indication of my opinion of the case or of what your

8    verdict should be.

9           After all of the evidence has been offered the

10   attorneys will make their closing arguments to summarize and

11   give you their interpretation of the evidence.  Obviously, like

12   opening statements, the closing statements are not evidence.

13   After the closing summations, I will give you instructions on

14   the law and then you will retire to deliberate on your verdict.

15   Do not make up your mind about what the verdict should be until

16   after I have instructed you on the law at the end of the case

17   and you have gone to the jury room and you and your fellow

18   jurors have discussed the evidence.  Keep an open mind until

19   then.  The parties deserve and the law requires that you give

20   them an opportunity to be fully heard.

21          And now some basics about our hours of sitting and

22   procedures.  We will sit to hear evidence from Monday to

23   Thursday, generally from 9:15 in the morning until 1 and then

24   from 2 in the afternoon until 4:15.  We will sit on a Friday

25   only if necessary for jury deliberations.

1           There are a couple of exceptions.  Today our lunch

2   break will be a little bit longer, it will start at 12:45 and

3   go to 2, and on Thursday, the 22nd, our trial day is going to

4   end early, at 2:00, and we'll just have a half hour lunch

5   break.  I will remind you of this again tomorrow but I would

6   suggest that you bring a snack or some lunch so that you can

7   relax for that half hour and not have to run out and try to buy

8   something.  If the trial continues into the week of

9   October 3rd, we will not have any sessions on October 3rd and

10  October 4th for religious observance.  We will have a short

11  recess in the morning and the afternoon.

12          As I said, generally there will be an hour for lunch.

13  If you need a break at any other time just raise your hand and

14  we'll accommodate you, and please make sure to be on time after

15  breaks and in the morning.  Each morning you must be ready in

16  the jury room by 9:15.  Ms. Ng is going to be organizing some

17  light breakfast goodies in the jury room as an incentive so you

18  can get there early, enjoy them and the lawyers and I will do

19  our best to be ready for you by 9:15 so we can maximize the

20  productive use of our time.  And in planning your route here

21  take into account the vagaries of transportation and the

22  security procedures downstairs.

23          We also ask that no one wear any perfumes or colognes

24  during the course of the trial because some people have

25  sensitivities to that and it's just easier if we exclude that

G9KFTIF2                        Trial

1    possibility.

2            If you wish, you may take notes to help you remember

3    what has been said.  We'll give you paper for doing that.  If

4    you do take notes, please keep them to yourself and do not show

5    them to your fellow jurors or compare notes at any time,

6    including during jury deliberations.  Don't let your note

7    taking distract you so that you don't hear other answers by

8    witnesses.

9            When you leave at night and at the end of the trial,

10   you must leave your notes in the jury room.  We'll be providing

11   each of you with a manila envelope in which to place your notes

12   when you leave each evening.  If you choose not to take notes,

13   remember, you should rely upon your own memory of what has been

14   said.  Do not be influenced by the notes of other jurors.  Some

15   people remember better when they don't take notes.  Just

16   because one juror takes notes doesn't mean that those notes are

17   a better reflection of what happened in court than your memory

18   is.

19           At this point, Ms. Ng will escort the jury into the

20   jury room and give you further reporting instructions and get

21   some contact information from you and then she'll bring you

22   back out into the courtroom and we'll begin with opening

23   statements.  So, all rise, and Ms. Ng will you escort the jury

24   into the jury room.

25           (Jury exits)

G9KFTIF2                    Trial

1          (In open court; jury not present)

2          THE COURT:  So this will take at most ten minutes, so

3     if anyone needs to leave the room to do anything now is the

4     time to do it and when Ms. Ng is ready we'll begin with the

5     opening statements, so she'll bring me out when everybody is

6     back.  Consider yourselves adjourned.

7          (Recess)

8                              o0o

9          (Discussion off the record)

10         THE COURT:  I don't see anything about writing on

11    whiteboards in paragraph 8 of document 317, which is the

12    revised joint final pretrial report.  Is there some other place

13    I should be looking?

14         MR. DABNEY:  Your Honor, I specifically recall this

15    being in a submission that we had made and I did not understand

16    that just writing words on a white sheet of paper is a

17    demonstrative in the sense of the demonstratives that we had

18    exchanged.

19         THE COURT:  This is why it's always a good thing to

20    talk to your opposing counsel.

21         MR. DABNEY:  We had set this out and I assumed

22    plaintiff's counsel does not agree and we respectfully request

23    a ruling from your Honor that on a plain white sheet of paper

24    for counsel to write out --

25         THE COURT:  I already ruled.  I told you, you can

G9KFTIF2                              Trial

1    talk.  That's my ruling.

2                    MR. MITCHELL:  Thank you.

3                    THE COURT:  Obviously, both sides are determined to be

4    as contentious as possible so you're just going to have to

5    communicate.  Is the jury ready?

6                    THE DEPUTY CLERK:  Yes.

7                    THE COURT:  All right.  Ms. Ng, would you please bring

8    the jury in?

9                    (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G9KFTIF2                    Opening - Mr. Mitchell

1          (In open court; jury present)

2          THE COURT:  Good morning again, members of the jury.

3     Please take your seats in the jury box.  Please be seated,

4     everyone.

5          We will now begin with the plaintiff's opening

6     statement.  Mr. Mitchell.

7          MR. MITCHELL:  Thank you, your Honor.  Good morning,

8     everyone.  First I want to reiterate what Judge Swain said to

9     you when you first came in yesterday and thank you for your

10    service as jurors.  I know it is a real inconvenience to be

11    called as a juror, but an even bigger inconvenience to be

12    picked.  But we as lawyers and our clients rely on people like,

13    citizens like you to help us resolve disputes, because without

14    you or system just wouldn't work, so even though some of you

15    might have preferred not to be picked, hopefully at least

16    you'll find this experience interesting and rewarding.

17         My name is Jeffrey Mitchell.  I'm here along with my

18    colleagues, that's Judith Cohen, and Brett Katz of my office.

19    Sitting next to Ms. Cohen is Ewa Abrams in her capacity as

20    general counsel of Tiffany.  Gerald Cole, who is helping me

21    with the electronics, and we also have a person assisting us

22    with the electronics from our office, Elizabeth Scher.

23         You all probably heard of Tiffany.  It is world famous

24    for jewelry since the 1800s, particularly for its diamond

25    engagement rings and whether or not you own something from

G9KFTIF2                    Opening - Mr. Mitchell

1   Tiffany almost everyone knows Tiffany as a high end, luxury
2   brand.  You have also probably heard of Costco.  Some of you
3   are even members.  Giant warehouses, concrete floors, huge
4   packages of food and household items stacked to the ceiling,
5   discount prices.  You're probably thinking that Tiffany and
6   Costco could not be more different.  In fact, when you first
7   heard you would be jurors in this case you might have been
8   wondering what could Costco and Tiffany possibly be fighting
9   about.  Now you know.  Engagement rings.  One of the most
10  sentimental gifts a person ever gives or receives.  And Costco
11  was caught red-handed calling its own engagement rings Tiffany,
12  even though Tiffany had absolutely nothing to do with them.
13          As Judge Swain just told you, she has already decided
14  that what Costco did to sell its own rings was wrong and that
15  under federal law Costco is liable to Tiffany for trademark
16  infringement and counterfeiting, and that Costco also violated
17  New York State law for trademark infringement and unfair
18  competition as well.  That part of the case is already
19  resolved.  Your role, as the Court now passes the baton to you,
20  is to decide how much Costco should pay for doing this and
21  whether you think Costco should be punished so this doesn't
22  happen again.
23          Now, this story has some interesting twists and
24  subplots.  For example, during this trial you will learn about
25  such things as treasure hunts, obsessions and questionable

G9KFTIF2                    Opening - Mr. Mitchell

1    appraisers.  You see, Costco wants to be known for more than

2    just giant packages and household items.  It wants us to come

3    in even when we don't need to to stock up on things, so the

4    treasure hunt is one of its clever ploys to get us in more

5    often.

6              Costco thinks luxury brands like Tiffany are

7    overpriced, but it also knows people love them and can't resist

8    a bargain.  So it uses luxury brands like Louis Vuitton,

9    Cartier, Rolex, Prada, Armani and even Tiffany as bait.  None

10   of these companies will supply directly to Costco, so what

11   Costco does is have people search the world for outdated or odd

12   lot goods made by high end companies like these outside its

13   normal channels of distribution.  It then sprinkles whatever it

14   can find; a Cartier watch here, Prada sunglasses there, in

15   small quantities in some of their stores at a steep discount.

16   The message is you never know what you're going to find when

17   you come into Costco.  We want to surprise you, so come in and

18   buy it now; here today, gone tomorrow.

19             We all love a deal and real deals are fine.  But

20   what's not okay is making something look like a deal when it's

21   not, like selling rings you call Tiffany for thousands of

22   dollars less than at a Tiffany store only to find out after

23   you're married that your ring really isn't a Tiffany.  We trust

24   stores like Costco to be honest with us, especially with

25   something as important as an engagement ring, so whether or not

G9KFTIF2                    Opening - Mr. Mitchell

1    the brands themselves like having their products sold by Costco

2    what's not okay is using the name of a famous brand in a

3    treasure hunt to sell your own products.

4            These treasure hunts are obviously not about the

5    profits Costco makes on the sales themselves.  The quantities

6    are way too small, especially for Costco which sells products

7    by the tractor trailer load and moves over $100 billion a year

8    in merchandise.  This is about the thrill of the treasure hunt;

9    looking for a surprising bargain and getting us to check back

10   between visits like a prospector panning for gold.

11           Obsession here relates to Tiffany.  Costco is obsessed

12   with Tiffany.  The evidence will show as buyers scout Tiffany

13   stores and the Tiffany website for style ideas, Costco then has

14   its vendors mimic Tiffany designs.  Costco salespeople are

15   trained to tell people its jewelry and diamonds are as good as

16   or even better than Tiffany and Costco uses Tiffany as the

17   standard against which it looks to tout the value of what it

18   sells.  Is it any wonder, then, that Costco also used Tiffany

19   and Tiffany's name in the jewelry case?  Costco doesn't even

20   have its own jewelry designers, so it often just takes what

21   Tiffany does and makes something like it and even searches for

22   actual Tiffany vendors to make some things.

23           Now, there is nothing wrong about using a Tiffany

24   style for inspiration.  That's fine.  Imitation is the

25   sincerest form of flattery.  But when knockoffs end up being

 1    called Tiffany in the Costco display case, that's another

 2    matter entirely.  And it's not some vendor's fault that the

 3    name Tiffany ended up in signs.

 4           Most people know without even telling them that you

 5    can't call jewelry Tiffany that is not made by Tiffany and as

 6    you will see, it was Costco that used the Tiffany brand and the

 7    brand name when it asked vendors to copy Tiffany styles in the

 8    first place.  Plainly and simply, the Tiffany name had no

 9    business being in the Costco jewelry case and that hardly seems

10    controversial, except, apparently, to Costco.  If you're so

11    proud of your jewelry, put your name on it.  Don't go around

12    calling engagement rings Tiffany when Tiffany has nothing to do

13    with it.

14           And then there were questionable appraisals.  When you

15    bought one of these things, you got an official-looking

16    certificate in the box with the word "appraisal" boldly written

17    across the top.  There was even an official-looking signature

18    on the certificate by someone who was identified as a graduate

19    gemologist.  This appraisal supposedly certified that the ring

20    you just bought was really worth a lot more than you just paid

21    for it, like this is what you would pay if you went to a store

22    like Tiffany, adding to the illusion.

23           You will also see a number of instances where the

24    appraised amount of the Costco appraisal matches exactly what

25    Tiffany customers paid for the same sized ring and we're not

1    talking about round numbers here.  A precise match.

2            These appraisals were questionable in other ways as

3    well.  The appraisal was not of your ring in particular but

4    rather of rings like yours generally.  The person signing the

5    appraisal was really a Costco employee who had taken a couple

6    of courses in appraising but had never been certified as an

7    appraiser and the certificate was really nothing more than a

8    preprinted form with a preprinted signature that was

9    essentially worthless as an appraisal.  So that is the context

10   in which these rings were sold.

11           Now, here is how this saga began, at least as far as

12   Tiffany is concerned.  Tiffany first learned about its name

13   being used by Costco in November 2012.  A Tiffany customer sent

14   an e-mail to a salesperson in the southern California Tiffany

15   store.  The Tiffany customer reported she had seen what looked

16   like her Tiffany engagement ring in a Costco store in

17   Huntington Beach, California.  She also forwarded picture.  The

18   information was then conveyed to Tiffany headquarters here in

19   New York.  Since Tiffany engagement rings are only sold in

20   Tiffany stores did this mean Costco had found a source for real

21   Tiffany engagement rings or were these fakes?

22           Tiffany hired a private investigator to visit the

23   store.  The investigator who went there, who you will hear

24   from, Brittni Popp, will tell you she made two visits to the

25   Huntington Beach, California Costco store.  On her first visit

G9KFTIF2                    Opening - Mr. Mitchell

1    she saw a sign beside a diamond engagement ring, "Platinum

2    Tiffany .7 carat VS2 I-round diamond ring, $3,199."  When she

3    spoke with the Costco salesperson, Jean LaBarbera who you'll

4    also hear from, Ms. Popp reported in her notes that

5    Ms. LaBarbera called the ring a Tiffany ring.  So not only did

6    the sign say Tiffany, but a Costco employee showing the ring

7    called it Tiffany as well.

8            When she went back, Ms. Popp, several days later to

9    purchase that ring, she also saw a second ring and another sign

10   next to that ring described this second ring as follows:

11   Platinum Tiffany 1 caret VS2 I-round Brilliant Solitaire ring

12   selling for $6,399.99.  Neither of these rings was a real

13   Tiffany ring.

14           Obviously, fake Tiffany rings at Costco was a big

15   problem for Tiffany.  You can imagine why.  As I said, Costco

16   and Tiffany can't be more different.  Tiffany is a high-end,

17   full-service jewelry store.  It may be too expensive or fancy

18   for some of you, but to some people that quality and service

19   means a lot and they're willing to pay for it.

20           Costco is a bare-bones, help-yourself kind of place.

21   Couldn't be more different than Tiffany.  But when confronted

22   by Tiffany in early December 2012 Costco treated this like no

23   big deal; said there was nothing wrong with what it had done

24   but it would stop the practice of using Tiffany as if just

25   pulling the signs after getting caught was enough.  But it

1    wasn't.  How could it be?  This was not some squabble between

2    friends.  Costco is a giant.  It has over 70 million members

3    who might have been misled.  And it's the second largest

4    retailer in the United States.  And what about Tiffany's own

5    customers, like the woman who reported seeing the ring in the

6    first place?  What about them?

7         Costco was way too sophisticated for this to be an

8    accident.  So Tiffany could not just ignore the impression that

9    these signs had made since it didn't know how big the problem

10   really was, especially in the beginning.  So Tiffany sued.  And

11   once it did, Costco was the opposite of apologetic.  In fact,

12   it retaliated by trying to turn the tables on Tiffany, as if

13   Costco and not Tiffany was the real victim.  How dare Tiffany

14   sue us, was Costco's response.  Costco not only claimed it was

15   entitled to use Tiffany in its signs as it did, it actually

16   countersued and asked the Court to cancel the Tiffany trademark

17   so Costco to use Tiffany in its signs again to sell its own

18   rings.  That was some line to draw in the sand.  Despite having

19   done exactly what it was accused of, Costco countersued to take

20   away from Tiffany its very own name.  All so it could use

21   Tiffany in signs to sell Costco rings in the future.  Why would

22   it even want to do that and risk that even one of its customers

23   might be confused?

24        No matter what Costco says it meant by using Tiffany

25   in its signs, we all instinctively know that not everyone could

1    possibly know that looking at a sign behind a locked glass

2    jewelry case could tell that these were not real Tiffany rings.

3    But we know that Tiffany is such a famous brand, the impression

4    that would make on somebody just walking by, just look in the

5    case and see there is a sign that says Tiffany next to a ring.

6    That's it.  You don't ask somebody to take it out.  That's all

7    you know.  What mental impression would that make?  Three

8    million people a day walk through Costco's.

9              So let me now turn to some of the things we will hear

10   during this trial, because you will be deciding how bad all of

11   this really is, and whether what I've told you is true.

12             From the very start of this case, Tiffany has tried to

13   figure out what Costco was up to.  One of the things Tiffany

14   asked for were records of all signs that said Tiffany.  This is

15   where the wild goose chase began.  By law, Tiffany can only go

16   back six years to recover Costco's products.  That is what is

17   called a statute of limitations.  But Costco says its use of

18   Tiffany in signs dates back many more years than that, maybe as

19   much as 20 years.  But for just the six-year period, and this

20   runs from 2007 to 2013, Costco produced a data dump of sign

21   information in the millions of lines.  Millions, that's a

22   spreadsheet with millions of lines of information that

23   supposedly shows the product, the sign and the dates those

24   signs are reflected in those records.  In sifting through that

25   data, Tiffany was able to extract that there were 213,600

G9KFTIF2                    Opening - Mr. Mitchell

1   signage records in which Tiffany appears in one form or another

2   supposedly at Costco stores around the country and unbeknownst

3   to Tiffany when it filed this case, Costco used a lot of

4   variations of signs with Tiffany in them, some worse than

5   others, but different than the sign that Tiffany saw or the

6   Tiffany investigator saw when the Tiffany investigator first

7   went to the store.  That will lead to some complications for

8   you as jurors, because the case evolved into something also

9   different in terms of signage, so I'm going to talk to you a

10  little bit about signage.

11        From those sign records there were 73,000 entries that

12  used the phrases "platinum Tiffany" and "solitaire Tiffany,"

13  which the Court will tell you is a standalone usage for which

14  you should be concerned.  And these standalone usages dated

15  back to 2007, the very beginning of the statute of limitations

16  period.  Another 22,000 signs had the same phrase "platinum

17  Tiffany" on the first line but the word "set" started on the

18  second line and as the Court told you, the word "set" as a

19  phrase together is not to be included, but "set" on the second

20  line I'm going to talk to you about in a moment.

21        So the 73,000 entries for signage, these we know are

22  standalone usage.  So how many rings did Costco sell, that's

23  what Tiffany really wanted to know.  And the answer to that

24  question has remained very elusive.  You will hear from

25  Costco's worldwide head of merchandising, Doug Schutt, who is

G9KFTIF2                    Opening – Mr. Mitchell

1    in the courtroom here.  Right after Tiffany sued he wrote a

2    letter to Costco purchasers who bought rings called Tiffany.

3    If any were troubled, he said, they could return their rings.

4    Just four months after he sent that letter, when I asked him

5    how many letters he had sent, Mr. Schutt said he was not sure,

6    but estimated about 11,000.  When Costco's president and CEO,

7    Craig Jelenik was told that that is what Mr. Schutt estimated

8    as the number of letters he had sent, Mr. Jelenik said, quote,

9    "I imagine that that's appropriate if Doug said so, I have no

10   reason to disbelieve him."

11          But since then Costco has retreated from that

12   estimate.  In doing so it has provided confusing, inconsistent,

13   incomplete and inaccurate documents, all intended to show that

14   Mr. Schutt's estimate was not just off, but way off.

15   Eventually through an expert Costco said that only 3,349 rings

16   were sold in total and after deducting returns and voids the

17   net was 2,498 rings.  So we go from 213,000 signs to maybe

18   11,000 letters to now we're down to 2500 sales.  No one has

19   ever explained how Mr. Schutt's 11,000 letter estimate could be

20   so off or how 213,000 signage records resulted in so few sales

21   but Tiffany's expert Brent Kaczmarek ultimately relied on what

22   Costco said the total sales were in performing his calculation

23   of profits because Mr. Kaczmarek could not replicate what

24   Costco's expert had done from the records that had been

25   provided.

G9KFTIF2                    Opening - Mr. Mitchell

1            Now, this is where it may get a little confusing for
2    you because Tiffany is only entitled to recover damages for
3    certain signs or recover profits from certain signs and Costco
4    claims its paid expert has broken down sales on a sign-by-sign
5    basis and I ask you not be misled.  This breakdown may look
6    authoritative on the surface, but I think you will see it is
7    not authoritative.  There are a lot of holes in it.

8            What you will hear is that Costco has no idea what was
9    on the sales floor at a particular Costco at any given time
10   because of the nature of the way signs go out on the floor,
11   they get printed out, but once the signs go out for jewelry
12   they sit there until it is sold, so a sign can stay there for
13   months.  So all Costco knows is what its computer record show
14   what signs could have been.  I don't even they think know what
15   should have been.  So anything they could tell you about what a
16   Costco customer saw, and what you're concerned with what did a
17   customer see when a customer made a purchase is a complete
18   guess.

19           And we will point out to you some of the mistakes and
20   missing information and it will be up to you to decide whether
21   we're right and these figures are reliable.  We will show you
22   obvious mistakes and oversights in these calculations that were
23   used to try to reduce the sales figures from below what was the
24   original estimate of total sales from Costco's own expert
25   because there are clearly missing sales and obvious mistakes.

G9KFTIF2                    Opening - Mr. Mitchell

1            You will hear from a Costco employee, Peter Hesketh,

2    who was the only actual Costco employee who apparently had any

3    involvement with sales records.  Hits actual job is not sales

4    records.  He manages the costs of logistics like shipping and

5    receiving, but for some reason he was the one asked to gather

6    records.  Mr. Hesketh will confirm that Costco does not keep

7    records of what physical signs are actually in stores and all

8    it knows is what its central computer system says are the signs

9    that are kept internally, so Mr. Hesketh turned Costco's data

10   over to paid experts and consultants to create fancy charts.

11   All that means is that Costco cannot tell you what ring was

12   sold to which purchaser in any particular store next to any

13   particular sign.

14           Tiffany's damages expert, Mr. Kaczmarek, will testify

15   that since he could not replicate the breakdown by Costco's

16   expert he ultimately just based his calculation on total sales

17   figures reported by his counterpart but not broken down by

18   sign.  That came to gross sales of 3,349 rings which generated

19   $13.9 million of revenue and after deducting returns and voids,

20   net sales of 2,498, rings for revenue of $10 and a half

21   million.  And those are the figures of Costco's own expert.  As

22   for profits Mr. Kaczmarek calculated they were 13 percent,

23   which he will tell you is very low in retailing, let alone

24   jewelry retailing.  That is because Costco's entire business

25   model is based on charging less per item than a regular mall or

G9KFTIF2                    Opening – Mr. Mitchell

 1    shopping center store and it makes up that difference by

 2    collecting a separate membership fee to gain access to its

 3    warehouses.  But we are limited here to recovering only actual

 4    profits on specific ring sales, so whatever that markup profit

 5    is, that's all we can recover.  It is up to you to determine

 6    what that amount is.

 7         Mr. Kaczmarek will also tell you that at first he

 8    tried to do an actual profit calculation based on purchase

 9    order and sales information produced by Costco.  But when he

10    dug into those records they were unreliable and incomplete.

11    For example, he couldn't match purchase orders to deliveries to

12    ultimate sale.  The records also had entries that showed ring

13    sales at a loss or with little or no markup at all, and orders

14    for rings for which there was no delivery.  So ultimately

15    Mr. Kaczmarek calculated profits based on the 13 percent markup

16    Costco's CEO had testified it generally used for its sale of

17    jewelry.  Costco's own expert says the profit margin was

18    10.31 percent.  So in any event their differences are not that

19    great.

20         Nevertheless, Mr. Kaczmarek will tell you that he

21    calculated gross profits at $1.8 million and net profits of

22    $1.4 million.  Costco will fight vigorously to reduce that

23    number for some reason at this trial.  Mr. Kaczmarek also

24    estimated that profits would be $6.3 million if sales were

25    11,000 rings or equal to the number of letters Mr. Schutt

G9KFTIF2                    Opening - Mr. Mitchell

1    estimated he sent to purchasers.

2              Ultimately you will have to decide if you believe

3    Costco could have produced comprehensible business records but

4    failed to do so.  Because if you ultimately find that Costco's

5    records were not produced in a comprehensible form, we will

6    argue to you that in no event should you find sales were less

7    than 2,498 rings because any slicing and dicing below that

8    number is unreliable.  And you will, if you find the records

9    unreliable you will need to estimate based on the evidence that

10   you hear what you think actual sales were.

11             However, if after hearing all of the evidence you

12   believe Costco sales and signage records are sufficient to

13   enable you to reliably calculate sales per sign in each

14   warehouse, and I'm talking about sales that customers saw in

15   the warehouse when they purchased their rings not reflected in

16   a record, but did the customer see that, is that the sign the

17   customer saw when the customer bought the ring, then you will

18   need to perform a sign-by-sign sales analysis.  If you end up

19   doing that, there are sales from certain sign usages that we

20   all agree will not count.  As Judge Swain told you, those

21   include Tiffany style and Tiffany setting, and Tiffany set

22   where the words are on the same line right next to each other.

23             And Tiffany is not seeking profits from those signs if

24   Costco can actually prove what the customer saw were those

25   signs when that customer made the purchase.  But the problem is

G9KFTIF2                    Opening - Mr. Mitchell

1    since Costco doesn't know what sign was in any store at any

2    given time, the fancy looking charts they have that appear to

3    contain a breakdown of sales per sign are really just a guess.

4    That's because it doesn't know what signs were in the stores

5    and its internal records are something that are very, very

6    different.  Therefore, Mr. Kaczmarek never performed a

7    sign-by-sign sales breakdown because he couldn't perform one

8    reliably.

9         But if after hearing all the evidence you think you

10   trust Costco's records and believe their breakdown is reliable

11   you will need to use their figures since there is no similar

12   breakdown by Mr. Kaczmarek.  So ultimately, if you believe that

13   what they did is right and their numbers are right, you're

14   going to have to go with their breakdown, because Mr. Kaczmarek

15   wasn't able to do it and he based his profit calculation on

16   total sales reported by their expert not broken down.

17        Now, in the event -- what you will count are

18   stand-alone usages in signs.  If you believe their records are

19   reliable, platinum Tiffany and solitaire Tiffany and any signs

20   in which the words "Tiffany" and "set" are separated.  There

21   are some signs where there's Tiffany, then there's a

22   description like VS2 I ring set.  We'll argue to you those also

23   are to be counted.  We will argue to you that using the word

24   "set" was used by Costco in various different ways and I'll

25   talk to you about that in a moment, so not every time when you

1    see set is it short for setting.

2            The Court will instruct you on how to do that at the

3    end of the case, but I want to talk to you about one usage

4    where "platinum Tiffany" was on one line and "set" was on a

5    different line.  It will be up to you to decide whether or not

6    to include profits from sales from that signage in Costco's

7    accounting and we think that should be counted for profits

8    we'll argue to you because Costco used "set" in different ways;

9    set as to mean a pair of something or set as to mean to place

10   into something, like to set a stone, set, like a set diamond.

11           Now, I want to turn to you a little bit about why

12   Tiffany thinks Costco's counterfeiting was so bad.  At its

13   heart, this case is about the Tiffany trademark.  For those of

14   you who don't know much about trademarks, trademarks are the

15   names and symbols we see every say that brand companies and

16   their products.  At the heart of this case, this case is about

17   Tiffany's name and identity and Costco's improper use of that

18   name and identity.  Just hearing a famous trademark often makes

19   us think of things.  For example, if I say McDonald's you might

20   think of a Big Mac or fries or think about what McDonald's

21   usually looks like.  If I say Apple, you might think of an

22   iPhone, an iPad, a iMac or an Apple store.

23           THE COURT:  Mr. Mitchell, you are reviewing the

24   evidence you expect to be presented in your opening, correct?

25           MR. MITCHELL:  Yes, your Honor.

1          THE COURT:  Not arguing your case.

2          MR. MITCHELL:  Yes, your Honor.

3          THE COURT:  Thank you.

4          MR. MITCHELL:  The Tiffany trademark has been around

5    much longer than any of us.  It was first used in 1868, 150

6    years ago.  You may even have heard of the 1961 movie

7    "Breakfast at Tiffany's" starring Audrey Hepburn.  That's how

8    long the trademark had been around.  Tiffany itself comes from

9    the name Charles Lewis Tiffany, the company's founder.  If I

10   say "Tiffany," something probably pops into your mind.  Maybe

11   it's, wow, I'd love to get a gift from there or perhaps it's

12   the thought of the Super Bowl trophy that Tiffany made or maybe

13   it's the wold famous Fifth Avenue store around Christmas time

14   or maybe perhaps it's just too expensive.  But to most people

15   Tiffany means something and every big company like Costco knows

16   without saying that you can't you can't use certain words to

17   mark product because they are trademarks.  In fact, the Tiffany

18   trademark is so famous it's hard to believe that many of

19   Costco's 170,000 employees didn't know the brand.  It simply

20   liked the idea of the name Tiffany in its jewelry case and took

21   a risk by using it there.

22          I'm going to give you an example of a Costco product.

23   Pain killers.  Most of us know the difference between generic

24   and brand name drugs.  For example, acetaminophen is the

25   generic name for what is sold under the brand Tylenol.

1    Ibuprofen is the generic name for the active ingredient in

2    Advil.  Costco also sells an acetaminophen and ibuprofen-based

3    pain killers, but those are clearly marked Kirkland Signature,

4    Costco's own brand.  Many people use the words Tylenol and

5    Advil even when they are taking a generic equivalent, but

6    Costco wouldn't dare call its own painkillers Tylenol and Advil

7    even if the ingredients were identical and it doesn't.  It

8    calls them Kirkland Signature.

9          So why should Tiffany be any different?  Whether or

10   not its rings looked like something Tiffany was famous for,

11   Costco had no business calling its own rings Tiffany any more

12   than it would call its own painkillers Tylenol or Advil and

13   doing so shows callous disregard for Tiffany's trademark.

14         Just a few more things before I sit down.  For those

15   of you who don't know Costco, you need a membership card to get

16   into its stores.  Costco charges its 70 million members a

17   yearly fee for those cards.  To sell memberships Costco has a

18   page on its website that asks why become a member.  The answer,

19   we are a membership warehouse club dedicated to bringing our

20   members the best possible prices for quality brand name

21   merchandise.  So well-known brands at a discount are what

22   Costco members pay for and expect.  And in its stores instead

23   of putting prices on each package, Costco uses thousands of

24   little white cards to identify its products by brand which it

25   places on shelves and display counters.  Everyone who shops at

1    Costco knows this.  In fact, Costco even has its own brand, as
2    I said, Kirkland Signature.  It uses Kirkland Signature on
3    hundreds of products from household and food items to
4    eyeglasses, hearing aids, wine and over-the-counter
5    medications.  And it relies on trademark laws to protect its
6    own Kirkland Signature trademark just like Tiffany is doing
7    here.
8            But when it came to these engagement rings, Costco did
9    not put Kirkland Signature anywhere near them; not on the
10   rings, the packaging or in the jewelry case.  Instead all you
11   saw was "Tiffany" on these signs.  If you're as proud of the
12   quality of your jewelry as Costco says it is, then why not
13   proudly, prominently put your name on the product and the box?
14   If Costco had done that we wouldn't be here.
15           You also learned that jewelry is important to Costco
16   as a lure.  The expensive diamond jewelry is always displayed
17   on the main aisle near the entrance of every one of Costco's
18   nearly 700 stores and at least one diamond piece in every
19   display case selling for $20,000 or more was a requirement of
20   Costco's former CEO.  High end treasure hunt watches like Rolex
21   and Cartier are also right next to the diamond jewelry counter.
22   And Costco even offered at one time a million dollar ring for
23   sale.  So attracting your attention to its jewelry counter is
24   important to Costco.  Tiffany in the jewelry case was another
25   clever way to catch the attention of shoppers.

 1              Now, during the trial, as the Judge told you, not
 2     every witness we produce here will be live.  When lawyers
 3     prepare they hear from witnesses in what is called a deposition
 4     and at a deposition a witness answers questions under oath.
 5     It's a lot like court, but the witness testifies in a lawyer's
 6     office and the questions and answers are then typed out.  We
 7     have asked that several Costco witnesses that we deposed come
 8     here to testify live at trial, but they have refused to come.
 9     Since these witnesses live out west, we have no way to compel
10     them to be here.  Among these witnesses are Costco's top
11     executive, its president and CEO, Craig Jelenik, so you will
12     hear his testimony by deposition.  Jen Murphy, a Costco buyer
13     and the person who Costco said was the one who knew the most
14     about the wording in signs when she was produced as a witness,
15     and Lisa Switzer, the person whose signature appears on the
16     questionable appraisals.  So we'll have to read you some of the
17     questions and answers from their depositions.  Hearing
18     testimony that way can be a little boring, but keep in mind
19     it's not our fault these witnesses aren't here and whatever
20     they said at their depositions counts just as much as what
21     witnesses said from the witness stand, as Judge Swain just told
22     you.
23              But since we already have their testimony, here are
24     some important things we'd like you to focus on when you hear
25     it.  Just days after this case was filed, Costco's CEO wrote to

G9KFTIF2                    Opening - Mr. Mitchell

1    each of Costco's then 170,000 employees by blast e-mail, even

2    though he said it would have been better -- I'm quoting him,

3    quote, it would have been better had we not used the

4    description the way we did, close quote, without doing any

5    investigation whatsoever, he told those employees in that

6    e-mail that no Costco customer had been confused by the signs.

7    As if just saying, saying it made it so.

8              (Continued next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. MITCHELL:  But Mr. Jelenik never had someone ask a

2    single customer about that.  He just said none had been

3    confused.

4          As you will see, this knee-jerk "we did nothing wrong"

5    reaction and "didn't confuse anyone" response at the beginning

6    hasn't changed one bit in the three and a half years since that

7    e-mail was sent to those employees.  And you will see that in

8    this courtroom.  In fact, Costco has never issued a public

9    apology to Tiffany.  Instead, it still acts like it is the

10   victim, not Tiffany.

11         So at the end of this case, we will ask you to decide,

12   how many rings should Costco be held accountable for, 11,000,

13   3,349, 2,498, or something less?  How much did Costco make from

14   those sales?  And should Costco be punished in such a way that

15   will teach the company a lesson to never do this again to

16   Tiffany or anyone else?  Thank you for your time and attention.

17   I look forward to speaking with you again at the end of the

18   case.

19         THE COURT:  Thank you, Mr. Mitchell.

20         Mr. Dabney, would you like to open for Costco.

21         MR. DABNEY:  Well, you've heard the saying, there's

22   two sides to every story, and this case is no exception.

23         What I'm going to talk to you about this morning falls

24   into three basic ideas: accepting responsibility.  We learned

25   that between 2007 and 2012, Costco had a sign-management

1    problem.  And Costco takes full responsibility for that

2    sign-management problem.  The word "setting" or "set" or

3    "style" was not used when it should have been used, when

4    diamond rings with Tiffany settings were displayed.  Accepting

5    responsibility.

6           The second thing is making full disclosure.  You will

7    hear that long before there was any lawsuit, long before we

8    were on trial here, when the plaintiffs, to which Costco wishes

9    every success, they complained about a sign that was in a

10   Huntington Beach store, and you will hear a salesperson from

11   there.  Within a week, Costco voluntarily, on a system-wide

12   basis, changed all its signs and launched an internal

13   investigation as to how it was that the word "setting" or "set"

14   had been dropped off its signs.  They asked us for information

15   about what the magnitude of the situation without the "setting"

16   or "set" was, and Costco provided it, voluntarily.  And Costco

17   told them that during most of the time, the signs said

18   "platinum .70 CT diamond solitaire set in 6-prong Tiffany

19   Setting" or "platinum .70 CT Tiffany set diamond solitaire" or

20   "platinum .70 CT VS2, I round Tiffany set diamond ring."

21          As the Court told you, if signs said that, there is no

22   claim in this case.  And the reason is, "Tiffany setting" was

23   the kind of setting that the rings actually had.  "Tiffany,"

24   yes, it is a trademark, there is no question about that, but

25   that's not all it is.  The Tiffany setting is the most popular

G9KATIF3ps                          Opening Statement - Mr. Dabney

1    engagement ring setting there is.  It's been around for more

2    than a hundred years.  And "Tiffany" is to settings what

3    "diesel" is to engines.  There's an engine without spark plugs.

4    It was then invented by a guy called diesel, who called it a

5    diesel engine.

6            MR. MITCHELL:  Objection, your Honor.

7            THE COURT:  There is an objection.  Consult.

8            (Pause)

9            THE COURT:  I directed you to consult, not roll your

10   eyes.  Thank you.

11           MR. DABNEY:  I have it.

12           MR. MITCHELL:  Your Honor, could we have a sidebar?

13           THE COURT:  Are you going on to something else?

14           MR. DABNEY:  Yes.  I'm going on to something else.

15           THE COURT:  Thank you.

16           Please be seated, Mr. Mitchell.

17           MR. DABNEY:  So as we've been told, there is no claim

18   in this case that the sign said "Tiffany setting" or "Tiffany

19   set."  And we told them that.  But then Valentine's Day 2013

20   came and they filed a lawsuit against Costco based on the fact

21   that some signs had said the word "Tiffany" without "setting"

22   or "set," although at first it appeared that they were claiming

23   "Tiffany setting" and "Tiffany set" because they did not

24   initially make clear that they were not complaining about use

25   of the name "Tiffany set" or "Tiffany setting."

G9KATIF3ps                    Opening Statement - Mr. Dabney

1              So we made full disclosure.

2              And then the third thing I want to talk to you about

3    is doing the right thing.  Costco seeks your verdict to do the

4    right thing in this case.  Costco is prepared to pay what it

5    owes for the use of jewelry case signs in which the word

6    "Tiffany" was used without "setting" or "set."  And this is one

7    of the issues that has to be decided in this case:  How many

8    sales of diamond rings happened which coincided with a time

9    when a sign in a jewelry case had the word "Tiffany" on it but

10   didn't have the word "setting," "set," or "style," to make

11   clear that what we're talking about is a shape of prongs

12   holding a diamond in place.

13             So you've heard that Costco has 70 million members.

14   The number today is more like 85 million members.  And there

15   are four numbers that I would like you to note down in your

16   notes if you have notes because you're going to be hearing a

17   lot about them.  Costco is a publicly traded company.  Costco

18   has very good records of how many items it sells between

19   point-in-time one and point-in-time two.  Costco in this case,

20   you will hear, recovered upwards of 85 disaster recovery backup

21   tapes so that we could go back in time and see exactly what the

22   text was on diamond jewelry case signs, when a sale might have

23   occurred.  There's absolutely nothing unclear about Costco's

24   records.  There's nothing at all imperfect about Costco's

25   records.  But it turns out that when you look at what the

G9KATIF3ps                    Opening Statement – Mr. Dabney

1    actual sales records were, the sales where the word "setting"

2    or "set" was left off turned out to be quite small.

3              So the four numbers I would like you to note down are

4    the following.  639911.  The highest-volume diamond-ring item

5    number in this case is 639911.  And Costco has made complete

6    disclosure of how many units of item 639911 were sold between

7    February 14, 2007 and December 16, 2012.  There is absolutely

8    no secret about it.  The sales records are what they are.  And

9    you'll hear evidence on what it was.

10             The second number I would like you to note down is

11   637277.  637277 was another diamond ring item that was sold

12   throughout the period of time we're talking about, February

13   2007 to December 2016.  And you will know the number of those

14   units that was sold.  And this is one where there are two

15   issues to be decided, because for the first four of those

16   years, between February of 2007 and about April of 2011, the

17   signage for that sign, according to Costco records, said

18   "platinum Tiffany set 1.0 CT round diamond solitaire."  So at

19   the same time that we had signs that said "Tiffany set" on one

20   line, for which there is no claim, we had other signs that said

21   "platinum Tiffany set" in which there was a carriage return,

22   there was a second line, and the "set" was on the second line.

23             You'll hear that the signage in the jewelry cases were

24   limited to 22 characters in length and that the abbreviation

25   "Tiffany set" sometimes resulted in the "set" being on the

G9KATIF3ps                    Opening Statement - Mr. Dabney

1   second line.  You'll be instructed, you have to decide, well,

2   was that an abbreviation for "Tiffany setting," "Tiffany set,"

3   or was it something else completely, an attempt to imply that

4   there's an "and Co." after the word "Tiffany" in the

5   description at the time.

6        The third number I would like you to note down is

7   605880.  That is the fourth jewelry item.  Again, there are

8   perfect sales records.  We know exactly how many of these items

9   was sold.  This was an item that was sold for only a relatively

10  brief time.  There were no sales of this item prior to

11  approximately September 2011.  It was on sale for only about 13

12  months before the signs were pulled and changed.

13       And the last number I would like you to take note of

14  is 380068.  That one is one that dated back to long ago.

15  There's relatively little information about it.  And there were

16  only, according to our records, 57 sales of that item.

17       So we have four item numbers.  This is how Costco

18  keeps its sales records.  And we told all this to the other

19  side.  And initially the plaintiff's expert seemed to agree

20  with this, that the way, if you want to know how many sales of

21  an item are made, you look at the sales records.

22       So you will hear that the one thing that the

23  plaintiff's damages expert did not look at in this case are the

24  sales records.  This must be the first business case in history

25  in which the plaintiff's damages expert does not look to sales

G9KATIF3ps                    Opening Statement – Mr. Dabney

1    records but is going to base his estimate of how many sales

2    there were based on a deposition answer by a senior executive

3    who says, well, how many letters did you send to members, and

4    he says about four times, I don't remember, I don't know the

5    exact number.  He didn't have the mailing list in front of him

6    at the time.  He says, the number 11,000 sticks in my head.  So

7    since 11,000 is a large larger number than what the sales

8    records show, it's easy to see why we could have a trial and

9    you all are taken out of your daily lives, because this storied

10   company thinks it's appropriate to make a claim that, based on

11   a witness's unrefreshed memory of how many letters might have

12   been sent out over his signature, that that should be taken by

13   you as showing what the number of sales were, rather than the

14   actual sales records.

15          So what we have to do here, and Costco accepts the

16   rulings from the judge, the law is very clear, you have sales

17   of items.  There is a certain number.  You have cost of goods

18   sold.  That leads to a cost number.  And the difference between

19   the two is the gross margin.  And that is what we're talking

20   about.  And the question is, what was that.

21          If you add up all -- if Costco was to forfeit every

22   dime that it made on sales of diamond rings where the word

23   "setting" or "set" was left off, and I can't emphasize enough

24   that this was a case in which Costco witnesses will tell you

25   that not only is Tiffany the name of this but Costco witnesses

G9KATIF3ps                    Opening Statement - Mr. Dabney

1   involved in creating signs will tell you that that name has

2   been around so long it is in the dictionary, as describing --

3               MR. MITCHELL:  Objection.

4               MR. DABNEY:  -- the setting.

5               THE COURT:  Consult, please.

6               Are you requesting a sidebar?

7               MR. MITCHELL:  I am, your Honor.  Thank you.

8               THE COURT:  Gentlemen, please come to the sidebar.

9               (At the sidebar)

10              MR. MITCHELL:  Your Honor, the rule is clearly that

11  there is no dictionary evidence unless there is a foundation.

12  We ask that there has to be a foundation first.  So as we are

13  now in opening, there's obviously no foundation, and mentioning

14  the definition of a dictionary is highly prejudicial.  If he

15  lays the foundation as your Honor has set forth because that

16  was the liability of the case.  But these comments in opening

17  that Tiffany had it in the dictionary, it bears exactly on what

18  your Honor has said, that there has to be a foundation first.

19              THE COURT:  Mr. Dabney?

20              MR. DABNEY:  We specifically discussed this on

21  September 8.  I said I intended to mention the dictionary in

22  opening and your Honor said, so long as I said Costco witnesses

23  involved in signs will tell you that the word is not only the

24  name of the setting, it's in the dictionary, that would be OK.

25  So I very carefully said Costco witnesses will tell you.

1          THE COURT:  Well, I don't recall phrasing it that way.

2     What I recall saying is if you have a Costco witness who would

3     say that, in using that term, that Costco witness subjectively

4     believed it was a generic term, then that's the predicate for

5     the exemplar of a dictionary definition.  But simply testimony

6     that a Costco witness knows at this point in time that the word

7     is in the dictionary is not the proper predicate.

8          MR. DABNEY:  Our witnesses have all said they

9     subjectively believed it was a generic term, so I could

10    certainly say that instead.

11         MR. MITCHELL:  Your Honor, but I believe your ruling

12    was the person responsible for creating the signs is someone

13    who relied on the dictionary to create the signs.  There is no

14    witness here that they're going to agree was the sign creator.

15    It's not going to come in.  So as a proffer he's suggesting to

16    you that there are witnesses who did not create the signs who

17    are going to say they knew it was in the dictionary, and I

18    don't think that's your Honor's foundation, because we have

19    their listed witnesses.  The signs were written by ICS people.

20    They were all inventory control specialists on their list of

21    witnesses, as Mr. Karig, and that's by deposition, and we have

22    his testimony.  So he's not someone who did it.  And there have

23    been no more ICS control specialists in any of their witness

24    lists, so I don't see how they're going to lay a foundation for

25    this.

G9KATIF3ps                    Opening Statement – Mr. Dabney

1            MR. DABNEY:  Our buyers are the ones who direct the

2       ICSs.  Our buyer's name, Ms. Grewall's name, is on the quote

3       sheet that has the name "Tiffany" on it.  She saw the signs in

4       the store.  She thought this was a generic term.  She will say

5       she did not see anything wrong with the signs, this is why they

6       continued in effect.  She saw nothing wrong with telling the

7       ICSs to base the signs on the quote sheet.  So under what your

8       Honor has just said this morning, that testimony clearly is a

9       sufficient predicate to say at that time Costco personnel

10      involved in the signs' creation and use subjectively believed

11      it was a generic term and the dictionary is corroboration of

12      that.

13           THE COURT:  A Costco witness will testify that, as

14      Mr. Dabney has proffered, a Costco witness will testify, as

15      Mr. Dabney referred to in his opening, that a Costco witness

16      will testify to that subjective belief, and on that basis he

17      may also refer to evidence that it came from the dictionary.

18           MR. DABNEY:  Thank you, your Honor.

19           (In open court; jury present)

20           MR. DABNEY:  Sorry for the interruption.

21           Multiple Costco witnesses will testify that they

22      subjectively believe that the word "Tiffany" is a common

23      descriptive name of a type of jewelry setting in which a single

24      gemstone is held in place by a plurality of four or six long

25      slender prongs that are in a generally V-shaped configuration

G9KATIF3ps                         Opening Statement - Mr. Dabney

1   and flare up from a shank to hold a single round gemstone.  And

2   they will tell you that their subjective believe as to that

3   term is reflected in multiple sources.  The vendor

4   documentation that uses the word "Tiffany" describes the

5   setting of the ring, including the educational materials from

6   the Gemological Institute that specifically defines that

7   setting by that name, "Tiffany."  It is unique and it is not

8   like the analogies that the opposing counsel said, like

9   acetaminophen and ibuprofen.  "Tiffany" denotes a very

10  particular shape of prong setting.  And Costco witnesses will

11  tell you that.  And so that "Tiffany" is a word that has more

12  than one meaning.  And in this context, the fight here is,

13  Costco meant to say that these diamond rings had Tiffany

14  settings.  Sometimes that was so clear, "Tiffany settings,"

15  "Tiffany set," that the Court has ruled there is no claim as to

16  that.  But for those signs where the abbreviation was just

17  "Tiffany" by itself without the word "set," the Court has ruled

18  that that description was wrong, and we accept that in this

19  trial.  And the issue here is to identify which of the sales

20  could have occurred when the signs left the word "set" off and

21  what you can do about it now over and above what Costco has

22  already said.

23       So what Costco has done already, again, without any

24  decision in this case, I've already said, Costco voluntarily

25  removed all of the signs within a week of the complaint.

1          Costco also did this investigation to find out what it
2     could about why the word "setting" was left off, how the sign
3     text was as variant as it was.  And we learned that we had a
4     real sign-management problem.  The management of the signs had
5     been changed.  At the time we're talking about in this case,
6     2007 to 2014, these signs were prepared by personnel known as
7     inventory control specialists.  They are entry-level,
8     corporate-level employees, and their training was to take the
9     information off the vendor documentation and to summarize it in
10    six characters, 22 characters alone.  And from how I just
11    described the sign, sometimes it said "round Tiffany set,"
12    sometimes it said "Tiffany set," sometimes it said "6-prong
13    Tiffany setting."  There was inadequate precision in the
14    instructions given to those personnel.  This is a management
15    failure.  Costco accepts this.  And Costco has acted to fix it.
16    It is no longer the case that a sign can go out on the floor
17    without it being reviewed by someone higher up in management
18    than it was at the time.
19          We have not heard that there is any recurrence of the
20    situation and this happening that occurred in 2007 and 2012.
21    And it bears repeating that even when we just had it done with
22    the buyers overseeing the inventory control specialists, Costco
23    got it right most of the time.  Most of the time, it was
24    "Tiffany set," and the intent was to communicate that the
25    diamond rings had Tiffany settings.

1          Costco went beyond, escalating this so that there is

2    now more management oversight over those jewelry case signs.

3    Costco has put a block in its computer system so that the word

4    "Tiffany" cannot be entered, even with "Tiffany setting" or

5    "Tiffany set," by a person who would be involved in creating

6    these signs.  That was over and above what anyone has said

7    Costco was required to do.  But they did that over three years

8    ago.  And you're not going to hear any recurrence of that.

9          Another thing that Costco did, in April of 2013, was

10   to try and find out who might have misunderstood the signs.

11   There's something you need to understand about Costco, those of

12   you who aren't Costco members.  Remember I mentioned the four

13   items and the good records.  Well, because the only people who

14   can shop in Costco are Costco members, there is a record of

15   every purchase made by a Costco member.  So it's possible to go

16   back in time and see who bought what when.  And so early on in

17   this case, before we knew that there was no claim as to

18   "Tiffany setting," before we knew there was no claim as to

19   "Tiffany set," Costco went back into its live systems and did a

20   little bit of backup recovery to say who could possibly have

21   bought a diamond ring of one of certain items at a time that

22   coincided with when a sign had the word "Tiffany" in it in any

23   form.  And that number, as Costco estimated it in April of

24   2013, was about 2,500.

25          Now, it turns out that that 2,500, including people

1    whose sales occurred when there was no "Tiffany"-only signs for

2    639911, when there was no claim that we knew of at the time,

3    but that the 2,500 number is on the mailing list.  So for the

4    plaintiffs even now -- they've had the mailing list for three

5    years -- for the plaintiffs even now to be saying that the

6    number of letters sent out was 11,000 is a sign of the unusual

7    nature of the proceedings we're in.

8            And what the letter said was to remind everybody, one

9    of the reasons you pay $55 a year to shop at Costco is not only

10   so that you can buy something like a diamond engagement ring

11   for 10 percent over Costco's actual cost; the ring we would

12   sell for 3999 might cost you 5,000 in cash, for instance, but

13   Costco has a trust relationship with its members because, you

14   buy something at Costco, you have the right to return it for

15   any reason.  You're dissatisfied, if you're dissatisfied for

16   any reason, you can return it, even years later.  In this case,

17   there are situations where people bought an engagement ring,

18   they went through a divorce, and they returned it years later,

19   saying they were dissatisfied, and they got a full refund.

20           The Costco membership policy, the membership

21   satisfaction policy is so generous that, at the time these

22   letters went out, some of the diamond rings had been sold at

23   prices that were higher than they were then selling for.

24   Diamond prices fluctuate quite a bit.  And so the member

25   satisfaction policy allowed someone to return a ring that they

1    had bought at a higher price and then repurchase the exact same

2    item for $900 less.  And they said they were dissatisfied and

3    that was OK.  Costco has a trusting relationship with its

4    members.

5            So the letter said, and it's true, at that time Costco

6    thought that the word "Tiffany" was understood by its members

7    as an abbreviation for "Tiffany setting," as most of the signs

8    said "Tiffany setting."  Costco does not sell branded find

9    jewelry.  It never has.  You will see evidence that all of the

10   Costco fine jewelry, whether it has a bezel setting, or a

11   tension setting, a necklace or whatever, is sold in brown boxes

12   with no word "Tiffany" anywhere.  The jewelry is stamped with

13   its actual manufacturer's trademark on it, so if you were

14   really curious to know who actually manufactured a diamond ring

15   item that Costco sells, the actual manufacturer's stamp is

16   there, because for over a hundred years precious metals are

17   required to be stamped with their manufacturer.  So not the

18   paperwork, not the box, not the cash register receipt, nothing

19   about the sales experience would have the word "Tiffany."  You

20   just have the sign in the jewelry case, which, in some

21   instances, left the word "set" off the sign.  And so there was

22   the possibility that someone could have misunderstood the sign.

23   Costco wrote these letters.  And you'll find that, out of the

24   2,500 letters that were sent, a very small number of returns

25   came in even immediately after the letter.

1          But under the law, for those signs where the jewelry

2     case signage left the word "set" or "setting" off, the Court

3     has ruled that Costco may be required to forfeit every dime it

4     made on those products, even if the people weren't unhappy and

5     even if the people had not misunderstood the signs.  And we

6     will show you that for the signs where the word "setting" was

7     left off, and there's no dispute as to what the sales records

8     show, if Costco forfeited every dime on the signs where there

9     was no "set" or "setting" or "style" or anything else, that the

10    grand total of the gross margin, not that you count overhead or

11    anything like that, but the gross margin on those products was

12    $381,719.

13         With regard to the item 637277, remember, there is one

14    item where it said "platinum Tiffany set 1.0 CT round diamond

15    solitaire."  There was one in that category where, if the word

16    "set" had been on the same line there would be no claim, but

17    because the word "set" was on the second line, the argument is,

18    well, people might have missed, not thought that was "Tiffany

19    set," it was "Tiffany" and the second line was some

20    incomprehensible statement, "set 1.0 CT round."  If you find

21    that the "Tiffany set" on two lines was a combined term, then

22    the instruction to you will be that there should be no verdict

23    as to that, that that was "Tiffany setting," abbreviation, and

24    that was OK.

25         But if you found the contrary and you found that

1    "Tiffany set" on two lines had a completely different meaning

2    than "Tiffany set" on one line, if you forfeit all the profits

3    Costco made on every one of those, again, that would be an

4    additional $399,171.

5          And so the grand total, if you look at the sales

6    records, which the plaintiff's expert didn't look at, and you

7    ask yourself what could possibly have been the number of those

8    sales that coincided with the "Tiffany"-only signs that are at

9    issue in the case, that comes up to a grand total of $780,890.

10         Costco doesn't think that it owes for that second

11   group of signs, for the $399,000, but it will accept your

12   verdict on that if you view it as to the contrary.

13         And then the last thing that you're going to be asked

14   to decide in this case is whether or not the facts here, that

15   the word "set" was not always used on the signs and therefore

16   some number of people might have misunderstood the signs,

17   whether Costco should not only be required to forfeit all of

18   the profits it earned on those products that might have been

19   misunderstood as to the signage, and even the second group of

20   profits, but whether or not there should be a finding that

21   Costco acted with criminal indifference to civil obligations,

22   with such wanton dishonesty that it's not enough to order

23   Costco to forfeit all of its profits but that there has to be a

24   punitive award here, that Costco should be punished for using

25   what it thought was a word in the dictionary legally and

1   truthfully in its signs.  And there are a set of guideposts.

2   You'll hear the Costco witnesses come in.  There is a very

3   clear explanation of exactly how this happened.  The word

4   "Tiffany" was on the vendor documentation.  The Costco employ-

5   ees copied that onto the signs.  They abbreviated it the best

6   they could.  They got it right most of the time.  But there was

7   a management signage problem, which has been corrected.

8          The suggestion on the other side that that isn't how

9   it happened, that this wasn't just a management signage

10  problem, that this was part of some very calculated scheme to

11  lure members into the store, I think when you hear the evidence

12  you will find that there is absolutely no basis for that

13  theory, that this was a mistake that was made.  It is not the

14  mistake of any individual employee.  If you think about it and

15  you think about Costco's membership model, the plaintiffs are

16  asking you to believe that Costco engaged in a totally

17  irrational, futile, self-destructive course of conduct.

18         Remember, anything you buy at Costco you can return.

19  So it would be completely futile and ridiculous for Costco to

20  try to use "Tiffany" not as a setting style name but to mislead

21  anyone, number one.

22         Number two, if Costco's whole business depends on

23  memberships and membership renewals, and if Costco breaks its

24  trust with its members, passing over the futility of it because

25  they can always return something if they're dissatisfied with

G9KATIF3ps                    Opening Statement - Mr. Dabney

1    it, but the theory of the other side is that Costco knowingly

2    and deliberately engaged in conduct that could only be

3    absolutely detrimental to the lifeblood of its business, which

4    is membership and membership renewal.  And you'll hear from

5    Mr. Schutt that Costco has over 90 percent membership renewal

6    rate.  And when Amazon.com seemingly is killing retail and

7    shopping-mall lots are emptier than they ever were before,

8    Costco is thriving and Costco is growing to the point where

9    opposing counsel is about 15 million off in the number of paid

10   Costco members that there are in the case.  So I suggest to

11   you -- I'm not going to have a chance to speak to you again

12   before the end of the case, but Costco witnesses will come

13   before you.  Costco has nothing to hide in this case.  You'll

14   hear from the buyers who oversaw the inventory control

15   specialists who made up the signs, who received the vendor

16   documentation in which the word "Tiffany" appears.  They will

17   tell you what they thought.  Costco buyers will identify member

18   correspondence in which the members asked for diamond rings of

19   Tiffany settings.  You will hear from Mr. Schutt, who will tell

20   you about Costco's membership policy.  And Mr. Schutt is the

21   handsome gentleman with the yellow tie and the blue shirt

22   sitting at our counsel table.

23          And you will hear from, this morning, you'll hear an

24   interesting exchange between an investigator that sort of set

25   this whole thing off in the Huntington Beach, California store

G9KATIF3ps                    Opening Statement – Mr. Dabney

 1   and Ms. Jean LaBarbera, who was a sales participant on the

 2   floor then, who engaged with the investigator, and she

 3   certainly knew what a Tiffany setting was and knew what the

 4   Costco products were and were not represented to be.

 5            So I will just say again, it is a real privilege for

 6   me to participate in this process with you.  This is one of the

 7   only places in the world where a civil dispute like this, the

 8   factual aspects of it, are decided by regular people, not by

 9   people who are in government.  And along with the plaintiffs,

10   Costco very much appreciates your service, and we look forward

11   to receiving your verdict in this case.  Thank you.

12            THE COURT:  Thank you, Mr. Dabney.

13            We will now take a ten-minute break before the

14   presentation of the evidence begins.  Members of the jury, keep

15   your minds open, keep your thoughts to yourselves, and enjoy

16   your break.

17            Ms. Ng, would you kindly escort the jury out.

18            Please be ready in the jury room in ten minutes.

19            (The jury left the courtroom)

20            THE COURT:  Counsel, is there anything we need to take

21   up?

22            MR. DABNEY:  No, your Honor.

23            MR. MITCHELL:  No, your Honor.

24            THE COURT:  We'll see you in ten minutes.  Thank you.

25            (Recess)

G9KFTIF4                      Popp - direct

1               (In open court; jury present)

2               THE COURT:  Good morning again, ladies and gentlemen

3     of the jury.  Please take your seats in the jury box.  Please

4     be seated, everyone.  Plaintiffs may call their first witness.

5               MR. MITCHELL:  Plaintiffs call Brittni Popp.

6               THE COURT:  Ms. Popp, please walk around that little

7     shelf that's sticking out and come up to the witness stand,

8     step up and remain standing to take the oath.  Thank you.

9      BRITTNI POPP,

10         called as a witness by the Plaintiff,

11         having been duly sworn, testified as follows:

12              THE DEPUTY CLERK:  Please state your full name and

13    spell it for the record.

14              THE WITNESS:  Brittni Popp, B-r-i-t-t-n-i, P-o-p-p.

15              THE COURT:  Thank you, please be seated.  Please seat

16    yourself very near the microphone.  That should be good.  If

17    you would just speak as if you expect Mr. Mitchell to hear you

18    without the microphone.

19    DIRECT EXAMINATION

20    BY MR. MITCHELL:

21    Q.  Good morning, Ms. Popp.

22    A.  Good morning.

23    Q.  In November, 2012, who did you work for?

24    A.  Investigative Consultants.

25    Q.  And what is Investigative Consultants?

G9KFTIF4                         Popp - direct

1    A.  It is a private investigation firm owned by Kris Buckner.

2    Q.  And where is Investigative Consultants located?

3    A.  Torrance, California.

4    Q.  Where is Torrance, California?

5    A.  Near Los Angeles.

6    Q.  Are you still employed by Investigative Consultants?

7    A.  No.

8    Q.  When did you leave?

9    A.  Approximately eight months ago.

10   Q.  What do you do now?

11   A.  I'm a process server.  I also do freelance investigative

12   work for a couple of different investigators and I also nanny.

13   Q.  In November 2012 did you receive an assignment that

14   concerned rings being sold at Costco?

15   A.  Yes.

16   Q.  What was that assignment?

17   A.  To visit a location, a Costco location in Huntington Beach,

18   to observe if there was any Tiffany rings on display for sale.

19   Q.  And that's Huntington Beach, California?

20   A.  Yes.

21   Q.  Where is Huntington Beach, California?

22   A.  Not far from Los Angeles.  It's a beach city in California.

23   Q.  In connection with your assignment, what did you do?

24   A.  I visited a Costco location and observed a Tiffany ring on

25   display for sale.

G9KFTIF4                          Popp - direct

1    Q.  And how many occasions did you visit the Costco location?

2    A.  Two times.

3    Q.  Could you describe, generally speaking, what happened on

4    your two visits?

5    A.  The first visit I was told just to go to the Costco

6    location and observe if there were any Tiffany rings on display

7    for sale and that was it for the first time.  The second time I

8    was asked to go to the Costco location, I was actually asked to

9    purchase one of the Tiffany rings observed for sale.

10             MR. MITCHELL:  Your Honor, may I hand up the exhibit

11   binder to the witness?

12             THE COURT:  Yes, you may.

13   Q.  Were there any written reports prepared to memorialize

14   whatever it is that happened on your visits?

15   A.  Yes, both visits.

16   Q.  And were those written reports?

17   A.  On a computer, yes, typed reports.

18   Q.  Who wrote those reports?

19   A.  I did.

20   Q.  And is your name at the end of those reports?

21   A.  No, the owner of the company, Kris Buckner's name is at the

22   end of the reports.

23   Q.  Why is Mr. Buckner's name at the end of the report?

24   A.  He proofs the reports before they're sent to the client and

25   then adds his name on the end.

G9KFTIF4                        Popp - direct

1   Q.  How soon after the events that occurred did you prepare

2   these reports?

3   A.  Right after.

4   Q.  When you prepared these reports, were the events reported

5   in them fresh in your mind?

6   A.  Yes.

7   Q.  Did you have any recordings to assist you in the

8   preparation of these reports?

9   A.  Yes, I had video recording.

10  Q.  And how did you have a video recording?

11  A.  It was an undercover camera.

12  Q.  Was there any sound with that camera?

13  A.  No sound.

14  Q.  Why is there no sound?

15  A.  Because it's illegal in California to video with sound.

16  Q.  So it was okay to video with only the pictures, correct?

17  A.  Yes.

18  Q.  Did you use any photographs to assist you in the

19  preparation of these reports?

20  A.  Yes, I did, on my cell phone.

21  Q.  And who took those pictures?

22  A.  I did.

23  Q.  Did you include in these reports photographs of the things

24  you saw?

25  A.  Yes.

G9KFTIF4                        Popp - direct

1    Q.   Did those reports accurately state what happened on each of

2    those two visits to the Costco store?

3    A.   Yes.

4    Q.   Were these reports prepared in the ordinary course of

5    business of your employer at the time, Investigative

6    Consultants?

7    A.   Yes.

8    Q.   Did Investigative Consultants regularly prepare reports

9    like these to memorialize investigations conducted by the

10   company?

11   A.   Yes.

12   Q.   And were you required to prepare these reports as part of

13   your job responsibilities at Investigative Consultants?

14   A.   Yes.

15   Q.   Now, in the binder in front of you, if you would turn to

16   what's marked as Plaintiff's Exhibit 65 for identification,

17   which is PTX65.  Do you see that?

18   A.   Yes.

19   Q.   Can you describe what Plaintiff's Exhibit 65 for

20   identification is?

21   A.   This was the report that I wrote on my first visit to the

22   location on November 27, 2012.

23   Q.   Does this report accurately report the events what happened

24   on the visit to Costco that you had on November 27, 2012?

25   A.   Yes.

1              MR. MITCHELL:  Your Honor, I would offer Plaintiff's

2     Exhibit 65 into evidence.

3              MR. DABNEY:  Your Honor, the same objection we

4     previously made to this exhibit.

5              THE COURT:  The objection is overruled and the exhibit

6     is admitted in evidence.  It may be published.

7              (Plaintiff's Exhibit 65 received in evidence)

8     Q.  On the screen, is that the report of your visit on

9     November 27, 2012?

10    A.  Yes.

11    Q.  Now, if you would, would you please turn to page 2 of the

12    exhibit?  There are photographs on this page.  Can you identify

13    it please, for the jury, what these photographs show?

14    A.  The photographs are the jewelry display cases located

15    inside of Costco and the Tiffany ring that I observed on

16    display for sale inside of the jewelry case.

17    Q.  And just so we can look at the different aspects of this,

18    there's a glass counter, is that the jewelry counter?

19    A.  Yes.

20    Q.  And there's a photograph, is that the case in which this

21    ring was displayed?

22    A.  Yes, inside of it.

23    Q.  How many rings did you observe in the jewelry case at the

24    time where Tiffany was in the sign?

25    A.  One.

1   Q.  Did you speak with anyone about the ring?

2   A.  Yes.

3   Q.  Do you remember the person to whom you spoke?

4   A.  Yes.

5   Q.  What was her name?

6   A.  Jean.

7   Q.  Would you turn to page 3 of the report, please?  Is that a

8   picture of the person you spoke with?

9   A.  Yes.

10  Q.  It's a photograph, is that taken with your video camera?

11  A.  With the video recorder.

12  Q.  With the video recorder.  And was this person, was this

13  Jean aware that you were recording an image of her at the time?

14  A.  No.

15  Q.  So this is a picture of her speaking with you without

16  knowing she was being recorded, is that correct?

17  A.  Yes.

18  Q.  Now, beneath the photograph are some bulleted entries.

19  What are those bulleted entries?

20  A.  The conversation I had with Jean.

21  Q.  Was it both sides of the conversation?

22  A.  Just her statements.

23  Q.  Were these things that Jean actually said to you?

24  A.  Yes.

25  Q.  How did you keep track of what she said to you?

G9KFTIF4                      Popp - direct

 1  A.  I was keeping notes on my phone during the course of this
 2  investigation.
 3  Q.  So it was your practice at Investigative Consultants to
 4  prepare reports like these after you conducted an
 5  investigation, is that right?
 6  A.  Yes.
 7  Q.  How many reports like these would you say you had prepared
 8  or you did prepare during the time you worked at Investigative
 9  Consultants?
10  A.  Hundreds.
11  Q.  So this format of the report, was that a format that you
12  created?
13  A.  No.  It's the format the company created.
14  Q.  And was it the company's practice to prepare reports that
15  looked like this after an investigator went out and saw
16  something?
17  A.  Yes.  Always.
18  Q.  Now, it says in a couple of the entries here, if you go
19  down to the fourth bulleted line, it says, I'm sorry, the fifth
20  bulleted line.  It says -- I'm sorry, this line right here.  Do
21  you see that line?
22  A.  Yes.
23  Q.  It says, "For right now, that is the only Tiffany ring I've
24  seen."
25  A.  Yes.

G9KFTIF4                         Popp - direct

1   Q.  Did Jean describe the ring that was in the case as a

2   Tiffany ring?

3   A.  Yes.

4   Q.  Did she use any other words to describe the ring other than

5   Tiffany to describe it?

6   A.  No.

7   Q.  Did she ever tell you that the ring was not made by

8   Tiffany?

9   A.  No.

10  Q.  Did she ever tell you the ring was a Costco ring?

11  A.  No.

12  Q.  Were both of you using "Tiffany" to describe the ring as

13  you were talking about it?

14  A.  Yes.

15  Q.  And did Jean ever try to correct you when you described the

16  ring as a Tiffany ring to tell you no, this is not a Tiffany

17  ring?

18  A.  No.

19  Q.  Did you form an impression, speaking with Jean, whether

20  Jean believed it was a Tiffany ring?

21  A.  I believed it was a Tiffany ring, so I was speaking as if

22  it was a Tiffany ring.

23  Q.  And you had not taken it out of the display case, is that

24  right?

25  A.  No.

G9KFTIF4                              Popp - direct

1    Q.  Was the display case locked when you saw it first time?

2    A.  Yes.

3    Q.  Was anything -- if you go back to page -- could you turn in

4    your book to the page marked PTX25, Plaintiff's Exhibit 25?

5    Are you there?

6    A.  Yes.

7    Q.  Can you identify what Plaintiff's Exhibit 25 is?

8    A.  A picture of the Tiffany ring I observed for sale.

9    Q.  And is that an enlargement of the picture that's contained

10   in your investigative report?

11   A.  Correct, yes.

12         MR. MITCHELL:  Your Honor, I offer Plaintiff's Exhibit

13   25?

14         MR. DABNEY:  No objection, your Honor.

15         THE COURT:  Plaintiff's Exhibit 25 is admitted and may

16   be published.

17         (Plaintiff's Exhibit 25 received in evidence)

18   Q.  So if we enlarge the photograph just of the ring and the

19   sign.  Mr. Cole, would you enlarge the ring and the sign?  Is

20   this what you observed in the jewelry case at the Huntington

21   Beach Costco store on November 27, 2012?

22   A.  Yes.

23   Q.  When you were looking into the case all you could see is

24   the top portion of the ring and the diamond in the setting,

25   correct?

G9KFTIF4                        Popp - direct

1    A.  Correct.

2    Q.  There were no other identifying features of the ring that

3    were visible to you when you looked through the glass case,

4    correct?

5    A.  Correct.

6    Q.  And is that the sign that you saw when you looked at the

7    ring through the glass case?

8    A.  Yes.

9    Q.  Let's walk through the sign, if you would, for a moment.

10   The top section 639911.  Do you know what that is?

11   A.  No.

12   Q.  The ring was described as a platinum Tiffany .70 CT VS2

13   I-round diamond ring, correct?

14   A.  Correct.

15   Q.  And the price was $3,199.

16   A.  Correct.

17   Q.  There's a date on the bottom left hand portion of that

18   sign.  Do you see that?

19   A.  Yes.

20   Q.  What date is on that sign?

21   A.  7/24/12.

22   Q.  And that date was on the sign when you looked at it through

23   the glass case, correct?

24   A.  Correct.

25   Q.  Was there any indication, looking through the glass of the

1   jewelry display case, that this ring was not made by Tiffany?

2   A.  No.

3   Q.  When you spoke with Jean, was it before the ring was taken

4   out of the case?

5   A.  Yes.

6   Q.  And did Jean call this a Tiffany ring while you were still

7   looking at it while it was in the case?

8   A.  Yes.

9   Q.  Did you engage with Jean in such a way that you might be a

10  Costco shopper looking to buy a ring?

11  A.  Yes.

12  Q.  Did Jean talk to you like you were a person who was

13  interested in buying a ring?

14  A.  Yes.

15  Q.  Where in the store was this ring located?

16  A.  The front of the Costco location where the high-end jewelry

17  is on display for sale.

18  Q.  Can you describe the jewelry case generally as to what's in

19  that jewelry case?

20  A.  It's all high-end jewelry so Kate Spade watches, Rolex

21  watches and then different rings and necklaces.

22  Q.  Were the items, the high-end watches in the display case in

23  close proximity to where this ring was being displayed?

24  A.  Yes.  Close.

25  Q.  So the other high-end branded items were in the display

G9KFTIF4                         Popp - direct

1    case close to this sign, am I correct?

2    A.  Close, yes.

3    Q.  Now, if you would go back to Plaintiff's Exhibit 65,

4    please.  If you could turn to the page numbered PTX65.004,

5    which is page 4 of Plaintiff's Exhibit 65.  There are

6    photographs of the ring.  Can you describe those photographs,

7    please?

8    A.  These are photographs that I took personally from my cell

9    phone the first visit to the Costco location.  The first photo

10   is the actual ring on display for sale inside of the display

11   case and the other photos are when I got the ring outside of

12   the display case.

13   Q.  And is the sparkly fingernail your fingernail?

14   A.  Yes.

15   Q.  Now, if you would turn to the last page of your report,

16   which is PTX65, page 5, there are two photographs there.  Would

17   you describe those photographs?

18   A.  That is the appraisal that comes with the ring.

19   Q.  And how did you come to see that appraisal?

20   A.  I went to the customer pickup and viewed it there.

21   Q.  What was the price, what was the appraised value shown on

22   the appraisal certificate that came with this ring?

23   A.  $4,480.

24   Q.  What was the price of the ring in the display case?

25   A.  It was $3,199.99.

G9KFTIF4                      Popp - direct

1    Q.  So the appraisal valued the ring at an amount greater by

2    more than a thousand dollars, correct?

3    A.  Correct.

4    Q.  Than what the purchase price was.

5    A.  Correct.

6    Q.  Now, if you would, turn to page, or the exhibit marked

7    Plaintiff's Exhibit 66 in your book for identification.  Can

8    you describe what that report is?

9    A.  This is the report from my second visit to the location,

10   the Costco location, on November 30, 2012.

11   Q.  And does this report memorialize what happened on your

12   visit to Costco on November 30, 2012?

13   A.  Yes.

14   Q.  And does this report accurately report the events that

15   happened on that day?

16   A.  Yes.

17           MR. MITCHELL:  Your Honor, I offer Plaintiff's Exhibit

18   66 into evidence.

19           MR. DABNEY:  Just the previous objection, your Honor's

20   previously considered Costco objection.

21           THE COURT:  Thank you.  That objection is overruled

22   and Plaintiff's Exhibit 66 is admitted and may be published.

23           (Plaintiff's Exhibit 66 received in evidence)

24   Q.  What was the purpose of this report, Ms. Popp?

25   A.  To visit the location and purchase the Tiffany ring

1   displayed for sale.

2   Q.  Did something accompany -- this was your second visit to

3   the Costco store, correct?

4   A.  Correct.

5   Q.  What was the date of this visit?

6   A.  November 30, 2012.

7   Q.  Did somebody accompany you on your visit to the store on

8   this occasion?

9   A.  Yes.

10  Q.  Who accompanied you?

11  A.  Heather Romo.

12  Q.  Who is Heather Romo?

13  A.  She is also an employee of Investigative Consultants and

14  the Costco member on the card.

15  Q.  Why did Ms. Romo come to you to the store that day?

16  A.  We were dealing with a large amount of money, so she came

17  with me and she was also the Costco member on the card.

18  Q.  If you would turn to page 2 of the report, PTX66 page 2.

19  We're going to talk about the photographs there.  Could you

20  enlarge that?  This page shows two photographs of the rings in

21  the case there.  Why does it show two photographs?

22  A.  I observed two rings that had the Tiffany markings when I

23  visited the location.

24  Q.  And the ring in the right hand photograph, was that ring

25  there when you were there on November 27, 2012?

1    A.  Yes.

2    Q.  On your first visit --

3    A.  Oh, on the first visit only the first ring was observed.

4    Q.  And on your second visit there was a second ring.

5    A.  Correct.

6    Q.  And that ring said, described the ring as a, quote,

7    platinum Tiffany VS2 I, 1 carat round ring diamond solitaire

8    ring, correct?

9    A.  Correct.

10   Q.  Now on the second visit there were two rings in the jewelry

11   case that had Tiffany signs, correct?

12   A.  Correct.

13   Q.  This report mentions -- actually, first, let me turn, if

14   you would, in your book to Plaintiff's Exhibit 26.  Is that an

15   enlargement of a photograph of the second ring that you

16   observed in the display case on November 30, 2012?

17   A.  Yes.

18          MR. MITCHELL:  Your Honor, I offer Plaintiff's Exhibit

19   26.

20          MR. DABNEY:  No objection, your Honor.

21          THE COURT:  Plaintiff's 26 is admitted and may be

22   published.

23          (Plaintiff's Exhibit 26 received in evidence)

24   Q.  Is that how the ring appeared in the display case as shown

25   in Plaintiff's Exhibit 26 on November 30, 2012 at the

1   Huntington Beach, California Costco store?

2   A.  Yes.

3   Q.  And again, looking through the glass, could you see any

4   markings on the ring itself?

5   A.  No.

6   Q.  So the only visible identification of the ring is what was

7   contained in that sign, correct?

8   A.  Yes.

9   Q.  Now, turning back, if you would, to Plaintiff's Exhibit 66.

10  Second page.  66, page 2.  If you could blow up the language at

11  the bottom, please?  Thank you.

12          The report mentions a person by the name of Emily.

13  A.  Yes.

14  Q.  As a Costco person you spoke to that day?

15  A.  Correct.

16  Q.  Where did you get that name?

17  A.  Through conversation.

18  Q.  Do you know for sure that that was the person's name?

19  A.  Not a hundred percent, but that's what she told me.

20  Q.  And do you have a photograph of that person?

21  A.  No.

22  Q.  Did you use any undercover video on the second trip?

23  A.  No, I did not.

24  Q.  Why didn't you use undercover video?

25  A.  The investigation was already taken place the first visit

1   of the location and I was just told to go to the location the

2   second time and just purchase the ring.

3   Q.  So this salesperson was a different salesperson than Jean

4   who you had seen the first time?

5   A.  Correct.

6   Q.  Did Emily use the word "Tiffany" to describe the ring?

7   A.  Yes.

8   Q.  Did you ask for the ring as a Tiffany ring?

9   A.  Yes.

10  Q.  Did Emily ever tell you that the ring was not a Tiffany

11  ring?

12  A.  No.

13  Q.  Was the purpose of this report to investigate or simply to

14  report on your purchase?

15  A.  Just to report the purchase.

16  Q.  Could you turn to the fourth page of -- sorry, could you go

17  to the third page first?

18  A.  Okay.

19  Q.  At the top there's some bullets.  There's a statement in

20  there after the first bullet, "All right, so you're going to

21  get the smaller Tiffany ring."  Do you see that?

22  A.  Yes.

23  Q.  Is that something that Emily said to you?

24  A.  Yes.

25  Q.  So she identified the ring to you as a Tiffany ring,

1   correct?

2   A.   Correct.

3   Q.   Now, could you turn to the fourth page of the exhibit,

4   please, PTX 004, and describe those photographs, please?

5   A.   The first photograph is of the Tiffany ring observed at the

6   Costco location and the other photographs are of the Tiffany

7   ring tagged with an evidence tag after the purchase was made.

8   Q.   What is the red plastic tag?

9   A.   That is our evidence tag that describes -- it's a given

10  number that's just for that actual item.

11  Q.   So you photographed the ring back at the office with your

12  evidence tags?

13  A.   Correct.

14  Q.   When do you tag items?

15  A.   Right after the purchase.

16  Q.   What do you mean by right after?

17  A.   Right when I get back into my vehicle I tag it.

18  Q.   Looking at this ring would you please describe for me the

19  photographs?

20  A.   Yes.  The first one is the Tiffany ring inside of the

21  display case and the other photographs are when I tagged the

22  actual Tiffany ring with the evidence tag.

23  Q.   And if you turn to page 6.  I'm sorry -- page 6, PTX --

24  page 5.  Could you describe the photographs on that page?

25  A.   Yes.  Those are, the top ones are the ring still tagged and

G9KFTIF4                    Popp - direct

1    marked and the boxes and the cloth that came with the ring

2    purchased.

3    Q.  And in terms of the last page of the exhibit, page 6, can

4    you identify the photographs on that page?

5    A.  Yes.  The first two are the appraisal that came with the

6    ring purchased and the third photograph is the description card

7    that was displayed in front of the ring that was purchased.

8    Q.  Now, if you would turn in your book to Plaintiff's Exhibit

9    58.  Can you identify what Plaintiff's Exhibit 58 is?

10   A.  The appraisal that was provided with the Tiffany ring

11   purchased from Costco.

12   Q.  And that's the ring you purchased?

13   A.  Yes.

14          MR. MITCHELL:  I offer Plaintiff's Exhibit 58 in

15   evidence.

16          THE COURT:  Any objection?

17          MR. DABNEY:  No objection.

18          THE COURT:  Plaintiff's Exhibit 58 is admitted in

19   evidence and may be published.

20          (Plaintiff's Exhibit 58 received in evidence)

21   Q.  Ms. Popp, so this is a copy of the appraisal you received

22   with the ring that you purchased at the Costco store in

23   Huntington Beach, California on November 30, 2012?

24   A.  Correct.

25   Q.  Would you please turn to the last page of the exhibit,

G9KFTIF4                        Popp - cross

1   Plaintiff's Exhibit 66.  Could you please blow up the receipt?

2   Could you describe the photograph on this page?

3   A.  This was the receipt that I received when I purchased the

4   Tiffany ring at the Costco location.

5   Q.  And the price of that ring reflected is how much?

6   A.  $3,447.99.

7   Q.  That's after tax.  How about before tax?

8   A.  It was $3,199.99.

9   Q.  And this is the receipt you received, correct?

10  A.  Yes.

11  Q.  And the date on the receipt is what?

12  A.  11/30/2012.

13              MR. MITCHELL:  Nothing further.

14              THE COURT:  Mr. Dabney?

15              MR. DABNEY:  May I approach the witness?

16              THE COURT:  Yes, you may.  One for me?

17              MR. DABNEY:  Yes, your Honor.

18  CROSS-EXAMINATION

19  BY MR. DABNEY:

20  Q.  Ms. Popp, could I -- you mentioned the name Kris Buckner.

21  A.  Yes.

22  Q.  That was the owner of the company?

23  A.  Yes, the owner of Investigative Consultants.

24  Q.  And that's a man?

25  A.  Yes, it's a man.

G9KFTIF4                    Popp - cross

1    Q.  Could I direct your attention to the tab in the book in

2    front of you, Defendant's trial Exhibit 76, and I would ask you

3    if you have ever seen a copy of that e-mail before.

4    A.  Yes.

5    Q.  You have?

6    A.  Yes.

7    Q.  Do you recognize this as an e-mail that set off the

8    investigation you described here in your testimony here today?

9    A.  Correct.

10            MR. DABNEY:  Your Honor, at this point we proffer

11   Costco trial exhibit 76 in evidence.

12            THE COURT:  Any objection?

13            MR. MITCHELL:  No objection.

14            THE COURT:  Costco Exhibit 76 is admitted and may be

15   published.

16            (Defendant's Exhibit 76 received in evidence)

17   Q.  Now, Ms. Popp --

18   A.  Yes.

19   Q.  This e-mail was sent to your boss from Tiffany and Company,

20   correct?

21   A.  Correct.

22   Q.  And I believe if I could direct your attention to the

23   bottom part of it, there seems to be one part of the message

24   from Ms. Abrams.  Have you met Ms. Abrams before?  Is she the

25   lady sitting at counsel table here?

G9KFTIF4                    Popp - cross

1    A.  Yes.

2    Q.  And she says here, "I just received your report of a

3    potentially counterfeit Tiffany SDR being sold."  Do you know

4    what a Tiffany SDR is?

5    A.  I don't know the actual term of SDR, but I know what I was

6    supposed to look for when I went to Costco.

7    Q.  And it says "The sales manager of the South Coast Plaza

8    called Costco and asked for the vendor's name and the Costco

9    sales associate indicated that the vendor was Rb Brilliance."

10        Have I read that correctly?

11   A.  Yes.

12   Q.  So before you went to the Costco store you knew that the

13   Costco vendor was Rb Brilliance, is that correct?

14   A.  I don't believe so.  I don't remember.

15   Q.  You don't remember?

16   A.  No.

17   Q.  And then you were also, you said -- did you ever look at

18   who Rb Brilliance was, Ms. Popp; did you do that?

19   A.  I wasn't the one that made this phone call.

20   Q.  So the question is, did you ever look into who Rb

21   Brilliance was?

22   A.  No.

23   Q.  That was not something you were asked to investigate?

24   A.  No, that was not something I was asked to look into.

25   Q.  And you don't know what Rb Brilliance's trademarks might

1    look like?

2    A.  No.

3    Q.  Then if we could go up above, there's a reference to what

4    they want to do and they set a guideline and they say you

5    should focus on things like the hallmarking on the end of the

6    ring.  Do you see where I'm referring to?

7    A.  Yes.

8    Q.  Did Mr. Buckner tell you to focus on the hallmarking on the

9    inside of the ring?

10   A.  That was one of the things that I was looking for

11   specifically, yes.

12   Q.  Did you mention that in your report, the hallmarking on the

13   inside of the ring?

14   A.  No.  I just took photographs of it.

15   Q.  And you were specifically looking to see whether the name

16   Tiffany was on the inside of the ring, weren't you?

17   A.  Yes, I did.

18   Q.  And you knew when you went in there that Tiffany & Co.

19   branded jewelry has the name Tiffany hallmarked on the inside

20   of the ring shank, didn't you?

21   A.  Yes.

22   Q.  And when you got the ring you knew that the word Tiffany

23   was not imprinted on the inside of the ring, didn't you?

24   A.  It was ineligible (sic), so I took photographs of the

25   inside of it.  I couldn't confirm that it didn't say that.

G9KFTIF4                        Popp - cross

1   Q.  Did you put it under a loop to see?

2   A.  Did I put it under a loop?

3   Q.  Yes.

4   A.  What is a loop?

5   Q.  Never mind.  So when you -- I think I heard you refer to

6   this product many times with the word, with the phrase "Tiffany

7   ring".

8   A.  Correct.

9   Q.  But as I understand it, when you went into the store you

10  knew that the product Huntington Beach supplied by Rb

11  Brilliance, correct?

12  A.  I had no idea was R&B Brilliance, no.

13  Q.  And you knew you couldn't see the word "Tiffany" on the

14  inside of the ring, couldn't you?

15  A.  I could tell it was not clear, but I could not confirm that

16  it did not say Tiffany inside of the ring.

17  Q.  Well, the Tiffany name is quite legible on the inside of

18  Tiffany products correct?

19  A.  That's true, yes.

20  Q.  And it says, "This is something that you could see with the

21  naked eye," right?

22  A.  Right, but I also didn't know how old this Tiffany ring was

23  as well.

24  Q.  Who told you it was a Tiffany ring before you went there?

25  A.  I just read the e-mail that was provided.

G9KFTIF4                    Popp - cross

1   Q.  So you're going -- so Mr. Buckner didn't tell you it was a
2   Tiffany ring?
3   A.  I was going to determine if the ring or not was a Tiffany
4   ring so I was not sure until I got to the location whether the
5   ring or not was going to be Tiffany's.
6   Q.  So at what point in your investigation, Ms. Popp, did you
7   conclude that this was a Tiffany ring?
8   A.  I was assuming that it was a Tiffany ring.  That's what the
9   sign said on the, describing the actual item in Costco, and I
10  went there looking for Tiffany's ring, so that's what my
11  conclusion was.
12  Q.  I think you said you met Ms. Jean LaBarbera on your first
13  visit?
14  A.  Correct.
15  Q.  And you said you were taking notes with your phone?
16  A.  Yes, in the notes portion of my phone, I was typing them on
17  my phone.
18  Q.  And you chose not to type the questions that you asked
19  Ms. LaBarbera?
20  A.  No, I just wrote down the actual bullet points of the
21  specific conversation that we had.
22  Q.  But you admitted under your counsel's questioning that you
23  yourself said this was a Tiffany ring and asked for the Tiffany
24  ring?
25  A.  Yeah, I was calling it the Tiffany ring because that's what

1   it said on the display card.

2   Q.  Well, you thought it was a Tiffany ring before you even

3   went in, didn't you?

4   A.  No, I have no idea what it even looks like.

5   Q.  You weren't sent in to look for the hallmarking on the

6   inside of the ring, is that what you're saying?

7   A.  Yes, but at that time I never even looked at the Tiffany

8   ring at all.  I didn't have it on my hand.  I was referring to

9   what was on the display card so that's what I was calling it.

10  Q.  Weren't you trained to look for the blue box?

11  A.  I was not trained to look for the blue box, but I know

12  that's a significant, a significant thing that comes with a

13  Tiffany's ring is a blue box.

14  Q.  You didn't get a blue box when you went to buy the ring,

15  did you?

16  A.  I did not.

17  Q.  You didn't get any paperwork that said "Tiffany" on it, did

18  you?

19  A.  I did not.

20  Q.  And the box that you get --

21          MR. DABNEY:  Your Honor, may I approach the witness

22  with a sample box?

23          THE COURT:  Yes, you may and at this time I'll just

24  tell you we have ten minutes to a break.

25          MR. DABNEY:  All right.

G9KFTIF4                          Popp - cross

1    Q.  Ms. Popp, I'd like to hand you a box which is similar to

2    what's previously been marked as Costco Exhibit 19, and I ask

3    you whether that box looks like the box that came with the

4    diamond ring that you bought?

5    A.  Yes.

6              MR. DABNEY:  Your Honor, at this point we would offer

7    the box, Costco Exhibit 19 in evidence.

8              THE COURT:  Any objection?

9              MR. MITCHELL:  No objection.

10             THE COURT:  Costco Exhibit 19 is admitted in evidence

11   and may be published.

12             (Defendant's Exhibit 19 received in evidence)

13   Q.  And your counsel asked you about the sales receipt that

14   came with the ring.  Do you recall that?

15   A.  I'm sorry, what was the question?

16   Q.  Do you recall being asked about the sales receipt that came

17   with your ring?

18   A.  Correct.

19   Q.  And I believe the point counsel drew to your attention was

20   the date, but this contained a description of the item on the

21   top, does it not?

22   A.  Correct.

23   Q.  .70 CT solitaire.  The cash register receipt didn't say

24   Tiffany on it, did it?

25   A.  No, it did not.

1    Q.  And when you bought this ring, you weren't planning to get

2    married, were you?

3    A.  No.

4    Q.  And you don't have the actual item you purchased here in

5    the courtroom with you, do you?

6    A.  I do not.

7           MR. DABNEY:  I don't have any further questions.

8           THE COURT:  Thank you.  Anything further, Mr.

9    Mitchell?

10          MR. MITCHELL:  Just a couple of questions.

11   REDIRECT EXAMINATION

12   BY MR. MITCHELL:

13   Q.  Just so we're clear, Ms. Popp, if you were walking by the

14   display case where this ring was displayed, but you didn't ask

15   someone to take the ring out of the display case, would there

16   be any way to know what the markings were inside the ring?

17   A.  No.

18   Q.  Mr. Dabney asked you about hallmarking.  Do you know what a

19   hallmark is?

20   A.  Yes.

21   Q.  When you looked inside -- first of all, do you know what Rb

22   Brilliance is?

23   A.  No.

24   Q.  And do you have any idea whether Rb Brilliance might make

25   rings for Tiffany?

1   A.  No.

2   Q.  So walking in the store and looking into the case without

3   asking for the ring to come out, was there any way to know as

4   you looked through that this ring was not made by Tiffany?

5   A.  No.

6   Q.  And again, so we're clear, at no time did Jean ever say to

7   you when you communicated with Jean, this is not a Tiffany

8   ring, correct?  She didn't correct you, right?

9   A.  No.

10  Q.  Emily didn't correct you either?

11  A.  No.

12  Q.  Both of them referred to it as a Tiffany ring?

13  A.  Right.  Correct.

14  Q.  Your state of mind when you talked to them was that you

15  thought it was a Tiffany ring based upon what they were saying

16  to you, correct?

17  A.  Correct.

18  Q.  And then when it was taken out and you looked at it you

19  became suspicious, correct?

20  A.  Correct.

21  Q.  Because you are trained to recognize a real Tiffany ring

22  from a counterfeit Tiffany ring?

23  A.  Correct.

24  Q.  So that was the first time you were able to have suspicions

25  about the ring when you finally held it in your hand.

G9KFTIF4                    Popp - redirect

1   A.  Correct.

2   Q.  And Emily and Jean never used the words Rb Brilliance, RB,

3   or anything like that to describe the ring to you?

4   A.  No.

5           THE COURT:  Mr. Mitchell, we have five minutes until

6   the break.

7           MR. MITCHELL:  No further questions.

8           THE COURT:  Thank you.  Anything further, Mr. Dabney?

9           MR. DABNEY:  No.

10          THE COURT:  Thank you, Ms. Popp.  Your testimony is

11  concluded and you may step down.

12          (Witness excused)

13          THE COURT:  This will conclude our presentation of

14  evidence for the morning.  We will resume at 2:00, so I would

15  ask that the jurors be ready in the jury room to proceed at

16  2:00.  We thank you for your work with us this morning.

17  Remember, you must not discuss the case or anything or anyone

18  having anything to do with it among yourselves or with any

19  other person, directly, electronically or by any other means,

20  and you must leave your notes in the jury room in the envelopes

21  provided if you're leaving the jury room.  Please be back in

22  time to start at 2.  Again, thank you.  Ms. Ng, would you

23  escort the jury out.  All rise.

24          (Continued on next page)

25

G9KFTIF4                          Popp - redirect

 1                 (In open court; jury not present)

 2                 THE COURT:  So, counsel, I have a proceeding over the

 3      lunch break so I would appreciate it if you would tidy your

 4      things over to one side of the table so you leave the side

 5      directly in front of me open for other counsel and make sure

 6      that you can walk in between the chairs back there.  Thank you

 7      all and I'll see you here at 2:00.

 8                 (Luncheon recess)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G9KATIF5ps

1              A F T E R N O O N   S E S S I O N

2                        2:00 p.m.

3         (In open court; jury not present)

4         THE COURT:  The jurors haven't flipped their ready

5    light yet.  I'm hoping that will flip on soon.  But is there

6    anything we need to discuss?

7         MR. MITCHELL:  There's nothing we need to discuss for

8    this afternoon's session, but I don't know if the Court wants

9    to take up an issue after the close of business today

10   concerning Costco's service at noon today on us of a different

11   witness list, because there are issues that we have with that

12   list after the pretrial conference.  I don't know if you want

13   to deal with that now while we're just waiting for the jury, or

14   if you want to wait until the end of the day.  I have had a

15   talk with Mr. Dabney on it, and I'm not sure he disagrees with

16   me, but I think he wants a ruling.

17        THE COURT:  Is the light still not on?  Let's let Ng

18   see what it looks like in there.  She'll be opening that door.

19   Actually she's not doing that now, so let's start.

20        MR. MITCHELL:  After our final pretrial conference we

21   asked -- I'm sorry.  They are all there?

22        THE CLERK:  They just flipped it on.

23        THE COURT:  All right.  Yes.  We'll do it at the end

24   of the day.  But I wish you both to be succinct because I have

25   a number of things I need to accomplish at the end of the day.

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

G9KATIF5ps                    LaBarbera - direct

1              MR. MITCHELL:  I think it's a simple issue, your

2      Honor.

3              THE COURT:  All right.  Ms. Ng, would you bring in the

4      jury.  All rise.

5              THE CLERK:  Judge, give me one minute?

6              THE COURT:  OK.  Thank you.  You can all relax.

7              (Pause)

8              (Jury present)

9              THE COURT:  Thank you, Ms. Ng.

10             Mr. Mitchell, you may could you your next witness.

11             MR. MITCHELL:  The plaintiff calls Jean LaBarbera.

12             THE COURT:  Good afternoon, Ms. LaBarbera.  Please

13     come to the witness stand, step up, and remain standing to take

14     the oath.  Thank you.

15             THE WITNESS:  Good afternoon, your Honor.

16             THE COURT:  Good afternoon.

17      JEAN MARCEL LABARBERA,

18         called as a witness by the plaintiff,

19         having been duly sworn, testified as follows:

20             THE COURT:  Thank you.

21             You may proceed, Mr. Mitchell.

22     DIRECT EXAMINATION

23     BY MR. MITCHELL:

24     Q.  Good afternoon, Ms. LaBarbera.

25             In November 2012, were you employed by Costco at its

1    Huntington Beach, California store?

2    A.  Yes.

3    Q.  And you worked in what Costco calls the majors department

4    at that time, correct?

5    A.  That's correct.

6    Q.  Would you tell the jury what the majors department consists

7    of?

8    A.  The majors department consists of the electronics

9    department, which would be your cameras, TVs, printers,

10   jewelry, cameras, watches.

11   Q.  So was jewelry included within the majors department?

12   A.  No.

13   Q.  So among the different departments that you had

14   responsibility for, jewelry was included, right?

15   A.  Yes, sir.

16   Q.  But you were not a jewelry specialist in any way, right?

17   A.  No, not at all.

18   Q.  Now, can we pull up, please, Plaintiff's Exhibit 25,

19   Mr. Cole, and if we could, first of all, Ms. LaBarbera, is this

20   a ring that was offered for sale in the Huntington Beach Costco

21   on November 27, 2012?

22   A.  I can only assume that it's the ring.  It is in the type of

23   setting that the box displayed that would have been used in our

24   jewelry case, but by just looking at your photo I can't

25   establish that that was and is a ring that would have been in

G9KATIF5ps                    LaBarbera - direct

1   the case, sir.

2   Q.  You don't remember anything specific about November 27,

3   2012 as you're sitting here today, right?

4   A.  No, sir.

5   Q.  That was one of many days that you worked at Costco helping

6   people in the majors department, right?

7   A.  That's correct.

8   Q.  So nothing -- you had no idea, obviously, in November of

9   2012, that you would ever be sitting in this courtroom, close

10  to four years later, testifying --

11  A.  No.

12  Q.  -- about a ring in a case, right?

13  A.  No, not at all.

14  Q.  And there were hundreds if not thousands of products that

15  you were assisting to sell on the Costco floor in the majors

16  department on November 27, 2012, right?

17  A.  Yes.  And that's assuming I was working on that day as

18  well.  We don't have my employment log or anything.

19  Q.  You don't remember going to work that day, right?

20  A.  It's been a while since then.

21  Q.  You don't remember anybody you saw that day, right?

22  A.  No, I don't.

23  Q.  And you don't remember anything you actually said that day,

24  do you?

25  A.  No, I don't.

G9KATIF5ps                    LaBarbera - direct

1    Q.  Now, looking at this photograph -- Mr. Cole, can you please
2    blow up the sign.
3          First of all, do you recognize that as a Costco
4    jewelry sign?
5    A.  Yes.  That would be a typical signage.
6    Q.  Would you tell the jury -- there's a date on the bottom
7    left-hand corner of that sign.  Do you see that date right
8    there in?
9    A.  Yes.
10   Q.  First of all would you read the date to the jury, please.
11   A.  It says July 24, 2012.
12   Q.  So what does that date mean?
13   A.  That is the date that the ring, that particular piece of
14   jewelry, came into inventory and to the Costco warehouse.
15   Q.  So that ring, that is depicted in that photograph, was
16   received by Costco in its warehouse on July 24, 2012, correct?
17   A.  Yes.
18   Q.  And that's a calendar date, right?
19   A.  Yes.
20   Q.  And if that ring was still on the floor on November 27,
21   2012, that would mean that ring was in the Costco store, in
22   Huntington Beach, California, from July 24 to the end of
23   November 2012, right?
24   A.  Yes.
25   Q.  And isn't it true that when you received the ring at the

G9KATIF5ps                    LaBarbera - direct

1    Costco store in Huntington Beach, you would print out a sign

2    for that ring?

3    A.   That's correct.

4    Q.   And the purpose of printing out a sign for that ring was so

5    that ring could then be displayed on the sales floor, correct?

6    A.   Yes.

7    Q.   Now, do you remember specifically taking the ring --

8    Mr. Cole, can you just back that picture up.

9         See that ring.  Do you remember specifically taking

10   that ring out of the jewelry case at the Costco Huntington

11   Beach store on November 27, 2012?

12   A.   I don't recall.

13        MR. MITCHELL:  Your Honor, may I approach the witness

14   to hand her a binder?

15        THE COURT:  Yes, you may.

16        MR. MITCHELL:  Thank you, your Honor.

17   Q.   Ms. LaBarbera, I would like you -- in that book I just

18   handed you is Exhibit 65, Plaintiff's Exhibit 65.  Could you

19   turn to that, please.

20   A.   OK.

21   Q.   And in particular would you turn to the third page of that

22   exhibit, stamped PTX 65.003.  Are you there?

23   A.   Yes, sir.

24   Q.   There is a photograph on that page.  Is that you?

25   A.   That's me.

G9KATIF5ps                        LaBarbera - direct

1    Q.  So you are the person that's photographed in this picture

2    in this investigative report, correct?

3    A.  Yes.

4    Q.  Now, the investigator, Ms. Popp, just testified that you

5    used the word "Tiffany" to describe the ring in the picture I

6    just showed you in Exhibit 25 to her when that ring was

7    displayed.  First of all, do you remember what words you used

8    that day at all?

9    A.  I don't recall.

10   Q.  OK.  So you can't sit here in the witness stand today and

11   tell the jury that Ms. Popp is wrong, that you did not use the

12   word "Tiffany," correct?

13   A.  Is this her testimony that I'm reading, or -- because I

14   can't testify to what I -- didn't hear what she said earlier.

15   Q.  I understand.  She said that you used the word "Tiffany" to

16   describe the ring when she was talking to you about the ring.

17   A.  OK.

18   Q.  Do you deny that you did that?

19   A.  No, I won't deny that I said that.

20   Q.  OK.  And she also said that she used the word "Tiffany" in

21   discussing the ring with you and you did not tell her that the

22   ring was not made by Tiffany.  Do you deny that?

23   A.  No.

24   Q.  OK.  Isn't it true that it was your practice when you

25   worked on the floor at Costco to refer to rings, when you

G9KATIF5ps                    LaBarbera - cross

1    referred to them, by the words that were used in the signs?

2    Isn't that true?

3    A.  Yes.

4              MR. MITCHELL:  Thank you.  I have nothing further.

5              THE COURT:  Mr. Dabney.

6              MR. DABNEY:  Ms. Ng, may I have the Elmo, please.

7              THE CLERK:  Sure.

8    CROSS EXAMINATION

9    BY MR. DABNEY:

10   Q.  Ms. LaBarbera, could you just briefly describe your work

11   experience before you came to work in Costco, your education

12   and work experience.

13   A.  I attended college and I studied business administration

14   for a couple of years.  I worked in my parents' business, so it

15   gave me some practical experience.  They had a retail hotel

16   business, wholesale restaurant equipment and smallwares.  I

17   then left there and went to work for the Los Angeles Police

18   Department as a police officer for five years.  After that time

19   I was a stay-at-home mom and raised some children.

20              And then, after 2010, when the economy kind of had a

21   downturn, then I went to work for Costco, at which time I

22   entered, just as everyone else, as what they call an assistant.

23   So I'm the person who bags your groceries, takes it out of your

24   cart, set it is on the belt.  And I then was promoted to

25   cashier, and I worked primarily MPU, pick up, and jewelry

G9KATIF5ps                    LaBarbera - cross

1    department for Costco.

2    Q.  And at what point did you start working in majors?

3    A.  When the Huntington Beach store was going to be a brand-new

4    location, I was asked by my store assistant manager to come

5    over to the new location and work MPU and jewelry.  I did

6    not -- I didn't participate a great deal in selling the TVs and

7    electronics, laptops, etc.  I primarily focused on jewelry.

8    Q.  And when you say "MPU," what do you mean by it?

9    A.  Oh, I'm sorry.  Merchandise pickup.  That's where the

10   jewelry and high-end items are actually kept.  That's where the

11   inventory is.

12   Q.  So between then and -- about what months and months months

13   were you actually manning the jewelry counter in the Costco

14   warehouse store?

15   A.  I went to work in Huntington Beach in April of 2012, which,

16   we opened the doors in May, and then I worked there, in

17   jewelry, for at least the minimum of a year before working any

18   other department.

19   Q.  So between July 2012 and December 2012, about how many

20   hours would you say you were out on the floor manning the

21   jewelry counter in the Costco Huntington warehouse store?

22   A.  Well, I was a full-time employee, so I was working 40 hours

23   a week, and half of my workweek would have been on the floor,

24   and the other half would have been in the merchandise pickup

25   actual -- we call it the cage or the room.

129
G9KATIF5ps                    LaBarbera - cross

1   Q.  Now, I would like to put up on the Elmo this photograph

2   that counsel showed you before, which was an item 639911 that

3   had a date on it of July of 2012.  Do you recall seeing signs

4   like that in the Costco jewelry case while you were working in

5   the store?

6   A.  Yes.

7   Q.  And could you walk us through, Ms. LaBarbera, what you

8   understood at the time the words meant in the sign.

9   A.  The first word is the metal that the ring is made of.  So

10  in this case it's platinum.

11  Q.  I'm going to stop you right there.  You know it's platinum,

12  but the word "metal" isn't there.

13  A.  That's correct.

14  Q.  So what's the second, what did the second -- just run

15  through if you could.

16  A.  So "Tiffany" represents the set, setting.  It's a simple

17  band with a six-prong setting.  That's the word "Tiffany."

18  Q.  And how did you -- when did you first learn what the word

19  "Tiffany" meant?

20  A.  Just in the course of my life it's a word that I learned.

21  It's not that -- I can't actually tell you, did I learn this on

22  a specific date.  This is just something I understood.

23  Q.  Could you walk us through the other words on the sign.

24  A.  OK.  So it says ".70 carat."  That's the physical size of

25  the stone.  And I believe it says, kind of fuzzy from my area,

G9KATIF5ps                    LaBarbera - cross

1   I'm sorry, it says "VS2" -- I think it says "5."  Anyway, that

2   is the cut and clarity.  "Round" being the shape of the stone.

3   And then "diamond ring."  So "diamond" also, again identifying

4   that it's actually a diamond and not like a cubic zirconia or

5   an emerald or gemstone, something like that.

6   Q.  Now, in your work at the Costco warehouse store, do you

7   recall the subject of whether this word meant the setting style

8   or the -- something else coming up?

9   A.  Only on one occasion.

10  Q.  Can you describe that.

11  A.  I had a gentleman and his wife, I don't know it's his wife,

12  a man and a lady came in, and they inquired if that was -- what

13  their question to me was, they specifically pointed to the

14  specific ring and asked me if they were getting a blue box.

15  And I said to them, no, we offer, comes in a brown kind of

16  walnut-color box, which is the typical ring pop-up, you know,

17  like any ring box would be, and then it comes in an outer

18  carrier box, which is kind of vanilla colored.  And he became

19  very angry at me.  And he said, but I want the blue box.  And I

20  was clueless.  I just didn't understand why he was becoming so

21  angry at me.

22          At that point, I finally figured out, he thinks it's a

23  Tiffany's & Co. ring.  And I said, no, no, no.  I said, I'm

24  sorry, this is just the setting.  And he just about leaped over

25  the counter at me and he was just screaming, and he said, I'm

G9KATIF5ps                    LaBarbera - cross

1    suing you, and -- for false advertisement.  And I just said, I

2    just work here, if you're going to sue somebody, you might try

3    Costco, because I'm just a worker bee.  And he said, this is

4    false advertisement and I am so angry at you, and I'm, I'm,

5    I'm -- this isn't the last of it.  And off he kind of pulled

6    his wife.  She said nothing at all to me.  And they left.

7    Q.  So, Ms. LaBarbera, at any time while you were working the

8    jewelry counter at Costco, did you ever think that the diamond

9    rings you were selling there were diamond rings made by

10   Tiffany?

11   A.  Never.

12   Q.  You understood -- did the question of what a Tiffany

13   setting was come up from time to time?

14   A.  No.  I just let my manager know that I had encountered this

15   angry man, and that was it.

16   Q.  Now, Ms. LaBarbera, this morning we heard testimony, you

17   heard a little bit about from a person by the name of Brittni

18   Popp, and the question of what is a loupe came up.  When you

19   worked at Costco, did you have something you understood to be a

20   loupe?

21   A.  Yes.  That's a jeweler's magnifying glass so that you can

22   actually look inside the diamond, or you could do it for any

23   kind of a stone, and its settings to look very closely at it.

24        MR. DABNEY:  With the Court's permission, could I

25   approach the witness with a loupe?

G9KATIF5ps                    LaBarbera - cross

1          THE COURT:  Yes, you may.

2          MR. DABNEY:  May the record show I'm approaching the

3    witness with an object in a leather case.  I would ask the

4    witness to tell us what it is.

5    A.  OK.  This is very similar to -- obviously this isn't the

6    one that we used in Huntington Beach, but it's very common.

7    It's just a jeweler's loupe.  It's a very high intense little

8    magnifying glass.  You can just look through.  And alls you're

9    going to see is any imperfections, or you can see that the

10   setting is solid.  A jeweler might use it for a number of

11   things.

12         THE COURT:  Is there --

13         THE WITNESS:  But --

14         THE COURT:  I'm so sorry.  You may finish your answer.

15         THE WITNESS:  I'm sorry.

16   A.  So this is what we had.  And we kept this in what we call

17   the merchandise pickup cage for our customers to use.

18         THE COURT:  Is there a designation for identification

19   of that?

20         MR. DABNEY:  Yes.  I would like to have this marked as

21   Defendant's Trial Exhibit 811 for identification.

22         THE COURT:  811.

23         MR. DABNEY:  The sticker backer is very, very

24   effective.

25         Your Honor, at this point Costco's would offer

1   Defendant's Trial Exhibit 811 in evidence.

2              THE COURT:  Any objection?

3              MR. MITCHELL:  No objection.

4              THE COURT:  Defendant's Exhibit 811 is admitted.

5              (Defendant's Exhibit 811 received in evidence)

6              MR. DABNEY:  So I'm just going to open this up and put

7   it.

8              Can I have the Elmo, Ms. Ng?

9              THE CLERK:  It's on.

10             MR. DABNEY:  Oh, it is?  Oh, sorry.

11  Q.  So, Ms. LaBarbera, is this a tool that you had in the

12  Huntington Beach store that you could use to look very closely

13  at a diamond ring?

14  A.  Yes.

15  Q.  And this is known as a jeweler's loupe?

16  A.  Yes.

17  Q.  Now, Ms. Popp showed us some photographs she said she look,

18  which I'm going to put up here on the Elmo again, where she's

19  holding a diamond ring in her finger, and she was asked

20  questions about whether she could read the hallmarking or

21  vendor stamping inside of the ring.  Do you recall anybody ever

22  asking you if they could use your loupe to look at it?

23  A.  I have had members ask to look at the jeweler's loupe to

24  carefully look at the diamond.  It's not very often.  Jewelry

25  tends to be kind of an emotional purchase and people look at

1    it, they either like the ring or they don't.  But you will get

2    somebody who's just -- kind of has that desire to use the

3    loupe.  In that case I would direct them, if I was on the sales

4    floor, I would direct hem to merchandise pickup because we

5    don't keep it at the jewelry counter, display counter.  We

6    would, if that was the one and only of that setting, we would

7    take the ring to merchandise pickup for the member to look at.

8    Q.  So if someone is standing in front of you, because, as I

9    understand the testimony, these photographs were taken while

10   Ms. Popp was standing in front of the jewelry counter, and

11   someone said, I can't read what's inside that, would you have

12   an answer for that question?

13   A.  Probably I wouldn't have -- if they couldn't read it, I

14   probably couldn't read it either.  So then I would offer, let's

15   take the ring over to merchandise pickup, we'll use the

16   jeweler's loupe, and you can take a look at it there.

17   Q.  Do you ever recall, by the way, a woman in their 30s

18   engaging in conversation and taking notes on a smartphone,

19   recording a conversation with you?

20   A.  No, not at all.

21           MR. DABNEY:  I have no further questions, your Honor.

22           THE COURT:  Thank you, Mr. Dabney.

23           Mr. Mitchell.

24   REDIRECT EXAMINATION

25   BY MR. MITCHELL:

G9KATIF5ps                    LaBarbera - redirect

1  Q.  So, Ms. LaBarbera, in order to read the inside of what the

2  ring said, you needed this loupe, right?

3  A.  It's possible.

4  Q.  So the writing was so small that without this intense

5  magni -- you said "intense magnifier" or something like that,

6  used words like that.  How did you describe this?  I don't want

7  to put words in your mouth.

8  A.  High-power magnification.  I believe that's a 10-times

9  loupe.  So --

10  Q.  So you needed a 10-times loupe to read what it said inside

11  the ring, right?

12  A.  Not necessarily so.  I said to you that the -- I pro -- I

13  probably could not have read what was inside it possibly

14  without putting on my eyeglasses.

15  Q.  And most Costco customers didn't bother with the loupe.

16  A.  Maybe 10 percent requested the loupe.

17  Q.  You testified about -- I think you told me in response to

18  my question that half the time you spent working on the sales

19  floor and half the time working in the cage, right?

20  A.  Yes.

21  Q.  The cage is a place you work after the customer has already

22  paid for the item, correct?

23  A.  Yes.  But a member is welcome to come up to the cage and

24  inspect it before purchase as well.

25  Q.  OK.  But with rings, you would have rings in the jewelry

1    case that you would take out and show the customer at the

2    jewelry counter, and then it would go to the cage.  After the

3    customer paid, they would then pick it up at the jewelry

4    counter.  Right?

5    A.  Yes.  However, if somebody wanted to take the opportunity

6    to look at an appraisal, they could do that prior to

7    purchasing, or --

8    Q.  I just want to focus on the ring part.

9    A.  OK.

10   Q.  OK?  I assume anybody can ask to do anything, but just

11   focus on the ring.  The ring is in the jewelry, the glass

12   jewelry case, right?

13   A.  Yes.

14   Q.  The customer is interested in the ring.  Somebody unlocks

15   the case, takes the ring out, and shows it to the customer,

16   right?

17   A.  Yes.

18   Q.  So if that customer is interested to purchase the ring --

19   now they've looked at the ring.  And they decide they're going

20   to make that purchase.  They don't take the ring with them to

21   the checkout counter, right?

22   A.  No, sir.

23   Q.  "No, sir" meaning they don't, right?

24   A.  No, they don't.

25   Q.  Right.  So what they do is, they get a slip of paper and

G9KATIF5ps                    LaBarbera - redirect

1  pay for the ring, and then collect the ring at the pickup

2  counter, right?

3  A.  Yes.

4  Q.  And that's the first time that the customer would get the

5  box, right?

6  A.  Yes.

7  Q.  OK.  Now, this customer you talk about who went crazy when

8  he didn't get the blue box, you said he jumped over the

9  counter, or practically jumped over the counter.  What counter

10  were you talking about?

11  A.  The jewelry display case.

12  Q.  OK.  So the customer thought, when the customer looked in

13  the jewelry display case, that this was a Tiffany ring and

14  expected to get a Tiffany blue box, correct?

15  A.  That was his mindset.

16  Q.  And his mindset was based upon what he saw in the jewelry

17  case, right?

18  A.  Yes.  And that's why he asked me, do I get a blue box.

19  Q.  Right.  And when he found out that you don't get a blue

20  box, he got angry.

21  A.  That's correct.

22  Q.  And he thought that Costco was misrepresenting what it was

23  it was selling in the jewelry case, right?

24          MR. DABNEY:  Your Honor, at some point the questions

25  about state of mind of a customer are --

138

1           THE COURT:  Speaking objections are not invited.  And

2    so if you have an objection, you say "objection," you ask to

3    consult.  And if there's a problem, then we have a sidebar.

4           That objection is sustained.

5    Q.  Now, Mr. Dabney asked you about the word -- could we put

6    this on, Mr. Cole, could we put Exhibit 25 up, just the sign.

7           Mr. Dabney asked you about Tiffany, right there,

8    right?

9    A.  Yes, sir.

10   Q.  The customer who was upset, was that also on the sign like

11   that?

12   A.  I assume this is probably the initial contact sign, due to

13   the date, yes.

14   Q.  Now, you said what was in your head was that this described

15   a style of setting, correct?

16   A.  Yes.

17   Q.  But you didn't necessarily explain that to any customer

18   when they asked about the ring, did you?

19   A.  I felt it was an implied -- if I knew it was a Tiffany

20   setting, I assumed they knew it was a Tiffany setting.

21   Q.  So you said nothing about what your state of mind was about

22   what the style -- or that this was a word describing a setting.

23   You just described it as a Tiffany, right?

24   A.  But to the angry customer, I definitely told him it was the

25   setting we were referencing.

G9KATIF5ps                    LaBarbera - redirect

1    Q.  And that's the only time you remember somebody raising the

2    issue with you, right?

3    A.  Yes, sir.

4    Q.  But it was your practice, wasn't it, not to expound on what

5    the sign said, right?

6    A.  No, sir.

7    Q.  "No, sir" meaning it was your practice; you would not

8    expound, right?

9    A.  No.

10   Q.  "No" is a little confusing in the --

11   A.  No -- I'm sorry.  No, I did not make any other description

12   to a piece of jewelry other than what the sign stated.

13   Q.  I assume it's fair to say that no one gave you any training

14   at Costco in trademarks before you went on the floor, correct?

15   A.  No.  I was -- the only training I received was from my

16   co-worker, who had ten years of jewelry experience working for

17   Costco.

18   Q.  And no one gave you any training on whether or not to be

19   careful how you described a ring like the one shown in

20   Plaintiff's Exhibit 25, so that customers would not be confused

21   that this was not a Tiffany ring, correct?

22   A.  That's correct.

23          MR. MITCHELL:  I have nothing further.  Thank you.

24          THE COURT:  Anything further, Mr. Dabney?

25          MR. DABNEY:  Yes.

G9KATIF5ps                         LaBarbera - recross

1    RECROSS EXAMINATION

2    BY MR. DABNEY:

3    Q.  Ms. LaBarbera, you mentioned that --

4              THE COURT:  I take that as a yes?

5              MR. DABNEY:  Yes.  Yes.

6              THE COURT:  You may proceed.

7    BY MR. DABNEY:

8    Q.  Ms. LaBarbera, you were asked about the packaging in which

9    the rings were displayed?

10   A.  Yes.

11   Q.  Can I show you what has been received in evidence as Costco

12   Exhibit 19 and ask you if this is similar to the packaging in

13   which the rings were displayed.

14   A.  This would be the standard packaging, so the interior box

15   is a walnut-style ring box, and we just, the ring would come in

16   here.  But once it went to the display cabinet, it was placed

17   in, actually, a display holder.  So when the ring was brought

18   back to purchase, we would place it in the assigned box that

19   had the matching item number, put it in there, obviously allow

20   the member to see it once they had paid for it -- they're

21   picking it up -- place it in the outer carry box, and then give

22   it to the customer with their receipt.

23             MR. DABNEY:  Your Honor, may I hand this to the jury

24   so they can inspect it?

25             THE COURT:  Yes, you may.

G9KATIF5ps                    LaBarbera - recross

1              MR. DABNEY:  Thank you.

2              THE COURT:  You can pass it among yourselves and when

3     you're done pass it forward on the front barrier.  Thank you.

4     Q.  Ms. LaBarbera, I would like to show you, you were asked

5     some questions about -- never mind.

6              MR. DABNEY:  I have nothing further, your Honor.

7              THE COURT:  Thank you.

8              Anything, Mr. Mitchell?

9              MR. MITCHELL:  No, your Honor.

10             THE COURT:  Thank you, Ms. LaBarbera.  Your testimony

11    is concluded and you may step down.

12             THE WITNESS:  May I just give this back to the

13    attorney?

14             THE COURT:  Yes: you can just hand that over on your

15    way out.  Thank you so much.

16             THE WITNESS:  You're welcome.

17             (Witness excused)

18             THE COURT:  Mr. Mitchell, you may call the next

19    witness.

20             MR. MITCHELL:  Plaintiff calls Ewa Abrams.

21             THE COURT:  Good afternoon, Ms. Abrams.  Please step

22    up and remain standing for the oath.

23     EWA ABRAMS,

24         called as a witness by the plaintiff,

25         having been duly sworn, testified as follows:

1           THE COURT:  You may proceed, Mr. Mitchell.

2           MR. MITCHELL:  Thank you, your Honor.

3   DIRECT EXAMINATION

4   BY MR. MITCHELL:

5   Q.  Good afternoon, Ms. Abrams.  Could you please tell the jury

6   your educational background.

7   A.  I attended Bucknell University, where I received a

8   bachelor's majoring in political science and English.  And then

9   I proceeded to law school, Brooklyn Law School, where I

10  received my JD.

11          THE COURT:  Ms. Abrams, would you just speak a little

12  closer to the microphone.

13          THE WITNESS:  Sure.

14          THE COURT:  Thank you.

15  Q.  When did you graduate from law school?

16  A.  2003.

17  Q.  Before that where did you attend college?

18  A.  Bucknell University.

19  Q.  Your background, your degree, and what nature of was that?

20  A.  Poli sci and English.

21  Q.  You're currently employed by Tiffany & Co., correct?

22  A.  Yes.

23  Q.  When did you join Tiffany?

24  A.  In 2001.

25  Q.  Could you please tell the jury your work experience and

1   progression at Tiffany over the years you've been there.

2   A.  Sure.  So I started at Tiffany in 2001, when I was actually

3   an intern -- when I was actually in law school.  So I started

4   out as an intern and worked my entire time during law school at

5   Tiffany.  And towards the end of my law school I became a

6   full-time trademark paralegal at Tiffany & Co.  And once I

7   graduated and was admitted I became an attorney there, and my

8   title there was director attorney.  And over the years I've had

9   several promotions, first to group director, also an attorney

10  in the legal department, and then later on to include my

11  current title, associate general counsel, and then later on

12  promoted to vice president, associate general counsel, and

13  chief privacy officer.

14  Q.  Chief privacy officer.

15  A.  Correct.

16  Q.  What does your job entail, on a day-to-day basis?

17  A.  We have a small legal department, so I handle a variety of

18  different matters, in compliance, commercial transactions and

19  contracts, and also including intellectual property related to

20  trademarks, copyrights, and patents.

21  Q.  Can you please tell the jury what your responsibilities are

22  with respect to Tiffany trademark registrations.

23  A.  So I oversee the maintenance of Tiffany's trademark

24  portfolio.

25          MR. MITCHELL:  Your Honor, may I approach the witness

G9KATIF5ps                        Abrams - direct

1    with an exhibit book?

2              THE COURT:  Yes, you may.

3              MR. MITCHELL:  Thank you, your Honor.

4    Q.  Ms. Abrams, can you please turn to what's been marked as

5    Plaintiff's Exhibit 5 for identification.

6    A.  Yes.

7    Q.  PTX 5.  What is PTX 5?

8    A.  It's a U.S. trademark registration certificate for the

9    trademark Tiffany in connection with jewelry.

10             MR. MITCHELL:  Your Honor, I offer Plaintiff's

11   Exhibit 5 for identification into evidence.

12             THE COURT:  Any objection?

13             MR. DABNEY:  Just the preceding, the previously made

14   objection.

15             THE COURT:  That was already discussed.

16             MR. DABNEY:  Yes.  That was already discussed.

17             THE COURT:  The objection is overruled and the exhibit

18   is admitted.

19             (Plaintiff's Exhibit 5 received in evidence)

20             (Continued on next page)

21

22

23

24

25

G9KFTIF6                        Abrams - direct

1    Q.  Ms. Abrams, is this the registration certificate that is

2    filed with the U.S. Patent and Trademark Office to protect the

3    trademark Tiffany in the class that covers jewelry?

4    A.  Yes, it is.

5    Q.  And could you tell the jury, first of all, is this a

6    publicly filed document?

7    A.  It is.  Anyone looking to search for a U.S. registered

8    trademark can go to the U.S. Patent and Trademark Office

9    website, USPTO.gov and search for free.

10   Q.  It's a very simple process?

11   A.  Yes.

12   Q.  You open up the web page, search for Tiffany and see that

13   registration pop up?

14   A.  Yes.  You can search for any trademark.

15   Q.  And that registration has been on file with the U.S. Patent

16   and Trademark Office for how long?

17   A.  Since 1860 -- it's been registered as of February 22, 1983.

18   Q.  And that was a registration that was a renewal of a prior

19   registration, is that correct?

20   A.  Right.

21   Q.  What's the date of first use of the Tiffany trademark

22   that's reflected in this registration certificate?

23   A.  1868.

24   Q.  So anyone who pulls this registration certificate up on the

25   U.S. Patent and Trademark Office website would be able to find

G9KFTIF6                        Abrams - direct

1   the date of first use claim by Tiffany to its trademark,

2   correct?

3   A.   Correct.

4   Q.   And is this the registration that is involved in this case?

5   A.   Yes.  This is the trademark that this Court has found

6   Costco to have counterfeited.

7   Q.   Ms. Abrams, can you tell the jury what your first

8   involvement with this case was?

9   A.   So in November of 2012 I received a forwarded e-mail from a

10  member of Tiffany's risk management department containing an

11  e-mail sent by a customer to one of our southern California

12  stores.

13  Q.   And did you read that when it was sent to you?

14  A.   I did.

15  Q.   And did you form a state of mind when you read that?

16  A.   I did.

17  Q.   What is the state of mind that it formed for you?

18  A.   The e-mail conveyed that the customer was shocked to see

19  the Tiffany name being used in the jewelry cases at Costco, so

20  of course dealing in my area of responsibility in trademarks it

21  was something that I was immediately attuned to.

22  Q.   If you would, please, please take a look at PTX27.  I

23  believe Mr. Dabney has already marked the first page of that.

24  If you look at Plaintiff's Exhibit 27, is that the entirety of

25  the e-mail string that you received that was previously marked

G9KFTIF6                          Abrams - direct

1   by Mr. Dabney Defendant's 76.  Mr. Dabney marked the first page

2   as Defendant's 76.  Is this the entirety of that e-mail?

3   A.  It is, yes.

4              MR. MITCHELL:  Your Honor, I need to approach on one

5   issue that which has to do with a confidentiality issue.

6              THE COURT:  You're asking for a sidebar?

7              MR. MITCHELL:  A sidebar just for one moment.

8              THE COURT:  Yes.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

148
G9KFTIF6                          Abrams - direct

1            (At the side bar)

2            MR. MITCHELL:  It turns out that the document that we

3    sealed, the specifications were attached to this e-mail so we

4    would have requested it be sealed, so we inadvertently -- you

5    already granted the sealing.  What we've done for this document

6    display, because it's not relevant to this, is redacted it.

7    What we will do is file the exhibit under seal pursuant to the

8    prior order so that it's protected.  What happened is I sent

9    these specifications to the investigator, so it was attached to

10   the e-mail and it's part of the string but it's not relevant

11   for the questioning that I have.

12           THE COURT:  So to be clear, what you're asking is that

13   we treat -- do we have Bates numbers on these pages?

14           MR. MITCHELL:  We do.  Could I look in the book --

15           MR. DABNEY:  The history --

16           MR. MITCHELL:  Let me just -- here's the order.  It's

17   PTX2 through -- PTX56, 2 through 16.

18           MS. COHEN:  I think it goes to 17, I believe.

19           THE COURT:  So the request is those pages which are

20   part of the document that you are offering as PTX --

21           MR. MITCHELL:  56.

22           THE COURT:  56, be deemed sealed in accordance with my

23   September 14th order.

24           MR. MITCHELL:  Correct.  We don't need it to be --

25   we'll treat it the same way, the jury will see it, I just want

149
G9KFTIF6                          Abrams - direct

1    it for public display here to be redacted from the screen.

2              THE COURT:  And treated the same way.

3              MR. MITCHELL:  And treated the same way.

4              THE COURT:  Fine.

5              MR. MITCHELL:  Thank you, your Honor.

6              MR. DABNEY:  There's no limit on using this at the

7    trial, is there, displaying it?

8              THE COURT:  What I had said in this order is that

9    anything that is being treated as under seal and not displayed

10   to the public can't go up on the screens because they have no

11   way of displaying only for the jury.  That I explained in the

12   endorsement that that request was technologically unfeasible.

13   So I believe that order or the other endorsement directed that

14   anything that falls within that category needed to be used,

15   published to the jury in hard copy.  I know that I said that

16   very specifically in something that I wrote out.

17             MR. DABNEY:  Okay.  Well, I --

18             MR. MITCHELL:  And we have hard copy.

19             THE COURT:  All right, so Mr. Mitchell can help you

20   out with that.

21             MR. MITCHELL:  That it be filed under seal at the

22   conclusion of the case, the jury can have unrestricted access

23   to it.

24             THE COURT:  To be clear, I do not file parties

25   exhibits with the Court, so keep your own exhibits, but to the

150

G9KFTIF6                         Abrams - direct

1    extent the public has to have anything before it, there's an

2    order that says filed under seal.  If you want to file it under

3    seal, you file it under seal.

4                 MR. MITCHELL:  Thank you.

5                 (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           (In open court; jury present)

2           THE COURT:  So we're dealing here with a proffer of

3    Exhibit 27?  Did you offer it in evidence yet or no?

4           MR. MITCHELL:  Just one question.

5    Q.  Ms. Abrams, is Plaintiff's Exhibit 27 the e-mail string you

6    received that notified you about the discovery of a ring marked

7    Tiffany in a display case in the Costco Huntington Beach,

8    California store?

9    A.  Yes, it is.

10          MR. MITCHELL:  I offer Plaintiff's Exhibit 27.

11          THE COURT:  Any objection?

12          MR. DABNEY:  No objection.

13          THE COURT:  Plaintiff's Exhibit 27 is admitted in

14   evidence and may be published.

15          (Plaintiff's Exhibit 27 received in evidence)

16   Q.  If you would, please turn to the page stamped PTX27 0022.

17   What is that?

18   A.  This is a picture of Costco's ring with the signage

19   indicating platinum Tiffany identifying the ring.

20   Q.  And how did you come to receive that photograph?

21   A.  This picture accompanied the e-mail string and Huntington

22   Beach part of the e-mail string and part of the e-mail that the

23   customer had sent to Tiffany.

24   Q.  Now, if you would turn to the page Bates stamped PTX27 003.

25          THE COURT:  Our break is scheduled for 3:00, so if you

G9KFTIF6                          Abrams - direct

 1    could find someplace within the next ten minutes to pause.

 2                MR. MITCHELL:  Thank you.

 3    Q.  Ms. Abrams, I'm referring to that e-mail at the bottom of

 4    the page.  Can you please identify what that e-mail, carries

 5    over to the next page, PTX27 004?

 6    A.  This is the e-mail from the customer, Sheila Sijtsema --

 7    sorry, can't pronounce it -- where she had written to a sales

 8    professional in our California store where she indicated she

 9    was shocked to see the Tiffany name in Costco cases in

10    connection with its engagement rings.

11    Q.  And did you receive that e-mail?

12    A.  I did.

13    Q.  And what did you do with this e-mail after you received it?

14    A.  So I forwarded it along to our internal security group

15    instructing an investigation so we could better understand what

16    this is about.

17    Q.  And is that reflected in the balance of e-mails in this

18    string?

19    A.  Yes, in my November 26 e-mail.

20    Q.  Now, Ms. Abrams, is it part of your job responsibility to

21    also assist outside counsel in the prosecution or defense of

22    lawsuits either brought by Tiffany or brought against it?

23    A.  Yes.

24    Q.  And as counsel at Tiffany, do you have access to Tiffany

25    sales records for any item you might need in connection with a

G9KFTIF6                          Abrams - direct

1    particular case?

2    A.  I personally cannot access them, but I can recall them from

3    colleagues.

4    Q.  Now, did there come a time where you accessed Tiffany sales

5    records for diamond engagement rings sold by Tiffany for the

6    same six-year period that is the period that's involved in this

7    case?

8    A.  Yes, in connection with this case.

9    Q.  Could you tell the jury what you did to gather that

10   information?

11   A.  Reached out to the retail and merchandising groups and

12   asked if they could produce for us reports of actual sales data

13   associated with Tiffany setting engagement rings.

14   Q.  Ms. Abrams if you could turn to document marked PTX82 in

15   your book.  Could you identify for the jury what that document

16   is?

17   A.  This document is such a sales report of Tiffany sales in

18   connection with the Tiffany setting engagement rings for rings

19   that are between the sizes .69 through .79 carats through the

20   period July 2007 to July 2013, year to date.

21   Q.  Does this document show the actual sales price for rings of

22   that size sold by Tiffany during that time period?

23   A.  It does.

24            MR. MITCHELL:  Your Honor, I offer PTX 82 as

25   Plaintiff's Exhibit 82.  It's subject to the Court's sealing

G9KFTIF6                          Abrams - direct

1    order, but I would offer it in evidence.

2             THE COURT:  Any objection?

3             MR. DABNEY:  No objection.

4             THE COURT:  Plaintiff's Exhibit 82 is admitted in

5    evidence and may be published in accordance with my recently

6    filed order.

7             (Plaintiff's Exhibit 82 received in evidence)

8             MR. MITCHELL:  Your Honor, without violating the

9    confidentiality I'm going to refer to certain lines in the

10   document without violating the order show them on the screen,

11   but in accordance with your order I'm going to show them the

12   physical document.

13            THE COURT:  Yes.

14   Q.  Now, Ms. Abrams, I just want to point you to five different

15   lines in this document, if I can.  The first, page 4, line 117.

16   A.  Yes.

17            THE COURT:  And so you intend to display this on all

18   of the screens?

19            MR. MITCHELL:  These are just discrete pages, not the

20   entire record.

21            THE COURT:  You don't have a problem with these

22   particular pages?

23            MR. MITCHELL:  Just discrete screens as opposed to the

24   entire document.

25            THE COURT:  Fine.

1   Q.  So page 4, lines 117 and 118.

2   A.  I believe it's page 3, 117, 118, but yes, I do see them.

3   Q.  It's PTX82.004, there are two lines there, 117 and 118.

4   A.  Yes.

5   Q.  Could you describe, first of all, what the description of

6   the ring that is the subject of those lines?

7   A.  It's a platinum round diamond ring, and again, this is in

8   connection with the Tiffany setting, Tiffany six-prong

9   solitaire engagement ring.  It indicates it's a platinum ring,

10  round diamond.  69 indicates the carat rate .69.  I color is

11  the color and VS1 clarity.

12  Q.  You were sitting in the courtroom.  The ring that was

13  displayed by Tiffany's investigator, what size was that?

14  A.  That ring was seven carats.

15  Q.  So this is .1-carat different than the size ring that was

16  displayed in the Costco jewelry case, correct?

17  A.  Correct.

18  Q.  And the general style of this ring sold by Tiffany is

19  similar to the ring that was for sale at Costco, correct?

20  A.  Correct.

21  Q.  So this would be a rough comparable if one were looking to

22  see what Tiffany sold, a similar ring for a Tiffany of Tiffany

23  quality, this would be the price, correct?

24  A.  Correct.

25  Q.  Now, if you would, please turn to line 2201, which is on

G9KFTIF6                          Abrams - direct

1    page 47.

2    A.  Yes.

3    Q.  And that item entry is a ring that was sold by Tiffany,

4    same style, same size, correct?

5    A.  Correct.  Platinum round diamond, .69 carats, I color VS1

6    clarity.

7    Q.  And the price point was 4,480?

8    A.  That's right.

9    Q.  Page 49, line 2794.  Would you please turn to that?

10   A.  Yes.

11   Q.  Again it is a ring, again the same size, same as

12   previously, the price of that ring was $4,480 again?

13   A.  Correct.

14   Q.  Would you turn to page 86, line 4079.  Again, same ring

15   same size sold for $4,480, correct?

16   A.  Correct.

17   Q.  And line 115 -- I'm sorry, page 115, line 5452.  Again,

18   same ring, same size, sold by Tiffany for $4,480, correct?

19   A.  Correct.

20   Q.  And if you could, would you please pull up Plaintiff's

21   Exhibit 58 that's in evidence.  Could we blow that up, please?

22   This is the appraisal that Ms. Popp testified came with the

23   ring that she purchased at Costco on November 30, 2012.  What's

24   the estimated retail replacement value that's reflected in the

25   Costco appraisal that was delivered with the ring purchased by

G9KFTIF6                          Abrams – direct

1    Tiffany's investigator?

2    A.  The same as the Tiffany's price, 4,480.

3    Q.  Now --

4            THE COURT:  Would you find some time in the next three

5    minutes --

6            MR. MITCHELL:  We can stop right now.

7            THE COURT:  And so we'll begin our afternoon break now

8    of ten minutes.  Members of the jury, please be ready in the

9    jury room in ten minutes and please continue to keep your

10   thoughts to yourselves and your minds open.  All rise, Ms. Ng

11   will escort the jury out.

12           (Recess)

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

G9KFTIF6                          Abrams - direct

1              (In open court; jury present)

2              THE COURT:  Good afternoon again, members of the jury.

3    Please take your seats in the jury box, and please be seated,

4    everyone.  Mr. Dabney?

5              MR. DABNEY:  Is plaintiff done?

6              THE COURT:  I'm very sorry.  Mr. Mitchell.

7              MR. MITCHELL:  I don't think I look like Mr. Dabney.

8              THE COURT:  Sorry about that.

9    BY MR. MITCHELL:

10   Q.  Ms. Abrams, each of these entries in this historical sales

11   record for Tiffany represents a separate ring sale, correct?

12   A.  Yes.  These are all independent separate ring sales, yes.

13   Q.  And each of these rings is a similar style to the style of

14   ring that was for sale at Costco 639911 that Tiffany's

15   investigator purchased on November 27, 2012, correct?

16   A.  That's right.

17   Q.  And not that the rings are the same, obviously, because

18   Tiffany, these are not Tiffany rings at Costco, but this is a

19   very close approximation.  If you were going to say that

20   Tiffany sells a ring of a similar style to the one that was

21   available at Costco, this is the closest approximation that you

22   would have in Tiffany sales records, correct?

23             MR. DABNEY:  Objection.

24             THE COURT:  Please consult.

25             (Pause)

1            THE COURT:  And if you're going to speak, please speak

2    next to each other so that the jury doesn't hear you.

3            (Pause)

4    Q.  If I ask you if you could find a closer approximation to

5    what the ring was for sale at Costco that Tiffany has, could

6    you find and approximation closer than this one?

7    A.  You know, without speculating on the quality of the Costco

8    ring as compared to Tiffany, a .69 carat ring of this clarity

9    and of this color is nearly identical to the ring characterized

10   in the Costco appraisal.

11   Q.  And this is not like a standard price in the industry that

12   Tiffany charges, is it?

13   A.  No.

14   Q.  So every company would charge its own different price for

15   whatever it is that they sell?

16   A.  Of course.

17   Q.  So these were simply particular rings that were sold at

18   Tiffany at this price that are comparable in size, as close an

19   approximation can be, right?

20   A.  Correct.

21   Q.  Now, Mr. Dabney said in his opening to the jury -- you were

22   here for that, right?

23   A.  Yes.

24   Q.  He said that Costco provided full disclosure to Tiffany of

25   all sales and signs before suit was filed.  Is that true?

160

G9KFTIF6                          Abrams - direct

1    A.  No.  That's not.

2    Q.  Approximately when did Tiffany notify Costco about its

3    discovery of signs in the Huntington Beach store?

4    A.  At the end of 2012.  I don't remember if it -- it must have

5    been in early December.

6    Q.  And when did Tiffany file suit?

7    A.  February of 2013.

8    Q.  Tiffany filed suit on Valentine's day?

9    A.  Yes.

10   Q.  And was there a reason Tiffany filed suit -- let's back up

11   for a second.  By the time Tiffany had filed suit, had Costco

12   provided full disclosure of all financial records concerning

13   every ring that Huntington Beach sold by Costco for signage

14   that said Tiffany?

15   A.  No.  At the time that we filed suit, maybe shortly before

16   that time, all we knew was that Costco, Costco's outside

17   counsel at the time, and our outside counsel, Mr. Mitchell at

18   the time, Huntington Beach discussing the issue, but no real

19   substantive disclosure of full sales records Huntington Beach

20   provided to us.

21   Q.  Why was it that the suit was filed on Valentine's day?

22   A.  Really, it was timing, first of all.  We had had a number

23   of exchanges for a couple of months since December of 2012

24   about this issue with Costco, and we felt that that response

25   was inadequate in substance and at that point we really had a

G9KFTIF6                        Abrams - direct

1    duty to our own customers to protect the value of the trademark

2    and a duty to all customers not to be misled by these types of

3    signs, so we filed suit at the time.

4    Q.  And has the filing of suit received a lot of attention at

5    that moment?  The whole world didn't know, but there was

6    certainly media attention of that.

7    A.   Look, it's on Valentine's day and it's an attractive case

8    from a media perspective, large companies are duking it out.

9    It's not surprising it generated media attention.  But, look,

10   most cases that probably Tiffany and Costco would enter into

11   would probably also receive media attention.

12             MR. MITCHELL:  I have nothing further.

13             THE COURT:  Thank you.  Mr. Dabney.

14             MR. DABNEY:  May I approach the witness with a binder?

15             THE COURT:  Yes, you may.

16             MR. DABNEY:  I can give the Court one, too.

17             THE COURT:  That would be helpful.  Thank you.

18             MR. DABNEY:  Can I have the ELMO, Ms. Ng?

19             MR. MITCHELL:  Your Honor, may I just have a moment

20   and see what's in the book, because this is the first time I'm

21   seeing it.

22             THE COURT:  Yes.

23             MR. MITCHELL:  Thank you.

24             (Pause)

25             THE COURT:  Please turn your faces away from the jury.

G9KFTIF6                          Abrams - direct

1   Turn your back, please.

2              (Pause)

3              THE COURT:  Jurors, looky here.

4              MR. MITCHELL:  May we have a sidebar, your Honor?

5              THE COURT:  Yes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G9KFTIF6                          Abrams - direct

1            (At the side bar)

2            THE COURT:  Let me begin.  Mr. Dabney, it's clear to

3     me you did not like my rules, but you have to comply with them

4     and exasperation, eye rolling and much of the body language

5     I've been seeing lately is disrespectful and inappropriate, and

6     I do not expect that it will continue.  And if there is any

7     lack of clarity about the mechanics of the classification rule,

8     if there was a request to consult, you come together in

9     physical proximity with your backs turned from the jury, walk

10    out into the audience a little bit and talk to each other in a

11    way that the jury can't read your lips or see your eye rolling

12    or anything else.  Anything unclear about that?

13           MR. DABNEY:  No, your Honor.

14           THE COURT:  Thank you.  Mr. Mitchell.

15           MR. MITCHELL:  Thank you, your Honor.  I was just

16    handed up a book, I haven't seen the cross-examination document

17    and because I asked Mr. Dabney if he was going to use all the

18    exhibits and he won't commit to me he will not.  I can go

19    through the book and tell you that --

20           THE COURT:  Quiet.

21           MR. MITCHELL:  DTX2 is a photograph of a ring, I have

22    no problem with it.  DTX19, no problem.  DTX20 is a different

23    appraisal, no problem.  DTX, I'm sorry, this is -- I may have

24    misspoken, yes, DTX28 our dictionary definition, this has to go

25    in on defendant's case after a witness testifies because this

G9KFTIF6                           Abrams - direct

1    is now trying to put in through a different witness dictionary

2    definitions and other items.  First of all, it's beyond the

3    scope of direct.  Secondly, this is subject to the Court's

4    prior ruling regarding dictionary definitions.  It's a back

5    door way to try to get around the Court's ruling.

6              I'm just going to walk through which ones.  DTX52, no

7    problem.  DTX77 is the dictionary stipulation your Honor has

8    ruled about.  Doesn't belong with this witness.  It's a

9    stipulation concerning the admissibility of dictionary

10   definitions.  Your Honor has ruled on this before and your

11   Honor's ruling with respect to dealing with dictionary

12   definitions doesn't belong with this witness, doesn't belong

13   with the case in any event.

14             Look at this, look at all this stuff.  This is all

15   libraries --

16             THE COURT:  So this issue will be clear because we

17   have a record, won't know what "this" is.

18             MR. MITCHELL:  This is something that was the subject

19   of expert discovery in connection with the genericism case.

20   These are publications in which Mr. Dabney's experts said the

21   word "Tiffany" appeared in advertisements dating back to the

22   1800s.  It's DTX, it's the exhibit to DTX77.

23             DTX209 is fine.  DTX485 is fine.

24             THE COURT:  Keep your voice down a little bit.

25             MR. MITCHELL:  DTX486 is fine.  DTX487 is fine.  This

G9KFTIF6                          Abrams - direct

1   is settlement communication.  Let me go back.  These are

2   settlement communications from their lawyer, they're going to

3   try to use it as a sword.  This is not fine.  We have here,

4   this is a letter, that's fine.

5            DTX209 is fine.  DTX485 is fine.  DTX486 is fine.

6            DTX487, settlement communications.  Their lawyer used

7   it, confidential, shouldn't be used.

8            And this is Tiffany trademark registration is fine.

9   The e-mails, the e-mail is fine but we'd have to deal with the

10  confidentiality of the attachment in some fashion so it doesn't

11  come into that same inspection criteria.  56 is the same, 58 is

12  fine, 82 is fine, we just marked it.  But --

13           THE COURT:  All right, so let's go back to the first

14  topic which is what's marked as DTX28 with a picture of a ring

15  and summary of dictionary definitions.  You haven't put your

16  witness on yet.

17           MR. DABNEY:  Your Honor, I cross-examined this witness

18  at her deposition.  Defendant's Exhibit 28 was a deposition

19  exhibit at Ms. Abrams deposition.  I cross-examined her about

20  this.  Seems to me they have totally opened the door with this

21  direct testimony characterizing her state of mind and her

22  beliefs about Tiffany, and Tiffany registration and their

23  statements that Costco customers could only have understood it

24  as referring to the trademark and not the setting.  So I don't

25  see how they can offer that kind of testimony on direct and

G9KFTIF6                      Abrams - direct

1    then not let us come in and impeach her with this.

2              So this goes directly to credibility of this witness's

3    direct testimony on a subject they opened the door to on

4    direct.  They didn't have to ask her those questions.  They

5    chose to.  This is no surprise.  This was marked at her

6    deposition.  She's already been cross-examined on this.

7              MR. MITCHELL:  I didn't ask her about the

8    registration.  All I did was put the registration in evidence.

9              THE COURT:  I don't recall questions about what

10   customers would have expected, customers in general would have

11   expected to see.  In any event, in the context of all of the

12   rulings and the discussions that we have had about the use of

13   genericism, it's not part of evidence.  The objection is

14   sustained.

15             So that also covers the stipulation that has

16   attachments.  To the extent that stipulation ever comes in as

17   an exhibit, it will not come in with all of those attachments

18   because that exceeds by many hundreds the six I allowed Costco

19   to use in aid of corroboration of its own witnesses, its own

20   signage witnesses testimony as to their subjective

21   understanding of the term.

22             I've lost track of the objections.

23             MR. MITCHELL:  I'd like to interject one point just so

24   I'm clear here.  And I just for the next step, not for this

25   ruling.  The -- let's save it for the future.

G9KFTIF6                        Abrams - direct

 1          THE COURT:  Save it if it's not necessary for this

 2   witness.

 3          MR. MITCHELL:  DTX47, which is settlement

 4   communications by their own lawyer --

 5          THE COURT:  Your Honor, they asked her what

 6   information did Costco provide to them.  That was the direct

 7   question.  This witness gave what we consider to be highly

 8   misleading testimony on this subject.  This is where Costco

 9   provided the information voluntarily to them in January that

10   they had asked for, so it might be Costco might object to this,

11   but given the testimony that we've just heard in which she

12   denies that we volunteered information to them, this is a very,

13   very important document that it seems to me goes directly to

14   the direct testimony that she gave.  She basically denied the

15   content of this document and that was false.

16          MR. MITCHELL:  Your Honor, first of all, we didn't put

17   "settlement communications privileged" on top.  They did, and

18   it was settlement discussions.  If you look at the body of the

19   letter it's plain because the Court knows the evidence.  You

20   heard Mr. Dabney's opening.  This is not full disclosure of

21   sales.  You can see from the letter it's a general statement --

22          THE COURT:  You can argue that at the appropriate

23   time.  This doesn't relate to a finding of liability of another

24   party.  This is the party itself, its own communication and

25   it's a proffer of information purported to be factual.  Your

G9KFTIF6                          Abrams - direct

1    objection is overruled as to DTX487.

2             MR. MITCHELL:  I just want to be sure Mr. Dabney has a

3    procedure in place to protect the confidentiality of the

4    inspection material so it's not displayed to the jury.

5             THE COURT:  So this is the attachment to the e-mail

6    chain and also the Exhibit 56 stuff?

7             MR. MITCHELL:  Yes, it's the same thing.

8             THE COURT:  So, Mr. Dabney, do you understand that

9    this is subject to the ruling?

10            MR. DABNEY:  I do.  Do you have an extra hard copy I

11   can hand out?

12            MR. MITCHELL:  You don't have it?

13            MR. DABNEY:  I don't.  I was going to use the ELMO.

14            MR. MITCHELL:  It's subject to the Court's ruling.

15   The Court had a ruling on it.

16            THE COURT:  I ruled and I said it you couldn't use it

17   with projection.  Now we have a practical problem.  Could you

18   lend him --

19            MR. MITCHELL:  I'll lend him.  I'll lend him a copy.

20            THE COURT:  Thank you.

21            (Continued on next page)

22

23

24

25

G9KFTIF6                              Abrams - cross

1                  (In open court; jury present)

2      CROSS-EXAMINATION

3      BY MR. DABNEY:

4      Q.  Ms. Abrams, I want to put back up on the ELMO the first

5      page of the e-mail that your counsel identified as your Exhibit

6      27.  But this was the e-mail you said that got this whole ball

7      rolling in this case.  Is that correct?

8      A.  Yes.  This is part of that chain.

9      Q.  And one of the things that you asked the investigator to

10     look for were things like the hallmarking on the inside of the

11     ring and some other aspects that can be seen easily with the

12     naked eye.  Is that fair to say?

13     A.  Yes.

14     Q.  And your investigator made a purchase of a ring in a Costco

15     warehouse store?

16     A.  Correct.

17     Q.  The ring came in a box like that beige one on the jury

18     rail?

19     A.  Correct.

20     Q.  And it came with an appraisal that had Costco Wholesale's

21     name on it?

22     A.  Correct.

23     Q.  And it came with a receipt which did not have Tiffany's

24     name on it, correct?

25     A.  None of which those items, the box, the appraisal, were

G9KFTIF6                    Abrams - cross

1    available for the customer to see when they made the purchase.

2            MR. DABNEY:  Your Honor, I request that the answer be

3    stricken as not responsive.

4            THE COURT:  The motion is granted.  The jury is

5    instructed to disregard the entirety of the last question.  You

6    may ask another question.

7    Q.  The sales receipt didn't say Tiffany on it did it,

8    Ms. Abrams?

9    A.  No.

10   Q.  And as I understand it, you had Mr. Mitchell write a letter

11   to Costco dated December 10, 2012, about this?

12   A.  I believe --

13   Q.  I direct your attention to tab 209 in the book you've got

14   before you.

15   A.  Yes.

16   Q.  Do you have it in front of you, Ms. Abrams?

17   A.  I do.

18   Q.  Is that a copy of the letter dated December 10, 2012 that

19   Mr. Mitchell here wrote to Richard J. Olin, vice president

20   general counsel Costco Wholesale Corporation?

21   A.  It is.

22           MR. DABNEY:  Costco offers Exhibit 209 in evidence.

23           THE COURT:  Any objection?

24           MR. MITCHELL:  No objection.

25           THE COURT:  Exhibit 209 is admitted and may be

G9KFTIF6                    Abrams - cross

1  published.

2          (Defendant's Exhibit 209 received in evidence)

3  Q.  I'll just put this on the screen.  So you describe the

4  events here.  Now, by the time of this letter, Ms. Abrams, you

5  had a chance to inspect the diamond ring that had been

6  purchased at Costco, hadn't you?

7  A.  I personally didn't inspect it, but within Tiffany, yes, we

8  sent it in for quality inspection.

9  Q.  I'd like to direct your attention to tab 2 in your book.

10 Do you have that in front of you?

11 A.  I do.

12          MR. DABNEY:  Your Honor at sidebar I believe counsel

13 stated they have no objection to this photograph coming in

14 evidence?

15          THE COURT:  Are you offering it in evidence?

16          MR. DABNEY:  Yes, we offer Defendant's Exhibit 2 in

17 evidence.

18          THE COURT:  Any objection?

19          MR. MITCHELL:  No objection.

20          THE COURT:  Defendant's Exhibit 2 is admitted in

21 evidence.

22          (Defendant's Exhibit 2 received in evidence)

23 Q.  Ms. Abrams, is this an example of the diamond ring that

24 your investigator purchased in the Huntington Beach store,

25 Ms. Popp, that we heard from earlier this morning?

G9KFTIF6                         Abrams - cross

1   A.  Yes.  I believe so.

2   Q.  Item 639911.  And your company inspected this item before

3   writing to Costco, didn't it?

4   A.  Correct.

5   Q.  And so if you focus in on the trademark that's stamped on

6   it, does that trademark look anything like a Tiffany and

7   Company trademark?

8              MR. MITCHELL:  Objection.

9              THE COURT:  Please consult.

10             (Pause)

11             MR. MITCHELL:  We need a sidebar, your Honor, sorry.

12             THE COURT:  Counsel.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the side bar)

2           MR. MITCHELL:  Mr. Dabney referred to the mark as a

3    trademark.  It is not a trademark.  It is not a registered

4    trademark, it is a hallmark.  I said to Mr. Dabney would you

5    please rephrase the question and call it a hallmark and he said

6    no.

7           THE COURT:  Mr. Dabney?

8           MR. DABNEY:  It is a trademark.  I don't understand

9    the objection.

10          THE COURT:  Explain how it's -- for clarity of the

11   record there is, the Court observed the letters PLAT and an

12   icon or image that is sort of a diamond shape and something

13   next to it.  So would you explain the basis of your position

14   that it's a trademark?

15          MR. DABNEY:  Yes.  The testimony will be that precious

16   metals are required to be stamped with the trademarks of their

17   manufacturers by law, so that if somebody gets an adulterated

18   piece of metal they can trace it back to the manufacturer.

19   That diamond shaped trademark which has the letters RB in it is

20   the trademark of Rb Brilliance, the company that they knew was

21   the manufacturer of the ring before they wrote the letter.

22          THE COURT:  So Mr. Dabney has represented that he has

23   a good-faith basis for asking the question as he phrased it and

24   the objection is overruled.

25          (Continued on next page)

1                 (In open court; jury present)

2    Q.  Ms. Abrams, directing your attention to the trademark that

3    appears on the inner side of the band in the ring depicted in

4    Defendant's Exhibit 2.  Does that trademark look like anything

5    that Tiffany and Company used?

6    A.  No, it does not.

7    Q.  And in fact, in Tiffany and Company solitaire SDR1 rings,

8    the words Tiffany & Co. with an ampersand C-o is spelled out,

9    isn't it?

10   A.  Yes.

11   Q.  And in Tiffany and Company diamond ring serial numbers are

12   also put in the ring, aren't they?

13   A.  Yes.

14   Q.  And this ring that you bought in the beige box, there was

15   no blue box with it, was there?

16   A.  No.

17   Q.  No white ribbon with it?

18   A.  I don't believe so.

19   Q.  No blue bag with it?

20   A.  No.

21   Q.  So, at the time you wrote to Costco, you had no reason to

22   believe, did you, that Tiffany and Company had manufactured

23   this diamond ring, did you?

24   A.  Well, at the time that we wrote to Costco, we were really

25   soliciting more information.  All we had was this ring in our

G9KFTIF6                    Abrams - cross

1    possession and the investigator's report, and we were looking

2    to see what this was all about.  It could have been a myriad of

3    different issues.

4         MR. DABNEY:  Your Honor, I believe my question called

5    for a yes or no.

6         THE COURT:  I will deny that motion to strike that

7    answer because it was generally responsive, but if you wish the

8    witness to answer yes or no, please indicate that clearly and

9    in such an event the witness should answer yes, no or the

10   question can't be answered.

11   Q.  Ms. Abrams, your company received a response from counsel

12   to Costco on December 18, 2012, did it not?

13   A.  I don't believe so.  I don't remember exactly.

14        (Continued next page)

176

G9KATIF7ps                    Abrams – cross

1    Q.  May I direct your attention to Exhibit 485?

2              THE COURT:  I ask that the witness and counsel don't

3    talk over each other because that makes it difficult for the

4    court reporter.

5    Q.  Ms. Abrams, directing your attention to Costco Exhibit 485,

6    is that a letter that your counsel received from Costco counsel

7    on or about December 18, 2012?

8    A.  Yes.

9              MR. DABNEY:  At this point defense offers Defense

10   Exhibit 485 in evidence.

11             MR. MITCHELL:  No objection.

12             THE COURT:  485 is admitted and may be displayed.

13             (Defendant's Exhibit 485 received in evidence)

14             MR. DABNEY:  I will zoom in so that the members of the

15   jury can see it.

16   Q.  So this was shortly before the Christmas holidays in 2012,

17   correct?

18   A.  Correct.

19   Q.  And did your company receive a preliminary response from

20   Costco in early January of 2013?

21   A.  Yes.

22   Q.  You didn't mention any of this on your direct examination,

23   did you?

24   A.  No.  I mentioned that there were a number of exchanges

25   between our respective outside counsels and that our

1    determination was that they were not substantive.

2    Q.  Could I direct your attention to Exhibit 486 in your trial

3    book.

4    A.  Yes.

5    Q.  Ms. Abrams, is Defendant's Exhibit 486 a letter that your

6    counsel wrote to Costco on January 10, 2013?

7    A.  It is.

8            MR. DABNEY:  Your Honor, at this point we offer Costco

9    Exhibit 486 in evidence.

10           THE COURT:  Any objection?

11           MR. MITCHELL:  No, your Honor.

12           THE COURT:  Exhibit 486 is admitted and may be

13   displayed.

14           (Defendant's Exhibit 486 received in evidence)

15   Q.  So this was a recounting by your counsel, Mr. Mitchell,

16   here in the courtroom of a phone call this past Monday in which

17   your counsel was describing what Costco's counsel had told him

18   up until that time.  Correct?

19   A.  Correct.

20   Q.  And he makes a request for further information, doesn't he?

21   A.  Yes.

22   Q.  He asks, for the magnitude of the problem, please provide

23   us with a list of each item, including history and retail price

24   that was marked.  And there are additional concerns so we need

25   to better understand how many items are involved with what we

178

G9KATIF7ps                    Abrams - cross

1   know, etc.  Did I read that directly?

2   A.  Yes.

3   Q.  Did Costco send you a letter back about three weeks after

4   this?

5   A.  I believe so.  I don't specifically recall.

6   Q.  I direct your attention to Costco Exhibit 487.

7   A.  Yes.

8   Q.  Ms. Abrams, is Exhibit 487 a letter that was received by

9   your counsel on or about January 31, 2013?

10  A.  Yes.

11          MR. DABNEY:  Your Honor, at this point we offer

12  Defendant's Exhibit 487 in evidence.

13          MR. MITCHELL:  No objection.

14          THE COURT:  The exhibit is admitted and may be

15  displayed.

16          (Defendant's Exhibit 487 received in evidence)

17          MR. DABNEY:  Thank you, your Honor.

18  Q.  So this was, let's look at this with some care.  You

19  understood this to be a follow-up conversation to -- a

20  recording of a conversation on January 29 in response to the

21  letter we were just looking at from January 10, correct?

22  A.  Yes.

23  Q.  And so Costco tells you, "We have identified three jewelry

24  items in which the word 'Tiffany' appeared on the sign in the

25  location in which the item was displayed."  And they go on to

G9KATIF7ps                      Abrams - cross

1    explain Costco's fiscal year which ends in September.  Fair to

2    say?

3    A.  Yes.

4    Q.  And then the first thing they do is, they tell you what the

5    signage said with regard to item 639911.  Do you see that?

6    A.  Yes.

7    Q.  And that's the one that we just looked at that had the

8    trademark stamped inside that wasn't yours, correct?

9    A.  Yes, I believe so.

10   Q.  And they say it was first sold in approximately 2003.  The

11   current retail price is $3,199.  They tell you what the net

12   sales were in fiscal 2012 and fiscal 2013.  And then they say

13   that in certain years the sign said "Tiffany set diamond

14   solitaire," "round Tiffany set," and then in approximately 2012

15   the signs began to refer to "platinum Tiffany."  That was

16   information that you had at that time.

17   A.  Yes.

18   Q.  And were you here when the Court instructed the jury that

19   signs that said "Tiffany set" and "Tiffany setting" were not

20   the subject of any claim in this case?

21   A.  Yes.

22   Q.  Then it goes on to talk about the second item that was also

23   mentioned in opening, this item 605880.  This was a platinum

24   1.0 carat, first sold approximately October 2011, current

25   retail price is $6399.  There were $145 net sales of this item

1    in fiscal year 2012 and 122 in fiscal year 2013.  The sign in

2    2012 read "platinum Tiffany."  That was information you had at

3    the end of January, correct?

4    A.  Yes.

5    Q.  And those items, unlike the "Tiffany setting" and "Tiffany

6    set" sign, those items, 605880, that said "platinum Tiffany,"

7    those are items for which potentially there is a recovery in

8    this case, correct?

9    A.  Correct.

10   Q.  Then we go to item 637277.  They said, "This item is a 1.0

11   carat diamond solitaire, also first sold in approximately 2003,

12   current retail price is $6299.  There were 67 net sales in 2012

13   and in 2013, eight in fiscal year 2013 through a few days ago.

14   It appears that 'platinum Tiffany' has appeared on the sign for

15   several years."  That was also information that you had at the

16   end of January.

17   A.  Correct.

18   Q.  And you understand that for a period of time for this item,

19   637277, the second line of the sign began with the word "set"?

20   A.  Correct.

21   Q.  And so as to that, the issue is, was that meant to be

22   "Tiffany set" or something else, correct?

23   A.  I know we did not know that information at the time.

24   Q.  And then, after this, Mr. Levine goes on to talk about the

25   distinction between "Tiffany setting" and the word "Tiffany."

1    He says, "You and I have discussed the meanings of the terms

2    'Tiffany' and 'Tiffany setting' in these contexts.  I think we

3    understand each other's positions and I will not repeat mine.

4    Please let me know if you have additional questions.

5    Sincerely, Norman Levine."  That was information that you had

6    in 2013, correct, January 2013?

7    A.  Yes.

8    Q.  And it's true, isn't it, that between January 31, 2013 and

9    February 14, 2013, your company did not go back to Costco and

10   ask for more information than what was given in this letter,

11   did it?

12   A.  We did not -- I do not believe we exchanged written

13   communication, but the lawyers, I believe, did speak to one

14   another.

15   Q.  Do you have any personal knowledge of that?

16   A.  From discussions with my counsel.

17   Q.  You do not have personal knowledge yourself of any

18   conversations between Costco and your counsel between January

19   2013 -- January 31 and February 14, 2013, do you, Ms. Abrams?

20   A.  I personally was not privy to those conversations.

21   Q.  So the next thing that happens in terms of the written

22   record is that the lawsuit was filed on February 14, just about

23   exactly two weeks after this information was provided in the

24   January 31 letter, correct?

25   A.  Correct.

G9KATIF7ps                    Abrams - cross

1    Q.  Now, Ms. Abrams, your counsel asked you a series of

2    questions about engagement ring pricing.  Do you recall that?

3    A.  Yes.

4    Q.  And when you -- you were shown, I think, an appraisal that

5    Ms. Popp, who was here earlier today, obtained in late 2012.

6    Is that correct?

7    A.  Correct.

8    Q.  And I believe that appraisal was marked as Plaintiff's

9    Exhibit 58, which was Costco's Exhibit 19, which I believe is

10   already in evidence, but if not we move it in evidence.

11              THE COURT:  Costco Exhibit 19 is what you're asking

12   about?

13              MR. DABNEY:  Yes, which has already been marked as

14   Plaintiff's Exhibit 58.

15              THE COURT:  It's been admitted.

16              MR. DABNEY:  All right.

17   Q.  So the date on this appraisal was April 13, 2012, wasn't

18   it?

19   A.  Yes.

20   Q.  And you were asked about, by my count, four line items in

21   Plaintiff's Exhibit 82, which is the final document in your

22   book there.  Could I draw your attention to that, please.

23   A.  Yes.

24   Q.  Now, Ms. Abrams, the first line item your counsel asked you

25   about, according to my notes, was line item 2201, which is on

G9KATIF7ps                         Abrams - cross

1    page 48.

2              MR. DABNEY:  Your Honor, may I speak to Mr. Dabney?

3              THE COURT:  Yes.

4              MR. MITCHELL:  Thank you.

5              (Counsel confer)

6    Q.  I stand corrected.  The first one you were asked about was

7    line 117.  Could I direct your attention to line 117.  Do you

8    have it there?

9    A.  Yes, got it.

10             THE COURT:  And which Bates-numbered page of the

11   document is that on?

12             MR. DABNEY:  That's PTX 82, page 4.

13             THE COURT:  Thank you.

14   Q.  So line 117, according to this chart, was a sale made on

15   April 9, 2009, correct?

16   A.  Correct.

17   Q.  More than three years before the date of the appraisal.

18   You didn't mention that during your direct, did you,

19   Ms. Abrams?

20   A.  I was not asked.

21   Q.  And you also were asked about a .69 carat stone, not a .70

22   carat, weren't you?

23   A.  Correct.

24   Q.  And you were asked about a VS1, not a VS2, right?

25   A.  Correct.

G9KATIF7ps                    Abrams - cross

1    Q.  So we have a three-year difference between that first one

2    and what you were asked about.  Are you aware, Ms. Abrams --

3    let's look at 118.  That was the next one you were asked about.

4    That was also in 2009, correct?

5    A.  Yes.

6    Q.  Again, three years before.  So you were asked a series of

7    questions in which you didn't show the jury the dates of the

8    sales, did you?

9    A.  Again, I wasn't asked that particular question.

10   Q.  Well, did you think that that was -- never mind.

11          So there are in this list, though, 2012 sales for

12   truly comparable items, aren't there, Ms. Abrams?

13   A.  There are 2012 sales, sure.

14   Q.  Well, Ms. Abrams, did you personally go through this

15   exhibit to try to find the most comparable items in it for

16   purposes of your testimony here today?

17   A.  Those were the most comparable in terms of close, very

18   close to the carat weight and identical in price, a price that

19   is relatively specific.

20   Q.  You're certain of that.

21   A.  I did go through it.

22   Q.  Did you personally do it, Ms. Abrams?

23   A.  I did not look line by line, but, yes, I have gone through

24   this document.

25   Q.  I don't want you to ever have a chance to say that you

G9KATIF7ps                    Abrams - cross

1   didn't personally do this.

2   A.  Again, I did not go line by line.

3   Q.  But you went through it enough that you came into court

4   today to tell the jury about five hand-picked items, years

5   before the date of the appraisal, to create the impression, as

6   you testified, that these were the most comparable sales prices

7   you could find in the document, didn't you?

8   A.  .69 carat is very close to a .7, and that price is

9   identical.

10  Q.  Ms. Abrams, would you direct your attention to line 1103 on

11  page 23 of this exhibit.  I would like to direct your attention

12  to line 1103, sale in Chicago on June 30, 2012.  Right?

13  A.  Right.

14  Q.  And then if we look and see what was sold on that date --

15  if I had a straight edge here -- well, look at there.  We have

16  .70 VS -- I've got to get -- I'm sorry.  I need a straight

17  edge.  Zoom out here.  We have .70 VS2 I color, correct?

18  A.  Correct.

19  Q.  So we have here a sale not of a .69 but a .70.  Right?

20  A.  Correct.

21  Q.  And we have a sale not in 2009 but in 2012, right?

22  A.  Correct.

23  Q.  And we have a sale at $5,950, not $4,400, right?

24  A.  Correct.

25  Q.  And we have a sale in 2012, not at the peak of the

G9KATIF7ps                    Abrams - cross

1    recession in 2009, correct?

2    A.  Correct.  It's in 2012.

3    Q.  So as between this sale and the ones you testified to,

4    Ms. Abrams, which one do you think more fairly represents what

5    was comparable in 2012?

6    A.  You know, I, I can't say, because diamond prices depend on

7    more than just these couple characteristics that are listed

8    here.  The quality can -- the price can range depending on the

9    quality of the stone, which can include other things like

10   prisms and symmetry.  So --

11   Q.  So you're saying Tiffany has such wide variation in quality

12   that we should --

13             MR. MITCHELL:  Objection.

14             THE COURT:  Please consult.

15             (Counsel confer)

16   BY MR. DABNEY:

17   Q.  Ms. Abrams, had you finished your answer?

18   A.  Well, I was going to say that I never said that there was

19   an identical ring, it was just similar.  And it was unusual

20   that we saw a price that was so specific and so on the mark as

21   to be $4,480.

22   Q.  This was trade-secret information to you, wasn't it,

23   Ms. Abrams?

24             You didn't even have access to this document, did you?

25   You had to ask somebody within the company to get it.

G9KATIF7ps                       Abrams - cross

1    A.  Correct.

2    Q.  You're not suggesting Costco ever had access to this

3    document.

4    A.  No.  But --

5    Q.  So I come back to my question, then.  We have on page 23 of

6    your own exhibit, on line 1103, we have a sale of a .70 VS2 I

7    diamond ring, and the sale price is $5,950.  Correct?

8    A.  Correct.

9    Q.  And the appraisal you're comparing it to is also dated

10   2012.  Right?

11   A.  Correct.

12   Q.  Whereas the ones you mention were from earlier years.

13          Let's go to line 1115, shall we, which is on page 24.

14   This one is also a .70 VS2 I.  Correct, Ms. Abrams?

15   A.  Correct.

16   Q.  And this was sold in November of 2012, the very month that

17   your investigator went into the Costco store, right?

18   A.  Correct.

19   Q.  And so, unlike the items you testified to on direct, this

20   is a .70, not a .69, right?

21   A.  Correct.

22   Q.  And this is a 2012 sale, not a 2008 or 2009 sale, correct?

23   A.  Correct.

24   Q.  And you think that this might have been a more fair

25   representation of what Tiffany & Co. pricing was in 2012 than

G9KATIF7ps                    Abrams - cross

1    what the pricing was that you referred to on direct,

2    Ms. Abrams?

3    A.  I was not making a representation of whether or not this

4    particular diamond item, .70, or the prior one, .69, was a

5    representation of Costco's prior.  It's just, you know,

6    surprisingly unusual to see that our exact price, one that's

7    not rounded to, you know, the highest thousandth, is also

8    represented on Costco's appraisal, that was it, for a similar

9    stone.  That was it.

10   Q.  That's a -- let's go on to line 1116, shall we.  Here's

11   another sale in November of 2012 in Chicago, correct?

12   A.  Correct.

13   Q.  VS2 I .70 carat weight, correct?

14   A.  Correct.

15   Q.  Tiffany company price was $5,950, right?

16   A.  Right.

17   Q.  And the Costco price was $3,199, right?

18   A.  Right.  Yes.

19   Q.  And the appraisal that you drew our attention to was one

20   that said that the suggested retail replacement price was

21   around $4,400, correct?

22   A.  Yes.  The appraisal was for $4,480.

23   Q.  The suggested retail replacement value, which was about

24   $1,500 below what Tiffany and Company was selling that same

25   carat cut quality item for.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G9KATIF7ps                         Abrams - cross

1   A.  I would not characterize it as necessarily the same

2   quality.  There are a number of different factors that go into

3   pricing a ring, and Tiffany quality and valuation calculations

4   go beyond just the product description that's listed in this

5   line item.

6              THE COURT:  Mr. Dabney, before you go on, we have

7   about eight minutes to the end of the day.

8   Q.  I just have a few more to ask you about this, Ms. Abrams.

9   Could you turn to line 1699, which is on page 36 of your

10  Exhibit 82.  1699.  Now we're in Houston.  Here we have a sale.

11  This one is also in August of 2012, right?

12  A.  Yes.

13  Q.  And if we look over at the price, we see again it's a .70

14  carat VS2, clarity I color, price $5,950.  Right?

15  A.  Correct.

16  Q.  Not at all what is on the Costco appraisal, is it?

17  A.  No.  Again, it doesn't have to mean that it's a comparable

18  stone of comparable quality.

19  Q.  Ms. Abrams, could we turn to line 1986 in your exhibit on

20  page 41.  I'm sorry.  It must be on page 42.  Yes, page 42.

21             Las Vegas.  We here again have a sale in June of 2012,

22  correct?

23  A.  Correct.

24  Q.  And again, unlike the items you referred to as .70 carat

25  weight VS2 clarity I color, price 5950?

G9KATIF7ps                          Abrams - cross

1    A.  Correct.

2    Q.  And if we could go on to 4292 on page 90.  Page 4292.  San

3    Francisco Center.  This one is October 17, 2012, correct?

4    A.  Yes.

5    Q.  And, again, we have a .70 I color VS2 clarity, 5950.

6    Correct?

7    A.  Yes.

8    Q.  Could I direct your attention to 4413, which is on page 92.

9    This is a sale in August of 2012 in San Jose, correct?

10   A.  Correct.

11   Q.  Again, it's .70 carat weight VS2, 5950.  Correct?

12   A.  Correct.

13   Q.  And finally, you'll be happy to know, we go down five more

14   lines to 4418, San Jose again.  We have a sale in December of

15   2012, December of 2012, and again it's a .70 VS2, 5950.  Am I

16   correct?

17   A.  Correct.

18   Q.  All right.  So, Ms. Abrams, when you were preparing to give

19   your testimony here today and you were trying to decide which

20   entries on your list would be the most relevant to deciding how

21   comparable were prices of the Tiffany & Co. .70 VS2 I diamond

22   rings compared to the items 639911 in this appraisal document,

23   did you overlook these entries?

24   A.  The purpose of my prior testimony was to show that

25   comparable rings, .69 --

1    MR. DABNEY:  Your Honor, I believe that called for a

2    yes or no.

3    A.  I'm sorry.  Can you repeat the question?

4    THE COURT:  Yes.  The jury will disregard the last

5    answer.  The question will be repeated.  And it's intended to

6    be a yes-or-no question.

7    Q.  Ms. Abrams, I have now referred to you, in your own

8    exhibit, Plaintiff's Exhibit 82, not one, not two, not three,

9    not four, not five, not six, not seven, but eight .70 carat

10   weight VS2 clarity I colored diamond solitaire rings sold in

11   the year 2012 from locations around the country, all having the

12   sale price $5,950.  The question to you, then, is, when you

13   prepared to give your testimony here today, were you aware of

14   these entries?

15   A.  Yes.

16   Q.  So you were aware of them and you chose deliberately to

17   leave them out of your testimony.  Is that what you're telling

18   this jury?

19   A.  I was not asked, in my direct testimony, as you heard,

20   about those particular entries.  I was asked about the .69.

21   Q.  Ms. Abrams, you're an attorney, aren't you?

22   A.  Yes, I am.

23   Q.  You're a member of the bar.

24   A.  Yes.

25   Q.  And you're here giving testimony intended to suggest that

192

G9KATIF7ps                        Abrams – cross

1    the price on a Costco appraisal Ms. Popp got from 2012 was

2    remarkably similar to certain price points in this exhibit,

3    Plaintiff's Exhibit 82.  Right?

4    A.  Right.

5    Q.  And with all of your knowledge of the law and legal

6    litigation, instead of telling them about sales in 2012 of the

7    identical item, you chose five items from three years before

8    with a smaller stone.  Right?

9              MR. MITCHELL:  Objection, your Honor.

10             THE COURT:  Consult.

11             MR. MITCHELL:  Sidebar, your Honor.

12             THE COURT:  All right.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

G9KATIF7ps                        Abrams - cross

1             (At the sidebar)

2             MR. MITCHELL:  He asked the question ten times and the

3     last question was mostly argument and not a question.  It's an

4     inappropriate question.  And I ask Mr. Dabney just to simply

5     withdraw that one question in the way phrased.

6             THE COURT:  The objection is overruled.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G9KATIF7ps                    Abrams - cross

1              MR. DABNEY:  Ms. Reporter, would you please read the

2    pending question to the witness.

3              (Record read)

4    A.  Yes.  I was directed to answer questions related to a .69

5    carat stone, one that's virtually indistinguishable from a .70.

6    Q.  You were directed to do what you did.

7    A.  I was asked a question about those items.

8    Q.  My question was a little different, Ms. Abrams.  This is a

9    Tiffany & Co. business record, isn't it?

10   A.  It is.

11   Q.  You understand this is a truth-finding process we're

12   engaged in, isn't it?

13   A.  Of course.

14   Q.  And you're an officer of the court.

15   A.  Of course.

16   Q.  And you're making a point about what was an appraisal in

17   2012, in a Costco document that your investigator received,

18   right?

19   A.  Correct.

20   Q.  And so you had thousands of sales to choose from in this

21   document.  And I understand your testimony to be when you stood

22   up here on direct, you were aware that in this document, on

23   your direct testimony, that there were eight .70 VS2 I diamond

24   sales rings items in the chart.  It's not that you overlooked

25   it.  You knew about it.  Right?

195

G9KATIF7ps

1    A.   I knew that there were .70 carat line items in this chart,

2    yes, but again --

3    Q.   Not just .70 carat.  VS2 I 2012.

4    A.   Correct.

5    Q.   You knew that.

6    A.   Correct.

7    Q.   And you left it out of your testimony, didn't you?

8    A.   I was not specifically asked about the .70.  And, again --

9    Q.   You also weren't asked about 2012, were you?

10   A.   No.

11              THE COURT:  Mr. Dabney, we're done for the day.

12              MR. DABNEY:  Thank you, your Honor.

13              THE COURT:  Ladies and gentlemen, thank you for your

14   work with us today.  This concludes the presentation of

15   evidence for today.  We will resume tomorrow morning.  We'll

16   have a full day tomorrow.  Please be ready in the jury room by

17   9:15.

18              I remind you that you must not discuss the case or

19   anything or anyone having anything to do with it among

20   yourselves or with any other person, directly, electronically,

21   or by any other means.  Leave your notes in the jury room in

22   the envelopes provided, and please be back in time to start

23   promptly at 9:15.  And I think we will have some goodies for

24   you there.

25              Again, thank you.  Safe home and safe return.

196
G9KATIF7ps

1          Ms. Ng will escort the jury out.

2          (The jury left the courtroom)

3          THE COURT:  Ms. Abrams, you may step down.

4          THE WITNESS:  Thank you, your Honor.

5          (Witness excused)

6          THE COURT:  Please be seated, everyone.

7          So your issue, Mr. Mitchell.

8          MR. MITCHELL:  Thank you, your Honor.  Pursuant to the

9    Court's ruling, order, pretrial order, we were served today

10   with Costco's proposed witness list for its case, for

11   defendant's case, and included on that witness list -- yes, we

12   received an e-mail today, and included among the witnesses

13   Costco proposes to offer on its case are linguists, and there

14   are three linguists identified on their list.  We had this

15   conversation about linguists at the pretrial conference on

16   December 8.  The Court ruled that no linguists were going to

17   testify and they weren't going to be brought in.  Yet they're

18   still on the list.

19          Subsequent to the pretrial conference on September 8,

20   on Friday, September 9, we wrote to Mr. Dabney and asked

21   Mr. Dabney whether he was going to revise his proposed witness

22   list for trial in light of your Honor's rulings at the pretrial

23   conference.  We never got a response.  Obviously the response

24   today is, no, it wasn't changing anything notwithstanding what

25   the Court had ruled on September 8.

197
G9KATIF7ps

1          So we would like to not be in a position of having to

2     prepare for witnesses that the Court has already ruled can't

3     testify in this case.  And I feel as if it's repeatedly, no

4     matter what your Honor rules, Mr. Dabney finds a way to kind of

5     bring it back into the case, either through objections to

6     deposition testimony, objections to documents, now it's his

7     exhibit list.  And we end up spending a lot of legal time and

8     expense revisiting issues that your Honor clearly rules on, and

9     at some point it becomes very challenging to have to constantly

10    get up to complain to your Honor about it.  I feel bad about

11    having to complain all the time.  But it seems as if Mr. Dabney

12    does not follow any order that your Honor says in good faith.

13         Obviously this trial process is grounded upon counsel

14    cooperating with each other, because all the rules of pretrial

15    conduct require the lawyers to observe professional courtesy,

16    to be reasonable with each other, no matter -- and it's been

17    now repeatedly, no matter what your Honor says, Mr. Dabney does

18    something different and I keep having to get up.  I have to get

19    up to object to his opening.  I have to get up to object to

20    questions.  At some point, your Honor, I would like to not have

21    to keep arguing the same things again.  Mr. Dabney is now going

22    to argue why the linguists should come in.  I had this

23    conversation with him because I tried to resolve it.  So now

24    we're going to have yet another conversation about linguists,

25    which I thought was already off the table.  And certainly I

198

G9KATIF7ps

1    would ask your Honor that Mr. Dabney be compelled to go back,

2    give us a new list of witnesses that complies with the pretrial

3    order that was entered and the rulings made at the pretrial

4    conference.  Thank you.

5             THE COURT:  Thank you.

6             Very briefly, Mr. Dabney, I will allow you to speak

7    before I respond.

8             MR. DABNEY:  Your Honor, I don't know how the

9    testimony is going to unfold completely in this case.  I

10   believe the testimony already has placed in issue what our

11   witnesses reasonably believed, what the buyers of these rings

12   believed, and we believe that the six dictionaries your Honor

13   has said can come in with appropriate foundation, the relevance

14   of those, one of which six dictionaries was edited by one of

15   the witnesses on the list, another dictionary was edited by

16   another witness on the list, the evidence the Court has said

17   may come in is made more powerful by some questioning about its

18   origin and significance.  So until a question is asked, I don't

19   think it's proper to say that there's absolutely nothing

20   Dr. Nunberg could possibly say that would be admissible in this

21   case, so I can't even have him listed as a witness at all.

22   They have his expert report.

23            THE COURT:  Mr. Dabney, I made a Rule 403 ruling that

24   you get six dictionary references, period, admissible pursuant

25   to that stipulation.  And I specifically said no linguist.  You

199

1   are not going to develop this genericism thesis through expert

2   testimony.  You get six exemplars, period.  And I don't want to

3   have to repeat my ruling.

4         And I said to you at the sidebar, I say this to you

5   again, you don't like my rules, you don't like my rulings,

6   you're perfectly welcome to disagree with me.  And I see you're

7   building a trump for your appeal.  You know, God bless you.

8   But those are issues that you take up on the 17th floor and you

9   don't repeatedly raise here.  I have charged the 330 sidebar

10  about your notebook entirely to your side.  I'm going to charge

11  this colloquy to your time allocation.  And I warn you that if

12  you continue to revisit in this way rulings that I have already

13  made clearly and if you continue by your actions, gestures, and

14  language to act contemptuously toward the Court, I'm going to

15  go there.  So please don't make me go there.

16        MR. DABNEY:  Your Honor, I don't mean to make any

17  offer of proof through any of these witnesses.  If there is

18  nothing that they could possibly say and that's clear on the

19  record, then we're happy to not even make a proffer.

20        THE COURT:  It was clear on the record when we were

21  here the last time.

22        MR. DABNEY:  OK.  Just so that we understand, we have,

23  for instance, dictionaries.  The Random House unabridged

24  dictionary is one of the six we think is relevant.  Charles

25  Levine is the current publisher of that dictionary, and he was

200
G9KATIF7ps

1    going to come in and explain why "Tiffany setting" was in it.

2              THE COURT:  I told you that an offer of proof is not

3    necessary because I've already ruled.  And I told you that you

4    get six dictionary exemplars.  I did that in very simple

5    English.  Don't make me do it again.

6              MR. DABNEY:  Then based on your Honor's rulings, we

7    will not attempt to call Dr. Nunberg.

8              THE COURT:  That's appropriate.

9              MR. DABNEY:  We will not attempt to call Mr. Levine.

10             THE COURT:  That is also appropriate.

11             MR. DABNEY:  We will not attempt to call John Morse,

12   publisher of --

13             THE COURT:  That is also appropriate.

14             MR. DABNEY:  -- of Webster's 3rd.  I think those

15   are --

16             THE COURT:  You have a stipulation that authenticates

17   those and get them in and you are allowed your six exemplars,

18   period.

19             MR. DABNEY:  With regard to the stipulation, we

20   accept, if the sidebar today is the Court's final word on the

21   stipulation, then we can move on with regard to that.  There

22   won't be any more discussion of that.

23             THE COURT:  And at the sidebar, to be perfectly clear

24   and for the avoidance of doubt, the stipulation doesn't mean

25   admission into evidence of the stipulation itself with all of

G9KATIF7ps

1    its references and the attachments that you have made to it.

2            MR. DABNEY:  Well, the attachments were part of the

3    stipulation.  I understand that the Court is ruling that the

4    stipulation is not going to be admitted in evidence.

5            THE COURT:  Correct.

6            MR. DABNEY:  All right.

7            THE COURT:  Thank you for conferring.

8            MR. MITCHELL:  So we can now -- we get a revised

9    witness list and a revised exhibit list, because there are so

10   many exhibits in here that go to the issue that your Honor has

11   ruled is not coming in, so that by tomorrow morning we have a

12   clear picture of who it is we're going to have to prepare for

13   and what evidence and documents we can prepare for, because as

14   your Honor knows there are 7 hundred and, I don't know, 50

15   defendant's exhibits that may go to this issue that your Honor

16   has ruled on repeatedly.

17           And one final witness that Mr. Dabney did not mention

18   is a Mr. Palmieri.  He was the author of that list of all of

19   those entries that supposedly appeared in the different

20   newspapers.  I believe that's the source of that.  His

21   testimony, as an expert, was solely to the issue of genericism,

22   and I have no idea what it is that Mr. Palmieri would come in

23   to testify to because he was exclusively a genericism witness.

24   So I think, notwithstanding what Mr. Dabney just said about

25   removing Levine, Nunberg, and Morse, I think Mr. Palmieri may

202
G9KATIF7ps

1    be a back-door way to try to do it again.  I don't want to

2    revisit the issue.  So I don't know what --

3              THE COURT:  I will permit Mr. Dabney to make an offer

4    of proof with respect to Mr. Palmieri.

5              MR. MITCHELL:  Thank you, your Honor.

6              MR. DABNEY:  Mr. Palmieri's roles in this case did

7    include evidence that we will now not be proffering based on

8    what your Honor has ruled.  But Mr. Palmieri is also a witness

9    with regard to the shapes of jewelry that the plaintiffs have

10   seen fit to introduce in this case, raising the argument that

11   Costco has improperly sold jewelry whose shape they say

12   resembles nothing but Tiffany & Company jewelry.  And

13   Mr. Palmieri is here.  The Court said September 8.  If they go

14   there with their evidence, we can go there with our jewelry

15   boxes of other settings.  They're going there obviously, so

16   those are Mr. Palmieri's demonstratives he's going to use to

17   rebut their claim.

18             THE COURT:  Within that limited scope and with the

19   predicate of testimony on the plaintiff's case, we'll see how

20   that develops.

21             MR. MITCHELL:  Thank you, your Honor.  I agree with

22   your Honor, we'll have to see how that develops.  I don't know

23   at this point.

24             THE COURT:  Thank you.

25             MR. MITCHELL:  Thank you.  Can we get a revised list,

203

G9KATIF7ps

1    though, at least.  Thank you.

2                THE COURT:  If you let me speak.

3                MR. MITCHELL:  I'm sorry.

4                THE COURT:  Revised witness and clarified exhibit list

5    by 9 o'clock tonight to the plaintiffs.  You have quite the

6    army there.  I think you can do that.

7                Mr. Dabney.

8                MR. DABNEY:  Yes.  Can I just ask that Ms. Abrams be

9    directed not to confer with counsel since she's under

10   cross-examination.

11               MR. MITCHELL:  It goes without saying.  Thank you.

12               THE COURT:  Thank you.

13               Now, counsel, I have to ask you to do a very complete

14   tidy-up of the tables because I have something in here later on

15   this evening and I will need the tables.

16               Thank you very much.  See you at 9 o'clock tomorrow

17   morning.  See you all.

18               Consider yourselves adjourned.  Thank you.

19               (Adjourned to 9:00 a.m., September 21, 2016)

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                            Page

3    BRITTNI POPP

4    Direct By Mr. Mitchell . . . . . . . . . . . .88

5    Cross By Mr. Dabney  . . . . . . . . . . . . 108

6    Redirect By Mr. Mitchell . . . . . . . . . . 116

7    JEAN MARCEL LABARBERA

8    Direct By Mr. Mitchell . . . . . . . . . . . 121

9    Cross By Mr. Dabney  . . . . . . . . . . . . 127

10   Redirect By Mr. Mitchell . . . . . . . . . . 134

11   Recross By Mr. Dabney  . . . . . . . . . . . 140

12   EWA ABRAMS

13   Direct By Mr. Mitchell . . . . . . . . . . . 142

14   Cross By Mr. Dabney  . . . . . . . . . . . . 169

15                       PLAINTIFF EXHIBITS

16   Exhibit No.                             Received

17    65     . . . . . . . . . . . . . . . . . . .93
      25     . . . . . . . . . . . . . . . . . . .97
18    66     . . . . . . . . . . . . . . . . . . 101
      26     . . . . . . . . . . . . . . . . . . 103
19    58     . . . . . . . . . . . . . . . . . . 107
      5    . . . . . . . . . . . . . . . . . . . 144
20    27     . . . . . . . . . . . . . . . . . . 151
      82     . . . . . . . . . . . . . . . . . . 154
21                       DEFENDANT EXHIBITS
     Exhibit No.                              Received
22    76     . . . . . . . . . . . . . . . . . . 109
      19     . . . . . . . . . . . . . . . . . . 115
23    811    . . . . . . . . . . . . . . . . . . 133
      209    . . . . . . . . . . . . . . . . . . 171
24    2      . . . . . . . . . . . . . . . . . . 171
      485    . . . . . . . . . . . . . . . . . . 176
25    486    . . . . . . . . . . . . . . . . . . 177
      487    . . . . . . . . . . . . . . . . . . 178
```