G9LFTIF1                    Trial

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------x

TIFFANY AND COMPANY, et al,

                    Plaintiffs,

            v.                          13 CV 1041 (LTS)

COSTCO WHOLESALE CORPORATION,

                    Defendant.

------------------------------x

                                        New York, N.Y.
                                        September 21, 2016
                                        9:00 a.m.

Before:

                    HON. LAURA TAYLOR SWAIN,

                                        District Judge

                         APPEARANCES

BROWNE GEORGE ROSS LLP
     Attorneys for Plaintiffs
JEFFREY A. MITCHELL, ESQ.
JUDITH R. COHEN, ESQ.
BRETT D. KATZ, ESQ.

HUGHES HUBBARD
     Attorneys for Defendant
JAMES W. DABNEY, ESQ.
RICHARD M. KOEHL, ESQ.
EMMA L. BARATTA, ESQ.

1          (Trial resumed)

2          (In open court; jury not present)

3          THE DEPUTY CLERK:  Tiffany and Company et al versus

4    Costco Wholesale Corporation.

5          THE COURT:  Good morning, Mr. Mitchell, Ms. Cohen,

6    Ms. Abrams.  Good morning to the plaintiff's team.  Good

7    morning to Mr. Dabney, Ms. Baratta, counsel for the defense and

8    Mr. Schutt.  So were the revised witness lists provided as

9    ordered last night?

10          MR. DABNEY:  Yes, they were.

11          THE COURT:  Very good.  Do you have copies for the

12    Court?

13          MR. DABNEY:  We should.  I have the exhibit list.  We

14    could get your Honor the witness list.

15          THE COURT:  All right, the exhibit list is very

16    helpful for now.  And we'll deal with the other.  Thank you.

17    So is that one more?

18          MR. DABNEY:  One more.  Do you need a third one?

19          THE COURT:  Ms. Ng and I each.

20          MR. DABNEY:  Very good.

21          THE COURT:  Thank you.  All right.  Mr. Mitchell,

22    would you update your projected witness sequence?

23          MR. MITCHELL:  Yes, your Honor.  After Ms. Abrams we

24    have Mr. Kaczmarek, Mr. Schutt, Mr. Hesketh and we have the

25    deposition testimony of, I don't remember the order of it, but

G9LFTIF1                    Trial

1    Ms. Switzer, Mr. Jelenik and Ms. Murphy and we conclude with

2    Mr. Hart.

3             THE COURT:  Thank you.  And just as a reminder, and

4    I'll remind everybody at the end of the day, that tomorrow we

5    have the early end time at 2:00 with the 30-minute lunch break.

6             So, Mr. Mitchell, you have some additional issues?

7             MR. MITCHELL:  Apparently.  I didn't know I did, but

8    apparently I do.

9             THE COURT:  Let's wait on those for a minute because I

10   have just one other thing on my list which is in anticipation

11   of the charge conference on Monday, which as you know it's

12   scheduled for 4:30 on Monday.  Any briefs for alternate or

13   supplemental proposed language on substantive or other nature

14   issue must be filed with a courtesy copy to chambers by noon on

15   Friday so that everyone has an opportunity to consider what's

16   proffered.  And objections with respect to issues that have

17   already been briefed are preserved and so I don't expect to

18   have to revisit old ground.

19             Mr. Mitchell?

20             MR. MITCHELL:  First of all, as your Honor may recall,

21   Mr. Dabney raised an objection yesterday to the use of the

22   chart that was in Mr. Kaczmarek's declaration from June of

23   2014, and we discussed in detail with the Court that we were

24   going to change that document, which we did.  His concern or

25   his expressed concern yesterday was use of the word "display,"

1    as you may recall in those charts.

2              THE COURT:  Yes.

3              MR. MITCHELL:  So we removed that and at 7:37 last

4    evening e-mailed Mr. Dabney the copy of the revised chart.  Ten

5    minutes before your Honor walked into the courtroom Mr. Dabney

6    says he still doesn't like the language and now he's handed me

7    a further markup.  We had given him this at 7:37 last night.

8    We had modified it based upon the conversation and the order

9    the Court entered yesterday, we'd like to proceed upon the

10   modified document that was served on him last night at 7:37.  I

11   said, "Is there any reason you couldn't have e-mailed me last

12   night if you had a problem with this?  Because we gave it to

13   you early enough to do that."  There was no response.

14             THE COURT:  Mr. Dabney, do you want to be heard?

15             MR. DABNEY:  Yes, your Honor.  And let me say, first

16   of all, before saying anything else that as your Honor knows, I

17   am fairly passionate about my approach to practice and I do

18   what I can to preserve my client's rights and anything I've

19   said or done that has been treated as disrespectful by the

20   Court or your Honor --

21             THE COURT:  Well, they have been.  This sort of

22   non-apology, "if anybody is offended I'm sorry," does not go

23   far.  You are operating in a profession that has rules in which

24   judges make directions and in which a level of civility and

25   basic propriety in human interaction is required as between

1    lawyers and as between lawyers and the Court, and, yes, you

2    have an obligation of zealous advocacy, but it's zealous

3    advocacy within the bounds of the law.  I'm not saying you

4    overstepped any specific legal boundaries here, but aggressive

5    tactics burn a lot of human capital, burn personal capital, I

6    assume you're making strategic decisions and yesterday I told

7    you your strategic decisions are ones that may be digging holes

8    in your road and I presume you're going to be taking that into

9    account in making your decisions.

10           MR. DABNEY:  Your Honor, I just want to make clear

11   that I hold this institution and your Honor in the highest

12   respect and I regret that if anything I've done or said as

13   seeming to signal otherwise, and if I have not been -- anyway,

14   I say that, because the way this has been approached is that

15   this application is very personal as to me, why didn't I do

16   something when I was exhausted last night getting ready to

17   cross-examine witnesses today.

18           I look at this document which over objection was not

19   in the expert report.  Before coming out here I told counsel

20   for the plaintiff how if they modified it it would be

21   acceptable to Costco.  I can put up on the ELMO the

22   modifications we proposed, because I believe that the

23   modifications that were attempted by the other side were not

24   consistent with the colloquy yesterday.

25           This is, again, a document that was never subject to

1    the pretrial expert exchange or discovery process and the

2    apparent purpose of this document is to create an inference

3    that Costco sales records are not true because there are so

4    many more sign records than there are sales records.  And the

5    problem we have with the headers on this, which no witness has

6    sponsored, no witness with personal knowledge as to this, we

7    don't know who created this document, implies that what is

8    shown here are signs and signs in use and the use of the word

9    "use" in this context is ambiguous.

10           So what we have said is simply use language that

11   removes any insinuation that what we're looking at here is

12   anything other than printouts of selected records in Costco's

13   AS/400 computer records, and if they do that and do not by

14   their headings imply that these were signs in stores, we have

15   no problem with the use of the document in that fashion.  And I

16   wrote it out so as to try to provide counsel with something

17   they could use and not to be obstructive.  So that was my

18   attempt at instruction.

19           THE COURT:  Thank you for that information.  I

20   understand it was delivered this morning and as you know I have

21   not given counsel permission to bring printers and such into

22   the courthouse in order to regenerate documents on the spot.

23   The exhibit refers to signage records.  To the extent you feel

24   anything is misleading or needs to be clarified you'll have the

25   opportunity to do that on cross.  So to the extent this is an

1    objection to this exhibit on the grounds that are outlined in

2    the exemplar that you've put on the ELMO, that objection is

3    overruled, and if you want to mark that in some way for the

4    record you can call it.

5              MR. DABNEY:  We'll call it, this is a page Plaintiff's

6    Exhibit 133.0001 and I'll just mark this with --

7              THE COURT:  Costco objections 9/21 or whatever the

8    date is, 2016.

9              MR. DABNEY:  That's fine, your Honor.

10             THE COURT:  Thank you.

11             MR. DABNEY:  We have another related, closely related

12   issue to bring up before your Honor and that is, and again,

13   this is something we hadn't exchanged before trial in which the

14   parties exchanged demonstratives and one of the plaintiff's

15   demonstratives on damages had included numbers and a theory

16   that we had objected to and we had thought they had withdrawn

17   that, but then in opening counsel for the plaintiff said that

18   their expert, I'm going to put up page 58 of the transcript,

19   that their expert was going to testify as stated on page 58,

20   lines 14 through page 58, line 19, and here again this figure,

21   3,349 rings and 13.9 million of revenues is not only not in

22   Mr. Kaczmarek's original report, it is not only not in his

23   untimely summary judgment opposition, but it's also directly

24   contrary to what he submitted in his summary judgment

25   opposition, and we under -- I'll put up what Mr. Kaczmarek did

1   in the summary judgment opposition which is the same place that

2   this chart came from.  This was handed up to the Court

3   yesterday.

4           The history here is that in Mr. Kaczmarek's original

5   expert report he relied on the summary document 37754.  Then

6   Dr. Cornell rebutted that and pointed out that 37754 included

7   some sales from before the statute of limitations and some

8   sales from after the signs were changed.  And so Mr. Kaczmarek

9   in his affidavit in June said okay, well, I can easily adjust

10  to that and he provided tables on page 13 of his expert report,

11  and I'll put up page 13 of his report on the document camera.

12  And what Mr. Kaczmarek said was okay, I originally said there

13  were 2,688 net sales on the spreadsheet and if that includes

14  things that shouldn't be included, I'll reduce it to the

15  2,000 -- well, he's using a different number here.

16          MR. MITCHELL:  It's the bottom of the page.

17          MR. DABNEY:  Okay, sorry, the bottom of the page.  So

18  we have the number 2,498 which was the net sales figure that

19  Dr. Cornell had relied on for all of the signs including

20  Tiffany set and Tiffany setting, round Tiffany set and so

21  forth.  Never did Mr. Kaczmarek suggest that the concept of

22  gross profits in this case should be based on Costco's gross

23  sales revenues rather than Costco's net sales revenues based on

24  the unit items.  The numbers in this case was always, if you

25  took -- if you didn't factor out signs that included setting

1    and set, the number was always about 2,498.  So for us to hear

2    two weeks before trial that their expert is proposing now to

3    say that the basis is not 2,498 and the sales figures here but

4    is 3,349, which is no figure that he ever suggested was a fair

5    measure of the profits here, we think is barred by Rule 37 and

6    should not be permitted.

7         Where this number comes from, apparently, if you look

8    at what counsel said during opening statement, is that after

9    Dr. Cornell's report was served and even after Mr. Kaczmarek

10   made his amendments we were just looking at sometime in 2015,

11   2016, we don't know when, someone thought to put forward yet

12   another theory of damages based on the intermediate calculation

13   by Dr. Cornell of what the gross unit sales were before you

14   took into account return.  But in a case in which gross profits

15   is the measure of damages, both experts agree that the correct

16   number was the net sales number, not the gross sales number on

17   returns.  So we don't believe it is appropriate for

18   Mr. Kaczmarek to give evidence on this theory which was never

19   disclosed even in his own timely summary judgment.

20            THE COURT:  Thank you, Mr. Mitchell?

21            MR. MITCHELL:  I'm always befuddled by some of these

22   objections.  We had an expert report prepared by Mr. Kaczmarek

23   in the fall of 2013, November.  He had to prepare his report

24   first.  He was provided with documentation, obviously long

25   before your Honor ruled in the case or where the scope of the

1    case had been narrowed in September of 2015 by the Court's

2    decision on the summary judgment motion.  Subsequent to the

3    submission of his report Mr. Cornell submitted a counter

4    report.  Mr. Cornell said, Mr. Kaczmarek, you were wrong, you

5    included sales outside the statute of limitations period.

6    Mr. Kaczmarek didn't know at the time he did it because he

7    assumed, he will testify, that when he received whatever

8    production Costco had made he assumed they produced relevant

9    sales information and he did not assume that whatever sales

10   information they produced was not sales information that he

11   should try to calculate profit on.

12          But what happened is, he is not disputing what

13   Costco's expert says.  Fine, it's outside the statute of

14   limitations.  If you look at what Mr. Dabney put up, the

15   difference is about $100,000, so he gave up on the point and

16   simply is adopting their calculation and using their

17   calculation with his profit figure of 13 percent which will

18   establish -- so we don't have to fight over it.  I don't even

19   understand --

20          THE COURT:  I think what I'm hearing Mr. Dabney say is

21   that his representation and understanding is that the experts

22   both at the end of the day calculated the damages figure based

23   on net sales of rings, rings after returns, which is that 2498

24   or thereabouts figure and he's hearing and reading you to have

25   said yesterday, no, our expert is now going to be proffering as

1    a basis for the damages calculation the number of sales prior

2    to returns, the 3349 figure and running that same 13 percent

3    margin or whatever on the 3349, although those rings were

4    returned and no expert report from the plaintiff had ever put

5    forward that theory or the analytical basis of it.  Did I hear

6    you correctly, Mr. Dabney?

7              MR. DABNEY:  Yes, your Honor.

8              THE COURT:  So are you planning to present 3349 as a

9    base figure for the profit calculation and if so, on what

10   disclosure and on what analytical basis?

11             MR. MITCHELL:  I wish I had a conversation with Mr.

12   Dabney about this before we came to court today, but, again,

13   this is another instance of us talking about it for the first

14   time, hearing it from him.  One of the rulings your Honor made

15   previously, and I don't know how the evidence is going to come

16   out, I think I know how it's going to come out, but we need to

17   show gross sales.  It's up to them to show returns and they

18   presumably had deducted from those gross sales returns of

19   subject rings.  I don't believe their records support that

20   deduction.  So what Mr. Kaczmarek will do is he'll say if you

21   go with gross sales, because returns are on Costco to prove, I

22   don't believe their records support a sign-by-sign matching --

23   Mr. Kaczmarek is going to talk about the state of the records

24   that he received, but I don't believe that their proof will

25   support the deductions.

1          The jury can disagree with that or agree with that.

2     The difference in the scheme of things is not that great.  I

3     think the difference is the difference between 1.4 million and

4     1.8 million, and I'm sure that 400,000 is going to be spent by

5     Costco in legal fees fighting over the 400,000.  But since we

6     only have to prove gross sales, that gross sales figure is

7     Dr. Cornell's gross sales figure and then he deducts from that

8     gross sales figure.  That's the point.  It's simply using your

9     number, if the number is 3,000 and the returns aren't credited

10    properly, which is your burden, then it's 3,000.

11         THE COURT:  So it's an issue of how you get to a net

12    number and the burden shifting in this particular context of

13    gross profit calculations.

14         MR. MITCHELL:  Absolutely correct and it's simply

15    using their numbers.

16         THE COURT:  Thank you.

17         MR. DABNEY:  Your Honor, the document Mr. Kaczmarek

18    relied on included gross units as well as gross dollars.  It

19    included net units as well as net dollars and the expert report

20    that they served in November shows not the gross units and

21    gross dollars but the net units and net dollars.  That is what

22    Dr. Cornell responded to.  That is the position Mr. Kaczmarek

23    took as recently as June, 2014, and there never was a word said

24    in this trial in prior proceedings that instead of looking at

25    sales net of returns as setting the top line revenue number in

1   this case from which costs of goods sold would be deducted that

2   Mr. Kaczmarek was going to come in and argue that in order to

3   figure out what Costco's profits were he was going to talk

4   about what the sales were on an intermediate number of the

5   rebuttal expert report that he obviously did not rely on even

6   when in June of 2014 he had the chance to change his report,

7   apparently, and he didn't do it even then.

8          So we just think that under Rule 37 and under Rule 26,

9   it is clearly not proper for the plaintiff to come in and try

10  to inflate the claim in the way that they're doing.  This is

11  not about who has the burden of proof in proving deductions

12  from revenues.  This has to do with what both experts said were

13  the revenues.  And this is a totally new issue being injected

14  into the case, the returns of items that are shown on the

15  records they relied on and put this out as the gross profits.

16  It wasn't -- this is a totally new concept that gross profits

17  should not take as the starting point the revenue from the

18  items according to records of gross net of returns.  So we

19  don't think this should be allowed to be used.

20         THE COURT:  The objection is overruled and your record

21  is made.  We will bring in the jury.

22         MR. MITCHELL:  One final item that had to do

23  apparently with the testimony of Mr. Schutt.  It may or may not

24  be an issue but I want to raise it so I don't have to be

25  interrupted if I don't have to be.  I have a question for Mr.

1    Schutt about Costco's counterclaim.  It's a general question.

2    I don't need to put the pleading into the record, but I might

3    need to read a paragraph from the pleading if the witness,

4    depending on what the witness's response is.  Assuming that's

5    okay, I don't need to put the pleading in.  Mr. Dabney's

6    objection was to putting the pleading in.  I said I don't need

7    to do that, and I wasn't clear, again, whether he's objecting

8    to me just asking him a question regarding the statement in the

9    counterclaim.

10              THE COURT:  Mr. Dabney?

11              MR. DABNEY:  Your Honor, before trial we had objected

12    to the plaintiff's exhibit list which had included the

13    complaint, the answer and counterclaim, the prior counterclaim

14    and the application for interlocutory appeal to the Second

15    Circuit.  We don't believe that these lawyer-signed pleadings

16    should be introduced into evidence or relied upon to

17    cross-examine a lay witness about the issues in this case which

18    is what was the state of mind and why did certain signs happen

19    prior to the lawsuit being filed.  By the time the pleading was

20    filed the signs had all been changed.  So we just think --

21              THE COURT:  Well, there is a claim and there's

22    argumentation that goes to the likelihood of recurrence of the

23    conduct and Costco's attitude going forward to Tiffany's

24    trademarks and that goes into the question of whether punitive

25    damages are necessary as determinable.  If there's a request

1    for injunctive relief that the Court will evaluate on the basis

2    of this record, it will be relevant to that.  So that's what I

3    understand the basis of that particular proffer being.

4           So, Mr. Mitchell has said he's not going to try to put

5    these pleadings themselves before, but instead will ask a

6    question designed to establish that Costco's response was

7    "invalidate the trademark" as opposed to "sorry."  So, do you

8    have an objection to that question and those circumstances with

9    the possibility that he might offer the document to refresh

10   recollection but not get into --

11          MR. DABNEY:  I don't know if it's going to be a

12   practical problem, but we'll object to that under Rule 403.

13          THE COURT:  That objection is overruled.

14          MR. DABNEY:  Your Honor, Mr. Mitchell said I have one

15   thing and I neglected to mention and I needed to yesterday.

16   When I was talking about what Mr. Palmieri would testify to,

17   one of the subjects that he was examined about in his

18   deposition and that he's going to potentially testify to is the

19   testimony the plaintiffs apparently may offer with regard to

20   appraisals of Costco diamond rings.  So in addition to

21   rebutting the testimony they want to proffer about jewelry

22   shapes, Mr. Palmieri is also potentially going to rebut the

23   evidence they've offered about appraisals.

24          MR. MITCHELL:  Your Honor, the issue of appraisals was

25   obviously before the Court in the motions in limine.  We had

1    proffered Cecilia Gardner, the head of the Jewelers Vigilance

2    Committee, as your Honor may remember, who was going to talk

3    about standards.

4              THE COURT:  Yes.

5              MR. MITCHELL:  The Court granted that motion in limine

6    so she is not going to testify at trial.  Mr. Palmieri is a

7    member of the Jewelers Vigilance Committee and he wrote the

8    very standards about which Ms. Gardner was going to testify.

9    So having used the shield of a motion in limine to prevent

10   Ms. Gardner from testifying, then he can't use Mr. Palmieri I

11   don't think as a sword to now testify about standards when

12   Ms. Gardner is not going to testify.  That was an issue that

13   was a discrete issue that was raised at Mr. Palmieri's

14   deposition and that's why we got Ms. Gardner, that's why we

15   obtained Ms. Gardner's testimony, because what Mr. Palmieri

16   said was wrong.  And I can't impeach him now without

17   Ms. Gardner.  That's what they wanted.  They didn't want

18   Ms. Gardner here.

19             We're simply putting before the jury the appraisal.

20   We bought the ring and got an appraisal and whatever that

21   appraisal is or whatever that appraisal is supposed to be, we

22   have one too, we bought a Costco ring.  So they wanted it to go

23   that way and they didn't want to talk about standards of

24   appraisals.  That's fine.  It's just before the jury as a fact,

25   but at this time to say now I'm going to bring Mr. Palmieri in

1    to talk about exactly what we prevented Ms. Gardner from

2    testify to this.

3         MR. DABNEY:  Your Honor, we had taken the position

4    this argument about appraisals shouldn't be taking place in

5    this case at all.  Your Honor overruled our position on that,

6    so notwithstanding the granting of the motion in limine to keep

7    out this third party's organization non-binding standards, the

8    Court has ruled that the plaintiffs may come in and make

9    arguments that the appraisal like we went over yesterday is

10   somehow relevant to issues in the case.

11        So I don't know how their case is going to unfold, but

12   just the potential subject matter of Mr. Palmieri's testimony,

13   not about standards, but about what evidence they're going to

14   put in on the subject, whatever that might be, it might include

15   that.  That's the only point.

16        THE COURT:  Well, I think we will need to see how this

17   develops, but I will put you all on notice that to the extent

18   it develops and I permit Mr. Palmieri to testify as to

19   standards that raise the matter of appraisal or the propriety

20   of those standards I may permit the plaintiff to rebut with the

21   evidence as to the Jewelers Vigilance, whatever it is,

22   standards and Mr. Palmieri's familiarity with it and

23   familiarization with those standards.

24        MR. DABNEY:  Very good.

25        THE COURT:  Let's call this a two-minute warning.  Do

1    whatever you need to do, come back to your places and we'll

2    bring the jury in.

3              (Recess)

4                            o0o

5              THE COURT:  Good morning, again.  Please be seated.

6    Before the jury is brought in I've been asked to clarify an

7    element of the timekeeping rules.  So when a party is

8    questioning a witness, the entire time period of that

9    examination including sidebars is ordinarily charged to the

10   time of the person who is questioning.  As I had told you

11   before, I reserve the right to determine that instead time

12   should be charged to one side or the other or in some other way

13   disproportionately, and I'll either make that determination on

14   the spot or shortly afterward and let you all know if that rule

15   is different.

16             So conferences and colloquies like this are

17   presumptively divided half and half unless I say otherwise.

18   The time that is taken for a direct or cross-examination is

19   charged to the person conducting, the party conducting the

20   examination, unless I say otherwise.  All right.  Thank you

21   all.

22             Ms. Ng, would you bring the jury in, please?

23   Ms. Abrams, would you please come back to your seat?

24             (Continued on next page)

25

1          (In open court; jury present)

2          THE COURT:  Members of the jury, thank you for your

3   patience while we sorted out some issues that will make the

4   presentation of evidence go for smoothly.  So now we continue

5   with the cross-examination of Ms. Abrams.  Ms. Abrams, you are

6   still under oath.

7          THE WITNESS:  Yes.

8    EWA ABRAMS,

9        called as a witness by the Plaintiff,

10        having been previously duly sworn, testified as follows:

11          THE COURT:  Mr. Dabney.

12   CROSS-EXAMINATION

13   BY MR. DABNEY:  (Continued)

14   Q.  Ms. Abrams, yesterday we talked a little bit about the

15   diamond ring that was purchased at Costco and we identified the

16   beige box, Plaintiff's Exhibit 19, which I believe you said was

17   similar to the box that your investigator got, correct?

18   A.  Yes.

19   Q.  And you were also asked about the Tiffany and Company blue

20   box package, do you recall that?

21   A.  Yes.

22          MR. DABNEY:  Your Honor, may I approach the witness

23   with a sample of packing?

24          THE COURT:  Yes.  Does it have a designation?

25          MR. DABNEY:  This has been marked as Defendant's Trial

1   Exhibit 821.

2   Q.  I hand you a bag and box marked Defendant's Exhibit 821.

3   Can you identify that please?

4   A.  This is Tiffany packaging blue box and blue bag.  Typical

5   packaging.

6           MR. DABNEY:  Your Honor we offer Exhibit 821 in

7   evidence.

8           THE COURT:  Any objection?

9           MR. MITCHELL:  Can I see what that is?

10          (Pause)

11          MR. MITCHELL:  Can we have a sidebar, your Honor?

12          THE COURT:  Yes.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              MR. MITCHELL:  This was not on their exhibit list and

3      now it's being offered as an exhibit.  I don't know for what

4      purpose.  Obviously this is a bag from a Tiffany store, not

5      Costco.  I don't know what he intends to do with it, but it's

6      certainly not on the list.  To the extent it's not on the list

7      it shouldn't be offered as evidence in the case.  I don't know

8      what Mr. Dabney intends to do with it should it be used in the

9      future, but 821 is not an exhibit.

10             THE COURT:  The list you gave me ends at 811, so

11     what's going on?

12             MR. DABNEY:  This is a demonstrative exhibit.  It was

13     provided to us by the plaintiffs throughout the case.  We had

14     been relying on other Tiffany and Company packaging throughout

15     our proceedings.  This is in fact a substitution for one of the

16     other exhibits on our list.  We now have their witness for the

17     first time to authenticate the bag which she has, so there's no

18     denial that the plaintiff's produced this to us.  This has been

19     in the case from the beginning and we're simply offering it so

20     that the jury can see the difference between the Costco

21     packaging and the Tiffany and Company packaging that the

22     investigator was sent to look for at the Costco store.

23             THE COURT:  If you want to have a voir dire and have

24     the witness undo the ribbon and make sure that everything

25     inside is produced as Tiffany, then you can, but the

1    representation is that's what they got from your side.

2            MR. MITCHELL:  You say you have a photograph of this

3    as one of the other exhibits?

4            MR. DABNEY:  You delivered at the end of the case --

5            MR. MITCHELL:  It doesn't mean you put it on your

6    exhibit list.

7            THE COURT:  All right, it's not on the exhibit list.

8    That's not going to be a ground that's going to get you the

9    objection.

10           MR. MITCHELL:  I understand.

11           THE COURT:  It's authenticity.

12           MR. MITCHELL:  I'll withdraw the objection.

13           THE COURT:  Thank you.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2              MR. DABNEY:  Your Honor, may I show this to the jury?

3              THE COURT:  Just a minute.  We're back on the record

4     now and I have to complete the record.  Defendant's Exhibit 821

5     is admitted into evidence.  You may ask your questions.

6              (Defendant's Exhibit 821 received in evidence)

7     BY MR. DABNEY:

8     Q.  Ms. Abrams, I believe you were in court yesterday for the

9     opening statements, correct?

10    A.  Correct.

11             MR. DABNEY:  With your Honor's permission, I'd like to

12    put up an excerpt from the opening a statement made by

13    plaintiff's counsel?

14             MR. MITCHELL:  If we could just read it?

15             THE COURT:  I don't understand why you need to put it

16    up.

17    Q.  Ms. Abrams, do you recall your counsel telling the jury,

18    quote, "So how many rings did Costco sell?  That's what Tiffany

19    really wanted to know.  And the answer to that question has

20    remained very elusive."

21             Do you recall that statement being made?

22    A.  I recall.

23    Q.  Now, I'd like to put up on the document camera Plaintiff's

24    Exhibit 487, which was a letter that plaintiff sent to you

25    January 31, 2014, I believe you testified?

1   A.   Yes.

2   Q.   So let's go to the first item listed here, item 639911 --

3          THE COURT:   I'm sorry, could you remind me what

4   exhibit that is?

5          MR. DABNEY:   This is Exhibit 487.  Do we have extra

6   copies?

7          THE COURT:   The witness has it.

8   A.   I have it in the binder.

9          MR. DABNEY:   You do have it.  Does the Court have a

10  copy?

11         THE COURT:   Yes.

12  Q.   Now, Ms. Abrams, before the case was brought in response to

13  a request for information from your company, Costco provided

14  you the information in this first paragraph that said, not only

15  were there 224 net sales of this item in fiscal year 2012 and

16  139 in fiscal year 2013 to date, but it also told you that the

17  signage text had changed over time, didn't it?

18  A.   Correct.

19  Q.   And in this case one of the things that you were provided

20  with by Costco was sales records, isn't that so?

21  A.   That's right.

22  Q.   Ms. Abrams, with the Court's permission, I'd like to

23  approach the witness with a copy of Costco trial exhibit 52

24  which is in her binder but it's small.

25         THE COURT:   Yes, you may.

1              MR. DABNEY:  I also have copies for the Court, just

2      larger so they can be read easier.

3              THE COURT:  Thank you.

4      Q.  Ms. Abrams, I show you what's been marked as Costco trial

5      exhibit 52.  You have seen this exhibit before, have you not?

6      A.  Yes.

7      Q.  And you understand this to be a listing of sales, of items

8      to specific members that Costco made, do you not?

9      A.  Yes.

10     Q.  And this was provided to you in 2013, was it not?

11     A.  I don't recall.

12             MR. DABNEY:  Your Honor, we would offer Defendant's

13     Exhibit 52 in evidence.

14             THE COURT:  Any objection?

15             MR. MITCHELL:  No objection.

16             THE COURT:  Defendant's Exhibit 52 is admitted in

17     evidence.

18             (Defendant's Exhibit 52 received in evidence)

19     Q.  And so if we look, for example, at page, direct your

20     attention to -- the pages aren't numbered, unfortunately.  But

21     let's just, if you could turn to the page where the item number

22     begins 639911 for the first time, which is about the middle of

23     the document.

24             MR. MITCHELL:  Where are you?

25             MR. DABNEY:  The pages on this copy aren't numbered.

1           THE COURT:  The first unit number on that page is

2      637277 and goes to 63991.

3           MR. DABNEY:  Correct.

4           THE COURT:  And it's a right side up as opposed to a

5      backward upside down page?

6           MR. DABNEY:  I guess so.

7           THE COURT:  Do you have it, Ms. Abrams?

8           THE WITNESS:  I don't.  Would you mind counting the

9      pages?

10          THE COURT:  I can swap copies with Ms. Abrams.

11          MR. DABNEY:  Sure.

12          THE WITNESS:  Thank you.

13          MR. DABNEY:  Do you have the page in front of you?

14     A.  Yes, I believe so.

15     Q.  And it's true, isn't it, that at your company's request

16     Costco provided you with records that not only showed the net

17     sales of these units but told you the names and addresses and

18     various information about the people who bought them?

19     A.  Yes, of these particular units, yes.

20     Q.  And if you wanted to count out the number of sales of these

21     items, 639911 in this document, was there anything that

22     prevented you from doing that?

23     A.  No.  You could count this unit in this document, yes.

24     Q.  And did you ever compare how many sales are on the buyer

25     list, Costco Exhibit 52, to the number of net sales for that

1   item for fiscal year 2012 that was given in the letter from

2   January 13?

3   A.   I personally didn't, but I -- yes, we went through that

4   exercise likely.

5   Q.   Did you provide this buyer list sales record to your expert

6   in this case, Mr. Kaczmarek?

7   A.   I believe we did.

8   Q.   And what's the basis of your belief?

9   A.   Because we were asking him to provide a report on potential

10  damages.  But I don't recall specifically, you know, the date.

11  Q.   And are you saying that you have some question about the

12  contents of this buyer list, Ms. Abrams?

13  A.   No, but this is an independent buyer list.  It's not

14  necessarily to any particular signs that were in the store at

15  any given time.

16          MR. DABNEY:  Your Honor, I believe that question

17  called for a yes or no.

18          THE COURT:  The motion to strike is denied.

19  Q.   Ms. Abrams, this document tells you exactly what the unit

20  sales were according to Costco sales records, doesn't it?

21  A.   I believe that's what it purports to show for these

22  particular units.

23  Q.   Okay.  So then, so what we have, then, is a listing of the

24  sales and then if we go back to the letter they also tell you

25  that the sign for the item 639911 changed sometime in

1    approximately 2012.  Do you see that?

2    A.  Yes.

3    Q.  And the letter says that before 2012 signs said Tiffany

4    setting or Tiffany set, didn't it?

5    A.  That's what it says, yes.

6    Q.  And you testified yesterday you understand that there's no

7    claim in this case for signs that said Tiffany setting or

8    Tiffany set, correct?

9    A.  We did not bring a claim with respect to Tiffany setting.

10   Q.  Now, you were shown Exhibits -- can I direct your attention

11   to Plaintiff's Trial Exhibit 25, which is in your book there.

12   Do you have it?

13   A.  Got it.

14   Q.  That's a 639911 sign that's in evidence?

15   A.  Yes.

16   Q.  So I'm going to put it up on the ELMO and I'm going to ask

17   you do you have any evidence that you're prepared to describe

18   here that a sign in this form was used by Costco prior to 2012?

19   A.  I don't have the signage information in front of me so I

20   don't recall.

21   Q.  So this case has been pending for three years.  Is there

22   any evidence that you're aware of that that sign was used prior

23   to 2012 by Costco?

24            MR. MITCHELL:  Objection.

25            THE COURT:  Consult.

1              (Pause)

2    Q.   Ms. Abrams, you understand that one of the issues in the

3    case is how many items 639911 sales were made between certain

4    dates in time.  Do you understand that?

5    A.   Yes.

6    Q.   And Defendant's Exhibit 52 is a document that you

7    understand to be a business record that would show the number

8    of sales for item 639911, correct?

9    A.   Yes.

10   Q.   And then a second issue we have to decide is what sales

11   coincided in time with signs like this.  Do you understand

12   that's another issue we have to decide?

13   A.   Sorry, can you repeat the question?

14   Q.   Yes.  Another issue we have to decide is what sales

15   coincided in time with signs that looked like this.

16   A.   That signs that were in the store that looked like this,

17   and others using the Tiffany name.

18   Q.   So with regard to this item in particular.

19   A.   Yes.

20   Q.   Sitting here today you don't have any basis for saying that

21   that sign was used anywhere prior to February of 2012, do you?

22   A.   Like I said, I don't recall.  There were thousands of

23   documents and pages produced in this case, so I don't recall

24   precisely.

25   Q.   You don't have any evidence you can identify here?

1    A.  Again, thousands of pages of documents were produced in

2    this case.  I do not recall precisely.

3    Q.  Well, Ms. Abrams, you were told by Costco in January 2013

4    that the sign was changed in 2013 -- in 2012.  I'm asking you

5    now do you have any basis for disputing that statement sitting

6    right here?

7    A.  We were not produced the records back in 2013 when we

8    received the letter in January.

9    Q.  I'm asking you when you want the truth to be found in this

10   case Ms. Abrams, you realized Costco told you more than three

11   years ago that this sign didn't exist prior to October 2012 and

12   was not in use prior to 2012.  Are you disputing that in this

13   case?

14   A.  Again, I don't recall what the response was prior to that

15   date and we had no documentary evidence from Costco as of

16   January 2013 concerning its representations in the letter.

17   Q.  Are you --

18          THE COURT:  Mr. Dabney, you've had several answers to

19   that question.

20   Q.  Ms. Abrams, you were also told with regard to item 605880

21   that this item was first sold in approximately October 2011.

22   Are you disputing that statement?

23   A.  Again, I don't recall whether or not further in the case

24   documents were produced to corroborate that.

25   Q.  I don't want you to ever be able to say you weren't given a

1    chance to tell us if you have some evidence you want the jury

2    to consider that a sign without "setting" or "set" for item

3    605880 was used prior to September or October 2011.  Do you

4    have any evidence you care to identify here today?

5    A.  We weren't produced any evidence in connection with this

6    letter.  Again, I don't remember of the thousands and thousands

7    of pages produced.

8              (Continued next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. DABNEY:  I'll put up the -- I have nothing

2     further, your Honor.

3          THE COURT:  Thank you.  Is there any redirect?

4          MR. MITCHELL:  Yes, your Honor.  Thank you.

5     REDIRECT EXAMINATION

6     BY MR. MITCHELL:

7     Q.  Ms. Abrams, first, I just want to be clear on the record,

8     you have not spoken to me or anyone else about your testimony

9     since court yesterday, correct?

10    A.  No, no one.

11    Q.  "No" meaning you have not, right?

12    A.  I have not.

13    Q.  And I instructed you that you were not to speak with anyone

14    about your testimony because you were still on

15    cross-examination, correct?

16    A.  Correct.

17    Q.  And you and I have not spoken since you stepped down from

18    the witness stand yesterday, right?

19    A.  Correct.

20    Q.  And you have not talked to anyone else about your

21    testimony; is that right?

22    A.  Correct, I have not.

23    Q.  So let me start with the following.  I'm sure you will

24    recall Mr. Dabney's aggressive questioning yesterday about your

25    testimony concerning the $4,480 sales price reflected in

1    Plaintiff's Exhibit 82.  Do you remember that?

2    A.  Yes, I do.

3    Q.  Mr. Dabney asked you why you did not mention the date of

4    each of those sales.  Do you remember those questions?

5    A.  Yes.

6    Q.  Were you answering my questions that I put to you during

7    your examination?

8    A.  Yes.

9    Q.  And it is true, isn't it, that I didn't ask you any

10   questions about the dates of those sales?

11   A.  Correct.

12   Q.  So if it was anyone's false for not saying something about

13   the date, it was my fault for not asking the question, right?

14   A.  I'll say yes to that.

15   Q.  And you were simply answering the questions that I put to

16   you, not volunteering information.  Right?

17   A.  Correct.

18   Q.  Have you ever testified before a jury before?

19   A.  No.

20   Q.  So that's the first time you've been on the witness stand

21   in this situation.

22   A.  Correct.

23   Q.  And you're an honest person?

24   A.  I am.

25   Q.  OK.  Was the date of those sales at the amount $4,480 the

1    point of your testimony about that figure?

2    A.  No.

3    Q.  What was the point you were trying to make about the amount

4    $4,480?

5    A.  It's just a very specific amount.  $4,480 is not something

6    that's rounded to the nearest hundredths, even to the nearest

7    thousandths.  It stuck out to us.  That was it.

8    Q.  And that was not an amount that you pulled out of thin air,

9    $4,480, right?

10   A.  Correct.

11   Q.  That was the amount that was actually in the appraisal that

12   came with the ring Tiffany bought at Costco, right?

13   A.  Correct.

14   Q.  So it's not something that was produced during discovery

15   during the case, right?

16   A.  Correct.

17   Q.  The investigator went in and that was in the box.

18   A.  Yes.  Yes.

19   Q.  Just look at it for one second if you would.  I want to go

20   to that appraisal, which is -- I have a book here.  One second.

21          Plaintiff's Exhibit 58, can you pull it up, please?

22          THE COURT:  Ms. Ng, can you switch to the plaintiff's

23   screen.

24          MR. MITCHELL:  And can we enlarge that part of the --

25   thank you.

1  Q.  There's a date of this appraisal that came with the ring

2  Tiffany purchased.  What's the date?

3  A.  April 13, 2012.

4  Q.  And the ring was purchased six months later, in November

5  2012, correct?

6  A.  Correct.

7  Q.  Mr. Dabney was asking you some questions about sales in

8  November 2012.  That was well after the date of this appraisal,

9  right?

10  A.  Correct.

11  Q.  And Mr. Dabney made it appear, from the questioning, as if

12  all of your exemplars of $4,480 were from 2009, that they were

13  three years old, right?

14  A.  Yes.

15  Q.  Do you remember his question about the height of the

16  recession, I think he usually prefaced his questions; do you

17  remember that?

18  A.  Vaguely, yes.

19        MR. MITCHELL:  Turn, if you would, Mr. Cole, if you

20  would pull up line 4079?

21        THE COURT:  Which document?

22        MR. MITCHELL:  I'm sorry.  4079 of Plaintiff's Exhibit

23  82.

24        THE COURT:  Thank you.

25  Q.  All right.  So we've enlarged here line 4079.  You see some

1    of the issues; the screen is not like we have TVs nowadays.  So

2    a 4 by 3 screen instead of the other one.  So that cuts things

3    off.  So we've enlarged this as best we can to keep all the

4    information on this line.

5              And what's the date of that $4,480 sale?

6    A.   June 5, 2011.

7    Q.   June 5, 2011.  Did Mr. Dabney mention 2011 in any question

8    to you about $4,480?

9    A.   No.

10   Q.   So the appraisal you got with your ring is dated April 13,

11   2012, and one of your exemplars is June 5, 2011.

12   A.   Correct.

13   Q.   So as late as 2011, there were sales reflected in Tiffany's

14   records at the price that's shown in the appraisal that Tiffany

15   received, $4,480, from Costco.  Correct?

16   A.   Yes.

17   Q.   So the jury doesn't think there's any attempt to hide

18   anything, we've already -- Mr. Dabney has already pointed

19   outlines 117 and 118.  Mr. Cole, could you please pull up line

20   2201.  Let's got all the dates in the record so there's no

21   confusion.

22             Line 2201, what's the date of that exemplar?

23   A.   March 24, 2009.

24             MR. MITCHELL:  OK.  Mr. Cole, can we do line 2754.

25             (Pause)

1          MR. MITCHELL:  Technological delay.

2     Q.  Line 2754, what's the date of that exemplar?

3     A.  February 16, 2010.

4     Q.  And we already did line 4079, so let's go to line 5452.

5     What's the date of that?

6     A.  January 15, 2010.

7     Q.  So all of those exemplars show that from April 2009 through

8     June of 2011, in the records that you had prepared, there were

9     six examples of rings almost the same as the one you bought at

10    Costco, in terms of style and size, not quality, that used as a

11    comparable price the amount $4,480.  Right?

12    A.  Yes.

13    Q.  Was there something that struck you as odd about that?

14    A.  I'm sorry, that struck me as odd about what?

15    Q.  The fact that you were able to find in your records this

16    exact price.

17    A.  Well, it was just an odd price, because it was the same

18    price that was on Costco's appraisal, which didn't match its

19    sales price.

20    Q.  And this was what you had in your own Tiffany records, not

21    the Costco records, right?

22    A.  Correct.

23    Q.  And this was not a situation where you were testifying

24    about what the appraisal should have said, right?

25    A.  No.

1   Q.   The idea was that you were testifying about the fact that

2   you had been delivered an appraisal that seemed as if someone

3   had gone to a Tiffany store and priced a similar ring and used

4   that for the appraisal, right?

5           (Pause)

6           THE COURT:  Consult.

7           (Counsel confer)

8   Q.   Ms. Abrams, if someone had gone to a Tiffany store during

9   this sales period, or during this time period, and asked to

10  see, or a ring was on display of this type, was the price that

11  that ring sold for a secret?

12  A.   No.

13  Q.   Mr. Dabney said that your list that you had was

14  confidential.  Why is the list confidential?

15  A.   The list are sales records list, because it's the sales

16  records of a specific engagement ring, the Tiffany setting

17  engagement ring, which we don't report, as a public company, as

18  a separate line item.

19  Q.   So the individual price of a particular ring at a

20  particular time can't be private or confidential, right?

21  A.   No.  A customer can come into the store, look at a ring,

22  ask for a sales price, and they will receive the retail sales

23  price of that particular ring.

24  Q.   Now, if someone goes to a store and there doesn't happen to

25  be a .7 carat ring there but there is a .69 carat ring there,

1    could they get the price of the .69 carat ring?

2    A.   Absolutely.

3    Q.   And you don't always have all sizes of all diamonds in all

4    rings at all times in stores, right?

5    A.   Right.

6    Q.   Also, Tiffany's prices are available online, aren't they?

7    A.   Some prices, yes.

8    Q.   So you were not -- withdrawn.  Were you by this, these

9    exemplars, attempting to say that the Costco appraisal was

10   wrong in any way?

11   A.   No.  We were trying to just demonstrate that the Costco

12   appraisal had a price that was identical to a comparable ring

13   within Tiffany's inventory.

14   Q.   And were you by your testimony yesterday in any way trying

15   to deceive anyone, the jury, the Court, or the audience about

16   what it was you were talking about?

17   A.   Not at all.

18   Q.   And is there anything I have neglected to ask you now that

19   you think should be said to clarify this even more, or do you

20   believe the jury understands the point of what you're saying?

21   A.   I think the jury understands.

22   Q.   OK.  Thank you.

23        Now, let's turn our attention now to this letter that

24   Mr. Dabney was talking to you about from January of 2013 that

25   was written to me.

1          First of all, this is not a letter that was sent to

2     you, right?

3     A.  Correct.

4     Q.  So to the extent you --

5          THE COURT:  You're talking about DTX 487?

6          MR. MITCHELL:  Yes.  Thank you, your Honor.  DTX 487.

7     Thank you.  I apologize for that.

8     Q.  DTX 487 is a letter from Costco's then counsel, Greenberg

9     Glusker, to me.  It was not a letter that was sent to you, so

10    you were not -- correct?

11    A.  Correct.

12    Q.  Were you in direct communication with these lawyers?

13    A.  No.

14    Q.  So any information you had concerning what the lawyers

15    might have spoken to with each other is the subject of

16    conversations you had with your own counsel, correct?

17    A.  Correct.

18    Q.  And we all have the protection of attorney-client privilege

19    in America, so there is information that may have been the

20    subject of communication with your lawyers that is not,

21    obviously, the subject of public disclosure, correct?

22    A.  Correct.

23    Q.  And we all as citizens have this protection of

24    attorney-client privilege, including companies, right?

25    A.  That's right.

1    Q.  And you know that as part of your day-to-day

2    responsibilities at work, right?

3    A.  Yes.

4    Q.  Now, turning first if you would -- turn away from 47 for a

5    moment and let's go to Defendant's Exhibit 209.  Mr. Dabney

6    showed you this.  And just look here.  That's the date of the

7    initial communication from Tiffany to Costco about the

8    discovery of the ring in the Huntington Beach store, correct?

9    A.  Yes.

10   Q.  December 10, 2012.  OK.

11           MR. MITCHELL:  Now can we go back, Mr. Cole, to 487.

12   The whole document, please.

13   Q.  The date of that letter is what?

14   A.  January 31, 2013.

15   Q.  OK.  So we are now a month and a half, a little more, since

16   the initial demand letter.  Right?

17   A.  Yes.

18   Q.  Let's walk through those paragraphs that Mr. Dabney pointed

19   out to you.  Let me start at paragraph 1.

20           Now, at this point, had Tiffany been provided with any

21   documentation as far as sales records, signage information, or

22   other Costco actual records to support any statement that was

23   made in this letter?

24   A.  No.

25   Q.  Now, on 639911, it says that it has -- it says in the first

1   paragraph -- so -- withdrawn.

2               This is now the first substantive written

3   communication to Tiffany about what was going on at Costco with

4   respect to signs, right?

5   A.  That's right.

6   Q.  How long did Costco say in this letter that this item had

7   been for sale?

8   A.  Since approximately 2003.

9   Q.  And can you tell me from that paragraph what period of time

10  Costco provided sales records?

11  A.  Only from fiscal 2012 and fiscal 2013.

12  Q.  Right there, right?

13  A.  Right.

14  Q.  Right there.  So this letter says Costco started using

15  Tiffany in one form or another in 2003, and in one paragraph of

16  a letter, with no backup, provided sales information for only

17  one fiscal year.  Right?

18  A.  That's right.

19  Q.  Did you consider that full disclosure?

20  A.  No.

21  Q.  Let's go to paragraph 3.  This is another item.  When was

22  this item first sold by Costco?

23  A.  Again, 2003.  Or approximately 2003.

24  Q.  What years were you given financial information for, in

25  this one paragraph?

1   A.  Again, fiscal 2012 and fiscal 2013.

2   Q.  Were you given any backup documentation?

3   A.  No.

4   Q.  I don't want to not ask you from paragraph 2.  This one

5   started when?

6   A.  Approximately October of 2011.

7   Q.  Sales information from when?

8   A.  Fiscal 2012 and '13.

9   Q.  Any backup information?

10  A.  No.

11  Q.  And isn't it true that during the course of this litigation

12  we have since learned that there were other permutations of

13  signs that used "Tiffany" besides these?

14  A.  Yes.  And we were given no signage information in this

15  letter either.

16  Q.  And also we have learned in this case that there were

17  different permutations of signs that used "Tiffany" in a manner

18  that the Court has defined as a standalone use.

19  A.  Yes.

20  Q.  So this letter was not only not complete; it was

21  inaccurate.  Right?

22  A.  You could say that.

23  Q.  Two weeks after this letter is when Tiffany filed the

24  lawsuit.  Right?

25  A.  I'm sorry?  Could you repeat that?

1  Q.  Two weeks after this letter is when Tiffany filed the

2  lawsuit.

3  A.  Yes.

4  Q.  Did you believe, when you saw this letter, that this was a

5  full and complete disclosure by Costco of all sales?

6  A.  No.

7  Q.  Now, Mr. Dabney showed you Defendant's Exhibit 52.  Can you

8  turn to that.

9  A.  Yes.  Yes.

10 Q.  Mr. Dabney suggested in his questioning to you that Costco

11 voluntarily delivered this to Tiffany.  Do you remember that?

12 A.  Yes.

13 Q.  Do you recall that we asked for, in the context of this

14 lawsuit, that Costco produce a customer list showing all people

15 who purchased rings with "Tiffany" in signage.  Do you remember

16 that?

17 A.  Yes.

18 Q.  Do you recall that Costco opposed that application?

19 A.  I do.

20 Q.  Do you also recall that we had to make a motion to

21 Magistrate Judge Freeman to compel Costco to produce this list?

22 A.  Yes.

23 Q.  Do you recall that Costco appealed the order of Judge

24 Freeman to produce this list?

25 A.  Yes.

1   Q.  And do you recall that Costco appealed the order of Judge

2   Freeman to Judge Swain?

3   A.  Yes.

4   Q.  And isn't it true that only after Judge Swain ordered

5   Costco to produce this list, that we got this list?

6   A.  Yes.

7   Q.  So this was hardly a voluntary production, right?

8   A.  Correct.

9   Q.  And Tiffany paid legal fees in connection with each of

10  those motions to compel Costco to give us this list.

11  A.  Yes.

12  Q.  And the production of this list came long after this

13  January 31, 2013 letter, didn't it?

14  A.  Yes.

15  Q.  This chart also shows what purports to be item numbers,

16  right?

17  A.  Yes.

18  Q.  Does it have any signage information?

19  A.  No.

20  Q.  So from this list --

21          MR. MITCHELL:  Can we just enlarge this so the jury

22  can see it here, Mr. Cole.  We have to do it in pieces.

23          THE COURT:  Let's avoid people's names.

24          MR. MITCHELL:  Yes.  Let's not use the names, but we

25  can stick to this part in the trial.  The jury will have a copy

of this.  It is a spreadsheet.  Can I walk and show it to the

jury, your Honor?

          THE COURT:  Yes.

Q.  So someone -- someone -- Tiffany looking at this list can't

tell what any of these numbers relate to as far as what the

sign said in any individual warehouse at any given time, could

they?

A.  Correct.

Q.  So if Mr. Dabney claims that this document is full

disclosure of all sales made by Costco next to affected signs,

is there any way to tell from this document when you look at

it?

A.  No.

Q.  Do you know the number of names that appear on this list --

back up one second.  If we look at this column, what's up on

the screen, Ms. Abrams, you see we have pluses and minuses?

A.  Yes.

Q.  And this was a document we had in a spreadsheet form,

correct?

A.  Yes.

Q.  So this document could be resorted to calculate the number

of names on the list, right?

A.  Yes.

Q.  So presumably this would be, in theory, gross sales, right?

A.  Yes.

1    Q.  And the minuses would be subtracted to come to net sales,

2    right?

3    A.  Correct.

4    Q.  And this was just a list that was provided to Tiffany --

5    withdrawn.

6         Did you make any assumptions, when you saw it, when

7    this list was finally produced after all that motion practice,

8    as to what this universe of people was on this list?

9    A.  Um, sorry.  I'm not...

10   Q.  Did you have a state of mind as to who these people were on

11   this list and why these people were included here?

12   A.  Presumably these people were included to represent the

13   customers that had purchased this unit item in connection with

14   the signs that were in Costco using the Tiffany name.

15   Q.  If we resorted it and used an Excel spreadsheet, we could

16   total how many people's names are on here, right?

17   A.  Right.

18   Q.  We could subtract returns, right?

19   A.  Right.

20   Q.  We could come up with a gross sales figure, right?

21   A.  Correct.

22   Q.  And a net sales figure.

23   A.  Yes.

24        MR. MITCHELL:  Thank you.  I have no further

25   questions.

1          MR. DABNEY:  May I have the Elmo again, please.

2     RECROSS EXAMINATION

3     BY MR. DABNEY:

4     Q.  Ms. Abrams, if I could draw your attention back to the

5     buyer list which we were just discussing, Costco Exhibit 52.

6     Your counsel asked you a series of questions about entries.

7     I'm just going to put the first page up for just an example.

8     Did you ever count up the number of buyers that were on this

9     list?

10    A.  Yeah.  I believe so.  I don't recall the exact number.

11    Q.  Well, you know it's nowhere near 11,000, don't you?

12    A.  Yes.  It's not 11,000.  That's correct.

13    Q.  It's nowhere near 11,000.

14    A.  Correct.

15    Q.  So were you here when your counsel made a mention of 11,000

16    letters during his opening statement?

17    A.  Yes.

18    Q.  And Costco provided you with the actual mailing list that

19    your counsel referred to in October of 2013, didn't he?

20    A.  I'm sorry.  Can you just repeat --

21    Q.  Costco provided your company with the actual mailing list

22    that was used for that -- that your counsel referred to --

23    A.  Oh.

24    Q.  -- in opening, didn't it?  In October of 2013.

25    A.  I don't recall, but yes.

1    Q.  So you had the list more than three -- about three years

2    ago.

3    A.  Yes.

4    Q.  And you know it had nowhere near 11,000 names on it.

5    A.  Yes.

6    Q.  And that's con-- and the history here is -- your counsel

7    asked you about the discussion of the list -- it's true, isn't

8    it, Ms. Abrams, that in 2013 Costco proposed to your company

9    that Costco and Tiffany and Company together, with the

10   assistance of the Court, conduct a scientific survey --

11            MR. MITCHELL:  Objection.

12            THE COURT:  Consult.

13            (Counsel confer)

14            THE COURT:  Keep your voices down.

15            MR. MITCHELL:  Sidebar, your Honor.

16            THE COURT:  Yes.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. MITCHELL:  It has nothing to do with my direct.

3     He showed her a list.  I established that the list doesn't have

4     signage information.  Then there are names on the list.  That's

5     all it is.  It's not even established that it's a purchasing

6     list or it's the mailing list.  I don't know what it is because

7     nobody has ever said what it is.

8          But that being said, that is an improper question.

9     The survey was denied.  They made a motion to survey the list.

10    They had taken the list, according to Judge -- I think it was

11    to judge --

12         THE COURT:  I remember the circumstances.

13         MR. MITCHELL:  So it's an improper question.  It

14    should not come in front of the jury.

15         I would ask also that the jury be instructed to --

16    that the opening part of the question be stricken and that the

17    jury be directed to disregard that.

18         MR. DABNEY:  Plaintiff's counsel totally opened the

19    door to the motion practice before Magistrate Judge Freeman and

20    your Honor.  Under counsel's questioning, he mischaracterized

21    the legal proceedings in this case, which began with an

22    application by Costco to your Honor for a protective order that

23    the parties conduct a joint survey with respect to the list.

24    Counsel saw fit to inject those court proceedings into this

25    case, and this is cross-examination about the very subject,

1    including specific mischaracterization of motions filed in this

2    court, to suggest by his questions that Costco was just

3    refusing to produce it, when in fact Costco was inviting the

4    plaintiffs, with the Court, to do a scientific survey.  We're

5    entitled to dispel the false implication of counsel's

6    questioning of this witness about those events.

7            And I didn't ask her a thing about this.  This was

8    brought up by them under their questioning.  It's a straight

9    cross-examination of the very thing they saw fit to inject into

10   this case.

11           MR. MITCHELL:  Mr. Dabney's examination of this

12   witness was, I would say implied if not directly said that

13   Costco voluntarily produced this document.  And it took motion

14   practice to get this document.  The impression left with the

15   jury was that this was something that Costco did as part of its

16   claim even though this information is different, when in fact

17   the Court knows that is not what happened here.  And the fact

18   that had they --

19           THE COURT:  Thank you.  I have heard enough.

20           The objection is sustained.  There has been litigation

21   at virtually every stage in this case as to production of

22   names.  The direct did not materially mislead the jury as to

23   the production of the list of names, and introduction of

24   testimony with respect to the proposal for surveys and whatnot

25   injects a level of detail about the underlying litigation that

1    raises the very real prospect of waste of time and jury

2    confusion.  And therefore, under 403, the objection is

3    sustained.  And I will instruct -- I will simply remind the

4    jury that lawyers' questions are not evidence.

5          MR. MITCHELL:  Thank you, your Honor.

6          (In open court; jury present)

7          THE COURT:  Ladies and gentlemen, we're going to go on

8    to another question, but I remind you that the question of a

9    lawyer is never evidence, and you are to disregard unanswered

10   questions.

11   BY MR. DABNEY:

12   Q.  Ms. Abrams, this list, let's just assume for the sake of --

13   Ms. Abrams, you don't claim to know what the criteria were that

14   were used by Costco to generate this list, do you?

15   A.  No.

16   Q.  So you don't know that, at the time this list was

17   generated, Costco might have written to people at times when

18   signs said "Tiffany setting," do you?

19   A.  I'm not aware of Costco's practices, no.

20   Q.  Costco might have written to people at times when signs

21   said "Tiffany set"?

22   A.  I'm not aware.

23   Q.  Costco might have written to people whose signs said

24   "platinum Tiffany" and "set" on the second line?

25   A.  Again, not aware.

Q.  Now, of the people on this list, let's just take a look at

this first page.  Sitting here today, do you have any

information about whether any of these individuals listed -- I

won't call them out, but we have specifics, specific names

here.  Do you have any information that any of these

individuals walked out of a Costco building with one of those

beige boxes that's on the jury rail and thought that the ring

that they had purchased was manufactured by Tiffany and

Company?

A.  I don't know all the names on this list, but I do believe

that there were customers that were confused, yes.

Q.  Can you identify anybody on any pages here that you think

walked out of a building with a beige box like what's on the

jury rail that thought that Tiffany and Company had made the

ring that was in the box?

A.  This is not in alphabetical order, so I don't know certain

customers aren't on here.

Q.  Let me ask a different question.  Did you make an effort to

find that out, Ms. Abrams?

A.  During the course of this litigation we had spoken to some

Costco customers, yes.

Q.  Well, in fact you hired a company to telephone people on

the list, didn't you?

          MR. MITCHELL:  Objection, your Honor.  I thought we

just went through this.

1          THE COURT:  Sustained.

2          MR. MITCHELL:  Thank you.

3          THE COURT:  You may move on and, again, disregard the

4    unanswered question.

5    Q.  So sitting here today, do you have a belief, Ms. Abrams,

6    with regard to, let's just take a page at random.  We have all

7    the names and addresses of the people here.  Are you prepared

8    to tell us any specific individuals on here that you believe

9    walked out of a building with one of those beige boxes thinking

10   that Tiffany and Company had made the ring and box?

11   A.  I did not personally speak to customers on this page or on

12   this list, but we absolutely reached out to Costco customers

13   and understand that some of them were confused.

14         MR. DABNEY:  Your Honor, I have nothing further.

15         THE COURT:  Thank you.

16         MR. MITCHELL:  Very brief.

17         THE COURT:  This is the last round.

18   REDIRECT EXAMINATION

19   BY MR. MITCHELL:

20   Q.  Mr. Dabney asked if you remembered anyone who was confused

21   by name?

22   A.  Mm-hmm.

23   Q.  Did we depose some individual customers I haven't gone

24   through, but presumably on this list?

25   A.  Yes.  Again, I -- it's not alphabetical so I can't see, but

1    yes, we did.

2    Q.  Andrew Pangellinan, do you remember that name?

3    A.  Yes, I recall that name.

4    Q.  Micah Day?

5    A.  Yes.

6    Q.  Pamela Miller?

7    A.  Yes.

8    Q.  Mr. and Mrs. Bentley?

9    A.  Yes.

10   Q.  Karina Roberts?

11   A.  Yes.

12   Q.  Did we take the depositions of all those people?

13   A.  We did.

14   Q.  Did Tiffany pay for those depositions?  We had to travel to

15   take those depositions?

16   A.  Yes.

17           MR. MITCHELL:  Thank you.  Nothing further.

18           MR. DABNEY:  No further questions, your Honor.

19           THE COURT:  Thank you, Mr. Dabney.

20           Thank you, Ms. Abrams.  Your testimony is concluded.

21           THE WITNESS:  Thank you, your Honor.

22           (Witness excused)

23           THE COURT:  Plaintiff may call their next witness.

24           MR. MITCHELL:  Brent Kaczmarek.

25           THE COURT:  Good morning, Mr. Kaczmarek.  Please come

 1  to the witness stand, step up, and remain standing for the

 2  oath.

 3   BRENT CHARLES KACZMAREK,

 4        called as a witness by the plaintiff,

 5        having been duly sworn, testified as follows:

 6              THE COURT:  Thank you.  Please be seated.

 7  DIRECT EXAMINATION

 8  BY MR. MITCHELL:

 9  Q.  Good morning, Mr. Kaczmarek.  How are you?

10  A.  Good morning.  I'm fine.  Thank you.

11  Q.  Would you please tell the jury your educational background.

12  A.  Yes.  I have a bachelor's of science in commerce, with a

13  specialty in finance.

14  Q.  When did you graduate -- where did you go to college?

15  A.  University of Virginia.

16  Q.  When did you graduate?

17  A.  Graduated in 1993.

18  Q.  Do you have any professional certifications?

19  A.  I do.  I hold a designation called a chartered financial

20  analyst.  It's a global designation awarded to professionals

21  demonstrating competence in valuation of investments and the

22  investment decision-making process.

23  Q.  How do you become a chartered financial -- withdrawn.

24          How do you receive the chartered financial analyst

25  designation?

1    A.   There are three annual exams that you need to take and pass

2    within a seven-year period.

3    Q.   And you passed those exams.

4    A.   I did.

5    Q.   By whom are you currently employed?

6    A.   I am currently employed by Navigant Consulting.

7    Q.   And where is Navigant located?

8    A.   Their headquarters is in Chicago, but my office is in

9    Washington, D.C.

10   Q.   How long have you been with Navigant?

11   A.   Almost 15 years.

12   Q.   What's your title?

13   A.   Managing director.

14   Q.   And what role did you fulfill at Navigant Consulting as

15   managing director?

16   A.   I am in charge of our international arbitration practice at

17   Navigant, which has about 24 individuals.

18   Q.   Can you describe to the jury, please, your primary role in

19   your job function at Navigant consultants.

20   A.   Sure.  I act as a consultant and as an expert witness in

21   disputes like this.  Most of my cases are of an international

22   realm, as opposed to this one.

23   Q.   And is there a focus that you provide expert testimony on

24   ordinarily?

25   A.   Yes.  Lost profits, lost business value, very common

1    calculations that we do.

2    Q.  Approximately how many expert opinions have you given which

3    involve the calculation of damages?

4    A.  I have been retain as an expert in that capacity more than

5    130 times.  Usually the cases I'm involved in require two

6    reports, so I would say somewhere more than 250 times I've

7    written expert reports on those subjects.

8    Q.  And how many times would you say you testified before a

9    tribunal either in the United States or abroad?

10   A.  I have testified 83 times.

11   Q.  Have you ever been qualified as an expert for purposes of

12   calculating lost profits and damages reports?

13   A.  I have always been qualified as an expert on that subject.

14            MR. MITCHELL:  Your Honor, may I approach to hand the

15   witness an exhibit book?

16            THE COURT:  Yes, you may.

17            MR. MITCHELL:  Thank you.

18   Q.  Mr. Kaczmarek, I have your book.  Can you please turn to

19   the tab that shows Plaintiff's Exhibit PTX 140 for

20   identification.

21            MR. MITCHELL:  Your Honor, I offer PTX 140 as

22   Plaintiff's Exhibit 140.  Mr. Dabney has no objection.

23            MR. DABNEY:  No objection.

24            THE COURT:  Plaintiff's Exhibit 140 is admitted in

25   evidence and may be published.

1                (Plaintiff's Exhibit 140 received in evidence)

2    Q.  Mr. Kaczmarek, would you describe for the jury what it is

3    that Plaintiff's Exhibit 140 is.

4    A.  This is a version of my CV that I issued with my first

5    expert report in this case.

6    Q.  What is the purpose of your CV?  For those of the jury who

7    don't know what a CV is, could you just briefly describe what

8    it is and what it means for purposes of what you do.  What do

9    you intend to show by it?

10   A.  Sure.  A CV lists here educational background, professional

11   background, and for someone like me we typically list all of

12   the matters in dispute that I've served as an expert in before.

13   So it's a lengthy list of different cases in which I have

14   served as an expert.

15                THE COURT:  Oh.  Sorry about that.  It's on the screen

16   now.

17                MR. MITCHELL:  Very good.  Great.

18   Q.  And is the purpose here to provide some synopsis of the

19   types of cases you've had, what you did in those cases, so that

20   people can read your qualifications?

21   A.  Absolutely.

22   Q.  So if the jury took this back to the jury room to see your

23   qualifications, this would be something that you would stand

24   by, correct?

25   A.  Absolutely.

1    Q.  And is this your current CV?

2    A.  No.  This was a CV I issued as of November 2013.

3    Q.  And that was the time you were retained as an expert in

4    this case, correct?

5    A.  That's correct.

6    Q.  So this is current through November 2013.

7    A.  Correct.

8    Q.  Where did you work before you were employed at Navigant?

9    A.  I worked for Arthur Andersen.

10   Q.  And what did you do with Arthur Andersen?  What's Arthur

11   Andersen?

12   A.  Arthur Andersen was one of the, at the time, big six

13   accounting firms.

14   Q.  What was your role at Arthur Andersen?

15   A.  My role was very similar to my role at Navigant, except I

16   was much junior back then and did not serve as an expert.  I

17   assisted others in preparing expert testimony.

18   Q.  Do you have experience acting as an expert in connection

19   with retail businesses?

20   A.  I do.

21   Q.  What types of businesses -- what types of retail businesses

22   have you acted as an expert in connection with?

23   A.  I have been involved in analysis of businesses selling

24   watches retail, luxury watches, duty-free shops, both in and

25   outside of airports, other commercial establishments within an

1   airport, and shopping centers.

2   Q.  Did any of those engagements involve the analysis of profit

3   margins?

4   A.  Yes.

5   Q.  Did you have to calculate gross profits and net profits?

6   A.  Yes.  In virtually every case that's a subject of my

7   testimony.

8   Q.  Did you prepare expert reports or opinions in connection

9   with those analyses?

10  A.  Yes.

11  Q.  And was your expert report or testimony ever rejected by

12  any tribunal?

13  A.  Never.

14          MR. MITCHELL:  Your Honor, I offer Mr. Kaczmarek as an

15  expert to testify in this case.

16          THE COURT:  Any objection?

17          MR. DABNEY:  No objection.

18          THE COURT:  The tender of Mr. Kaczmarek as an expert

19  is accepted.

20          MR. MITCHELL:  Thank you, your Honor.

21  Q.  Mr. Kaczmarek, when were you first hired to provide

22  services in this case?

23  A.  I believe it was October 2013.

24  Q.  What was it that you were hired to do?

25  A.  I was hired to calculate the profits that Costco earned

1    associated with their sales of rings that had "Tiffany" in the

2    signage.

3    Q.  And did your assignment include differentiating sales from

4    one sign to another sign at that time?

5    A.  No.

6    Q.  So how did you -- or describe to the jury if you would how

7    you went about performing your services back in October of

8    2013.

9    A.  Sure.  I was provided with information that Costco had

10   disclosed on that subject, and I relied on that information in

11   performing my initial calculations despite the fact that I

12   indicated I was dissatisfied with the level of information that

13   I had to work with.

14   Q.  And did you prepare a list of items that you were provided

15   to review for purposes of trying to calculate profits?

16   A.  Yes.

17   Q.  Can you turn in your book to PTX 141.  Are you there?

18   A.  I'm there.

19   Q.  Can you describe for the jury what PTX 141 is.

20   A.  This is a list of the documents that I considered in

21   performing my analysis.

22   Q.  And that was back in October 2013.

23   A.  Correct.

24          MR. MITCHELL:  Your Honor, I offer PTX 141 as

25   Plaintiff's Exhibit 141.

1            MR. DABNEY:  No objection.

2            THE COURT:  Plaintiff's Exhibit 141 is admitted in

3    evidence and may be displayed.

4            (Plaintiff's Exhibit 141 received in evidence)

5    Q.  Now, can we go down that page to the middle part of the

6    page.  Right there.  These individuals here, did you review

7    their deposition transcripts?

8    A.  Yes.

9    Q.  Who did you understand these individuals to be?

10   A.  Mr. Jelenik was the CEO.  Mr. Schutt, I think, was chief

11   merchandising officer.  I forget Mr. Galanti's role.

12   Q.  Chief financial officer?

13   A.  Would most likely be.  That would have been my guess.  But

14   I, my memory fails me.

15   Q.  And they had been deposed in the case a little more than a

16   month before you were retained, right?

17   A.  Yes.

18   Q.  Can you describe for the jury if you could what you

19   attempted to do from or based upon this list of documentation

20   that you were provided.

21   A.  Yes.  I was attempting to calculate, again, the profits

22   Costco earned from sales of diamond rings with signage that had

23   "Tiffany" next to it.

24   Q.  And did you observe any issues that hindered your ability

25   to perform a profit calculation when you received these

1   documents?

2   A.  I did, yes.

3   Q.  Can you describe for the jury what some of the problems

4   were that you confronted when you tried to calculate profits

5   based upon what had been provided.

6   A.  Sure.  So for sales, all I had was what I would describe as

7   a summary spreadsheet that Costco had, I understand, produced

8   to Tiffany.  Clearly there would have been underlying records

9   to that spreadsheet, but I was not provided with those.

10          I didn't understand how the item numbers, the universe

11  of item numbers, had been established.

12          I observed that some of the signage in that

13  spreadsheet didn't have the name "Tiffany" at all, so I

14  wondered how it was relevant.

15          I also observed that there were sales data in that

16  spreadsheet after Costco said it wasn't using the Tiffany name,

17  but based on that particular file, I presumed the information

18  was relevant, since Costco had produced it.

19  Q.  And was it your understanding that the source of all of

20  this documentation and information was Costco?

21  A.  Yes.

22  Q.  Would you turn, please, to the page marked in your book DTX

23  258.

24          MR. MITCHELL:  Your Honor, for the clarity of the

25  record, this is a defendant's exhibit.  We would like to put it

1    in evidence.  Mr. Dabney -- I offer it in evidence just so we

2    have it in the record.

3              MR. DABNEY:  We have a copy that -- the copy

4    plaintiffs have marked is all chopped up.  We have a copy.

5              THE COURT:  If there's an objection, first consult and

6    if you can't work it out, we'll go in the corner.

7              (Counsel confer)

8              THE COURT:  Please go closer together so that you

9    don't talk so loud.

10             (Counsel confer)

11             MR. MITCHELL:  I think we have a, Mr. Dabney has a

12   copy of the same thing, it was his exhibit, but they have it in

13   a different form.  That's fine.  We're happy to use their

14   version.  So I assume, then, there's no objection to it.

15             MR. DABNEY:  No objection to the taped-together copy

16   of Defendant's Exhibit 258.

17             THE COURT:  All right.  Defendant's Exhibit 258 is

18   admitted in evidence.

19             (Defendant's Exhibit 258 received in evidence)

20             MR. MITCHELL:  Thank you.  May I approach the witness

21   with this?

22             THE COURT:  Yes, you may.

23             MR. DABNEY:  Your Honor, would it be appropriate for

24   us to publish a copy for the jury so they could follow along.

25             THE COURT:  Well, this is Mr. Mitchell's examination.

1              MR. DABNEY:  Thank you.

2              THE COURT:  If he wants to, he may.

3              MR. DABNEY:  I'm happy if you want the jury to have

4    it.

5              THE COURT:  Thank you.

6    Q.  Mr. Kaczmarek, was Defendant's Exhibit 258 one of the

7    documents you were provided with?

8    A.  Yes.

9    Q.  Given the unwieldy nature of it I presume you were provided

10   it in computerized form.

11   A.  Yes.

12   Q.  Does this version of Exhibit 258 represent an approximation

13   of what it was that you were provided with in connection with

14   your efforts to calculate profits?

15   A.  Yes.  This is one of the pages in the workbook, the Excel

16   workbook.  There are other pages with dollar sales, but this

17   one was net sales.

18              MR. MITCHELL:  Your Honor, Mr. Dabney would like to

19   provide the Court with a copy.

20              THE COURT:  Yes.  Thank you.

21   Q.  Now, first, Mr. Kaczmarek, what were your observations

22   about this information when you first looked at it?

23   A.  Again, it was very summary-level information, where I would

24   have expected detail data behind this.  Somebody actually must

25   have had detail data to create it.  Again, as I said, I wasn't

1    sure how the universe of item numbers had been determined and

2    some didn't even have a Tiffany name.

3              I also recall, too, and as the sheet shows, there are

4    some rings that have negative sales, only returns, which

5    obviously can't be the case; you have to first have a purchase

6    before you have a return.  So clearly there is some missing

7    data that was not compiled to create this.

8    Q.  And so the jury can understand what you're saying about the

9    negative numbers, explain what you would expect a sales record

10   to show if there were returns as well as sales.

11   A.  Sure.  You would have obviously a positive unit sale, and

12   then you would have a negative unit sale.  So it can't be lower

13   than zero.  So anything that's negative clearly shows there is

14   missing data.

15   Q.  So did you make any assumptions about the reliability of

16   this spreadsheet?

17   A.  I had expressed that I was dissatisfied with this level of

18   information.  But nonetheless I went ahead and made

19   calculations using it.

20   Q.  Did you make any assumptions, at least about the sales

21   reflected on this document, in terms of their relevance to the

22   case?

23   A.  I did not.

24   Q.  Did you make any assumptions about this document in

25   connection with the need to provide a calculation of profits on

1    some amount that's reflected here?

2    A.  I assumed all of these sales were relevant sales.

3    Q.  Why did you assume that?

4    A.  At the time I was unaware of whether there would be any

5    restrictions, and because Costco produced it all, I presumed

6    they were producing to Tiffany relevant information.

7    Q.  In your experience as an expert, when you receive a summary

8    spreadsheet like this, are you ordinarily provided just a

9    spreadsheet, or does it usually come with something else?

10   A.  No.  We usually are provided with the underlying data,

11   because I would consider this what we would call work

12   product -- somebody took data and created something -- as

13   opposed to the underlying records reflecting the actual sales.

14   Q.  Were you ever provided the underlying records that

15   supported the entries that appear on this spreadsheet?

16   A.  Yes.  I was ultimately provided with that data but after I

17   issued my first report.

18   Q.  And did -- what type of underlying data were you provided

19   to review?

20         MR. MITCHELL:  Your Honor, before I ask that question,

21   may I show this to the jury?

22         THE COURT:  Yes, you may.

23         MR. MITCHELL:  Thank you, your Honor.

24         (Pause)

25   Q.  What type of underlying data -- what type of underlying

1   data do you ultimately review in connection with Costco's

2   records of sales?

3   A.  Well, in preparing my first calculation, I did have very

4   detailed data associated with purchase orders, so Costco

5   purchases, of rings.  And that was data that I did analyze and

6   consider for my analysis.

7                   (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Q.   Was there anything else you recall looking at?

A.   That, well, I also looked at some testimony of Mr. Jelenik

about the average profit margin that they typically apply in

the jewelry section, which is 13 percent, and that's the profit

margin I ultimately applied in my calculations.  That was due

to additional problems I saw in the purchase order file.

Q.   Can you describe for the jury what the problems were you

saw in the purchase order file?

A.   First, there were three items in this spreadsheet, DTX258,

that were not in the purchase order file.  So no record of a

purchase of an apparently relevant ring sale.  I saw instances

where there were lots of orders, but never fulfilled, which I

found a bit strange.  There might be a record, for example, of

an order for 50 rings and only three are delivered and then

further orders following that.  I would have thought the vendor

would have first filled the unfulfilled order without a need

for more orders.  And then perhaps the most unusual aspect I

found with the file and the reason I primarily did not rely on

it, there were several records indicating Costco was selling

the ring below its cost, below the cost to acquire it.  And it

was doing so in a repeated manner, apparently.  So they'd buy a

ring for, say, 5,000 and sell it at 4,000 and then they'd buy

another two of the same ring for 5,000 and they'd sell it again

for 4,000.

          And so the repetition of that to me did not make

1    sense, because Costco has very thin margins, but it doesn't

2    make any sense to actually buy a product and deliberately sell

3    it below the cost to acquire it.

4    Q.  Were you able to match purchase orders to the ultimate sale

5    order?

6    A.  No.  We were not able to do that.  We could really only try

7    to do it by total and there I found some problems too.  In

8    instances for certain ring items, the number of purchases was

9    lower than the number of sales.  So obviously I knew I was

10   missing additional purchase data.  You obviously can't have a

11   sale unless you first purchase the ring.  So we could not tie

12   up the information.

13            MR. MITCHELL:  Mr. Cole, can you pull up Defendant's

14   258 to the screen?  And scroll down a couple of pages, please.

15   Further, please.  Still further.  Can you blow this area up?

16   Q.  This is a portion of this and there are other places this

17   appears but let me focus in on this.  Negative entries appeared

18   this way.  I'm circling them.  Could you describe to the jury

19   the format so you know when something is a negative entry on

20   this chart?

21   A.  Right.  In Excel you can have two different formats.  You

22   can either have a minus and a number or in parenthesis that

23   also reflects a negative number.

24   Q.  So as a financial person analyzing profits is that an

25   immediate red flag to you?

1   A.  Yes.  It indicated to me we clearly did not have all of the

2   sales information to work with.

3   Q.  Now, Mr. Kaczmarek --

4         MR. MITCHELL:  Let's go back one page, Mr. Cole,

5   please.  Go back one more page.

6   Q.  So in this, just taking as an example, let's blow this up

7   down here.  Okay.  So right here we would see positive entries.

8   Do you see that?

9   A.  Yes.

10  Q.  Does the existence of the negative entries or your

11  knowledge that there are negative entries that don't make sense

12  in the spreadsheet affect the reliability of the positive

13  entries?

14  A.  Yes.  I think it would.

15  Q.  Explain to the jury why.

16  A.  Well, the existence of just the negative means we're

17  clearly missing data.  How much data we're missing, whether

18  we're missing it just for those items or for other items, it's

19  very possible the way the data was put together that any of

20  these ring item figures could be different, could be higher if

21  data was overlooked.

22  Q.  And the parenthesis would indicate subtractions from total

23  sales, correct?

24  A.  Correct.

25  Q.  So if a positive entry has within it improper negative

1   entries then the positive entry would be too low, is that

2   correct?

3   A.   That would be correct.  All of these are net sales,

4   represented to be net sales.  So the gross would be higher if

5   there was a return.

6   Q.   Now, Mr. Kaczmarek, in your expert opinion does the

7   information you just described to the jury cast doubt on the

8   reliability of the information reported in this document?

9   A.   Yes.

10  Q.   And do you believe based on your expert opinion that this

11  document is accurate and reliable?

12  A.   For purposes of making a calculation of profit, it's all I

13  had to go by, so I went ahead and used it.

14  Q.   But you did not believe it was complete or accurate,

15  correct?

16  A.   Correct.

17  Q.   Now, if you look --

18          MR. MITCHELL:  Mr. Cole, can you back out of that for

19  a moment, and let's see if we can just highlight that top line,

20  somewhere around there.

21  Q.   Now, this is an example of one entry, this is the top part

22  of the page.  Do you see it says 2012, right?

23  A.   Right.

24  Q.   There appeared to be 13 months reported for 2012.  Do you

25  see that?

1    A.  I do.

2    Q.  Can you explain to the jury what that means?

3    A.  These -- Costco does not report on a calendar year basis.

4    They report on a fiscal year basis, and within each fiscal year

5    they have 13 fiscal periods I'll call them, since they're not

6    months.  Each fiscal period is 28 days.

7    Q.  And when you see a date, a date and month such as let's say

8    1/2013, which is right here on that report, when does that

9    date, or how does that correspond to a calendar date?

10   A.  Right.  So that does not represent January 2013.  Costco's

11   fiscal year starts around the end of August, beginning of

12   September.  It actually changes from year to year because of

13   this convention.  So when you see a 1 it would correspond to

14   the first 28 days starting around the end of August or early

15   September.  Of 2012.  Excuse me.  2012.

16   Q.  I'm sorry.  Are you finished?

17   A.  Yes.

18   Q.  So 2013, let's say new year's for Costco would be

19   August 31, January 1, something like that?

20   A.  The start of their fiscal period would always be the end of

21   August or beginning of September.

22   Q.  Is this an unusual -- in your experience in the retail

23   business, is this an unusual way to report financial

24   information?

25   A.  Yes.

1    Q.  What's unusual about it?

2    A.  Well, in my analysis looking at the performance of

3    businesses or companies, we typically like to look quarter to

4    quarter from one year to the next to see how they're performing

5    and you really can't do quarters with 13 months.  It's not

6    divisible by four.  So that I found somewhat unusual.  Also,

7    their fiscal periods don't add up to 365 days, it's 364, which

8    is the product of 13 periods times 28 days.

9    Q.  Now, ultimately, Mr. Kaczmarek, how did you rely, despite

10   those problems you just testified to, how did you use

11   Defendant's 258?

12   A.  Well, I basically took the total number of ring sales

13   expressed in this sheet, so on the far right column where it

14   says grand total for each line item I simply summed those up,

15   including the negatives and applied the 13 percent profit

16   margin to the corresponding dollar sales for these units.

17   Q.  Did you remember how many gross unit sales before

18   returns -- withdrawn.  There were other variations of this

19   report, is that correct?

20   A.  Right.  There were four sheets.  One was gross unit sales

21   and gross dollar sales and then one was net unit sales, which

22   is the one we've been looking at and then there were net dollar

23   sales.

24   Q.  So do you recall the number of the gross unit sales that

25   were shown on another version of Defendant's Exhibit 258?

1    A.  I believe it was 3807.

2    Q.  Do you recall the net unit sales that were reflected?

3    A.  Yes.  I believe for this particular sheet it was 2688.

4    Q.  And did you calculate what the total sales were based upon

5    these charts?

6    A.  Yes.  For the net sales associated with these units was

7    approximately 11.5 million.

8    Q.  And did you calculate profits on those sales?

9    A.  I did.  At 13 percent it was approximately $1.5 million.

10   Q.  And I think you testified previously that the 13 percent

11   figure was derived from the testimony of Costco's CEO Craig

12   Jelenik, is that correct?

13   A.  That's correct.

14   Q.  And that was one of the deposition transcripts that you

15   reviewed?

16   A.  Yes.

17   Q.  Did you try to perform an actual profits analysis before

18   reverting to the 13 percent?

19   A.  I did and that you'd have to use the purchase file and for

20   the reasons I described before, missing item numbers, sales at

21   apparent losses, I was not comfortable relying on that

22   information.  So I applied the 13 percent margin instead.

23   Q.  So the jury can understand, in your experience as an expert

24   in the retail field, is a 13 percent markup low?

25   A.  Yes.  Very.

1    Q.  Why is it low?  Why do you say it's low?

2    A.  Well, that 13 percent is really just the difference, again,

3    between the price of acquiring the good, in this case rings,

4    and then what you sell it at.  So that 13 percent difference

5    has to cover a number of other costs such as rent, your

6    employees, utilities, and at that small of a markup you

7    couldn't make money in the retail business covering those other

8    costs.

9    Q.  How can Costco survive with such little markup?

10   A.  They're able to survive with that low markup because they

11   charge membership fees annually.  So they make most of their

12   money on the membership fees and so that's how they can

13   actually make such small profits on the items.  That's what

14   attracts customers to want to go to Costco.

15           THE COURT:  Mr. Mitchell, would you find a place to

16   stop in the next ten minutes?

17           MR. MITCHELL:  I can stop now, your Honor.  It's a

18   good spot.

19           THE COURT:  All right, then, we will begin our morning

20   break now of ten minutes.  Members of the jury, please be ready

21   in the jury room at 11:25 and continue to keep your minds open

22   and your thoughts to yourselves and thank you for working with

23   us.  All rise and Ms. Ng will escort the jury out.

24           (Jury exits)

25           (Continued on next page)

1          (In open court; jury not present)

2          THE COURT:  Mr. Kaczmarek, you may step down.  All

3     right, would someone retrieve the exhibits from the front rail

4     of the jury box and I also have here the defendant's Ewa Abrams

5     binder and an exemplar of some anticipated plaintiff's exhibits

6     from a discussion yesterday that I don't need.  So I'll just

7     give those back.  Thanks so much.  So see you all in ten

8     minutes.

9          (Recess)

10                                o0o

11         THE COURT:  Good morning again.  Please be seated.

12    Mr. Kaczmarek, would you please come back to the witness stand?

13    And Ms. Ng, would you please bring the jurors in?

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Good morning again, members of the jury.

3    We hope you had a good break.  Please take your seats in the

4    jury box.  And please be seated, everyone.

5              Mr. Mitchell.

6              MR. MITCHELL:  Your Honor.

7    BY MR. MITCHELL:

8    Q.  When we left off, Mr. Kaczmarek, we were talking about

9    13 percent markup.  When you took the total units, gross sales

10   and net sales, how would you use that then?  You could walk the

11   jury through the process, if you would, of calculating a gross

12   and net profit figure based upon those sales numbers.

13   A.  So if you wanted to calculate the profits before returns

14   you could apply the 13 percent to gross sales.  If you want to

15   calculate profit after returns you would apply 13 percent to

16   the net sales numbers.

17             MR. MITCHELL:  Your Honor, can we get this turned on?

18             THE COURT:  Yes.

19             MR. MITCHELL:  Thank you.

20   Q.  Just from the standpoint so we understand, so you would

21   take a total sales figure, you would take total sales figure,

22   that could either be in dollars -- it has to be in dollars,

23   right?

24   A.  Correct.

25   Q.  You multiply that times 13 percent and that then equals a

1    profit figure, correct?

2    A.  Correct.

3    Q.  So it's just a formula, it's just a simple mathematical

4    formula?

5    A.  Exactly.

6    Q.  So you calculated -- did you calculate profits based upon

7    this initial calculation that was derived from Defendant's

8    Exhibit 258?

9    A.  Yes.

10   Q.  And you based that on, I think you testified earlier, unit

11   sales of 2,688 rings, correct?

12   A.  Correct.

13   Q.  So you would take -- and that was, 2,688 rings sold for

14   $11,472,291, which you said is about 11 and a half million

15   dollars, correct?

16   A.  Correct.

17   Q.  So you would take 11,472,291 times .13 and you said the

18   total calculated to approximately one and a half million

19   dollars?

20   A.  Correct.

21   Q.  I said the number was $1,472,291.  That sounds right?

22   A.  That sounds right, yes.

23   Q.  1,472,291, so that's an easy calculation to make, right?

24   A.  Yes, it is.

25   Q.  And based upon that calculation, if you had the number of

1    unit sales, could you then estimate a profit per unit?

2    A.   Yes.

3    Q.   So depending upon what the number of units were you could

4    multiply that amount times the number of units, is that right?

5    A.   You could take the profit 1,472,291 and divide it by 2688

6    and that would give you an average profit per unit of sale.

7              MR. DABNEY:  Your Honor, we have an issue.  Can I

8    confer?

9              THE COURT:  Yes, please.

10             (Pause)

11             THE COURT:  Would you angle yourselves more towards

12   the door?  Thank you.

13             (Pause)

14             MR. DABNEY:  Your Honor, may we have a sidebar?

15             THE COURT:  Yes.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. DABNEY:  Your Honor, we once again have a

3    situation where the expert is going outside his expert report

4    and is injecting a new concept which is you could take all of

5    these disparate items, different sizes, different times,

6    including before the statute of limitations and after, and you

7    lump them together and you come up with an average price per

8    unit.

9          MR. MITCHELL:  Profit.

10          MR. DABNEY:  An average profit per unit which is some

11    kind of artificial construct which we're hearing about today,

12    September 20, for the first time in this litigation.  It is not

13    a concept that was identified in his expert report.  It is not

14    a concept we've ever validated, but it is apparently the

15    springboard to the new, totally never disclosed opinions that

16    they can come up with, this artificial profit per unit.  Well,

17    then I could just come up with a totally new damages opinion by

18    multiplying that by what I now say are the total number of

19    sales.  So we object to the plaintiff's repeated attempts to

20    introduce new theories into this case in the middle of the

21    trial that were never the subject of any prior opportunity to

22    Daubert, rebut, whatever.

23          THE COURT:  Mr. Mitchell.

24          MR. MITCHELL:  It's simple math.  I just explained to

25    the jury simple math.  The closing instruction that your Honor

1    has says that if you can't decide you should estimate, so based

2    upon our expert's report, this is how you take his numbers, if

3    you believe his numbers, but if he didn't have a complete set

4    of numbers he could take total sales, divide by total units,

5    come up with a profit per unit to assist the jury in helping

6    estimate what the profits would be if the jury concludes that

7    the records produced were inadequate.

8            It's a methodology just using math to do it.  I

9    explained to them how they could do it if they want to go in

10   the back to do their own calculation which your Honor's closing

11   instructions offer the jury the opportunity to do in

12   estimating.

13           THE COURT:  The objection to do-it-yourself

14   instructions for profit per unit is sustained.  There is not to

15   my knowledge in this record any basis for establishing the

16   validity or reliability of a profit per unit across disparate

17   products.  And so that element of the testimony is different

18   from the do-it-yourself arithmetic instructions for applying

19   13 percent to a dollar figure.

20           So is there a motion to --

21           MR. DABNEY:  Yes.

22           THE COURT:  First I just want to get clarity to what

23   I'm being asked to do.  Is there a motion to strike the

24   testimony concerning computation of profit per unit?

25           MR. DABNEY:  Yes, your Honor.

1          MR. MITCHELL:  I accept that.  The question was could

2     I ask, could I question the witness concerning percentage

3     against total sales.

4          THE COURT:  You already did.

5          MR. MITCHELL:  No.  I'm saying if they choose a

6     different number, any number you choose, you can take the total

7     sales figure and multiply it by 13 percent.

8          THE COURT:  Yes.

9          MR. MITCHELL:  That's all I wanted to do.

10         THE COURT:  And the motion to strike is granted and

11    I'll instruct the jury accordingly.

12         MR. DABNEY:  Thank you, your Honor.

13         MR. MITCHELL:  Thank you.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1        (In open court; jury present)

2        THE COURT:  Members of the jury, I am striking from

3   the record the testimony regarding computation of average

4   profit per unit.  You are to disregard that testimony and

5   dismiss it from your minds.  It is stricken from the case.

6   BY MR. MITCHELL:

7   Q.  Approach this from a different way, Mr. Kaczmarek.  If the

8   total sales in terms of a dollar amount were different than the

9   amount reflected in your report, could you multiply total

10  dollar sales times 13 percent to come out with a profit

11  calculation based upon a 13 percent profit margin?

12  A.  Absolutely.

13  Q.  Explain to the jury how you would do that?

14  A.  Well, I had done a separate calculation, so give an

15  example, I did a calculation assuming there were 11,000 unit

16  sales, which I understand was the testimony of Mr. Schutt, that

17  that's about how many letters he approximated that were sent

18  out to customers.  And so I came up with an adjusted amount of

19  dollar sales just scaling up all of the units to 11,000 and

20  applying the average sales in each fiscal period.  And that

21  came out to about 47 million in sales.  I just applied a

22  13 percent profit margin to that, and that came to about

23  6.1 million in profit.

24  Q.  So if I said to you total sales were $10 million as a

25  number, how would you calculate profit at 13 percent profit

1   margin on a $10 million sales number?

2   A.  1.3 million.

3   Q.  And that is the product of the multiplication of 10 million

4   times .13, correct?

5   A.  Correct.

6   Q.  And that formula would apply regardless of what total

7   number was you're starting with in terms of dollar sales,

8   correct?

9   A.  Correct.

10  Q.  So if the jury has to calculate or wants to calculate on

11  its own what it believes total sales were, it could simply take

12  whatever number it believes is the appropriate sales number and

13  multiply that by 13 percent to calculate what it believes

14  actual profits were based on a 13 percent margin, correct?

15  A.  That's correct.

16  Q.  Did you ever review a profit margin that Costco's expert

17  presented?

18  A.  I did.

19  Q.  And what was that profit margin?

20  A.  It was 10.31 percent.

21  Q.  So Costco's expert and you disagreed by approximately

22  2.7 percent, is that correct?

23  A.  That's correct.  Costco's expert utilized the purchase

24  order data that had the sales below cost, so he just

25  incorporated those negative profit sales into his analysis,

1    whereas I did not.

2    Q.  Now, at the time you prepared your initial expert analysis

3    in October of 2013, had you reviewed the testimony of Douglas

4    Schutt, the chief merchandising officer of Costco?

5    A.  Yes.

6    Q.  And did you review any testimony of Mr. Schutt that you

7    thought had some potential application to the calculation of

8    damages in this case?

9    A.  Yes.  I referred to his approximation of 11,000 letters.

10   Obviously, from reviewing DTX258 I knew we had missing data, so

11   I ran an alternative calculation as I just explained assuming

12   11,000 sales.

13   Q.  So did you take essentially the data that was shown in 258

14   and grow it in some way?

15   A.  Yes.

16   Q.  Explain to the jury how you do that?  How do you take a

17   lower number and make it a reliably larger number?

18   A.  So I took the sales, unit sales in each period and then I

19   proportionally grew them so that I got 11,000 in total.  So

20   each fiscal period grossed up by the same percentage, such that

21   it solves for 11,000 units in sales.  I then took the average

22   net sales in each fiscal period and multiplied it by those new

23   unit sales and that's how I got to 47 million.

24   Q.  This was intended to be an estimate depending upon what may

25   have later come out in the case, right?

1   A.   Yes.

2   Q.   And it was based upon your concern that financial

3   information was missing based upon review of Exhibit 258,

4   correct?

5   A.   Correct.

6   Q.   So at the time you prepared your report you didn't know

7   whether 11,000 was right, but you knew that whatever was

8   reflected in Exhibit 258 was not right.

9   A.   Correct.

10  Q.   Okay.  So if there were sales of 11,000 units what would

11  that equate to in gross sales?

12  A.   That's 47 million is what I calculated.

13  Q.   And approximately what would the profits be at 13 percent?

14  A.   6.1 million.

15  Q.   Now, you initially, you relied upon Defendant's Exhibit 258

16  for your calculation of profits based upon a report from Costco

17  that purported to be actual sales records.  Did there come a

18  time where you had to adjust your calculations?

19  A.   Yes.

20  Q.   Why did you have to adjust your calculations?

21  A.   I subsequently was provided with underlying sales records

22  and those were accompanied with Costco's expert's report.

23  Q.   And the sales records that you were provided with, did

24  those provide certainty to any calculations that you would have

25  been able to make had you had those figures earlier?

A.  In my view, no.  The sales records themselves don't have an

item description at all.  It just says the item number, and I

wasn't certain whether or not, again, the item numbers

identified in that data set were the total universe of

engagement ring sales at Costco.

Q.  Can you please turn in your book to the page stamped

DTX139?  Can you describe what DTX139 -- first of all, did you

receive a copy of DTX139?

A.  I did, yes.

Q.  And can you describe what you understood DTX139 to be?

A.  Yes.  This is Exhibit 4 to Dr. Cornell, Costco's expert,

his analysis of the gross sales and net sales of what he termed

the relevant rings in this case.

        MR. MITCHELL:  Your Honor, I would offer Exhibit

DTX139 into evidence so it could be published to the jury?

        MR. DABNEY:  No objection.

        THE COURT:  Defendant's Exhibit 139 is admitted in

evidence and may be published.

        (Defendant's Exhibit 139 received in evidence)

Q.  So is this the, I'll call it the spreadsheet -- what would

you call it, spreadsheet or report?

A.  It's a printout of a spreadsheet.

Q.  Is this a copy of a spreadsheet that you saw that you

understood was prepared by Costco's expert, Dr. Cornell?

A.  Yes, that's correct.

1  Q.  And did you review this document?

2  A.  I did.

3  Q.  Could you tell the jury what your impressions were when you

4  first saw this?

5  A.  Well, it was at even more of a summary level than what

6  DTX258 was at, and it was unclear as to precisely how he had

7  arrived at the figures he had arrived at.

8  Q.  Why do you say that?

9  A.  Because he hadn't provided any details in his report

10  explaining how he arrived at these figures.

11  Q.  Did you ever review a document by which Dr. Cornell

12  purported to describe how he came up with his calculations?

13  A.  Yes.

14  Q.  And did you review that?

15  A.  I did review it, yes.

16  Q.  Did you understand it?

17  A.  I understood it, but it lacked a lot of details necessary

18  for me to basically replicate what he had done.

19  Q.  Were you able to identify where it was that Dr. Cornell

20  started his calculation that's contained on DTX139?

21  A.  Yes.  In my view he must have started the calculation

22  relying on DTX258, because that's the only, this spreadsheet is

23  the only thing that really ties the item number to a sign.  The

24  sales file does not have signs or item descriptions, the

25  purchase file does not have item descriptions or signs.  So

1    this had to be sort of a starting point for his analysis.

2    Q.  So what's marked as Defendant's Exhibit 258 is the document

3    that had all of the problems that you testified to you received

4    in October, correct, October 2012?

5    A.  Correct.

6    Q.  Or 2013, correct?

7    A.  2013.

8    Q.  So if Dr. Cornell started from that document to build his

9    analysis, embedded within Dr. Cornell's analysis would be the

10   same problems that you found in DTX2589, right?

11   A.  Yes.  For example, I believe Dr. Cornell identified 150

12   instances through his analysis where there was a return but no

13   purchase.

14   Q.  What did he do with that?

15   A.  He just excluded the return data, which is an implicit

16   assumption that there's only 150 purchases missing, which I

17   think is a substantial assumption to make.

18           MR. MITCHELL:  One moment, your Honor.

19           (Pause)

20           MR. MITCHELL:  May I have a moment, your Honor?

21           THE COURT:  Sure.

22           MR. MITCHELL:  Thank you.

23           (Pause)

24   BY MR. MITCHELL:

25   Q.  Mr. Kaczmarek, did you prepare in this case a declaration

1    that was filed in June of 2014?

2    A.  Yes.

3    Q.  And did you have attached to that declaration a copy of

4    what was provided to you as the analysis and work papers of

5    Dr. Cornell?

6    A.  Yes.

7    Q.  And did you review that analysis and those work papers?

8    A.  I did.

9    Q.  And did you attempt to follow what it was that Dr. Cornell

10   explained he had done to prepare DTX139?

11   A.  I did.

12   Q.  Can you explain to the jury whether there were some things

13   in there that you saw that were unreliable in terms of how he

14   prepared that document?

15   A.  Well, it's a 16-page document explaining how he went about

16   doing his analysis, as well as how Costco's systems operate.

17   And there were several instances in his steps where we tried to

18   replicate the entire analysis.  We couldn't because he just

19   didn't provide sufficient detail for us to do so.

20   Q.  Do you remember all of the steps that you counted on?  Is

21   there anything in particular that you remember or if you had a

22   copy would it refresh your recollection?  I'm not trying to

23   make this a memory test.

24   A.  It would help if I had a copy.  I don't recall all of the

25   steps.

1          MR. MITCHELL:  I would propose to hand the witness a

2     copy of his declaration so he can look at it to the extent to

3     refresh his recollection about how and what it was he observed

4     in Dr. Cornell's report or explanation in his report that he

5     found problematic.

6          MR. DABNEY:  Your Honor, we have an objection.  I'll

7     confer with counsel.

8          THE COURT:  Would you please?  Thank you.

9          (Pause)

10         THE COURT:  Gentlemen, would you move a bit further

11    out?

12         (Pause)

13    BY MR. MITCHELL:

14    Q.  Mr. Kaczmarek, do you recall a figure 3C in Dr. Cornell's

15    explanation?

16    A.  Yes.  There were some examples he provided as to how he

17    matched records from the different files that he was provided

18    by Costco.

19    Q.  And can you describe for the jury what it was you saw was a

20    problem with some of that?

21    A.  Sure.  So he had the sales file as well as a member file

22    and a returns file.  And he linked them together and he

23    provided some examples of how that linking worked and 3C, as I

24    recall, was an example of a particular person where first she

25    bought a ring, so he showed the record of the purchase, and

 1    then it was voided.  And then the person bought it again.  And

 2    so he tried to show how to identify a voided sale versus what's

 3    a return.  Because six months later or so I think his data

 4    showed the person went to a different Costco and returned the

 5    ring.  But then that person just minutes later bought the exact

 6    same ring again at the same price.  And then what he has

 7    explained in that, his understanding of the data is, a return

 8    is when you leave the store, right?  So if you look at the ring

 9    and you don't want it at the cage he explained that that's a

10    void.  But this person apparently after buying the exact same

11    ring for the same price left the store and came back minutes

12    later and returned the ring again.  So that was one of the

13    examples he provided of how the data linked, but I think the

14    substance of the data looks a bit funny, is an odd behavior,

15    someone returning and buying and returning the same ring over

16    and over.

17    Q.  Did you ultimately believe that Dr. Cornell's calculation

18    in DTX139 was reliable?

19    A.  I don't believe it's reliable.  I believe because he is

20    using DTX258 in particular he's made an assumption that the

21    signs were the signs used in the time frames that this document

22    shows.  You can see the time frames he's assumed.  But there's

23    no way of knowing this, and I haven't seen any detailed

24    documentation from Costco purporting to show when a sign was

25    used and what the content of the sign actually was.  So he's

1  making a substantial assumption in that regard in my view.  But

2  nonetheless, as another alternative I provided a calculation

3  assuming his numbers were right.

4  Q.  And these, this supposed breakdown on a sign-by-sign basis,

5  was that materially different than what you saw in DTX258 or

6  mostly just a regurgitation of that?

7  A.  It's mostly a regurgitation, but you can see from his

8  spreadsheet there are several instances where he says the signs

9  were being used don't even use the Tiffany name.  That's what I

10  had observed already from DTX258.  So again, why, if that sign

11  is truly correct it shouldn't even be part of the analysis.

12  Something's wrong clearly in the way this information is being

13  compiled.

14  Q.  So what if any information did you use from Dr. Cornell's

15  report to adjust your profits calculation?

16  A.  So the bottom of the, his spreadsheet indicates 2,498 sales

17  at approximately 10.6 million.

18          MR. MITCHELL:  Could you put up DFX139, please?  Go to

19  the bottom half of the page.

20  Q.  Is that helpful?

21  A.  Yes.

22  Q.  Could you tell the jury, then, what portion of

23  Dr. Cornell's report you used?

24  A.  I just used the totals, which you can see on the screen,

25  because, again, I have no reason to know or understand how

1    these signs were attached to the item numbers for periods of

2    time and whether or not the signs actually read like they say

3    they read.  So I took his total in the far right column,

4    10,553,593 and I multiply that by 13 percent and got a profit

5    figure of about 1.4 million.

6              (Continued next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  If you would calculate profits based on gross units, it

2    would simply be taking a different figure.  How would you do

3    that?

4    A.  You could take the gross sales of 13.9 million and multiply

5    it by 13 percent.

6    Q.  Did you rely on these total amounts at the bottom because

7    you did not find the breakdown in his chart reliable?

8    A.  That's correct.

9    Q.  Is that why -- withdrawn.

10        Would you ever issue an analysis for use in a legal

11   proceeding where you did not have confidence that the amounts

12   you were reflecting were accurate?

13   A.  I would typically try to provide an answer in any event,

14   but I would certainly qualify it quite heavily in the report to

15   indicate that I was concerned about the information I was

16   getting and, you know, it may not be a reliable calculation.

17   And that's actually, I provided that qualification in my first

18   report.

19   Q.  If the jury disagrees with you and believes Dr. Cornell's

20   breakdown of sales on a sign-by-sign basis is reliable after

21   listening to all the evidence, do you have a separate

22   broken-down analysis that would refute his calculation?

23   A.  I do not.

24   Q.  So if the jury finds that Dr. Cornell's breakdown is

25   reliable, as opposed to unreliable as you testified, then the

1    jury should rely on his breakdown for purposes of calculating

2    damages; is that correct?

3    A.  They could do that if they so desired.

4    Q.  Or they could take bits and pieces, choose rings that are

5    covered, rings that aren't covered, total sales, and multiply

6    that by 13 percent, correct?

7    A.  Precisely.

8    Q.  Your belief, though, is that there's no way to do that

9    reliably so you should use the total figures for all ring sales

10   because everything that's broken down is a bit of a mess,

11   right?

12   A.  That's a fair way of putting it, yes.

13   Q.  You are not sitting here testifying today that you believe

14   Tiffany should recover profits for sales of rings that are not

15   covered by the Court's order of what it is entitled to recover

16   for, are you?

17   A.  Of course not.

18   Q.  Is your testimony limited to the fact that what Costco

19   provided cannot be reliably broken down, so the first stopping

20   point, where you can have a reliable number at least, is

21   Dr. Cornell's totals; that would be one spot, right?

22   A.  That's fair, yes.

23   Q.  And that also assumes that Dr. Cornell counted all sales of

24   signs with "Tiffany" on them, correct?

25   A.  Correct.

G9LATIF4ps                    Kaczmarek - direct

1    Q.  Did you in fact ever analyze sign data to determine whether

2    in fact Dr. Cornell had included all signs, from its signage

3    data, that reflected Tiffany in the signage?

4    A.  I did.

5            MR. MITCHELL:  I hate to do this to you, but may I

6    hand the witness this pile of documents?

7            THE COURT:  Yes, you may.  You have companions.

8            MR. MITCHELL:  This is the top, so I'll put the bottom

9    here.

10   Q.  Mr. Kaczmarek, I have placed in front of you a stack of

11   bound volumes of paper.  Do you see that?

12   A.  I do.

13   Q.  Can you describe for the jury what that is.

14   A.  This is what we have been referring to as the signage data.

15   So it's the number of records that have sign descriptions and

16   dates that they were apparently in a database in a warehouse.

17   Q.  I unfortunately made a mistake.  The last volume, I think,

18   is on the bottom, but I would like you to pull out the last

19   volume, so if you need somebody to help you pick, I would --

20           THE COURT:  Can you help --

21           MR. MITCHELL:  He's got it, he's got it.  He's doing

22   very well.

23   Q.  Is that the last volume of all the sign data?

24   A.  It appears to be, yes.

25   Q.  And can you give me the number of the line, of the last

 1    line of sign data.

 2              THE COURT:  Are you offering --

 3              MR. MITCHELL:  Oh, I'm sorry.  Thank you, your Honor.

 4         I would offer Plaintiff's Exhibit 64 into evidence.

 5              MR. DABNEY:  May I voir dire the witness about this,

 6    your Honor?

 7              THE COURT:  Would you consult first and then...

 8              (Counsel confer)

 9              JUROR NO. 5:  Your Honor, could we just move them so

10    we can see the witness?  Thank you.

11              MR. MITCHELL:  May we have a sidebar, your Honor?

12              THE COURT:  Yes.

13              (At the sidebar)

14              MR. DABNEY:  We have a pile of documents with no

15    sponsoring witness.  These records, again, were not part of the

16    experts' reports or any discovery.  So they are coming in based

17    on your Honor's rulings earlier.  So the proffer of evidence

18    has been made without a sponsoring witness.  And we don't know

19    how these were selected.  This is a selected subset.  We don't

20    know who selected it.  We don't know what criteria were used to

21    select it.  We don't know anything about it really, other than

22    that it arrived last week in two bankers boxes from plaintiff's

23    counsel.

24              So our position simply is, if they want to lay a

25    foundation for entering these documents in evidence through a

1    sponsored witness, that's fine.  That's not this witness.

2              THE COURT:  Mr. Mitchell.

3              MR. MITCHELL:  I can go back to say, that's wrong, but

4    he's had this document for a very long time.  But putting that

5    aside, I thought we had resolved this yesterday.  This is the

6    document from which the spreadsheet we talked about this

7    morning was derived.  And this is the underlying data from

8    Costco.  It's Costco's data that the expert used to create that

9    spreadsheet, the document we talked about, so I thought that's

10   what we spoke of yesterday.

11             Mr. Dabney also had a pile of this on his desk and we

12   discussed the admissibility of this document and the Court said

13   it could come in, because he has already made this motion, and

14   the Court denied it.

15             THE COURT:  Yesterday you're talking about, we didn't

16   talk specifically about foundation and authentication of the

17   particular sets of exhibits.  And so you need to do something.

18   What do you want to do?

19             MR. MITCHELL:  I would lay more of a foupdation, have

20   him describe what the document is.  And I thought we were

21   getting it in under agreement, so I didn't know this would be

22   an issue.  It's their data.  It's part of the data that this

23   expert had.  It's part of the data that was provided after he

24   had his expert report that he analyzed in order to examine

25   Dr. Cornell's report.

1          THE COURT:  Mr. Dabney, I want as clear an indication

2     of the depth of your investigation -- to the extent that

3     Mr. Mitchell represents that this data was taken from what's

4     called the January 1, 2014 data set provided by Costco, are you

5     saying that you're going to require him to call a Costco

6     witness to authenticate that that data set came out of Costco's

7     records before this witness can then say, I took that data set

8     and I examined it in this way and manipulated it in that way?

9          MR. DABNEY:  Yes.  And the reason is, as your Honor

10    ruled, I thought, they have to lay a foundation for these

11    documents before they can ask their expert about them.  This is

12    not -- we have a witness with all of the records that were

13    produced to them in electronic form.  I expected that Kaczmarek

14    would go on after our witness so that the meaning of these

15    documents, the completeness of these documents, the content of

16    the documents would be understandable.  This witness has no

17    clue as to what these documents signify.  There's all kinds of

18    headings and columns, information that this witness has no idea

19    about.  This is a problem when they're going outside the expert

20    report.

21          So our position simply is, no foundation has been laid

22    for this made-for-litigation subset, which as your Honor knows

23    we have objections to in the way it's been characterized, and

24    obviously they will try to characterize through this witness,

25    who has -- no foundation has been laid that he knows anything

1    about the content of the documents.  He said over and over

2    again it's unreliable, unreliable, unreliable, and yet now they

3    want him to identify documents that he doesn't pretend to

4    understand.

5         So I can't help it that they decided to put this guy

6    on before the foundational witness that I fully expected them

7    to call.  But I don't think that this is a proper way to

8    short-circuit the rule of evidence to get in a compilation that

9    some person made of records, who didn't know what he was doing

10   and doesn't know what they are.  I can't cross-examine him

11   about these documents.  He doesn't know what they are.

12        MR. MITCHELL:  Mr. Dabney had our orders of witnesses.

13   He knew, we discussed it the other day, that it was coming in

14   through this witness.  I understood Mr. Dabney to be objecting

15   to the offer of that document through this witness because this

16   witness is the one who created the chart.  So what he's saying

17   is not what he said the other day.  He may argue that now, but

18   that's not what he was talking about.  This is data, Costco

19   data.  This is an expert who analyzes data.  We provided this

20   to your Honor on the motion for summary judgment.  This is the

21   source of the chart that your Honor had on the summary judgment

22   motion.  It's simply data.  It has sign -- for instance, for

23   Mr. Dabney to say he doesn't know what it is, anybody knows

24   what it is.  It's what he's relying on, because he's saying,

25   they're only relying on summaries.  So Dr. Cornell's

1     description of all the signs has to derive from this particular

2     document, because there's no other place for it.  They produced

3     it to us.  It is a subset of millions and millions of lines of

4     signage data.  And it is an extraction of all the signs that

5     said "Tiffany" in every permutation that will result in the

6     jury not look at those but the summary of what they list that

7     Mr. Dabney has had two years.

8               MR. DABNEY:  I have a practical suggestion.  Peter

9     Hesketh, who does know the contents of the originals of his

10    documents, all of which are on defendant's -- not this subset

11    but the actual business records that were produced, is

12    available.  He is here to answer questions.  And this line of

13    questioning could be deferred until Mr. Hesketh is examined and

14    he can be asked questions to create the basis, the foundational

15    basis on which a witness could be asked to interpret these

16    documents.  But just to go -- what they proposed, to make a

17    proffer of documents that the witness has no knowledge of, no

18    foundation of as to their accuracy, completeness, whatever, we

19    think there is no basis under the rules of evidence for doing

20    it, and --

21              MR. MITCHELL:  May I just make one point.

22              THE COURT:  Yes.

23              MR. MITCHELL:  As Mr. Dabney just said, at

24    Mr. Hesketh's deposition, when I showed him pages from this,

25    Mr. Dabney objected about this.  So he deprived me of the

1   opportunity to question Mr. Hesketh about it.  That's why it

2   ended up going to the expert to analyze what was in the data,

3   because he obstructed him from getting that evidence before.

4   And now he's trying to force me to bring that witness, who was

5   produced as a 30(b)(6) witness.  He wants me to call that

6   witness back so he can obstruct me from concluding with my

7   expert, getting him off the stand, letting him to leave.  He's

8   known about this since Mr. Hesketh's deposition in February

9   2014.

10          THE COURT:  I am going to permit this examination to

11  continue without prejudice to reaching the conclusion that

12  plaintiff is to strike the testimony if the origin of the data

13  is not established in a fashion that I deem appropriate by the

14  end of the plaintiff's case.  And I do, as the judge, have the

15  responsibility and ability to determine the conduct of the

16  presentation of evidence.

17          MR. DABNEY:  Well, he can rely on what -- there was a

18  ruling.  There was an offer to proffer the document in

19  evidence.  And that was what we have objected to.  If they want

20  to question the witness about it, that's proper.

21          THE COURT:  I am permitting it in evidence subject to

22  a later application.

23          MR. MITCHELL:  Also, I'm happy to show it to

24  Mr. Hesketh, have him identify it as Costco signage data.  Is

25  that what you want me to do?

1            THE COURT:  It's admitted subject to connection.  So

2     I'm granting the application to admit this identified document

3     as an exhibit and we'll revisit it if necessary in the future.

4            MR. DABNEY:  Thank you, your Honor.

5            MR. MITCHELL:  Thank you.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  What is the exhibit number, Mr. Mitchell?

3              MR. MITCHELL:  PTX 64.

4              THE COURT:  PTX 64 is admitted in evidence.

5              (Plaintiff's Exhibit 64 received in evidence)

6    Q.  Mr. Kaczmarek, I ask you to turn to the last page of that

7    compilation spreadsheet.  Can you just tell the jury, please,

8    what line number is reflected there?

9    A.  213,761.

10   Q.  So this is an Excel spreadsheet, correct?

11   A.  Correct.

12   Q.  So Excel spreadsheets start with line no. 1 being the

13   heading, correct?

14   A.  Correct.

15   Q.  So you really start on line no. 2, right?

16   A.  That's right.

17   Q.  So how many lines of data are in Plaintiff's Exhibit 64?

18   A.  213,760.

19   Q.  Now, what did you understand this data to consist of?

20   A.  I had understood it to be records of signs that were

21   maintained by each warehouse of diamond engagement rings.

22   Q.  Whose records did you believe -- withdrawn.

23              Whose records did you believe this data was extracted

24   from?

25   A.  From Costco.

1    Q.  And was there any -- did this data include signage

2    information as far as you understood it?

3    A.  Yes, it does.

4    Q.  And are you able, in -- just so we can -- let's blow

5    something up right there.  This is just an example of how the

6    data is reported in this, correct?

7    A.  Yes.

8    Q.  What this shows is what was understood to be signage data,

9    correct?

10   A.  Correct.

11   Q.  And where it says WISGN1, 2, and 3, did you make any

12   interpretation of what you thought that was?

13   A.  Line 1, which is column J, would be the first line of the

14   sign, the next column would be the second line of the sign, and

15   the third column the third line of the sign.

16           MR. MITCHELL:  Can we go to the right side of that

17   page, please.

18           THE COURT:  Mr. Mitchell, unless you're going to be

19   asking the witness to delve into the other volumes, I ask that

20   that stack be taken away so that the jury can have a full view

21   of the witness.

22           MR. MITCHELL:  Yes.  Sorry about that, your Honor.

23           Keep that one.  I don't want anybody to trip.

24           Would you like -- is there place to put it?

25           THE COURT:  Well, if --

1              MR. MITCHELL:  I think I can use electronic, yes.

2              THE COURT:  Thank you.

3   Q.  And if we look at the right side of the columns, you can

4   see information that says "FS year" and "FS period."  Do you

5   see that?

6   A.  Yes.

7   Q.  Did you interpret what those entries meant?

8   A.  Yes.  It would mean that a particular warehouse had in its

9   records the signs shown in columns K, L, and M in fiscal period

10  2 thousand -- fiscal period 13 of fiscal year 2012.

11  Q.  And did you go to the left side of this page?  Were there

12  other columns that you were able to easily identify within

13  that?

14  A.  Yes.  Column A is the department for jewelry.  B is the

15  item number.  C is the vendor.  D is a suffix that often is

16  just zero.  E is a buyer.  F is the landed cost.  That's the

17  cost of acquiring a particular ring.  The next column is

18  generally zero.  H repeats E for some reason.  And then I is

19  the warehouse number depicting a unique store.

20  Q.  And in the performance of your duties as an expert witness,

21  have you ever had occasion to review raw data, underlying data,

22  that's not necessarily identically like this but you have

23  experience in looking at things like these?

24  A.  All the time, yes.

25  Q.  Is this complicated for you?

1    A.   No.

2    Q.   And this was an Excel spreadsheet that you had?

3    A.   Yes.

4    Q.   Is this data sortable?

5    A.   Absolutely.

6    Q.   So are you capable of sorting out signs and sign

7    permutations one from the other?

8    A.   Absolutely.

9    Q.   Did you ever do that?

10   A.   What I ended up doing was, I found how many unique signs

11   there were, how many unique combinations of line 1, 2, and 3 in

12   the data.  And I found that there were 16 unique signs, all

13   having the name Tiffany in them.  And then I counted up how

14   many times each of those signs appeared in the data.

15   Q.   Now, would you turn in your book, please, to PTX 133.

16        MR. MITCHELL:  Your Honor, may I approach with a

17   replacement 133?

18        THE COURT:  Yes, you may.

19        MR. MITCHELL:  Thank you.

20   Q.   Can you describe what PTX 133 is.

21   A.   Yes.  This is a summary of the analysis that I did and just

22   described.  You see there were 16 unique signs in the 213,760

23   records.  And then I counted up how many times they existed in

24   the record, and the range of dates in use for that record.

25   Q.   And, Mr. Kaczmarek, what was the source of the data that's

1    contained in the spreadsheet?

2              THE COURT:  Are you offering the spread sheet?

3              MR. MITCHELL:  I was going to offer it after this

4    question.

5              THE COURT:  Thank you.

6    A.  It was the spreadsheet in electronic form corresponding to

7    all your binders.

8              MR. MITCHELL:  Your Honor, I offer PTX 133 as

9    Plaintiff's Exhibit 133.

10             MR. DABNEY:  Counsel repeats its earlier objection.

11             THE COURT:  The objection is overruled and the exhibit

12   is admitted.  Plaintiff's 133 may be displayed.

13             (Plaintiff's Exhibit 133 received in evidence)

14   Q.  Now if we could walk through this chart briefly.  Could you

15   describe for the jury what portions of the larger signage data

16   are summarized in this spreadsheet.

17   A.  So I summarized the data by the combination of line 1, 2,

18   and 3.  Again, those are all unique combinations.  And then I

19   counted up how many records arose of data you could find in the

20   entire file for that unique combination.  So, for example, the

21   first line appeared in the data 24,469 times.  And you see the

22   total matches out to the total we saw earlier of 213,760.

23   Q.  And the date "dates in use" column, could you describe for

24   the jury what that is, please.

25   A.  That's a summary of the range of dates corresponding to

1    that fiscal year and fiscal period that we saw at the end of

2    the file.  So the first line, I consulted the sign in the

3    records from 2007 to 2013.

4    Q.  What I would like to do is to take, maybe we can do it in

5    some way that the jury can follow this, but hopefully we can do

6    it with the screens, but I would like you to walk through what

7    information you observed from your spreadsheet from your

8    analysis of Plaintiff's Exhibit 64 that appeared to be missing

9    from Dr. Cornell's breakdown analysis.

10            MR. MITCHELL:  It might be easier to use the overhead

11   as opposed to the...

12   Q.  I'm going to try to do this by highlighting it and matching

13   the highlighting from one chart to the other, if you give me a

14   moment.

15            OK.  So starting with the first line, 1 CTW diamond

16   round solitaire Tiffany ring, 24,469 entries in the report.  Do

17   you see that?

18   A.  I do.

19   Q.  Was there any problem -- and I'm going to highlight that in

20   orange to keep track of it easily.  Can you tell me if there

21   was any issue with respect to that sign entry in Dr. Cornell's

22   report.

23   A.  That sign was in his summary report, yes.

24   Q.  Were there any errors in Dr. Cornell's report based upon

25   that sign?

1  A.  For that particular sign, there was one gross sale, zero

2  net sales.

3  Q.  So for a sign that is reflected in Costco's signage records

4  for the entire statute of limitations period of 2007 to 2013,

5  Dr. Cornell only reports one gross sale and zero net sales.  Is

6  that what you're saying?

7  A.  Yes, correct.

8  Q.  Did you form any conclusion -- I will show that here.  Did

9  that cause you to form any conclusion concerning the

10  reliability of that calculation by Dr. Cornell?

11  A.  The data seems to suggest that that would be highly unusual

12  to have signs at particular warehouses for such an extended

13  period of time and have zero net sales.

14  Q.  And how about the dates reflected in Dr. Cornell's report

15  where he says the signage was used?  Was that correct?

16  A.  It differs from the signage data.  His report suggests it

17  was stopped in 2010, whereas the signage data suggests records

18  were still at the warehouses through 2013.

19  Q.  And Dr. Cornell also said that the time period started in

20  2008, did he not?

21  A.  Yes, fiscal period 9 in 2008.

22  Q.  So your observation from the actual records is that this

23  was in use from 2007 to 2013, correct?

24  A.  Correct.

25  Q.  So this would be incorrect that Dr. Cornell -- and correct

1    would be 2007 to 2013.  And his report shows that nothing was

2    sold, next to that sign, correct?

3    A.  On that basis, correct.

4    Q.  Now, let's look at the next line.  I'm referring to

5    Plaintiff's Exhibit 133, your summary report.

6    A.  Yes, on the second line?

7    Q.  Yes.

8    A.  I was not able to find that in his summary, the particular

9    signage.

10   Q.  So line no. 2, which reflects 160 sign entries over a

11   period of time 2007 to 2013, where the word "Tiffany" appears

12   in the sign, there is no signage data at all reflected in

13   Dr. Cornell's report, correct?

14   A.  That's correct.

15   Q.  How about the next line?

16   A.  The next line, that I do recall finding in Dr. Cornell's

17   reports.

18   Q.  Was there a problem that you observed with respect to what

19   Dr. Cornell's report reported concerning these items?

20   A.  Yes.  I had observed there was a different number of unique

21   signs that were in his report compared to what I found in the

22   signage data.  And besides line 2, I found that line 7 and line

23   9 for those particular signs also do not appear in his summary

24   analysis.

25   Q.  Line 7 and line 9.

1    So let's first go back to the one I have in blue here

2  and look at Dr. Cornell's report.  These are the 1 carat

3  princess cut and 1 carat round diamond.  In Dr. Cornell's

4  report, those are reflected in these two entries, correct, the

5  last two entries on the bottom of PTX 139?

6  A.  Yes, that appears correct.

7  Q.  Your records, though, your spreadsheet indicates that these

8  signs are present in the signage data from 2007 to 2013,

9  correct?

10  A.  Correct.

11  Q.  Dr. Cornell's report of these scenes, or the data for these

12  signs, shows that they are only there for a period that's

13  shorter than that, correct?

14  A.  Correct.

15  Q.  So the raw signage data appears to show signs that are in

16  use in the system for a longer period of time than Dr. Cornell,

17  correct?

18  A.  Correct.

19  Q.  The pen is what you observed, is that correct?

20  A.  That's correct.

21  Q.  2007 to 2013.

22  A.  Correct.

23  Q.  Now, in going back and preparing for your testimony today,

24  did you observe there was one, call it one error in terms of

25  signage information that was contained in your chart, in going

1    back and preparing for today?

2    A.  I did.  It's the fifth line.  It should -- the line 2,

3    column 2, should read "diamond solitaire," not "solitaire

4    Tiffany."

5    Q.  So the word was wrong, but you observed that that was in

6    his report.  You just had the wrong word there.  You didn't

7    report that as any error of Dr. Cornell; it was a mistake of

8    one word in your report, in your spreadsheet, correct?

9    A.  Correct.

10   Q.  Anything else that you observed was wrong in the

11   spreadsheet?

12   A.  No.

13   Q.  The green entry, "1 carat princess cut diamond solitaire,"

14   that shows that that was in use from 2007 to 2013, correct?

15   A.  Correct.

16   Q.  And if we look at that line in Dr. Cornell, he shows that

17   it was only in use in 4/2013, correct?

18   A.  That's correct.

19   Q.  Is there anything else wrong with that information in

20   Dr. Cornell's report?

21   A.  The signage displayed in what you highlighted in green is

22   different than what was on my summary of the signage.  You can

23   see in his report it doesn't have the word "Tiffany" at all.

24   But the big signage data indicates that the sign that we looked

25   at, line 7 of my table, did have the word "Tiffany" in it.  So

1   it is a different sign for the same item.

2   Q.  And the sign that Dr. Cornell's report says was present is

3   "1 carat princess cut diamond solitaire white gold ring," no

4   "Tiffany" in the wording at all, correct?

5   A.  Correct.

6           MR. MITCHELL:  Mr. Cole, can we go back to the

7   computer for one moment and pull up line 60 of Plaintiff's

8   Exhibit 64, page 1,828.  Can we just enlarge this area for the

9   moment.

10  Q.  Is this the sign data that you observed in the raw records

11  that you reviewed and summarized?

12  A.  That's correct.

13  Q.  And as opposed to the sign saying, as Dr. Cornell said, "1

14  carat princess cut diamond solitaire white gold ring," you

15  observed it said "1 carat princess cut diamond solitaire ring

16  white gold Tiffany style," correct?

17  A.  Correct.

18  Q.  And how long did you observe that that usage was in place?

19  A.  From 2007 to 2013.

20  Q.  And there is no indication in Dr. Cornell's report of any

21  sales in connection with any sign like that, correct?

22  A.  Correct.

23  Q.  And then lastly, if we go back to --

24          MR. MITCHELL:  Can we go back to the overhead one

25  second.

1    Q.  You had another entry at the bottom highlighted that we

2    went through that was wrong.  It was another one that's just

3    not on Dr. Cornell's report, correct?

4    A.  Correct.

5    Q.  So Dr. Cornell's report appeared to be -- to the extent

6    that Dr. Cornell purported to report sales of every sign that

7    had "Tiffany" in it, based on a review of the raw signage data,

8    there were clearly signs that were not reported in

9    Dr. Cornell's report, right?

10   A.  Correct.

11   Q.  Now let's look at Dr. Cornell's report.  I have highlighted

12   the changes you had.  Let's look at Dr. Cornell's report,

13   because I want to ask you some questions about some other

14   things.

15        Now that we have modified Dr. Cornell's report to

16   reflect what was there, we have a ring at the bottom, 140513, 1

17   CTW diamond round solitaire Tiffany ring.  You see that?

18   A.  Yes.

19   Q.  That shows that that sign in the raw data was used for a

20   period of six years.  Correct?

21   A.  Correct.

22   Q.  But the report of Dr. Cornell shows that in the entire

23   six-year period, there were zero sales.  Correct?

24   A.  Correct.

25   Q.  Does that make any sense to you?

1    A.  It doesn't make sense that you'd have records for every

2    fiscal period for six years for a sign and have no sales over

3    such a long period.

4    Q.  As an expert in analyzing profits for companies, did that

5    cause you to form an opinion as to the completeness of Costco's

6    records concerning its report of sales next to the signs, or in

7    connection with signs?

8                THE COURT:  Do you want to consult.

9                (Counsel confer)

10               MR. MITCHELL:  I withdraw the question.

11   Q.  Looking at the entries -- well, let's go back a second.

12   You adjusted your profit calculation based upon a criticism

13   that Dr. Cornell made of your initial expert report, in which

14   he said you included items beyond the appropriate period in

15   your first report.  Correct?

16   A.  I made that observation in my first report, but, yes, he

17   said it should be adjusted.

18   Q.  In response to Dr. Cornell's criticism of your first

19   report, you adjusted your own figures, correct?

20   A.  Yes.  I tried to replicate what he did.  I got different

21   numbers, about 11 million in total net sales.  But I ran a

22   profit figure presuming his analysis was right.

23   Q.  And you had testified earlier that you found that

24   Dr. Cornell's breakdown of sales per sign was unreliable.  You

25   did say that, correct?

1   A.   Yes.

2   Q.   Is one of the reasons you found it unreliable the fact that

3   there appeared to be signs present in Costco records for long

4   periods of time for which no sales were reported?

5   A.   Yes.

6   Q.   And if we take a look, Mr. Dabney had said in his opening

7   that Costco, in coming clean and all this, had dropped --

8   originally said "setting" and then went to "set" and ultimately

9   somebody made a mistake and dropped that entirely.  Does the

10  entry, just as an example, 140513, show that the phrase

11  "solitaire Tiffany," without "set" or "setting" is reflected in

12  the Costco sales information, dating back to 2007?

13  A.   Correct.  From 2007 to 2013, they used the word "Tiffany"

14  without any modifier.

15            (Counsel confer)

16            MR. MITCHELL:  I'm sorry.  I may have misspoken.

17  Mr. Dabney is correct.  I said "sales information."  Mr. Dabney

18  said "signage information."  I misspoke.  I'm sorry.  I was

19  referring to Mr. Dabney's opening where Mr. Dabney said signage

20  information changed and it went originally from "setting," to

21  "set," to drop entirely.

22  Q.   And I would also call your attention to the first entry,

23  the first line of entries here, which shows the use of

24  "solitaire Tiffany" without any modifier dating as far back as

25  2007.  Correct?

1    A.  Correct.

2    Q.  So your review of the signage data that's summarized in

3    your spreadsheet indicates that the word "set" or "setting" did

4    not appear in certain signage at Costco as far back as 2007.

5    Right?

6    A.  That's correct.

7    Q.  And that is the earliest date on which you were provided

8    records.  Correct?

9    A.  That's correct.  It could -- the use or the presence of the

10   records could certainly go back earlier, but that's the

11   starting period at which the data was provided.

12             MR. MITCHELL:  I have nothing further, your Honor.

13             THE COURT:  Thank you.

14             Mr. Dabney, we'll have 15 minutes to the lunch break.

15             MR. DABNEY:  Your Honor, may I approach the witness

16   with a binder, please?

17             THE COURT:  Yes, you may.

18             MR. DABNEY:  Your Honor, may I also approach the

19   witness with a copy of Defendant's Exhibit 52, which is in

20   evidence?

21             THE COURT:  Yes, you may.

22             MR. DABNEY:  I believe your Honor has a copy of this

23   one.

24             THE COURT:  52 I have, right.

25             MR. DABNEY:  52, yes.  Thank you.

1          MR. MITCHELL:  Do you have a binder for us?

2          MR. DABNEY:  Yes.  Yes.

3          MR. MITCHELL:  Your Honor, one thing before Mr. Dabney

4    proceeds.  Can I have Mr. Kaczmarek just initial these, so in

5    case I want to refer to them as a demonstrative later, I could

6    identify them?

7          THE COURT:  Yes.  And perhaps we ought to call that,

8    what was that, 133A or something like that?

9          MR. MITCHELL:  OK.  I'll make 133A the spreadsheet.

10          THE COURT:  It's the marked copy.

11          MR. MITCHELL:  And Defendant's 139, make it DTX 139A.

12          THE COURT:  All right.  And you'll ask Mr. Kaczmarek

13    to initial and date those now.

14          MR. MITCHELL:  Thank you, your Honor.

15          THE COURT:  So 133A and 139A as described are

16    admitted.

17          (Defendant's Exhibits 133A and 139A received in

18    evidence)

19    CROSS EXAMINATION

20    BY MR. DABNEY:

21    Q.  Good afternoon, Mr. Kaczmarek.

22    A.  Good afternoon.

23    Q.  As I understand it, Mr. Kaczmarek, one of the things that

24    you were hired to do by the plaintiffs was to give testimony

25    with regard to the number of sales of certain diamond ring

1    items that Costco made.  Is that right?

2    A.  That was part of the analysis, yes.

3    Q.  And did you consider any actual sales records,

4    Mr. Kaczmarek, before you gave your first expert report in the

5    case?

6    A.  I considered the spreadsheet that was marked DTX 258, but

7    nothing else in detail, because I didn't have any detailed

8    sales records.

9    Q.  Mr. Kaczmarek, were you here for the testimony of

10   Ms. Abrams?

11   A.  Yes.

12   Q.  Did you hear my questions and her answers about the buyer

13   list that was given to the plaintiffs in October of 2013?

14   A.  I do recall that.

15   Q.  Did you hear her give testimony that she believed that

16   buyer list had been provided to you, Mr. Kaczmarek?

17   A.  That buyer list had definitely not be provided to me.  I

18   specifically mentioned that in my first report.

19   Q.  So when Ms. Abrams testified -- let me pull it up on the

20   document camera.  This is Defendant's Exhibit 52, which has a

21   control number on it 37765.  You're saying that you were not

22   provided with a buyer list in this case by the plaintiffs

23   before you gave your first expert report.

24   A.  That's correct.  I explicitly stated so.

25   Q.  Did you ask plaintiff's counsel if they had sales records

1    relevant to these items, Mr. Kaczmarek?

2    A.   Yes.

3    Q.   And what did they tell you?

4    A.   That all we had was the spreadsheet, that no sales

5    records --

6    Q.   Plaintiff's counsel didn't tell you that they had the

7    actual sales records that they were asking you to give

8    testimony about?

9    A.   Prior to issuing my report in early November, no.

10   Q.   And you actually had asked them for that, didn't you?

11   A.   We had asked for any information relevant to calculating

12   profits.

13            MR. MITCHELL:  Could -- objection, your Honor.

14            THE COURT:  Please consult.

15            (Counsel confer)

16            MR. MITCHELL:  Your Honor, may I see you at sidebar,

17   please?

18            THE COURT:  Yes.

19            (Continued on next page)

20

21

22

23

24

25

1          (At the sidebar)

2          MR. MITCHELL:  I know all of this was contemporaneous

3    with motion practice, which is getting this document, which was

4    supposedly the purpose of this.  I don't have a problem with

5    Mr. Dabney asking this witness, did you review it, did you see

6    it, did you get it.  That's fine.  But for him to say, did you

7    know that they withheld it from you, with all those histronics,

8    is completely improper, because as your Honor knows, it was

9    like pulling teeth to get this from them.  That they're now

10   calling this sales records when in fact that was supposed to be

11   the customer list, not sales records, his questionig now is

12   completely misleading.  And because this was the subject of

13   heated debate between Judge Freeman and in front of your Honor

14   as well, let him ask the questions after he has established the

15   fact, didn't see it.  He can argue whatever he wants

16   afterwards, but these are not sales records.

17          THE COURT:  The objection that it is improperly

18   argumentative and containing inflammatory characterizations is

19   sustained.  Seek to rephrase, to ask the question in a more

20   straightforward way.  I think you've already gotten your answer

21   a couple of times, but --

22          MR. DABNEY:  Thank you, your Honor.

23          MR. MITCHELL:  Can we have clar -- because your Honor

24   knows, he's called them "sales records."  This was the purchase

25   list that we fought hard to get, not sales records.

1            THE COURT:  This is a compiled list, not --

2            MR. DABNEY:  Oh, no, no, no, no.  This list has the

3    sales information on these items.  It has the sale date, the

4    item number, the price, the buyer, everything.  It is a --

5            THE COURT:  It's not --

6            MR. DABNEY:  It is more than just a buyer list.

7            THE COURT:  It's not --

8            MR. MITCHELL:  But there was -- I'm sorry.

9            THE COURT:  It's not raw data.  It's the compiled

10   report, a compiled list.

11           MR. DABNEY:  It is an extraction from our sales

12   records of those records they wanted, which was who got the

13   letters.  So the history here is, we provided the actual

14   mailing list.  They said that's not enough, we need more

15   information.  So we provided them immediately with lists that

16   provided the member name, address, sale price, everything,

17   everything in the Exhibit 52 in evidence.  So the point I'm

18   trying to make simply is that they had it, they knew they had

19   it.

20           We now have a conflict in the testimony.  Ms. Abrams

21   testified that they provided this document to this witness, and

22   this witness is saying he never got it.  And one of the

23   fundamental issues in this case, your Honor, is that the sales

24   records were not relied on by their expert even though

25   plaintiff's counsel had them.  And it's not just this subset of

1   the sales records.  They also had the basic sales records that

2   they also didn't give the expert.

3            THE COURT:  You have established that this document

4   had been provided.  The witness has acknowledged his

5   nonpossession of it and nonreliance on it.  You have the

6   earlier testimony from Ms. Abrams that she agreed to have them

7   provided.  So that part of the foundation of your argument is

8   established.  You may go on.

9            MR. DABNEY:  Thank you, your Honor.

10           MR. MITCHELL:  Here is my issue as the fact -- because

11  what the jury has heard is inconsistent with the manner in

12  which this document was presented.  I can at least recall the

13  chronology.  Mr. Dabney never tells a hundred percent of the

14  truth.  When we pulled teeth to get this information --

15           THE COURT:  It --

16           MR. MITCHELL:  No, here's what happened, your Honor.

17  I just want to let you know.  The jury should know this.  This

18  was presented as the contact information to reach out so we

19  could find customers who were actually confused.  This was

20  never sought as sales information for the expert's report.

21  What was provided as the sales information was that DTX

22  document, the long spreadsheet.  So the fact that it happens to

23  show the item number and the purchase price, that was not the

24  reason -- and it's completely reckless.  We fought over this

25  because we wanted to communicate with these individual

1    purchasers.  And that's this document.  Now what Mr. Dabney is

2    doing is misleading the jury into thinking that he produced

3    this like a sales record in October, and it's just not the way

4    the record is in this case.  It's incorrect.  And the Court

5    knows that.  That's why I would like some ability to correct

6    this, the misimpression with the jury.  Ms. Abrams didn't give

7    it to Ms. Kaczmarek.

8              THE COURT:  It's now two minutes to one.  We'll come

9    back at 1:55.  And you can propose some evidentiary approach

10   for me to consider if you, you know, are considering this

11   particular material as to Tiffany's understanding or use of

12   this document.  You may or may not still want me to do that at

13   the end of lunch.

14             MR. MITCHELL:  What's in my mind is simply that your

15   Honor made a ruling with respect to these particular records,

16   and the issue of these being sales records was not the subject

17   of that motion.  I would like some clarification that these

18   documents were produced in connection with Tiffany's request to

19   get specific purchaser information with contact information so

20   that we could reach out to these purchasers.  There are two

21   versions of this.  One didn't even have that.

22             THE COURT:  I'm not going to testify to that.  I'm may

23   give rulings, but I'm not going to become a witness in this

24   case.

25             MR. MITCHELL:  Can we at least -- I'm just asking a

G9LATIF4ps

1    question as a question, your Honor, one final question.  The

2    production of this material was following a motion, something

3    to that effect.

4               THE COURT:  Which is not going to go to your point.

5    So you can think about whether there is a witness you want to

6    call or recall to say, when we had this in hand, it was in the

7    context of reaching out to people, we considered it a customer

8    list.  But --

9               MR. MITCHELL:  I may recall Ms. Abrams on that one

10   subject.

11              THE COURT:  Either way.  We can talk about it later.

12              MR. MITCHELL:  Thank you.

13              THE COURT:  So it's 1 o'clock.  Can we just break for

14   lunch?

15              MR. DABNEY:  Yes.

16              (In open court; jury present)

17              THE COURT:  Ladies and gentlemen, thank you for your

18   work with us this morning and your patience as we are sorting

19   issues out.  We are now going to begin the lunch break.  So

20   please be ready in the jury room at 2 o'clock to proceed, and

21   remember not to discuss the case or anything or anyone having

22   anything to do with it in any way.  Don't reach out for any

23   outside information.  And please enjoy your break and your

24   lunch.

25              All rise.  Ms. Ng will take the jury out.

1           (The jury left the courtroom)

2           THE COURT:  You may step down, Mr. Kaczmarek.

3           (Witness excused)

4           THE COURT:  Counsel, we'll reconvene at 1:55.

5           MR. MITCHELL:  Thank you, your Honor.

6           THE COURT:  Thank you.

7           MR. DABNEY:  Your Honor, I know it goes without saying

8    that Mr. Kaczmarek will not be in communication.

9           THE COURT:  Mr. Kaczmarek, you are under

10   cross-examination.  You are not to discuss your testimony or

11   any anticipated testimony with anyone.  Do you understand that?

12          THE WITNESS:  Understood, your Honor.

13          THE COURT:  Thank you.

14          (Continued on next page)

1                        AFTERNOON SESSION

2                            2:05 p.m.

3            (In open court; jury present)

4            THE COURT:  Good afternoon, jurors.  Welcome back.

5    Please take your seats in the jury box.  And please be seated,

6    everyone.

7            Members of the jury I have two things to tell you

8    before we get started.  One is that we have been asked to have

9    the temperature raised here a little bit.  I understand that it

10   gets a little bit chilly for people who aren't in a big black

11   dress, so we're going to do something about that.

12           I also want to remind you tomorrow is our early day,

13   we'll be finishing the proceedings at about 2 and we'll have a

14   half hour break for lunch.  So if you want to bring a sandwich

15   so you can relax during lunch I encourage you to do that.

16           Mr. Dabney?

17   BY MR. DABNEY:

18   Q.  Good afternoon, Mr. Kaczmarek.

19   A.  Good afternoon.

20   Q.  Before the lunch break I was asking you about the buyer

21   list which has control number 37765 on it.  Do you recall those

22   questions?

23   A.  I do.

24   Q.  You were asked on your counsel's examination about a

25   document that was received in evidence as Defendant's Trial

1    Exhibit 139.  This is the one that Dr. Cornell prepared that

2    you were asked about.  Do you recall that?

3    A.  I do.

4    Q.  And if we look on the reverse side of Dr. Cornell's report

5    where he talks about the documents that he considered, one of

6    the documents that he considered is document Costco 37765,

7    correct?

8    A.  Correct.

9    Q.  Now, when did you first realize, Mr. Kaczmarek, that

10   Dr. Cornell had relied on document 37765, the buyer list, which

11   you say plaintiff's counsel never provided to you?

12   A.  Probably when he issued his first report.

13   Q.  So did you ask for a copy of that?

14   A.  Yes.

15   Q.  Did you get it?

16   A.  Yes.

17   Q.  When did you get it?

18   A.  I don't specifically recall.

19   Q.  Well, how soon after December, 2016 would you say,

20   Mr. Kaczmarek, you received a copy of the buyer list 37765?

21   A.  I don't recall.

22   Q.  Month?

23   A.  I don't recall.

24   Q.  Well, you gave a second declaration in this case that your

25   counsel asked you about in June of 2014, right?

1    A.  Correct.

2    Q.  You had 37765 at that time, didn't you?

3    A.  Yes.

4    Q.  So at that point you had the actual buyer list that

5    Ms. Abrams testified about, didn't you?

6    A.  Yes.

7    Q.  And you didn't mention that in your second declaration, did

8    you?

9    A.  I did not, no.

10   Q.  But what you did talk about was the number of records in

11   certain signage files that Costco had produced to you, right?

12   A.  Among other things, yes.

13   Q.  Was it your idea to leave out any mention of the sales

14   records in either your first or your second written submissions

15   in this case, Mr. Kaczmarek?

16   A.  I didn't leave out that omission.

17   Q.  I thought I understood you to say, Mr. Kaczmarek, that you

18   were dissatisfied with the summary sales records that you based

19   your first expert report on.  Didn't I hear you say that right?

20   A.  That's correct.

21   Q.  And you're saying you don't recall exactly when you

22   received the buyer list, Costco 37765, is that your testimony?

23   A.  Correct.

24   Q.  Were you dissatisfied with that, too?

25   A.  I was dissatisfied with a number of files, yes.

1   Q.  Well, I'm asking specifically about the buyer list, 37765.

2   Are you testifying here today -- let's take a look at the first

3   page of the buyer list, which has -- let's zoom in.

4           THE COURT:  That's Trial Exhibit 52?

5   Q.  Trial Exhibit 52.  We have here a series of entries for

6   item 140513.  Do you see that, sir?

7   A.  I see that.

8   Q.  And in your first expert report you relied on a spreadsheet

9   that showed that there were no net positive sales of that item

10  during the six years prior to February 14, 2013, isn't that so?

11  A.  Correct.

12  Q.  And so if we look at -- I'd like to hand the witness a

13  copy, a more readable copy of Exhibit 258.  With the Court's

14  leave I'd like to hand up to the -- do you have your exhibit

15  book up there, Mr. Kaczmarek?

16  A.  I have a binder you've provided me.

17  Q.  Would you look at Defendant's Trial Exhibit 233?

18  Mr. Kaczmarek, does Defendant's Exhibit 233 appear to be the

19  summary of net sales units and net sales dollars that you

20  relied on in providing your first report in this case?

21  A.  Yes, it does.

22          MR. DABNEY:  Your Honor, Costco offers Defendant's

23  Exhibit 233 in evidence.

24          THE COURT:  Just for the Court's information, clarity,

25  is this the same as the taped together --

1            MR. DABNEY:  The summary of net unit sales is a

2      one-page piece of paper that is the taped up 258.

3            THE COURT:  And this is different?

4            MR. DABNEY:  And Defendant's Exhibit 233, the other

5      part of it is the net sales dollars as opposed to net unit

6      sales.

7            THE COURT:  The thing that I have that I took out of

8      the pocket in mine behind the 233 tab says sum of net sales

9      units in the upper left-hand corner, but there's another thing

10     in the pocket, so -- are there two different things?

11           MR. DABNEY:  There should have been two different ones

12     in the binder.

13           THE COURT:  I want the record to be clear and I want

14     to be sure.  So there is another thing in the pocket that says

15     sum of net sales dollars at the top.  So is it just the sum of

16     net sales dollars that you're offering as 233 or both of those?

17           MR. DABNEY:  They are both tabs of the original Excel

18     document, Defendant's Exhibit 233.

19           THE COURT:  All right, so now that we've clarified

20     what 233 is, is there any objection to the admission of 233?

21           MR. MITCHELL:  No, your Honor.

22           THE COURT:  Thank you.  Defendant's Exhibit 233 is

23     admitted and it may be published.

24           (Defendant's Exhibit 233 received in evidence)

25           MR. DABNEY:  May I approach the witness, your Honor?

1          THE COURT:  Yes, you may.

2   Q.  Mr. Kaczmarek, I'm going to hand you a document which I

3   would ask you to review and satisfy yourself that it shows the

4   first column and the last column of the net unit sales document

5   portion of Costco Exhibit 233.  Oh, I'm sorry.  Your Honor

6   needs a copy.

7          THE COURT:  Well, I have this notebook.

8          MR. DABNEY:  I don't think this shortened version is

9   in the notebook.

10          THE COURT:  All right.  Thank you.  So when referring

11  to a shortened version it's one column of the net sales unit?

12          MR. DABNEY:  It is the first column which has the sign

13  text and the last column which has the grand total.

14          THE COURT:  And all of that information appears on

15  233?

16          MR. DABNEY:  Yes.

17  Q.  So, Mr. Kaczmarek, are you able to verify that the grand

18  total column and the item signage column of what I'll call

19  Defendant's Exhibit 233A are the same as in the unit sales

20  column of Defendant's Exhibit 233?

21  A.  I believe it's correct, yes.

22          THE COURT:  And so are we admitting 233A as well?

23          MR. DABNEY:  Yes.

24          THE COURT:  Any objection?

25          MR. MITCHELL:  No, your Honor.

1          THE COURT:  233A, an excerpt from 233, is admitted in

2    evidence.

3          (Defendant's Exhibit 233A received in evidence)

4    Q.  So, Mr. Kaczmarek, if we could just then do some

5    comparisons, I'm going to put up on the document camera the

6    document your counsel asked you about, the summary of signage

7    data.  I believe you said you prepared this in June of 2014, is

8    that right?

9    A.  Right.

10         THE COURT:  What document number is that?

11         MR. DABNEY:  This is Plaintiff's Exhibit 133.

12         THE COURT:  All right.

13   Q.  So if we look here at this -- this is a summary of signage

14   record entries you found in that pile of books that was in

15   front of you earlier, right?

16   A.  Correct.

17   Q.  So you don't list what the item numbers are in the sign,

18   right?

19   A.  I have not, no.

20   Q.  And you don't show what the sales were of any of these

21   items here, do you?

22   A.  No.

23   Q.  And you had Costco 37765 both at the time you prepared this

24   document and at the time you testified this morning, didn't

25   you?

1    A.   Yes.

2    Q.   And you, if we look at these first two sign entries, I'm

3    going to put up next to that the first entry of the document

4    you relied on in your first expert report.  Does it appear to

5    you that the signage there for 1 carat weight diamond round 1.0

6    in the first line is an item 140513?

7    A.   The first column matches, yes.

8    Q.   And then if what we do is we look at the actual sales

9    document and look and see what it shows, we see in the upper

10   left hand column, and the jury will have the actual documents

11   to look at, but I'll put it side by side, we have actual sales

12   entries of that item that show a very small number of positive

13   and negative and positive and negative sales on the list.  Am I

14   right?

15   A.   That's fair.

16   Q.   And this indicates that during the period we're talking

17   about, there were no positive net sales of that item at all, is

18   that right?

19   A.   Correct.  We have --

20   Q.   And that's what the sales document shows?

21   A.   Negative five unit sales on a net basis.

22   Q.   And have you -- so this is a -- do you have any other

23   Costco sales records that you were provided that would show

24   anything different than what is shown in the buyer list?

25   A.   I was provided with a file that was a returns file which

1    Dr. Cornell viewed as being helpful to distinguish between a

2    voided sale and an actual return.

3    Q.  Mr. Kaczmarek, I'd like to direct your attention back to

4    Dr. Cornell's report, which in addition to referring to Costco

5    37765 also refers to a document Costco 7159.  Did plaintiff's

6    counsel ever provide you with document 7159?

7    A.  Yes.

8    Q.  Well, when did that happen, sir?

9    A.  Again, I don't specifically recall the date.  It was

10   certainly subject or after my first expert report.

11   Q.  Do you know what's in 7159?

12   A.  I don't recall specifically, no.

13   Q.  Do you know if 7159 contains sales records from which the

14   buyer list was pulled, sir?

15   A.  That could be, yes.

16   Q.  Well, you know that to be true, don't you?

17   A.  I didn't memorize the Bates stamps associated with each

18   file.

19   Q.  So you were hired in about October of 2013 to work on this

20   case, is that right?

21   A.  Yes, sometime in October of 2013.

22   Q.  And one of the things you asked plaintiff's counsel for was

23   copies of Costco's sales records, isn't it?

24   A.  I asked for any information that Costco had provided that

25   would assist in calculating Costco's profits.

Q.  Well, you'd agree that sales records would be pretty

helpful in calculating profits on sales that rely on them,

wouldn't you?

A.  Yes.

Q.  Mr. Kaczmarek, do you have any -- did you ask -- let me --

         MR. DABNEY:  May I approach the witness, your Honor?

         THE COURT:  Yes, you may.

Q.  I'd like to show you the witness -- I don't have another --

         THE COURT:  That's fine.

Q.  Your Honor, may the record show that I've handed the

witness a document marked Defendant's Exhibit 822 and which I

showed to opposing counsel during the break and they say they

have no objection to it coming in evidence and we would offer

it in evidence.

         THE COURT:  Defendant's Exhibit 822 is admitted in

evidence.

         (Defendant's Exhibit 822 received in evidence)

Q.  So, Mr. Kaczmarek, I want to show you this letter of

August 16, 2013, which refers to Costco 7157 through Costco

7159.  Do you see that?

A.  I see that.

Q.  Does this indicate to you that by August 16, 2013, two

months before you were hired, the plaintiff had been provided

with Costco's sales records in general, not just the buyer

list?

1    A.  It would suggest that, but I've never seen this letter.

2    Q.  Okay.  So is the content of this letter consistent with

3    whatever answer you got from plaintiff's counsel in response to

4    your request for Costco's sales records in October of 2013?

5    A.  I couldn't say.  I don't know what form the information was

6    provided.

7    Q.  Well, what form was it given to you?  You said you got this

8    7159 document at some point, didn't you, Mr. Kaczmarek?

9    A.  I did, yes.

10   Q.  But you can't remember when?

11   A.  I don't recall a specific date, no.

12   Q.  And you didn't amend your report or anything after that?

13   A.  I did.  I issued a declaration with the alternative

14   calculation.

15   Q.  Well, did you go back and check whether the summary

16   document figures were backed up by 7159, sir?

17   A.  Backed up in what sense?

18   Q.  Well, you had a summary of underlying sales records, didn't

19   you?

20   A.  I did, yes.

21   Q.  For nine specific items like 14513, didn't you?

22   A.  Correct.

23   Q.  And so if you wanted to, if you genuinely had doubts about

24   the numbers in the summary you relied on, Mr. Kaczmarek, you

25   had available to you the Costco sales records in 7159 that

1    would have allowed you to verify whether or not the sales for

2    that item, say negative 22,000 in sales, all returns of a

3    discontinued item were what was shown in the summary or not,

4    didn't you?

5    A.  That's something that could have been performed, yes.

6    Q.  Did you do that, sir?

7    A.  I have not done that, no.

8    Q.  Did you suggest maybe that would be a good thing to do?

9    A.  I didn't think it was a good thing to do.  I thought

10   instead to try to replicate Dr. Cornell's analysis was more

11   important.

12   Q.  So are you saying now that in all the time you've had this

13   you haven't found any discrepancy between the net sales units

14   or the net sales dollars between the summary and the underlying

15   document 7159?

16   A.  I haven't checked.

17   Q.  Have you found discrepancy between the -- I'm sorry.  Well,

18   Mr. Kaczmarek, if you haven't checked, for all you know the net

19   unit sales numbers in Costco Exhibit 133 are 100 percent

20   accurate?

21   A.  It's possible.  It's possible they're not accurate.

22   Q.  Didn't you understand one of your jobs in this case was to

23   verify what the actual sales numbers were?

24   A.  I don't think I could have ever verified what the actual

25   sales numbers were with the data I had.

1    Q.  Well, but you said you didn't need to check it.

2    A.  I didn't check whether the underlying detail matched this

3    summary specifically.

4    Q.  Well, you also haven't produced any sales records out of

5    7159 either, have you?

6    A.  I performed a calculation with that file, yes.

7    Q.  I'm asking you, sir, have you presented in this courtroom

8    any sales numbers that you yourself pulled out of 7159?

9    A.  Yes.

10   Q.  You have?

11   A.  Yes.

12   Q.  So, okay, for item 140593 what sales numbers did you pull

13   out of 7159?

14   A.  I didn't perform a calculation at an item level or signage

15   level.

16   Q.  Well, don't you understand, sir, that there are various

17   signs in this case as to which the plaintiff is making no

18   claim?

19   A.  Yes.

20   Q.  So it's important, then, isn't it, to try to find out what

21   sales coincide in time with when signs existed?

22   A.  I agree with you.  That's very important.

23   Q.  Okay.  So if we could go to, still sticking with item

24   140513, just to use it as the sake of example, this is one for

25   which Dr. Cornell reported net sales of zero, is that right?

1    I'm looking at the first row of Defendant's Exhibit 233A.

2    A.  It would help to answer the question to see his actual

3    chart in front of me to verify that it is zero.

4    Q.  Well, Dr.  -- strike that -- Mr. Kaczmarek, you have not

5    presented any evidence that the sales for that item were

6    greater than zero, have you?

7    A.  I couldn't, because I can only work with the data Costco

8    has provided.

9    Q.  Okay, well, let me get this straight, then.  Your counsel

10   had the sales records from August of 2013.  You accept that?

11   A.  In some form it appears so.

12   Q.  And your counsel didn't provide those to you at the time

13   that you provided your original expert report, right?

14   A.  Yes.

15   Q.  So we therefore have a situation where the information you

16   relied on in your first expert report was that for this item

17   there were no positive net sales during the statute of

18   limitations period.

19   A.  Correct.

20   Q.  That's what the documents show.  And that's also consistent

21   with the 37765 document you say you also weren't given before

22   your expert report.

23   A.  It may be.  As I stated, I haven't checked on an

24   item-by-item basis these numbers.

25   Q.  All right.  So then we come to the next one, the item

1   378259.  The summary document shows that the sales of that were

2   zero during the statute of limitations period, doesn't it?

3   A.  Net sales of zero, yes.

4   Q.  Did you check that one against the buyer list, sir?

5   A.  No, I don't recall doing so.

6   Q.  Did you check that against the underlying sales record

7   7159?

8   A.  I don't recall doing so.

9   Q.  So are you asking the jury to find that as to that item the

10  sales were greater than zero during the statute of limitations

11  period?

12  A.  I can only report what the data says, but the data to me

13  indicates it's incomplete.

14  Q.  What about -- let me put up Exhibit 52 again.  We have an

15  item here 378259 which has one positive and one negative sale

16  that nets out to zero.  Do you have any reason to believe,

17  Mr. Kaczmarek, that this set of line entries is not the Costco

18  sales of that item during the statute of limitations period?

19  A.  No, I do not.

20  Q.  Have you found in 7159 any different information for that

21  item?

22  A.  No.  7159 contained only items apparently listed on the

23  summary spreadsheet.

24  Q.  And you don't think this one was one of those items?

25  A.  Yes, I believe that is one of the items.

1    Q.  So are you saying for, if the buyer list says that the net

2    sales of that item were zero, are you asking the jury to find

3    that the sales were greater than zero?

4    A.  I simply opine that I believe the information is incomplete

5    and that is not disagreed between myself and Dr. Cornell.

6    Q.  So this information you say is incomplete, let's talk about

7    sales, then.  The number of sales of this item.  What number of

8    sales of this item do you think were made between 2007 and

9    2012, of this item 378259?

10   A.  I'm uncertain.

11   Q.  So you haven't ventured any opinion on that at all, have

12   you?

13   A.  No.

14   Q.  But you relied initially on a document that showed the net

15   sales were zero, didn't you?

16   A.  Yes.

17   Q.  And you thought it was reliable enough for you to put your

18   signature on an expert report that so stated, didn't you?

19   A.  I said I was dissatisfied with the level of information,

20   but I went ahead and made a calculation nonetheless.

21   Q.  And the information you wanted was information your counsel

22   had and didn't provide to you at that time, isn't it?

23   A.  Again, I don't know what form they had the information;

24   hard copy or soft copy.  I don't know.

25   Q.  Would that have made a difference to you if they had an

1    electronic copy?

2    A.  It would have certainly been easier to work with than a

3    hard copy where I would have needed to enter all the data again

4    before I analyzed it.

5    Q.  Let's go back again to Plaintiff's Exhibit 822.  Did

6    plaintiff's counsel ever tell you that they had a CD rom with

7    7159 on it?

8    A.  You can copy a PDF file --

9    Q.  Do you know what was on 7159, sir?

10   A.  Sorry.

11   Q.  Do you know if plaintiff's counsel was provided with an

12   electronic copy of 7159, sir?

13   A.  At some point, yes.

14   Q.  At some point?  When do you think they got the electronic

15   copy?

16   A.  I have no idea.

17   Q.  Did you ever ask?

18   A.  No, I did not.

19   Q.  Would it have been consistent with their answers to

20   questions to you if they had an electronic copy of the sales

21   records and didn't give it to you in October of 2013?

22   A.  I'm sorry, could you repeat the question?

23   Q.  You said you asked for sales records from plaintiff's

24   counsel, didn't you?

25   A.  I don't specifically recall asking for sales records but

1    asking for any information Costco has provided that would be

2    helpful in calculating profits.

3    Q.  And they never provided you with any electronic copy of

4    7159 until sometime you don't remember after your expert

5    report, sir, right?

6    A.  Correct.

7    Q.  So let's go to the next one, shall we, 380068.  This is the

8    dollar sales.  Mr. Kaczmarek, this is another item that was the

9    subject of your initial expert report, wasn't it?

10   A.  It was certainly listed in the spreadsheet, yes.

11   Q.  And the spreadsheet for this item included time periods

12   that were before the statute of limitation period, didn't it?

13   A.  Yes.  I was unaware of any statute of limitations when I

14   prepared my first report.

15   Q.  So in any of your work on this have you found sales records

16   that show a different net sales figure than what is shown here

17   for the periods covered in the spreadsheet for item 380068?

18   A.  I can only calculate what was based on Costco's

19   disclosures.

20   Q.  Then we go to the next one, which is 380177.  380177.  Do

21   you understand, Mr. Kaczmarek, that sales of that item under

22   that sign text are out of the case?

23   A.  It's possible.

24   Q.  You don't understand that a sign that says "Tiffany style

25   ring" is out of the case, Mr. Kaczmarek?

1    A.  It's possible.  I didn't make any judgment call as to what

2    would be admitted and what would not be admitted.

3    Q.  I'm just asking you now, as you understand it, in this

4    trial here, do you understand that a sign that says "Tiffany

5    style ring" is not the subject of a claim in this case?

6    A.  Possibly, yes.

7    Q.  Possibly?  Are you asking the jury to find that some amount

8    of sales of a product that said "Tiffany style ring" on the

9    sign is the basis of a claim in this case?

10   A.  I'm not asking them to do that at all.  I think that's

11   based on the judge's instructions.

12   Q.  Okay.  Then we have the next one 384113.  Did you check

13   that against any sales records?

14   A.  Again, I didn't reconcile the sales records to this

15   particular spreadsheet.

16   Q.  Let me draw your attention to the second page of

17   Defendant's Exhibit 52.  We have 380177, that was the one we

18   just looked at.  If I could put them side by side we have

19   380177 which shows negative net sales of 10,600 and then we

20   have the buyer list which shows about the same information,

21   don't we?

22   A.  Certainly shows in sum a net figure, which as I testified

23   earlier can't possibly happen.

24   Q.  It can't possibly happen.  Do you know about the Costco

25   member satisfaction return policy, Mr. Kaczmarek?

1  A.  I do.

2  Q.  You address that in your expert report, didn't you?

3  A.  I'm not sure if I specifically did.

4  Q.  Well, you talked about return rates in your expert report,

5  didn't you?

6  A.  I did.

7  Q.  So what is to prevent Costco from receiving a return of a

8  discontinued item, Mr. Kaczmarek?

9  A.  Nothing prevents them from accepting it.  My point was

10  simply you have to have a purchase before you can have a

11  return.

12  Q.  So the purchase could have been prior to 2007, couldn't it?

13  A.  It's possible.  I'd be speculating.

14  Q.  I understand, but you are, you're saying that based on this

15  snapshot of information that if there's a showing of returns

16  but no corresponding sale, you're saying that it couldn't be

17  that the purchase was made before the period of time covered by

18  the records of that, is that your position?

19  A.  It's possible.  I don't have specific knowledge as to how

20  long Costco allows a buyer to acquire something and then return

21  it.  This would be quite some time after the purchase was made,

22  then.

23  Q.  Let's go on to 384113.  This again, this is one where there

24  was no positive net sales according to Dr. Cornell and no

25  positive net sales according to the buyer list, right?

1    A.   Yes.

2    Q.   And then we go to 38114, that's the next one on the list.

3    Again, it shows no positive net sales and Dr. Cornell shows no

4    positive net sales.  Fair to say?

5    A.   That's fair, yes.

6    Q.   And I understand you to say --

7              Now, another thing you mentioned in your expert report

8    was, you made a statement if I can find it here -- your expert

9    report, your first expert report was given, we've established,

10   in November of 2013, is that right?

11   A.   November 2nd, 2013.

12   Q.   And in that you reported on, among other things, what

13   Costco's sales of certain diamond ring items were.

14   A.   Correct.

15   Q.   And you did not have available to you at that time the

16   buyer list you said.

17   A.   Correct.

18   Q.   And you did not have available to you at that time the

19   sales records in Costco 7159 either.

20   A.   Correct.

21   Q.   And you therefore relied entirely on a summary that had

22   been provided of the underlying records, correct?

23   A.   I presume it was prepared with underlying records.  Whether

24   they were the same that were ultimately produced, I don't know.

25   Q.   But in all the time since November 13 you have not come

1    forward with any discrepancy between the summary and the

2    underlying records you've had for more than two years, have

3    you?

4    A.  I haven't done the analysis.

5    Q.  Now, you understand that one of the tasks we're about here

6    is to get at the truth with respect to what the actual sales

7    were.  Do you agree with that?

8    A.  Quite fair.

9    Q.  And yet even then your opinions in this case are not

10   grounded in any actual review by you of the Costco sales

11   records, are they?

12   A.  I would disagree.

13   Q.  Let me -- you mentioned in your testimony, in your report,

14   quote, "According to deposition testimony I have read,

15   approximately 11,000 letters were sent out to Costco members

16   who allegedly purchased Tiffany rings."  Have I read that

17   correctly?

18   A.  Sounds right.  I don't have it in front of me.

19   Q.  So when you filed your expert report you didn't have sales

20   records, but you provided an opinion that the amount of sales

21   could be based on some deposition testimony that 11,000 letters

22   were sent out.

23   A.  That was an alternative calculation I provided, yes.

24   Q.  And in any prior case, Mr. Kaczmarek, have you offered an

25   opinion with a reasonable degree of certainty for a publicly

1    traded company for sales records that you would say that the

2    number of sales of certain items could be based on a piece of

3    deposition testimony that you just referred to?

4    A.  I don't recall.

5    Q.  In fact, you have never done that; have you, Mr. Kaczmarek?

6    A.  I don't recall.

7    Q.  And let's look at, I want to put up --

8              MR. DABNEY:  Can I approach the witness, your Honor?

9              THE COURT:  Yes, you may, and you'll show Mr. Mitchell

10   what you --

11             MR. DABNEY:  Yes.

12   Q.  Mr. Schutt, I'm going to hand you --

13             MR. MITCHELL:   Kaczmarek.

14   Q.  Mr. Kaczmarek, I'm going to hand you two pages of

15   deposition testimony and I'm going to direct your attention to

16   pages 69 and 70 and I'm going to ask if that is the deposition

17   testimony that you based your alternative theory on.

18   A.  I wouldn't characterize it as my alternative theory.  It's

19   an alternative calculation.

20   Q.  Well, Mr. Kaczmarek, one of the things that you said in

21   your report -- let's put it up first.  This is some deposition

22   testimony of Mr. Douglas Schutt who is sitting at counsel's

23   table.  I'd like to put up the questions and answers we've

24   heard so much about in this trial.  In which he says:

25   "Q.  Do you know how many of these letters were sent?

1    "A.  I don't know the exact number.

2              Approximately.

3              I don't remember.  I -- my recollection it was around

4    11,000 or so.  I don't remember the exact number.

5              11,000.

6              I don't know for sure the exact number.

7              Who would know?

8              I would -- I would ask my legal team if they knew

9    first."

10             Is that the testimony you're relying on to say pay no

11   attention to the sales records, you should base the damages in

12   this case based on this 11,000 number.

13   A.  That was not my testimony at all.

14   Q.  Okay.  So you said in your report, "I have not seen the

15   data used as a basis for the distribution of the letters nor

16   have I seen information that would assist me in reconciling the

17   different level of sales suggested by these letters and those

18   suggested by the summary level spreadsheet file provided by

19   Costco."

20             Do you recall making that statement?

21   A.  Sounds about right.

22   Q.  Did you ask plaintiff's counsel whether they had the

23   mailing list?

24   A.  I asked again for anything that would assist me in

25   calculating profits.

1    Q.  Well, we now know -- I'm going to put up on the screen

2    paragraph 7 of your expert report so we can see it here.  It

3    says -- this is what I just read to you.  "I have not seen the

4    data used as a basis for the distribution of letters nor have I

5    seen information that would assist me in reconciling the

6    different levels of sales suggested by those letters and those

7    suggested by the summary spreadsheet."

8            Did you ask for that information?

9    A.  Again, I asked for anything that would be relevant to

10   performing my calculations of Costco profit.

11   Q.  You're specifically asking about the mailing list, aren't

12   you, Mr. Kaczmarek?

13   A.  Yes.  Here I said I did not have that data.  That's what I

14   testified to earlier.

15   Q.  And did you know that the plaintiffs had the mailing list

16   at that time?

17   A.  I don't know when they received the mailing list.

18   Q.  I direct your attention to Exhibit 234 in your book.

19   Mr. Kaczmarek, I show you what's been marked as Defendant's

20   Exhibit 234.  Have you ever seen this mailing list before?

21   A.  I've seen it, yes.

22   Q.  And when did you first see it?

23   A.  It was after the preparation of my first report.

24           MR. DABNEY:  Your Honor, we offer Defendant's 234 in

25   evidence.

 1              THE COURT:  Any objection?

 2              MR. MITCHELL:  No objection.

 3              THE COURT:  Defendant's Exhibit 234 is admitted in

 4    evidence.

 5              (Defendant's Exhibit 234 received in evidence)

 6              MR. DABNEY:  We have -- may I have a conference with

 7    counsel, your Honor?

 8              THE COURT:  Yes.

 9              (Pause)

10              THE COURT:  If you would please walk further back and

11    turn your backs to the jury.  Hey, jury.  Thank you.

12              MR. DABNEY:  While counsel is looking at that, if I

13    could hand up a copy for the Court?

14              THE COURT:  Yes.  Thank you.

15              MR. DABNEY:  Your Honor, I understand from counsel

16    that there's no objection to the proffer in evidence of Costco

17    Trial Exhibit 825.  I should have given the Court a copy of

18    825.

19              THE COURT:  I'll just write 825 on this.  So

20    Defendant's Exhibit 825 is admitted into evidence.

21              (Defendant's Exhibit 825 received in evidence)

22    Q.  All right, Mr. Kaczmarek.  I want to -- Mr. Kaczmarek, I'm

23    first going to put up on the screen Costco Trial Exhibit 234,

24    which is headed native file 37756.  Is that what you have in

25    front of you?

1   A.   Yes.

2   Q.   And now I'm going to put up Costco Trial Exhibit 825 which

3   is a letter dated October 21, 2003, enclosing a copy of, among

4   other things, Costco 37756.  Have I read that correctly?

5   A.   Yes, I see that on the document.

6   Q.   And then if we would go back -- so does this indicate to

7   you that this Costco 37756 document was provided to plaintiff's

8   counsel by October 21, 2013?

9   A.   Yes, just a couple of weeks before I had to file my report.

10  Q.   When were you first hired in this case?

11  A.   It was in October.  I don't recall the specific date.

12  Q.   So you were hired at most three weeks before this letter?

13  A.   At most, yes.

14  Q.   And your report was filed about three weeks after this

15  letter, right?

16  A.   It would have been 17 days.

17  Q.   And then we look at the Exhibit 234 itself and what we have

18  is a list of names and addresses.  Did plaintiff's counsel ever

19  explain to you what this was?

20  A.   Yes.  I understood it to be the basis of the data that

21  produced the letters that Costco sent.

22  Q.   And so when do you recall this document first being

23  provided to you?

24  A.   I don't recall a specific date, but it was obviously after

25  I issued my first report.

1   Q.  All right.  So are you telling us, sir, that you wrote a

2   report that says "I have not seen the data used as a basis of

3   the report," you're putting that out there and yet your counsel

4   is sitting there with the data that's the basis of the report.

5   Is that what you understand to be the case now?

6   A.  Again, I don't know what form the data was delivered.

7   Q.  Okay.  And so did you provide a draft of this report to

8   plaintiff's counsel before it was filed?

9           MR. MITCHELL:  Objection, your Honor.

10          THE COURT:  Consult, please.

11          (Pause)

12  Q.  At any time, Mr. Kaczmarek, was this statement of yours

13  called out to you as maybe being not accurate by plaintiff's

14  counsel?

15          MR. MITCHELL:  Same objection.

16          MR. DABNEY:  Withdrawn.

17  Q.  So at some point did you learn, Mr. Kaczmarek, that the

18  11,000 figure that you repeated as late as today, it was

19  contradicted by the mail list Costco Trial Exhibit 234?

20  A.  Obviously the sales totals and the buyer file are less.  So

21  when I looked at it I could see it was less but I don't believe

22  Dr. Cornell was relying on that particular list to do any

23  calculations.

24  Q.  I want to find out from you, sir, you're saying -- in what

25  year did you first receive this mailing list?

1    A.  It likely was the end of 2013.

2    Q.  So you knew by not later than the end of 2013 that Mr.

3    Schutt's testimony that he couldn't remember was inaccurate.

4    A.  Well, it could be that we're missing data as well.  I can't

5    rule that possibility out.

6    Q.  Okay.  So you distrust the mail list, is that what you're

7    saying?

8    A.  What I'm saying is there's a large discrepancy between the

9    two.

10   Q.  And what you said in your report was, "I haven't seen the

11   data that was used to generate the mail list."

12   A.  Correct.  That's a caveat telling the reader I don't have

13   underlying data to support this.

14   Q.  But now that you have the data and you're a professional,

15   you're saying that as between the mail list that's in front of

16   you and the deposition testimony in which you said about four

17   times "I don't remember and don't know the exact number," which

18   of the two letter numbers do you think is the more relevant?

19   A.  I don't have an opinion one way or the other.  I've

20   provided calculations for both.

21            THE COURT:  Mr. Dabney, if you would find a place

22   within the next ten minutes to stop for a break, I'd be

23   grateful.

24            MR. DABNEY:  Thank you, your Honor.  Yes.

25   Q.  In fact, the number of names on the buyer list, Defendant's

1    Exhibit 52, matches up with the number of names in the mailing

2    list, Defendant's Exhibit 234, doesn't it?

3    A.   It may.  I don't recall.

4              (Continued next page)

1              MR. DABNEY:  Your Honor, I'm happy to take a break

2      now, if this is an OK time to do it?

3              THE COURT:  Very well.

4              So, ladies and gentlemen, we'll take our afternoon

5      break.  Please be ready in the jury room at ten past 3.

6              (Recess)

7      BY MR. DABNEY:

8      Q.  Good afternoon, Mr. Kaczmarek.

9      A.  Good afternoon.

10     Q.  During your direct -- I would like to direct your attention

11     back to Defendant's Trial Exhibit 139, which is, I believe, in

12     your book, which is in evidence, and I'm going to put it up on

13     the screen.

14             Mr. Kaczmarek, I direct your attention to the upper

15     left-hand part of this exhibit.  Do you see where I'm referring

16     to?

17     A.  I do.

18     Q.  As I understand it, after your expert report was submitted

19     in this case, you got ahold of a copy of Exhibit 4 to

20     Dr. Cornell's report; is that right?

21     A.  Correct.  He issued a report following my report.

22     Q.  All right.  And what he did is, he went through, based on,

23     among other things, the buyer list 37765, and the underlying

24     sales record, 7159, he did an analysis of what the sales were

25     of the nine items that are listed in this chart.  That was your

1  understanding?

2  A.   And more.  He relies upon this particular --

3  Q.   Defendant's Exhibit 258.

4  A.   258, yes.  Because the sales records don't have any signage

5  in them at all.

6  Q.   All right.  So if we go to this first item, 639911, you

7  understand that that's one of the four items for which

8  Dr. Cornell reported positive net unit sales in this case?

9  A.   That's one of them, yes.

10  Q.   And in your analysis, what you did is, you took

11  Dr. Cornell's analysis, and then you adjusted your previous

12  analysis so that the total number of units was adjusted to be

13  the same as the total number of units that Dr. Cornell had

14  arrived at.  Is that right?

15  A.   I wouldn't say that's precisely right.  We tried to

16  replicate what Dr. Cornell did.  We couldn't replicate it.  We

17  got a different figure, net sales of just over 11 million,

18  which I put in my affidavit.  And then I also just provided a

19  profit calculation, assuming his figures were right.

20  Q.   So, Dr. Kaczmarek, Mr. Kaczmarek, you understand that one

21  of the issues we have to decide is what sales occurred at a

22  time when the word "set" or "setting" was omitted from the

23  639911 signage.  Is that right?

24  A.   I understand that may be the case, yes.

25  Q.   And Dr. Cornell's report indicates that the first time when

1    the words "set" or "setting" was dropped from the 639911

2    signage was Costco fiscal period, year and period 2012/6.

3    Isn't that what he indicates here?

4    A.  He does indicate that.  How he determined that I have no

5    idea.

6    Q.  Well, you determined the same thing, did you?

7    A.  No, I did not.

8    Q.  You didn't.

9    A.  I used signage files and came up with ranges with the

10   signage files.  Dr. Cornell doesn't use that signage file.

11   Q.  You don't think Dr. Cornell looked at signage files.

12   A.  He may have looked at them, but the source of the date

13   ranges here, I understand, correspond to 258.

14   Q.  So if we could look at your exhibit that your counsel

15   showed you, which was Plaintiff's Exhibit 33, you show a series

16   of signs down at the bottom of your chart, which I'm going to

17   put up here --

18             MR. MITCHELL:  130?

19             MR. DABNEY:  133, Plaintiff's 133.

20   Q.  And what we have here according to your analysis is, we

21   have a sign that says "platinum Tiffany .70 CT VS2 I round,

22   diamond ring."  And you would agree with me that that text

23   corresponds with the signage that Dr. Cornell first refers to

24   as having started in 2012/6?  Do you agree with that?

25   A.  The signs match, yes.

1   Q.  And then according to your chart, you first refer to that

2   signage as starting in 2012-2013, don't you?

3   A.  It occurred between 2012 and 2013, yes.

4   Q.  So your own analysis confirms that that particular sign did

5   not exist prior to 2012.

6   A.  That's what the data shows, yes.

7   Q.  Your own analysis of the data.

8   A.  My analysis of the data, but the data is not mine.

9   Q.  OK.  So insofar as you and Dr. Cornell have addressed this

10  subject, both of you say there is no evidence that that sign

11  existed in 2007, 2008, 2009, 2010, or 2011, do you?

12  A.  Based on the evidence I've seen, I have no reason to

13  conclude that.

14  Q.  So based on that, if that's right, then with regard to item

15  639911, we can cross off the first row, the second row, and the

16  third row, as you understand the rules of the game.  All right,

17  Mr. Kaczmarek?

18  A.  That's for the jury to decide.  That's not for me to

19  decide.

20  Q.  But as you understand it, if a sign said "Tiffany setting"

21  or "Tiffany set," the award should be zero.  Correct?

22  A.  If it does.  I don't have confidence that the signs are

23  necessarily correct because I don't know how that was com --

24  that information was compiled.

25  Q.  The data you looked at showed that this particular sign

1    didn't exist prior to 2012?  True or false.

2    A.  In the signage data it did not exist.

3    Q.  And then you commented on this further sign that has the

4    word "Tiffany" removed.  Do you understand that the signage

5    records here were all produced as of the last day of the fiscal

6    year and periods in question?

7    A.  I don't know if they're produced as of the last day or not.

8    I don't recall.  They summarize it by fiscal year and fiscal

9    period.

10   Q.  All right.  So if a sign changed in the middle of a fiscal

11   period, the sign text earlier in the period might not show up

12   as of the last day of the fiscal period, would it?

13   A.  It's possible.  I don't have all the details as to how

14   those records are kept and created.

15   Q.  Then if we go to 637277, this is the one where there's a

16   distinction between a sign where "Tiffany set," the word

17   "Tiffany" and "set" are together but on different lines.  Do

18   you understand that to be the case?

19   A.  I can see that, yes.

20   Q.  And you found signs with that pattern too, didn't you?

21   A.  Yes.

22   Q.  And you understand that one of the things that needs to be

23   decided in this case is whether "Tiffany set," where "Tiffany"

24   is on one line and "set" is a different line, is supposed to

25   mean something different than when "Tiffany set" is on one

1  line.

2  A.  Yes.  I understand there is some tension between the

3  parties on that.

4  Q.  So if it's concluded that "Tiffany set," where "set" was on

5  the second line, was intended to be a combined term, "Tiffany

6  set," as you understand the rules of the game here, those

7  should not be included in any monetary award.  Correct?

8  A.  Again, if it's determined that that indeed was actually the

9  sign next to the ring when it was sold.

10  Q.  So then we could strike those off.

11         And then we have the items at the bottom where the net

12  sales according to Dr. Cornell are zero.  Let's read those out.

13  That's 384114, 384113, 380177, 378259, 140513.  Dr. Cornell's

14  analysis was the net sales of those were zero during the

15  relevant period.  Is that right?

16  A.  That's what he concluded, yes.

17  Q.  And you have not provided any contrary sales data, have

18  you?

19  A.  By signage, no, because I don't understand how the signs

20  were assigned to the sales records.  There isn't signs in the

21  sales records.

22  Q.  Well, we're talking about items with zero net sales

23  according to the sales data.  You understand that.

24  A.  For that particular item, yes.

25  Q.  All right.  So you're not aware of any data that shows that

1    sales of item 384114 were greater than zero during the statute

2    of limitations period, are you?

3    A.   I can only do calculations based upon data given to me.

4    But I have some doubts as to whether the data is complete.

5    Q.   So if these are all zero according to Dr. Cornell, these

6    can all be crossed out.

7              So then that leaves us with a subset of the items in

8    which the word "setting" or "set" was dropped off the signs.

9    And then we have to figure out what the rate of profit was on

10   those items.  Would you agree with me there?

11   A.   Yes.  We have to determine the profit rate, I agree.

12   Q.   Among the documents that were provided to you,

13   Dr. Kaczmarek, were Costco's records of cost of goods sold.  Is

14   that right?

15   A.   I would disagree with that characterization.  They are

16   purchase orders showing landed cost.  Cost of goods sold is a

17   different type of calculation using goods acquired.

18   Q.   Let me show you a copy of your -- the list of the documents

19   you considered in this case.  If I could put up here --

20             THE COURT:  This is which exhibit number?

21             MR. DABNEY:  This is Plaintiff's Exhibit 141.

22             THE COURT:  Thank you.

23             MR. DABNEY:  In evidence.

24   Q.   So as I understand it, Mr. Kaczmarek, when you rendered

25   your opinions in this case, among other things you relied on

1   was Costco 37754, which we looked at earlier as Defendant's

2   Exhibit 233.  Correct?

3            The big spreadsheet.

4   A.  Yes, the big spreadsheet.

5   Q.  It's been marked as two things.  258 is the unit sales and

6   233 is a big, complete copy with units and dollar sales.

7   A.  OK.

8   Q.  And then you refer to Costco Department 35 purchase order

9   data, Costco 37753.

10  A.  Yes.

11  Q.  You did not rely on that data in forming your profit rate

12  calculation, did you?

13  A.  That's correct, for the reasons I've already explained.

14  Q.  So what you did instead was to rely on deposition testimony

15  again about what Costco's profit rate in general was on items.

16  Is that right?

17  A.  Not in general on items but specifically on jewelry.

18  Q.  Do you think the deposition testimony was specific as to

19  jewelry?

20  A.  I believe so.

21  Q.  But the records would show what it was.

22           And one of the things you said you relied on was

23  Costco vendor quote sheets.  Isn't that so?

24  A.  Those were documents that we did receive a day before I had

25  to issue the report.  We looked at some but could not

1   incorporate them into our analysis in a single day.

2   Q.  Well, Mr. Kaczmarek, if I could direct your attention back

3   to 141 again, one of the things you say you considered in

4   providing your report was Costco document 1432.  That was a

5   document you considered, wasn't it?

6   A.  Yes.  It was provided to me.  But I specifically indicated

7   in my report that I did not have sufficient time to analyze all

8   of the vendor quote sheets.

9   Q.  Did you look at them?

10  A.  Yes.

11  Q.  So I would like to direct your attention to Defendant's

12  Exhibit 27 and ask you if that is one of the documents that you

13  looked at in your report.

14  A.  Yes.  That appears to be one of the quote sheets.

15          MR. DABNEY:  Your Honor, we offer Defendant's Exhibit

16  27 in evidence.

17          THE COURT:  Any objection?

18          MR. MITCHELL:  No, your Honor.

19          THE COURT:  Defendant's Exhibit 27 is admitted in

20  evidence and may be displayed.

21          (Defendant's Exhibit 27 received in evidence)

22  Q.  So, Mr. Kaczmarek, this document is called a Costco vendor

23  quote sheet, from R. B. Diamond Inc.  You see where I'm

24  referring to?

25  A.  Yes.

1    Q.  Did anyone explain to you what the Costco vendor quote

2    sheet information is?

3    A.  I presumed it was a quote from a vendor to possibly supply

4    Costco with diamond rings.

5    Q.  And this had in it an item description and it had in it an

6    image of the item being supplied; is that right?

7    A.  Yes.  It does have the description, which the sales files

8    never contained.

9    Q.  And then down in the lower left, there is some handwritten

10   notation which talks about Costco's cost, Costco's sell, IMU,

11   cost, IMU, WAC.  Did you pay any attention to that information

12   in those handwritten notes?

13   A.  No, I did not.

14   Q.  Do you know what "IMU" stands for in Costco parlance?

15   A.  I don't.  I would assume it's some internal markup.

16   Q.  And analyzing what Costco's actual profits were on items

17   including item 639911, of which this is an example, you did not

18   take account of the cost data in these quote sheets, did you?

19   A.  Correct, because they're not actual transactions.  This is

20   just a quotation.

21          MR. DABNEY:  Nothing further, your Honor.

22          THE COURT:  Mr. Mitchell.

23   REDIRECT EXAMINATION

24   BY MR. MITCHELL:

25   Q.  Two things, Mr. Kaczmarek.  Mr. Dabney was a little quick

1   with the pen here.  I've highlighted here from -- what's the

2   number of the Defendant's exhibit?

3        MR. DABNEY:  139.

4   Q.  139.  Mr. Dabney just crossed out this particular entry,

5   where "Tiffany" and "set" are not on the same line.  Do you see

6   that?

7   A.  Yes.

8   Q.  We're aware that that's for the jury to decide whether

9   that's included or excluded; it doesn't get automatically

10  crossed out.  You understand that?

11  A.  Absolutely it's for the jury to decide on any of these

12  sales items what's included or not included.

13  Q.  And the other entry we had corrected on the bottom, as you

14  recall.  The signage data had showed that the sign for item

15  140513, which, Mr. Dabney showed you a very small sampling of

16  purchases and returns that had a negative number.  Your review

17  of the signage data showed that this signage was visible in the

18  Costco records from 2007 to 2013, correct?

19  A.  Correct.

20  Q.  And if I understood you correctly, you questioned the

21  completeness of the report of sales for that item number given

22  the fact that the signage records persisted in the Costco

23  records for a period of six years.  Correct?

24  A.  That's correct.  And I believe that particular item we have

25  no purchase data for either.

1    Q.  And it is not disputed in this case that the wording of

2    that sign, "solitaire Tiffany," would be included for the

3    recovery of damages if there were sales reported for that.

4    A.  That's my understanding, yes.

5              MR. MITCHELL:  Nothing further.  Thank you.

6              THE COURT:  Anything further, Mr. Dabney?

7              MR. DABNEY:  Yes, just for clarity of the record.

8    RECROSS EXAMINATION

9    BY MR. DABNEY:

10   Q.  If I could put back up 139 that we were looking at before,

11   I should have probably put a question mark here because, unlike

12   the first three items, this is the one, the 637277, where

13   "Tiffany" and "set" are together but on two different lines.

14   That is in a different category than the ones in the first

15   three at the top, as you understand.  Right?

16   A.  It may be.

17   Q.  Well, as you understand the rules of the game here, if

18   "Tiffany" and "set" on a sign was on a single line, then there

19   is no claim.

20   A.  Again, that's for the jury to decide.  It's not for me to

21   decide.

22   Q.  I'm asking what you understand the rule is, sir.  "Tiffany

23   set" on one line, there's no claim.  You understand that.

24   A.  Yes.

25   Q.  "Tiffany setting" on one line --

1          THE COURT:  Mr. Dabney, is this witness qualified as

2     an expert in what the Court's rules are?

3          You've got plenty of time to make your arguments at

4     the appropriate time for argument.

5          MR. DABNEY:  Nothing further, your Honor.

6          THE COURT:  Thank you.

7          Thank you, Mr. Kaczmarek.  You may step down.  Your

8     testimony is concluded.

9          THE WITNESS:  Thank you.

10          (Witness excused)

11          THE COURT:  And someone will need to tidy the witness

12     stand as the next witness is ready to come to the stand.  Who

13     will the next witness be, Mr. Dabney?

14          MR. MITCHELL:  Mr. Mitchell, please.

15          THE COURT:  Mr. Mitchell.

16          MR. MITCHELL:  Douglas Schutt.

17          THE COURT:  Mr. Schutt, would you please come to the

18     witness stand.  I apologize to Mr. Mitchell and Mr. Dabney for

19     mixing up the names.

20          Please come to the witness stand, step up, and remain

21     standing to take the oath.

22      DOUGLAS WAYNE SCHUTT,

23          called as a witness by the plaintiff,

24          having been duly sworn, testified as follows:

25          THE COURT:  Thank you, Mr. Schutt.  You may be seated.

1   DIRECT EXAMINATION

2   BY MR. MITCHELL:

3   Q.  Good afternoon, Mr. Schutt.

4   A.  Good afternoon.

5   Q.  Could you please briefly give your background at Costco.

6   A.  Sure.  I actually was hired in 1985 as a buyer at the Price

7   Club, and was promoted two years after that to an assistant

8   general merchandise manager and then to a vice president of

9   hard lines at Price Club in 1989.

10          In 1992, we consolidated our East Coast and West Coast

11  buying offices with Price Club and I was transferred to San

12  Diego as a vice president for half the non-foods business at

13  Price Club.

14          In 1993, we merged, "we" being Price Club, merged with

15  Costco, and I was transferred up to Seattle, Washington, and

16  got promoted to senior vice president over non-foods

17  merchandising.  I was in that position until 2000, as a senior

18  vice president over non-foods merchandising.  I left the

19  company briefly.  I came back six or seven months later as a

20  senior vice president in charge of our e-commerce business, a

21  new furniture business we had created, special-order kiosk, and

22  business delivery.

23          In 2004, I was promoted to executive vice president,

24  chief operating officer for the northern division for Costco,

25  which included the Midwest region, the Northwest region, and

1    the Bay Area region.

2              In 2010 I was promoted to executive vice president and

3    COO of all merchandising at Costco, a position I held until

4    just recently.

5              THE COURT:  Mr. Schutt, would you mind just speaking a

6    little closer to the microphone.

7              THE WITNESS:  Oh, sure.

8              THE COURT:  Thank you.

9    Q.  Did I understand you to say the end position you held until

10   just recently?

11   A.  Yes.

12   Q.  What happened recently?

13   A.  At the end of May, I, I stepped down from full-time work at

14   Costco, announced my retirement.  I am still an employee of

15   Costco until the end of December and I'm in a consulting role,

16   helping out with the transition with the new individual who has

17   taken my position.

18   Q.  During the period of time that is relevant to this case,

19   you were the executive vice president and chief operating

20   officer of merchandising for Costco, correct?

21   A.  Yes.

22   Q.  And that's a global position?

23   A.  It's a position that is responsible for the direct

24   purchasing for all buying in the United States, both for inline

25   and online, and also I would be involved with global

1    negotiations on behalf of the whole company, which would

2    include our international divisions potentially.

3    Q.  Mr. Schutt, I would like to move this along.  Please listen

4    to my questions because if I ask you a question that can be

5    answered yes or no, I would appreciate that.  Mr. Dabney is

6    certainly capable of coming up and asking you questions

7    afterwards.  I just asked you whether it was a global position.

8    The answer is yes, correct?

9    A.  It required a yes-and-no answer, I believe, but --

10   Q.  You had responsibility for every Costco store around the

11   world for merchandising, correct?

12   A.  No.

13   Q.  Where did you not have responsibility for merchandising?

14   A.  I didn't have the direct responsibility for purchasing in

15   Canada, the U.K., Japan, Taiwan, Korea, Australia, Spain.

16   Q.  So you had certainly direct responsibility for all of the

17   United States.

18   A.  Yes.

19   Q.  And all of the rings that are at issue in this case are

20   rings that were sold in the United States, correct?

21   A.  Yes.

22   Q.  So you were the person, the senior, most senior

23   merchandising person at Costco responsible for the area of

24   merchandising that would have included the rings that are

25   involved in this case, right?

1   A.   Yes.

2   Q.   To whom did you directly report in the chain of command?

3   A.   I directly reported to Craig Jelenik.

4   Q.   And Craig Jelenik is the president and CEO of Costco,

5   correct?

6   A.   He is.

7   Q.   And that makes one of the most senior executives in Costco;

8   is that fair, or made you one of the most senior?

9   A.   That's fair.

10  Q.   And you were in the position of being a direct report to

11  the president and CEO of Costco since at least 2010, right?

12  A.   Yes.

13  Q.   How many stores does Costco currently have?

14           Did they not break it down in the United States and

15  then outside the United States?

16  A.   Break it down between -- I don't think I remember all of

17  those.  But I think we have roughly 700-some locations

18  worldwide.

19  Q.   Approximately how many employees, part time and full time?

20  A.   It's over 200,000.

21  Q.   And your experience at Costco is, you rose from -- you rose

22  through the ranks to become the top merchandising person in the

23  company, at least as it related to United States sales,

24  correct?

25  A.   Yes.

 1  Q.  Is it fair to say that Costco, during your time there, has

 2  grown to become the second-largest retailer in the United

 3  States?

 4  A.  Yes.

 5  Q.  And Costco has revenues of at least $100 billion a year,

 6  correct?

 7  A.  Yes.

 8          MR. MITCHELL:  Your Honor, I would like to hand the

 9  witness a witness book.

10          THE COURT:  Yes, you may.

11          MR. MITCHELL:  Thank you.

12  Q.  If you would in the witness book please open that and turn

13  to page PTX 14.  Would you have a look at that.  This is a

14  redacted copy.  The financial statements at the end are

15  unredacted.  But this is Costco's annual report for 2012.  Can

16  you confirm that this is the annual report for 2012?

17  A.  Yes, it is.

18          MR. MITCHELL:  We offer Plaintiff's Exhibit 14 in

19  evidence.

20          MR. DABNEY:  Your Honor, this document has not been

21  redacted as required, so, subject to the proper redaction, we

22  would not oppose the proffer.

23          THE COURT:  The exhibit is admitted subject to the

24  redactions that were earlier ordered.

25          (Plaintiff's Exhibit 14 received in evidence)

1          MR. MITCHELL:  We will not take time over -- I'm not

2     going to refer to anything in there now in this, but -- I think

3     it was redacted but I don't need to take up time with the jury.

4     Q.  Mr. Schutt, can you please turn to the page, or to the

5     exhibit marked PTX 17.  I ask again, could you confirm that

6     this is Costco's annual report for 2015.

7     A.  It is.

8          MR. MITCHELL:  Subject to the same objection, we would

9     offer PTX 17 in evidence, and we can talk about it afterwards.

10          THE COURT:  PTX 17 is admitted subject to compliance

11    with the earlier order.

12          (Plaintiff's Exhibit 17 received in evidence)

13    Q.  Is it fair to say that, while you were in your position as

14    global -- or as executive vice president, chief operating

15    officer of merchandising, that you were the most important

16    merchandising person in all of Costco?

17    A.  Correct.

18    Q.  And does that include all merchandise, no matter what

19    category?

20    A.  It does not include products that are in our ancillary

21    businesses.

22    Q.  But if you're talking about the Costco warehouse that most

23    people know, the building, the Costco warehouse, were the most

24    senior person responsible for everything that was in that

25    building?

1   A.  I can clarify that for you, or for the jury.

2   Q.  OK.

3   A.  So I would not have been responsible for our optical

4   business, you know, our contact lenses, our eyeglasses that we

5   sell.  I would not be responsible for hearing aids, for

6   example.

7   Q.  Anything else?

8   A.  I was not responsible for gasoline sales.  Photo, one-hour

9   photo, I was not responsible for that either.

10          THE COURT:  I would ask you that you both keep your

11  voices up a bit and particularly Mr. Schutt, that you speak in

12  proximity to the microphone.

13          THE WITNESS:  Speak louder, your Honor?

14          THE COURT:  Can you just project a little bit more.

15          MR. MITCHELL:  I apologize.

16          THE WITNESS:  I'll speak up.

17          THE COURT:  Thank you.

18  Q.  Mr. Schutt, you've been here the entire trial so far,

19  correct?

20  A.  Yes.

21  Q.  And you were here for Mr. Dabney's opening statement; is

22  that right?

23  A.  Yes.

24  Q.  You were also here for the testimony of Brittni Popp and

25  Jean LaBarbera, correct?

1    A.  Yes.

2    Q.  So you were in the courtroom when the signs that were

3    observed by Ms. Popp on November 27 and November 30, 2012 were

4    displayed in the courtroom, right?

5    A.  Yes.

6    Q.  So you saw that those signs said "Tiffany" as a standalone

7    to describe the rings that were on sale in the Huntington

8    Beach, California store on that day, right?

9    A.  Could we take another look at that sign just so I recall

10   exactly what that showed?

11          MR. MITCHELL:  Mr. Cole, I think it's 25.

12   Q.  Remember that one?

13   A.  Yes.

14   Q.  OK.  And I think 26 is the other sign.

15          You saw those photos when they were displayed in the

16   courtroom, correct?

17   A.  Yes.

18   Q.  And did you also hear Ms. LaBarbera testify that it was her

19   practice to call the rings "Tiffany" when she spoke with

20   customers about them?

21   A.  Yes.

22   Q.  And did you also hear Ms. Popp testify that she and

23   Ms. LaBarbera engaged in a conversation about the rings in

24   those photographs and refer to them as "Tiffany"?

25   A.  OK.

1   Q.  You heard that, right?

2   A.  Yes.

3   Q.  Did you find that troublesome?

4   A.  No.

5   Q.  Did you hear the testimony of Ms. LaBarbera that she was

6   confronted by an irate customer, Costco customer, who thought

7   that a ring of a Tiffany sign in a Costco display case in

8   Huntington Beach was a real Tiffany ring?

9   A.  Yes.

10  Q.  Did that bother you?

11  A.  Sure.

12  Q.  Did you hear that she took that complaint to her manager?

13  A.  Yeah.

14  Q.  So -- and a manager, I assume, at Costco is someone that is

15  part of the management structure at Costco; is that fair?

16  A.  That's fair.

17  Q.  So a floor person went to a manager at a Costco store in

18  Huntington Beach, California and reported to the manager that

19  there was an irate customer who was misled by signage in that

20  store, and nothing happened about it.  Does that bother you?

21          MR. DABNEY:  Your Honor, we have an objection.

22          THE COURT:  Please consult.

23          (Counsel confer)

24          THE COURT:  Please stand a little closer together and

25  don't talk quite so loud.

1            (Counsel confer)

2            MR. DABNEY:  Um --

3            THE COURT:  Are you requesting a sidebar?

4            MR. DABNEY:  Yes, your Honor.

5            (At the sidebar)

6            MR. DABNEY:  I believe the question mischaracterizes

7    the testimony previously given and calls for -- it assumes a

8    state of mind on behalf of this customer, which there is

9    absolutely no foundation for in the question.  So I think the

10   question is objectionable.

11           THE COURT:  Would you just reread the question to me,

12   please.

13           (Record read)

14           THE COURT:  The objection to the form of the question

15   is sustained.

16           MR. MITCHELL:  Could I rephrase?

17           THE COURT:  Yes.

18           MR. MITCHELL:  Thank you.

19           (Continued on next page)

20

21

22

23

24

25

1              (In open court; jury present)

2    Q.  Mr. Schutt, do you dispute that Ms. LaBarbera was

3    confronted by an upset customer who had come to her and asked

4    whether the ring in the display case at the Huntington Beach

5    store where the sign said "Tiffany" came with a blue box?

6    A.  Yes.

7    Q.  You dispute that.

8    A.  I don't dispute that.  I do not dispute that.

9    Q.  You do not dispute that.

10   A.  Yes.

11   Q.  And do you recall her testimony; I think she said "he

12   almost came over the counter at me," right?  Remember that?

13   A.  I do.

14   Q.  And she became startled by the reaction, right?

15   A.  She sure did.

16   Q.  OK.  So is it fair that the conclusion can be drawn from

17   what Ms. LaBarbera said, somebody like you listening to it,

18   that there was a Costco customer looking at the sign in the

19   display case at the Huntington Beach store that interpreted

20   that sign as offering for sale a real Tiffany ring?

21              MR. DABNEY:  We have an objection.

22              THE COURT:  Is it -- speak to Mr. Mitchell.

23              (Counsel confer)

24   Q.  You seemed as if you're a merchandising person who's been

25   in merchandising almost your entire life, right?

1    A.  Yes.

2    Q.  I am sure over the years -- maybe I'm wrong, tell me if I'm

3    wrong -- but you must have heard of some complaints sometimes

4    that filtered their way up to you from customers.  Is that

5    fair?

6    A.  It's fair.

7    Q.  So what Ms. LaBarbera was testifying about was a Costco

8    customer -- right?

9    A.  Yes.

10   Q.  And she was expressing in this courtroom that she had been

11   startled by that customer, who wanted a blue box with the ring

12   that was in the case, right?

13   A.  Yes.

14   Q.  So as a merchandising person your entire life, listening to

15   that in the chair right over here, did you at least conclude

16   yourself that this customer must have thought that what that

17   customer saw in the case was a Tiffany ring?  Did you conclude

18   that?

19              MR. DABNEY:  Objection.

20              THE COURT:  Overruled.

21   A.  No.

22   Q.  So you think the customer was asking if it came with a blue

23   box because that customer thought it was a Costco ring.  Is

24   that your assumption?

25   A.  I, I wasn't -- I don't know.

G9LATIF6ps                    Schutt - direct

1   Q.  And you heard Ms. LaBarbera say she took the complaint to

2   her manager, correct?

3   A.  Yes.

4   Q.  Informed her manager about what had happened.  Right?

5   A.  Yes.

6   Q.  And that never filtered its way up to you in your

7   merchandising position at Costco.  Right?

8   A.  No.

9   Q.  So whatever your training was of your managers in your

10  Costco stores, nobody thought enough to report this up the

11  chain of command that we have a customer in the store upset

12  looking at this sign, that they're not getting a blue box with

13  their ring.  Is that fair?

14  A.  OK.

15  Q.  Yes?

16  A.  Yes.

17  Q.  OK.  Now, I want to go back to Mr. Dabney's opening and

18  read you something he said to the jury.  He said, quote, this

19  is management failure, Costco accepts this, and Costco has

20  acted to fix it.  It is no longer the case that a sign can go

21  out on the floor without it being reviewed by someone higher up

22  in management than it was at the time.  Did you hear that

23  statement?

24  A.  Yes.

25  Q.  Did you approve of that statement?

1    A.   Yes.

2    Q.   Was that an accurate statement?

3    A.   Yes.

4    Q.   OK.  So my first question to you is, are you the one who's

5    responsible for this failure in management as the top

6    merchandising person at Costco?

7    A.   It happened under my watch.  I take full responsibility for

8    the sign management failure.

9    Q.   Are you taking responsibility like Harry Truman that the

10   buck stops here, or are you taking personal responsibility

11   because you didn't do something?

12   A.   I'm taking responsibility.

13   Q.   Personally.

14   A.   Yes.

15   Q.   OK.  What should you have done?

16   A.   Could you ask that -- I'm not clear on that question.

17   Q.   OK.  We know about Ms. LaBarbera's recounting of a story

18   about a customer who climbed over the counter at her, over the

19   signage, right?

20   A.   Yes.

21   Q.   You've heard that.  You know that Tiffany was certainly

22   upset about that signage.  Right?

23   A.   Yes.

24   Q.   So listening to Mr. Dabney, I presume you would now agree

25   that Tiffany was right to be upset about that signage.  Right?

G9LATIF6ps                    Schutt - direct

1    A.  I think, I think that requires a yes-and-no answer.  Would

2    you like me to explain?

3    Q.  It requires a yes-or-no answer.  Do you think Tiffany was

4    right to be upset --

5    A.  Excuse me.  I'm sorry.  I think that question requires a

6    yes *and* a no answer.  Can I explain?

7    Q.  No.  The answer is, you can't say -- you can say that your

8    customer had a right to be upset, but Tiffany did not.  That's

9    what your -- because you can't say yes for Tiffany, you can

10   only say for the customer.

11   A.  No.

12   Q.  That's not true.

13   A.  Could -- you know, I'm not clear on your question now.

14   You've asked it several different times.  If you could be so

15   kind to ask it one more time for me, make it clear for me.

16   Q.  Mr. Schutt, Mr. Dabney made a point to this jury in his

17   opening that there was a management failure at Costco,

18   obviously as related to this case.  Right?

19   A.  Sign maintenance management area.

20   Q.  Well, Tiffany doesn't manage your signs, do they?

21   A.  No.

22   Q.  So the net result of your sign maintenance management

23   failure, if that's the parlance you use, is that you had signs

24   in your stores where "Tiffany" standing alone was being used to

25   describe rings not made by Tiffany.  Right?

1    A.   (Pause)

2    Q.   That's a yes or no --

3    A.   Yes.

4    Q.   -- I think that was a --

5    A.   Yes.

6    Q.   OK.  And I assume you would have to agree with me that

7    Tiffany didn't go out searching for this problem; it was

8    reported -- you heard the testimony -- it was reported by a

9    Tiffany customer, as this was observed in the Huntington Beach

10   store.  Right?  You heard that?

11   A.   Yes.

12   Q.   And Tiffany sent an investigator to the store, and the

13   investigator confirmed that the signage reported was there.

14   Right?

15   A.   Yes.

16   Q.   So Costco's, I think you said sign maintenance management

17   issue, resulted in a Tiffany customer reporting this to Tiffany

18   and Tiffany confirming that its name was being used on signage

19   in a Costco store.  You follow me so far, right?

20   A.   I follow you.

21   Q.   And my question to you was whether or not you think Tiffany

22   was right to be upset when it saw this signage.  You say you

23   can't answer that yes.

24   A.   Yes.

25   Q.   OK.  You can't say yes.  OK.

1          So obviously, if you're taking the blame of some kind,

2    whatever that blame is -- and I'll get into it in a minute --

3    but if you're taking some blame for something, whatever you're

4    taking blame for, it has nothing to do with Tiffany, right?

5    A.  No.

6    Q.  It doesn't have anything to do with Tiffany.  Right?

7    A.  It does.

8    Q.  Tiffany is responsible for your signs at Costco?

9    A.  I'm here because of a lawsuit filed by Tiffany against our

10   company.

11   Q.  That's why we're here, right.

12   A.  Yes.

13   Q.  Because Tiffany was upset.  Right?

14   A.  Yes.

15   Q.  OK.  And you're now coming to this court and telling this

16   jury, as a company, that it was your fault, we're responsible,

17   we take responsibility for what it is that precipitated what

18   happened here, because without the sign we wouldn't be here.

19   Right?

20   A.  I take responsibility.

21   Q.  OK.  So it's not Tiffany's fault that Tiffany's name was

22   used in signs.  It was Costco's fault.  Right?

23   A.  Yes.

24   Q.  And you're sitting in front of this jury taking

25   responsibility for that.  Yes?

1   A.   Yes.

2   Q.   So actually, until Mr. Dabney said that in his opening, to

3   the jury, and you now confirm it, isn't that the first time

4   Costco has ever communicated publicly that it is taking

5   responsibility for what precipitated this lawsuit?

6   A.   We respect the ruling of the Court and acknowledge that.

7   Q.   Well, let's go back.  You're now saying -- by the way, when

8   did Costco take this responsibility that Mr. Dabney told the

9   jury?  Was it right before trial?

10  A.   I'm not clear on your question.

11  Q.   I understood Mr. Dabney in his opening to be making a

12  statement to the jurors that Costco as a company is accepting

13  blame -- I didn't exactly say for what -- but they're accepting

14  blame.  We changed the signs.  We're not going to do it again.

15  Our bad.  That's kind of what he said.  Right?

16  A.   Yes.

17  Q.   OK.  When did Costco accept that responsibility and take

18  that blame?

19  A.   We accept the ruling of the Court.

20  Q.   So when Judge Swain issued her decision on a summary

21  judgment motion, is that the first time Costco accepted

22  responsibility?

23  A.   No.

24  Q.   After that?

25  A.   Well before that.

1    Q.  Well before that.  How far well -- how well before that?

2    A.  Well, as, as -- when we were first notified by Tiffany that

3    we had the word "Tiffany," "Tiffany set," "Tiffany setting,"

4    "Tiffany style," within days we removed that from our signage

5    in our locations.

6    Q.  So that's it.  That's what taking responsibility means?

7    You took it off the signs?

8    A.  That's part of it.

9            We also took responsibility, in my view, in how we

10   provided Tiffany with the information that they requested.  I

11   think that's taking responsibility.  We also subsequently,

12   after that, took responsibility in contacting our members to

13   let them know that if there is any chance of any

14   misunderstanding on this whole thing, that we wanted to make

15   sure that they -- we wanted to make it right, we wanted to make

16   sure they knew that they could return that ring for a full

17   refund.  So we didn't want to take any advantage of any

18   misunderstanding out there with our valued members.

19   Q.  How about responsibility to Tiffany and its customers?

20   What about that responsibility?  I only hear about you're

21   talking about how to avoid liability, not responsibility.

22   Responsibility is saying, I did something wrong, I'm going to

23   take a public statement that we did something wrong, it's our

24   fault?

25            THE COURT:  Is there a question?

1  Q.  Did Costco ever do that?

2          Did Costco ever issue a public apology to Tiffany?

3  A.  No.

4          THE COURT:  Mr. Mitchell, we have ten minutes till the

5  end of the day.

6          MR. MITCHELL:  How many?

7          THE COURT:  Ten.

8          MR. MITCHELL:  Thank you.

9  Q.  You were here when Ms. Abrams was on the stand, right?

10  A.  Yes.

11  Q.  And Mr. Dabney was questioning her about these letters that

12  went back and forth between me and your prior counsel?

13  A.  Yes.

14  Q.  So you just said to this jury that Costco took

15  responsibility as soon as it was notified by Tiffany, right

16  after.  That's when you started taking responsibility.  Right?

17  A.  That's my view.

18  Q.  The letter, there's a sentence in this letter, DTX 487, on

19  the second page, from your lawyer, on January 31, 2013 that

20  says, referring to Costco about the signage, "It did so not

21  because it believed it was obligated to do so" -- this is about

22  removing the signage.  "It did so not because it believed it

23  was obligated to do so but because it did not want to get into

24  a fight over the issue."  Does that read like taking

25  responsibility to you?

1   A.  I, I know what, what the signs were intended to, to mean.

2   So we did not want to get in a fight over this.  It really

3   wasn't worth it.

4   Q.  Explain to me, Mister -- let me say it this way.  When you

5   were the chief of merchandising at Costco, was there a

6   management team that met on a regular basis, that included the

7   CEO and most senior managers of the company?

8   A.  I was part of our executive committee, which included all

9   the executive vice presidents in our company, our CEO, and a

10  few other individuals.

11  Q.  And were you part of the management team that approved the

12  filing of a counterclaim against Tiffany seeking to have the

13  word "Tiffany" declared generic to describe a certain type of

14  ring?  Were you part of the team that approved that?

15            MR. DABNEY:  Your Honor, we have an objection.

16            THE COURT:  Confer, please.

17            (Counsel confer)

18            THE COURT:  Please stand closer together.

19            MR. MITCHELL:  Your Honor, may I just go -- I don't

20  want to -- it would save time if I could read over Mr. Cole's

21  shoulder to ask a question.

22            THE COURT:  All right.  Shall we take -- OK.  It's not

23  on the monitor.

24            MR. MITCHELL:  Yes, it's not on -- just --

25  Q.  I want to read you a paragraph from the counterclaim that

1    Costco filed against Tiffany on March 8, 2013, paragraph 9.

2    "The word 'Tiffany' is a generic term for a ring setting

3    comprising multiple slender prongs extending upward from a base

4    to hold a single gemstone exemplified by the type of setting

5    depicted on page 1 above and by settings depicted described,

6    and referred to in Exhibit 1 as 'Tiffany settings.'"

7             Were you aware that Costco was filing that

8    counterclaim before it was filed?

9    A.   I didn't have any specific knowledge about a counterclaim.

10   Q.   You know that Costco did file a counterclaim in this case

11   that made that claim?

12   A.   I, I know of --

13   Q.   It's a yes or no.  Did you know or not?

14   A.   That requires a yes-and-no answer.

15   Q.   Yes, it does.

16   A.   It's a yes-*and*-no answer.  Sorry.

17   Q.   Did you -- I read you what the claim said.  I'll rephrase

18   the question.  I just read you what the paragraph of the

19   pleading said.  You know now, having been involved in the

20   suit -- I deposed you in this lawsuit -- you were aware of the

21   claims made in this case by Costco, right?

22   A.   I do know that some sort of claim was made on a

23   countersuit.  I'm not an attorney.  I don't know, I just don't

24   know the specifics of that claim.

25   Q.   So Costco in response to this lawsuit filed its own suit

G9LATIF6ps                    Schutt - direct

1   against Tiffany attacking the Tiffany trademark, in its

2   broadest sense.  Right?

3   A.  OK.

4   Q.  All right.  Is that taking responsibility?

5   A.  Yes.

6   Q.  That's taking responsibility for what you did, for your

7   management failure to manage your signs right?

8   A.  Um, I -- no.  It's, it's not taking responsibility for,

9   for, for managing the signs right.  It is an action that,

10  although we respect the ruling of the Court, is that we felt it

11  was something that, that was, was right to do.  I was -- I was

12  not attorney, wasn't part of the -- our law team, legal team's

13  conversations or anything like that.  But that's why I think

14  it's a yes and a no answer.

15  Q.  You're saying here, you're using the phrase, I don't want

16  to misquote you, but something like, you know, we accept the

17  ruling of the Court.  That means the summary judgment decision

18  from Judge Swain.  Is that what you're referring to?

19  A.  Yes, sir.

20  Q.  OK.  And that summary judgment decision, you know,

21  dismissed your counterclaim.  Correct?

22  A.  Yes.

23  Q.  You know that, right?

24  A.  Yes.

25  Q.  And the Tiffany trademark is not generic according to Judge

1    Swain in her decision.  You know that too, right?

2    A.  Yes.

3    Q.  So prior to that ruling, before your counterclaim to

4    invalidate the Tiffany trademark in some fashion had been

5    denied, can you tell me anything you did, anything, other than

6    providing the sales information in that January 31st letter

7    that has three paragraphs, that would constitute taking

8    responsibility for your management failure to Tiffany?

9    A.  We immediately took the "Tiffany" word off of any and all

10   signs in our jewelry case, very, very quickly, as soon as we

11   were notified by Tiffany.  And we had, we had no legal

12   obligation to do that.  But we just did.  And we, we took full

13   responsibility for, for that sign maintenance management issue.

14   We, we made full disclosure of, the best of my knowledge, in

15   all these documents and these letters going back and forth and

16   these attorneys, and we tried to do what was right after that.

17   Q.  So finally, the counterclaim is part of, to the value of

18   the Tiffany mark, is part of doing what was right.  Is that it?

19   A.  I'm not an attorney.  I don't understand counterclaims.  We

20   respect Judge Swain's ruling.

21              THE COURT:  One minute, Mr. Mitchell.

22              MR. MITCHELL:  How many?

23              THE COURT:  One.

24   Q.  Back going back to, let me ask you this question.  Did you

25   know that after Judge Swain's decision was entered, that Costco

G9LATIF6ps

1  filed an appeal with the Second Circuit claiming a First

2  Amendment right to use the word "Tiffany" in its stores?

3  A.  I'm not aware of any specifics related to that.

4  Q.  So you didn't know that Costco filed papers with the Second

5  Circuit Court of Appeals trying to avoid this trial and get an

6  immediate appeal, claiming a First Amendment right to continue

7  to use "Tiffany" in its signs?  You didn't know that?

8  A.  I have no personal knowledge of that.

9          MR. MITCHELL:  Your Honor, I can stop there.

10          THE COURT:  Thank you.

11          Ladies and gentlemen, thank you for your work with us

12  today.  This concludes today's presentation of evidence.

13  Please be ready in the jury room tomorrow morning for 9:15.  As

14  I indicated before, it will be a short day.  We'll finish at 2

15  tomorrow.  We'll take a half-hour lunch break, probably around

16  12:30.

17          And remember, you must not discuss the case or

18  anything or anyone having anything to do with it among

19  yourselves or with any other person, directly, electronically,

20  or by any other means.  Leave your notes in the jury room in

21  the envelopes provided.  And please be back in time to start at

22  9:15 tomorrow morning.

23          Thank you for your work.  Safe home, safe return.

24          (The jury left the courtroom)

25          THE COURT:  You may step down, Mr. Schutt.

1     THE WITNESS:  OK.

2          (Witness excused)

3          THE COURT:  Counsel and parties will resume tomorrow

4     morning at 9.  And I just want to make sure I don't have any of

5     my papers mixed up in these papers up on the board, but I'll

6     give them back after that.

7          MR. MITCHELL:  May we have the standard direction with

8     Mr. Schutt that he is in the box, so to speak?  He is in the

9     cross examination.

10          THE COURT:  He's not on cross.

11          MR. MITCHELL:  But he's under examination by an

12     adverse party.  I mean, it really is...

13          THE COURT:  Are you, Mr. Dabney, willing to agree to

14     that protocol, for this, while he's on direct?

15          MR. DABNEY:  Yes, your Honor.

16          THE COURT:  All right.  So, Mr. Schutt, you are not to

17     discuss your testimony or the subject thereof with anyone.

18          THE WITNESS:  Yes, your Honor.

19          THE COURT:  Thank you very much.

20          MR. MITCHELL:  I guess the question is, we may get to

21     depositions tomorrow.

22          THE COURT:  Yes.

23          MR. MITCHELL:  And obviously your Honor has ruled on

24     designations.  There may be a couple of -- we don't really have

25     any.  We may have none.  So that's not the issue.  But within

1  the text of some of the questions are form objections at

2  deposition.  How are we going to handle those, as they come

3  through the reading?

4          THE COURT:  Objections that are not being pressed

5  should not be read.  It should be questions and the answers.  I

6  haven't memorized the transcript.  Sometimes in order to

7  explain the way the testimony is laid out, the person reading

8  the questions may just have to say, there was an objection, and

9  then the question went on, and then the person gives the

10  answer.  But colloquy between counsel should not be read out

11  and it should be redacted from any hard copy prepared of the

12  transcript for distribution to the jury.

13          MR. MITCHELL:  OK.

14          And one final thing.  As we go through the transcript

15  and we get to the admission of exhibits, how would you like to

16  handle those?

17          THE COURT:  It would be helpful and efficient if

18  counsel could simply stipulate that Exhibit Z referred to in

19  the deposition is Defendant Exhibit 123 or Plaintiff's

20  Exhibit 4, and then offer whatever the exhibit number is that

21  we're using for this trial and explain that stipulation on the

22  record.

23          MR. MITCHELL:  OK, your Honor.

24          THE COURT:  Is that acceptable, Mr. Dabney?

25          MR. DABNEY:  Yes, your Honor.

G9LATIF6ps

1          THE COURT:  Thank you.

2          MR. MITCHELL:  Thank you.

3          THE COURT:  All right.  Thank you all.  Safe home and

4    safe return.  And I'll just have a quick look to make sure that

5    are not extraneous papers here.

6          Thank you all.  They're ready for pickup.  See you in

7    the morning.

8          I'm sorry.  I would like to give back my copy of

9    Defendant's Exhibit 52 as well.

10          (Adjourned to 9:00 a.m., September 22, 2016)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                              Page

3   EWA ABRAMS

4   Cross By Mr. Dabney . . . . . . . . . . . 223

5   Redirect By Mr. Mitchell . . . . . . . . . 236

6   Recross By Mr. Dabney . . . . . . . . . . 252

7   Redirect By Mr. Mitchell . . . . . . . . . 258

8   BRENT CHARLES KACZMAREK

9   Direct By Mr. Mitchell . . . . . . . . . . 260

10  Cross By Mr. Dabney . . . . . . . . . . . 326

11  Redirect By Mr. Mitchell . . . . . . . . . 374

12  Recross By Mr. Dabney . . . . . . . . . . 376

13  DOUGLAS WAYNE SCHUTT

14  Direct By Mr. Mitchell . . . . . . . . . . 378

15                   PLAINTIFF EXHIBITS
    Exhibit No.                          Received
16   140   . . . . . . . . . . . . . . . . . 263
     141   . . . . . . . . . . . . . . . . . 267
17   64    . . . . . . . . . . . . . . . . . 311
     133   . . . . . . . . . . . . . . . . . 315
18   14    . . . . . . . . . . . . . . . . . 382
     17    . . . . . . . . . . . . . . . . . 383
19                   DEFENDANT EXHIBITS
    Exhibit No.                          Received
20   821   . . . . . . . . . . . . . . . . . 227
     52    . . . . . . . . . . . . . . . . . 229
21   258   . . . . . . . . . . . . . . . . . 269
     139   . . . . . . . . . . . . . . . . . 293
22   133A and 139A . . . . . . . . . . . . . 326
     233   . . . . . . . . . . . . . . . . . 339
23   233A  . . . . . . . . . . . . . . . . . 341
     822   . . . . . . . . . . . . . . . . . 344
24   234   . . . . . . . . . . . . . . . . . 360
     825   . . . . . . . . . . . . . . . . . 360
25   27    . . . . . . . . . . . . . . . . . 373