G9MATIF1ps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    TIFFANY AND COMPANY, et al,

4                  Plaintiffs,

5           v.                              13 CV 1041 (LTS)

6    COSTCO WHOLESALE CORPORATION,

7                  Defendant.

8    ------------------------------x
                                           New York, N.Y.
9                                          September 22, 2016
                                           9:05 a.m.
10
     Before:
11
                    HON. LAURA TAYLOR SWAIN,
12
                                           District Judge
13
                          APPEARANCES
14
     BROWNE GEORGE ROSS LLP
15        Attorneys for Plaintiffs
     JEFFREY A. MITCHELL, ESQ.
16   JUDITH R. COHEN, ESQ.
     BRETT D. KATZ, ESQ.
17
     HUGHES HUBBARD
18        Attorneys for Defendant
     JAMES W. DABNEY, ESQ.
19   RICHARD M. KOEHL, ESQ.
     EMMA L. BARATTA, ESQ.
20

21

22

23

24

25

1          (Trial resumed; jury not present)

2          THE CLERK:  This case is Tiffany and Company et al. v.

3     Costco Wholesale Corporation.

4          THE COURT:  Good morning, Mr. Mitchell, Ms. Cohen,

5     Ms. Abrams, Mr. Cole, and Ms. Schutt.  And good morning,

6     Mr. Dabney, Ms. Baratta, Mr. Schutt, and Ms. Vogtman.

7          Do we have any issues that we need to address before

8     we start with the jury?

9          MR. MITCHELL:  Not for the plaintiff, your Honor.

10          MR. DABNEY:  Not for the defendant, your Honor.

11          THE COURT:  Very well, then.  The jury are not all

12     here yet.  I just remind everybody that today is a short day.

13     We will end at 2.  Lunch break at 12:30.  We'll do the

14     ten-minute midmorning break sometime between 11 and 11:15.  And

15     I will give you my usual ten minutes' heads up if we haven't

16     gotten to a stopping point.

17          Let's then wait for notice from Ms. Ng that the jurors

18     are ready.  When they're ready she'll give us a two-minute

19     warning, and then we'll resume.  Thank you very much.

20          (Recess)

21          THE COURT:  Mr. Schutt, would you please return to the

22     witness stand.  And Ms. Ng, would you please bring the jurors

23     in.

24     DOUGLAS WAYNE SCHUTT, Resumed.

25          (Jury present)

1           THE COURT:  Mr. Mitchell.

2           MR. MITCHELL:  Thank you, your Honor.

3    DIRECT EXAMINATION (Cont'd)

4    G9MATIF1ps                    Schutt - direct

5    BY MR. MITCHELL:

6    Q.  Good morning, Mr. Schutt.

7    A.  Good morning.

8    Q.  I was reading the transcript of your testimony from

9    yesterday last evening, and I want to come back to something

10   you said about what Mr. Dabney told the jury that was Costco

11   taking responsibility.  This is the quote of what you said.

12   You said, quote, we respect the ruling of this Court, close

13   quote.  Do you remember saying that?

14   A.  Yes, sir.

15   Q.  What did you mean by that?

16   A.  I meant that we, we respected the, the ruling of Judge

17   Swain relative to this case.

18   Q.  Can you be a little more detailed.  I mean, to what extent?

19   You understand, she issued a ruling, and obviously that exists.

20   But how deep does that respect for the ruling go in terms of

21   how it's going to -- you understand what it means to take

22   responsibility.  I just don't understand the objection.

23           (Mr. Dabney rose)

24           THE COURT:  Is that an objection to form?

25           MR. DABNEY:  Yes, your Honor.

G9MATIF1ps                    Schutt - direct

1          THE COURT:  Sustained.  Try again.

2   Q.  Can you give a little more detail about what you mean by

3   that?

4          MR. DABNEY:  Same objection, your Honor.

5          THE COURT:  Would you two consult.

6          (Counsel confer)

7   Q.  Let me ask you this.  I'll rephrase the question.  In

8   connection with respecting the ruling of the Court, does that

9   mean that Costco accepts, for purposes of this proceeding we're

10  in right now, that "Tiffany" as a standalone is a valid and

11  enforceable trademark?

12  A.  Yes.

13  Q.  And does that also mean that, sitting in the court right

14  now, that Costco concedes it had no right to use the Tiffany

15  trademark in signs as a standalone trademark?

16  A.  Yes.

17         Does that also mean that Costco understands and

18  concedes that it is accountable to Tiffany for all profits it

19  made from sale of rings using the Tiffany trademark as a

20  standalone?

21         THE COURT:  Please consult.

22         (Counsel confer)

23  Q.  Your lawyer doesn't want me to ask that question.  I'll

24  withdraw.  OK?

25         THE COURT:  The remark is stricken.

G9MATIF1ps                    Schutt - direct

1                MR. MITCHELL:  I'm sorry.

2                THE COURT:  Disregard the remark.

3    Q.  So I'm clear, Costco still doesn't agree with the decision,

4    right?

5                MR. DABNEY:  Your Honor, we --

6                THE COURT:  Come to the sidebar, please.

7                (At the sidebar)

8                MR. MITCHELL:  Your Honor, Mr. Dabney made a

9    representation to the jury in his opening that Costco accepts

10   responsibility for what happens here.  I asked the witness

11   yesterday what he meant by that.  And he said, we respect the

12   ruling of this Court.  I was reading the transcript.  And I

13   don't understand that evidence.  I want to know to what extent

14   Costco has accepted responsibility now that counsel has made

15   that representation, and he's gone down that line of

16   questioning.  Understanding the proceeding against Costco, why

17   they're here, this goes to the question of punitive damages:

18   what does Costco intend to do in the future?  So to the extent,

19   at least in the well of this courtroom, that they respect the

20   ruling of this Court, then he should be able to explain to them

21   the extent to which they do for purposes this of this

22   proceeding.  That was his answer.  I'm only drilling down on

23   his answer.  Obviously when he gives an answer I'm entitled to

24   drill down on that.

25                THE COURT:  Mr. Dabney.

1          MR. DABNEY:  Your Honor, this line of questioning is

2     why we objected to the use of the answer and counterclaim and

3     then the Second Circuit proceedings for the suggestion that a

4     litigant should have inferences drawn against it because it

5     filed pleadings or waived its legal rights or filed a motion in

6     appellate court, a practice we think is improper.  For the

7     witness to say he respects the ruling of the Court is simply,

8     that's what he said.  The line of questioning seems to be

9     asked, well, do you really respect the ruling of the Court and

10    are you waiving any rights you might have outside of the trial.

11    And I don't think that that is an appropriate line of

12    questioning for this witness.  The issue here is, the facts

13    that they did before the lawsuit was filed, what did they

14    believe then, what did they do to stop the reality on the

15    ground.  That's all fair game.  To try to give indirectly what

16    they can't do directly, to argue with this witness about legal

17    pleadings in court and legal rights that Costco may or may not

18    have or have waived, I don't think, is relevant to any issue in

19    this case, and we would be asking for a strong corrective

20    instruction with regard to questions that have already been

21    asked with the insinuation that defendant, because Costco filed

22    a counterclaim and because Costco made a motion to the Second

23    Circuit, that that somehow means that Costco is a willful

24    infringer here.  We don't think that that is the proper

25    argument at all.

1          THE COURT:  Well, you opened the door on this issue

2     with your presentation in the opening that Costco accepts

3     responsibility and either explicitly or by implication that the

4     issues here are no big deal and at most about a small amount of

5     money.  There are issues here with respect to what Costco's

6     intent is, whether there is a need to disincentivize further

7     intentional misuse of the trademark, and having led with that

8     proposition, we have an issue on Costco's -- whether there is a

9     change of heart or that's merely a different strategy in

10     relation to a particular claim that was filed and the court

11     decision and what the prospects are for a recurrence.

12          Having said that, there are legitimate questions of

13     waiver and the way that plaintiffs were questioning,

14     particularly the ending line, goes to that issue.  And so if

15     this is a line of argument, then that's something for me to

16     manage in terms of getting an appropriate record but not one

17     that prejudices Costco's rights with respect to appeals.

18          So it is fair for you to ask him what the relationship

19     is in his mind between respecting the rulings of the Court and

20     accepting responsibility and at what point was it his

21     understanding that using "Tiffany" as a standalone is wrong.

22     And if you want to go over that later in your closings, fine.

23     But I am instructing you to stay away from leading on actual

24     legal positions and --

25          MR. MITCHELL:  My original question was a totally

1    open-ended question, which was, what did you mean.  And I was

2    just saying, I didn't understand, can you explain more, and

3    that's why I started to be more specific.

4              THE COURT:  It ended up being very meandering and

5    confusing, so what you want to get is the relationship between

6    accepting responsibility and respecting the ruling of the

7    Court.

8              MR. MITCHELL:  I will ask that question.

9              THE COURT:  I'll allow that.

10             MR. DABNEY:  Thank you.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2    Q.  Mr. Schutt, would you please state to the jury if you can

3    the relationship between accepting responsibility and

4    respecting the ruling of the Court.  Can you explain how those

5    two go together.

6    A.  Well, sure.  And I'm proud to be part of a company that has

7    a code of ethics that in the first line it says we obey the

8    law.  And we obey the law in everything that we do.

9          The Court has made a ruling.  We respect that.  And I

10   am here personally to be part of the resolution.  If anybody

11   was harmed in any way, we want to make sure that we do the

12   right thing.

13   Q.  And you accept the ruling of the Court that Tiffany as a

14   standalone trademark is not generic.

15   A.  Yes.

16   Q.  OK.  Now, Mr. Schutt, as part of your job responsibilities

17   as the head of merchandising, certainly for the United States,

18   I presume you visited Costco stores regularly?

19   A.  Yes.

20   Q.  About how many times, could you -- thousands of times?

21   A.  Over 30 years, I'd say probably a thousand, thousand times.

22   Q.  And I assume on your way into every Costco store when you

23   walked in, there was a jewelry case near the entrance.  Right?

24   A.  Yes.

25   Q.  You walked by it every time you walked in the store every

1   one of those thousands of times, right?

2   A.  Yes.

3   Q.  So over the course of those thousands of visits to the

4   Costco stores, there must have been occasions where you looked

5   in the jewelry case on the way into the store, right?

6   A.  Sure.

7   Q.  So there also must have been occasions when you looked into

8   the jewelry case where you saw signs that had "Tiffany" on

9   them, right?

10  A.  I can't recall ever seeing a specific sign with, with

11  "Tiffany" on it.

12  Q.  You looked in the case, so either you saw it or it never

13  made a mental impression on you, right?

14  A.  It could have been there.  I might not have noticed it.

15  I'm looking at a lot of things when I, when I visit a location,

16  a lot of things in the case.

17  Q.  So assuming you looked into one of these jewelry cases

18  during a time when a Tiffany sign was there, it didn't cause

19  you to react in any way to question whether that was an

20  appropriate way to put a sign next to a ring.  Right?

21  A.  Could you re-- could you clarify that question for me?

22  Q.  You're walking by the jewelry case.  You look in.  There's

23  a Tiffany sign there.  It didn't bite.  So you didn't do

24  anything about it even if you saw it.  Right?

25          THE COURT:  Please consult.

1          MR. MITCHELL:  I'll withdraw.  Let me rephrase the

2     question.

3     Q.  How long was the word "Tiffany" in signs in the jewelry

4     case at Costco?

5     A.  Well, since this all came up, I've had an opportunity to

6     look into this, and, and the word "Tiffany" or "Tiffany set" or

7     "setting" has been used for quite a long time.

8     Q.  Give me an idea of "quite a long time."  Ten years?

9     A.  I think longer than that.

10    Q.  20 years?

11    A.  I'd say 20 years.

12    Q.  OK.  And we know that the phrase "solitaire Tiffany"

13    appeared in signage at least as far back as 2007, right?

14    A.  Yes.

15    Q.  So you're in the store thousands of times.  You walk past

16    the jewelry case.  It's fair to assume that, at least on one

17    occasion in those thousands of times, there had to be a sign in

18    one of the cases that said "Tiffany," right?  Can't we assume

19    that?

20          THE COURT:  Please consult.

21          (Counsel confer)

22          MR. MITCHELL:  I withdraw the question.

23    Q.  It's fair to say, Mr. Schutt, that in your tenure as the

24    head of merchandising, you never raised any issue about the use

25    of "Tiffany" in signage of Costco, correct?

1   A.  I never had the opportunity to, to raise that.

2   Q.  That was a yes or no, Mr. Schutt.  Yes or no.  You never

3   raised an issue about it.

4   A.  No.

5   Q.  OK.  And jewelry is within your -- you delineated all the

6   things you weren't responsible for, but jewelry was within your

7   area of responsibility, right?

8   A.  Yes.

9   Q.  And you looked in the jewelry case on a regular basis when

10  you visited the stores, right?

11  A.  Of course.

12  Q.  Now, I think you said yesterday that as part of taking

13  responsibility, that Costco took the signs down right away.

14  Right?

15  A.  That's correct.

16  Q.  And it was your belief, wasn't it, Mr. Schutt, that that

17  should have been enough, right?  For Tiffany.

18  A.  I don't know about Tiffany, but I do know that, in addition

19  to taking the signs down, we put a block in the system so that

20  the word "Tiffany" could never ever be, be used again.

21  Q.  So from your perspective, at the time the head of

22  merchandising, this was not such a big deal, take the signs

23  down, that should be the end of it.  Right?

24  A.  Well, that was part of, you know, accepting responsibility,

25  and of course there's more to, to that.

1   Q.  But from your perspective, you felt that should have ended

2   it with Tiffany, right?  Tiffany should have been satisfied

3   with that and it was finished.

4   A.  Sure, yeah.  It...

5   Q.  OK.  So since we know there were signs in the display case

6   at Costco with standalone uses of "Tiffany" at least as far

7   back as 2007, your testimony is that you never raised that as

8   an issue with anyone, right?

9   A.  The use of "Tiffany," since I had not seen it, I had no

10  reason to raise it as an issue, in my visits.

11  Q.  Well, you don't know if you saw it or you didn't see it.

12  You just don't remember if you saw it, right?

13  A.  I don't recall seeing a Tiffany sign.  I do know now, after

14  seeing photos and researching that, of course, it was in our

15  cases at some point.

16  Q.  Is it fair to say since it was in the case, you at least

17  concede you may have seen it, you just may not remember that

18  you saw it.  Is that fair?

19  A.  OK.

20  Q.  So when you said yesterday to this jury -- I asked, who's

21  taking responsibility since this is merchandise, and you said

22  you were taking responsibility.  You were the, you know -- I

23  even asked you about Harry Truman, right, the buck stops with

24  you, right?

25  A.  That's right.

1   Q.  So you also were within physical proximity to these signs

2   many, many times in the jewelry case at Costco during the

3   period of time that standalone usage of "Tiffany" was being

4   made in the jewelry case, right?

5   A.  OK.

6   Q.  So this idea that, I think you used the phrase yesterday

7   "sign maintenance management failure," is that what you called

8   it or --

9   A.  I called it an issue.

10  Q.  "Sign maintenance management issue," OK.  And that made it

11  sound like Costco didn't properly manage junior-level employees

12  from the senior management level.  Correct?

13  A.  I take responsibility for that.

14  Q.  Right.  So what you mean by that is, if I understand you

15  correctly, that from a senior management level, the junior

16  employees were putting words on signs that you're now not

17  letting them do because you've tightened your control, right?

18  A.  Yes.

19  Q.  But you are senior, you are about as senior management as

20  there could be, right, in Costco?

21  A.  Yes.

22  Q.  And you're in the stores all the time, and you're not even

23  noticing the signage as you come into the store.  Right?

24  A.  I notice a lot of things about a lot of signs when I visit

25  locations.

G9MATIF1ps                    Schutt - direct

1   Q.  So isn't this -- you said you noticed a lot of things about

2   a lot of signs?

3   A.  Sure.

4   Q.  So you looked at signs.  That's part of what you did when

5   you walked in the store.

6   A.  Signs are very important in our relationship with our

7   customer, because that's what they read when they are looking

8   at a product.

9   Q.  Signs are important.

10  A.  Yes.

11  Q.  Signs are very important to Costco.

12  A.  Of course.

13  Q.  Because you don't price your products individually, right?

14  A.  That's correct.

15  Q.  You use the signs to describe the products you sell.

16  A.  Yes.

17  Q.  And that's the only place there's a product description at

18  Costco that's written by Costco, right, on those white signs?

19  A.  Yes.

20  Q.  So it sounds like besides there being a sign maintenance

21  management issue, there is also a senior management issue

22  concerning signs; would you agree with that?

23  A.  We have certain protocols that we have put in place that

24  we've used the 30 years I'm with the company, and, you know,

25  we, if we have an issue with a protocol, we, we work to change

1   that as fast as we can.  So, yeah, if a mistake is made,

2   ultimately I take responsibility for that, for that sign.

3   Q.  I'm trying to distinguish that between, like I said, the

4   Harry Truman, the buck stops here, and Mr. Schutt who is

5   actually on the floor of Costco looking at these signs and not

6   doing anything about it.  These signs were there.  They existed

7   in physical form.  And they were in the jewelry case.  Yet at

8   no time during all of these thousands of visits was there ever

9   any report from you that somebody should look into the

10  propriety of these signs.  That's my question to you.  That's

11  correct, that never happened, right?

12  A.  We never thought that there was an issue with, with the use

13  of "Tiffany" in our signage.  It never was an issue over, you

14  know, 20 years.

15  Q.  Thank you.  So you didn't think there was an issue, which

16  indicates that you were doing it on purpose: we were putting

17  "Tiffany" in the signs in that way on purpose.  Right?

18  A.  Well, I do know that, you know, since, you know, this came

19  up three years ago, that I could trace back and see what

20  occurred here, the abbreviation that was made.  That was the

21  sign maintenance management issue.  Abbreviation was made.  And

22  I had the opportunity to talk to individuals who were involved

23  with this situation.  And I've looked at sign maintenance

24  records.  So I know how this management issue happened.

25  Q.  Mr. Schutt, Mr. Dabney told the jury the sign said

G9MATIF1ps                    Schutt - direct

1   "setting," then said "set," and then some low-level person at

2   Costco, thousands of levels below you, made some incorrect

3   decision to remove "set" from signage.  You heard that?

4   A.  Yes.

5   Q.  OK.  But the evidence is, Mr. Schutt, that Costco is using

6   a sign variation that said "solitaire Tiffany" without "set,"

7   "setting," or any other modifier as early as 2007.  Right?

8   A.  OK.

9   Q.  So that whole statement that you make about removing

10  wording from signs, these signs didn't have "set" as early as

11  2007, and for all we know go back 20 years, right?

12  A.  I do know that they are --

13  Q.  It's a yes or no, Mr. Schutt.

14  A.  Could you please ask the question.

15  Q.  I said, you understand that the "solitaire Tiffany"

16  designation on a sign, which is a standalone, existed on the

17  floor of Costco since 2007.  Right?

18  A.  Yes.

19  Q.  There's no removal of "setting" or "set" from that, right?

20  A.  No.

21  Q.  OK.  So the whole "set," "setting" story really is a side

22  issue; it's not the main point here.  You understand that?

23  A.  Yes.

24  Q.  So I keep going back to it.  I don't understand why you

25  keep raising it.  If you answer my questions either yes or no,

1   I think we could probably save a little time, because that was

2   not what I was asking you.  You know that.  So please try to

3   answer my questions.

4           Mr. Dabney said in his opening, he corrected me -- I

5   had said in my opening that Costco has 70 million members, and

6   he said, oh, no, no, much more popular than that, 85 million

7   members.  Is that right?

8   A.  Yes.

9   Q.  So it goes without saying, with that many members, that

10  there must be some Tiffany shoppers who also are Costco

11  members, right?

12  A.  Oh, I think so, yeah.

13  Q.  Yeah.  And you wouldn't exclude Tiffany customers from

14  membership with Costco, right?

15  A.  Of course not.

16  Q.  And even you are a Tiffany customer, aren't you?

17  A.  I have bought Tiffany products, my wife has, yes.

18  Q.  And I believe you said earlier that Costco has about 3

19  million shoppers a day that walk through stores.  Is that about

20  right?

21  A.  Yes.

22  Q.  3 million shoppers a day.  Right?

23  A.  Yes again.

24  Q.  So what about the impression left on Costco members who,

25  like you, also shop at Tiffany, weren't interested in buying

1  jewelry, but happened to look into the jewelry case and saw

2  this standalone usage of "Tiffany"?  Wouldn't they have the

3  impression that Costco is selling actual Tiffany merchandise?

4              THE COURT:  Please consult.

5              MR. MITCHELL:  I'll rephrase the question.

6  Q.  You would concede to me, Mr. Schutt, would you not, that

7  when you looked into the jewelry case and saw the ring in its

8  holder, there was no visibility to any markings inside the

9  ring; all you saw was the diamond in the top of the ring

10  itself, right?

11  A.  Yes.

12  Q.  And if a sign said "Tiffany" next to it, to describe that

13  ring, there was nothing in the case that said, either, this is

14  not a real Tiffany ring, or, this is a Kirkland Signature ring,

15  which is your brand.  Right?

16  A.  Yes.

17  Q.  Yes, it did not say that, right?

18              When you say "yes," I said there was something in

19  there that said you suggested that.  I just want to make sure

20  we're clear.  Right?

21  A.  Yes.

22  Q.  So anyone walking past the case, looking into the case, all

23  they would see is the sign that described the product and the

24  product itself.  Right?

25  A.  Yes.

G9MATIF1ps                    Schutt - direct

Q.  And that was visible to Tiffany customers who are Costco

members as well, right?

A.  Yeah.

Q.  Yes?

A.  Yes.

Q.  So I want to just, before I turn to something else, just

finish up this area.  Taking responsibility and changing your

conduct after you're caught, would you agree with me that those

are two different things?

A.  Yeah.

Q.  OK.  So what really happened here was Costco finally got

caught by photographic evidence, using signs in its jewelry

case that use "Tiffany" on a standalone basis.  Correct?

A.  We now know that was being used as a standalone, yes.

Q.  So it's fair to say that once Costco was put on notice that

Tiffany had an investigator who observed this conduct at the

Huntington Beach store, that Costco would take action to

prepare itself for the possibility of a lawsuit.  Right?

A.  Uh, OK.

Q.  OK.  So one of the things you might do to prepare yourself

for a lawsuit is to change your conduct so that things don't

quite look as bad as they may appear.  Would you agree with

that?

A.  Could -- that question isn't clear to me.  Could you, you

say that again, please.

1   Q.  Costco is a big sophisticated company, right?

2   A.  OK.

3   Q.  You hire, you know, you hire lawyers to represent you.  You

4   understand the legal system and lawsuits.  Right?

5   A.  Sure.

6   Q.  So when you're put on notice of a possible lawsuit, the

7   company does things to prepare itself for a possible claim.

8   Right?

9   A.  Sure.

10  Q.  And one of those things might be to modify conduct because

11  it will look better in the lawsuit later unless they don't do

12  that.  Right?

13  A.  I can't speak to that.

14  Q.  You would agree with me, though, that changing your

15  internal practices and becoming more vigilant after you're

16  caught is not the same thing as being vigilant on something you

17  should have been vigilant for already and when you catch a

18  problem, being a standup company and accountable, before

19  there's a lawsuit, right?

20  A.  I think we had an oversight issue and it needed to be

21  corrected.

22  Q.  I will move on to something else.  I want to turn to Costco
    membership if we can.  Mr. Cole, can you pull up DTX 19.

23              I need to hand you up a book.  I'm sorry.
                MR. MITCHELL:  May I hand it up, your Honor?

24              THE COURT:  You may.
                THE WITNESS:  Thank you.

25              (Continued on next page)

1   Q.  Turn in your book, please, to page PTX19.  Are you there?

2   A.  Yes, sir.

3   Q.  Okay.  Do you recognize what PTX19 is?

4   A.  Yes.

5   Q.  Fair to say it's a printout from the Costco website?

6   A.  Yes.

7   Q.  And is this a page on your website which explains to people

8   considering membership why they should become a member of

9   Costco?

10  A.  Yes.

11          MR. MITCHELL:  I offer PTX19 as Plaintiff's Exhibit

12  19.

13          MR. DABNEY:  No objection.

14          THE COURT:  Plaintiff's Exhibit 19 is admitted and may

15  be displayed.

16          (Plaintiff's Exhibit 19 received in evidence)

17          THE COURT:  Just to make sure the projection system is

18  working, would you just put your hand on the ELMO?  Actually,

19  the screens are, the screen is dark.  We're calling the AV

20  department.  The AV department are coming now.  We can take a

21  break for a few minutes -- I'm sorry -- we tried the screen

22  from the ELMO and all the screens are black.  All your screens

23  are black?  There seems to be a problem with the main feed.  So

24  we can either use paper for the examination and publish to the

25  jury or we can take a break of ten minutes and hope that our AV

1    people can get this going.  I wish I knew what the problem was

2    but I don't, that's why I called the AV people.

3            MR. MITCHELL:  I would prefer the latter so the jurors

4    could follow.  We prepared this in a way that the jurors could

5    follow.

6            THE COURT:  All right, so ladies and gentlemen, we'll

7    ask Ms. Ng to escort you back into the jury room and continue

8    to keep your thoughts to yourselves and don't go far because

9    we'll call you back out as soon as we get it fixed.  Thank you.

10           (Jury exits)

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court; jury not present)

2        THE COURT:  Please be seated, everyone.  Now, I do

3   hope this is something simple.  Here are our AV experts, so

4   let's hope we can get this fixed, but one thing I was going to

5   tell counsel, assuming the system can be revived is to let you

6   know or remind you that when the system is working it does have

7   a facility for displaying to the witness and counsel and Court

8   only and not to the jury, and so that is one way you can show a

9   document for authentication purposes and then once it's

10  admitted we can change the feed to show the jury and everybody

11  else.  So --

12        MR. DABNEY:  Thank you, your Honor.

13        THE COURT:  I'll let you know this.

14        MR. MITCHELL:  I'll stick with this formula because

15  I'm used to it, but --

16        THE COURT:  Of course the screens have to show

17  something and that's what we're working on now.

18        (Recess)

19        THE COURT:  Mr. Schutt, if you could come back to the

20  witness stand, everybody else be seated, and I understand the

21  machines are working.  I apologize for the inconvenience.

22  Ms. Ng, please bring the jury in.

23        (Continued on next page)

24

25

1                (In open court; jury present)

2                THE COURT:  Welcome back, ladies and gentlemen of the

3      jury.  We've addressed our technical difficulties.  Please take

4      your seats in the jury box.  Everyone else, please be seated.

5                MR. MITCHELL:  Mr. Cole, please put on the screen,

6      Plaintiff's Exhibit 19.

7      Q.  So, Mr. Schutt, what's now been displayed on the monitor,

8      this is the web page maintained by Costco.  It explains, it

9      says why become a member, right?

10     A.  Yes.

11     Q.  This is Costco's official explanation to the public of why

12     these 85 million people should become members of Costco, right?

13     A.  Correct.

14     Q.  I want to focus in on this paragraph.  "What is Costco?"

15     It says, quote, "We are a membership warehouse club dedicated

16     to bringing our members the best possible prices on quality

17     brand name merchandise."  That's an accurate statement, right?

18     A.  Yes.

19     Q.  So Costco is famous for not only carrying brand-name

20     products but at low prices, right?

21     A.  Yes.

22     Q.  Yes?

23     A.  Yes.

24     Q.  And a lot of what Costco sells are famous brand-name

25     products, right, famous brands?

1    A.  Yes.

2    Q.  Brands we've all heard of; Coke, Charmin, you name it.  All

3    the products, products we hear every day, Costco sells them?

4    A.  Yes.

5    Q.  Now, Costco has also created and developed its own brand,

6    right?

7    A.  Yes.

8    Q.  It's called Kirkland Signature, isn't it?

9    A.  Yes.

10   Q.  And Kirkland Signature products are offered alongside

11   brand-name products for the same product category, right?

12   A.  Yes.

13   Q.  And the idea of Kirkland Signature products is you can get

14   something as good as, if not better than a famous brand at an

15   even lower price if it's Kirkland Signature, right?

16   A.  Yes.

17   Q.  So I'm going to tick off some products and tell me if you

18   agree that these products are sold at Costco under the Kirkland

19   Signature brand.  Wine?

20   A.  Yes.

21   Q.  Eyeglasses?

22   A.  Yes.

23   Q.  Hearing aids?

24   A.  Yes.

25   Q.  Clothing?

1   A.   Yes.

2   Q.   Toiletries?

3   A.   Yes.

4   Q.   Paper goods?

5   A.   Yes.

6   Q.   Food products?

7   A.   Yes.

8   Q.   Over-the-counter drugs?

9   A.   Yes.

10  Q.   Okay.  And that's just a short list.  There's even more,

11  right?

12  A.   Yes.

13  Q.   Okay.  Take a look, if you would, at PTX32.  That is --

14  first of all, is there a publication called the Kirkland

15  Signature Wine Connection?

16  A.   We have a magazine that we publish that's called "The

17  Connection".

18  Q.   So is this a photograph of a page from the Kirkland

19  Signature Connection?

20  A.   Yes.

21          MR. MITCHELL:  I'll offer Plaintiff's Exhibit 41.

22          MR. DABNEY:  No objection.

23          THE COURT:  I'm sorry, you said 41?  32?

24          MR. MITCHELL:  I'm sorry, wrong number, that was the

25  deposition number.  32, PTX32.

1            THE COURT:  Plaintiff's Exhibit 32 is admitted and may

2   be displayed.

3            (Plaintiff's Exhibit 32 received in evidence)

4   Q.  So Plaintiff's Exhibit 32 is a photograph of a bottle of

5   wine labeled Kirkland Signature, right?

6   A.  Yes.

7   Q.  And this is the way you label the wine, it clearly says

8   "Kirkland Signature" on the wine bottle, right, the wine label?

9   A.  Yes.

10  Q.  Could you take a look at PTX33, please?  It's a photograph

11  of Kirkland Signature eyeglasses, right?  If you look at the

12  stem you'll see the word there?

13  A.  Yes.

14            MR. MITCHELL:  I'll offer PTX33 as Plaintiff's Exhibit

15  33.

16            MR. DABNEY:  No objection.

17            THE COURT:  PTX33 is admitted in evidence and may be

18  displayed.

19            (Plaintiff's Exhibit 33 received in evidence)

20  Q.  And if I circle right here, this is where it says "Kirkland

21  Signature" on the stem of the eyeglasses, correct?

22  A.  Yes.

23  Q.  So the product is clearly marked that it's a Kirkland

24  Signature product, right?

25  A.  Yes.

1  Q.  Take a look at PTX34, if you would.  It's a paragraph of an

2  eyeglass case, right?

3  A.  Yes, it is.

4         MR. MITCHELL:  I offer PTX34.

5         MR. DABNEY:  No objection.

6         THE COURT:  Plaintiff's Exhibit 34 is admitted and may

7  be displayed.

8         (Plaintiff's Exhibit 34 received in evidence)

9  Q.  This is the case that the eyeglasses come in, clearly

10  marked "Kirkland Signature" on the case, right?

11  A.  Yes.

12  Q.  In fact, isn't it true that there's almost nothing that

13  Costco sells -- let me ask a preliminary question first.  These

14  products, these Kirkland Signature products are often made by

15  outside vendors to Costco specifications, right?

16  A.  Yes.

17  Q.  So you communicate with the vendor about what you want, the

18  vendor makes the product for you and delivers it with the

19  Kirkland Signature name on it, correct?

20  A.  Yes.

21  Q.  So you -- there's another product.  I mentioned in my

22  opening Tylenol and Advil, did you hear that?

23  A.  Yes.

24  Q.  Costco also makes painkillers or has painkillers made for

25  it by an outside vendor, right?

1    A.   Yes.

2    Q.   So you know acetaminophen is in Tylenol, right?

3    A.   Yes.

4    Q.   And ibuprofen is the active ingredient in Advil?

5    A.   Yes.

6    Q.   The over-the-counter painkiller that Costco makes with

7    ibuprofen or acetaminophen, you'd label that Kirkland

8    Signature, correct?

9    A.   Yes.

10   Q.   Defendant's Exhibit 19, which is the box in which the rings

11   at issue in this case came, has no markings at all, right?

12   Nothing.  Do you want me to hand it to you?

13   A.   No.  I'm familiar with that box.  It's a generic box.

14   Q.   Generic box.  Totally blank, right?

15   A.   Yes.

16   Q.   No brand name on the inside or the outside, right?

17   A.   Correct.

18   Q.   And the inner box, this inner box here also plain.

19   A.   Yes.

20   Q.   Right?

21   A.   Yes.

22   Q.   You don't even put "Costco" or "Kirkland Signature" on the

23   inside part of the box, right?

24   A.   No.

25   Q.   So unlike eyeglasses, hearing aids, over-the-counter

1    medications, paper products, these rings came in plain

2    packaging with no branding on them whatsoever, right?

3    A.   Yes.

4    Q.   So the only place that a brand name appeared in connection

5    with these rings was on the signs that had Tiffany being used

6    as a standalone in the jewelry case, correct?

7    A.   Just clarify for me.  When you say "these rings," could you

8    clarify?

9    Q.   We're talking about in this case about the standalone use

10   of "Tiffany" in signage next to rings, right?

11   A.   Yes.

12   Q.   So we already saw photographs of the rings, there was no

13   Costco signature even printed on the inside of the ring?

14   A.   On the pictures we looked at yesterday?  Yes.

15   Q.   Yes, there was no brand on those rings?  You didn't put

16   Kirkland Signature on them?

17   A.   No, there's just the manufacturer's emblem or trademark.

18   Q.   Didn't say Kirkland Signature?

19   A.   It did not.

20   Q.   Okay.  And these vendors, like all your other vendors who

21   make Kirkland Signature products, could have put Kirkland

22   Signature on this product had you asked them to do it, correct?

23   A.   We don't have Kirkland Signature branded jewelry, but I

24   think our vendors if we asked them, they would do it.

25   Q.   Right, they would do it.  Why wouldn't they?  You could

1    also put Kirkland Signature on your boxes, right?

2    A.   Sure.

3    Q.   But nobody really wants to get a Kirkland Signature

4    engagement ring probably.  That's probably why you don't do it,

5    right?

6    A.   No.

7    Q.   And this Kirkland Signature brand that you have is now a

8    pretty big brand, right?

9    A.   Yes.

10   Q.   $15 billion a year, is that right?

11   A.   No, you're way off.

12   Q.   Is it even bigger?

13   A.   Oh, yes.

14   Q.   Even bigger than 15 billion a year.  How big is it?

15   A.   I think this past fiscal year our sales on a Kirkland

16   Signature product exceeded $32 billion, not including the

17   gasoline, which we put our name on the gasoline.

18   Q.   So you have created within the four walls of Costco on this

19   model of selling memberships in order to sell branded products

20   at a discount, you've also on the back of that built this giant

21   branded house brand, Kirkland Signature, right?

22   A.   Yes.

23   Q.   So the growth of Kirkland Signature, which is now over

24   $30 billion, owes a lot to branded products that you also sell

25   at Costco at a discount, right?

1   A.  It many times allows us to have a price comparison with the

2   leading national brand, yes.

3   Q.  Right.  And if you just opened Costco at the beginning, you

4   filled it with Kirkland Signature products, nobody would have

5   known what it was, right?

6   A.  Hmm, no.

7   Q.  It took years to build that brand, right?

8   A.  It started in 1995.

9   Q.  Now, if you would turn to tab 14 --

10          MR. MITCHELL:  Your Honor, did I offer Plaintiff's

11  Exhibit 34?

12          THE COURT:  Yes.  That was admitted.

13  Q.  Let's turn to PTX14 in your book.  And, Mr. Schutt, this is

14  Plaintiff's Exhibit 14 which is in evidence and if you would,

15  would you please turn to the page Bates stamped 14.0014.

16          THE COURT:  Do you have an objection or desire to

17  consult?

18          MR. DABNEY:  Yes, your Honor.

19          THE COURT:  Would you please consult?  It's helpful if

20  you just say "objection."

21  Q.  I'm sorry, could you go to 15.  PTX14.0015.  This is a page

22  from Plaintiff's Exhibit 14.

23          MR. MITCHELL:  Mr. Cole, can you please blow that

24  paragraph up?

25  Q.  Now, this is a section of your 2012 annual report which is

1    the year in which this -- right around the time that this

2    dispute arose, and you said in your publicly filed annual

3    report, "We rely on trademark and copyright laws, trade secret

4    protection and confidentiality and license agreements with our

5    suppliers, employees and others to protect our proprietary

6    rights."

7              You, Costco as a company, made a public statement that

8    when it comes to the Kirkland Signature brand that it takes

9    action to protect its own trademark rights, correct?

10   A.  Of course.

11   Q.  So when it comes to Costco, if somebody improperly uses

12   your trademark Kirkland Signature you will take action against

13   those people, that's the purpose of that statement, right?

14   A.  Sure.

15   Q.  Do you have a standard markup for Kirkland Signature

16   products?

17   A.  We put a limit on how high a buyer could, or we would

18   approve as an initial markup, which is referred to as our IMU,

19   yes.

20   Q.  And what is the, markup is the difference between what you

21   pay for a product and what you sell it for?

22   A.  Including all the costs included with -- transportation,

23   manufacturing and packaging all that kind of thing.  That all

24   rolls up into the net landed cost of the product and then our

25   sell price off that will give it your initial markup, which is

1    your IMU.

2    Q.  On a percentage basis, on a percentage basis, so it doesn't

3    need to be a speech, just the percentage, what is the standard

4    percentage that you mark up Kirkland Signature product?

5    A.  No more than 15 percent.

6    Q.  Is that markup different than the markup you use for

7    jewelry?

8    A.  That ceiling is different because --

9    Q.  Just the question.  Is it different?  I can follow up if I

10   want to follow up.  Is there a different markup on jewelry?

11   A.  Yes.

12   Q.  And what is, if you know, the average standard markup for

13   jewelry products?

14   A.  I do not know the standard markup because it varies by

15   item.

16   Q.  Do you dispute Mr. Kaczmarek's testimony yesterday that

17   Costco generally marks up its jewelry products about

18   13 percent?

19   A.  That's not accurate.

20   Q.  It's not accurate.

21   A.  Not accurate.

22   Q.  Is it close?  I mean, if we were talking about multibillion

23   dollar companies here, are we off by 10 percent, 20 percent or

24   like 1 percent?

25   A.  He's off by about 200 basis points, so I think our average

1   gross margin on our product is roughly 10-1/2, 11 percent,

2   somewhere in there.

3   Q.   So he said 13 and you're saying 10-1/2, 11.

4   A.   Approximately, yes.

5   Q.   Now, Mr. Kaczmarek also said that the markup at Costco is

6   less than what you would find in a normal retail store.  Do you

7   agree with that?

8   A.   Yes.

9   Q.   And do you know what the standard or ordinary markup is in

10  an ordinary jewelry store that doesn't charge members, that's

11  just in a shopping center, street store?  Do you have any idea?

12  A.   Roughly.

13  Q.   What would that percentage be?

14  A.   I would say probably in the 50 percent to 100 percent

15  markup range.

16  Q.   So the jury understands that distinction, if I buy a

17  product for $10 -- let's say it costs me $10 to put a product

18  on my shelves, how much would I be selling it for if the

19  product had a 50 percent markup?

20  A.   Did you say $10?

21  Q.   $10.

22  A.   So a 50 percent markup would be half of that, so it would

23  be a $5 gross margin dollar amount, that's how you get the

24  50 percent.

25  Q.   That's a 50 percent?

1    A.  Yes.

2    Q.  So in that circumstance, in a 50 percent markup, the

3    product I paid $10 to acquire would be sold in my store for

4    $15, correct?

5    A.  Yes.

6    Q.  And my profit over the cost of the goods is $5?

7    A.  Yes.

8    Q.  You said sometimes it's a hundred percent.  If I buy that

9    product and sell it on my shelves for $10, what's the sale

10   price for that product in the store?

11   A.  That would be a hundred percent markup, which would be $20.

12   Q.  So that would be $10 profit on the acquisition cost of that

13   product?

14   A.  Yes.

15   Q.  And in the jewelry industry, the run-of-the-mill stores

16   that sell jewelry mark their products up between 50 and

17   100 percent?

18   A.  That would be my estimation.

19   Q.  Mr. Kaczmarek said that no ordinary retailer that doesn't

20   have membership fees to supplement its income, that it couldn't

21   survive on a 13 percent markup.  Do you agree with that?

22   A.  I don't know.  It depends on if they are a low-cost

23   operator and manage their expenses it could be done.

24   Q.  It would be pretty hard, right?

25   A.  It's hard.

1   Q.  Your business model of charging the membership fee to stop

2   at your store is one of the things that enables you to charge

3   less of a markup on the individual products you sell, right?

4   A.  Yes.

5   Q.  Now, Costco stores in their physical appearance, for the

6   jurors who have never been in a Costco, these look like big,

7   giant warehouses, right?

8   A.  They average 155,000 square feet in size.

9   Q.  The typical look is a high, very high ceiling like a

10  warehouse, right?

11  A.  Yes.

12  Q.  An industrial enclosure with, you could see the beams,

13  cinderblock walls, things like that, right?

14  A.  You bet.

15  Q.  Concrete floors?

16  A.  Absolutely.

17  Q.  You have 30-foot metal shelving, right?

18  A.  It's not 30 feet, but it's tall.

19  Q.  Tall.  You need a forklift to get products down from the

20  top, right?

21  A.  And to put it up, sure.

22  Q.  So even with the customers all walking around, you've got

23  people driving forklifts with pallets full of products, right?

24  A.  Of course.

25  Q.  And your business model as a general matter is that you

1    sell products by the pallet full.  I'm talking about you take

2    forklifts, they are filled, if I'm standing here they're

3    probably filled as high as five feet, and you put them beneath

4    the shelves and people take them and when they're empty you put

5    another pallet, right?

6    A.  Yes.

7    Q.  That's most of what you sell, right?

8    A.  Selling product by the pallet?

9    Q.  Yes.

10   A.  Yes.

11   Q.  Okay.  And your business system is that you have giant

12   tractor trailer loads of those pallets of products delivered to

13   these warehouses and those pallet fulls of product are then put

14   on the warehouse floor, sold and you bring in another truck and

15   replace it, right?

16   A.  Hopefully.

17   Q.  Well, you do $100 billion a year in sales, right?

18   A.  More than that.

19   Q.  More than that.  How much more?

20   A.  I think last year was roughly 120 something million --

21   billion, excuse me, in sales.

22   Q.  So 120 billion?  So your business -- obviously, this is the

23   heart of your business, right, selling large amounts of product

24   by the pallet full, right?  That's the heart of the business.

25   A.  Hopefully we have items that do that, yes.

1    Q.  Well you limit the number of items that you sell at any

2    given time, right?  So of those you have about 3,000 standard

3    products, right?

4    A.  It's actually 4,000.

5    Q.  4,000, but 3,000 are pretty much there all the time, right?

6    A.  It's actually our SKU counts, which is our stock keeping

7    units, our average per warehouse is roughly 4,000 different

8    items, and that includes tires, apparel, meat.

9    Q.  I assume because you're bringing in such giant a amount of

10   product it takes up a lot of space, that you keep track of

11   what's selling, right?

12   A.  Of course.

13   Q.  And if something is not selling it gets the boot.

14   A.  Yes.

15   Q.  So you're saying you hope to sell that amount of product

16   but you're watching it closely to make sure that if you're

17   devoting floor space in your giant warehouse to pallets of

18   product that that product is moving.

19   A.  Okay.

20   Q.  Yes?

21   A.  Yes.

22   Q.  Costco is not in the business of keeping stale merchandise

23   around?

24   A.  Any business.  Of course Costco is not.

25   Q.  Isn't it true that in many ways Costco is just like a super

1    supermarket?  A lot of the products you sell are also in

2    supermarkets but in smaller quantities, right?

3    A.  Yes.

4    Q.  And most of the floor space in a Costco is devoted to

5    household items, food products, the kinds of things you would

6    ordinarily go to a supermarket for, right?

7    A.  Oh, I'd say about 60 percent is food, sundries and fresh

8    and then the other 40 percent roughly is what we refer to as

9    non-foods products.

10   Q.  But now supermarkets also have pharmaceutical and sundries

11   areas.  You have that too, right?

12   A.  Of course.

13   Q.  And then a portion of your floor space is devoted to other

14   things; computers, televisions, GPS devices, jewelry among

15   them, right?

16   A.  Yes.

17   Q.  Would you turn in your book to the page stamped PTX29.  If

18   you flip through PTX29 you'll see photographs of some signs.

19   Could you identify those as being signs generated at Costco?

20   A.  Sure.  I want to make sure I'm looking at the right thing.

21   On the first page here I have Sony as the first thing on that

22   sign.

23   Q.  Yes.

24   A.  Yes.

25              MR. MITCHELL:  I'd offer PTX29.

1          MR. DABNEY:  No objection.

2          THE COURT:  PTX29 is admitted in evidence and may be

3     displayed.

4          (Plaintiff's Exhibit 29 received in evidence)

5          MR. MITCHELL:  Mr. Cole, can you just flip through

6     that for the jurors?

7     Q.  So Costco uses these little white cards in varying sizes,

8     depending upon the location so you can seed them, throughout

9     its warehouses to display what it's selling and what the price

10    of it is, right?

11    A.  Yes.

12    Q.  And virtually every one of these signs in one form or

13    another has a brand name on it, right?

14    A.  Yeah.  All of them have a brand name as the first word on

15    the top line, yes, that I see so far here.

16    Q.  I know you want to make that point.  My question was

17    simpler than that.  They all have a brand name on them,

18    correct?

19    A.  Yes.

20    Q.  And all Costco members know that the little white signs

21    identify the products that you're selling by brand and price,

22    right?

23    A.  They've been trained over the last 34 years to do that,

24    yes.

25    Q.  You don't train them in how you write your signs; they know

1    the white signs are there, right?

2    A.   Of course.

3    Q.   There's no training manual that you send to your customers

4    when they become your customer, "this is how we say it in the

5    sign," do you?

6    A.   No.

7    Q.   So what the customers know is the signs have a brand on

8    them; that's what they know, right?

9    A.   Sure.

10   Q.   And if it's a Kirkland Signature product, the sign would

11   say "Kirkland Signature," right?

12   A.   It should be on the first line on that sign, yes.

13   Q.   So even when it comes to the Kirkland Signature brand, you

14   put the Kirkland Signature brand on it.  That's your practice?

15   A.   That's our protocol.

16   Q.   Right.  Now, Costco also sells some luxury or high-end

17   brand products, right.

18   A.   Also.

19   Q.   In addition to this run-of-the-mill supermarket

20   by-the-pallet-full quantities of stuff, Costco also sells small

21   amounts of some brand-name products, right?

22   A.   Yes.

23   Q.   You don't sell those by the pallet full, right?

24   A.   No.

25   Q.   So Costco has sold Louis Vuitton, right?

1   A.  Yes.

2   Q.  Costco has sold Prada, right?

3   A.  Yes.

4   Q.  Costco has sold Armani?

5   A.  Yes.

6   Q.  Costco has even sold Tiffany sunglasses, right?

7   A.  Yes.

8           MR. MITCHELL:  Mr. Cole, can you please pull up from

9   PTX65, page 65.002.  And if you would, would you blow up, I'm

10  sorry, I've got some -- okay.  If you can, can you blow that

11  picture up?  Okay.

12  Q.  This is a photograph that's part of Plaintiff's Exhibit 65.

13  Is that a photograph of the Costco standard jewelry case?

14  A.  Is that in my book?  Because this is kind of blurry and

15  sideways.

16  Q.  No, it's not.  Mr. Dabney asked that I not use the one in

17  the book, so I'm using this one.

18  A.  Yes.

19  Q.  So the jury can understand.  First, you can see a little

20  bit of the warehouse, the concrete floor, the high ceilings,

21  the poles, the unfinished look, correct?

22  A.  Yes.

23  Q.  The jewelry case, first of all, is made of glass, right?

24  A.  Yes.

25  Q.  And it's locked.

1    A.  You bet.

2    Q.  Right.  The portion, there's a lower portion and an upper

3    portion.  There's a setback wedding cake-like portion on the

4    top.  That's the section where you sell watches, right?

5    A.  Typically it's almost all watches.  There's a couple of

6    other things in there occasionally.  Yes.

7    Q.  And on one end of this jewelry case, on the bottom portion,

8    if you look down this way, you have fine jewelry, correct?

9    A.  Yes.

10   Q.  And on the portion above the fine jewelry, maybe there or

11   right around the corner, you'll have high-end watches, right?

12   A.  Yes.

13   Q.  So your most expensive watches sit right above your

14   high-end jewelry, right?

15   A.  Yes.

16   Q.  Okay.

17   A.  Yes.

18   Q.  And some of the high-end watches you sell, Rolex?

19   A.  Yes.

20   Q.  Cartier?

21   A.  You bet.

22   Q.  Is that a yes?

23   A.  Yes.

24   Q.  Breitling?

25   A.  Yes.

1   Q.  TAG Heuer?

2   A.  Yes.

3   Q.  Others.  Chanel?  Might be others?

4   A.  Yes.

5   Q.  Would you agree with me that those branded watches have a

6   reputation for high quality and craftsmanship?

7   A.  Yes.

8   Q.  And would you agree with me that they are generally

9   considered luxury brands?

10  A.  Yes.

11  Q.  Same for Louis Vuitton, Prada, Armani, Tiffany with the

12  sunglasses, all those are luxury brands?

13  A.  Yes.

14  Q.  Now, none of these items is a high volume item at Costco,

15  right?

16  A.  Not relative to a lot of other items, no.

17  Q.  Insignificant these particular items to the overall bottom

18  line of 120 billion, I think you said, right?

19  A.  Yes.

20  Q.  Infinitesimal in the scheme of things, right?

21  A.  We'd like to get more.

22  Q.  Right, but it's infinitesimal now?

23  A.  Yes.

24  Q.  The signs that use Tiffany as a standalone in the jewelry

25  case, those signs were sold right next to where all of these

1    branded watches were also sold, weren't they?

2    A.   I would expect that to be true, yes.

3    Q.   Well that would be the only place -- the only place you put

4    your high-end jewelry is right next to where you put your

5    branded watches, correct?

6    A.   Yes.

7    Q.   Isn't it true that your management of how this whole

8    jewelry arrangement was supposed to be set up, I'm talking

9    about the jewelry counter arrangement, is that each store was

10   given a schematic; high-end jewelry goes on the end, expensive

11   branded watches go in a certain portion of the case, and you

12   didn't leave it to each store to decide how these items would

13   be displayed, right?

14   A.   They had autonomy but we gave a recommended layout to our

15   locations.

16   Q.   But when you would walk into the store to visit stores you

17   would walk past that counter and see things were displayed the

18   way they were supposed to be which is expensive watches near

19   the high-end jewelry, right?

20   A.   Sure.

21   Q.   That was yes?

22   A.   Yes.

23   Q.   Now, the products, the branded products, these luxury

24   branded products that I just mentioned to you, none of them

25   sell directly to Costco for you to sell their products in

G9FMTIF2                    Schutt - direct

1   stores, right?

2   A.  There's one that I should clarify, if I can.

3   Q.  What brand?  Just give me the brand.

4   A.  TAG Heuer sold us direct at a time.

5   Q.  One -- at a time.  They no longer do?

6   A.  I'm not sure.

7   Q.  So other than TAG Heuer, Louis Vuitton, Tiffany, Armani,

8   Prada, that whole list, none of them sell you directly?

9   A.  No, they don't.

10  Q.  And Costco gets these products from companies that don't

11  sell to them directly from secret sources, right?

12  A.  Secret sources?

13  Q.  Yes.

14  A.  Yes.

15  Q.  And you have people all over the world looking on your

16  behalf to see if they can find some of this high-end branded

17  stuff so you can sell it in your store at a discount, right?

18  A.  Yes.

19  Q.  A lot of the things that these people find might be in

20  Europe, Asia, you name it, right?

21  A.  I think so.

22  Q.  And you don't get a lot of this stuff, it's usually either

23  outdated or there's some, it's leftover goods from someplace,

24  bankruptcy sales, who knows what the thing, but this is not

25  necessarily current merchandise, right?

1    A.  Not all the time.  Sometimes it's current, sometimes it's

2    not.

3    Q.  A lot of times it's not, right?  Maybe not that old, but a

4    little old?

5    A.  Old is a relative term, but okay.

6    Q.  Okay.  One season or two seasons old.

7    A.  I have -- okay.

8    Q.  Okay.  So you don't get enough of these products from these

9    secret sources to fill every one of your stores with that

10   particular product, right?

11   A.  No.

12   Q.  So what you really get are small quantities, certainly

13   relatively small quantities of whatever it is that you're able

14   to find, right?

15   A.  Yes.

16   Q.  And then you take whatever you find and you distribute it

17   here and there to your various stores so you'll have a few

18   stores, maybe more than that if you're able to get a hundred

19   watches, who knows, but you're going to have, some of your

20   stores are going to have some of these products in small

21   quantities, right?

22   A.  Yes.

23   Q.  And it's not a lot of stuff, so for the overall scheme of

24   things for Costco, it's very small in terms of the profit that

25   you're going to make from selling these small quantities of

1    goods.  I mean, is a hundred -- let's say a hundred watches, is

2    that a typical quantity, let's say?

3    A.  It depends, you know.  I'll say yes because it could be

4    more, could be less.

5    Q.  I mean Rolex, you're not getting thousands of Rolexes.

6    A.  We're not getting a hundred of them.

7    Q.  Pardon me?

8    A.  We're not getting a hundred of those.

9    Q.  How many Rolexes would you get?

10   A.  I can't really say a number.  It varies by time of year.

11   Q.  Less than a hundred?

12   A.  Less than a hundred.

13   Q.  Cartier less than a hundred?

14   A.  Depending on the time of year, yes.

15   Q.  So you're basically sending one watch to that warehouse,

16   one watch to that warehouse and a few of your warehouses will

17   have Cartier, some will have Rolex, a few have Louis Vuitton

18   bags -- you're not getting a thousand of those, they don't make

19   a thousand.  So a few of those?

20   A.  Yes.

21   Q.  Costco uses these branded products in something it calls

22   the treasure hunt, right?

23   A.  There are a lot of products that are used in what we call

24   our treasure hunt, but those particular brands would be part of

25   that concept, sure.

1  Q.  And the treasure hunt is something you use to surprise your

2  members, right?

3  A.  I think it's a big reason why our members shop with us.

4  Q.  Big reason why your members shop.  You'll be surprised?

5  A.  Sure.

6  Q.  You walk into a Costco and maybe you'll find a Louis

7  Vuitton bag, right?

8  A.  Yes.

9  Q.  And since you don't get many, it depends on what Costco you

10  go to, like playing the lotto, if you walk into the right

11  Costco --

12  A.  Winning the lottery.

13  Q.  Winning the lottery.  So I go to Costco one day, I walk in

14  and my God, I'm wearing a Rolex, I see there's my Rolex, and

15  it's expensive, and you only have one.  It's in the Costco in

16  Brooklyn, but I happen to walk into the Costco in Brooklyn that

17  day and it was sitting there.  My lucky day, right?

18  A.  Yes.

19  Q.  And if I walked into the wrong Costco on that day I

20  wouldn't have seen a Rolex watch?

21  A.  No.

22  Q.  That's the concept of the treasure hunt, right?

23  A.  Part of it.

24  Q.  You never know what prices you're going to find when you

25  walk into a Costco?

1    A.  You're getting me excited, yes.

2    Q.  Right.  Keep being excited.  Now, let's get back to the

3    watches for a moment that are a part of this treasure hunt.

4            You're not an authorized, you being Costco, you're not

5    an authorized distributor of Cartier or Rolex watches, correct?

6    A.  We don't sell anything we can't legally -- we don't buy

7    anything we can't legally sell.

8    Q.  I'm not talking about legally sell, but if I buy, for

9    example, if I buy a Cartier watch from Cartier, a Cartier store

10   on Fifth Avenue, I get a Cartier warranty with that watch,

11   right?

12   A.  Yes.

13   Q.  The watches, the Cartier watches you sell do not come with

14   a Cartier warranty, right?

15   A.  No.

16   Q.  No, meaning they don't?

17   A.  No, they don't.

18   Q.  So you are selling these -- I'm not trying to cast

19   aspersions.  I want the jury to understand I'm not saying

20   there's anything wrong with this.  I'm saying you are selling

21   watches outside the ordinary source of distribution of these

22   luxury brands, right?

23   A.  Yes.

24            (Continued next page)

25

1   Q.  And because you're not an authorized -- and I'm using it

2   not that you're not allowed to sell it, but you're not one of

3   the network of dealers that are authorized -- because you're

4   not an authorized seller, those brands don't offer their own

5   company warrantee for these products.  Right?

6   A.  Yes.

7   Q.  Now, if you would, please turn to PTX 117 in your book.  Is

8   this a sign that Costco posts on its jewelry counters at each

9   of its stores?

10  A.  Yes.

11          MR. MITCHELL:  I offer Plaintiff's Exhibit 117.

12          MR. DABNEY:  No objection, your Honor.

13          THE COURT:  Plaintiff's 117 is admitted and may be

14  published.

15          (Plaintiff's Exhibit 117 received in evidence)

16  Q.  So let's look at this for a moment.  This is a customer

17  satisfaction policy you post at the jewelry counters of each of

18  your stores, right?

19  A.  It should be there.

20  Q.  And you post this to tell your customers that you may be

21  acquiring these watches outside the ordinary course of

22  distribution of these companies.  Right?

23  A.  Yes.

24  Q.  And these companies may not honor a warrantee or they may

25  not provide you with warrantee service if you need it.  Right?

G9MATIF3ps                    Schutt - direct

1    A.   Yes.

2    Q.   And that if there is a problem, Costco will take care of

3    the problem.   Right?

4    A.   You bet.

5    Q.   Right.   Yes.

6    A.   Yes, you bet.

7    Q.   OK.   So you're also telling your customers with this

8    customer satisfaction policy that you're working hard for them,

9    looking for the best possible prices on the best stuff you can

10   find, but sometimes you find this stuff in places that the

11   manufacturers wouldn't themselves have authorized you to get it

12   from, right?

13   A.   Yeah.

14   Q.   And you're saying, even though we found these items from

15   your secret sources, since the manufacturers won't stand behind

16   it, don't worry, Costco will.   Right?

17   A.   Yes.

18   Q.   So you tell your customers, in each and every one of your

19   stores, that you are out there scouring the world for these

20   outside-of-the-ordinary-course-of-distribution branded items so

21   that you can offer them in your store.   Right?

22   A.   Yeah.

23   Q.   OK.

24        MR. MITCHELL:   Mr. Cole, can we turn back to

25   Plaintiff's Exhibit 14 -- I'm sorry.   Can I offer -- I didn't

1   offer -- I did offer it.  Sorry.

2            THE COURT:  117 has been admitted.

3            MR. MITCHELL:  Has been admitted already.

4   Q.  Could I direct your attention to Plaintiff's PTX 144.006.

5   A.  Could you give me that number again, please.

6   Q.  I'm just going to post it to your screen.

7   A.  OK.

8            THE COURT:  And when you said 006, that's a reference

9   to --

10           MR. MITCHELL:  That's the page number.

11           THE COURT:  -- a page within Exhibit 14?

12           MR. MITCHELL:  Yes.  It's actually the annual report,

13  page 4, but the number on the bottom is PTX 14.006.  Thank you,

14  your Honor.

15           THE COURT:  Thank you.

16           MR. MITCHELL:  Could we go down to this paragraph

17  right here, the one thing it's all about.

18  Q.  Now, in your annual report, you reported to the public in

19  your 2012 annual report, "Although we continue to expand our

20  Kirkland Signature merchandise offerings, we also continue to

21  bring our members the latest, most interesting brand name

22  merchandise at exceptional values.  This kind of merchandise

23  not only sells well but helps create a 'buzz' among our

24  members."  Is that buzz you're looking to create something that

25  you used the treasure hunt for?

1    A.  Yes.

2    Q.  I think you said, I think your words were, you want to make

3    your members excited.

4    A.  I got a -- I was getting excited, yes.

5    Q.  You were getting excited.

6    A.  The way you were describing it, I mean.

7    Q.  It's that exciting, the treasure hunt.

8    A.  I'm excited about this company, yes.

9    Q.  OK, great.  Was it your idea?

10   A.  Which part?

11   Q.  The treasure hunt was your idea?

12   A.  No.

13   Q.  The treasure hunt is not about selling, or making profit on

14   the sale of these small amounts of items themselves, right?

15   A.  We like, you know, we try not to sell anything below cost,

16   so we do want to make money on anything we sell, of course.

17   Q.  Right.  But it's not, in the scheme of a $120 billion

18   company, it's nothing, right?

19   A.  Not to the bottom line.

20   Q.  Yes.  So it's about the buzz, right?

21   A.  Sure.

22   Q.  Get people into your stores.  Right?

23   A.  Sure.

24   Q.  Come back, check and see if there's a surprise for you

25   today.  Right?

1   A.  Renew your membership.

2   Q.  Renew your membership.

3   A.  Sure.

4   Q.  Right?  Got a call from a friend who went to the Costco in

5   Rockaway and said, you won't believe what I found here.

6   Somebody goes to the Costco in, I don't know, somewhere in New

7   Jersey, and checks their store to see if they find the same

8   thing.  That kind of stuff, right?

9   A.  Right.

10  Q.  That's part of the buzz.  You won't believe what I found at

11  Costco.

12  A.  Yes.

13  Q.  And these treasure hunt items are part of that whole

14  marketing strategy of getting people into your stores more

15  often.  Right?

16  A.  Yes.

17  Q.  You don't want people just coming in when they need toilet

18  paper and paper towels or soda.  You want them to come in in

19  between those visits, right?

20  A.  We want them to buy every time they come.

21  Q.  Right.  Drive by and stop in.  Right?

22  A.  Sure.

23  Q.  Maybe you'll be surprised.

24  A.  OK.

25  Q.  Yes?

G9MATIF3ps                    Schutt - direct

1    A.  Yes.

2              THE COURT:  Mr. Schutt, could you just keep your voice

3    up a bit more.

4              THE WITNESS:  You bet.  Is that better?

5              THE COURT:  Yes.  Thank you.

6              THE WITNESS:  OK.  Sorry.

7    Q.  Now, would you turn, Mr. Schutt, to PTX 20 in your book.

8    This is a standard Costco store layout, correct?

9    A.  Yes.

10   Q.  It's called, you call it a master, call it a master layout

11   for a certain type of store, correct?

12   A.  Yes.

13             MR. MITCHELL:  I offer Plaintiff's Exhibit 20.

14             MR. DABNEY:  No objection, your Honor.

15             THE COURT:  Plaintiff's Exhibit 20 is admitted and may

16   be displayed.

17             (Plaintiff's Exhibit 20 received in evidence)

18             MR. MITCHELL:  Mr. Cole, can we just enlarge it as

19   much as we can on the screen.  No, not that large, too close.

20   Just so it fills the screen but doesn't -- just so this part,

21   that part fills the screen.  Right there, thank you, perfect.

22   Excellent.

23   Q.  OK.  So the jury understands the Costco layout, because

24   this is all -- at Costco you think through a lot, don't you,

25   about marketing, merchandising, and selling products?

G9MATIF3ps                    Schutt - direct

1    A.  Yes.

2    Q.  You don't get to be number two in the United States without

3    doing that.  Right?

4    A.  Of course not.

5    Q.  OK.  So first over here, in this particular -- and it may

6    be more clear for you in the book, because I think the book is

7    probably -- it's the same documents.  You might want to refer

8    to the paper copy.  But if you look at the screen, this right

9    here, that solid line, that is a fence that you put in every

10   Costco at the entrance, correct?

11   A.  Yes.

12   Q.  So on this side of the fence, that's the way in.  That's

13   supposed to be an arrow.  And on this side of the fence is the

14   way out.  Right?

15   A.  Yes.

16   Q.  These are your cash registers.  Right?

17   A.  Yes.

18   Q.  So the traffic flow is intended to be in, around, and then

19   back that way.  Right?

20   A.  Generally, yes.

21   Q.  Yes.  And there's no other way in.  You've got to go in

22   that way, past the fence, into the store on that ail, in every

23   store.  Right?

24   A.  Yes.

25   Q.  And on the way in you have to show a membership card to get

1    in.  Right?

2    A.  Yes.

3    Q.  OK.  Now, if we can, let's go to PTX 21.  Mr. Schutt,

4    that's just an enlargement of the entryway.  You see that?

5    A.  I see that.

6              MR. MITCHELL:  We offer PTX 21.

7              MR. DABNEY:  No objection, your Honor.

8              THE COURT:  PTX 21 is admitted and may be displayed.

9              (Plaintiff's Exhibit 21 received in evidence)

10   Q.  So, again, you may prefer the paper copy just so you can

11   read it.  This now shows, in a closeup, the entryway.  So as

12   you come in the store in this particular layout -- this is your

13   master layout -- this is your main aisle.  Right?

14   A.  Yes.

15   Q.  And in this, in the master plan, this is your high-end

16   jewelry counter, right?  That's your jewelry counter.

17   A.  That's typically where it's put, yes.

18   Q.  Right on the maybe aisle, right by the entrance, right?

19   A.  Yes.

20   Q.  And the high-end jewelry sits in the end, or at the end of

21   that jewelry display counter, facing the main aisle.  That's a

22   requirement of your standard layout for the jewelry counter.

23   Right?

24   A.  Yes.

25   Q.  OK.  So the intention that Costco has, in walking into all

1   of these stores, is that members entering the store will come

2   in the main aisle and pass the high-end jewelry counter on the

3   way in.  Right?

4   A.  Yes.

5   Q.  And can you give the jury just an idea of this high-end

6   counter, a price range of products that you'll put in that

7   counter.

8   A.  In the whole case?

9   Q.  No, just in the end, just a high-end end cap where you put

10  the most expensive stuff.

11  A.  I would say generally speaking that's where our diamonds

12  are.  I would say the prices would range from a couple thousand

13  to, the highest, $250,000.

14  Q.  In that case.

15  A.  Yes.

16  Q.  So a lot of $250,000 rings.

17  A.  No.

18  Q.  They're to catch the eye, right?

19  A.  Offering a hell of a value.  Yes.

20  Q.  Right.  Eye popping.

21  A.  To see it, yeah.

22  Q.  So a $250,000 ring in a jewelry case in a Costco, you're

23  not really expecting to sell that ring.  What you're expecting

24  to do is attract attention to the fact that you sell jewelry.

25  A.  Oh, I want to sell that ring.

1    Q.  I know you do, but only one is not going to really keep the

2    lights on in a Costco for an hour, right, not at a 10.2 percent

3    markup.

4    A.  Makes somebody really happy.

5         I don't mean to be a smart as.  I'm just saying that.

6    Q.  I understand.  But at your 10 percent markup, that's only a

7    $20,000 profit.  How many employees do you have in that store?

8    A.  We average probably about 400 so.

9    Q.  In ten minutes the profit from that ring would be

10   dissipated in salary, right?

11   A.  It all adds up.

12   Q.  Yes, I get it.  But really the point of that is to attract

13   attention to the case, right?

14   A.  Yeah.

15   Q.  And the jewelry case is also one of the, what I would say

16   clever ways that Costco has devised to draw people into the

17   store on a basis that's more regular than household stuff,

18   right?

19   A.  That, no.

20   Q.  OK.

21   A.  Can I, can I, can I clarify for you?

22   Q.  That's OK.  If you're saying that's not what it is, then

23   OK.

24   A.  Part of it.

25   Q.  I accept that.  Let's move beyond that.

G9MATIF3ps                    Schutt - direct

1    A.  OK.

2    Q.  It's certainly there to attract attention to the fact that

3    we sell jewelry.

4    A.  Absolutely.

5    Q.  And when you sell jewelry in the case at the end of the

6    jewelry counter, generally speaking in the high-end portion you

7    have one of a kind of an item at a time.  Right?

8    A.  I'd say usually, yes.  Yeah.

9    Q.  Right.  When that item is sold, you may or may not restock

10   that item at that location, right?

11   A.  No.  It depends.

12   Q.  Right.  So it still falls within the, if you see it here

13   today and don't buy it, it may be gone tomorrow.  Right?

14   A.  Yes.

15   Q.  You're saying -- you're hesitating a bit.  I assume that's

16   because these are more regularly manufactured products that

17   would appear in stores more often than just a treasure hunt,

18   right?

19   A.  If you let me explain, yes, but may I explain?

20   Q.  OK.  I'll let you explain it.

21   A.  We have some, some solitaire rings that we sell on a more

22   regular basis that we would have in a lot more often than, you

23   know, a Tiffany or a Cartier watch or a Louis Vuitton bag.  So

24   there's clarification there, for the jury.

25   Q.  So for the ring, for the style of ring that's involved in

1   this case is a style of ring that you would have in the case

2   more often, as a product line, more often than you would have a

3   Louis Vuitton bag.

4   A.  Yeah.

5   Q.  Costco even offered a million dollar ring for sale once,

6   right?

7   A.  Yes.

8   Q.  That got a lot of publicity, right?

9   A.  I think so.

10  Q.  Yeah.  People were surprised that Costco even sold jewelry

11  when you promoted the $1 million ring, right?

12  A.  Sure.

13  Q.  So these 3 million people a day who walk through Costcos,

14  around -- is that the world, 3 million around the world or

15  there's even more?  Am I low on that number too?

16  A.  I think you're low.

17  Q.  I'm low.  So even more than 3 million a people walking

18  through a Costco, the intention is that they should have their

19  attention drawn to this high-end jewelry case on their way into

20  the store, no matter what they're at the store to purchase.

21  Right?

22  A.  OK.

23  Q.  Yes?

24  A.  Yes.

25  Q.  That's your goal as a merchant.  As head of merchandising,

1   that's what you would like to see happen, right?

2   A.  Yes.

3   Q.  And it's true, isn't it, that the items that you sell in

4   this case are the most expensive items in the entire store.

5   I'm not just saying individually but I mean you don't have any

6   other $250,000 products or $20,000 products, something like

7   that.  So this is your really expensive stuff.  Right?

8   A.  Yes.

9   Q.  The idea of drawing people's attention to the jewelry case

10  on the way in is to let them know, even if they're not in the

11  market at a particular time for a product, that, for example,

12  let's say you're getting engaged, that you will remember, hey,

13  Costco sells engagement rings, maybe I should check there

14  first.  Right?

15  A.  Yeah.

16  Q.  And this jewelry case is therefore a significant part of

17  the overall marketing that Costco does of itself to its

18  members, right?

19  A.  It's part of it, yes.

20  Q.  So on these thousands of visits that you made to Costco

21  stores while you were the head of merchandising, it's fair to

22  say that on the way into the store most of the time you would

23  look at the jewelry case.  Right?

24  A.  Yes.

25  Q.  Mr. Schutt, have you ever heard of the film *Breakfast at*

1   *Tiffany's*?

2   A.   I've heard of it.

3   Q.   And do you know that it was made in 1961 and starred Audrey

4   Hepburn?

5   A.   I know Audrey Hepburn was in that movie, yes.

6   Q.   Would you take a look, please, Mr. Schutt, at page

7   Bates-stamped PTX 38.  First of all, have you ever heard of Jen

8   Murphy?

9   A.   Yes.

10  Q.   Could you tell the jury who Jen Murphy is.

11  A.   Jeni is one of our jewelry buyers at Costco.

12  Q.   And how about Cindy Gallardo?

13  A.   Cindy is, Cindy is not a buyer.  I'm, I don't -- I forget

14  what she was doing for us in 2007.

15  Q.   And these are two Costco employees.  This was marked at

16  Ms. Murphy's deposition back in 2014, February 12, 2014.

17  They're communicating with each other, do you see that, about a

18  ring, about a Tiffany design, quote, Tiffany Novo.  Do you see

19  that?

20  A.   Yes.

21  Q.   And if you turn to the second page, you can see --

22          THE COURT:  Are you going to offer this in evidence?

23          MR. MITCHELL:  I'm going to have him identify it first

24  and then -- do you have any objection, Mr. Dabney, to my offer?

25          MR. DABNEY:  No objection.

1          MR. MITCHELL:  Thanks.

2          THE COURT:  Plaintiff's Exhibit 38 is admitted in

3     evidence.

4          (Plaintiff's Exhibit 38 received in evidence)

5     Q.  OK.  So we can see that here.  You can see that

6     Ms. Gallardo is writing to Ms. Murphy and she's asking her to

7     take a look at a diamond band when she's in LA next week.  And

8     this is written on July 16, 2007.  Do you see that?

9     A.  I see that.

10    Q.  And she describes what it is that she wants Ms. Murphy to

11    look at, which is something called, it looks like it's copied

12    from the Tiffany website, "Tiffany Novo, our newest design, is

13    a, is a dazzling creation of spirit, fire, and style.  This

14    brilliant cushion cut creation was inspired by the famous

15    128.54 carat Tiffany diamond."  Do you see that?

16    A.  Yes.

17    Q.  Now, if we go to the second page of this exhibit, you will

18    see an image of the Tiffany Novo.  You see that?

19    A.  Yes.

20    Q.  OK.  Now, would you please turn in your book to the

21    document PTX 130.

22         MR. MITCHELL:  Can I offer this, Mr. Dabney, or you're

23    going to object?  It makes it easier if I could show it to the

24    jury.

25         MR. DABNEY:  No objection.

1    MR. MITCHELL:  OK.  So we offer --

2    THE COURT:  PTX 130 is admitted in evidence and may be

3    displayed.

4    MR. MITCHELL:  Thank you.

5    (Plaintiff's Exhibit 130 received in evidence)

6  Q.  Do you recognize this as a page from the Costco website

7  that sells jewelry?

8  A.  Yes.

9    MR. MITCHELL:  Can you go to the bottom of the page,

10  Mr. Cole.

11  Q.  You can see that this was printed out on September 6, 2016,

12  a couple weeks ago.  Do you see that?

13  A.  Yes.

14  Q.  OK.  So I go back to the top of the page.  You would agree

15  with me -- this looks like, first of all, you can see that the

16  heading is "cushion cut 3.46 carat," or "CTW," "VS1 clarity E

17  color diamond platinum 'Audrey' wedding set."  Do you see at

18  that?

19  A.  I see that description, yes.

20  Q.  Do you see there's a word set there, do you see the word

21  "set"?

22  A.  Yes.

23  Q.  Two rings there, there's two rings.  There's a wedding band

24  and an engagement.  Right?

25  A.  Yes.

1   Q.  So let's focus on the engagement ring portion.  You would

2   agree with me, wouldn't you, that that is almost the same --

3   and, again, I'm not casting aspersions of copying the style.

4   I'm just saying, that's a pretty close copy of the Tiffany Novo

5   style.  It's Costco's version of it.  Right?

6   A.  It appears similar to me, yes.

7   Q.  Right.  Put them side by side, they look similar, you know,

8   as -- you know, obviously there's some variation, but pretty,

9   pretty close, right?

10  A.  Yes.

11  Q.  Was the use of the word "Audrey" some kind of joke to like

12  bring to mind *Breakfast at Tiffany's*?  Is that how it ended up

13  being called "Audrey"?

14  A.  I have no idea.

15  Q.  So Costco checked out the Tiffany Novo style in 2007 and

16  created a knockoff of the Tiffany Novo style, and it ends up

17  being called "Audrey" at Costco.

18  A.  Could you please --

19  Q.  Is that correct?

20  A.  Could you please define "knockoff" for me.

21  Q.  OK.  And I'm not trying to, honestly I'm not trying to put

22  any -- I'm not challenging you on copying stuff.  People copy

23  people's styles all the time.  I get that.

24  A.  Sure.

25  Q.  And I'm not even saying it's exact.  It's just close.  But

1   clearly the inspiration for this Audrey ring was the Tiffany

2   Novo ring.  It's almost the same.  Right?

3   A.  OK.  I don't know.

4   Q.  Right.  And then Costco calls it "Audrey."  Right?

5   A.  That's what it says there, yes.

6   Q.  There's some coincidence, since Audrey Hepburn is very well

7   known for having been the star of the iconic film *Breakfast at*

8   *Tiffany's*, right?

9   A.  With people our age, yeah, probably, yeah.

10          THE COURT:  Would you find a place in the next ten

11  minutes to stop.

12          MR. MITCHELL:  We can stop right now and I can --

13          THE COURT:  All right.  You have right now a quick

14  ten-minute break.  Continue to keep your thoughts to yourself.

15          Ms. Ng, would you escort the jury to the jury room.

16          (The jury left the courtroom)

17          THE COURT:  See you all in ten minutes.  Thank you.

18          (Recess)

19          THE COURT:  Good morning.  Mr. Schutt, would you

20  please come back to the witness stand, and, Ms. Ng, would you

21  bring the jury in.

22          We have asked for the temperature to be raised a

23  little.  They made it "a little."

24          (Jury present)

25          THE COURT:  I would just ask that you put in a call

 1    for the temperature, to raise it a little bit more.  Thank you.

 2              Mr. Mitchell.

 3              MR. MITCHELL:  Thank you, your Honor.

 4    BY MR. MITCHELL:

 5    Q.  Mr. Schutt, when did you learn that Tiffany had sued Costco

 6    for its use of the signs that are at issue in this case?

 7    A.  I first learned of it on February 14, 2012.

 8    Q.  So were you one of the -- because this was merchandise, was

 9    this something that fell within your sphere of responsibility

10    as the client representative for Costco in connection with this

11    lawsuit?

12    A.  No.

13    Q.  No?

14    A.  No.

15    Q.  So you simply found out as part of being an executive of

16    Costco.

17    A.  I read it on the Internet and I heard about it in the

18    office, sure.

19    Q.  Can you turn your book, please, to PTX 103.

20              MR. MITCHELL:  Mr. Dabney, do you have any objection

21    to offering PTX 103?

22              MR. DABNEY:  No objection.

23              MR. MITCHELL:  Plaintiffs offer PTX 103 as Plaintiff's

24    Exhibit 103.

25              THE COURT:  Plaintiff's Exhibit 103 is admitted and

1    may be published.

2              (Plaintiff's Exhibit 103 received in evidence)

3    Q.  Mr. Schutt, is PTX 103 an e-mail that was sent by the

4    president and CEO of Costco, Craig Jelenik, to all employees of

5    the company?

6    A.  Yes, it is.

7    Q.  And are you one of the people, as an employee of the

8    company, to whom this e-mail was sent?

9    A.  Yes.

10   Q.  And you received it.

11   A.  Yes, I did.

12   Q.  Had you discussed with Mr. Jelenik before you wrote this

13   e-mail the contents of the e-mail?

14   A.  Yes.

15   Q.  So were you one of the people he consulted before deciding

16   on a final version of this to be sent out?

17   A.  We discussed it.

18   Q.  Did you help him write it?

19   A.  No.

20   Q.  Did you read it before it went out?

21   A.  I, I don't recall.

22   Q.  Did you agree with it when you saw it?

23   A.  Yes.

24   Q.  And you were aware of Costco's claims before this e-mail

25   was sent, the date of this being February 19, 2013, correct?

1    A.  Could you say that again, please?

2    Q.  The date of the e-mail is February 19, 2013?

3    A.  Yes.

4    Q.  Do you see that?  So you already knew about the lawsuit by

5    the time this e-mail went out.

6    A.  Yes.

7    Q.  At the time of this e-mail, you did not know when Costco

8    first used "Tiffany" in signage, correct?

9    A.  Correct.

10   Q.  Even sitting here today, you couldn't tell the jury how

11   long the practice had been going on, right?

12   A.  No.

13   Q.  And obviously since you don't know when it started you

14   don't know all the variations of "Tiffany" in signs that

15   existed throughout the time period because you don't even know

16   when it started, right?

17   A.  At this time, yes.

18   Q.  Even today.

19   A.  Well, I know a lot more today than I did on that date,

20   sure.

21   Q.  Going back to the beginning of the usage, you don't know

22   even who wrote it first, who did it first, right?

23   A.  No.

24   Q.  You don't know the reason the person did it first, right?

25   A.  First?

1   Q.  The first use.

2   A.  No.

3   Q.  We had this -- just so we're clear, OK, I know -- I want

4   the jury to understand your testimony.  That's why we went back

5   and forth on that solitaire Tiffany from 2007.  You had

6   interjected in response to a question from me that it was

7   "Tiffany setting," to "Tiffany set," to "Tiffany" alone, and I

8   pointed out to you that as of 2007 it was already "Tiffany"

9   standalone.  Do you remember that?

10  A.  Yes.

11  Q.  So you have no idea when "Tiffany" as a standalone was

12  first used in signage at Costco, right?  You don't know.

13  A.  I don't know.

14  Q.  And you don't know who the person was who first used it.

15  A.  That's correct, no.

16  Q.  Since you don't know when it started and you don't know the

17  person, you can't know what was in that person's mind, right?

18  A.  No.

19  Q.  No, you can't.  Right?

20  A.  That's correct.

21  Q.  And isn't it true that at the time of this e-mail, you had

22  not seen the photographs taken by Tiffany's investigator,

23  Ms. Popp, right?

24  A.  No.

25  Q.  You had not.

1   A.  No.

2   Q.  Right.  The first time you saw those photographs was on

3   August 15, 2013 when I showed them to you at your deposition,

4   right?

5   A.  Yes.

6   Q.  OK.  So at this point, when this e-mail is going out, your

7   state of knowledge about the use of Tiffany in signage, the

8   historic use of Tiffany in signage, going back to the beginning

9   when it first started, was very little.  Right?

10  A.  Yes.

11  Q.  And other than what was recounted in what we looked at

12  before in that January 31, 2013 letter from your lawyer to me,

13  you didn't know much more than that, did you?

14  A.  No.

15  Q.  Right.  It turns out there was much more than what was in

16  that letter, as we all know now, right?

17  A.  Yes.

18  Q.  Now, turning to the second paragraph of Mr. Jelenik's

19  e-mail, he writes, "In the past few years, we have sold some

20  high-quality diamonds that were signed and labeled using the

21  word 'Tiffany.'  That was intended to describe a setting style

22  used in those rings."  At the time Mr. Jelenik wrote that, you

23  didn't know what the intent was in using the word "Tiffany" to

24  describe those rings, did you?

25  A.  I did.

1    Q.  If you didn't know who did it first, how could you know the

2    intent of what the use was when it started?

3    A.  Because I had talked to some individuals, my vice president

4    in charge of that area and the assistant merchandise manager,

5    and I had talked to them about it, sure.

6    Q.  So they were the ones who did it first.

7    A.  No.

8    Q.  They didn't do it first either.

9    A.  Not to my knowledge.

10   Q.  They didn't tell you who did it first, right?

11   A.  No.

12   Q.  So based on a conversation you had with people who didn't

13   do it themselves, you took their word for it, what was intended

14   by the person who first used the word "Tiffany" in signs.

15   That's what you're saying.

16   A.  OK.

17   Q.  Mr. Jelenik goes on.  He says in the same paragraph, "In

18   retrospect, it would have been better had we not used that

19   description the way we did."  Do you see that?

20   A.  Yes.

21   Q.  Sitting here today, do you agree with that now?

22   A.  Yes.

23   Q.  Now, can you turn in the book to PTX 104, please.

24            MR. MITCHELL:  Mr. Dabney, we offer PTX 104.

25            MR. DABNEY:  No objection.

1          THE COURT:  104 is admitted and may be displayed, PTX

2     104.

3          (Plaintiff's Exhibit 104 received in evidence)

4     Q.  Now, Mr. Schutt, this is a letter that you sent on April 5,

5     2013.  Do you see that?

6     A.  Yes.

7     Q.  And you write, "Dear Costco member," right?

8     A.  Yes.

9     Q.  At the time you wrote this letter, you had still not seen

10    photographs taken by Ms. Popp at the Costco store in November

11    2012, right?

12    A.  No.

13    Q.  Right.  You had not.  So you did not know what the display

14    case at Huntington Beach looked like on the day Tiffany

15    complained about what that display case contained, right?

16    A.  I did not.

17    Q.  You did not.  And just as a universe, what was the universe

18    of people you thought you were sending this letter to, as a

19    description?

20    A.  I wasn't sure what the number was.

21    Q.  I'm not talking about the number.  I'm talking about,

22    describe to me -- at this point, the lawsuit was filed in

23    February 2014 -- 2013.  Right?

24    A.  Yes.

25    Q.  The answer and counterclaim was filed in March, right?

1    A.  OK.

2    Q.  I think we looked at the date yesterday.  It was March 8.

3    You remember?

4    A.  Yes.

5    Q.  So your letter was coming out less than a month after

6    Costco filed its answer and counterclaim, right?

7    A.  Yes.

8    Q.  So someone, within a month of filing the answer, thought it

9    was a good idea at Costco to write to certain of your members,

10   right?

11   A.  Yes.

12   Q.  And at that point, we're in the very, very early stage of

13   the lawsuit, so almost nothing had happened in the lawsuit yet,

14   right?

15   A.  Yes.

16   Q.  So you had to go out there and say, I'm going to send a

17   letter to these people.  Describe for me the universe of what

18   "these people" was.

19   A.  Well, these, these people were those who had purchased

20   diamond rings that said -- had "Tiffany" anywhere in the

21   description of that particular diamond ring.

22   Q.  Going how far back in time?

23   A.  I don't recall what -- how far back.

24   Q.  And you didn't personally gather this list, right?

25   A.  I did not.

1    Q.  You didn't address the envelopes.

2    A.  I did not.

3    Q.  They went to some place to be sent out.  Correct?

4    A.  Yes.

5    Q.  But you had some understanding, I'm sure, about how many

6    people were in this universe that you were writing to.  Right?

7    A.  I didn't know the exact number of, the number of people

8    that bought those rings.

9    Q.  Well, I don't want to quibble with you if that's your

10   answer.  Let me drill down on that just for a moment.  Hold on

11   a second.

12        This is a letter you're writing to members who you

13   care a lot about, you said yesterday, telling them about an

14   issue as it relates to this lawsuit.  Right?

15   A.  Yes.

16   Q.  And I assume you don't write to Costco members very often

17   about issues in lawsuits, right?

18   A.  No.

19   Q.  And you have no interest in writing letters to people you

20   don't intend to get your communication when you're writing to

21   members like this, right?

22   A.  Yes.

23   Q.  So from the standpoint of a member receiving a letter from

24   one of the top executives at Costco, for that member, this must

25   be an important communication.  Right?

1   A.  This was.

2   Q.  Right.  So one would reasonably expect as part of your

3   job -- you know, I use "global head."  That's probably the

4   wrong -- at least head of all the merchandise sold in the

5   United States for Costco and on the executive board.  Are you

6   saying you did not ask anyone, before this letter went out, how

7   many of these letters are there, how many people are affected?

8   A.  I don't recall asking anybody how many were to go out.

9   Q.  So you were just sending this e-mail out without knowing

10  the universe.

11  A.  OK.

12  Q.  That's what you're telling the jury.

13  A.  Yes.

14  Q.  OK.  You remember at your deposition I asked you how many

15  letters you thought you sent.  Right?

16  A.  Yes.

17  Q.  And that was in August of 2013, less than four months, or

18  about four months after you had sent the April letter.  Right?

19  A.  Yes.

20  Q.  And at that deposition you were represented by lawyers.

21  Right?

22  A.  Yes.

23  Q.  You met with your lawyers before you were deposed, right?

24  A.  Yes.

25  Q.  You knew going into that deposition that the subject matter

1    of this letter would be discussed at that deposition, right?

2    A.  Yes.

3    Q.  And I asked you, how many of these letters did you send,

4    and you said you didn't remember the exact number but you

5    estimated it was around 11,000.  Didn't you do that?

6    A.  Yeah, I did do that.

7    Q.  And you didn't say to me at the time, I never asked anybody

8    how many letters were sent, did you?

9    A.  No.

10   Q.  And the explanation you just gave about, you know --

11   withdrawn.

12        You didn't give any indication in the response, that

13   answer to me, that your estimate was way off from 11,000.  You

14   thought it was around 11,000.  Right?

15   A.  I had heard that in passing from somebody.  I, I didn't

16   know the number.  I did say that my guess was around 11,000.  I

17   did say that.

18   Q.  I can read -- should we read it exactly or it doesn't

19   matter?  You're sitting here today and you're saying to me that

20   you admit at that deposition you estimated 11,000.  Right?

21   A.  That was my guess.

22   Q.  So you're saying a guess now.  You didn't use the word

23   "guess."  I don't think -- you're saying you used the word

24   "guess"?

25   A.  I did not say that.

1  Q.  You did not say "guess."

2  A.  I did not say "guess" in the deposition.

3  Q.  Right.  You said you did not know the exact number but you

4  estimated around 11,000.  Yes?

5  A.  OK.  Yes.

6  Q.  And when you gave me that estimate, it was just four months

7  after you had sent the letter in April 2013.  Right?

8  A.  Yes.

9  Q.  And when you gave that answer and that estimate, you knew

10  you were under oath, right?

11  A.  Yes.

12  Q.  Now turning back to your letter, you start by saying --

13  well, first of all, do you see in this letter anywhere that

14  this ring was not made by Tiffany that they bought?

15  A.  It does not say that.

16  Q.  Does not say that.  So you're supposedly writing to your

17  customers, whom you value, coming clean to them that if they

18  want to return their ring they should do it, but you're not

19  even telling them why it is they might want to return the ring.

20  Right?

21  A.  Yes.

22  Q.  So supposedly you're writing to people who may have heard

23  about the lawsuit who would be concerned that they bought rings

24  that said "Tiffany" in the jewelry case, but you're not telling

25  them in the letter that the ring isn't even made by Tiffany.

1   A.   No.

2   Q.   So that's a pretty crafty way to write the letter, right?

3   A.   OK.

4   Q.   Let's go through it.  I think the jury should hear -- we

5   should look through it.  It's not as clear on the screen.  I'll

6   read what you wrote.  "Dear Costco member:  Our records

7   indicate that you purchased a diamond ring at one of our Costco

8   warehouses."  So you don't say "a diamond ring with a sign that

9   said Tiffany," right?  You said "you purchased a diamond ring."

10  A.   Yes.

11  Q.   Vanilla.

12  A.   Yes.

13  Q.   "We hope you have been fully satisfied with your purchase."

14  Well, you're about to tell them -- you're supposedly

15  communicating something that would make them unhappy about

16  their purchase, and you're hoping that they're satisfied with

17  their purchase.  Does that really make sense to you now,

18  looking at this letter?

19  A.   I don't look at it that way, about unhappy.

20  Q.   OK.  Next sentence.  "We are writing to you because a

21  jewelry store chain, Tiffany & Co., recently filed a lawsuit

22  against Costco complaining about certain signs that were used

23  to describe rings on display in Costco warehouses.  The signs

24  use the word 'Tiffany' to indicate a ring that had a

25  Tiffany-style pronged setting holding the diamond."  Did I read

1    that correctly?

2    A.   Yes.

3    Q.   That's not what Tiffany said.  Tiffany sued Costco because

4    it was selling diamond rings that were not made by Tiffany but

5    the sign said "Tiffany" on a standalone basis, right?  Isn't

6    that what this lawsuit was about?

7    A.   OK.

8    Q.   OK.  Then you go on in the next sentence and say, "We do

9    not believe that our signs were inaccurate."  So let me finish,

10   I want to finish in the sentence.  "We do not believe that the

11   signs were inaccurate; however, under our member satisfaction

12   policy you have the right to return your ring to a Costco

13   warehouse for a full refund if for any reason you are not

14   satisfied."

15        First of all, for somebody to even know what you're

16   writing to them about and what they should be complaining

17   about, they would have to have heard about the lawsuit, right?

18   A.   Maybe.

19   Q.   Maybe?  Why would they know what you're telling them if --

20   we're not saying, you bought a ring.  You're not saying in your

21   letter, you bought a ring, with a sign that said "Tiffany,"

22   that was really made by Costco.  You're not saying that, are

23   you?

24   A.   I sent this letter out because if there was any

25   misunderstanding, at all, from our -- on our members' part that

1    they had a misunderstanding of what they were buying, I wanted

2    to be perfectly clear to them and make sure they understood, if

3    they misunderstood anything, that they could return that

4    diamond ring to Costco.

5    Q.  But how would they know if they misunderstood if they

6    hadn't heard about the lawsuit and you're not telling them that

7    the ring that had "Tiffany" in the sign wasn't made by Tiffany.

8    How could they possibly know that?  You're not explaining to

9    them, right?

10   A.  There was enough press out there on the Internet and --

11   that I, I wanted to send this letter out to make sure, if

12   there's any misunderstanding, any misunderstanding at all, that

13   they could please return that diamond if they misunderstood in

14   any way.

15   Q.  So when Mr. Dabney said to the jury, Costco was taking

16   responsibility for what happened here, your letter of April 5,

17   2013 is one of the things that you think shows Costco taking

18   responsibility.

19   A.  It shows we want to do the right thing.

20   Q.  Right.  But you don't say specifically in your letter that

21   we sold you a ring with "Tiffany" in the sign that wasn't made

22   by Tiffany, do you?

23   A.  No.

24   Q.  And to the extent anybody hadn't heard about the lawsuit,

25   then those people as well wouldn't even know what you're

G9MATIF3ps                    Schutt - direct

1    writing about because you're just telling them that you

2    described the ring properly.

3    A.   Yes.

4    Q.   I had asked you earlier, Mr. Schutt, whether getting caught

5    and changing your practice, and doing the right thing are the

6    same thing.  And you said no.  Do you remember that?

7    A.   Yes.

8    Q.   Now, here's an instance of getting caught, writing a letter

9    to your valued members, who may have been misled by signage in

10   your jewelry case, and you're not even telling them in your

11   letter that your signs said "Tiffany" and the rings were not

12   made by Tiffany and Company.  Correct?

13   A.   Correct.

14   Q.   So taking responsibility the way Costco is defining it is

15   not even, when you're writing to people who may have been

16   directly affected by the signage, is telling those people

17   honestly and truthfully that that ring you bought was made by

18   Costco, not Tiffany & Company, right?

19   A.   I told you why I wrote the letter, sir.

20   Q.   I know why you wrote the letter.  That wasn't my question.

21   The question to you is, when you're coming clean to your own

22   customers and supposedly taking responsibility, your counsel's

23   words, you're not even coming clean enough to say fully and

24   honestly and truthfully to those customers, it may have said

25   "Tiffany" in the sign but the ring was made by Costco.  You're

1   not saying that, are you?

2   A.  No.

3   Q.  And the statement that you have here, "We do not believe

4   that our rings were -- that our signs were inaccurate," you

5   believe that to this day.

6   A.  Yes.

7           MR. MITCHELL:  I have nothing further.

8           THE COURT:  Mr. Dabney.

9           MR. DABNEY:  Your Honor, may I approach the witness

10  with binders?

11          THE COURT:  Yes, you may.

12          Thank you.

13          MR. DABNEY:  Could I have the Elmo, Ms. Ng, please.

14  CROSS EXAMINATION

15  BY MR. DABNEY:

16  Q.  Good morning, Mr. Schutt, or good afternoon.

17  A.  Good afternoon.

18  Q.  I would like to take up where counsel for the plaintiff

19  left off, which was your letter to members which we were just

20  looking at.  I think it was Plaintiff's Trial Exhibit 104.  So

21  I will put it up here so we can look at it.

22          Mr. Schutt, do you recall being asked about the style

23  of diamond rings that were identified by the signage at issue

24  in this case?

25  A.  No.

1    Q.  Well, let me show you what was.

2                MR. MITCHELL:  May I confer with Mr. Dabney for one

3    moment?

4                THE COURT:  Yes.

5                (Counsel confer)

6    Q.  Mr. Schutt, are you familiar -- were you here when Ms. Popp

7    came in and testified on the first day of trial?

8    A.  Yes.

9    Q.  And do you recall that she produced a photograph of a

10   diamond ring that had been offered for sale in the Huntington

11   Beach store?

12   A.  Yes.

13   Q.  I'm going to put up on the screen a copy of Plaintiff's

14   Trial Exhibit 25, which is in evidence.  This is the item

15   639911 that Ms. Popp testified about.  You saw that?

16   A.  Yes.

17   Q.  And I want to ask you, you were asked a whole series of

18   questions about Costco's signage.  And when you said in your

19   letter to members, "We do not believe that our signs were

20   inaccurate," do you believe that statement was true at the

21   time?

22   A.  Yes.

23   Q.  Now, can you walk us through what each word on the sign as

24   understood by you to mean.

25   A.  So this sign here has "platinum" as the first word there,

1    and that describes the metal that is used on the band for that

2    ring.  My understanding that the Tiffany brand after that was

3    used to describe the type of setting for that ring.  Then ".70"

4    is the carat of the ring.  "VS2" is the clarity of that ring.

5    "I" is the color, I believe.  And "round" is the size.  And

6    then of course "diamond ring," diamond ring.

7    Q.  So do I understand you to say that every word on the sign

8    is describing a physical feature of the ring?

9    A.  Yes.

10          MR. MITCHELL:  Objection, your Honor.

11   Mischaracterizes -- sorry.

12          MR. DABNEY:  I will withdraw.

13   Q.  Mr. Schutt, does every word on the sign describe a physical

14   feature of the ring, to your understanding?

15   A.  Yes.

16   Q.  Now, do you know of any other word besides "Tiffany" that

17   describes the particular style of ring setting that that item

18   actually had?

19   A.  No.

20   Q.  Now, Mr. Schutt, you were asked a series of questions about

21   branded signage in Costco stores.  Do you recall that?

22   A.  Yes.

23   Q.  And I think you made a couple of points about that.  Let me

24   put up on the screen, I believe it was marked as Plaintiff's

25   Exhibit 29.  Could you look in the plaintiff's exhibit book

1   under Plaintiff's Exhibit 29.

2           THE COURT:  Do you want the witness to look in the

3   other notebook?

4   Q.  Do you have the plaintiff's exhibit book you were just

5   being asked about?

6   A.  Yes, I do.

7   Q.  I will just put it up on the screen so you can see.  You

8   were shown a sign you had for a Sony 3D Blu-Ray home theater?

9   A.  Yes.

10  Q.  Now, in Costco stores, what is the practice with regard to

11  branded goods sold in Costco?

12  A.  For branded goods, it has always been our protocol to have

13  the brand, manufactured brand of that product in the first word

14  of that first line.

15  Q.  And what about selling goods in factory packaging?  When

16  Costco sells branded goods, are they sold in factory packaging?

17  A.  Yes.

18  Q.  Are you aware of a situation where Costco sold branded

19  goods that were not in the factory packaging?

20  A.  I could give you an example.

21  Q.  OK.  In general, then just take an example, you were given

22  this example of a Nikon camera that they showed you.  If you

23  sold the Nikon camera, would the camera be delivered in its

24  factory box?

25  A.  Yes.

1    Q.  Now, in the case of these fine jewelry items, is the

2    signage here consistent with how Costco signs branded items?

3    A.  Well, there is not a brand here, so it's, no, it's

4    different.

5    Q.  So at the time you wrote your letter, did you think

6    "Tiffany" was a word that described the ring?

7    A.  Described a setting.

8    Q.  And these products, I believe you said, were delivered in

9    boxes similar to the beige box that I'm holding in my hand?

10   A.  Yes.

11   Q.  Can you describe for us the purchase sequence for a

12   fine-jewelry item purchase like this.  We've seen photos of the

13   jewelry case, but just, can you describe all of the steps that

14   a member would have to go through before they could actually

15   walk out of the building with a diamond ring like this.

16   A.  Well, typically at our jewelry counter we have a

17   salesperson there, and a member will ask to look at the ring or

18   necklace, earrings, whatever it is.  And then if they want to

19   purchase that item, they would fill out what's called an MPU --

20   it's a little slip of paper that would have the item number on

21   it and sell price quantity.  And they take that slip to the

22   cashier, and they pay for the goods.  And they go to the MPU

23   cage to pick up the diamond.

24           If it's a one-of-a-kind item, that diamond would have

25   to be retrieved from that case and brought out to the

1   merchandise pickup to be placed in a box like this and get

2   their appraisal and inspect the item.  And then what would

3   happen is that a supervisor would be there with the member,

4   make sure the member sees everything, and then sign off on that

5   purchase, to make sure that member understood exactly what they

6   were getting, that they were getting the right thing.

7   Q.  You mentioned an appraisal that would come with this

8   specific item, the 639911 item?

9   A.  Yes.

10  Q.  Could I direct your attention to Defendant's Trial Exhibit

11  20, which is in the binder that I handed to you just a moment

12  ago.

13  A.  Yes.  Got it.

14  Q.  Mr. Schutt, is this the type of appraisal that Costco

15  provided with diamond rings that were less than 1 carat in

16  weight at the time of this item in 2012?

17  A.  Yes.

18          MR. DABNEY:  Your Honor, we offer Defendant's Exhibit

19  20 in evidence.

20          MR. MITCHELL:  No objection.

21          THE COURT:  You said no objection?

22          MR. MITCHELL:  No objection.

23          THE COURT:  Defendant's Trial Exhibit 20 is admitted

24  in evidence and may be displayed.

25          (Defendant's Exhibit 20 received in evidence)

1              MR. DABNEY:  Thank you.

2    Q.  So the document, as I understand it, if the person, if the

3    member is interested in possibly buying the diamond ring, they

4    would go to the, I think you called it the --

5    A.  MPU cage, MPU pickup.

6    Q.  -- merchandise pickup cage, and at that location, the

7    member would be provided with a beige box similar to Costco's

8    Exhibit 19, correct?

9    A.  Yes.

10   Q.  And they would also be provided with an appraisal that has

11   Costco Wholesale's name on it.

12   A.  Yes.

13   Q.  And was there anything in the appraisal that made mention

14   of Tiffany and Company?

15   A.  No.

16   Q.  Now, I would like to put up on the screen a photograph

17   that's been marked as Costco Trial Exhibit 2, which is the

18   photograph, an enlarged photograph of an item 639911 ring.

19   Mr. Schutt, is this in general a representation of the type of

20   ring that was identified by that sign, "platinum Tiffany .70 CT

21   VS2, I diamond ring"?

22   A.  Yes.

23   Q.  Now, there is a trademark stamped on the inside surface of

24   the diamond ring.  Do you see that?

25   A.  Yes.

G9MATIF3ps                    Schutt - cross

1    Q.  Is that a legal requirement, that precious metals be

2    stamped with their manufacturer's trademark?

3            MR. MITCHELL:  Objection.

4    A.  Yes.

5            THE COURT:  Please consult.

6            (Counsel confer)

7            MR. DABNEY:  Your Honor, I'll rephrase.

8    Q.  Mr. Schutt, do you know why that trademark is stamped on

9    there?

10   A.  It's a legal requirement.

11   Q.  Will Costco sell a diamond ring that does not have a

12   manufacturer's stamp?

13   A.  No.

14   Q.  Mr. Schutt, are you familiar with the vendor documentation

15   that Costco received for diamond rings similar to this?

16   A.  Yes.

17   Q.  Mr. Schutt, could I direct your attention to the document

18   that's been marked as Defendant's Trial Exhibit 27, which I

19   asked Mr. Kaczmarek about yesterday in his testimony.  Were you

20   here for that testimony?

21   A.  Yes.

22   Q.  This is in evidence, so I'm just going to put it up on the

23   screen.  Mr. Schutt, I'm going to put up on the screen a

24   document that's been marked as Costco Trial Exhibit 27, which

25   is dated 3 May 2012.  Do you see where I'm referring to?

1   A.  I see that, yes.

2   Q.  There is a name Harjit Grewall.  Do you know Harjit?

3   A.  Yes, I do.

4   Q.  Who is Harjit Grewall?

5   A.  Harjit is a jewelry buyer for Costco wholesale.

6   Q.  And then it identifies the vendor being R. B. Diamond Inc.

7   Is that correct?

8   A.  Yes.

9   Q.  So this is Costco's vendor.  And then there is information

10  that includes an item description, and the item description

11  says "Tiffany ring 3/4 carat."  Do you see where I'm referring

12  to?

13  A.  I see, yes.

14  Q.  Where does that information come from, Mr. Schutt?

15  A.  That comes from the supplier of this particular item.

16  Q.  And what do you understand the word "Tiffany" in this

17  vendor document is referring to?

18  A.  I understand it to be referring to a setting style called

19  Tiffany.

20  Q.  And does the image shown on the document depict an item

21  639911 diamond ring?

22  A.  Yes.

23  Q.  You understand the word "Tiffany" is describing the style

24  of the setting of that ring?

25  A.  Yes.

1    Q.  And at the time you wrote your letter and you said, the

2    sign was meant to say that the ring had a Tiffany-style pronged

3    setting holding the diamond, did you have in mind any different

4    meaning of "Tiffany" than what you understood the word

5    "Tiffany" in Defendant's trial 27 to be referring to?

6    A.  No.

7    Q.  Now, while we're on the subject, you were asked a series of

8    questions about Kirkland Signature.

9    A.  Yes.

10   Q.  Are you aware of any dictionaries in which the phrase

11   "Kirkland Signature" appears?

12            MR. MITCHELL:  Objection, your Honor.

13            THE COURT:  Please consult.  And bear in mind that we

14   have about eight minutes to the lunch break.

15            (Counsel confer)

16   Q.  Mr. Schutt, are you aware of any dictionaries in which the

17   phrase "Kirkland Signature" appears?

18   A.  I'm not aware, no.

19   Q.  Are you aware to your knowledge that the term "Kirkland

20   Signature" referred to some specific configuration of a

21   product?

22   A.  No.

23   Q.  You were asked about certain things like hearing aids and

24   eyeglasses and stuff.  Does Kirkland Signature have any meaning

25   as describing a physical feature of eyeglasses?

1   A.  No.

2   Q.  Does Kirkland Signature have any meaning as describing a

3   physical feature of hearing aids?

4   A.  No.

5   Q.  Does Kirkland Signature have any meaning as describing a

6   physical picture of red wine?

7   A.  No.

8   Q.  Now, you referred on your direct testimony to certain terms

9   like "VS2" and "I."  Do you recall that?

10  A.  Yes.

11  Q.  Do diamonds have a grading system?

12  A.  Yes, they do.

13  Q.  Is there any similar grading system for the type of

14  products that are private-label Kirkland Signature products?

15  A.  I don't think so, no.

16  Q.  So could I direct your attention now to the thing on the

17  lower left.  There is a stamp on the lower left here.  And I

18  wonder if you could explain to the members of the jury what

19  these figures in the lower left-hand side of Defendant's

20  Exhibit 27 are referring to.

21  A.  OK.  So it says "cost" there.  So that would be the cost of

22  that diamond ring, including not only the cost of the diamond

23  and the setting but costs that would include the assembly of

24  the particular diamond ring.  And those all add up to that

25  cost.

1   Q.  And then you have -- so you show a cost of 2924.29?

2   A.  Yes.

3   Q.  And then a sell of 3299?

4   A.  Yes.  That would be our sell price on that particular item.

5   Q.  And then it says "IMU."  What does that stand for?

6   A.  Yes.  That's the initial markup.  And that is the margin

7   percent on that item.

8   Q.  And this is also showing another cost and another IMU.  Do

9   you understand why there are two different costs and two

10  different IMUs?

11  A.  Yes.  The cost went down on this particular item.  And that

12  IMU would be the new IMU if the sell price remain at 3299.

13  Q.  Thank you, Mr. Schutt.

14          THE COURT:  You have about three minutes, Mr. Dabney.

15  Q.  Mr. Schutt, I think you testified on direct that the Costco

16  warehouses have jewelry displayed out in the open in the

17  warehouses.  Is that fair to say?

18  A.  Yes.

19  Q.  So I heard opposing counsel used the word "caught" several

20  times.  Was Costco ever trying to hide its jewelry from its

21  members?

22  A.  No.

23  Q.  Are you aware of any attempt to not let people know what

24  was being said about the rings in Costco's stores?

25  A.  No.

1    Q.  Now, you also talked about, I'd like to direct your

2    attention to the document plaintiffs referred to, Plaintiff's

3    Exhibit 19, in the plaintiff's book, the one that plaintiff

4    showed you.  And this will be the last question before lunch.

5    A.  Are you going to put that on the screen?

6    Q.  I am.

7    A.  OK.

8    Q.  The plaintiffs showed you part of this exhibit, and I want

9    to show you another part, which is the "shop confidently."  And

10   it says, "Membership: we will refund your membership fee in

11   full at any time if you are dissatisfied."  Is that a fair

12   statement of the Costco policy with regard to people who buy

13   memberships?

14   A.  Yes.

15   Q.  And then it goes on to say that "merchandise: we guarantee

16   your satisfaction on every purchase we sell with a full

17   refund," with certain exceptions.  Is that right?

18   A.  Yes.

19   Q.  Is there any time limit on that member satisfaction policy?

20   A.  No.

21   Q.  How important do you believe that return policy is to

22   Costco members?

23   A.  It's extremely important.

24   Q.  Because?

25   A.  Extremely important because, our members buy with

1    confidence from us.  And they know that we stand behind

2    everything that we sell.  And if they're ever dissatisfied,

3    they can bring it back, and hopefully that leads to them

4    renewing their membership every year.

5    Q.  Is there an element of trust in that relationship?

6    A.  It's huge.  Yes.

7    Q.  And the members trust you and Costco trusts its members not

8    to abuse that?

9    A.  Yes.

10            MR. DABNEY:  Your Honor, if this is a good time to

11   stop.  Thank you.

12            THE COURT:  Yes.  Thank you.

13            So, ladies and gentlemen, we'll now commence our

14   half-how lunch break.  Members of the jury, please be ready to

15   begin at 1 o'clock.  Remember, don't discuss the case or

16   anything or anyone having anything to do with it.  Enjoy your

17   lunch.

18            (Luncheon recess)

19            (Continued on next page)

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                            1:05 p.m.

3              (In open court; jury present)

4              THE COURT:  Good afternoon, ladies and gentlemen.

5    Please take your seats in the jury box.  And please be seated,

6    everyone.

7              MR. DABNEY:  Mr. Dabney, if you'd like to go to the

8    podium.  Just let the jurors get settled.

9    BY MR. DABNEY:

10   Q.  Mr. Schutt, before the lunch break I was asking you about

11   Costco membership.  Do you recall that?

12   A.  Yes.

13   Q.  Is Costco membership renewal important to Costco?

14   A.  Very important.

15   Q.  Can you explain?

16   A.  Well, our renewal rate is over 90 percent and having our

17   members come back year after year and pay their membership fee

18   is a very important part of our financial picture.

19   Q.  Now, you also mentioned on direct that you had a code of

20   ethics?

21   A.  Yes.

22   Q.  And you mentioned there were certain, there was a sequence

23   of things that were part of that.  Could you tell us what that

24   is?

25   A.  Certainly.  Our code of ethics starts with obeying the law.

1    That means you obey the law, the company, no matter what

2    country it's in, what business it's in, you obey the law first.

3            Next part of our code of ethics is to take care of our

4    members, provide them high-quality goods, lowest possible

5    prices, safe facilities, clean facilities.  Next would be

6    taking care of our employees which would be, amongst other

7    things, paying high wages and giving good benefits to them.

8    Fourth would be respect our suppliers and we feel if you do all

9    four of those things in that order you will reward your

10   shareholders.

11   Q.  I think you said -- how many employees does Costco have

12   today?

13   A.  Well over 200,000.  I don't recall the exact number.

14   Q.  And approximately how many of those employees qualify for

15   health benefits?

16   A.  I think somewhere in the 90 percentile qualify.

17   Q.  And you said pay high wages, what did you mean by that?

18   A.  We're known for paying the highest wages at retail in the

19   country.

20   Q.  And do you know of any other retailer that has a return

21   policy that is similar to what Costco offers?

22   A.  Nordstrom's would be one that would approximate Costco's

23   return policy, I think.

24   Q.  Any others?

25   A.  I can't think of one.

1    Q.  Now, Mr. Schutt, I think you testified on direct that prior

2    to December of 2012 you were not aware that any use of the word

3    Tiffany, Tiffany setting, Tiffany style, Tiffany set, no use of

4    the word Tiffany, you were not aware of any use of the word

5    Tiffany in Costco's jewelry case signs.

6    A.  No.

7    Q.  Is that correct?

8    A.  Yes.

9    Q.  So the first time you heard of that was when, sir?

10   A.  After we were served a request from Tiffany and Company for

11   information.

12   Q.  Was that in about December of 2012?

13   A.  Yes.

14   Q.  And what action did Costco take in response to the initial

15   communications with Tiffany?

16   A.  We within days we removed any sign in any of our jewelry

17   cases that had the word Tiffany in them.  We placed a block in

18   the system so that Tiffany could not be put on any sign in the

19   future.

20   Q.  And did you respond to information requests from Tiffany

21   and Company that followed in the ensuing weeks?

22   A.  Our company did.

23   Q.  And were you here for the testimony of Ms. Abrams when she

24   was shown the letter from Mr. Levine which described, well, for

25   this time the sign said set in six prong Tiffany setting, and

1   another time the sign said Tiffany set.  Do you recall them?

2   A.  Yes.

3   Q.  Are you aware of any communication between Tiffany and

4   Company and Costco between January 31, 2013 and Valentine's day

5   of 2016?

6   A.  No.

7   Q.  As far as you know, the response to Mr. Levine's letter was

8   the complaint?

9   A.  Yes.

10  Q.  Now, Mr. Schutt, you mentioned a sign management issue on

11  your direct testimony.

12  A.  Yes.

13  Q.  I'd like to put up before you a document that's been in

14  evidence as Defendant's Exhibit 139 and I want to ask you, I

15  want to first draw your attention -- I'm just going to kind of

16  scroll down for the members of the jury so they can see all of

17  the different sign variations that are shown on the exhibit.

18  Do you see where I'm referring to, Mr. Schutt?

19  A.  Yes.

20  Q.  So sometimes it said .70 CT diamond solitaire set in six

21  prong Tiffany setting.  Sometimes it said platinum .70 CT

22  Tiffany set.  Do you see that?

23  A.  Yes.

24  Q.  And sometimes it said platinum .70 VS1 I-round Tiffany set

25  diamond ring.  Do you see that?

1    A.  Yes, I do.

2    Q.  Another variation.  And then we come to the one that was

3    the subject of Ms. Popp's visit.  Platinum Tiffany .70 CT VS2

4    I-round diamond ring.  Then we come to the next one, which is

5    .70 CT VS2 I-round platinum diamond ring.

6           We have here over in the right fiscal year periods, do

7    you understand that?

8    A.  Yes.

9    Q.  Now, when you said that you changed the signage within a

10   few days of getting the communication from Tiffany, did that

11   include changing the text from what's shown on row four to row

12   five for item 639911 that we're looking at here?

13   A.  Yes.

14   Q.  And then if we go farther down we see for other items

15   different variations.  For 637277 we had platinum Tiffany set

16   1.0 CT round diamond solitaire, and then three other

17   permutations.

18          Let me draw your attention to row seven and eight

19   where you have platinum Tiffany VS2 I-round diamond, then 1.0

20   CT platinum round.  Then there's a change from 20133 to 20134.

21   Does that also refer to the sane change that you referred to in

22   your direct testimony?

23   A.  Yes.

24   Q.  And I believe Mr. Kaczmarek testified to this, but could

25   you please remind the jury what the year and digit to the right

1    of it refers to in Costco fiscal calendar?

2    A.   So on the last, the last column under 637277, for example,

3    that would be 2013 period four.

4    Q.   2013 period four would be a fiscal year that started in

5    approximately August or September of 2012?

6    A.   Yes.

7    Q.   So 20134 would be a date like November 23, something?

8    A.   Our period four is typically from the end of November to

9    the end of December.

10   Q.   Mr. Schutt, can I direct your attention, I don't know

11   whether I have it in your binder or not.  We'll get Mr. Hesketh

12   to explain the fiscal calendars.

13           So going back, looking at all these variation of

14   signs, do these sign variations illustrate what you referred to

15   as the sign management issue?

16   A.   Yes.

17   Q.   Now, at the time these signs were created, Mr. Schutt, what

18   was, who had responsibility for creating the signs?

19   A.   The inventory control specialists.

20   Q.   And did they work under the supervision of buyers?

21   A.   Yes.

22   Q.   At that time was there any management oversight above the

23   level of buyer over these signs?  Do you know?

24   A.   No.

25   Q.   And as a result of the notice and investigation that you

1    did -- strike that.  Did your investigation of the

2    communications from Tiffany and Company about the signage lead

3    to your discovery of these variations?

4    A.  Yes.

5    Q.  What management change if any was put in to prevent a

6    recurrence of this?

7    A.  Well, we now required a buyer to sign off on that sign

8    that's created by the ICS.

9    Q.  So prior to this time was it within the ability of an ICS

10   to make a change and it would just go out on the floor without

11   any buyer actually personally reviewing the sign?

12   A.  Yes.

13   Q.  Mr. Schutt, have you seen an example of that in action in

14   this case, where an ICS was requested to make a change?

15   A.  I have.

16             THE COURT:  Please consult.

17             (Pause)

18             MR. MITCHELL:  Sidebar, your Honor?

19             THE COURT:  Yes.

20             MR. MITCHELL:  Thank you.

21             (Continued on next page)

22

23

24

25

1          (At the side bar)

2          MR. MITCHELL:  I asked Mr. Dabney for a proffer of

3    that question because I presumed he's referring to Mr. Karig.

4    Mr. Dabney made a proffer that he has seen Mr. Karig's e-mail,

5    but I don't think this is a witness, the chief of

6    merchandising, who can honestly say that he was aware of what

7    Karig was doing, because this is before the signage problem was

8    even brought to anyone's attention and this witness has already

9    said he didn't even know it was being used in signs.  So I

10   think if he's going to offer the Karig e-mail or anything that

11   Karig did, that's in his case in chief through Karig, not

12   through this witness.  Because it's clear this witness had

13   nothing to do with signs, didn't know about the signs and Karig

14   didn't report to him and he certainly didn't supervise Karig.

15         THE COURT:  What is the basis of the proffer through

16   this witness?

17         MR. DABNEY:  The sole purpose of this is to provide an

18   illustration of what the authority of ICSs was at the time.

19   He's testified that there now is a requirement of buyer signoff

20   on signage which is a management change from what existed in

21   2012.  So the sole purpose of this is to illustrate what he

22   meant that at the time these signs were created somebody like

23   Karig could change a sign on his own and put it out on the

24   floor.  Mr. Schutt obviously has no knowledge of these events

25   or what Karig was doing.  What he's testified to is that there

was a management change, a new requirement for buyer signoff

and this shows the old practice.

THE COURT:  Well, I'm sure you'll both correct me if

I'm wrong, but my recollection of the Karig e-mail and

deposition testimony is that it referred specifically to the

inventory designation part of the computer screen rather than

specifically to the signage part of the computer screen, that

even Karig testified he wasn't sure what he did or if he

changed the signage.  I said I would let it in as the basis for

arguments and inference, but arguments and inference are for

lawyers and to have this witness testify to an inference drawn

from this e-mail correspondence to which he wasn't a party and

of which he isn't aware is a bit too far of a stretch.  So I

sustain the objection to use of the e-mail for that

illustrative purpose for this witness.

MR. DABNEY:  Thank you, your Honor.

MR. MITCHELL:  Thank you, your Honor.

(Continued on next page)

1                    (In open court; jury present)

2    BY MR. DABNEY:

3    Q.   So I believe I understood you to say, Mr. Schutt, that

4    after you got the notice from Tiffany and Company a block was

5    put in the Costco computer system so that you not only couldn't

6    say Tiffany style ring, Tiffany style ring, but you couldn't

7    put the word "Tiffany" in at all.

8    A.   That's correct.

9    Q.   At that time, Mr. Schutt, did you know that the plaintiffs

10   in this case were making no claim as to use of "Tiffany style"

11   on signage?

12   A.   I didn't.

13   Q.   At that time, were you aware that the plaintiffs were

14   making no claim as to the use of "Tiffany setting" in signage?

15   A.   No.

16   Q.   At that time were you aware that the plaintiffs were making

17   no claim to the use of "Tiffany set" in signage, that they were

18   not making any claim as to that?

19   A.   No.

20   Q.   At the time were you aware that the plaintiffs were making

21   no claim as to use of "round Tiffany set" in signage?

22   A.   No.

23   Q.   So you wrote a letter.  You were asked on direct who you

24   sent your letter to.  Did someone on your team get tasked with

25   trying to figure out who the letter should go to?

1   A.  Yes.

2   Q.  And what was the name of that person; do you remember?

3   A.  Peter Hesketh.

4   Q.  And do you know of your own knowledge what criteria

5   Mr. Hesketh used in order to generate the mailing list for your

6   letter?

7   A.  Yes.

8   Q.  And what was that criteria?

9   A.  It was any sign in our jewelry case that had the word

10  Tiffany in it, Tiffany set, Tiffany setting, Tiffany style.

11  Anything that had "Tiffany" in it.  Any diamond that had a

12  "Tiffany" in it.

13  Q.  So that means you sent a letter to someone who bought a

14  diamond ring in 2006 where the sign had a description on it as

15  to which the plaintiffs were not even making a claim?

16  A.  Yes.

17  Q.  Now, you were asked at your deposition how many of the

18  letters you sent.  Do you recall that?

19  A.  Yes.

20  Q.  At the time of your deposition did you have the mailing?

21  A.  I didn't have it in my personal possession, no.

22  Q.  Have you since seen the mailing list for your letter?

23  A.  I have.

24  Q.  And how many names, approximately, were on the list?

25  A.  2500.

1    Q.  And that 2500 included sales that coincided with times

2    where the sign said Tiffany setting, correct?

3    A.  Yes.

4    Q.  And Tiffany set?

5    A.  Yes.

6    Q.  And round Tiffany set?

7    A.  Yes.

8    Q.  And, Mr. Schutt, you understand, I believe, that one of the

9    issues in this case has to do with the sign on row 5 of

10   Defendant's Exhibit -- sorry, row 6 of Defendant's Exhibit 139

11   where it says "Tiffany" on the first line and then "set" at the

12   beginning of the second line?

13   A.  Yes.

14   Q.  Did you understand that sign to have any different meaning

15   than, say, the line on row 3?

16   A.  No.

17   Q.  What did you understand the word "Tiffany" to mean in

18   signage that took the form of row 6 of Defendant's Exhibit 139?

19   A.  It would be describing the setting for that particular

20   diamond ring, Tiffany setting.

21   Q.  "Tiffany set" was an abbreviation for Tiffany setting?

22   A.  Yes.

23   Q.  Now, you were also asked on direct about whether from time

24   to time Costco actually sold Tiffany and Company branded

25   products.  Do you recall that?

1   A.  Yes.

2   Q.  And has Costco from time to time told Tiffany and Company

3   branded products?

4   A.  Yes.

5   Q.  And when Costco has sold Tiffany and Company branded

6   products have they been delivered to customers in beige boxes

7   like this?

8   A.  No.

9   Q.  This, referring to Costco Exhibit 19.  When Costco has, had

10  Tiffany and Company branded products, has it used the factory

11  packaging that comes with those products?

12  A.  Yes.

13  Q.  Mr. Schutt, could I direct your attention to the document

14  in the plaintiff's book that was given to you, the very first

15  item in the book.  Do you have it in front of you?

16  A.  Yes.  I do.

17  Q.  Are you able to identify what this is, Mr. Schutt?

18  A.  These are sunglasses with the Tiffany and Company brand on

19  them.

20  Q.  And do you recognize this as a display from inside a Costco

21  warehouse store?

22  A.  Yes.

23          MR. DABNEY:  Your Honor, we offer Defendant's Trial

24  Exhibit 58 in evidence.

25          THE COURT:  Any objection?

1              MR. MITCHELL:  No objection.

2              THE COURT:  Defendant's Exhibit 58 is admitted in

3      evidence.

4              (Defendant's Exhibit 58 received in evidence)

5      Q.  Mr. Schutt, I'm going to put up on the screen -- zoom out a

6      little bit, so you can see what we're looking at here.  Can you

7      explain, Mr. Schutt, how this display of Tiffany and Company

8      branded goods differs from the way Costco displays fine

9      jewelry?

10     A.  Well, sure.  This display here shows the manufacturer's box

11     that comes with this particular item.  This sign is consistent

12     with our protocol, where you have the brand of these particular

13     items on the first line of those signs.  That's generally it.

14     Q.  So is it fair to say that when Costco has Tiffany and

15     Company branded goods it uses the blue box in order to mark it?

16     A.  Yes.

17     Q.  And is the blue box an important aspect of the Tiffany and

18     Company branding as you understand it?

19     A.  Yes.

20     Q.  Now, Mr. Schutt, if I could direct your attention to

21     another photograph that's in the book that I handed you which

22     has been marked as Exhibit 59, and I ask you to take a look at

23     that photograph.

24     A.  Yes.

25     Q.  Could you tell us what this is?

1    A.  This is, and it's not on my screen here, but this is a

2    picture of the majors area of our location, one of our

3    locations, and more specifically in the center would be our

4    jewelry case for that location.

5    Q.  Does this photograph illustrate the general type of store

6    layout that Mr. Mitchell asked you about on direct examination?

7    A.  Yes.

8              MR. DABNEY:  Your Honor, we offer Exhibit 59 in

9    evidence?

10             MR. MITCHELL:  No objection.

11             THE COURT:  Defendant's Exhibit 59 is admitted and may

12   be displayed.

13             MR. DABNEY:  Thank you.

14             (Defendant's Exhibit 59 received in evidence)

15   Q.  So, Mr. Schutt, I'm going to put up on the screen this

16   scene.  Could you tell us what we're looking at here?

17   A.  Well you're looking at the jewelry case at a Costco

18   location.

19   Q.  So if we look at -- I notice that there's some cases down

20   on the first level that appear to have yellow light in them.

21   Can you tell me what is in the cases that are in the lower part

22   that I'm calling out that has the yellow light?

23   A.  That would be where our gems and higher end -- our diamonds

24   and gems would be displayed.

25   Q.  And this is where in this part of the case this would be

1   where the diamond rings at issue in this case would have been

2   presented for display?

3   A.  Yes.

4   Q.  Now, does Costco sell any branded fine jewelry in the

5   United States?

6   A.  We don't sell branded gems in the United States.  We sell

7   branded watches, for example, which would be considered

8   jewelry, yes.

9   Q.  But talking about necklaces, engagement rings, broaches,

10  bracelets, does Costco sell branded jewelry in this part of the

11  display case?

12  A.  No.

13  Q.  So if someone is looking down in this part of the case

14  where the diamond rings are, they're not going to see anything

15  that Costco intended to be a branding, is it fair to say?

16  A.  Yes.

17  Q.  And if you look down in this part of the jewelry case

18  you're not going to see any factory packaging, are you?

19  A.  No, you are not.

20  Q.  In fact, you see some of what look like wood boxes in this

21  end of the case.  Do you see what I'm referring to?

22  A.  Yes.

23  Q.  Are those boxes similar to the ones in Defendant's Exhibit

24  19?

25  A.  Yes, they are.

1   Q.  So the only packaging that would be in the display case if

2   there was any packaging where the diamond rings are offered is

3   packaging like Defendant's Exhibit 19, is that right?

4   A.  Yes, that's correct.

5   Q.  You wouldn't ever see packaging like the blue box for

6   Tiffany, would you?

7   A.  No.

8   Q.  Then Mr. Mitchell asked you a series of questions about

9   Rolex watches and so on.  Do you recall those questions?

10  A.  Yes.

11  Q.  Would such products be disclosed in this upper part of the

12  case up here?

13  A.  Yes, they would.

14  Q.  And would they be displayed in their original factory

15  package?

16  A.  Yes, they would.

17  Q.  And would their branding be the first word of any signage

18  that shows up here?

19  A.  Yes, they would.

20  Q.  Now, Mr. Schutt, I'd like to direct your attention to a

21  photograph that is marked and you can go back to my book, it's

22  Exhibit 71.  Mr. Schutt, could I ask you if you recognize what

23  we're looking at in Defendant's Exhibit 71?

24  A.  Yes, this would be a prototypical display for our diamonds

25  in our jewelry case.

1  Q.  Does Defendant's Exhibit 71 provide an illustration of how

2  diamond jewelry is displayed in the part of the case that we're

3  looking at in Defendant's Exhibit 59?

4  A.  Yes, it would.

5          THE COURT:  Your Honor, we offer defendant's Trial

6  Exhibit 71 in evidence.

7          MR. MITCHELL:  May I have a brief voir dire of this

8  exhibit?

9          THE COURT:  Would you discuss with Mr. Dabney what

10  your issue is?

11          (Pause)

12          THE COURT:  Look at me, jury.

13          MR. DABNEY:  Could we have a sidebar, your Honor?

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1        (At the side bar)

2        MR. DABNEY:  Mr. Mitchell --

3        MR. MITCHELL:  I asked if I could have a brief voir

4   dire and Mr. Dabney said "maybe," then "no."  I don't know.  I

5   thought you wanted to ask the question.  You want me to

6   raise -- okay, fine.

7        I don't know the source of this photograph and I don't

8   know whether it was staged or not.  I don't know if this

9   witness knows so I want to know whether this is, and the person

10  who took the photos was a photographer, apparently, our concern

11  with this, with respect to introduction of the document in the

12  exhibit list is that it's a staged photograph.  I don't think

13  he's offering it through this witness, at least I have a right

14  to ask before I make a decision what his knowledge is, I'd like

15  to find out what his knowledge is with respect to the photo.

16        THE COURT:  I hear what you're saying.  Do you plan to

17  ask any foundational questions?

18        MR. DABNEY:  He's testified this is a prototypical

19  display in Costco warehouse stores of which there are hundreds.

20  That's all he knows.

21        THE COURT:  Well, I'm not even sure what

22  "prototypical" means in this context, so if you want to, if

23  you're not planning to ask him, you want to voir dire as to

24  whether this is an accurate representation of a typical actual

25  display in the store or different, I'll let you voir dire on

1  that, if you're not planning to make that foundation.

2            MR. DABNEY:  I can ask him that, sure.

3            MR. MITCHELL:  I want to find out whether he knows

4  whether or not this was set up for this photograph or whether

5  this was an actual display in use in the store at a particular

6  time.

7            THE COURT:  You can ask him that on cross.  If he

8  establishes through this witness that this is a fair and

9  accurate representation according to the witness of a typical

10  display in an actual store I'll let him go forward.

11            MR. DABNEY:  Okay, thank you.

12            MR. MITCHELL:  Thank you.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2    BY MR. DABNEY:

3    Q.  Mr. Schutt, is the photograph Defendant's Exhibit 71 a fair

4    and accurate representation of a typical fine jewelry display

5    of the type depicted in Costco Trial Exhibit 59?

6    A.  Yes.

7              MR. DABNEY:  Your Honor, we offer Defendant's Trial

8    Exhibit 71 in evidence.

9              MR. MITCHELL:  No objection.

10             THE COURT:  Defendant's Exhibit 71 is admitted and may

11   be displayed.

12             (Defendant's Exhibit 71 received in evidence)

13   Q.  So, Mr. Schutt, supposing you're standing in the foreground

14   of this photograph and you walked up to the case where you see

15   these wooden boxes there and you looked down in it.

16   A.  Yes.

17   Q.  Does Defendant's Exhibit 71 depict what you would see?

18   A.  Yes.

19   Q.  All right, so I'm going to put this up on the screen.

20             So are you able to just tell us what we're looking at

21   and comment on anything you believe the jury should know?

22   A.  Well, sure.  We're looking at the right side, I believe, of

23   a jewelry case and I know that because our standard is we put

24   in the middle of the jewelry case our highest end diamond items

25   that we have in our warehouse at that time, and we put them in

1    the brown box that you've seen and then the other items are

2    merchandised around those.

3    Q.  So the tags here would all have information that describes

4    features of the ring?

5    A.  Yes.

6    Q.  So they might provide the metal type?

7    A.  Yes.

8    Q.  And the clarity, like VS2I, or VS2?

9    A.  Yes.

10   Q.  The color and the carat weight and the other information?

11   A.  Yes.

12   Q.  But you would not see any brand names down in this part of

13   the case?

14   A.  No.

15   Q.  So, Mr. Schutt, even today if someone had bought a diamond

16   ring in a Costco store before December 16, 2012, if that person

17   was dissatisfied they could return it to Costco and get a

18   refund?

19   A.  Absolutely.

20   Q.  And you were here when I showed Mr. Kaczmarek the buyer

21   list that was provided to plaintiff's counsel?

22   A.  I was.

23   Q.  And you recall when I also gave it to Ms. Abrams?

24   A.  Yes.

25   Q.  And the people on that list, if any of them misunderstood

1   the signs or even if they didn't, they could come and get a

2   refund from Costco for the full amount?

3   A.  For any reason.

4   Q.  Now, in some of the -- in one of the cases, Mr. Schutt, if

5   someone had taken you up on your offer, was the price that they

6   paid more than what the item was selling for at the time?  If

7   you recall.

8   A.  Yes, it could have been, sure.

9   Q.  So even if the price of diamonds had gone down between the

10  time of purchase and the time they came in for a refund, they

11  could still get what they paid back?

12  A.  Yes.

13          MR. DABNEY:  Your Honor, I have no further questions.

14          THE COURT:  Any redirect?

15          MR. MITCHELL:  Yes, your Honor.

16  REDIRECT EXAMINATION

17  BY MR. MITCHELL:

18  Q.  Mr. Schutt, just so I understand that policy that you just

19  discussed, this lifetime return policy would apply to people

20  who had bought rings even before the statute of limitations

21  period, correct?

22  A.  Yes.

23  Q.  So you could have bought your ring in 2000 by the time you

24  sent your letter in April of 2013, right?

25  A.  Yes.

1    Q.  And we would know that from April 2000 to April of 2013,

2    using that as an example, the price of gold and the price of

3    diamonds went up, right?

4    A.  I think so.

5    Q.  Things usually go up in price, not down.  I know within

6    short periods there could be fluctuations but in the long term

7    prices generally go up, right?

8    A.  Yes.

9    Q.  Your policy, though, was to give people their money back,

10   right?

11   A.  Yes.

12   Q.  So you were writing to people who bought engagement rings.

13   You agree with me engagement rings is a pretty important gift

14   that people give to people in their lifetime?

15   A.  Yes.

16   Q.  And for those married, I'm sure when someone gives a ring

17   to a significant other to get engaged, that becomes a

18   sentimental act, right?

19   A.  Yes.

20   Q.  So even if you bought the ring, gave the ring, received the

21   ring thinking it was a Tiffany ring, if you've had it as an

22   engagement ring for a number of years you might not return it,

23   right?

24   A.  You had ability to do that.

25   Q.  But it's not like, this is not like a vacuum cleaner.  This

1    is an engagement ring we're talking about.  So you're

2    suggesting what we need is, you either need people who are so

3    annoyed or are no longer married or some other reason that

4    they'd be willing to part with their engagement ring in

5    response to your offer.  That's right, isn't it?

6    A.  Yes.

7    Q.  Okay.  Now, for somebody who is that angry and wants to

8    bring the ring back, your offer essentially was no matter what

9    the price of gold and diamonds is today, we'll give you your

10   money back at the price you paid for it in the past, right?

11   A.  Yes.

12   Q.  So for people who actually thought they had a Tiffany

13   engagement ring and found out they did not, their choice was to

14   return the ring to you, get the discounted Costco price back

15   and then go over to Tiffany and buy the same ring for a lot

16   more money, right?

17            MR. DABNEY:  Please consult.  Please stand closer

18   together and talk quieter.  Thank you.

19            (Pause)

20            MR. MITCHELL:  I'll rephrase the question.

21   Q.  Assume, Mr. Schutt, that one of your customers read your

22   letter, read between the lines of your letter and understood

23   you to be saying your sign may have said Tiffany but it wasn't,

24   it was made by us at Costco.  Even though you didn't say that,

25   but they interpreted it that way.  And were upset.  Because

1   that person thought they had a Tiffany ring.  Can you envision

2   that kind of Costco purchaser?

3   A.  It's a little far-fetched, but yes, I could see that.

4   Q.  Okay.  So we know for sure that that person is not going to

5   go back to Costco and buy another Costco ring, right?

6   A.  No.

7   Q.  Right?  You don't know that for sure?

8   A.  I can't assume that they will not buy another Costco ring,

9   no.

10  Q.  Why would they return an engagement ring at Costco and get

11  the money back for what they paid for it years ago when it

12  would cost them more even at Costco to buy the same ring today?

13  A.  Actually, there are situations where the diamond, or the

14  ring could cost less and a member could come back and get a

15  full refund for what they paid and if that same item was being

16  sold for less they could buy it for less and pocket that

17  difference for what they paid.

18  Q.  That's what you expected to happen in response to your

19  letter?

20  A.  I didn't know.

21  Q.  Okay, I didn't think so.  So why did you -- there's no

22  reason to make that speech if you didn't think it was going to

23  happen, you just answer yes or no.

24  A.  Because I didn't know.

25  Q.  Mr. Dabney marked this appraisal for a ring.  By the way,

1  do you see this date now is 2/4/13, do you see the date, right

2  around the time the lawsuit was filed?

3  A.  Yes.

4  Q.  And the appraised amount now has gone up even in your

5  appraisal from the 4850 that was in the ring that Tiffany

6  bought that had been appraised in April of 2012, now you've

7  raised the number to another amount.  Do you see that?

8  A.  I see that the price is 4525 estimated retail value.

9  Q.  So even Costco thinks in that period from somewhere between

10  April of 2012 and February of 2013 the price went up?

11  A.  This appraisal is the appraisal for that diamond ring that

12  was bought at that time.

13  Q.  Focus on the question --

14  A.  That exact ring.

15  Q.  Are you finished?

16  A.  That exact ring.

17  Q.  Say again?

18  A.  That appraisal would be an appraisal for a specific ring.

19  Q.  Maybe I can refresh your recollection.  If you don't know

20  we'll hear it later, but aren't these ring appraisals for a

21  class of ring, not that specific ring in the photograph?  It's

22  for all rings.  It's not your specific ring.  That's how your

23  appraisals are, right?

24  A.  I think our appraisals are, if I remember correctly, for

25  that specific ring in that particular, that particular ring.

1    Q.  So you think that is the actual ring that you're getting

2    and not all 639911 rings; that's your testimony?  You don't

3    even know?  Are you sure or you're not sure?

4    A.  I'm pretty sure, yeah.

5    Q.  You're pretty sure.  Lisa Switzer, though, is the person

6    who does the appraisals?

7    A.  She's one of them.

8    Q.  So if Lisa Switzer testified the appraisal was for the

9    class of ring not the ring in particular, you wouldn't have

10   anything to contradict that, correct?

11   A.  I don't know what her testimony is, no.

12   Q.  But you don't have any specific evidence contrary to that?

13   A.  No.

14   Q.  So focusing on the amount in this one which is 4,525 let's

15   assume this ring was sold for $3,299.  Were you offering your

16   members at least a recovery of the appraised value that you

17   gave them of the ring so that they could go somewhere else and

18   buy a comparable ring that was really worth that?

19   A.  No.  Our refund policy was that they could receive back

20   what they paid for the ring.

21   Q.  Just what they paid for the ring?

22   A.  Yes.

23   Q.  So you told them when they bought the ring that they got

24   this great deal by delivering an appraisal that appraises the

25   amount of the ring for more than a thousand dollars more than

1  what they paid for it, but when you offered to give them their

2  money back knowing it's a engagement ring and if they're still

3  married they have to replace it, you didn't give them the

4  replacement cost, did you?  You weren't offering that, were

5  you?

6  A.  No, we offered what they paid for the ring.

7  Q.  And your expectation would be that anyone who has an

8  engagement ring who is still married and is angry enough to

9  return the ring would go off and have to buy another engagement

10  ring, right?

11  A.  I don't know if they'd go off.  They might buy another one

12  from Costco.

13  Q.  If they're angry at you for misrepresenting the ring to

14  them why would they come back to Costco and buy another ring

15  from them.  Doesn't make much sense, does it?

16  A.  Oh, okay.

17  Q.  Did you give any consideration to perhaps changing your

18  return policy a little bit in this circumstance because you

19  might be dealing with people who were upset and were going to

20  go and replace their rings, maybe we should give them the

21  appraised value of the ring?

22  A.  No.

23  Q.  Didn't give that any thought?

24  A.  No.

25  Q.  Okay.

1          THE COURT:  We have ten minutes till the end of the

2    day.

3          MR. MITCHELL:  Thank you.

4    Q.  Let me show you what Mr. Dabney marked Defendant's Exhibit

5    71.  This was the photo of the rings in the case.  Now, you saw

6    the photos that Ms. Popp took, correct?

7    A.  Yes.

8    Q.  And the photos that Ms. Popp took showed that the rings

9    that she saw with "Tiffany" in the signage were in those

10   holders, right?

11   A.  Yes.

12   Q.  Okay.  The boxes over here were not where the ring that had

13   the Tiffany sign next to it were displayed, correct?

14   A.  Best of my recollection, no.

15   Q.  And the rings here that we're talking about were

16   approximately $3,200 when they were observed and a little over

17   $6,000, right?

18   A.  Yes.

19   Q.  So if you look here you'll see that you have a $7,200 ring

20   that's not in the box, right?

21   A.  Yes.

22   Q.  And you have a $5,000 ring that's not in a box?

23   A.  Yes.

24   Q.  What's in the box is a $16,000 ring and a $12,000 ring,

25   right?

1    A.   Yes.

2    Q.   You said this is a typical display at a Costco, right?

3    A.   Yes.

4    Q.   And the middle part where the expensive rings are?

5    A.   Yes.

6    Q.   So the rings that had the sign "Tiffany" next to them were

7    not displayed in a Costco box, right?

8    A.   Not to my knowledge.

9    Q.   Mr. Dabney showed you a vendor quote sheet from the company

10   RB Diamond, I believe.

11   A.   Yes.

12   Q.   I want to make sure I understand Costco's corporate

13   position here about taking responsibility.  Okay?  Here's the

14   diamond.  RB Diamond, 22 West 48th Street, New York.

15   A.   Yes.

16   Q.   Which for most New Yorkers is the diamond district, right?

17   A.   Yes.

18   Q.   So RB Diamond is a diamond or jewelry dealer on 48th

19   Street, right?

20   A.   Yes.

21   Q.   To the extent they even manufacture anything there this is

22   a relatively small company.  There are thousands of jewelry

23   dealers and wholesalers there on 48th Street in New York.

24   You're aware of that?

25   A.   I am not.

1   Q.  You're not.  Costco, you said, you corrected me when I said

2   $100 billion, does 120 billion a year in sales, correct?

3   A.  Yes.

4   Q.  And your corporate position is, if I understand you

5   correctly, a little company on 22 West 48th Street, New York,

6   is responsible for Tiffany being in the signage of Costco.  Do

7   I understand you correctly?  Their fault?

8   A.  No.

9   Q.  It was not their fault?

10  A.  No.

11  Q.  Whose fault is it?

12  A.  It is essentially my responsibility for the actions of our

13  ICSs that take the information directly from our supplier's

14  sheets and abbreviate it and put it on to our signs.

15  Q.  It's your fault because the jewelry people --

16  A.  We rely on people to give us accurate information.

17  Q.  Let me be clear I understand what you're saying.  It's your

18  fault, and ICS -- that's an entry level position at Costco in

19  terms of the corporate headquarters, it's like an entry level

20  position, right?

21  A.  Yes.

22  Q.  You could be promoted from working in one of the warehouses

23  if you get promoted to headquarters, an entry level position is

24  ICS, correct?

25  A.  Yes.

1  Q.  So you're saying in taking responsibility it's my

2  responsibility that the most junior person at Costco was given

3  the responsibility to use trademarks in signage without any

4  supervision whatsoever.  You're taking responsibility for that?

5  A.  Yes.

6  Q.  Okay.  And we're not going to hear, then, that Costco is

7  taking the position that RB Diamonds is responsible for what

8  appeared in Costco signage.  You're much bigger than they are,

9  you should know what you're doing, right?

10 A.  We take the information directly off the vendor quote

11 sheet.

12 Q.  That sounds like you're blaming RB Diamonds.  So let me be

13 clear.  Is Costco, a $120 billion a year company, taking

14 responsibility for what the signs say in its own stores?

15 A.  We're responsible for and I am responsible for the signs

16 for products sold at our Costco locations.

17 Q.  Right, it's not RB Diamond's fault when it winds up on the

18 floor at Costco?

19 A.  They are the supplier for us and they provide information

20 for us to create our signs from.

21 Q.  That sounds like a non-answer answer.  I want to get an

22 answer answer.  Okay?  RB Diamonds is not responsible for the

23 language of signs on the floors of Costco around the world, is

24 it?

25 A.  They are responsible for providing us accurate information

1   on their quote sheets.

2   Q.  So the level of your corporate oversight at the time these

3   signs were made was such that a little store or a little

4   vendor, a little dealer on 48th Street could cause signs all

5   over the world at Costco to say "Tiffany".  That's what your

6   testimony is?

7   A.  If that's what they put on their quote sheet and we took it

8   from their quote sheet, that would be accurate.

9   Q.  Do you think that sounds frightening when you say that?

10  A.  Could you clarify that question for me?

11  Q.  Yeah, because I'm representing a company that has one of

12  the most famous trademarks in the world and what you're saying

13  is that Tiffany ends up on the floor of a Costco all over the

14  world because somebody at a small vendor in New York used the

15  word "Tiffany" in a sheet.  Seems like you're blaming somebody

16  else.  It sounds like a kid saying, "He did it, she did it, but

17  it's not my fault."  That's what it sounds like to me.

18  A.  Okay.

19  Q.  Doesn't sound like that to you?

20  A.  No.

21  Q.  Do you remember at your deposition I asked you about the

22  use of "Tiffany" in signage and you said that it was something

23  you didn't even need to do, you didn't need to use the word

24  "Tiffany" to describe these rings, you could just see it with

25  your eyes and know what the setting was?

1   A.  Yes.

2   Q.  Okay.  So you said in answer to Mr. Dabney's question you

3   needed to use the word "Tiffany" to describe the style of the

4   ring.  That's not true.  You don't really mean that, right?

5   A.  No, I meant it.  I told you in my deposition that it wasn't

6   necessary for us to be successful in selling diamonds.

7   Q.  From page 33 of your deposition.  We were talking about

8   certain market -- gray market goods.  I'll read this.  If you

9   need me to read the whole thing, I will.  This is a sentence,

10  it starts at line ten, page 34, line 10.

11          "If you looked at the prongs, you know, the generic-

12  looking Tiffany setting, it's not necessary in my view, in my

13  opinion --"

14          I'm sorry, one step up.  It says, "The Tiffany

15  description of the setting would speak for itself.  If you

16  looked at the prongs, you know, the generic-looking Tiffany

17  setting, it's not necessary in my view, in my opinion."

18          So you're saying in your deposition you don't need to

19  use the word "Tiffany" to describe the ring?  That's what

20  you're saying?

21  A.  It's not a hundred percent necessary, no.

22  Q.  Okay.

23          THE COURT:  Two minutes.

24          MR. MITCHELL:  Thank you.

25  Q.  In the -- I don't need to put it up again.  You

1    acknowledged in answer to questions to me that part of taking

2    responsibility was that you accept that this Court has found

3    that "Tiffany" standing alone is a valid trademark, right?

4    That was part of what you said you accept responsibility for,

5    correct?

6    A.   Yes.

7    Q.   Okay.  And that Tiffany is not generic, right?

8    A.   Tiffany on its own is not generic.

9            MR. MITCHELL:  Right, okay.  Mr. Cole, could you

10   please put up, this will be the last thing.  20, is it?  25,

11   PTX25.  Is that the photograph of the sign?  Just zoom in on

12   that.

13   Q.   You would agree with me, would you not, that that

14   constitutes a standalone use of Tiffany?

15   A.   Yes.

16   Q.   And you would agree with me, would you not, that Tiffany in

17   that sign is used as a brand, correct?

18   A.   No.

19   Q.   You would not agree with that?

20   A.   No.

21   Q.   I thought you took responsibility for it.

22   A.   I do.

23   Q.   Could you tell me any other name and any other word in that

24   sign that is a brand other than the word "Tiffany"?

25   A.   This sign refers to a setting for this diamond, a Tiffany

1   setting, yes.

2   Q.  If you're a customer, can you tell me any other word that a

3   customer would look through the glass and look at and see in

4   that sign that they would consider a brand?

5   A.  They may think platinum is a brand because it's the first

6   word on that first line.  They could think that.

7   Q.  That's your testimony?

8   A.  Yes.

9   Q.  That platinum might be a brand for somebody who walks in

10  the store?

11  A.  It could be.

12  Q.  You don't think the first word they might think is a brand

13  in that sign is the word "Tiffany"?  No?

14  A.  I can't speak for every member that saw it, but that sign

15  refers to a Tiffany setting.

16          MR. MITCHELL:  No further questions, your Honor.

17          THE COURT:  Thank you, Mr. Mitchell.

18          Ladies and gentlemen, this concludes our presentation

19  of evidence for the week.  Thank you for your work with us this

20  week.  We will resume on Monday morning, the 26th, at 9:15.  So

21  please be ready in the jury room for 9:15 on Monday.  I remind

22  you that you must not discuss the case or anything or anyone

23  having anything to do with it in any way among yourselves or

24  with any other person, directly, electronically or by any other

25  means.  You must leave your notes in the jury room in the

1    envelopes provided and, as I said, please be back ready on

2    Monday for 9:15.  We hope that you have a good relaxing weekend

3    and safe travels if you're going anywhere.  We look forward to

4    seeing you on Monday.

5                (Jurors exit)

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court; jury not present)

2            THE COURT:  Mr. Schutt, since you're still on

3    examination do you understand that you are not to discuss with

4    anybody the subject matter of your testimony?

5            MR. DABNEY:  Your Honor, I understood that Mr.

6    Mitchell had concluded his examination.  He said he had no

7    further questions.

8            THE COURT:  Oh, you're done, then?

9            MR. MITCHELL:  I am concluded unless Mr. Dabney has

10   redirect.

11           MR. DABNEY:  I do not expect to have redirect.

12           THE COURT:  I'm sorry, I just thought you meant for

13   today.  Therefore, Mr. Schutt, your testimony is concluded.

14   Anyway, sorry for that misunderstanding.  I look forward to any

15   submissions in connection with the charge conference to get to

16   my chambers by noon tomorrow, which I believe is the deadline

17   and to see you all on Monday morning at 9:00.  Mr. Mitchell?

18           MR. MITCHELL:  As a question.  If I understood your

19   Honor correctly yesterday, because when we originally submitted

20   proposed jury charges we provided cases, we provided law to the

21   Court and the Court has since reviewed those, researched the

22   issues I'm sure, itself and come up with jury charges.  If I

23   understood the Court correctly those types of submissions that

24   the Court has are not to be rehashed, we're not going to do

25   those again?

1                THE COURT:  Correct.

2                MR. MITCHELL:  So if something that was not part of

3     the original submission process concerning how we would want

4     the jury to be charged that we've already given you cases or

5     given you legal arguments about why we were right or the other

6     side wasn't right, we're not to do that again?

7                THE COURT:  Please, please don't.

8                MR. MITCHELL:  Thank you.

9                THE COURT:  All right, everything clear?  Great, thank

10    you.  As Ms. Ng will tell you, I need the tables tomorrow, so

11    please do tidy up and try to get some relaxation on your

12    weekend.  We'll see you all Monday.

13                (Adjourned to September 26, 2016 at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   DOUGLAS WAYNE SCHUTT

 4   Direct By Mr. Mitchell . . . . . . . . . . . 409

 5   Cross By Mr. Dabney  . . . . . . . . . . . . 493

 6   Redirect By Mr. Mitchell . . . . . . . . . . 529

 7                    PLAINTIFF EXHIBITS

 8   Exhibit No.                           Received

 9     19   . . . . . . . . . . . . . . . . . . . 428

10     32   . . . . . . . . . . . . . . . . . . . 434

11     33   . . . . . . . . . . . . . . . . . . . 434

12     34   . . . . . . . . . . . . . . . . . . . 435

13     29   . . . . . . . . . . . . . . . . . . . 448

14    117   . . . . . . . . . . . . . . . . . . . 459

15     20   . . . . . . . . . . . . . . . . . . . 464

16     21   . . . . . . . . . . . . . . . . . . . 466

17     38   . . . . . . . . . . . . . . . . . . . 473

18    130   . . . . . . . . . . . . . . . . . . . 474

19    103   . . . . . . . . . . . . . . . . . . . 478

20    104   . . . . . . . . . . . . . . . . . . . 483

21

22

23

24

25
```

DEFENDANT EXHIBITS

Exhibit No.                                      Received

20  . . . . . . . . . . . . . . . . . 498

58  . . . . . . . . . . . . . . . . . 520

59  . . . . . . . . . . . . . . . . . 521

71  . . . . . . . . . . . . . . . . . 527