UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TIFFANY AND COMPANY and TIFFANY (NJ) LLC,<br><br>                    Plaintiffs,<br><br>          v.<br><br>COSTCO WHOLESALE CORPORATION,<br><br>                    Defendant. | No. 13 Civ. 1041 (LTS) (DCF) |

**PLAINTIFFS' POST-TRIAL MEMORANDUM**

*Of Counsel*:
Jeffrey A. Mitchell, Esq.
Judith R. Cohen, Esq.
Brett D. Katz, Esq.

BROWNE GEORGE ROSS LLP
5 Penn Plaza, 24th Floor
New York, New York 10001
Telephone:  (212) 413-2600
Facsimile:  (212) 413-2629
Attorneys for Plaintiffs

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... ii

I.     THE JURY'S VERDICT SHOULD BE ADOPTED ......................................... 1

     A.    Whether Or Not The Jury's Verdict Is Advisory With Respect To Its Calculation Of Profits Is An Open Question ........................................... 1

     B.    The Court Is Bound By The Jury's Determinations Of Factual Issues Common to The Legal And Equitable Claims ......................................... 3

II.    THERE ARE NO EXTENUATING CIRCUMSTANCES THAT PRECLUDE TREBLING OF THE PROFITS AWARD ..................................................... 4

     A.    The Extenuating Circumstances Exception Is Intended For Extreme Cases And Is Not Applicable Here ................................................. 4

     B.    Costco Has Not Proved Extenuating Circumstances ............................... 6

III.   A PERMANENT INJUNCTION SHOULD BE GRANTED ........................... 7

     A.    The Standard For A Permanent Injunction ........................................ 7

     B.    Tiffany Has Established Irreparable Injury ....................................... 7

     C.    There Is No Adequate Remedy At Law ............................................. 9

     D.    The Balance Of Hardships Weigh In Tiffany's Favor ......................... 11

     E.    The Public Interest Would Not Be Disserved ..................................... 12

IV.   THE JURY'S VERDICT IS SUPPORTED BY THE EVIDENCE .................. 12

     A.    Profits ................................................................................... 12

     B.    Enhanced Profits ..................................................................... 18

     C.    Punitive Damages .................................................................... 20

     D.    Statutory Damages .................................................................. 25

CONCLUSION ....................................................................................... 25

CASES                                                                    Page(s)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................15

*Black & Decker Corp. v. Positec USA Inc.*, 118 F. Supp. 3d 1056 (N.D. Ill. 2015) ..................1, 2

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962) ................................................1, 2

*Daisy Grp., Ltd. v. Newport News, Inc.*, 999 F. Supp. 548 (S.D.N.Y. 1998) ................2

*eBay v. MercExch.*, 547 U.S. 388 (2006)................................................7

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A, Inc.*, 778 F.3d 1059 (9th Cir. 2015)................1

*Fresh Del Monte Produce, Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655
    (S.D.N.Y. 2013) ................................................9, 12

*Gucci Am., Inc. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014)................2

*Gucci Am., Inc. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014)................1

*Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207 (S.D.N.Y. 2012)................9, 17

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257 (2d Cir. 2005) ..........11

*Ismail v. Cohen*, 899 F.2d 183 (2d Cir. 1990) ................................................15

*Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 12 Civ 6283 (AJN), 2012 WL 5265727
    (S.D.N.Y. Oct. 24, 2012) ................................................3

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*, No. C 04-4146 MMC,
    2007 WL 328696 (N.D. Cal. Feb. 2, 2007) ................................................5, 6

*Koon Chun Hing Kee Soy & Sauce Factory v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312
    (E.D.N.Y. 2009), *aff'd*, 409 F. App'x 389 (2d Cir. 2010) ................................................5

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995)................3

*Louis Vuitton S.A. v. Lee*, 875 F.2d 584 (7th Cir. 1989)................5, 6

*Mattel, Inc. v. Robarb's, Inc.*, No. 00 Civ. 4866(RWS), 2001 WL 913894
    (S.D.N.Y. Aug. 14, 2001) ................................................9

*Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247 (2d Cir. 2014)................20

*Microban Prods. Co. v. API Indus., Inc.*, No. 14 Civ. 41 (KPF), 2014 WL 1856471
    (S.D.N.Y. May 8, 2014)................8, 9

CASES (cont.)                                                                Page(s)

*Mister Softee, Inc. v. Tsirkos*, No. 14 Civ. 1975 (LTS)(RLE), 2014 WL 2535114
 (S.D.N.Y. June 5, 2014)..........................................................................................8, 12

*Mister Softee, Inc. v. Tsirkos*, No. 14 Civ. 1975 (LTS)(RLE), 2015 WL 7458619
 (S.D.N.Y. Nov. 23, 2015) ...................................................................................9

*N.Y. Racing Ass'n, Inc. v. Stroup News Agency Corp.*, 920 F. Supp. 295 (N.D.N.Y. 1996).........20

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014)....................................2

*ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*,
 314 F.3d 62 (2d Cir. 2002).................................................................................12

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)..................................16

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ...................................................7

*SharkNinja Operating LLC v. Dyson Inc.*, No: 14-cv-13720-ADB, 2016 WL 6134101
 (D. Mass. Oct. 19, 2016).....................................................................................2

*Song v. Ives Labs., Inc.*, 957 F.2d 1041 (2d Cir. 1992) .............................................3

*Sorelle v. Cosmetic World, Ltd.*, 642 F. Supp. 1143 (S.D.N.Y. 1986) ..........................4, 5

*Teutscher v. Woodson*, 835 F.3d 936 (9th Cir. 2016) ...............................................3

*Tolbert v. Queens Coll.*, 242 F.3d 58 (2d Cir. 2001) ...............................................16

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 511 F. App'x 81 (2d Cir. 2013).................7

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515 (S.D.N.Y. 2011),
 *aff'd*, 511 F. App'x 81 (2d Cir. 2013)...................................................................8

*Wade v. Orange Cty. Sheriff's Office*, 844 F.2d 951 (2d Cir. 1988)...............................3

STATUTES

15 U.S.C. § 1117(a) .................................................................................18

15 U.S.C. § 1117(b) .................................................................................4, 5

OTHER AUTHORITIES

Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H. 12076
 (Oct. 10, 1984) .................................................................................................5

Plaintiffs Tiffany and Company and Tiffany (NJ) LLC (collectively "Tiffany") submit this post-trial brief in response to the four questions set forth in the Court's October 20, 2016 Order, ECF No. 387 (the "Post-Trial Briefing Order").[1]

## I.     THE JURY'S VERDICT SHOULD BE ADOPTED

### A.     Whether Or Not The Jury's Verdict Is Advisory With Respect To Its Calculation Of Profits Is An Open Question

The Court stated in its Summary Judgment Opinion that whether the accounting of profits in a trademark infringement action is an equitable or legal remedy "is an open question in the Second Circuit." Summ. J. Op. 36. *Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 132-33 (2d Cir. 2014), which was decided before the Summary Judgment Opinion, found that where a prejudgment restraint of assets was sought in advance of an accounting, the claim for profits was equitable. The Court did not address the right to a jury trial where no prejudgment relief was sought. However, the Ninth Circuit Court of Appeals in *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075-76 (9th Cir. 2015), found the next year that a pure accounting for profits under 15 U.S.C. §1117(a) is an equitable remedy not triable to a jury.

Then, later still, the United States District Court for the Northern District of Illinois in *Black & Decker Corp. v. Positec USA Inc.*, 118 F. Supp. 3d 1056 (N.D. Ill. 2015), disagreed with the Ninth Circuit in *A.V.E.L.A.* and concluded a profits determination under § 1117(a) was triable to a jury. It rejected the basis on which the Ninth Circuit in *A.V.E.L.A.* distinguished *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962), which held that "the plaintiffs had a Seventh Amendment jury right as to their demand for an accounting" because the claim was "'wholly

---

[1]     The Court granted the parties permission to address these issues to the extent they are not fully addressed in motion practice under Federal Rules of Civil Procedure 50 and 59. Since Costco did not file any motion under Rule 50 and 59 on November 2, 2016 as it had initially proposed to do, Tiffany is responding here to all four questions posed in the Post-Trial Briefing Order.

legal in its nature,' regardless of whether the complaint was construed to allege a breach of contract, trademark infringement, or both." 118 F. Supp. 3d at 1059 (quoting *Dairy Queen*, 369 U.S. at 477). The court went on to find that a claim for profits on a deterrence theory, as here, is triable to a jury. *Id.* at 1064.

Then, just last month, the United States District Court for the District of Massachusetts in *SharkNinja Operating LLC v. Dyson Inc.*, No: 14-cv-13720-ADB, 2016 WL 6134101 (D. Mass. Oct. 19, 2016), in looking at the state of the law in the First Circuit and elsewhere, concluded that it was in flux, so the court proceeded with a jury on a profits determination but "reserved the right to treat the jury's determinations as advisory or disregard them altogether," leaving the final decision open "until 'after the case has been completed,'" *id.* at *3 (citation omitted).

To the best of Tiffany's knowledge, no court in the Second Circuit after *Gucci v. Bank of China* has addressed the right to a jury under the set of circumstances presented here, i.e., infringement and counterfeiting having already been found, with punitive damages triable to a jury in the same trial as the profits determination. So, that question can still be characterized as an open one.[2] The Court charged the jury here that if it found that gross revenue from sales of rings using the improper signage could not be determined due to a lack of records, it could "reach a reasoned approximation resolving any doubts against Costco." Tr. 1266:1-4 (citations to the trial transcripts are preceded by "Tr."). The jury clearly followed that instruction in determining that Costco's profits were $3,700,000. However, since the jury thereafter found that

---

[2]    In *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1967 n.1 (2014), decided several months before *Gucci v. Bank of China*, the Court concluded that recovery of profits under the Copyright Act would be treated as equitable in that case, in the context of determining whether laches might be invoked. However, the Court explained that recovery of profits "is not easily characterized as legal or equitable," for it is an "amalgamation of rights and remedies drawn from both systems." *Id.* (citation omitted) (internal quotation marks omitted); *see also Daisy Grp., Ltd. v. Newport News, Inc.*, 999 F. Supp. 548 (S.D.N.Y. 1998).

an award of $5,500,000 would be a just award of profits, and that determination *is* advisory, the issue of whether or not the lower actual profits award is advisory too may be moot. In an abundance of caution, regardless of where the Court comes out on the state of the law, Tiffany believes the Court should set out findings of fact that would support the jury's determination, whether or not it was advisory on actual profits.

**B.  The Court Is Bound By The Jury's Determinations Of Factual Issues Common to The Legal And Equitable Claims**

Even if the calculation of Costco's profits is treated as advisory (along with the verdicts with respect to questions 1(b) and 1(c)), the jury's verdicts are not advisory with respect to the calculation of statutory damages and the award and calculation of punitive damages.[3]

Where, as here, an action involves both legal and equitable claims, "the right to a jury trial on the legal claim, including all issues common to both claims, remains intact." Summ. J. Op. 37-38 (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 426 (2d Cir. 1995)). Moreover, "the jury's verdict on the common factual issues precludes a contrary finding of fact by the court." *Wade v. Orange Cty. Sheriff's Office*, 844 F.2d 951, 954 (2d Cir. 1988). Thus, where equitable claims are tried to a Court and legal claims to a jury, "the trial judge must 'follow the jury's implicit or explicit factual determinations' 'in deciding the equitable claims.'" *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016) (citations omitted). "[A] judge sitting at equity may not render a verdict which is inconsistent with that of a jury sitting at law on a claim involving the same essential elements." *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1048 (2d Cir. 1992). Tiffany respectfully submits that the Court here is constrained in its ability to reject any

---

[3]  Numerous courts have concluded that statutory damages under the Lanham Act are a remedy at law. *E.g.*, *Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 12 Civ. 6283 (AJN), 2012 WL 5265727, at *7 (S.D.N.Y. Oct. 24, 2012). Tiffany's prior reference to the jury's verdict as advisory on this issue in the parties' October 14, 2016 joint letter (ECF No. 360), was in error.

portion of the jury verdict that is advisory. Because the determinations with respect to punitive damages and statutory damages are not advisory, the Court must accept the jury's "implicit or explicit" factual determinations made in connection with them.

The verdict forms did not require the jury to explain its rationale. However, what is implicit from the verdicts is that the jury determined that Costco's records were inadequate and unreliable, and as instructed, performed its own calculations in order to estimate Standalone Use[4] profits from what was in the record. What is also implicit is that in awarding punitive damages and the maximum statutory damages, the jury found Costco's conduct reprehensible, and its excuses insufficient. The Court, therefore, must not make any findings in connection with any equitable claims that are inconsistent with those implicit and explicit determinations.[5]

## II. THERE ARE NO EXTENUATING CIRCUMSTANCES THAT PRECLUDE TREBLING OF THE PROFITS AWARD

### A. The Extenuating Circumstances Exception Is Intended For Extreme Cases And Is Not Applicable Here

Under 15 U.S.C. § 1117(b), "absent 'extenuating circumstances,' federal courts are expected, and not merely authorized to 'enter judgment for three times such profits [calculated under § 1117(a)] or damages . . . .'" *Fendi S.a.s. Di Paola Fendi e Sorelle v. Cosmetic World, Ltd.*, 642 F. Supp. 1143, 1147 (S.D.N.Y. 1986) (quoting 15 U.S.C. § 1117(b)). Trebling "is mandatory (as is the award of the plaintiff's attorney's fees), subject only to the statute's

---

[4] "Standalone Use" as used herein means Costco's use of "Tiffany" in signs on a standalone basis or without any immediately following modifier.

[5] In that regard, Costco argued to the jury that the standalone use of "Tiffany" was merely intended to describe a setting style and not a brand. The jury obviously rejected that excuse when it awarded punitive damages. To the extent it now proffers that excuse in contemplation of claiming extenuating circumstances, the Court should not make any finding that is inconsistent with the jury's implicit rejection of that excuse.

4

exception for 'extenuating circumstances.'" *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 588 (7th Cir. 1989).[6]

The application of extenuating circumstances is intended for "extreme cases." *Id.* at 590; *see also Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*, No. C 04-4146 MMC, 2007 WL 328696, at *11 (N.D. Cal. Feb. 2, 2007). "Congress has indicated that 'it will be a rare case in which a defendant who has trafficked in goods or services using a mark that he or she knows to be counterfeit can show that he or she should not be assessed treble damages.'" *Fendi*, 642 F. Supp. at 1147 (quoting Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H. 12076, 12083 (Oct. 10, 1984)); *accord Koon Chun Hing Kee Soy & Sauce Factory v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312, 325 (E.D.N.Y. 2009), *aff'd*, 409 F. App'x 389 (2d Cir. 2010). Thus, "where the defendant is an 'unsophisticated individual, operating on a small scale, for whom the imposition of treble damages would mean that he or she would be unable to support his or her family,' treble damages may be inappropriate." *Fendi*, 642 F. Supp. at 1147 (quoting Joint Explanatory Statement, 130 Cong. Rec. H. 12076 at 12083); *accord Louis Vuitton*, 875 F.2d at 590; *Star Mark*, 628 F. Supp. 2d at 325.

To state the obvious, Costco cannot show such extenuating circumstances.

---

[6]     Although § 1117(b) requires that the defendant intentionally used the mark knowing that such mark is a counterfeit mark, these predicates were established by the Court's prior findings in its summary judgment ruling, that Costco (i) is liable for trademark counterfeiting, Summ. J. Op. 23, and (ii) acted willfully and with deceptive intent, *id.* at 15, 17, 22, 32 n.5, 33. And, for purposes of § 1117(b), "[w]illful blindness is knowledge enough." *Louis Vuitton*, 875 F.2d at 590. Here, such willful blindness has been established, where the proof was that Tiffany is a strong mark, Summ. J. Op. 8; Costco's top management never questioned the use of Tiffany in signage over the 20 year period during which Costco used the mark, Tr. 415:20-416:6, 417:3-11, 417:23-418:11; and Costco did nothing at all to change the signage even after a customer expressed confusion about its meaning, Summ. J. Op. 15.

## B.  Costco Has Not Proved Extenuating Circumstances

A claim of extenuating circumstances is an affirmative defense, that must be pled and proved or otherwise presented by the defendant.  If the defendant fails to do so, the defense is waived.  *Louis Vuitton*, 875 F.2d at 590; *Eastimpex*, 2007 WL 328696, at *12.  Here, although Tiffany sought treble damages in its Complaint, Compl. ¶ 72, ECF No. 1; *id.* at 24 ¶ E, Costco failed to set forth any affirmative defense of extenuating circumstances, Answer & Countercl., ECF No. 5.  Nor did Costco even mention – much less prove – extenuating circumstances at trial. Even if Costco could point to evidence which might establish the "extreme" or "rare" case in which extenuating circumstances would apply, it should not be permitted to do so now.

In any event, Costco never had any intention of proving the facts necessary to establish extenuating circumstances.  At the December 21, 2015 pretrial conference, the Court asked whether Costco intended to establish extenuating circumstances.  When Costco confirmed that it would do so, the Court asked for a general offer of proof as to the evidentiary basis.  Hr'g Tr. 24:11-15, Dec. 21, 2015.  Costco then recited its familiar litany of excuses:  it thought the signs described a setting style, the signage was based on vendor-supplied information, it immediately stopped use of the signs, it immediately cooperated in providing Tiffany with historical evidence, the signage did not generate any significant degree of confusion, Costco allows returns for full refunds, Tiffany has not identified any loss, and there are only five purchasers. *Id.* at 24:16-26:1.

Not only is this "evidence" insufficient to establish extenuating circumstances, it was rejected by the Court in its Summary Judgment Opinion, and/or was rejected by the jury as part of its determinations that Tiffany was entitled to recover the maximum level of statutory damages and an award of punitive damages.  In his closing statement in the first phase of the trial, Costco's counsel began by telling the jury that Costco's case revolved around three basic

6

points – "accepting responsibility, making full disclosure, and doing the right thing," Tr. 1184:4-9 – in essence, the same arguments Costco proffered to the Court last year as its evidence of extenuating circumstances. It is implicit (if not explicit) that the jury rejected these "basic points" in their entirety in determining that Tiffany was entitled to an award of punitive damages in the amount of $8,250,000. For the Court to now conclude that this same rejected evidence constitutes extenuating circumstances that preclude trebling of the profits award would be inconsistent with the jury's "implicit or explicit" factual determinations made in connection with the legal claims. As already established, the Court must avoid such a result. *See supra* p. 3.

## III.    A PERMANENT INJUNCTION SHOULD BE GRANTED

### A.    The Standard For A Permanent Injunction

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay v. MercExch.*, 547 U.S. 388, 391 (2006). Governed by these well-settled principles, Costco should be permanently enjoined from using the mark TIFFANY or any colorable imitation thereof, on a standalone basis or without any immediately following modifier, in connection with its advertisement and/or sale of any products not manufactured by, at the direction of, or under the authority of Plaintiffs or their affiliates.

### B.    Tiffany Has Established Irreparable Injury

The Second Circuit has not yet decided whether a presumption of irreparable harm still applies after the decisions in *eBay* and *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010). *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 511 F. App'x 81, 85 (2d Cir. 2013). However, as in *PRL*, the Court need not do so since Tiffany proved irreparable harm.

As this Court has stated, "'[i]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark ... because loss of control over one's reputation is neither "calculable nor precisely compensable."'" *Mister Softee, Inc. v. Tsirkos*, No. 14 Civ. 1975 (LTS)(RLE), 2014 WL 2535114, at *9 (S.D.N.Y. June 5, 2014) ("*Mister Softee I*") (omission in original) (quoting *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013)). Such loss of control follows from a finding of likelihood of confusion: irreparable harm exists "in situations where there is a likelihood of confusion between the marks, and where the reputation and goodwill cultivated by the party seeking the injunction would be out of the party's control because of the infringement." *Microban Prods. Co. v. API Indus., Inc.*, No. 14 Civ. 41 (KPF), 2014 WL 1856471, at *21 (S.D.N.Y. May 8, 2014).

Here, not only has the Court found a likelihood of confusion, Summ. J. Op. 20, it has also made several findings which establish the irreparable harm to Tiffany's goodwill and reputation because of Costco's infringement. Among other things, in view of the "superior quality of Tiffany products, the rigorous quality control techniques that Tiffany employs, and the lack of any equivalent quality control on Costco's part. . . . Tiffany's reputation could be compromised by Costco's sale of inferior rings under the Tiffany mark." *Id.* at 18. And, significantly, there has been actual confusion on the part of several Costco customers, including Maria Bentley who was "brought to tears when the diamond fell out of the ring she purchased at Costco because she believed that she had purchased a genuine Tiffany ring." *Id.* at 11. In addition, one Tiffany customer was "shocked" when she visited the Costco store in Huntington Beach, California and saw Costco advertising a Tiffany ring; as she had a Tiffany ring she found this a "disappointment." PTX 27.0003-04. Another accosted a Costco salesperson when he was told

the rings were not real Tiffany.  Tr. 130:11-131:6, 137:7-21.  Plainly, if Costco sells its own rings as "Tiffany" rings, Tiffany loses control over its carefully cultivated and well-justified reputation and goodwill, to its irreparable harm.

**C.        There Is No Adequate Remedy At Law**

The first two *eBay* factors – irreparable harm and no adequate remedy at law – often blend together.  *Fresh Del Monte Produce, Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 664 (S.D.N.Y. 2013).  The loss of reputation and goodwill to a trademark plaintiff's brand is unknown, which demonstrates the absence of an adequate remedy at law.  *Microban*, 2014 WL 1856471, at *21.  Harms such as loss of control over quality and the undermining of the goodwill and competitive value associated with a plaintiff's trademark "cannot be adequately addressed by money damages."  *Mister Softee, Inc. v. Tsirkos*, No. 14 Civ. 1975 (LTS)(RLE), 2015 WL 7458619, at *5 (S.D.N.Y. Nov. 23, 2015).  As discussed above, both on the summary judgment motions and at trial, the record clearly showed that Costco's rings were inferior to those made by Tiffany, and the damage to Tiffany's reputation and goodwill from the false association between Costco rings and the Tiffany brand was real.

In addition, no adequate remedy at law will be found where the record contains no assurance against a defendant's continued violation of a plaintiff's trademark.  *Microban*, 2014 WL 1856471, at *21.  "Courts in this circuit have long held that a permanent injunction should issue in trademark cases where a defendant asserts that its pre-lawsuit use was lawful . . . ."  *Del Monte*, 933 F. Supp. 2d at 661 (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 256 (S.D.N.Y. 2012)); *see also Mattel, Inc. v. Robarb's, Inc.*, No. 00 Civ. 4866(RWS), 2001 WL 913894, at *3 (S.D.N.Y. Aug. 14, 2001) (granting a permanent injunction and considering the fact that defendants had ceased their infringing behavior "skeptically given

that [defendant] has already infringed, continues to contest the lawfulness of its action, and ceased its infringing conduct only after the initiation of this lawsuit").

This is precisely Tiffany's concern here. While Costco proclaimed to the jury that it takes full responsibility for its actions, Tr. 68:24, 391:7-14, did the right thing, Tr. 71:3-4, 415:9-12, and took down the offending signs immediately, Tr. 78:24-25, 396:2-5, these self-serving, litigation-driven attempts to explain away its willful infringement are belied by Costco's words and actions ever since Tiffany first contacted Costco about the matter. Costco's CEO, Craig Jelinek, told all Costco employees that Costco merely intended to describe a setting style when it used the word "Tiffany," PTX 103, and Costco's Executive Vice President-Merchandising, Douglas Schutt, in his letter to Costco members who had purchased diamond rings next to Tiffany signs, told them that the signs were not inaccurate and that they used the word "Tiffany" to indicate a setting style, PTX 104.

Mr. Jelinek testified that he thought Tiffany's claims were frivolous at the time he first heard about them and still thought they were frivolous at the time of his deposition, many months later. Tr. 820:21-821:1. Both he and Mr. Schutt did not think Costco did anything wrong, and that the use of "Tiffany" was not a big deal." Tr. 823:11-13, 418:21-25. Even after the jury returned its first verdict awarding Costco's profits to Tiffany, enhancing those profits, awarding the highest level of statutory damages, and determining that Tiffany was entitled to an award of punitive damages, Court Ex. 18, Costco persisted in its attempts to justify its infringement. Thus, in Costco's summation to the jury on the punitive damages phase of the trial, Costco's counsel continued to argue that Costco was only using the "actual name of the setting style" and that "'Tiffany' is a word in a dictionary." Tr. 1329:21-22, 1333:15-16. Costco's continuing assertion that its pre-lawsuit use of the famous Tiffany mark was lawful is

not at all indicative of a defendant that takes responsibility for its actions, or that might not try something similar in the future.

More important, particularly from the perspective of whether a permanent injunction should issue, are Costco's efforts to continue to use the Tiffany mark. Costco's counterclaim sought a declaratory judgment that Tiffany's trademark registrations are invalid because they aim to exclude others from using the word "Tiffany" generically to describe a ring setting, and asked that Tiffany's registrations be modified accordingly. Consistent with Costco's protestations that its use was lawful, the counterclaim also sought a declaration that Costco's prior use had not infringed Tiffany's rights. Summ. J. Op. 2. And, in its Emergency Motion For Expedited Briefing and Argument, Costco represented to the Second Circuit that the summary judgment order had the effect of enjoining Costco from engaging in truthful speech and that such "loss of First Amendment freedoms . . . constitute[d] irreparable injury."[7] Emerg. Mot. Expedited Briefing & Arg. at 11-12, No. 15-2916-CV (2d Cir. Sept. 21, 2015), ECF No. 29 (citation omitted) (internal quotation mark omitted). In view of all of these efforts by Costco to justify and continue its use of the TIFFANY mark, a permanent injunction is necessary and appropriate.

### D.    The Balance Of Hardships Weigh In Tiffany's Favor

Tiffany is requesting a narrow injunction consistent with the Court's rulings and instructions to the jury as to which signs are in issue here. Costco says that it has removed all

---

[7]    Costco's submission to the Second Circuit was discussed several times at trial, and was the subject of its own jury instruction. Tr. 218:11-219:13, 401:24-402:3, 1262:22-1263:3. The submission itself had been marked as PTX 116, but was not moved into evidence in view of Costco's stated intent to object. Tr. 217:25-218:20. Tiffany is submitting proposed PTX 116 for the Court to review as part of its equitable determination as to whether it should issue a permanent injunction. Under Rule 201 of the Federal Rules of Evidence the Court can take judicial notice of Costco's filing at any stage of the proceeding, as a fact not subject to reasonable dispute, because it can be accurately and readily determined from sources whose accuracy cannot be reasonably be questioned. *See, e.g.*, *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005).

offending signs and notwithstanding its hyperbolic assertions to the Court of Appeals concerning loss of First Amendment freedoms, its CEO has testified "'[w]e don't need to use anybody's name.'" Tr. 815:22. The Court has ruled that Costco's use of the Tiffany mark is both infringing and counterfeiting.

Simply put, Costco has no right to use the Tiffany mark, nor any need to do so. It "could hardly suffer hardship from complying with an injunction limited to enforcing the [Court's ruling]." *Del Monte*, 933 F. Supp. 2d at 665.

### E. The Public Interest Would Not Be Disserved

There is nothing in the record to indicate that the public interest would be harmed by the issuance of the requested injunction. To the contrary, "[t]he Second Circuit has determined that there is a 'strong interest in preventing public confusion.'" *Mister Softee I*, 2014 WL 2535114, at *10 (quoting *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002)). The Court has found both likely and actual confusion here and the public interest will be served by a permanent injunction which stops such confusion. For all of the foregoing reasons, the Court should issue the permanent injunction requested by Tiffany.[8]

## IV. THE JURY'S VERDICT IS SUPPORTED BY THE EVIDENCE

### A. Profits

Costco did not keep and maintain records sufficient to enable it to accurately account for all rings sold with a Standalone Usage, so the jury had to estimate profits. For example:

---

[8] The Post-Trial Briefing Order asked about what "equitable and injunctive relief ought to be granted." Other than the equitable relief discussed in Tiffany's responses to the other questions posed by the Court (e.g., enhanced and trebled profits) and the permanent injunction discussed herein, Tiffany does not now seek any other equitable relief.

1.      Costco did not match purchasers on the purchaser list to any specific signs, Tr. 588:15, 603:3-8, nor could it do so because it had no records which showed the particular sign each purchaser saw in a Costco display case at the time of a purchase, Tr. 576:5-12, 602:3-6, 577:5-16, 580:1-16, 610:8-9.

2.      Records produced by Costco showed negative ring sales during certain periods and in the aggregate, which is not possible.  DTX 258; Tr. 271:3-14, 276:10-277:16.

3.      Records also implausibly showed negative margins for some platinum and diamond engagement rings, Tr. 274:7-275:3; DTX 804, raising legitimate questions about the reliability of such records, Tr. 1141:9-1143-6.

4.      Costco sales records showed 150 returns of rings for which no prior sale was shown, DTX 139, at 2 n.4; Tr. 294:19-295:17, 1144:21-1146:15, revealing that critical records were missing, Tr. 1144:21-1146:15, 295:8-17.

5.      Even though it was undisputed that the ring purchased by Tiffany's investigator on November 30, 2012 was a Standalone Use sale during Costco's fourth fiscal period of fiscal year 2013, the sales report produced by Costco did not account for that sale and showed no Standalone Use sales at all during that fiscal period for the Standalone Use sign that was actually photographed as being displayed next to this ring at the time of purchase.  PTX 25; DTX 258; Tr. 610:3-9, 612:4-8.

6.      Purchase order information (to calculate the cost of each ring) could not be matched to actual sales making it impossible to calculate profits on a ring-by-ring basis, Tr. 275:4-12, even if a Standalone Use could have been determined.

7.     Raw signage data produced by Costco showed 213,761 separate sign entries in which the word "Tiffany" appeared from 2007-2013, 70,000 of which showed a Standalone Use over that six year period, PTX 64; PTX 133; PTX 133A, suggesting far greater sales than reported in Costco sales records.

8.     One of the foregoing Standalone Use signs for which there were 24,469 separate entries read "1 CTW DIAMOND ROUND – SOLITAIRE TIFFANY – RING" for the entire six year period, PTX 64; PTX 133/PTX 133A (first entry), yet Costco's expert, Dr. Cornell, reported zero net sales attributable to that sign, and identified a far shorter time period during which that sign was supposedly in use, DTX 139/PTX 139A (last entry).

9.     Dr. Cornell did not review the underlying signage data to verify the completeness and accuracy of his report, so he was unable to refute the strong implication that his report was incomplete and unreliable.  PTX 64; PTX 133; Tr. 1152:4-1155:9.

10.    Costco tracks the performance of products it offers for sale, and any that do not sell are eliminated, Tr. 446:9-14, making it highly improbable a sign would have 24,469 entries in signage records over a six year period but have no net sales, as Dr. Cornell reported.

11.    Tiffany's expert, Brent Kaczmarek, testified that the failure to include sales for that sign, and the inclusion of the wrong dates of use for that one and others, rendered Dr. Cornell's report unreliable.  Tr. 315:14-318:3.

12.    Mr. Kaczmarek observed and identified other material errors and omissions from Dr. Cornell's report (DTX 139), which further rendered that report unreliable.  Tr. 318:4-323:3.

13.    Costco represented that it ceased all use of "Tiffany" in signs in mid-December 2012, promptly after receiving notice from Tiffany of its claims, Tr. 509:14-19, but Costco sign specimens produced to Tiffany, and represented as being from Costco records, showed signs dated as late as March 17, 2013 with a Standalone Use, and those signs likely remained in stores long after that date, PTX 151 (second and third rows); Tr. 747:1-17.

14.    The purchaser list produced by Costco, PTX 81; DTX 52, (i) showed sales of rings from February 14, 2007 through August 31, 2013, Tr. 629:24, (ii) contained 4,053 names, Tr. 738:8-9, and (iii) reflected gross sales to those listed purchasers of $17.1 million, Tr. 738:8-9.

15.    Even though the time period for the transactions reflected on the purchaser list ran through August 31, 2013, and specimens of signs produced by Costco had dates at late as March 2013, Costco's expert inexplicably cut off his already deficient profits analysis as of December 16, 2012. Tr. 1118:25-1119:6, 1129:3-14.

16.    Four months after sending a letter dated April 5, 2013 to purchasers of rings next to signs that said "Tiffany," PTX 104, the author of that letter, Costco's chief merchandising officer, Mr. Schutt, estimated that 11,000 letters were sent, an amount confirmed by Costco's CEO, Tr. 487:3-488:8, 814:20-815:1, a clear indication that sales were far greater than Costco claimed.

When sitting in a non-advisory capacity, "[i]t is well settled that calculation of damages is the province of the jury." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990).  In reaching a verdict, juries regularly make determinations about the credibility of witnesses, the reliability or lack thereof of expert opinions, and the quality and sufficiency of the evidence.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."); *Tolbert v. Queens Coll.*, 242 F.3d 58, 73 (2d Cir. 2001) ("[T]he matter of which of permissible inferences were to be drawn from that evidence was solely within the province of the jury."). Even if the jury was acting in an advisory capacity in determining profits here, the Court gave it specific instructions on what was to be considered in reaching a verdict. While the Court has the authority to countermand the verdict of an advisory jury, as long as a reasonable interpretation of the trial record supports the advisory verdict in this case, the jury's advice should be taken and the verdict validated.[9] That is especially true here, since the non-advisory portions of the verdict (punitive damages and statutory damages) rest, in part, on the findings made by the jury in calculating profits.

The Court charged the jury here, "If you find that the amount of gross revenue from sales of rings using the improper signage cannot be determined precisely due to a lack of records, you may reach a reasoned approximation resolving any doubts against Costco." Tr. 1266:1-4.[10] As the foregoing citations to the record clearly demonstrate, there was ample evidence for the jury to conclude that Costco's sales records were incomplete, inconsistent and/or unreliable, so as instructed, the jury was required to reach a reasoned approximation of infringing sales, *resolving*

---

[9] Whether or not the jury's profit calculation was advisory, the standard governing a Rule 50 motion is instructive. In ruling on such a motion, the Court *must disregard all evidence favorable to the moving party that the jury is not required to believe. ... That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Tolbert*, 242 F.3d at 70 (internal quotation mark omitted) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000)).

[10] It is fair to assume that the jury instructions reflect the factors the Court itself would consider in making these determinations, further reinforcing that it should take the jury's advice on this record.

*any doubts against Costco*. This instruction itself is fully supported by Second Circuit law. *See e.g.*, *Gucci v. Guess?*, 868 F. Supp. 2d at 254-55 & n.288.

The undisputed evidence of Mr. Kaczmarek was that if total sales by Costco were of 11,000 rings, gross revenue would be approximately $47 million. Tr. 291:2-292:12. Costco claimed its standard markup for jewelry was 13%, Tr. 835:11, 274:1-6, even though records it produced showed its markup for rings was as much as 24%, DTX 804. But, even applying a 13% markup, gross profits on the sale of 11,000 rings would be $6.1 million. Tr. 292:13-14.[11] This evidence shows that the jury's award of $3,700,000 in actual profits falls well within the range of a reasoned approximation of actual profits on sales from the Standalone Use in signs, *resolving all doubts against Costco*, as instructed.

The evidence established that Costco could not account for all sales of Standalone Use because it did not know what signs were on the floor at the time of each purchase, and what sales information it did report was incomplete, inaccurate and/or unreliable, and not linked in any way to point of sale signage. For example, Costco's witness at trial on sales, Peter Hesketh, could not even sort and extract relevant sales information from Costco records when he was deposed as a 30(b)(6) witness in February 2014 because he "did not have this program Delimitware," and "[a]t the time of the deposition, I had this data on CD-ROM drives. They were huge," Tr. 729:15-730:6, containing 18.6 million lines of data, Tr. 657:6. Dr. Cornell's report does not shed light on these records. It cannot be the case that Dr. Cornell, an outside consultant, could do what Mr. Hesketh – Costco's most knowledgeable person about Costco's sales records – could not do himself.

---

[11] At 24%, profit would be $11.3 million ($47 million x 24%).

Accordingly, any award would necessarily require that profits be estimated because Costco's records and reports were shown at trial to be incomplete, inaccurate and/or unreliable. In *resolving any doubts against Costco*, it would be appropriate to consider the testimony of Mr. Schutt, buttressed by the testimony of Mr. Jelinek, that approximately 11,000 letters were sent to ring purchasers after the suit was filed. Because Costco cannot prove which of these purchasers saw which sign, the jury's finding that $3,700,000 of Costco's profits were derived from Standalone Use is a reasonable approximation. Based on the foregoing, this verdict should be adopted by the Court and not nullified.

**B.      Enhanced Profits**

In pertinent part, 15 U.S.C. § 1117(a) provides, "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." The jury found that an award of $3,700,000 on the facts of this case would be inadequate, and that $5,500,000 would be a just award. That determination is amply supported by the evidence, and should be adopted by the Court.

A 13% markup in retail is very low. Tr. 280:23-25. Costco's counsel called his client's margins "razor thin." Tr. 1185:19. The ordinary markup for jewelry at retail is between 50% and 100%. Tr. 442:14-15, 835:11. The only reason Costco can survive with a *razor thin* markup is because it charges its 85 million members, Tr. 424:4-8, a separate annual membership fee to gain admittance to its stores, the income from which helps cover operating costs that would otherwise have to be paid out of markup profit, Tr. 281:9-14, 443:15-444:4. Indeed, the small markup is a lure to sell memberships so customers can access Costco bargains. PTX 19. Without that membership income, Costco would have to charge the more customary markup of between 50% and 100%. Tr. 281:9-14.

Costco also benefited from the use of the Tiffany name in other important ways. It utilized what it calls the "treasure hunt" to encourage customers to visit its stores more often. Tr. 463:13-16. The "treasure hunt" is intended to keep customers excited about shopping at Costco, and uses a sprinkling of small quantities of famous brand merchandise in a handful of stores at any given time, like Louis Vuitton bags, and Rolex or Cartier watches, all obtained outside ordinary channels of distribution. Tr. 456:21-457:23, 817:21-819:9. The treasure hunt is intended to create a "buzz" among shoppers, so much so, in fact, that Mr. Schutt himself testified that he got excited just hearing questions about it on the witness stand. PTX 14.0006; Tr. 461:18-462:8. The buzz of the treasure hunt gets shoppers to stop by more often to see if there are any surprises in stock, and the resulting excitement and the possibility of finding surprise deals entices them to renew their memberships. Tr. 462:24-464:1. Prestige brands are an important part of the treasure hunt, Tr. 818:18-21, and Costco considers Tiffany to be a prestige brand, Tr. 809:7-15.

The rings at issue were sold from the same jewelry case as, and within close proximity to, authentic high-end watches by famous brands such as Cartier, Rolex, Breitling, Tag Heuer, Chanel and others. Tr. 451:2-452:10. This, along with Costco's reputation for selling brand name merchandise at a discount, PTX 19; Tr. 431:5-432:1, and the fact that brand names appeared in virtually every Costco point-of-sale sign to connote a brand, PTX 29; Tr. 448:7-11, buttressed the impression created by the signs that the rings were made by Tiffany. For a customer looking into the jewelry case, there was nothing to indicate that the rings sold next to a sign that said "Tiffany" were actually made by Costco. Tr. 425:6-25. The high end jewelry case is placed on the main aisle near the entrance of every Costco store. PTX 21; Tr. 466:10-24. Costco's intent is to have every customer pass the jewelry case on every visit. Tr. 466:25-467:4.

The purpose for the location and content of the jewelry case is to catch the eye of the customer on the way into each store, Tr. 467:18-21, and at least 3 million people a day pass through Costco stores, Tr. 424:18-23. So, the number of false impressions created by the signs easily numbered in the hundreds of millions over the six years at issue. Costco admitted that it was not necessary to use the word "Tiffany" in its signs to sell rings. Tr. 541:2-21. However, seeing "Tiffany" in the jewelry case created the impression that Tiffany jewelry, and Tiffany engagement rings in particular, were among the treasure hunt items to be found at Costco.

Costco obtained significant benefit from its association with the Tiffany brand in its jewelry case in ways that are not reflected in the razor thin markup it charged for the rings. PTX 14A.0006 ("This kind of merchandise not only sells well, but helps to create a 'buzz' among our members.").[12] Under the circumstances of this case, a profits award based on actual markup on the rings alone would not be just. The jury's verdict that $5,500,000 is a just award of profits is appropriate, is consistent with the evidence, and should be adopted by the Court. *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262-63 (2d Cir. 2014) (Enhanced profits award of three times profit to "reflect the intangible benefits that accrued to [defendant] as a result of its false advertising" not an abuse of discretion).

### C.      Punitive Damages

The jury found that Costco should be liable for punitive damages, and awarded $8,250,000.

Both of these determinations are supported by the evidence. Costco told the jury that it accepted responsibility for its actions, and respected the summary judgment ruling of the Court. Tr. 395:2-7, 68:23-69:5. It acknowledged that "Tiffany" is a valid and enforceable trademark,

---

[12]      *See, e.g., N.Y. Racing Ass'n, Inc. v. Stroup News Agency Corp.*, 920 F. Supp. 295 (N.D.N.Y. 1996).

and Costco had no right to use it as a Standalone Use. Tr. 410:7-16. Yet, Costco's actions and conduct, both before and during trial, demonstrated that these admissions were nothing more than a litigation strategy, and Costco actually believed the opposite.

After first being sued, Costco filed an aggressive counterclaim, seeking to invalidate the Tiffany mark as generic for the use made of it in the subject signs. Tr. 398:11-400:14. After summary judgment was granted, Costco persisted and argued in an attempted emergency appeal to the Second Circuit that, among other reasons, its First Amendment right to use "Tiffany" in its signs was being infringed by the Court's summary judgment decision. *See supra* p. 11. At trial, Costco tried to shift blame for the sign wording to its most junior people, entry level inventory control personnel, whom it said simply copied language from quote sheets of small vendors without any oversight whatsoever. Tr. 538:4-540:20.[13]

But, the evidence showed that Costco's senior executives visited stores thousands of times, Tr. 415:16-416:6, 829:17-20, and never once questioned the use of "Tiffany" in any jewelry case signs, Tr. 417:23-418:11. From the CEO, Tr. 821:21-23, down to low level personnel who wrote the signs, Costco believed the Standalone Use was appropriate,

---

[13]     It turned out this excuse was another moving target. Tiffany showed Costco's expert, Dr. Cornell, two vendor quote sheets from Costco's own exhibit which used "Tiffany" to describe separate numbered ring styles, which did not appear anywhere on his report of sales. DTX 228, at COSTCO0000001685 (22nd page), COSTCO0000003864 (24th page). The quote sheets showed the use of "Tiffany" in the product description, and the Costco product numbers 549635 and 595545. However, neither product number was shown on the report of sales prepared by Dr. Cornell. DTX 139; PTX 139A; Tr. 1155:10-1156:20. Mr. Hesketh was then recalled by Costco to search through the 18.6-million lines of data he brought with him on a laptop, after which he testified that the signage data indicated that the actual signs for these product numbers did not say "Tiffany." Tr. 1169:13-17, 1170:17-20. There are only two potential explanations for this result – either inventory control personnel did not automatically copy the word "Tiffany" from vendor quote sheets, in which event the primary excuse offered by Costco at trial (and throughout this case) was false, or the Cornell report was missing additional sales information. Neither conclusion is good for Costco, so the jury could properly take into account this contradictory evidence in awarding punitive damages.

Tr. 1031:17-19.  Costco personnel responsible for creating the signs called the rings "Tiffany" intentionally, with the knowledge and approval of management.  Tr. 1031:17-1032:19.  So, the lack of oversight of lower level personnel, Tr. 427:14-21, and the role of the vendors, Tr. 539:6-540:20, were each a red herring.  Blindness to and willful disregard of Tiffany's trademark rights by Costco senior management was to blame.  Even Costco's own trial witness concerning signage, Cindy Gallardo, testified that in hindsight, she no longer believed the Standalone Use was ever proper for Costco signs, and admitted that she now understood "why the change needed to be made."  Tr. 1034:13-20.  Ms. Gallardo was never deposed, yet saw the problem with the signs in just a few minutes of testimony under cross-examination, while years after suit was filed, senior management and counsel still claimed at trial that Costco did nothing wrong. Tr. 493:3-6.

The indifference to Tiffany's trademark rights persisted well into this case.  Costco's CEO did not even ask to see the actual signs when he first heard about Tiffany's claims because he thought the claims were "'frivolous,'" and still does "'think it is frivolous.'"  Tr. 820:21-821:1.  The CEO also did not believe Tiffany's claims were a big deal.  Tr. 823:11-13.  Costco's corporate representative at trial, Mr. Schutt, similarly thought Tiffany's claims were not a big deal, and that removing TIFFANY from signs should have been enough.  Tr. 418:21-25.  In truth, Costco believed it was *entitled* to use the Tiffany mark in its signs, and that its razor thin profit margins would serve as insulation against any meaningful recovery by Tiffany if Costco's position turned out to be wrong.  Costco's misread in that regard does not entitle it to a do-over.

Costco also tried to tell the jury that Mr. Schutt's letter to purchasers of rings was part of taking responsibility, but nowhere in his letter did he even say that the signage said "Tiffany," or that the "Tiffany" rings were really made by Costco.  Tr. 490:3-493:2.  In fact, this letter told the

recipient that Costco believed the signs were accurate without even explaining the real problem. *Id*.; PTX 104. Compounding matters, Costco employees themselves called the rings "Tiffany" when describing them to customers, supporting an inference that at some point even they may have believed the rings were real. PTX 65; PTX 66; Tr. 96:12-97:2, 105:3-12, 126:15-19, 139:4-22.

The jury heard testimony from Jean LaBarbera, the Costco salesperson who first showed the ring to Tiffany's investigator, that one customer she helped became irate when told the rings did not come with a Tiffany blue box, and that the customer was so aggressive with her that she reported the confrontation to management. Tr. 130:11-131:6, 137:7-21. Yet, no action was taken by Costco with respect to the false signage. Tr. 131:12-15. The Tiffany customer who first alerted Tiffany to the usage was herself upset to see what she thought was her Tiffany ring at Costco selling for what looked like a discounted price. PTX027.0003-04. Costco customers identified on the purchaser list were also confused by the signage. Tr. 258:20-259:16. There is no dispute that people were misled, and Costco was indifferent to their confusion.

Costco was also obsessed with Tiffany, the brand and its jewelry. It was a company practice to copy Tiffany jewelry designs. PTX 40; PTX 42; PTX 44-PTX 45; PTX 47; PTX 49; PTX 106-PTX 107; PTX 112; PTX 115; PTX 118; Tr. 842:23-844:9, 845:12-846:19, 847:20-848:4, 848:16-21, 854:11-24, 855:5-11, 855:22-857:10, 857:12-20, 859:25-862:17, 683:1-12, 864:13-865:8, 871:23-872:5, 872:13-873:3. Costco buyers would regularly visit Tiffany stores to scout out those designs. Tr. 636:9-16, 862:6-12. Among the styles copied by Costco was one Tiffany calls "Legacy," PTX 118; Tr. 860:13-861:13, the name Costco also used for those rings in its signs, Tr. 846:25-847:7. Costco also copied the Tiffany "Novo" style, and called it "Audrey," PTX 130; Tr. 475:1-6 (an apparent reference to Audrey Hepburn, who starred in the

1961 classic movie *Breakfast at Tiffany's*, Tr. 471:25-472:5), as well as the iconic Elsa Peretti heart, PTX 47; Tr. 854:16-855:11. It was common knowledge at Costco that buyers were copying Tiffany designs in this manner. Tr. 862:15-864:4. Buyers even joked about it. PTX 49; Tr. 856:14-18. Costco made no attempt to refute this evidence.

Costco also used Tiffany as the industry benchmark, and told managers, employees and Costco members that the quality of its diamond jewelry was comparable to, if not better than, that of Tiffany. Tr. 862:15-864:4, 895:19-896:6. Yet, Tiffany standards, as well as its inspection criteria and practices, were considerably more robust and comprehensive than those of Costco. Tr. 917:15-19, 922:7-16, 927:8-13. The persistent association made by Costco of its diamond jewelry to the quality of Tiffany was knowingly false.

The appraisal that came with the ring sold to Tiffany's investigator was curious as well. It showed an estimated retail replacement value of $4,480, PTX 66; PTX 58, which was the same retail price – $4,480 – Tiffany records show its own similarly sized ring was being sold for around that time, PTX 82.0086 l. 4079; Tr. 239:22-240:6. The specificity of that amount further falsely associated the Costco rings with Tiffany, and supported an inference that someone from Costco had visited a Tiffany store to copy the Tiffany retail sales price of a similarly sized ring to use in the Costco appraisal as the replacement value. This also demonstrated Costco's continuing obsession with Tiffany.

The jury awarded $8,250,000 in punitive damages. That award is reasonable under the circumstances of this case. Costco has grown from 58 million members in 2010, PTX 14A.0013, to 81 million members at the end of fiscal year 2015, PTX 17A.0011, to 85 million members by the time of trial, Tr. 424:4-9. Costco has 205,000 employees, PTX 17A.0011, annual sales of over $113-billion, PTX 17A.0025, 28, 46, and cash on hand of close to $5 billion as of the end of

August 2015, PTX 17A.0045.  Profits in 2015 were $2.4 billion.  PTX 17A.0047.  The punitive damages award is less than two times what the jury found to be a just award of profits, and is only 0.17% of the cash on hand at Costco.  Given Costco's size and wealth, anything less would have no deterrent effect whatsoever.  This award represents a fair and reasonable amount of punitive damages, and will not have a material effect on Costco or its finances.  Since ample grounds existed in the record to support its finding, the jury's punitive damages award should not be disturbed.

### D.  Statutory Damages

The Court charged the jury that in deciding the amount of statutory damages between $1,000 and $2 million that would be appropriate, it should consider such things as expenses saved, if any, profits reaped, the value of the trademark, deterrent effect on others, whether Costco's conduct was innocent or willful, and whether it cooperated in providing particular records.  Tr. 1268:2-20.

The jury determined that the maximum, $2 million, was an appropriate award of statutory damages.  Based on the foregoing evidence from the record cited above, including the jury's decision to award $8,250,000 in punitive damages, that determination should be adopted by the Court.  Tiffany is among the most famous trademarks in the world, and Costco knew before using it in signs that it did so at its peril.  Costco banked solely and exclusively on prevailing on its genericism counterclaim, and the fact that razor thin margins meant the disgorgement risk was not meaningful.  Having now lost in that regard, a $2 million statutory damages award is amply justified by the record here.

### CONCLUSION

For all of the reasons set forth above, Tiffany respectfully submits that the jury verdicts should be adopted, the enhanced profits award of $5,500,000 should be trebled, a permanent

injunction should be issued, and judgment should be entered accordingly, together with an award

of Tiffany's attorneys' fees, interest and costs, and such other and further relief as the Court

deems just and proper.

Dated:      New York, New York
             November 28, 2016

BROWNE GEORGE ROSS LLP

By:    s/Jeffrey A. Mitchell
       Jeffrey A. Mitchell
       Judith R. Cohen
       Brett D. Katz
5 Penn Plaza, 24th Floor
New York, New York 10001
Telephone:  (212) 413-2600
Facsimile:  (212) 413-2629
jmitchell@bgrfirm.com
jcohen@bgrfirm.com
bkatz@bgrfirm.com
Attorneys for Plaintiffs