UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TIFFANY AND COMPANY and
TIFFANY (NJ) LLC,

                        Plaintiffs,

            v.

COSTCO WHOLESALE CORPORATION,

                        Defendant.

ECF CASE
No. 13-cv-1041 (LTS) (DCF)

**ORAL ARGUMENT REQUESTED**


**COSTCO'S OPENING POST-TRIAL BRIEF ON THE ISSUES
IDENTIFIED IN THE COURT'S ORDER DATED OCTOBER 20, 2016**


HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone:  212-837-6000
Fax:  212-422-4726

Attorneys for Defendant and Counter-Plaintiff
Costco Wholesale Corporation

James W. Dabney
Richard M. Koehl
Ross Lipman
Emma L. Baratta
Stefanie M. Lopatkin

November 28, 2016

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ii

I.    SPECIAL VERDICTS 1(A)-(C) ARE ADVISORY AND NON-BINDING ........................1

II.   COSTCO EARNED NO MORE THAN $381,718 IN GROSS PROFITS ON SALES
      OF RINGS DISPLAYED WITH "TIFFANY ONLY" SIGNS. ...............................5

III.  EXTENUATING CIRCUMSTANCES ARE PRESENT HERE...........................................15

      A.    The Descriptive Meaning of the Word Tiffany ....................................................16

            1.    Origin of the Complained of "Tiffany Only" Item 605880 Signage .........19

            2.    Origin of the Complained of "Tiffany Only" Item 639911 Signage .........19

      B.    The Novelty of Plaintiffs' "Trademark Counterfeiting" Theory ...........................20

      C.    The Absence of Proof of Loss or Harm to Plaintiffs .............................................22

      D.    The Absence of Proof of Gain to Costco ...............................................................22

      E.    Costco's Voluntary Cessation and Cooperation ....................................................23

IV.   A LIMITED INJUNCTION WILL SATISFY THE EQUITIES OF THIS CASE. ...............25

      A.    Profits Disgorgement Is Not Warranted in Equity.................................................25

      B.    An Injunction Will Fully "Deter" Recurrence of "Tiffany Only" Use. .................27

V.    THE PUNITIVE DAMAGES VERDICT IS LEGALLY INSUPPORTABLE.....................27

      A.    Plaintiffs' Waiver of, and Failure to Prove, Any Basis for an Award of
            Actual Damages Is Fatal to Their Claim for Punitive Damages Under New
            York Law. ...............................................................................................................27

      B.    The Punitive Award Is Contrary to the Weight of the Evidence ..........................29

      C.    The $8.25 Million Punitive Award Is Excessive Under New York Law .............31

      D.    The $8.25 Million Punitive Award Is Excessive as a Matter of Due
            Process ....................................................................................................................33

CONCLUSION...................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Already, LLC v. Nike, Inc.*,
   133 S. Ct. 721 (2013) ..........................................................................................27

*Am. Home Prods. Corp. v. Johnson & Johnson*,
   577 F.2d 160 (2d Cir. 1978) ................................................................................27

*BMW of N. Am. Inc. v. Gore*,
   517 U.S. 559 (1996) ...............................................................................29, 34, 35

*In re Bogdanovich*,
   292 F.3d 104 (2d Cir. 2002) ................................................................................30

*Burndy Corp. v. Teledyne Indus., Inc.*,
   748 F.2d 767 (2d Cir. 1984) ..................................................................................3

*Capitol Records, Inc. v. MP3tunes, LLC*,
   48 F. Supp. 3d 703 (S.D.N.Y. 2014) (Pauley, J.), *modified on other grounds*,
   840 F.3d 69 (2d Cir. 2016) .......................................................................32, 33, 34

*Cardoza v. City of N.Y.*,
   139 A.D.3d 151, 29 N.Y.S.3d 330 (N.Y. App. Div. 2016) ............................29, 31

*Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*,
   433 F.2d 686 (2d Cir. 1970) ....................................................................4, 21, 22

*Champion Spark Plug Co. v. Sanders*,
   331 U.S. 125 (1947) ..........................................................................................4, 22

*Connaughton v. Chipotle Mexican Grill, Inc.*,
   135 A.D.3d 535, 23 N.Y.S.3d 216 (N.Y. App. Div. 2016) .................................29

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*,
   532 U.S. 424 (2001) .............................................................................................35

*Dairy Queen, Inc. v. Wood*,
   369 U.S. 469 (1962) ...............................................................................................2

*Design Strategy, Inc. v. Davis*,
   469 F.3d 284 (2d Cir. 2006) ...............................................................................2, 3

*Dimick v. Schiedt*,
   293 U.S. 474 (1935) ...............................................................................................4

*Donlon v. City of New York*,
   284 A.D.2d 13, 727 N.Y.S.2d 94 (N.Y. App. Div. 2001) ....................................31

**Cases**                                                                                              **Page(s)**

*Faulk v. Aware, Inc.*,
19 A.D.2d 464, 244 N.Y.S.2d 259 (N.Y. App. Div. 1963) *aff'd*, 14 N.Y.2d
899, 200 N.E.2d 778, 252 N.Y.S.2d 95 (1965)........................................................32

*Estate of Ferguson v. City of New York*,
73 A.D.3d 649, 901 N.Y.S.2d 609 (N.Y. App. Div. 2010) ....................................31

*Forschner Grp. Inc. v. Arrow Trading Co.*,
124 F.3d 402 (2d Cir. 1997)....................................................................................25

*Gasperini v. Ctr. for Humanities, Inc.*,
518 U.S. 415 (1996)...........................................................................................29, 32

*Gelb v. Royal Globe Ins. Co.*,
798 F.2d 38 (2d Cir. 1986)......................................................................................30

*George Basch Co. v. Blue Coral, Inc.*,
968 F.2d 1532 (2d Cir. 1992)...........................................................................3, 4, 26

*Getty Petroleum Corp. v. Island Transp. Corp.*,
862 F.2d 10 (2d Cir. 1988)......................................................................................33

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989)....................................................................................................1

*Gucci America, Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014)..................................................................................1, 2

*Hubbell v. Trans World Life Ins. Co.*,
50 N.Y.2d 899, 408 N.E.2d 918, 430 N.Y.S.2d 589 (1980)..................................28

*Hutton v. Klabal*,
726 F. Supp. 67 (S.D.N.Y. 1989) (Marrero, J.) .....................................................34

*Iannaccone v. 21st Century Open MRI, P.C.*,
8 A.D.3d 233, 777 N.Y.S.2d 315 (N.Y. App. Div. 2004) ......................................31

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
176 F. Supp. 3d 137 (E.D.N.Y. 2016) (Matsumoto, J.).........................................33

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
146 F.3d 66 (2d Cir. 1998).........................................................................................3

# TABLE OF AUTHORITIES
## Cont'd

**Cases**                                                                                                    **Page(s)**

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
    No. 94 Civ. 2663 (RPP),
    1999 WL 108739 (S.D.N.Y. Mar. 3, 1999), *aff'd mem.*, 205 F.3d 1323 (2d
    Cir. 2000) .............................................................................................................3

*King v. Fox*,
    418 F.3d 121 (2d Cir. 2005)...............................................................................30

*Koch v. Greenberg*,
    14 F. Supp. 3d 247 (S.D.N.Y. 2014) (Oetken, J.), *aff'd*, 626 F. App'x 335 (2d
    Cir. 2015) ............................................................................................32, 34, 35

*Kohn v. McNulta*,
    147 U.S. 238 (1893)..............................................................................................4

*Koon Chun Hing Kee Soy & Sauce Factory v. Star Mark Mgmt., Inc.*,
    628 F. Supp. 2d 312 (E.D.N.Y. 2009) ................................................................21

*Kronos, Inc. v. AVX Corp.*,
    81 N.Y.2d 90, 612 N.E.2d 289, 595 N.Y.S.2d 931 (1993)..................................29

*Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*,
    13 F. Supp. 2d 430 (S.D.N.Y. 1998) (Sweet, J.).................................................15

*Lynch v. County of Nassau*,
    278 A.D.2d 205, 717 N.Y.S.2d 248 (N.Y. App. Div. 2000) ...............................31

*Malletier v. Carducci Leather Fashions, Inc.*,
    648 F. Supp. 2d 501 (S.D.N.Y. 2009) (Keenan, J.) ...........................................33

*Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co.*,
    349 F.2d 389 (2d Cir. 1965)...............................................................................25

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm.*
    *Co.*,
    290 F.3d 578 (3d Cir. 2002)...............................................................................26

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014).......................................................................................15

*Payne v. Jones*,
    711 F.3d 85 (2d Cir. 2013).................................................................................32

# TABLE OF AUTHORITIES
## Cont'd

**Cases**                                                                                           **Page(s)**

*Perfect Fit Indus., Inc. v. Acme Quilting Co.,*
    618 F.2d 950 (2d Cir. 1980)..............................................................................29

*Prote Contracting Co. v. Bd. of Educ. of City of N.Y.,*
    276 A.D.2d 309, 714 N.Y.S.2d 36 (1st Dep't 2000) ...................................28

*Rocanova v. Equitable Life Assur. Soc'y,*
    83 N.Y.2d 603, 634 N.E.2d 940, 612 N.Y.S.2d 339 (1994)........................28

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
    538 U.S. 408 (2003).....................................................................................34

*Straus v. Notaseme Hosiery Co.,*
    240 U.S. 179 (1916).......................................................................................4

*Tiffany & Co. v. Costco Wholesale Corp.,*
    994 F. Supp. 2d 474 (S.D.N.Y. 2014)........................................................21

*Time Warner Cable Inc. v. DIRECTV Inc.,*
    497 F.3d 144 (2d Cir. 2007)....................................................................26, 27

*Tull v. United States,*
    481 U.S. 412 (1987).........................................................................................1

*Virgilio v. City of New York,*
    407 F.3d 105 (2d Cir. 2005)..........................................................................28

**Statutes and Rules**

15 U.S.C. § 1117(a) .........................................................................................3, 4

15 U.S.C. § 1117(a)(1)......................................................................................1, 2

15 U.S.C. § 1117(a)(2)..........................................................................................1

15 U.S.C. § 1117(b)........................................................................................15, 20

15 U.S.C. § 1117(c).................................................................................20, 33, 35

Fed. R. Civ. P. 26...................................................................................1, 27, 28

Fed. R. Civ. P. 37(c)(1).......................................................................................11

Fed. R. Civ. P. 39(a)(2)......................................................................................1, 2

**TABLE OF AUTHORITIES**
**Cont'd**

**Page(s)**

Fed. R. Civ. P. 50(b) ................................................................................31

Fed. R. Civ. P. 59 .....................................................................................31

N.Y. C.P.L.R. 5501(c) ...............................................................29, 31, 32, 33

**Miscellaneous**

The Random House Dictionary of the English Language (2d ed. 1987) ......................................15

# I.    SPECIAL VERDICTS 1(A)-(C) ARE ADVISORY AND NON-BINDING

Federal Rule of Civil Procedure 39(a)(2) provides in part:  "When a jury trial has been demanded . . . [t]he trial on all issues so demanded must be by jury unless . . . the court . . . finds that on some or all of those issues there is no federal right to a jury trial."   The threshold question as to special verdicts 1(a)-(c), thus, is whether there was a "federal right to a jury trial" of the issues that those verdicts address.  The answer is clearly "no."

In order for an issue to be subject to trial by jury, the claim giving rise to the issue must be one that triggers the Seventh Amendment phrase, "In Suits at common law." To determine if a statutory claim of right to relief triggers the Seventh Amendment, a court must "examine the remedy sought and determine whether it is legal or equitable in nature." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989) (quoting *Tull v. United States*, 481 U.S. 412, 417-18 (1987)).

Special verdicts 1(a)-(c), entitled "<u>Accounting of Profits</u>," were directed to the Plaintiffs' claim for recovery of "defendant's profits" under 15 U.S.C. § 1117(a)(1), not compensatory "damages" under 15 U.S.C. § 1117(a)(2).  The Plaintiffs did not make any Rule 26(a) disclosures with respect to the amount of, or any basis for calculating, any loss incurred or sustained by Plaintiffs for which "damages" were sought.  At the pretrial conference held December 21, 2015, the Plaintiffs were pressed on this point and confirmed that they were not seeking damages:

> THE COURT: . . . Mr. Mitchell, will you confirm that Tiffany is not seeking to prove or recover damages but is seeking an accounting of profits, is that correct?
>
> MR. MITCHELL:  That's correct. . . .
>
> THE COURT: . . . Mr. Mitchell, is Tiffany proceeding on a deterrence theory in seeking to recover profits on just enrichment or both?
>
> MR. MITCHELL: Deterrence theory, your Honor.  (Dec. 21, 2015, Tr. at 18-19).

In *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014), the Second Circuit held that an accounting of a defendant's profits under 15 U.S.C. § 1117(a)(1) is an "equitable

remedy" such that district courts have "inherent equitable authority" to issue pre-judgment asset freeze injunctions in aid of that remedy. *Id*. at 130. *Gucci America* distinguished the Supreme Court's decision in *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962), as having involved claims for compensatory damages as distinct from claims for an accounting of a defendant's profits, saying: "*Dairy Queen* does not abrogate the longstanding treatment of an accounting of *profits* as an equitable remedy, nor could it change how the remedy was treated at the time of the Court of Chancery." 768 F.3d at 132-33.

After *Gucci America*, there is no doubt whatsoever that a claim for an accounting of "defendant's profits" under 15 U.S.C. § 1117(a)(1) is one seeking an equitable remedy as to which "there is no federal right to a jury trial." Fed. R. Civ. P. 39(a)(2). The Second Circuit's *Gucci America* decision is consistent with its prior decision in *Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006). In *Design Strategy*, the plaintiff alleged that a disloyal employee had acted in concert with others to misappropriate a corporate opportunity. Although the plaintiff's complaint prayed for both compensatory damages and an accounting of profits earned by the defendants, the District Court (Marrero, J.) precluded the plaintiff from seeking compensatory damages as a discovery sanction and then struck the plaintiff's jury demand, reasoning that "the remedies sought by Design, save the lost profits that the District Court had precluded evidence of, were all equitable." *Id*. at 299. The District Court determined that the plaintiffs' claims for "constructive trust" and "restitution" were "equitable" because "these remedies do not aim to compensate Design for damages it suffered in the form of monetary gains it would have earned" and "could not be deemed 'compensatory' in the strict sense." *Id*.

The Second Circuit affirmed, holding that "the District Court correctly found that all of Design's claimed remedies were equitable." *Id*. After listing all of the categories of monetary

relief sought by the plaintiff in *Design Strategy*, including "[a]ll profits earned by the Defendants as a result of the unlawful diversion of business from the Plaintiff to the Defendants," the Second Circuit concluded (*id.* at 300):

> As found by the District Court, none of these categories is 'damages' in the strict sense of remedying 'loss' to Design. Rather, all these categories seek monies unjustly earned by [defendants] . . . or monies expended during litigation – none of these categories has any connection to Design's actual loss.

As in *Design Strategy*, the "deterrence theory" (Dec. 21, 2015, Tr. at 18-19) pressed by Plaintiffs "is not compensatory in nature." *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1539 (2d Cir. 1992). It is, rather, a matter of equitable "discretion" (*id.* at 1540); and even in cases of "willful" infringement, "a district court has discretion to fashion an alternative remedy, or to award only a partial accounting, if the aims of equity would be better served." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 72 (2d Cir. 1998) ("*ISCYRA*"). The *ISCRYA* case is illustrative.

In *ISCYRA*, the defendant had made what it had believed was a non-trademark, decorative use of the name STAR CLASS on a line of nautical sportswear. Although the defendant had disregarded counsel's advice to conduct a full availability search and had continued the disputed use after suit was filed, and thus was arguably a "willful" infringer, the district court concluded that "the entry of an injunction against use of plaintiff's trademark was sufficient to deter any further infringement of plaintiff's unregistered mark." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, No. 94 Civ. 2663 (RPP), 1999 WL 108739 at *4 (S.D.N.Y. Mar. 3, 1999), *aff'd mem.*, 205 F.3d 1323 (2d Cir. 2000).

*ISCYRA* illustrates how "the decision as to whether a defendant will be ordered to account for its profits under § 1117 rests in the broad discretion of the district court, guided by principles of equity." *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 772 (2d Cir. 1984).

*See, e.g., Straus v. Notaseme Hosiery Co.*, 240 U.S. 179, 182-83 (1916) (affirming injunction but reversing award of profits as a matter of equitable discretion); *George Basch,* 968 F.2d at 1540-42 (affirming injunction but reversing award of profits and listing factors a court must "generally" consider before determining that an award of profits is warranted in equity); *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 706-07 (2d Cir. 1970) (affirming injunction but reversing award of profits, where case raised "complex and difficult factual and legal issues" and "the injunction will satisfy the equities of the case") (quoting *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 131-32 (1947) (affirming judgment awarding injunction but denying award of profits for trademark infringement)).

The equitable character of the "defendant's profits" remedy in 15 U.S.C. § 1117(a) is underscored by the statute's further provision that: "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." *Id*.   This remedial authority is proper in "Cases . . . in Equity," U.S. Const. art. III, § 2, but is fundamentally inconsistent with an accounting of defendant's profits being characterized as a "legal" remedy that is subject to trial by jury. *Cf. Dimick v. Schiedt*, 293 U.S. 474, 486-87 (1935) (under the Seventh Amendment, a trial court may not itself increase amount of a jury's verdict, but may order a new trial if damages are deemed inadequate).

In the joint letter to the Court dated October 14, 2016, Plaintiffs conceded that special verdicts 1(b), 1(c), and 2 are "advisory."  Docket Item ("D.I.") 360 at 3.  In view of the authorities cited above, special verdict 1(a) is equally advisory, and the Court has responsibility and authority to make an independent determination of the accounting of profits issue.  *Cf. Kohn v. McNulta*, 147 U.S. 238, 240 (1893) (affirming dismissal of claim in equity suit despite contrary

jury verdict; in equity, "such verdict is not binding upon the judgment of the court. It is advisory simply, and the court may disregard it entirely, or adopt it either partially or *in toto*.").

## II.    COSTCO EARNED NO MORE THAN $381,718 IN GROSS PROFITS ON SALES OF RINGS DISPLAYED WITH "TIFFANY ONLY" SIGNS.

Special verdict 1(a) called for determination of "the amount of profits (gross revenue minus deductions proved by Costco) earned by Costco from the sale of rings displayed with signs which used the 'Tiffany' trademark without any immediately following modifiers such as 'setting,' 'set,' or 'style.'"  Docket Item ("D.I.") 353 at 1.  Plaintiffs bore "the burden in the first instance of proving that Tiffany only signage was used in connection with a relevant universe of sales."  Sept. 8, 2016, Tr. at 34.

The damages proofs in this case concerned nine (9) specific diamond ring Items having the following Costco Item numbers: 639911, 605880, 637277, 380068, 384114, 384113, 380177, 328259, and 140513.  The evidence received at trial concerning these nine (9) Items includes:

(1) archival jewelry signage records existing as of the last day of each fiscal period between February 18, 2007 (the last day of Costco fiscal period 2007/6) and August 4, 2013 (the last day of Costco fiscal period 2013/12) [DTX 230 (Costco fiscal calendars), Tr. 607 (Hesketh), DTX 494 (hard drive containing jewelry signage records, COSTCO 7157); 618-25 (Hesketh)];

(2) archival jewelry sales records existing as of the last day of each fiscal period between February 18, 2007 (the last day of Costco fiscal period 2007/6) and August 4, 2013 (the last day of Costco fiscal period 2013/12) [DTX 230 (Costco fiscal calendars); DTX 494 (hard drive containing jewelry sales records, COSTCO 7159); Tr. 618-25, 691-93 (Hesketh)];

(3) a summary of the contents of the fiscal period end sales and signage records referred to in subparagraphs (1) and (2), above, for the nine diamond ring Items whose signage records had ever included the word Tiffany in any form [DTX 233 (COSTCO 37754, printouts of sum-

mary), Tr. 662 (Hesketh), DTX 233X (electronic copies of summaries); Tr. 663 (Hesketh); DTX 258 (net unit sales tab of DTX 233 proffered by Plaintiffs); Tr. 612-13, 739-40 (Hesketh)];

(4)  the mailing list for Mr. Schutt's letter to ring buyers dated April 5, 2013 [DTX 234 (printout, COSTCO 37756); Tr. 485, 516-17 (Schutt); Tr. 722-26 (Hesketh)];

(5) cash register level transaction detailed data for every transaction involving one of the nine subject Items between February 14, 2007, and August 31, 2013, including Item number, sale date, sale amount, return date, return amount, buyer name, buyer member number, and warehouse location [DTX 52 (printout, COSTCO 37765), Tr. 625-27 (Hesketh); DTX 235 (electronic copy, COSTCO 37765); Tr. 628-30, 638-55 (Hesketh); Tr. 1132-35 (Cornell)];

(6)  records of returns of the nine subject Items including any stated reasons for a return [DTX 232 (printout, COSTCO 37741); Tr. 720-21 (Hesketh)]; and

(7)  records of the invoice amounts paid by Costco to acquire any subject Items that were acquired on or after February 14, 2007 [DTX 773 (printout, COSTCO 37761); Tr. 721 (Hesketh); DTX 804 (gross margin calculation based on DTX 773); Tr. 1125-27 (Cornell)].

In his expert report dated November 7, 2013 (D.I. 268-2), which was served after the Plaintiffs had received all of the Costco records described above, the Plaintiffs' expert, Mr. Kaczmarek, calculated Costco's gross profits on sales of all of reported Items between 2006 and 2013, including time-barred and non-subject sales, as  $1.49 million as shown below (*id*. at 9):

**Table 1 – Net Unit and Dollar Sales, 2006 to 2013**

| Measure | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Units | 148 | 302 | 430 | 286 | 346 | 435 | 436 | 305 | **2,688** |
| Dollars | 516,299 | 1,111,896 | 1,565,246 | 1,145,897 | 1,436,697 | 2,011,546 | 2,189,014 | 1,495,697 | **11,472,291** |

**Table 2 – Gross Profits, 2006 to 2013**

| Component | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Sales | 516,299 | 1,111,896 | 1,565,246 | 1,145,897 | 1,436,697 | 2,011,546 | 2,189,014 | 1,495,697 | 11,472,291 |
| Margin | 13% | 13% | 13% | 13% | 13% | 13% | 13% | 13% | 13% |
| **Profit** | **67,119** | **144,546** | **203,482** | **148,967** | **186,771** | **261,501** | **284,572** | **194,441** | **1,491,398** |

6

The sales figures in Mr. Kaczmarek's expert report included (i) sales made in 2006, prior to the statute of limitations period, and (ii) sales made after the word Tiffany was removed from signage in December 2012. DTX 513-514; Tr. 671-75 (Hesketh). In a declaration dated June 19, 2014, Mr. Kaczmarek corrected for these errors and re-calculated Costco's net unit and dollar sales of diamond rings identified by signage including the word Tiffany *in any form* as being exactly what Dr. Cornell had concluded in DTX 139 and DTX 806, as follows (D.I. 268-4 at 13):

**Table 4 – Potential Adjustment to the Navigant Calculation of Costco's Gross Profits for Statute of Limitations and Sign Use Cessation Dates**

| Measure | Total Net Sales 2006-2013 | Net Sales (14 February 2007- 16 December 2012) | Difference |
|---|---|---|---|
| Unit Sales | 2,688 | 2,498 | 190 |
| Dollars Sales | 11,472,291 | 10,553,593 | 918,698 |
| Margin | 13% | 13% | |
| **Gross Profit** | **1,491,398** | **1,371,967** | **119,431** |

Mr. Kaczmarek testified that he had asked the Plaintiffs to provide him with "any information that Costco had provided that would assist in calculating Costco's profits" (Tr. 343 [Kaczmarek]), but that Plaintiffs did not provide him with either the Costco archival sales records in COSTCO 7159 (included in DTX 494) or the cash register level transaction detailed data in COSTCO 37765 (DTX 52/DTX 235) until after his expert report was served. Tr. 336, 343, 348, 351-52, 355 (Kaczmarek). This conduct was so unusual that the Plaintiffs' corporate representative, Ms. Abrams, was apparently unaware that it had even happened. She testified (Tr. 231):

Q.    Did you provide this buyer list sales record to your expert in this case, Mr. Kaczmarek?

A.    I believe we did.

Q.    And what's the basis of your belief?

A.    Because we were asking him to provide a report on potential damages. But I don't recall specifically, you know, the date.

The Court can and should find that the Plaintiffs' withholding of Costco sales records from Mr. Kaczmarek was inexcusable, purposeful, and designed to set up a false claim for re-

covery of non-existent profits on non-existent sales. At trial, the Plaintiffs first had Mr. Kaczmarek present his original, over-inclusive calculation of 2,688 net unit and $11,472,291 net dollar sales as stated in Table 1 of his report (Tr. 284),[1] even though those sales figures included (i) time-barred 2006 sales, (ii) Item 639911 sales made before any "Tiffany only" sign text for that Item existed, and (iii) sales made after December 16, 2012, as to which the Plaintiffs presented no evidence that any of the nine subject Items had been sold under "Tiffany only" signage.

The Plaintiffs next had Mr. Kaczmarek present a "separate calculation" of Costco profits, which he said he made by "just scaling up all of the units to 11,000 and applying the average sales in each fiscal period." Tr. 289. The Court ruled inadmissible (Tr. 286-88) the average profit per unit concept that underlay Mr. Kaczmarek's simplistic "scaling up" of Costco profits on disparate diamond ring Items,[2] so the jury heard only Mr. Kaczmarek's unexplained "calculation" that Costco's net dollar sales of the subject Items during the over-inclusive 2006-2013 period set out in Table 1 of his expert report *might* have been "about 47 million" (Tr. 289), rather than the $11,472,291 shown in the summary he relied on (DTX 233); and if so, Costco's profits on those fictitious, undocumented sales *might* have been "about $6.1 million" (Tr. 289), rather than the $1,491,398 figure given in Table 2 of his (over-inclusive) expert report.

The sole purported basis of Mr. Kaczmarek's "scaling up" of Costco's reported net sales by a factor of roughly 4 (11000÷2688 = 4.0922) was the following deposition testimony of Cost-

---

[1] Plaintiffs' assertion at trial that DTX 52/DTX 235 shows *gross* sales of "4,053 rings" and "17.1 million in gross sales" (Tr. 1241) amounted to a mid-trial repudiation of their own expert's opinion and report that net sales (i.e., sales less returns), not gross sales, were the relevant measure of Costco's gross revenues (*see* Tables 1 and 2 on page 6 *supra*). Both sides' experts agreed on this point. Tr. 1124 (Cornell).

[2] "THE COURT: . . . "There is not to my knowledge in this record any basis for establishing the validity or reliability of a profit per unit across disparate products." Tr. 287. The "about 47 million" sales and "about 6.1 million" profit figures that Mr. Kaczmarek presented are approximately equal to the sales and profit figures presented in Tables 1 and 2 of his expert report multiplied by 11000÷2688 (*e.g.*, $1,491,398 × 11000÷2688 = $6,103,191).

co witness Douglas Schutt with regard to the number of letters in the form of PTX 104 that he sent to Costco members on or about April 5, 2013:

> Q. Do you know how many of these letters were sent?
>
> A. I don't know the exact number.
>
> Q. Approximately?
>
> A. I don't remember. I -- my recollection it was around 11,000 or so. I don't remember the exact number.
>
> Q. 11,000?
>
> A. I don't know for sure the exact number.
>
> Q. Who would know?
>
> A. I would -- I would ask my legal team if they knew first.
>
> Q. Who were -- how did you identify the people to send these letters to?
>
> A. Well, we have -- as I mentioned, we have a sales history, purchasing history by membership number and that would be -- and each membership number -- each member has an address, sometimes a phone number, sometimes the e-mail address attributed to that membership number so we can tell when an item is -- specific item is purchased by a member, by their membership number. Not to say that that card couldn't be used by -- you know, they're not supposed to, but by another family member could use that card.
>
> Q. Was it the intent of this letter that it be sent to every member you could identify who purchased a ring with a SKU number where the sign for that SKU number had the word "Tiffany" on it?
>
> A. We think.
>
> Q. Okay.
>
> A. Not sure but we think.
>
> Q. And that was -- that was the universe of people to whom this letter was intended to be sent, correct?
>
> A. Yes.
>
> Q. And it's your belief that you sent 11,000 of these letters?
>
> A. Yeah, that's a number that sticks in my head. I don't remember what the exact number is.

Deposition of Douglas Schutt dated August 13, 2013, at 69-70, cited in D.I. 268-2 at 4 n.5.

Mr. Kaczmarek stated in his expert report: "I have not seen the data used as a basis for the distribution of the letters nor have I seen information that would assist me in reconciling the

different levels of sales suggested by these letters and those suggested by the summary-level spreadsheet file provided by Costco." D.I. 268-2 at 4. This stated justification for "scaling up" (Tr. 289) Costco's net sales was one that the Plaintiffs engineered by withholding requested sales and mailing list records from Mr. Kaczmarek.

Costco submits that the above-quoted deposition testimony does not provide any valid, reliable, or legally sufficient basis for calculating Costco's gross profits on sales of diamond ring Items identified by "Tiffany only" signs during the statute of limitations period, and provides no support for the $3.7 million figure in special verdict 1(a). This is so for several reasons:

First, both above and at trial (Tr. 483, 487), Mr. Schutt repeatedly testified he did not know from memory how many copies of his letter dated April 5, 2013 (PTX 104) had been sent.

Second, the actual mailing list (DTX 234, COSTCO 37756; Tr. 485, 516-17 (Schutt); Tr. 722-26 (Hesketh)) shows that the number of recipients was 2,517 – a figure that is consistent with both (i) the archival jewelry sales records (COSTCO 7159, included in DTX 494) and (ii) the cash register level transaction detailed sales records (COSTCO 37765, DTX 52 (paper), DTX 235 (electronic)) that Plaintiffs withheld from Mr. Kaczmarek without justification or excuse (Tr. 336, 343, 348, 351-52, 355 (Kaczmarek)).

Third, Mr. Schutt agreed with Plaintiffs' counsel's question, "the intent of this letter that it be sent to every member you could identify who purchased a ring with a SKU number where the sign for that SKU number had the word 'Tiffany' on it?" Schutt Dep. at 70. On its face, the cited testimony is no reliable indication of how many sales Costco made of diamond rings that were described by "Tiffany only" signs.

Withholding Costco sales and mailing list records from Mr. Kaczmarek was just part of the Plaintiffs' strategy for seeking disgorgement of non-existent profits on non-existent sales.

For the first time at trial, the Plaintiffs asserted that Costco had deliberately manipulated its responses to Plaintiffs' requests for sales records. They argued to the jury: "I'm not saying they don't have records. I'm saying whatever they were doing, and it probably was somebody just saying why don't you give me this number, this number and this number without doing a comprehensive search for Tiffany in their records." Tr. 1227. The Court can and should reject this baseless assertion.

First, Mr. Kaczmarek's expert report (D.I. 268-2) did not cite or rely on, and did not purport to characterize as incomplete, the sales and signage records that Costco produced to the Plaintiffs and that Plaintiffs withheld from him. In these circumstances, the Plaintiffs' failure to raise any question as to the completeness of the sales records that Costco produced, and that Plaintiffs deliberately withheld from Mr. Kaczmarek, was not "substantially justified," Fed. R. Civ. P. 37(c)(1), and the Court should refuse to consider Plaintiffs' untimely and baseless speculation that those records purportedly did not include all sales of the subject Items made *during the statute of limitations period* as Costco argued at trial (Tr. 172-85; Tr. 304-09).

Second, the Plaintiffs presented no evidence that Costco's sales of the subject Items *during the statute of limitations period* were incomplete. To illustrate: the buyer list (DTX 52) include the following transaction data for Item 14513 (highlighting added):

| Item # | Units | Dollars | Whse# | Whse Name | Whse State | Date or Purchase |
|---|---|---|---|---|---|---|
| 140513 | 1 | $4,699.99 | 69 | BILLINGS | MT | 1/27/2010 |
| 140513 | -1 | -$4,699.99 | 69 | BILLINGS | MT | 1/27/2010 |
| 140513 | -1 | -$4,299.99 | 1002 | ANTIOCH | CA | 12/16/2008 |
| 140513 | 1 | $4,299.99 | 1002 | ANTIOCH | CA | 12/16/2008 |
| 140513 | -1 | -$4,699.99 | 1002 | ANTIOCH | CA | 12/16/2008 |
| 140513 | -1 | -$4,299.99 | 122 | TUSTIN RANCH | CA | 11/4/2007 |

Mr. Kaczmarek noted that the sales summary he relied on (DTX 233) contained "negative" entries for some fiscal periods which implied "missing" data. Tr. 271 (Kaczmarek), but Mr. Kaczmarek did not identify any "missing" data from any sales records *covering the statute of*

*limitations period*. It is undisputed that Costco accepts returns of Items long after a sale occurs, and that returns show up as negative sales entries in DTX 52. Tr. 640-42 (Hesketh). The high-lighted entry above records the return of an Item that was purchased in <u>2001</u>. DTX 232 p. 4. The so-called "missing" sales data for this return was sales data from *before* the statute of limitations period. Plaintiffs' argument to the jury, "He [Mr. Kaczmarek] said negative entries don't make sense" (Tr. 1229) was misleading and unsupported by evidence.

Equally unsupported was Plaintiffs' suggestion that the Item 639911 purchase their investigator made on November 30, 2012, was purportedly not included in the sales records that Costco produce. Tr. 612, 620-21 (Hesketh). It was, as shown below (DTX 52 at p. 55):

| Item # | Units | Dollars | Whsel | Whse Name | Whse State | Date or Purchase | Reg # | Trans # | Time | Member# | Acct Type # | Cmpy # | Primary Member IPK | Member IPK | First Name | Last Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 639911 | 1 | $2,899.99 | 483 | SE SAN DIEGO | CA | 7/17/2007 | 5 | 359 | 2000 | 111777112145 | 1 | 1 | 84524750 | 84524750 | NEMESIO | VALDEZ |
| 639911 | -1 | -$2,899.99 | 483 | SE SAN DIEGO | CA | 7/17/2007 | 5 | 359 | 2000 | 111777112145 | 1 | 1 | 84524750 | 84524750 | NEMESIO | VALDEZ |
| 639911 | 1 | $2,799.99 | 483 | SE SAN DIEGO | CA | 7/17/2007 | 5 | 359 | 2000 | 111777112149 | 1 | 1 | 84524750 | 84524750 | NEMESIO | VALDEZ |
| 639911 | 1 | $3,199.99 | 401 | MORENA | CA | 3/6/2013 | 6 | 68 | 1543 | 111777112145 | 1 | 1 | 84524750 | 84524750 | NEMESIO | VALDEZ |
| 639911 | -1 | -$3,199.99 | 401 | MORENA | CA | 3/6/2013 | 6 | 68 | 1543 | 111777112145 | 1 | 1 | 84524750 | 84524763 | KATLYN | VALDEZ |
| 639911 | 1 | $3,199.99 | 401 | MORENA | CA | 3/7/2013 | 15 | 405 | 1722 | 111810247506 | 1 | 1 | 84524750 | 84636377 | RICHARD | BROOKS |
| 639911 | 1 | $2,799.99 | 628 | GRAFTON | WI | 3/14/2010 | 51 | 72 | 1348 | 111777244241 | 3 | 1 | 84636377 | 84636377 | | |
| 639911 | 1 | $3,199.99 | 1110 | HUNT BEACH | CA | 11/30/2012 | 10 | 77 | 1112 | 111805940945 | 1 | 1 | 84716895 | 84716895 | HEATHER | ROMO |
| | | | | | | | | | | | | | | | | MATTHEW |

Mr. Kaczmarek's expert report (D.I. 268-2) did not cite or rely on Costco signage records and expressed no opinion that Costco *signage* records purportedly *implied* the existence of unre-corded *sales*. Nevertheless, over objection (Tr. 172-85; Tr. 304-09), Plaintiffs proffered a "com-pilation" of Costco signage record printouts (PTX 64) and elicited from Mr. Kaczmarek the speculative assertion: "*It doesn't make sense* that you'd have records for every fiscal period for six years for a sign and have no sales over such a long period." Tr. 322 (Kaczmarek) (emphasis added). But Mr. Kaczmarek did not even claim to have familiarity with Costco record keeping practices such that his purely subjective, "doesn't make sense" statement had any probative val-ue. The only admissible evidence on that point was that signage records imply nothing about the existence or volume of sales. Tr. 659 (Hesketh).

In sum, the record contains no evidence – none – that Costco's *sales* of the subject Items during the statute of limitations period were other than what Costco's *sales records* showed them

to be. In terms of which of those sales were potentially made under "Tiffany only" signs, the only evidence that Plaintiffs proffered on this point (Tr. 293, DTX 139; Tr. 269, DTX 258) showed that during most of the statute of limitations period (that is, between 2007 and 2011), the terms "setting" or "set" were included in the vast majority of the signage records for the subject Items as shown below (DTX 516-761; Tr. 678 [Hesketh]):

### Fiscal Year 2007 Signage

| 639911 PLATINUM .70CT DIAMOND SOLITAIRE SET IN SIX-PRONG TIFFANY SETTING | 637277 PLATINUM TIFFANY SET 1.0CT ROUND DIAMOND SOLITAIRE | 380068 1.0CT ROUND DIAMOND SOLITAIRE TIFFANY RING |
|---|---|---|
| 2/18/07 **2799.99** | 2/18/07 **4999.99** | 2/18/07 **4799.99** |

### Fiscal Year 2008 Signage

| 639911 PLATINUM .70CT DIAMOND SOLITAIRE SET IN SIX-PRONG TIFFANY SETTING | 637277 PLATINUM TIFFANY SET 1.0CT ROUND DIAMOND SOLITAIRE | 380068 1.0CT ROUND DIAMOND SOLITAIRE TIFFANY RING |
|---|---|---|
| 2/17/08 **2899.99** | 2/17/08 **4999.99** | 2/17/08 **4799.99** |

### Fiscal Year 2009 Signage

| 639911 PLATINUM .70CT DIAMOND SOLITAIRE SET IN SIX-PRONG TIFFANY SETTING | 637277 PLATINUM TIFFANY SET 1.0CT ROUND DIAMOND SOLITAIRE | 380068 1.0CT ROUND DIAMOND SOLITAIRE TIFFANY RING |
|---|---|---|
| 2/15/09 **2999.99** | 02/15/09 **5299.99** | 2/15/09 **4799.99** |

### Fiscal Year 2010 Signage

| 639911 PLATINUM .70CT VS2,I ROUND TIFFANY SET DIAMOND RING | 637277 PLATINUM TIFFANY SET 1.0CT ROUND DIAMOND SOLITAIRE | 380068 1.0CT ROUND DIAMOND SOLITAIRE TIFFANY RING |
|---|---|---|
| 2/14/10 **2799.99** | 2/14/10 **4999.99** | 2/14/10 **4799.99** |

## Fiscal Year 2011 Signage

| 639911 | 637277 | 380068 |
|--------|--------|--------|
| PLATINUM .70CT VS2,I ROUND TIFFANY SET DIAMOND RING | PLATINUM TIFFANY SET 1.0CT ROUND DIAMOND SOLITAIRE | 1.0CT ROUND DIAMOND SOLITAIRE TIFFANY RING |
| 2/13/11 **2799.99** | 2/13/11 **5299.99** | 2/13/11 **4799.99** |

It was not until Costco fiscal year 2012 that the signage text referred to in the Plaintiffs' complaint first appeared in Costco signage records. The parties' experts proposed different gross profit rates (*i.e.,* 10.31% versus 13%; *see* DTX 804; Tr. 1125-26 [Cornell], Tr. 279 [Kaczmarek]), but when those profit rates are applied to all potential "Tiffany only" sales summarized in DTX 139 which Plaintiffs sponsored (Tr. 293) and both sides' experts relied on, the result is:[3]

| Item | Net Sales | Profit @ 13% | Profit @ 10.31% |
|------|-----------|--------------|-----------------|
| 639911 | $805,098 | $104,663 | $83,006 |
| 637277 | $1,158,217 | $150,568 | $119,412 |
| 605880 | $1,465,498 | $190,515 | $151,093 |
| 380068 | $273,599 | $35,568 | $28,208 |
| Totals | $3,702,412 | $481,314 | $381,718 |

The $3.7 million figure given in special verdict 1(a) is nearly identical to Costco's *revenues* on the net sales of Items 639911, 637277, 605880, and 380068 highlighted in dark green and in yellow on DTX 806, which sales excluded Item 637277 sales made prior to Costco fiscal period 2011/9 (highlighted in light green on DTX 806) when the corresponding signage records for that Item said TIFFANY SET as illustrated above. But not even Plaintiffs contended that these Items were free goods having a 100% profit margin; the only dispute as to profits was between a profit rate of 13% (Plaintiffs) or 10.31% (Costco).

---

[3] The figures in the text omit Item 637277 sales made under signs that said TIFFANY SET with the word "SET" on the second line. The Court's summary judgment ruling does not address these TIFFANY SET signs and Plaintiffs presented no legally sufficient evidence to support a monetary award as to these signs as described *infra.*

Costco purchase orders for the subject Items (COSTCO 37761, included in DTX 494) show its actual cost to acquire the subject Items (Tr. 718-21 [Hesketh]; Tr. 1124-27 [Cornell]; DTX 804) and its actual gross profits, namely, $381,718. That is the baseline profits figure under the Court's rulings, before any equitable or punitive considerations are taken into account.

## III.  EXTENUATING CIRCUMSTANCES ARE PRESENT HERE.

15 U.S.C. § 1117(b) provides in part (emphasis added):

> In assessing damages under subsection (a) for any violation of section 1114(1)(a) of this title . . . , in a case involving use of a counterfeit mark . . . , the court shall, unless the court finds *extenuating circumstances*, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of –
>
> (1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services . . . .

The Court has called for briefs on "[w]hether there are any 'extenuating circumstances' within the meaning of 15 U.S.C. § 1117(b) that preclude trebling of the profits award." D.I. 387 at 3. The Trademark Act does not define "extenuating," and the term is therefore to be construed "in accordance with its ordinary meaning." *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014) (citations and quotations omitted).

The ordinary meaning of "extenuating" is: "serving to make a fault, offense, etc., appear less serious." *The Random House Dictionary of the English Language* 684 (2d ed. 1987). Various circumstances have been found to be "extenuating" that were far less compelling than are those present here. *See, e.g.*, *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 13 F. Supp. 2d 430, 447 (S.D.N.Y. 1998) (Sweet, J.) ("complicated business relationship" was a factor justifying withholding automatic trebling). In this case, Costco submits that multiple "extenuating" circumstances are present which take this case out of the meaning and intent of the mandatory punitive sanctions prescribed in 15 U.S.C. § 1117(b).

### A. The Descriptive Meaning of the Word Tiffany

Paramount among the extenuating circumstances in this case is the descriptive, non-trademark meaning that the word Tiffany has when used in certain contexts.[4] Indeed, when used together with setting, set, or style, the descriptive meaning of the word Tiffany is so clear that, following the Court's second summary judgment ruling, the Plaintiffs abandoned any claim that Costco's use of "Tiffany setting" or "Tiffany set" as a combined term invaded any trademark rights claimed by them, and the jury was so instructed. Tr. 1262.

A "Tiffany" setting is one in which long slender prongs are arranged with generally V-shaped openings and rise up from a shank and flare out slightly to hold a single gemstone as shown at left, below. DTX 3, 5, 7, 9, 11, 25, 28A; Tr. 1002-15 (Gallardo). These structural features distinguish a "Tiffany" setting from other types of pronged jewelry settings, such as the "buttercup" setting depicted at right, below (DTX 25; Tr. 1002-03 [Gallardo]):

Tiffany setting                                     Buttercup setting




In vendor documentation that accompanied the subject diamond ring Items 639911, 637277, and 605880, the word Tiffany was used in its descriptive, non-trademark sense to de-

---

[4] Plaintiffs' registration of the plain word TIFFANY as a trademark (PTX 5) was not issued until 1983, which was long after the word Tiffany had acquired descriptive meaning as a setting style name. *See, e.g.*, DTX 3 (original copyright 1961); DTX 5 (original copyright 1966).

scribe the type of setting that those Items had.  DTX 228; Tr. 978-82 (Gallardo).  Reproduced

below is an excerpt from a vendor "Quote Sheet" for a diamond ring Item 637277:

**COSTCO VENDOR QUOTE SHEET**
**(USE ONE SHEET FOR EACH STYLE SUBMITTED)**

DATE:    January 19, 2006

VENDOR INFORMATION:
COMPANY NAME:  R.B. Diamond Inc.                    VENDOR CONTACT NAME: KARLA JONES
ADDRESS:        22 West 48th Street                                    999 Lake Drive
CITY, STATE & ZIP: New York, NY  10036                      Issaquah, WA 98027
TELEPHONE:      (212) 398 - 4560                       FAX #: (425) 313 - 6060

PRICED AT $      67.00   Gold/ **Plat**    VENDOR STYLE #     RBM26       COSTCO ITEM #     637277
                                                    ITEM DESCRPTION        1.0CTW PLAT RING TIFFANY SET 01/19/06

In the above "item description," the word Tiffany identifies a setting style (DTX 3; DTX

9; Tr. 982, 1004-05, 1010-11 [Gallardo]) and describes the type of setting that the subject dia-

mond ring Items actually had (DTX 9; Tr. 1015-20 [Gallardo]) as illustrated below:



**GIA Dictionary Definition**

**Tiffany head,** high, four- or six-prong head with V-shaped openings between the prongs; introduced in 1886 by Charles L. Tiffany for setting solitaires. Also called a Tiffany setting or Tiffany mount.

**Tiffany mount,** see TIFFANY HEAD.

**Tiffany setting,** see TIFFANY HEAD.

*Tiffany head*

According to the evidence received at trial, "Tiffany" is the only word in the English lan-

guage that identifies and distinguishes the setting configuration depicted above from other types

of pronged jewelry settings (Tr. 1005 [Gallardo]; 1082-03 [Palmieri]), of which there are several.

*See* DTX 498 (basket); DTX 499 (Belcher); DTX 500 (illusion); DTX 501 (fishtail); DTX 504

(woven); DTX 505 (buttercup); DTX 507 (cathedral); Tr. 1072-88 (Palmieri). The "Tiffany set" signage used prior to 2012 (*see* pp. 13-14 *supra*) was similar to that of other signage that included setting style names, as illustrated below (DTX 656, 747-57; Tr. 678-79 [Hesketh]):

| 637268 | 637277 | 796107 |
|---|---|---|
| PLATINUM CATHEDRAL | PLATINUM TIFFANY | PLATINUM 1.25CTW VS2,I |
| SET 1.0CT ROUND | SET 1.0CT ROUND | CHANNEL SET ENGAGEMENT |
| DIAMOND SOLITAIRE | DIAMOND SOLITAIRE | RING .71CT CENTER |
| 4/11/10 **5299.99** | 04/11/10 **4999.99** | 7/4/10 **3599.99** |

Costco in-store signage is prepared based on vendor quote sheets like the one excerpted above. Tr. 539-40 (Schutt); Tr. 866-67 (Murphy Dep.); Tr. 1021 (Gallardo). The signage description and the presentation of the subject Items in Costco warehouse stores were both unlike the signage description and presentation of branded Items in Costco warehouse stores, in that (i) the word Tiffany was not the first word of the sign, and (ii) the subject Items were not displayed or delivered in factory packaging. Tr. 519-23 (Schutt), as illustrated below. DTX 71; Tr. 523-24, 527 (Schutt).



### 1. **Origin of the Complained of "Tiffany Only" Item 605880 Signage**

Costco Item number 605880 was set up in the fall of 2011 (Costco fiscal 2012) in response to a "huge spike" in the price of diamonds (Tr. 979 [Gallardo]), so that newly received diamond ring Items previously sold under Item number 637277 would thenceforth be sold under Item number 605880 at a higher price while the older existing inventory of those Items would continue to be sold at a lower price under Costco Item number 637277.  Tr. 983 (Gallardo).  Ms. Gallardo further testified that she had hand written the number "605880" on the quote sheet below (Tr. 979), and that the word Tiffany in the quote sheet item description refers to the "type of setting" or "head" that the described ring actually had (Tr. 982):



Ms. Gallardo testified that the Item 605880 sign change in November 2011 reflected her work (Tr. 985), and that the word Tiffany in the Item 605880 signage was meant to refer to the ring's setting style (Tr. 988-89, 1029), a usage of Tiffany she had learned as a student as the Gemological Institute of America.  Tr. 989, 1002-05 (Gallardo). Costco has acknowledged that "it would have been better" if the modifier "set" had not been dropped from the sign (PTX 103), but the author of the sign plainly intended it to be truthful and accurate.

### 2. **Origin of the Complained of "Tiffany Only" Item 639911 Signage**

With regard to the "Tiffany only" signage for Item 639911, uncontradicted and unrebutted evidence shows that the text of that signage was first created after January 15, 2012, prior to

which date the signage had said TIFFANY SETTING or TIFFANY SET. DTX 233X; Tr. 656-65 (Hesketh). The timing of the creation of the "Tiffany only" signage for Item 639911 was consistent with the events recorded in the contemporaneous documents set out below:

| Costco Document No. | Costco Document Content | Costco Document Date |
|---|---|---|
| 12518 (IBM AS/400 Sign Record -- DTX 248) | PLATINUM .70CT VS2,I ROUND TIFFANY SET DIAMOND RING | 1/15/12 |
| 38467 (Switzer-Karig e-mail exchange dated 2/10/12 -- DTX 491) | "Hello, This was just brought to my attention that the ITM de-scription says this is a set. It is actually a solitaire ring. Can you fix it? Thanks!" | 2/10/12 |
| 38467 (Switzer-Karig e-mail exchange dated 2/10/12 -- DTX 491) | "I see what the problem is it is one of the tiffany style settings and whoever set it up tried to shorten the setting to set. I will fix it." | 2/10/12 |
| 12518 (IBM AS/400 Sign Record -- DTX 248) | PLATINUM TIFFANY .70CT VS2,I ROUND DIAMOND RING | 2/12/12 |

Even as modified during Costco fiscal period 2012/6, the Item 639911 signage included terms having unstated following modifiers ("platinum [metal]"; "VS2 [clarity]"; "I [color]"; *see* Tr. 989 [Gallardo]), and the word Tiffany on the signs was consistent with the non-trademark, descriptive meaning below (DTX 3):



³tiffany \"\ *adj, usu cap* [after Charles L. *Tiffany* †1902 Am. jeweler] *of a jewelry setting* : having long prongs to hold a gem

**B. The Novelty of Plaintiffs' "Trademark Counterfeiting" Theory**

This appears to be the first case in which a *genuine* product, bearing the actual trademark of its maker, has been held to trigger application of 15 U.S.C. §§ 1117(b) or (c). No claim is made, or could be made, that the subject diamond ring *Items* were "counterfeits" of any *Items* sold by Plaintiffs. The Plaintiffs' theory, rather, is that an allegedly false *description* of an Item on a *sign* triggers application of 15 U.S.C. §§ 1117(b) and (c) even if the Item being described is

not itself counterfeit and indeed, in this case, is actually stamped with its maker's trademark. Tr. 174 (Abrams).

At the time of the events complained of by Plaintiffs, there was no precedent holding that the sale of a genuine item, bearing its maker's trademark, and sold and delivered in unmarked packaging with a time-unlimited right of return, constituted "intentional trafficking in counterfeit goods." *Koon Chun Hing Kee Soy & Sauce Factory v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312, 323 (E.D.N.Y. 2009) (Gold, U.S.M.J.) (importation and sale of packaged soy sauce bearing counterfeit labels). The record shows, moreover, that the two "Tiffany only" signs referred to in the Court's second summary judgment decision (D.I. 175 at 4) did not exist prior to Costco fiscal year 2012 and were preceded by years during which signage for the subject Items said "Tiffany setting" or "Tiffany set" (*see* pp. 13-14 *supra*). As to the pre-2012 signs whose text included "Tiffany setting" or "Tiffany set," the Court made no pretrial finding of counterfeiting and the Court also made no finding that Costco's claim of right to use the word Tiffany in its descriptive, dictionary definition sense was *asserted* in bad faith. To the contrary, Costco's fair use defense and counterclaim both withstood the Plaintiffs' first motion for summary judgment. *See Tiffany & Co. v. Costco Wholesale Corp.*, 994 F. Supp. 2d 474, 482 (S.D.N.Y. 2014).

The facts here are somewhat analogous to those in *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686 (2d Cir. 1970). In that case, the parties asserted competing claims of right to use identical trademarks (ZEISS and ZEISS IKON) in association with optical and mechanical precision instruments. Although the defendant had used the disputed trademarks with knowledge of the plaintiff's adverse claim and was in that sense a "willful" infringer, the Second Circuit reversed the district court's award of an accounting of profits where the parties' competing claims of right had raised "complex and difficult factual and legal issues," the defendants were not

found to have "acted in bad faith in *asserting* their claim," and "the injunction will satisfy the equities of the case." *Id.* at 707 (emphasis added) (quoting *Champion*, 331 U.S. at 131-32). The complained of use of the word Tiffany here is far less aggravating than was the use of ZEISS and ZEISS IKON as brand names by the defendant in *Carl Zeiss*, as is confirmed by the trial record in this case.

### C. The Absence of Proof of Loss or Harm to Plaintiffs

A third extenuating circumstance in this case is the absence of proof that the subject "Tiffany only" signs were misunderstood by any appreciable number of ring buyers. The subject diamond ring Items were stamped on their inner surfaces with their manufacturer's trademarks as illustrated on page 17, above (Tr. 499-500 (Schutt)), and were delivered to Costco members in plain beige boxes (DTX 19) and with paperwork (DTX 20) and sales slips (PTX 66.0007) that had Costco's name on them and did not include any reference to the word Tiffany.

Contact details for each and every one of the buyers of the subject Items were provided to the Plaintiffs on October 23, 2013 (D.I. 245 Ex. 23 [letter of transmittal for COSTCO 37765]). Plaintiffs elected not to conduct any scientific survey of the buyers. The Plaintiffs presented no evidence that Costco's use of "Tiffany only" signs had been misunderstood by any appreciable number of buyers or had caused the Plaintiffs any actual loss.

### D. The Absence of Proof of Gain to Costco

The Plaintiffs presented no evidence that Costco's use of "Tiffany only" signs resulted in any actual economic gain to Costco. The Court granted summary judgment dismissing the Plaintiffs' "halo effect" theory for seeking profits earned on sales of Costco memberships and non-subject goods, noting that Plaintiffs had presented "zero admissible evidence of either general or specific causation between the subject signs and sales of Costco memberships or non-subject sales." D.I. 175 at 13.

With regard to the subject diamond ring Items themselves, the Plaintiffs presented no evidence that the presence or absence of the word Tiffany on Costco signage had any causal effect on sales, or that any appreciable number of Costco's sales of those Items were made to Costco members who believed that Tiffany & Co. had made the rings that they purchased despite the absence of any reference to the word Tiffany on the rings, their packaging, their sales slips, their appraisals, or (in the case of Items 605880 and 637277) their GIA certificates. The subject diamond ring Items were, moreover, all sold on terms that included a time-unlimited member satisfaction return policy.  Tr. 505-06 (Schutt).

### E. Costco's Voluntary Cessation and Cooperation

Within one week of being notified by Plaintiffs' objection, Costco voluntarily removed the word Tiffany from all fine jewelry signage.  DTX 513-514; Tr. 665-70 (Hesketh).  Costco also voluntarily cooperated with information requests made by the Plaintiffs.  In a letter dated January 30, 2013, Costco's counsel advised the Plaintiffs (DTX 487; Tr. 178 [Abrams]):

> 1. Item 639911: This item is a .70 carat diamond solitaire, which was first sold in approximately 2003; the current retail price is $3,199.99. There were 224 net sales of this item in fy 2012 and 139 in fy 2013. For this item, the signs displayed in 2005-06 included the words "Tiffany Set Diamond Solitaire," the signs in 2007-09 referred to "Six-Prong Tiffany Setting," the 2010-11 signs referred to "Round Tiffany Set," and at some point in approximately 2012, the signs began to refer to "Platinum Tiffany."

> 2. Item 605880: This item is a Platinum 1.0 carat diamond solitaire, first sold in approximately October 2011; the current retail price is $6,399.99. There were 145 net sales of this item in fy 2012 and 122 in fy 2013. The sign in 2012 read "Platinum Tiffany."

> 3. Item 637277: This item is a 1.0 carat diamond solitaire, also was first sold in approximately 2003; the current retail price is $6,299.99. There were 67 net sales in fy 2012 and 8 in fy 2013 through a few days ago. It appears that "Platinum Tiffany" has appeared on the sign for several years.

Plaintiffs were further advised that "Costco removed all references to 'Tiffany' on the signs for each of these items after receipt of your first letter." *Id*. Plaintiffs never responded to

this letter, but elected instead to file this lawsuit and issue a press release that stated in part: "We now know that there are at least hundreds if not thousands of Costco members who think they bought a Tiffany engagement ring at Costco, which they didn't." D.I. 39-6.  These actions generated enormous hurtful publicity and prompted Costco's CEO, Mr. Jelinek, to say in an e-mail to all Costco employees on February 19, 2013 (PTX 103):

> You have probably seen or heard some media coverage of a lawsuit filed by the jewelry retailer, Tiffany & Co., against our company, claiming that we sold diamond rings that were improperly labeled as Tiffany.
>
> As you well know, our policy has always been to sell only genuine goods. We have no motive to do otherwise, because our business depends on the continued trust and loyalty of our more than 60 million cardholders around the world.
>
> In the past few years, we have sold some high-quality diamonds that were signed or labeled using the word "Tiffany."  That was intended to describe a setting style used in those rings, and was not intended to claim that the rings were of any particular brand. In retrospect, it would have been better had we not used that description the way we did. Still, we do not believe that any of our members believed they were buying a Tiffany-brand ring. If any of our members were confused, under our company protocol and our long-standing Membership Satisfaction Policy, they can obtain a full refund at any time.
>
> When Tiffany & Co. brought this issue to our attention, we changed the signs and cooperated fully with their requests for historical sales data. We are disappointed that our efforts to resolve the issue with them did not result in an amicable solution as we had hoped.[5]

In March 2013, Costco put a block in its IBM AS/400 computer system to ensure that the word Tiffany was not used on jewelry signage.  Tr. 516 (Schutt); Tr. 677 (Hesketh).  On or about April 5, 2013, Costco sent a letter to all members who may have purchased a ring identified by a sign that included the word Tiffany in any form.  PTX 104; Tr. 516-17 (Schutt).  Costco in this litigation produced years of archival sales and signage records which confirmed what Costco had voluntarily told the Plaintiffs prior to suit being filed in January 2013.

---

[5] The "efforts" referred to by Mr. Jelinek are reflected in DTX 487 quoted on p. 23 *supra*.  Mr. Jelinek testified that prior to suit being filed, he had been told that "we are trying to get it resolve[d] with Tiffany's."  Tr. 820-21 (Jelinek).

## IV. A LIMITED INJUNCTION WILL SATISFY THE EQUITIES OF THIS CASE.

The Court has called for briefing on "[w]hether and to what extent equitable and injunctive relief ought to be granted." D.I. 387 at 3. "It is well-settled that that the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *Forschner Grp. Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997).

### A. Profits Disgorgement Is Not Warranted in Equity.

Plaintiffs assert that Costco should forfeit the profits it earned on sales of diamond rings described by "Tiffany only" signage, not as compensation for any loss incurred or sustained by Plaintiffs and not because Costco was unjustly enriched, but solely on a theory that such an award is necessary to "deter" Costco from again using the word Tiffany on jewelry case signs without an immediately following modifier such as "setting," "set," or "style."

Plaintiffs' "deterrence" theory for court-ordered profits disgorgement should be rejected for several reasons. To begin, the Plaintiffs have articulated no reason why a permanent injunction would be ineffective to "deter" Costco from using the word Tiffany on jewelry case signs without an immediately following modifier such as "setting," "set," or "style." Costco voluntarily discontinued all use of the word Tiffany on jewelry case signage nearly four (4) years ago. Any resumption of such use would be immediately and readily detectable, as it would involve display case signage out in the open, and would subject Costco to sanctions for contempt.

Second, the trademark at issue here is highly unusual: Tiffany is a word whose meaning is highly context dependent and has non-trademark, descriptive meaning at least when used in a combined term such as Tiffany setting, Tiffany set, or Tiffany style. These circumstances are the polar opposite of those in which disgorgement on a "deterrence" theory have been ordered in the past. *Cf. Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co.*, 349 F.2d 389, 396 (2d Cir. 1965)

(defendant used plaintiff's arbitrary trademark ACRILAN to defraud consumers into believing that mislabeled mattress pads sold by defendant were filled with ACRILAN acrylic fibers).

Third, the Plaintiffs have presented no evidence that Costco "benefited from the unlawful conduct." *George Basch*, 968 F.2d at 1540. As noted above, the Court granted summary judgment dismissing the Plaintiffs' claim that Costco's use of the word Tiffany had purportedly resulted in incremental sales of memberships or non-subject Items, finding that Plaintiffs presented "zero admissible evidence" (D.I. 175 at 31) in support of the theory. The Plaintiffs similarly presented no evidence that Costco's sales of the subject diamond ring Items were any higher than they would have been if "Tiffany only" signs had not been used, or that Costco currently retains profits from sales of diamond ring Items that is justly ordered forfeit. Any member who misunderstood the "Tiffany only" signs has either already received a full refund (leaving nothing to be disgorged), is able to obtain a full refund in the future, or has decided that they want to keep their purchase for the time being.

Fourth, the Plaintiffs proved no loss at trial, and an award of Costco profits to them would amount to a wholly unjustified windfall and do nothing for supposed direct "victims" of the subject signage, namely, the Costco members who purchased the subject Items.

Fifth, as to signage that differs substantially from that encompassed by the Court's summary judgment decision, including the Item 380068 signage and Item 637277 signage from prior to Costco fiscal period 2012/4, the record contains no evidence of actual confusion or any other basis for a profits disgorgement award as to the use of those signs. Under Second Circuit precedent, "only an *unambiguous* message can be literally false." *Time Warner Cable Inc. v. DIRECTV Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 587 (3d Cir. 2002)). Where, as with

the Item 637277 signage saying TIFFANY SET on two lines, a challenged advertising display

has a truthful meaning but is asserted to be ambiguous, no *presumption* of deception is permissi-

ble. *Id*. ("In short, where the advertisement does not unambiguously make a claim, 'the court's

reaction is at best not determinative and at worst irrelevant.'") (quoting *Am. Home Prods. Corp.*

*v. Johnson & Johnson*, 577 F.2d 160, 166 (2d Cir. 1978)).

### B.  An Injunction Will Fully "Deter" Recurrence of "Tiffany Only" Use.

Although Costco voluntarily ceased all use of the word Tiffany in jewelry case signage

nearly four years ago, the Plaintiffs' claim for injunctive relief is not moot because Costco has

not waived its right to appeal the Court's summary judgment decision.  *Cf. Already, LLC v. Nike,*

*Inc.*, 133 S. Ct. 721, 727 (2013) (voluntary cessation of allegedly wrongful activity does not ren-

der a case moot unless it is "absolutely clear" that challenged conduct cannot resume in the fu-

ture).  Under the summary judgment decision, the Court may appropriately enjoin use of the dis-

play signage that the Court considers is encompassed by that decision.

## V.     THE PUNITIVE DAMAGES VERDICT IS LEGALLY INSUPPORTABLE.

The jury's finding and award of punitive damages should be set aside as being both con-

trary to law and excessive under applicable statutory and constitutional limits on private fines.

### A. Plaintiffs' Waiver of, and Failure to Prove, Any Basis for an Award of Actual
###     Damages Is Fatal to Their Claim for Punitive Damages Under New York Law.

As noted above, the Plaintiffs in this case explicitly waived any claim for compensatory

damages prior to trial. Dec. 21, 2015 Tr. at 18:21-24 ("[THE COURT]: Mr. Mitchell, will you

confirm that Tiffany is not seeking to prove or recover damages but is seeking an accounting of

profits, is that correct?  MR. MITCHELL:  That's correct.").  Consistently with this stated posi-

tion, the Plaintiffs at no time disclosed any "computation" of any "category of damages" under

Federal Rule of Civil Procedure 26(a)(1)(A)(iii) and Plaintiffs similarly made no disclosure of

any "documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered." *Id*. Mr. Kaczmarek testified at his deposition (D.I. 119-38 at 8):

> Q.  With regard to losses incurred by the plaintiffs in this case, your report doesn't refer to any such losses, does it?
>
> A.  That's correct.

Also consistently with the Plaintiffs' pretrial Rule 26(a) disclosures, the Plaintiffs' expert disclosures, and the Plaintiffs' express waiver of damages on the record of hearing held December 21, 2015, the Plaintiffs offered no proof at trial that Costco's use of "Tiffany only" signage had caused the Plaintiffs any actual loss for which actual damages were sought.  The jury was not instructed on actual damages and the jury did not award the Plaintiffs any actual damages.  In these circumstances, the Plaintiffs' claim for punitive damages under New York law is fatally deficient and should be dismissed as a matter of law.

Under New York law, punitive damages may not be awarded "absent a valid claim for compensatory damages." *Hubbell v. Trans World Life Ins. Co.*, 50 N.Y.2d 899, 901, 408 N.E.2d 918, 919, 430 N.Y.S.2d 589, 590 (1980).  "Once a claim for compensatory injuries is barred, the possibility of a punitive award is likewise relinquished." *Virgilio v. City of New York*, 407 F.3d 105, 116-17 (2d Cir. 2005). *Accord Rocanova v. Equitable Life Assur. Soc'y*, 83 N.Y.2d 603, 616-17, 634 N.E.2d 940, 945-46, 612 N.Y.S.2d 339, 344-45 (1994) (punitive damages unavailable where underlying claim was barred by a release); *Prote Contracting Co. v. Bd. of Educ. of City of N.Y.*, 276 A.D.2d 309, 310, 714 N.Y.S.2d 36, 37-38 (1st Dep't 2000) (punitive damages unavailable where underlying claim was barred by statute of limitations).

The above-quoted principle is controlling and dispositive here: having failed to prove or recover any actual damages, the Plaintiffs are barred from recovering punitive damages under

New York substantive law. *See Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 955 (2d Cir. 1980) (monetary relief for unfair competition under New York law requires proof of actual loss); *see also Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 95-96, 612 N.E.2d 289, 292, 595 N.Y.S.2d 931, 934 (1993) (holding that in contexts other than trespass to real property, "actual loss must be demonstrated" before a tort right of action exists); *Connaughton v. Chipotle Mexican Grill, Inc.*, 135 A.D.3d 535, 539-40, 23 N.Y.S.3d 216 (N.Y. App. Div. 2016) ("in tort there is no enforceable right until there is loss").

The requirement of actual damages as a prerequisite to recovering punitive damages is reflected in statutory and constitutional strictures on punitive awards. Under New York law, a punitive damages award is "excessive . . . if it deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. 5501(c) (McKinney 2016). *See, e.g.*, *Cardoza v. City of N.Y.*, 139 A.D.3d 151, 166, 29 N.Y.S.3d 330, 342 (N.Y. App. Div. 2016) ("In reviewing the excessiveness of the punitive damages awards, the issue is whether they 'deviate[] materially from what would be reasonable compensation.'") (quoting N.Y. C.P.L.R. 5501(c)).[6] Similarly, under the Due Process Clause of the Fourteenth Amendment, a punitive damages award "must bear a 'reasonable relationship' to compensatory damages." *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 580 (1996). At least where purely economic interests are at stake, as here, these review mechanisms make no sense if a Plaintiff does not establish any right to compensatory damages.

### B. The Punitive Award Is Contrary to the Weight of the Evidence

For the reasons set forth in Parts III and IV *supra*, there was no legally sufficient basis on which the jury could find that Costco's use of "Tiffany only" signs evidenced the high degree of moral turpitude that is necessary to support a punitive award under New York law. The Court's

---

[6] Section 5501(c) of the New York Civil Practice Law applies to state law claims heard in federal court. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 435 (1996).

authority to reach this conclusion is in no way restricted by special verdict 3, for the Plaintiffs saw fit to present evidence of alleged willful wrongdoing (e.g., alleged willful discovery misconduct) that was wholly unrelated to Costco's intent in using the word Tiffany on the subject signage or the impact of that signage on Plaintiffs. *See, e.g.*, *King v. Fox*, 418 F.3d 121, 129-30 (2d Cir. 2005) (jury verdict did not preclude claim where verdict did not *necessarily* rest on rejection of a factual predicate of the claim); *In re Bogdanovich*, 292 F.3d 104, 114 (2d Cir. 2002) (same). *See also Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44-45 (2d Cir. 1986) (collateral estoppel did not apply to issue underlying judgment where appellate court declined to review the issue).

Plaintiffs presented no evidence that the word Tiffany in the "Tiffany only" signs was intended by Costco to have any different meaning than the word Tiffany had in signs whose text included "setting," "set," or "style" after the word Tiffany, as to which the Plaintiffs have pressed no claim. Why would the meaning be totally different in the two different sets of signs? Lacking evidence that the "Tiffany only" signs were intended to mislead Costco members or had in fact misled any appreciable number of Costco members, Plaintiffs focused their trial presentation on matters having nothing to do with the origin of the "Tiffany only" signs: an alleged failure by Costco to comply with Plaintiffs' discovery request for sales records; an alleged failure by Costco to produce requested sales records in a usable form; Costco's filing of a compulsory counterclaim that sought cancellation relief; Costco's attempt to take an immediate appeal from the Court's second summary judgment decision; Costco's use of the name "Audrey" in association with a diamond ring Item; Costco's use of the term "legacy" in certain internal business records; Costco's failure to waive its CEO's right to testify in this case by deposition rather than in person; Costco's issuance of certain allegedly deficient appraisals; and Costco's failure to stop certain vendors from copying certain jewelry items sold by Plaintiffs. *E.g.*, Tr. 1220-21 ("We

know there's a lot of copying going on in designs. We know that it's a big joke inside Costco for people to be copying Tiffany designs. We know they sent pictures of Tiffany designs to their vendors."); *id.* at 1230-31 ("this is another one, the Audrey ring. Audrey Hepburn, right? We showed that this was a copy of the Tiffany Novo ring."); *id*. at 1231 ("And then on the aborted appeal to claim we have a first Amendment right to call it Tiffany").

This diverse array of alleged faults had one thing in common: none of them had the slightest thing to do with how the word Tiffany came to be on the subject "Tiffany only" jewelry case signs or what the impact of those signs was on the Plaintiffs. There was, at trial, a complete failure of *relevant* proofs relating to whether the use of "Tiffany only" signs inside Costco warehouse stores was sufficiently reprehensible as to warrant a punitive award, much less the $8.2 million award that the jury rendered. This subject will be taken up more fully, if necessary, in post-judgment motions invoking Federal Rules of Civil Procedure 50(b) and 59.

### C. The $8.25 Million Punitive Award Is Excessive Under New York Law

Even assuming, for purposes of argument, that there were a legal basis for *some* punitive damages award in this case, the amount awarded here plainly "deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. 5501(c). *See, e.g.*, *Cardoza*, 139 A.D.3d at 166, 29 N.Y.S.3d at 342; *Estate of Ferguson v. City of New York*, 73 A.D.3d 649, 651, 901 N.Y.S.2d 609, 612 (N.Y. App. Div. 2010); *Iannaccone v. 21st Century Open MRI, P.C.*, 8 A.D.3d 233, 235, 777 N.Y.S.2d 315, 316 (N.Y. App. Div. 2004); *Lynch v. County of Nassau*, 278 A.D.2d 205, 206, 717 N.Y.S.2d 248, 249-50 (N.Y. App. Div. 2000).

To determine whether an award deviates materially from what would be reasonable compensation, New York courts compare the challenged award to "comparable" awards in "similar" or "analogous" cases. *See, e.g.*, *Cardoza*, 139 A.D.3d at 166, 29 N.Y.S.3d at 342 (citing *Donlon v. City of New York,* 284 A.D.2d 13, 15, 727 N.Y.S.2d 94 (N.Y. App. Div. 2001)). New York

courts also consider "the purpose to be achieved as well as the mala fides of the defendant in the particular case." *Faulk v. Aware, Inc.*, 19 A.D.2d 464, 472, 244 N.Y.S.2d 259, 266 (N.Y. App. Div. 1963), *aff'd*, 14 N.Y.2d 899, 200 N.E.2d 778, 252 N.Y.S.2d 95 (1965).

N.Y.C.P.L.R. 5501(c) was enacted in 1986 as a part of as a tort reform effort to contain outsize verdicts. *Gasperini*, 518 U.S. at 423, 424-25 (CPLR 5501(c) "in design and operation, influences outcomes by tightening the range of tolerable awards"). In applying the statute, the Second Circuit has emphasized the importance of reducing excessive verdicts in the interests of "fairness, predictability and proportionality of the legal system" and preventing "harmful, burdensome costs on society" including rising prices, inhibited innovation, and harm to the economy. *Payne v. Jones*, 711 F.3d 85, 94 (2d Cir. 2013).

Here, where the Plaintiffs presented no evidence of loss and a punitive award is, accordingly, unauthorized by law, it is difficult to find "comparable" cases in which such an invalid verdict was reviewed. In *Koch v. Greenberg*, 14 F. Supp. 3d 247 (S.D.N.Y. 2014) (Oetken, J.), *aff'd*, 626 F. App'x 335 (2d Cir. 2015), the jury awarded punitive damages of $12 million based on its finding that the defendant made "concerted efforts to forge indicia of authenticity" regarding collectible wine bottles "which he then offered for sale to the public," and "made knowingly false statements about the wine to auction houses and brokers, with the intent that the statements be disseminated to the public," *id.* at 273, but even then, the $12 million award "was excessive under New York law" and reduced by more than 90% to $711,622. *Id.* at 279.

In *Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703 (S.D.N.Y. 2014) (Pauley, J.), *modified on other grounds*, 840 F.3d 69 (2d Cir. 2016), a copyright case, even a defendant who "intentionally misled users . . . [,] facilitated the infringement of numerous works; and contributed significantly to an era of rampant digital piracy" in a scheme intended to "siphon[] bil-

lions of dollars of revenue from copyright owners," was held entitled to have its punitive damages award of $7.5 million reduced by 90%, to $750,000. 48 F. Supp. 3d at 732-33.

In *Getty Petroleum Corp. v. Island Transp. Corp.*, 862 F.2d 10 (2d Cir. 1988), a jury found that the defendants "unlawfully sold and delivered non-Getty brand gasoline to two Long Island Getty-branded service stations in 1985 and 1986, intentionally infringing the Getty trademark." *Id.* at 12. The jury awarded $43,255 in compensatory damages and $1 million in punitive damages. *Id.* at 12-13. The Second Circuit held that "a punitive damage award in the amount of $1 million on these facts is grossly disproportionate to the proven actual damages" and ordered that on remand, if the District Court found entitlement to punitive damages under New York law, "should be entered in an amount not to exceed $250,000." *Id.* at 14.

In light of the extenuating and equitable circumstances set for the in Parts III and IV, *supra*, and the availability of a punitive award under 15 U.S.C. § 1117(c), Costco submits that any award of punitive damages in this case would be excessive under N.Y. C.P.L.R. 5501(c) and should be disallowed. *Cf. Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 165-66 (E.D.N.Y. 2016) (Matsumoto, J.) ("The court will not impose punitive damages on the defendants found to have infringed willfully because . . . enhanced statutory damage awards already allow for a punitive component."); *Malletier v. Carducci Leather Fashions, Inc.*, 648 F. Supp. 2d 501, 506 (S.D.N.Y. 2009) (Keenan, J.) (adopting report and recommendation that: "The substantial sum that I previously have recommended as a statutory damages award under the Lanham Act includes a punitive component. Accordingly, Louis Vuitton is not entitled to an additional [punitive] award under New York law.").

### D. The $8.25 Million Punitive Award Is Excessive as a Matter of Due Process

Under the Due Process Clause of the Fourteenth Amendment, courts reviewing punitive damage awards must "consider three guideposts: (1) the degree of reprehensibility of the defend-

ant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

Where, as here, only economic interests are at stake, the "reprehensibility" factor weighs in favor of a low punitive award. *See, e.g.*, *Koch*, 14 F. Supp. 3d at 279 ("The harm was strictly economic, and the victims were far from vulnerable consumers. These facts merit a relatively low award of punitive damages."); *Capitol Records*, 48 F. Supp. 3d at 729 ("*Gore* held that 'purely economic' harm does not rise to the level of reprehensibility in its punitive damages analysis.").

The second *Gore* guidepost is the proportionality between a punitive award and a plaintiff's damages. Here the Plaintiffs did not prove and were not awarded any damages, thus precluding any punitive award as set forth above. The Plaintiffs also did not prove that Costco's use of "Tiffany only" signage resulted in any unjust enrichment; and at all events, "[p]unitive damages are inappropriate with respect to a claim of unjust enrichment." *Hutton v. Klabal*, 726 F. Supp. 67, 73 (S.D.N.Y. 1989) (Marrero, J.). But if Costco's profits on sales of diamond rings that potentially were described by "Tiffany only" signs were considered, the jury's punitive award is more than 17 times (at Plaintiffs' posited 13% profit rate) and more than 21 times (at the actual 10.31% profits rate) the profits, a figure well above the "four times" figure that the Supreme Court has repeatedly found to be "close to the line of constitutional impropriety." *State Farm* 538 U.S. at 425.

The third and final *Gore* guidepost requires the Court to examine comparable civil penalties. In an action about bottles of counterfeit wine brought for fraud and violations of New

York's General Business Law, the court applied the third *Gore* guidepost by looking to the $1,000 civil penalty for willful deceptiveness under the GBL. *Koch*, 14 F. Supp. at 278-79.

All three Due Process "guideposts," in short, point to the same conclusion: any punitive award in this case would be duplicative of statutory damages under 15 U.S.C. § 1117(c) and none should be awarded. *Cf. Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001) (punitive award amounts are subject to plenary review).

## CONCLUSION

Based on the Court's second summary judgment decision, the Court may appropriately award a permanent injunction against use of "Tiffany only" signage as the Court has defined it. No further relief should be awarded under 15 U.S.C. §§ 1116 or 1117(a) or (b). Plaintiffs' claim for punitive damages under New York law is legally insupportable and should be dismissed.

Dated:    New York, New York                     Respectfully submitted,
          November 28, 2016

                                                 Hughes Hubbard & Reed LLP

                                                   By:     /s/ James W. Dabney
                                                           James W. Dabney
                                                           Richard M. Koehl
                                                           Ross Lipman
                                                           Emma L. Baratta
                                                   One Battery Park Plaza
                                                   New York, New York 10004
                                                   212-837-6000 (telephone)
                                                   212-422-4726 (facsimile)
                                                   james.dabney@hugheshubbard.com

74047378