UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TIFFANY AND COMPANY and TIFFANY (NJ) LLC,<br><br>                    Plaintiffs,<br><br>       v.<br><br>COSTCO WHOLESALE CORPORATION,<br><br>              Defendant. | No. 13 Civ. 1041 (LTS) (DCF) |

## **PLAINTIFFS' RESPONSIVE POST-TRIAL MEMORANDUM**

BROWNE GEORGE ROSS LLP
5 Penn Plaza, 24th Floor
New York, New York 10001
Telephone: (212) 413-2600
Facsimile: (212) 413-2629
Attorneys for Plaintiffs

*Of Counsel*:
Jeffrey A. Mitchell, Esq.
Judith R. Cohen, Esq.
Brett D. Katz, Esq.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ...........................................................................................1

I.    THE VERDICTS ARE SUPPORTED BY THE WEIGHT OF THE EVIDENCE ...........3

    A.    When The Evidence Is Weighed There Is No Basis to Disturb The Jury
        Verdicts .............................................................................................................4

    B.    Dr. Cornell's Expert Testimony Was Properly Discounted Or Rejected ..............8

    C.    Costco's Underlying Records Were Incomplete And Indecipherable .................12

    D.    The Jury Properly Held The Testimony Of Douglas Schutt Against Costco ........15

    E.    The Enhancement Of Profits Verdict Is Supported By The Evidence ..................22

    F.    Tiffany Has Not "Abandoned" Any Claims ........................................................23

II.   THERE ARE NO EXTENUATING CIRCUMSTANCES .............................................23

    A.    The "Tiffany As A Descriptive Word" Excuse ...................................................24

    B.    The Vendor Quote Sheet Excuse ........................................................................25

    C.    The Court's Finding Of Trademark Counterfeiting Is Not "Novel" ....................27

    D.    There Is No Absence Of Proof Of Loss Or Harm To Tiffany .............................28

    E.    There Is No Issue Of Gain To Costco .................................................................29

    F.    Costco's Claims Of Good Faith Cooperation Have Been Rejected .....................29

III.  TIFFANY IS ENTITLED TO DISGORGEMENT OF COSTCO'S PROFITS ..............30

IV.   THE PUNITIVE DAMAGES AWARD IS CONSISTENT WITH THE LAW
     AND EVIDENCE .......................................................................................................31

    A.    Costco Cannot Contend That Tiffany Failed To Prove Actual Damages .............31

    B.    The Punitive Damages Award Is Consistent With The Weight Of The
        Evidence ...........................................................................................................33

CONCLUSION .................................................................................................................36

## **TABLE OF AUTHORITIES**

CASES                                                                     Page(s)

*Birnbaum v. United States*, 588 F.2d 319 (2d Cir. 1978) ...............................................2

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127 (2d Cir. 2008) ......................................15

*Brandt v. Hicks, Muse & Co.*, 213 B.R. 784 (D. Mass. 1997), *aff'd sub nom. Brandt v. Wand
    Partners*, 242 F.3d 6 (1st Cir. 2001) ..........................................................................2

*Brink's, Inc. v. City of New York*, 546 F. Supp. 403 (S.D.N.Y. 1982), *aff'd*, 717 F.2d 700
    (2d Cir. 1983) ............................................................................................................35

*Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703 (S.D.N.Y. 2014), *aff'd in part,
    and vacated in part and rev'd in part on other grounds sub nom. EMI Christian Music
    Grp., Inc. v. MP3tunes LLC*, 844 F.3d 79 (2d Cir. 2016) ........................................35

*Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 136 (S.D.N.Y. 2000).......................29

*Koch v. Greenberg*, 14 F. Supp. 3d 247 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335
    (2d Cir. 2015) ............................................................................................................34

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Market Mgmt., Inc.*,
    628 F. Supp. 2d 312 (E.D.N.Y. 2009), *aff'd*, 409 F. App'x 389 (2d Cir. 2010)....................24

*NAACP v. Acusport Corp.*, 226 F. Supp. 2d 391 (E.D.N.Y 2002) ..................................3

*Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577 (2d Cir. 1993) ........................25

*Providencia V. ex rel. K.V. v. Schultze*, No. 02 Civ. 9616 (LTS)(HBP), 2009 WL 890057
    (S.D.N.Y Apr. 2, 2009) (Swain, J.)............................................................................15

*TVT Records v. Island Def Jam Music Grp.*, 257 F. Supp. 2d 737 (S.D.N.Y. 2003) ...................35

STATUTES

15 U.S.C. § 1117(b) ......................................................................................................23, 30

15 U.S.C. § 1117(c) ............................................................................................................35

## PRELIMINARY STATEMENT

Starting with its opening statement, Costco's[1] theme at trial was that it *took responsibility for its actions*, and *respected the decision of the Court*. *See, e.g.*, Tr. 68:21-69:5, 394:15-23, 401:17-20 (citations to the transcripts of the trial portions of the proceedings are preceded by "Tr." unless otherwise noted). A unanimous eight-person jury, composed entirely of college graduates, most of whom also had advanced degrees,[2] did not believe those *mea culpas*, and with good reason. Nevertheless, it is Costco's view that the jury, just like the Court in granting summary judgment, got everything wrong.

So, once again, Costco trots out in its Post-Trial Brief ("Costco Brief") the same images of setting styles, mock signs, dictionary definitions, jewelry case photographs and vendor quote sheets that have been the focus of its failed defense throughout this case. Relying on that evidence, Costco resorts to its standard operating procedure of rearguing already decided issues, an approach it was admonished for following the second day of trial:

> And I said to you at the sidebar, I say this to you again, you don't like my rules, you don't like my rulings, you're perfectly welcome to disagree with me. And I see you're building a trump [sic] for your appeal. You know, God bless you. But those are issues that you take up on the 17th floor and you don't repeatedly raise here.

Tr. 199:4-9; *see also* Hr'g Tr. 48:25, Sept. 8, 2016, ECF No. 341 (Court to Mr. Dabney: "You don't like a lot of my rulings?"). After Mr. Dabney offered a half-hearted apology the next

---

[1]   Unless otherwise defined herein, defined terms are as defined in Tiffany's Post-Trial Brief ("Tiffany Brief").

[2]   Juror No. 1, Tr. 125:21-24 (Voir Dire); Juror No. 2, Tr. 32:6-9 (Voir Dire); Juror No. 3, Tr. 35:8-9 (Voir Dire); Juror No. 4, Tr. 128:11-13 (Voir Dire); Juror No. 5, Tr. 138:19-20 (Voir Dire); Juror No. 6, Tr. 46:2-8 (Voir Dire); Juror No. 7, Tr. 163:19-20 (Voir Dire); Juror No. 8, Tr. 49:20-21 (Voir Dire). Juror Nos. 4, 5 and 6 disclosed during *voir dire* that they each had Masters Degrees. *Linkedin* biographies of Juror Nos. 2 and 8 show they have Masters Degrees as well.

morning, the Court said:

> This sort of non-apology, "if anybody is offended I'm sorry," does not go far. You are operating in a profession that has rules in which judges make directions and in which a level of civility and basic propriety in human interaction is required as between lawyers and as between lawyers and the Court, and, yes, you have an obligation of zealous advocacy, but it's zealous advocacy within the bounds of the law. I'm not saying you overstepped any specific legal boundaries here, but aggressive tactics burn a lot of human capital, burn personal capital, I assume you're making strategic decisions and yesterday I told you your strategic decisions are ones that may be digging holes in your road and I presume you're going to be taking that into account in making your decisions."

Tr. 208:21-209:9.

None of this seems to have resonated, as Costco again argues here (i) the Summary Judgment Opinion was wrong, (ii) "Tiffany" alone describes a setting, (iii) Tiffany was not entitled to recover Costco's profits, (iv) the use of "Tiffany" in its signs was not counterfeiting, and (v) Tiffany could not even seek, let alone recover, punitive damages. Each of those arguments has been rejected repeatedly, is well preserved for appeal, and has no place in this briefing. Costco also takes issue with the amount of the jury verdicts, but in doing so, simply assumes the testimony of its witnesses and its documentary proof was bulletproof, and that no rational jury could possibly have doubted its evidence. On those counts, it is wrong. The jury's awards were amply supported by the weight of the evidence, and should not only be respected, but to the extent advisory, adopted by the Court as well.[3]

---

[3]      As set forth in Tiffany's initial brief, this jury acted in both an advisory capacity and not. Tiffany Br. 1-4. To the extent jury findings are common to both legal and equitable claims, its verdict on these common claims precludes a contrary finding by the Court. In addition, the jury was highly educated and well-instructed, and those instructions are presumably the instructions the Court would follow itself. *Cf. Birnbaum v. United States*, 588 F.2d 319, 334 (2d Cir. 1978) ("As the District Judge properly charged the advisory jury (and we assume charged himself) . . . ."). So, unless the Court finds its instructions were not followed, whatever findings it makes should be consistent with those of the jury that are common to the legal and advisory claims. *Brandt v. Hicks, Muse & Co.*, 213 B.R. 784 (D. Mass. 1997) (District Court adopts

## I.   THE VERDICTS ARE SUPPORTED BY THE WEIGHT OF THE EVIDENCE

Costco confuses *weight of the evidence* with *how much the evidence weighs*.  As the Court instructed, "preponderance of the evidence" refers to "the quality and persuasiveness of the evidence, not to the number of witnesses or documents."  Tr. 1254:6-8.  The nine categories of evidence listed by Costco in its brief at pages 5-6 (sales records, signage records, etc.) regarding profits ignore the basic and fatal fact that Costco has no evidence of, and cannot prove, what any sign in any display case said when each sale was made.  Tr. 602:3-6; *see also id.* at 577:5-12, 580:1-16, 610:8-9.  As a result, Costco has not – *and cannot* – prove sales per sign, or that its profits were only $381,718 from standalone uses of "Tiffany," as it claims.  That Costco dumped into the record a hard drive, DTX 494, containing 18.6 millions of lines of signage data and other records, Tr. 657:4-8, does not change that fact.  *See, e.g.*, DTX 235A (bottom tab – "data dump").[4]  A hard drive without competent and reliable testimony about its contents is worthless to prove that profits were *de minimis*.

Since Costco tried the case with a battery of lawyers, consultants, and experts, one can only presume its decision to dump a loaded hard drive into the record wholesale was one of

---

unanimous advisory verdict based on jury instructions and facts), *aff'd sub nom. Brandt v. Wand Partners*, 242 F.3d 6 (1st Cir. 2001).

Moreover, even when acting in an advisory capacity, juries perform an important function, especially in a case like this, where public perception is an issue.  "Because advisory juries permit community participation and may incorporate the public's views of morality and changing common law, their use is particularly appropriate in cases involving community-based standards."  *NAACP v. Acusport Corp.*, 226 F. Supp. 2d 391, 398 (E.D.N.Y 2002).  That two jurors were former Costco members, and one a current member, make the jury's insights here even more compelling.  Tr. 132:25-133:1, 165:18-21, 83:9-10.

[4]     Even Costco's business records witness, Mr. Hesketh, could not meaningfully use the files on this hard drive when he was deposed in February 2014.  Tr. 729:3-730:3.  And, at the final pre-trial conference, the Court itself could not imagine how this hard drive could be used at trial.  Hr'g Tr. 75:3-7, Sept. 8, 2016.

conscious strategy.[5]   Much like its tactical decision to keep Costco's CEO, Craig Jelinek, from testifying live at trial despite Tiffany's repeated requests that he appear, and its failure to call David White, the consultant and e-discovery liaison who actually collected, organized and maintained all of the hard drive files, this strategic decision also backfired.   Instead, Costco focused a good deal of its limited trial time by, among other things, repeating objections on issues already decided, attacking the integrity of Tiffany and its in-house counsel, showing the jury mock signs created solely for this case, calling Mr. Palmieri to do a tedious show-and-tell about different ring setting styles, and trying to convince the jury that it really did accept responsibility for its actions and really did respect the Court's decision when clearly it did not. This all served to undermine Costco's credibility with the jury.   Costco does not get a *do over* now.

A.   **When The Evidence Is Weighed There Is No Basis to Disturb The Jury Verdicts**

In his opening, Costco's counsel admitted his client made at least $381,719 in profits on the subject rings.  He said:

> And we will show you that for the signs where the word "setting" was left off, and there's no dispute as to what the sales records show, if Costco forfeited every dime on the signs where there was no "set" or "setting" or "style" or anything else, that the grand total of the gross margin, not that you count overhead or anything like that, but the gross margin on those products was $381,719.

Tr. 83:5-12.  Now Costco says it *proved* at trial that this floor was also the ceiling, and it "earned no more than $381,718 in gross profits."  Costco Br. 5 (Heading II).  Stated differently, Costco

---

[5]     The hard drive was offered by Costco during cross-examination on Tiffany's case, and was never used on its case in chief, other than when Mr. Hesketh was re-called to answer questions about certain vendor quote sheets, which said "Tiffany," that had been shown to Dr. Cornell during his cross-examination, but for which Costco claimed the signage did not say "Tiffany."  *See* Tiffany Br. 21 n.13; *infra* p. 26.

argues it really *won* at trial, but a unanimous jury, in finding otherwise, just got everything wrong.

Unlike on a motion for summary judgment, a trial allows the trier of fact to discount or disregard evidence or arguments it finds are inaccurate, misleading, unsupported, not credible, contradicted or, even worse, knowingly false.  As the Court instructed the jury here:

> As members of the jury, you are the sole and exclusive judges of the facts that are disputed in this case.  You pass upon the evidence.  You determine the credibility of the witnesses.  You resolve such conflicts as there may be in the testimony.  You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

Tr. 1249:16-22.  Thus, the jury was not compelled to believe something just because Costco or its lawyers said so.  The Court told the jurors:

> In deciding the facts, you may have to decide which testimony to believe and which testimony not to believe.  You may believe anything a witness says, part of it, or none of it.  In considering the testimony of any witness, you may take into account many factors, including the witness' opportunity and ability to see or hear or know the things the witness testified about; the quality of the witness' memory; the witness' appearance and manner while testifying; the witness' interest in the outcome of the case; any bias or prejudice the witness may have; other evidence that may have contradicted the witness' testimony; and the reasonableness of the witness' testimony in light of all of the evidence.  The weight of the evidence does not necessarily depend upon the number of witnesses who testify.

Tr. 1257:8-21.  Governed by these instructions, there was ample evidence for the jury to conclude that Costco's records, and the summaries created from them, were unreliable. Likewise, there was ample evidence for the jury to reject as incredible the testimony of Costco witnesses purporting to explain away its counterfeiting of the TIFFANY mark, as well as ample evidence to conclude that Costco had not really taken responsibility for its actions.

With respect to the critical issue of what sign actually appeared in stores at the time of actual purchases, Costco argues here, as it did at trial, that "Plaintiffs bore 'the burden in the first

instance of proving that Tiffany only signage was used in connection with a relevant universe of sales.'"  Costco Br. 5.  Citing the Court's statement to this effect at the September 8, 2016 conference, Costco simply ignores the Court's next point, i.e., if the jury cannot find the amount of gross revenue from these sales due to a lack of records, "they may reach a reasoned approximation, *resolving any doubt as against Costco*."  Hr'g Tr. 34:6-10 (emphasis added). The Court so charged the jury.  Tr. 1266:1-4.  Given the admissions that Costco had no way to match actual sales to actual signs, Tr. 742:14-19, 577:5-12, 580:1-16, 602:3-6, 610:8-9, and proof that Costco's records were incomplete and unreliable, *see infra* Sections I.B, I.C, the jury's rejection of Costco's profit calculation is fully supported.

Costco also appears to contend that the jury had no basis to reject Dr. Cornell's report on profits.  DTX 139; DTX 806 (color coded version of DTX 139) (collectively, the "Cornell Report").  That belief stems from the misguided notion that the jury (and the Court) was required to accept the Cornell Report as proof of profits on a sign-by-sign basis, even if it found the Cornell Report was an example of "garbage in, garbage out," a phrase Dr. Cornell understood. Tr. 1153:13-22.  The jury instruction concerning expert evidence was clear.  "You may give the expert testimony whatever weight, *if any*, you find it deserves in light of all of the evidence in this case."  Tr. 1259:6-8 (emphasis added).  Thus, Dr. Cornell's expert evidence could properly be given *no* weight if it was found unreliable.  His report, which supposedly reflected sales per sign, had to be unreliable, because Mr. Hesketh, a Costco employee with personal knowledge of Costco records, said such records did not exist:

> Q.    And you know that's what this case is about, what did purchasers see at Costco. You know that, right?
>
> A.    This case is about what was on our signage.
>
> Q.    Yes.  And all of these papers and files that you have on your system, nothing answers that question, right?

A. Yes.

Tr. 742:14-19.  In the absence of that critical evidence, the jury properly rejected the Cornell

Report's bottom line, and, as instructed, reached its own "reasoned approximation *resolving any*

*doubts against Costco,*" and there is no reason to nullify the jury's profits determination.[6]

 Nor was the jury obliged to accept Costco's position that its infringement was no "big

deal," *e.g.*, Tr. 823:11-13, 418:21-25, or that an unrecognizable maker's mark stamped on the

inner shank was enough to enable a potential customer to distinguish Costco rings from real

Tiffany rings.[7]  As Costco's corporate representative admitted:

> Q. You would concede to me, Mr. Schutt, would you not, that when you looked into the jewelry case and saw the ring in its holder, there was no visibility to any markings inside the ring; all you saw was the diamond in the top of the ring itself, right?
>
> A. Yes.
>
> Q. And if a sign said "Tiffany" next to it, to describe that ring, there was nothing in the case that said, either, this is not a real Tiffany ring, or, this is a Kirkland Signature ring, which is your brand.  Right?
>
> A. Yes.

Tr. 425:6-16; *see also id.* at 116:13-17.  Even the Tiffany customer who first alerted Tiffany to

this misconduct was herself confused by the signage when she looked into the jewelry case at

---

[6] Along with its charge to the jury as to resolving any doubts against Costco arising from a lack of records, the Court also instructed, "If Costco fails to prove that any portion of the profit was attributable to factors other than use of the improper signage, you must award Tiffany the total profit from the sale of the rings."  Tr. 1267:1-4.

[7] Costco referred to the RB stamp as a "trademark" at trial and repeats that several times in its brief.  Costco Br. 20-21.  It is actually what is known in the jewelry industry as a maker's mark.  Costco's counsel was well aware that the mark is not a trademark.  *See, e.g.*, Mitchell Decl. Opp'n to Costco Mot. Partial Summ. J. Ex. 3, ECF No. 138-3 (U.S. PTO search results: no listings for RB Diamond).  In addition, as the Court concluded in granting Tiffany's motion for summary judgment of liability for Costco's trademark counterfeiting, Costco "offered no evidence that the stamping of these rings with generic marks has done anything to alleviate confusion."  Summ. J. Op. 23.

Costco, and she had her own authentic Tiffany ring.  PTX0027.0003-04.  Unlike every other product Costco makes and sells, these rings were delivered in plain packaging with no Costco identifying marks.  Tr. 436:10-437:11.[8]  What Costco will not acknowledge, is that its reputation for selling authentic luxury brand items for less, and its marketing materials focused on that *brands for less* philosophy, fostered a consumer perception that "Tiffany" in Costco signage meant Tiffany, the brand, rather than a setting style.  The fact that Costco also did nothing to clearly identify itself as the actual source of the rings contributed to the false impression created by these signs.  Here too, the jury had ample evidence on which to reject Costco's excuses that it did not intend to refer to the brand, it only copied vendor descriptions, and the like.

**B.    Dr. Cornell's Expert Testimony Was Properly Discounted Or Rejected**

The trial record fully supports the jury's implicit finding that Dr. Cornell's testimony concerning profits, and his purported attribution of sales to particular signs, was unreliable.  For example:

1.    Dr. Cornell is an independent consultant, Tr. 1137:3-5, yet the Cornell Report that purported to attribute sales and profits on a sign-by-sign basis was actually compiled and reported by others, employees of a company known as Compass Lexecon – Elizabeth Brown, James Tam, and John Haut – none of whom are agents of Dr. Cornell, Tr. 1138:13-1139:4.  Compass Lexecon was never identified as an expert, nor were its people ever offered for deposition, let alone called as witnesses at trial.

2.    Dr. Cornell never saw nor had possession of any of the underlying raw data on which the Cornell Report prepared by Ms. Brown and Messrs. Tam and Haut was supposedly derived.  Tr. 1137:11-17.

---

[8]    The jury knew what authentic Tiffany packaging looked like, as Costco introduced that packaging at trial.  DTX 821.

3.     Dr. Cornell never examined the underlying signage data produced by Costco, PTX 64 (the "Signage Chart"), so he was unaware that a comparison to the raw data from the Signage Chart showed that the Cornell Report was missing sales data for standalone uses, and that time periods in the Cornell Report showed shorter periods of sign usage than the raw signage data revealed.  Tr. 1149:19-1151:7.

4.     The Cornell Report was nothing more than a consolidation and summary of sales spreadsheets Mr. Hesketh said were prepared by David White, Tr. 731:11-733:19, an employee of consultant Alix Partners, DTX 258 (collectively, the "White Spreadsheets"),[9] and was not Dr. Cornell's work product.  Nor was the Cornell Report the result of an independent review *by Dr. Cornell* of the actual underlying sales and signage records.  Tr. 1151:4-7.

5.     Though he was listed multiple times as a live witness for Costco even after the trial started, Costco never called Mr. White as a witness at trial, either live or by deposition, to refute the deficiencies in these White Spreadsheets about which Mr. Kaczmarek testified on Tiffany's case.

6.     Both Mr. Kaczmarek and Mr. Hesketh identified mistakes and material omissions in the White Spreadsheets, such as negative sales entries for certain signage uses, the inability to match purchase order information with sales, and the failure to account on the charts for the ring sale to Tiffany's investigator next to the entry for the Standalone Use sign observed and photographed in Huntington Beach in November 2012.  PTX 25; DTX 258; Tr. 610:3-9, 612:4-8.

---

[9]     Mr. White prepared four separate spreadsheets, each based on the same information, covering gross sales by dollar volume and units per fiscal period, and net sales by dollar volume and units per fiscal period.

7.      Costco did not even keep records which showed what signs were actually on display at a store at any given time when a customer made his or her purchase, so Costco had no idea what any customer saw at the time of purchase, Tr. 577:5-12, a fact of which Dr. Cornell was not even aware, Tr. 1157:1-7.   Accordingly, the Cornell Report could not do what it purported to do, i.e., match sales to particular signs.

8.      Dr. Cornell arbitrarily cut-off his profits analysis as of December 12, 2012, even though the purchaser list contained transactions through August 31, 2013. Tr. 1157:8-11.

9.      Dr. Cornell observed 150 returns for which no purchase was found, but rather than investigate to find obviously missing sales information (there cannot be a return without there first being a sale), he simply ignored those returns.   Tr. 1144:21-1146:15.

10.      Dr. Cornell also inexplicably ignored negative margins for some sales, as had been observed and questioned by Mr. Kaczmarek, and admitted that Mr. Kaczmarek's questioning the accuracy of the records based on those negative margins was reasonable.   Tr. 1142:22-1143:11.

Consistent with this evidence, as a witness Dr. Cornell came across as uninformed about Costco's underlying records, and appeared to be relying on others for the details.   Indeed, Dr. Cornell testified that Compass Lexecon, and not he, had possession of Costco's records, which itself was likely untrue.[10]

---

[10]      The failure to call Mr. White as a witness was also telling on this point.   Mr. White testified at deposition that AlixPartners alone had possession of the underlying records, and that none were ever provided to Compass Lexecon.   White Dep. 143:22-144:16 (Cohen Decl. Supp. Pls.' Consol. Mot. *in Lim.* Ex. 8, ECF No. 300-8).   In fact, he said, "I've never heard of Compass Lexicon. . . . Never heard of Bradford Cornell."   *Id.* at 143:2-8.   Dr. Cornell had no idea what

Against Dr. Cornell's unreliable testimony about sales per sign, the jury heard Mr. Schutt flatly admit that he estimated having sent 11,000 letters to purchasers of rings with "Tiffany" in signs. Tr. 484:16-21. He testified:

Q.      You did not say "guess."

A.      I did not say "guess" in the deposition.

Q.      Right.  You said you did not know the exact number but you estimated around 11,000. Yes?

A.      OK.  Yes.

Q.      And when you gave me that estimate, it was just four months after you had sent the letter in April 2013.  Right?

A.      Yes.

Q.      And when you gave that answer and that estimate, you knew you were under oath, right?

A.      Yes.

Tr. 488:1-11.  Mr. Jelinek concurred with that estimate.  Tr. 814:20-815:1.  Costco never put on any evidence to explain away this testimony, or to show that both of these senior executives were mistaken.  It also did not re-call Mr. Schutt on its case in chief, or bring Mr. Jelinek to the trial at all.  Mr. Kaczmarek estimated that gross sales on 11,000 rings would total $47 million based on the Costco records he had reviewed, and at Costco's professed standard markup of 13%, would result in profits of $6.1 million.  Tr. 292:13-14.  Any other profit calculation was just a simple matter of multiplying a total sales figure by 13%.  Tr. 289:7-290:15.  That testimony was unrebutted.  Accordingly, $3.7 million is a reasonable approximation of profits from standalone usage based on total profits of $6.1 million for all signs with "Tiffany," especially since the

---

was and was not done to prepare the Cornell Report offered through him because he did not do the work, and as it turns out, Compass Lexecon never had access to the records Dr. Cornell said were reviewed.

markup on some sales may have been as high as 24%.  DTX 804.  Tiffany's counsel argued in summation that if the jury related the letters to sales, "[t]he 13 percent times whatever sales figure you come up to is an easy calculation," and that $3.6 million would be an appropriate Standalone Use profit figure.  Tr. 1243:4-23.[11]

### C.   Costco's Underlying Records Were Incomplete And Indecipherable

Costco produced 18.6 million lines of sign data alone, Tr. 657:4-8, most of it in a computerized form that was nearly impossible to manipulate.  So much so, in fact, that Costco's own 30(b)(6) witness on these records, Mr. Hesketh, could not himself answer detailed questions about what was in those records as they related to sales and signs at his February 2014 deposition because, he said, they were "huge," and he did not have the "Delimitware" program at the time. Tr. 728:7-730:3.  Yet, two and a half years later, Mr. Hesketh showed up at trial with these massive files loaded on to his laptop, and tried to make it look like he could now extract discrete bits of information from them upon prodding by Costco's counsel.  Though he looked like Billy Joel at the piano, the jury was not fooled, as in the end this charade proved nothing.

That was because no matter what Mr. Hesketh did with his laptop, the jury fully understood one unalterable fact – *Costco had no records to show what any sign said in any store at the time of purchase*.  Mr. Hesketh testified:

> Q.   And you would agree with me that this signage data does not show what a customer making a purchase actually saw on the floor of any particular Costco, right?
>
> A.   Yes.

Tr. 602:3-6; *see also id.* at 577:5-12, 580:1-16, 610:8-9 ("I've already answered that we do not

---

[11]   Costco speculates about what the jury might have done in reaching its verdict on profits. However, the jury did not state its reasons or methodology, and this guess from Costco is entitled to no weight whatsoever.

have a record of what sign was on our floor at the time."), 742:14-19.

Mr. Hesketh also admitted that the sale of a ring to Tiffany's investigator in Costco's fourth fiscal period of 2013 (November 2012) was inexplicably not accounted for on the White Spreadsheets in connection with the standalone Tiffany sign which had been displayed next to this ring, casting further doubt on the accuracy and completeness of Costco's report of sales:

> Q.   And on that giant spreadsheet next to the entry "Platinum Tiffany .7 CT VS2, I round diamond ring," you show zero sales, correct?

> A.   Next to that sign, yes.

> Q.   You have a sign entry on your big chart. That was the idea of the big chart, right, PTX250?[12] It's a big chart. It has sign information and then you go across and it has data, right?

> A.   Yes.

> Q.   And for the fourth fiscal period of 2013, on your very chart that Costco produced in this lawsuit, the very ring sold to Tiffany doesn't show up next to the sign, right?

> A.   The way this chart is being looked at in this manner, yes, that is correct.

> Q.   OK. So someone cannot say -- it seems like you are trying to say it yourself -- that this big chart accurately portrays what customers saw on the floor of Costco at the time they made their particular purchases, right?

> A.   *This chart represents what's in the data, not necessarily what was on the floor.*

Tr. 611:12-612:14 (emphasis added).

Importantly, the White Spreadsheets, the big charts that purported to show sales of rings on a fiscal period-by-period basis in relation to signs, were prepared by Mr. White, Tr. 732:5-12, who, as discussed above, did not show up at trial. As such, the mistakes and material omissions in the White spreadsheets, which both Mr. Kaczmarek and Mr. Hesketh observed, *see supra* p. 9 ¶ 6, were not explained or remediated at trial by their author, Mr. White. These included net

---

[12]   As the parties have agreed in the joint errata sheet submitted to the court reporter, the reference to PTX 250 should be DTX 258.

negative entries for particular rings, and the failure to identify and provide the underlying records from which these spreadsheets were supposedly created.  Tr. 268:3-21; DTX 258.  Since the Cornell Report primarily relied on the White Spreadsheets, and Dr. Cornell chose to ignore these errors and omissions, rather than to search for, and drill into, the source material himself (admittedly, a difficult task, since Costco never provided him access to the source material), it was well within the jury's purview to reject Dr. Cornell's report as similarly incomplete and unreliable.  It also bears noting that Costco's decision not to call Mr. White at trial strongly suggests that it believed his testimony would not have been helpful.

It was certainly the case that Mr. Hesketh's testimony did not shed any light on how the White Spreadsheets were created:[13]

> Q.  You appeared at a deposition in order to explain what all this stuff meant that you dumped on Tiffany, and you said you didn't do this, you sent it to David White. That's what you said at your deposition, right?
>
> A.  I said I did not create that document, [DTX] 258, correct.
>
> Q.  Right, which was the document that purports to bring all this stuff together into one piece of paper, right?
>
> A.  Yes.
>
> . . . .
>
> Q.  And you also don't know how Mr. White prepared it because Mr. White didn't work with you to prepare the document, right?
>
> A.  Yes.

Tr. 733:5-19.  It appears that the jury took note of this gap in Costco's case, and estimated profits as it was instructed to do, by "resolving any doubts against Costco,"  Tr. 1266:1-4, and properly

---

[13]  The White Spreadsheets were originally produced to Mr. Kaczmarek as Costco's supposed report of sales.  At that time, Mr. Kaczmarek did not know that the source of the spreadsheets was Mr. White.  Tiffany only learned that Mr. White, and not Costco, had prepared the spreadsheets at Mr. Hesketh's deposition in February 2014.

discounted or disregarded entirely the sales breakdown offered through Dr. Cornell as unreliable.

**D.     The Jury Properly Held The Testimony Of Douglas Schutt Against Costco**

The jury also properly concluded that Costco's corporate conduct warranted an award of punitive damages.  Without question this issue is one for the jury to decide and, as such, the jury's decision cannot be set aside unless "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Providencia V. ex rel. K.V. v. Schultze*, No. 02 Civ. 9616 (LTS)(HBP), 2009 WL 890057, at *1 (S.D.N.Y Apr. 2, 2009) (Swain, J.) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (internal quotation mark omitted)).

Here, in denying Costco's motion for summary judgment dismissing Tiffany's punitive damages claim, the Court has already determined that Tiffany had proffered evidence upon which a jury could conclude that Costco's behavior cleared the "high bar" for awarding punitive damages.  Summ. J. Op. 34.  Costco's evidence at trial was largely the same as the evidence rejected by the Court on summary judgment, e.g., Costco only meant a setting style and its lower-level personnel only copied vendor quote sheets, and the same evidence from Jen Murphy on which the Court relied in rejecting Costco's excuses as "untenable," *id.* at 15-17, was read and shown to the jury, Tr. 837:19-877:8.  Plainly, Costco cannot contend that there was a "complete absence of evidence" supporting the punitive damages verdict.

The testimony of Costco's corporate representative Douglas Schutt, the recently retired head of merchandising, Tr. 379:9-21, who was the only live witness to speak on behalf of senior management, did not help Costco's cause.  Mr. Schutt was called *by Tiffany* only, and a brief review of his testimony shows why Costco never put him back on the stand during its case in

chief, despite having identified him as its final live witness.

The Court had already found in its Summary Judgment Opinion that Costco had acted in bad faith, so the issue for trial was "how bad the bad faith was." Hr'g Tr. 44:14-19, Sept. 8, 2016. At trial Costco argued that it was not so bad, and tried to convince the jury it took *responsibility for its actions* and *accepted the summary judgment decision of the Court*. Mr. Schutt was the designated sponsor of these confessions. In his opening, Costco's lawyer assured the jury that Costco had learned its lesson, and no longer can "a sign . . . go out on the floor without it being reviewed by someone higher up in management than it was at the time." Tr. 79:16-18.

Mr. Schutt downplayed prior failures, calling this a mere "sign maintenance management issue," meaning that senior management had not properly instructed and trained junior employees to know better than to use "Tiffany" on signs. Tr. 419:20-420:18. But, as it turned out, this was not a *sign maintenance management issue*. It was a *senior management issue*, because senior management saw nothing wrong with calling the rings "Tiffany" during the 20 years Costco admittedly did so. Tr. 417:3-11. Mr. Schutt explained, "We never thought that there was an issue with, with the use of 'Tiffany' in our signage. It never was an issue over, you know, 20 years." Tr. 422:12-14. Since senior management did not see this as a problem, no one would have instructed and trained junior employees to do otherwise. It was clear that any change in training and management was only brought about by Tiffany's claims. Tr. 426:6-19.

Mr. Schutt also suggested that there was some kind of evolution of usage, from "setting" to "set" to the eventual removal of a modifier altogether, intended to excuse Costco's bad faith as a mistake. The same argument is made in Costco's brief, as if the Standalone Use only came about after the word "setting" was truncated to "set" and then removed entirely. Costco Br. 19.

But, that was not true, which Mr. Schutt finally admitted:

> Q.    OK.  But the evidence is, Mr. Schutt, that Costco is using a sign variation that said "solitaire Tiffany" without "set," "setting," or any other modifier as early as 2007. Right?
>
> A.    OK.
>
> Q.    So that whole statement that you make about removing wording from signs, these signs didn't have "set" as early as 2007, and for all we know go back 20 years, right?
>
> A.    I do know that they are --
>
> Q.    It's a yes or no, Mr. Schutt.
>
> A.    Could you please ask the question.
>
> Q.    I said, you understand that the "solitaire Tiffany" designation on a sign, which is a standalone, existed on the floor of Costco since 2007.  Right?
>
> A.    Yes.
>
> Q.    There's no removal of "setting" or "set" from that, right?
>
> A.    No.
>
> Q.    OK.  So the whole "set," "setting" story really is a side issue; it's not the main point here.  You understand that?
>
> A.    Yes.

Tr. 423:5-23.  So, "Tiffany" had been used on a standalone basis throughout the six-year statute of limitations period, and for all Mr. Schutt knew, throughout the entire 20 years the trademark had appeared in one form or another in Costco signs.  Tr. 480:11-15.

Undermining Costco's assertion that it took responsibility for its conduct, Mr. Schutt was asked whether Costco was still blaming a small West 48th Street vendor in New York named RB Diamond for Costco's use of "Tiffany" in its signs.  At first he appeared to imply *no*, saying "[i]t is essentially my responsibility for the actions of our ICSs that take the information directly from our supplier's sheets and abbreviate it and put it on our signs."  Tr. 538:12-14.  But, as he

ultimately clarified, according to Costco, RB Diamond *was* to blame because "[t]hey are the supplier for us and they provide information for us to create our signs from. . . . They are responsible for providing us accurate information on their quote sheets."  Tr. 539:17-540:1.  By the time he was finished, Mr. Schutt was blaming RB entirely, saying that Costco took no responsibility for the use of "Tiffany" in signs in Costco stores, Tr. 540:2-20, a claim the Court itself had previously rejected in granting Tiffany summary judgment, Summ. J. Op. 16-17.

Mr. Schutt's testimony about the email sent to all employees by Costco CEO Craig Jelinek right after suit was filed in February 2013, PTX 103, and his own letter to purchasers in April 2013, PTX 104, further undermined Costco's "taking responsibility" mantra.  At the time of Mr. Jelinek's email, Mr. Jelinek and Mr. Schutt did not know how long Costco had used "Tiffany" in signs, something they *never* bothered to ever find out.  Tr. 827:19-829:16, 479:7-12.  And, since Costco did not know who first used "Tiffany" in signs, it obviously did not know what that person was thinking, Tr. 480:11-20, so it could not *know* what was intended by this unknown employee.  Indeed, the first time Mr. Schutt even saw photographs of the signs Tiffany was complaining about was at his August 2013 deposition, Tr. 480:21-481:5.  Mr. Jelinek was similarly uninformed.  Tr. 808:25-809:5.  Yet, despite knowing close to nothing about the signs and their origin, Mr. Jelinek nevertheless wrote in his email that the use of "Tiffany" in signs was intended to describe a setting style.  PTX 103.  That assumption set the tone for Costco's defense which persists to this day.  Costco only *meant* "setting," whether it used that word or not.

Mr. Schutt still had not seen the display case signage when he wrote to purchasers.  Tr. 483:9-16.  He said his letter was sent to people "who had purchased diamond rings that . . . had 'Tiffany' anywhere in the description of that particular diamond ring."  Tr. 484:19-21.  The idea was to make it look like Costco was taking responsibility with its customers by

making the generous offer of full credit upon returning a ring, but never once in the letter did

Mr. Schutt say that even though the rings were sold next to signs that said "Tiffany," they were

really made by Costco.  Tr. 490:19-492:3.  As he admitted,

> Q.    I had asked you earlier, Mr. Schutt, whether getting caught and changing your practice, and doing the right thing are the same thing.  And you said no.  Do you remember that?
>
> A.    Yes.
>
> Q.    Now, here's an instance of getting caught, writing a letter to your valued members, who may have been misled by signage in your jewelry case, and you're not even telling them in your letter that your signs said "Tiffany" and the rings were not made by Tiffany and Company.  Correct?
>
> A.    Correct.

Tr. 492:4-13; *see also id.* at 492:20-493:2.

Even the offer to provide a refund if a customer was not satisfied was less than what it

seemed.  The price of diamond engagement rings has increased over time, but all Costco offered

on return was the price originally paid.  "Our refund policy was that they could receive back

what they paid for the ring."  Tr. 534:19-20.  That adherence to standard corporate "policy" left

an unhappy customer with the Hobson's choice of keeping a ring he or she had been deceived

into buying, or returning this sentimental item for the original price and paying more for a

replacement.  Costco was not even offering the represented value of the rings even though all

came with appraisals for more than the purchase price.  Tr. 534:23-535:6.  Mr. Schutt even

disputed that such a customer would necessarily go elsewhere for a replacement, saying the

person "might buy another one from Costco," but then admitted that a misled customer was not

likely to return a Costco ring only to buy another from Costco for more money.  Tr. 535:7-24.

Mr. Schutt also claimed Costco ceased and desisted from the use of "Tiffany" in all forms

in December 2012, shortly after receiving notice from Tiffany, but the evidence showed

otherwise. He testified, "We within days we removed any sign in any of our jewelry cases that had the word Tiffany in them. We placed a block in the system so that Tiffany could not be put on any sign in the future." Tr. 509:16-19. But, Mr. Hesketh testified that a "block" was only put into the Costco system in March 2013. Tr. 677:11-22. Consistent with that testimony, Costco produced sign specimens with a Standalone Use as late as March 2013, and any signs with this usage could have remained in stores long after that. PTX 151 (second and third rows); Tr. 747:1-17. The purchaser list produced by Costco showed sales as late as August 31, 2013. Tr. 735:6-8. Costco never explained or refuted any of the foregoing, from which a fact finder can properly infer Costco's continued use of "Tiffany" in signs through the latter part of 2013.

The notion that Costco actually *respected the decision of the Court* fared no better under close scrutiny.[14] Mr. Schutt was clear that the decision to which he was referring was the Summary Judgment Opinion, Tr. 400:15-19, and that he knew and understood that Costco's genericism counterclaim had been dismissed, Tr. 400:20-401:2. He admitted that meant that "Tiffany" as a Standalone Use is a valid and enforceable trademark, is not generic, and that Costco had no right to use it as it had. Tr. 410:7-16. Nevertheless, Mr. Schutt persisted that he still believed "Tiffany" standing alone properly described a ring setting, Tr. 495:13-19, demonstrating that he really did not "respect" the summary judgment decision of the Court. This destroyed his credibility altogether. After finally conceding that "Tiffany on its own is not generic," Tr. 542:8, and that a signage photograph taken by Tiffany's investigator in November

---

[14]    The Court is well aware that this story-line is nothing more than hollow words in Costco's made-for-litigation script. Costco has made it no secret that it disagrees vehemently with the summary judgment decision, reminding the Court of this view whenever it can. *See, e.g.*, *supra* p. 1. As Costco stated in one letter to the Court, "the Court will know from the pending appeal to the Second Circuit that Costco strongly disagrees with the summary judgement ruling and seeks its reversal." Letter 3, Oct. 16, 2015, ECF No. 187. Mr. Schutt's contrary statements at trial came across as the canned and inauthentic speeches that they were, and the jury no doubt saw them as such.

2012, PTX 25, showed a Standalone Use, Tr. 542:13-15, he still denied that "Tiffany" in the sign

connoted a brand.  The following exchange then ensued:

> Q.     Could you tell me any other name and any other word in that sign that is a brand other than the word "Tiffany"?
>
> A.     This sign refers to a setting for this diamond, a Tiffany setting, yes.
>
> Q.     If you're a customer, can you tell me any other word that a customer would look through the glass and look at and see in that sign that they would consider a brand?
>
> A.     ***They may think platinum is a brand because it's the first word on that first line. They could think that***.
>
> Q.     That's your testimony?
>
> A.     Yes.
>
> Q.     That platinum might be a brand for somebody who walks in the store?
>
> A.     It could be.

Tr. 542:23-543:11 (emphasis added).  Costco made no effort to rehabilitate Mr. Schutt after this

exchange, or to even call him back as a witness on its own case.  This speaks volumes about how

it really thought the jury perceived him by that point.  In fact, when the jury heard closing

arguments on punitive damages, Mr. Schutt was gone, having left the trial altogether.

Tr. 1318:5-8.

All of this seriously undermined not only Mr. Schutt's credibility, but ripped to shreds the

concept that Costco was honestly taking responsibility for its misconduct, or that it really

respected the decision of the Court on summary judgment.  What Mr. Schutt's testimony showed

instead was a total lack of respect for Tiffany's trademark rights, as well as for the legal process

and everyone's intelligence.  This testimony, together with the rejected excuses proffered by

Costco, properly formed the foundation for the jury's award of punitive damages.

E.     **The Enhancement Of Profits Verdict Is Supported By The Evidence**

Tiffany is not aware of any reported trademark counterfeiting case awarding profits generated by a membership warehouse from unlawful sales.  A membership warehouse like Costco, unlike an ordinary retailer, maintains "razor thin" margins; here, as little as 13%, Tr. 835:11, 274:1-6 (or an incredibly low 10.31 percent, as the discredited Dr. Cornell claimed, Tr. 1144:3-8), to entice customers to purchase memberships, Tr. 1185:19; PTX 19.   For a company the size of Costco, with annual sales of over $120 billion, Tr. 445:17-21, disgorgement of such a small markup is meaningless, most especially for a relatively low volume treasure hunt item like "Tiffany" engagement rings, which is more about "image" than profits, Tr. 859:9-16.[15] Costco's "image" was significantly enhanced by the appearance of "Tiffany" in the Costco display case, as it created an impression with tens of millions of Costco customers that Tiffany jewelry was among the prestige brand name items available for sale at a discount.  Tr. 424:18-23

Tiffany, on the other hand, never discounts the products it sells, particularly engagement rings, which are only available in Tiffany stores, Tr. 912:6-14, so this false impression was significant.  This was illustrated by the "shock" voiced by the Tiffany customer who first brought the signage to Tiffany's attention.  PTX 27.0003-04.  Engagement rings are a product category that Tiffany uses to introduce customers to its brand, and to become familiar with Tiffany's quality and customer service.  Tr. 943:24-944:24.  So, the false impression was damaging to Tiffany's business model, as the Court determined previously.  Summ. J. Op. 18.

Costco is renowned for selling brand name products at a discount, and luxury brand names like Tiffany, along with Louis Vuitton, Cartier, Rolex, and others, are the kinds of

---

[15]     Costco's business model is to primarily sell household items by the pallet-full, and jewelry and other specialty items are ancillary to that business.   Tr. 444:25-445:25, 449:19-450:7, 452:14-23, 462:13-23.

products Costco uses in its "treasure hunt" merchandising strategy.  Tr. 456:15-457:23, 817:21-819:9.  These are not stocked and sold for the volume sales profits they generate, but rather to create excitement and a buzz, and to motivate people to renew their memberships.  PTX 14.0006; Tr. 461:18-463:12.  The membership fees are what enables Costco to charge a razor thin margin on these items.  Tr. 444:1-4, 1185:17-18 (Mr. Dabney: "The lifeblood of Costco's business is its membership revenues.").  The jury heard all of this evidence and properly found that an award of Costco's profits alone would be inadequate.  *See generally* Tiffany Br. 18-20.  That finding is well supported by the weight of the evidence.

### F.       Tiffany Has Not "Abandoned" Any Claims

Costco's assertion that Tiffany has "abandoned" any claim of infringement with respect to Costco's use of "Tiffany Setting or Tiffany Set, *e.g.*, Costco Br. 16, simply misrepresents the record.  As Costco is well aware, Tiffany has never condoned this usage.  At the time it filed suit, Tiffany had photographs of two Costco signs, each of which displayed a Standalone Use.  Tiffany filed its complaint based on the conduct it observed.  During discovery, Costco produced records showing all sorts of permutations of signage data using "Tiffany," but those records were, as discussed previously, in great measure incomprehensible, incomplete or simply wrong.  Moreover, Costco never provided photographic proof of any *actual* sign with any other iteration of Tiffany.  Given these circumstances, Tiffany proceeded with litigating the discrete Standalone Use issue.  However, it has always made it clear that it has not abandoned anything – as the Court acknowledged at the November 3, 2015 pretrial conference, "any Tiffany setting litigation is left for another day."  Hr'g Tr. 31:12-31:16, Nov. 3, 2015.

## II.       THERE ARE NO EXTENUATING CIRCUMSTANCES

Tiffany's prior brief shows that the extenuating circumstances exception set forth in 15 U.S.C. § 1117(b) is intended to apply only to extreme cases, where the imposition of treble

damages would mean that the defendant would be unable to support his or her family.  Tiffany Br. 5.  Costco simply ignores the Lanham Act's legislative history and the several decisions which confirm the exceedingly limited scope of this exception, instead resorting to one outlier decision and a dictionary definition.  Costco Br. 15.  Indeed, although Costco has cited *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Market Mgmt., Inc.*, 628 F. Supp. 2d 312, 323 (E.D.N.Y. 2009) for the unremarkable proposition that the importation and sale of packaged soy sauce bearing counterfeit labels will constitute trafficking in counterfeit goods, Costco has ignored the discussion in that case (affirmed by the Second Circuit, 409 F. App'x 389 (2d Cir. 2010)), which confirms that Congress intended the exception only for the "rare case" as described above, *see Star Mkt.*, 628 F. Supp. 2d at 325-26; Tiffany Br. 5.

In any event, Costco's supposed extenuating circumstances do not support an application of this rare exception for Costco's benefit.  Costco's list lays out the familiar litany of Costco excuses, which the Court has already rejected in granting Tiffany's summary judgment motion, and particularly by its finding that Costco acted willfully, in bad faith and with the intent to deceive and that no reasonable finder of fact could find otherwise.  Likewise, the jury rejected these excuses in concluding that Costco would be required to pay punitive damages, a determination not to be set aside unless there is a complete absence of evidence to support this result.  *See supra* p. 15.  For the Court now to find extenuating circumstances based upon this same collection of excuses would require the Court to reverse its prior findings and the jury's determination.  Nothing happened at trial which would support either outcome.

A.      **The "Tiffany As A Descriptive Word" Excuse**

Having accomplished nothing with its presentation to the Court in opposing Tiffany's summary judgment motion, Costco came to trial with the same "proof" that it was only referring to Tiffany as a setting style in its signs.  Like the Court, the jury appeared unimpressed with

Costco's array of dictionary definitions and self-serving testimony, particularly in view of the extensive evidence of Costco's copying of Tiffany products, its regular references to "Tiffany" as a brand, and its obvious recognition of the fame of the Tiffany brand.  Summ. J. Op. 15-17; Tr. 838:17-848:21, 854:4-857:20, 859:19-865:5, 871:10-875:9, 1029:23-1030:1.  Costco made no effort to rebut or explain this evidence, even though it had been a critical part of the Court's summary judgment findings.

Indeed, Costco's new witness for trial, Cindy Gallardo, did not help its cause.  As Costco's sole foundation witness for what was supposedly meant by the signs, Ms. Gallardo acknowledged her own frequent references to "Tiffany" as a brand or a company.  Tr. 1025:22-1027:21, 1034:21-1036:2.  She also agreed that not everyone and not every Costco member knew what a "Tiffany setting" was, and that a person who does not know this phrase would be misled.  Tr. 1027:23-1028:25.  Ultimately she admitted, "I see now what – you know why the change [to remove Tiffany] needed to be made."  Tr. 1034:13-20.

### B.    The Vendor Quote Sheet Excuse

The Court correctly concluded that Costco's excuse that it had merely copied its vendors' references to "Tiffany" was "untenable in light of the evidentiary record," Summ. J. Op. 17.  It appears that the jury similarly rejected the excuse.  If the Court now accepts this as an extenuating circumstance on these submissions, it will be reversing its own prior finding and nullifying the jury's verdict.

The evidence plainly demonstrates that Costco did not merely copy vendor quote sheets.  And, even if it did, this practice does not excuse Costco's Standalone Use.  First, Costco's bad faith is not diminished by the fact that someone else may have created this infringing usage.  *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 587 (2d Cir. 1993) ("[Defendant's] bad faith is not diminished by the fact that it did not create the [infringing trade

718203                                                           25

dress] but rather selected it from three options presented to it by [the distributor].").   As Ms. Gallardo agreed, the vendor put the word "Tiffany" on the quote sheet, but didn't put it on the Costco signs.   Tr. 1021:1-9.   Second, the same witnesses who testified that Costco only copied the vendors' descriptions also testified that Costco's use of Tiffany started more than 20 years ago and, as Mr. Dabney has emphasized, no one has direct personal knowledge of what happened 20 years ago or who first decided to use Tiffany on a sign.   Hr'g Tr. 53:4-5, Dec. 21, 2015, ECF No. 275; Tr. 972:5-10 ("No one knows.").   Ms. Gallardo confirmed that the determination to use "Tiffany" was already in place when she got there and she was not taking responsibility for that decision.   Tr. 1034:1-12.   Here, where the signs sued upon (limited to the last six years of Costco's use because of a six-year statute of limitations) merely continued a 20-year-long practice, the relevant evidence as to Costco's intent is evidence as to how and why it first used Tiffany.   Costco did not provide such evidence.[16]

Moreover, the trial showed that Costco's actual practice was not to blindly copy vendor quote sheets anyway, as reflected by quote sheets from Costco's own exhibit, which showed the vendor's use of "Tiffany", but where the corresponding Costco signage data supposedly did not include "Tiffany."   Tiffany Br. 21 & n.13.   Similarly, whereas Costco's signage data showed Standalone Use at least as early as 2007, Tr. 423:15-23; Hr'g Tr. 18:18-19., Sept. 8, 2016, vendor quote sheets said "Tiffany Set" at that time, and through at least March of 2008.   The first Standalone Use appeared in a quote sheet dated July 24, 2008.   DTX 228, at COSTCO1735, COSTCO1446.   So, the vendor quote sheets themselves refuted Costco's excuse.

---

[16]     As the Court previously found, "In essence, Costco urges the Court to find that Costco jewelry buyers used the word 'Tiffany' in a generic sense when communicating with vendors, while at the same time asking those vendors to copy Tiffany & Co. designs, and that signage incorporating the word 'Tiffany' on the resulting merchandise was nothing more than clerical duplication of a generic reference from an invoice.   Such a conclusion is untenable in light of the evidentiary record."   Summ. J. Op. 16-17.

Finally, using just one of the sign permutations observed by Tiffany's investigator as its supposed example, Costco tried to make it seem as if the Standalone Use started much later when modifiers were dropped, but even that failed.  Andrew Karig's testimony – consisting of his inability to recall and rank speculation in response to Mr. Dabney's leading questions – should not be given any weight for even this one sign variation.  And, Ms. Gallardo also never explained the dropping of "set" from signage for item 605880.  (The testimony at page 985 of the trial transcript to which Costco cites, Costco Br. 19, includes Ms. Gallardo's explanation of her adding to the sign an extra zero to the carat weight and the word "brilliant," but does not say anything about how "set" came to be removed.)  With all of the gaps and inconsistencies in Costco's evidence, the vendor quote sheet excuse failed, and failed so badly that in the end, it probably worked against Costco with the jury.

**C.**     **The Court's Finding Of Trademark Counterfeiting Is Not "Novel"**

Costco claims that there is no precedent for the Court's finding that it is liable for trademark counterfeiting and that this amounts to an extenuating circumstance (calling it Tiffany's novel theory), Costco Br. 20-21.  In fact, as the Court correctly found, Tiffany established trademark counterfeiting as a matter of law, based upon the express language of 15 U.S.C. §§ 1114(1)(a) and 1127.  Responding to Costco's arguments, the Court explained both that there is no statutory requirement that the counterfeit mark be placed on the product itself, and that the stamping of the rings with the generic marks of the vendor did not require a different finding.  Summ. J. Op. 20-23.  Particularly in view of Costco's repeated references here to the maker's "trademark" (a reference which Costco knows is inaccurate, *see supra* note 7), it should be obvious that Costco's argument is nothing more than an ill-disguised and untimely attempt to reargue the Court's summary judgment determination – *again*.

**D.    There Is No Absence Of Proof Of Loss Or Harm To Tiffany**

Costco's assertion that there is an absence of proof that an appreciable number of ring buyers misunderstood the signs and that this is an extenuating circumstance, Costco Br. 22, is nothing short of frivolous.   In the Summary Judgment Opinion the Court cited Tiffany's "concrete evidence of consumer confusion," emphasized that "Costco has not offered a single piece of evidence affirmatively demonstrating that consumers were <u>not</u> confused," and concluded that Tiffany's evidence of consumer confusion stood unrebutted.  Summ. J. Op. 14. Ignoring this finding and the case law, which could not be more clear that actual confusion is not even necessary to support an accounting of Costco's profits, Costco argued over and over that actual confusion was required for an accounting award and that evidence of a lack of confusion would be admissible.  *E.g.*, Mem. Law Opp'n Pls.' Mot. *in Lim.* No. 2, at 8-10, ECF No. 239. Each time the Court properly rejected Costco's position.  *E.g.*, Hr'g Tr. 18:16-20, 34:12-16, 44:4-6, 61:17-19, Dec. 21, 2015.  Ultimately, at trial, the Court made it clear that its prior ruling regarding the sufficiency of the record was "the law of the case."  Tr. 956:16-19.  Undaunted, Costco argues this point again here.

Indeed, Costco ultimately *relied* on the Court's summary judgment ruling against it to preclude testimony at trial from the several customers who had credibly testified about their actual confusion in purchasing Costco rings which they believed had been made by Tiffany. Hr'g Tr. 67:19-25, Dec. 21, 2015.  That has not stopped Costco from now arguing there was an absence of proof based on the very evidence these customers would have provided had they not been precluded at Costco's request.  Yet, even without this customer evidence, the trial record includes substantial and unrebutted evidence of customer confusion.  *E.g.*, Tr. 137:7-21, 146:18-19, 152:3-10, 257:5-11, 258:11-259:13; PTX 27.  For Costco to assert now that there was a lack of evidence of confusion at trial as an extenuating circumstance smacks of bad faith.

### E.      There Is No Issue Of Gain To Costco

Costco's argument that the so-called absence of proof of gain to Costco from its infringing activity constitutes an extenuating circumstance, Costco Br. 22-23, is yet another construct which ignores the law and evidence.  Where, as here, Tiffany is seeking disgorgement under a deterrence rationale, and not an unjust enrichment rationale, Hr'g Tr. 19:9-12, Dec. 21, 2015, "the deterrence rationale is an alternative route to an award of profits that does not require a showing that the defendant benefitted from the [infringing] conduct," *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 136, 144 (S.D.N.Y. 2000).  Moreover, as shown in Tiffany's prior brief, Costco's sale of rings with Tiffany signage is not about the razor thin profits on the rings themselves.  Rather, these sales are part of Costco's treasure hunt strategy, which is intended to create a "buzz" among shoppers so they keep renewing their memberships, which are the "lifeblood" of Costco's business.  *See supra* p. 23.  This is just the type of "intangible benefit" which can support an award of enhanced damages, Tiffany Br. 18-20, and certainly is not an extenuating circumstance.  There can also be no doubt Costco benefited from its false association with Tiffany.

### F.      Costco's Claims Of Good Faith Cooperation Have Been Rejected

In its prior brief and as discussed above, Tiffany has shown that Costco's protestations that it cooperated and took responsibility after Tiffany complained about Costco's infringement are not credible.  Among other evidence, there is proof of signage data still using "Tiffany" after December 2012, and Costco's top management continued to justify Costco's use of "Tiffany" and contended that this use was "no big deal."  Further, Costco's counterclaim and attempted improper interlocutory appeal from the Summary Judgment Opinion reflect a complete lack of respect for the Court's ruling, Mr. Schutt's rote claims to the contrary notwithstanding.  *See supra* pp. 20-21 and note 14; Tiffany Br. 9-11, 20-24.  In awarding punitive damages, the jury

plainly did not buy Costco's claims of cooperation and good faith.  So, those rejected claims cannot support a finding of extenuating circumstance.  Because none of Costco's excuses establish an extenuating circumstance, the Court must treble the profit award pursuant to 15 U.S.C. § 1117(b).

## III.   TIFFANY IS ENTITLED TO DISGORGEMENT OF COSTCO'S PROFITS

As the Court reiterated at trial,

> I held in summary judgment that the record made there was sufficient to permit Tiffany to seek a disgorgement of profits on the sale of Tiffany standalone rings. *That's the law of the case.*

Tr. 956:16-19 (emphasis added).  Even though Mr. Dabney responded "I am not disputing your Honor's ruling.  Your Honor has so ruled," Tr. 956:20-21, Costco now argues again that Tiffany is not entitled to profit disgorgement.  Costco Br. 25-27.  Mr. Dabney's assurance to the Court must have had an expiration date.  Nevertheless, nothing in Costco's submission here justifies its latest attempt to reargue the Court's clear and consistent rulings in this respect.[17]

In fact, Costco's arguments are virtually identical to those rejected by the Court in denying its summary judgment motion.  In both instances Costco pressed its ongoing assertions about the descriptive meaning of Tiffany, its purported voluntary discontinuance of any use of the word "Tiffany," and the supposed lack of harm or loss to Tiffany or benefit to Costco. Tiffany has shown repeatedly that these arguments are irrelevant, incorrect and/or not supported by the evidence, and the Court has agreed.  It is fundamentally unfair that the Court and Tiffany need to address these issues again and again and again.

---

[17]   At the charge conference Costco proposed a change to the Court's instruction "'Tiffany is entitled to an award of all profits'" to "'Tiffany *may* be entitled to an award of profit.'" Tr. 761:18-21 (emphasis added).  The Court rejected that as "contrary to my summary judgment ruling, which is that Tiffany is entitled to recover proven profits under the law of the case." Tr. 761:21-24.

As to Costco's one arguably new claim – that Tiffany has not said why a permanent injunction would be ineffective to deter Costco from using "Tiffany" – there is no requirement that Tiffany do so.  More importantly, the evidence and the Court's findings of Costco's bad faith and willful deceptiveness, together with Costco's continuing claims of right to use "Tiffany" and its "strong" disagreement with the Court's ruling, *see supra* note 14, mitigate against an injunction as the sole deterrent here.  Particularly in view of Costco's massive resources and  its evident willingness to litigate to the death, whatever the cost, requiring Costco to disgorge its profits is the best way to ensure its ongoing compliance with a limited injunction.

## IV.   THE PUNITIVE DAMAGES AWARD IS CONSISTENT WITH THE LAW AND EVIDENCE

### A.   Costco Cannot Contend That Tiffany Failed To Prove Actual Damages

With respect to Costco's argument that Tiffany must prove actual damages as a prerequisite to recovering punitive damages, it has never submitted or requested any jury instruction or verdict to this effect.  Costco pressed this argument only in its November 2015 Trial Brief.  Costco's Trial Br. 19-20, ECF No. 229.  Tiffany responded in its Opposition to Costco's Motions *In Limine*, Pls.' Mem. Law Opp'n 14 n.18, Dec. 4, 2015, and showed that punitive damages may be awarded where a plaintiff can seek nominal damages.  Costco elected not to respond in its Reply Memorandum of Law in Support of Costco's Motions *in Limine*, ECF No. 249, and did not raise this issue at the December 2015 pre-trial conference.[18]

---

[18]    Costco's contention during its argument on its Rule 50 motion, that it never had the opportunity to brief or address this argument, Tr. 949:20-950:6, is simply incorrect.  For whatever strategic reason Costco has elected to raise this issue only intermittently.  And, when Costco made this argument in its December 28, 2015 letter, ECF No. 264, it merely reiterated the argument in its Trial Brief and ignored Tiffany's arguments to the contrary.  In its response to Costco's letter, ECF No. 271, Tiffany duly referred the Court to its prior submission.

Nor did Costco raise this issue after receipt of the Court's draft jury instructions on August 17, 2016, ECF No. 314, which included a supplemental instruction to be given if the jury found that punitive damages were warranted and told the jury that any award must be reasonable and proportionate to *Costco's actual profits* on sales.  *Id.* at 57.  At the September 8, 2016 final pre-trial conference Costco "implored" the Court not to instruct the jury about the Summary Judgment Opinion, Hr'g Tr. 60:12-16, 62:11-14, 62:25-63:2, 63:12-15, Sept. 8, 2016, and asked that the Court revise its charge to instruct the jury that clear and convincing evidence is required for punitive damages, *id.* at 81:23-82:6.  But, it did not say anything about any requirement that Tiffany prove compensatory damages or the Court's proposed instruction that a punitive damages award be proportionate to Costco's profits.  In fact, when counsel argued about whether Costco's annual reports would be admissible, Mr. Dabney objected on the basis that these reports would be inconsistent with the Court's supplemental instruction, since the reports would be used to show how big Costco is, whereas the amount of punitive damages "has to bear a proportion, reasonable proportion to the profits on the sale of the rings."  *Id.* at 68:15-24.

Likewise, Costco said nothing about any requirement that Tiffany prove or recover actual damages in the September 23, 2016 submissions regarding the jury instructions invited by the Court, ECF No. 343, and did not raise this issue at the September 26, 2016 Charge Conference. When Costco resurfaced this argument (last seen in its 2015 submissions) as part of its Rule 50 motion at trial, the Court properly rejected it as one of the legal issues which had been "thoroughly considered and addressed in connection with the summary judgment motion and/or the extensively briefed and carefully constructed jury instructions."  Tr. 960:5-17.

After the jury returned its verdict that Tiffany was entitled to recover punitive damages, Mr. Dabney made his summation in Phase 2 of the case and told the jury that the amount of

punitive damages must stand "in a reasonable relationship to Costco's actual profits on sales of rings" with signs with a Standalone Use of Tiffany.  Tr. 1329:5-18; *see also id.* at 1332:16-22. He acknowledged that the "actual profits" was the number as already determined by the jury, Tr. 1330:14-16, and the Court then instructed the jury accordingly, Tr. 1357:11-19.  Under all of these circumstances, Costco cannot now argue that the punitive damages award must be set aside because the jury looked to Costco's profits in calculating that award and because Tiffany has not proved actual damages.

**B.    The Punitive Damages Award Is Consistent With The Weight Of The Evidence**

Costco's contention that the jury's award of punitive damages is contrary to the weight of the evidence is just one more rehash of arguments already presented and rejected.  Costco moved for summary judgment dismissing Tiffany's punitive damages claim, on the ground that Tiffany had not presented any evidence that satisfied the stringent standards for an award of punitive damages.  The Court denied this motion, ruling that Tiffany had proffered sufficient evidence for a finder of fact to conclude that Costco's behavior satisfied the "gross, wanton or willful" standard.  Summ. J. Op. 34.  Nonetheless, Costco continued to press its contention that Tiffany was not entitled to a punitive damages award and included with each of its proposed jury instructions relating to the punitive damages issue the argument that no instruction concerning a punitive damages award should be given until the matter of whether defendant's conduct warrants any punitive damages at all had been tried.  *See* Costco Proposed Instr. Nos. 33, 35-45, 54-67, ECF No. 206.  The Court denied this request for bifurcation.  Hr'g Tr. 34:1-2, Dec. 21, 2015.

Now comes Costco yet again arguing that there was no basis for the jury to award punitive damages.  And, yet again, it relies on its already-rejected excuses to say that its conduct

was not reprehensible and ignores the extensive evidence on which the Court had relied in denying Costco's motion for summary judgment and which was presented to the jury.[19]  Costco also ignores the additional evidence presented at trial, which provided further support for a determination that Costco's conduct was reprehensible.  *See supra* pp. 15-21; Tiffany Br. 20-24. The jury was properly charged on punitive damages, and there is no basis to disturb its finding that Costco's conduct was sufficiently reprehensible to justify such an award.

### C. The Punitive Damages Verdict is not Excessive

Although Costco told the jury that in deciding what a reasonable amount of  punitive damages would be "we start with" the actual profits as determined by the jury, Tr. 1330:14-16, it now falls back on its rejected profit number of $381,718 to argue that the punitive award is more than 21 times Costco's actual profits.  Costco Br. 34.  Using the correct profit number, i.e., "the actual profits as determined by [the jury]," Tr. 1330:14-15, the punitive award represents 2.2 times  Costco's profits of  $3,700,000.   (Using the jury's enhanced profits figure of $5,500,000, the punitive award is a multiple of 1.5.)  Costco trumpets the reduction "by more than 90%" to the punitive award in *Koch v. Greenberg*, 14 F. Supp. 3d 247, 253-54 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015), as if to suggest that the verdict here should be reduced similarly.  Costco Br. 32.  However, what Costco fails to mention is that the *Koch* court had reduced the damages proved to $212,699, so that the reduced punitive award of $711,622 allowed by the court was 3.3 times the reduced damages figure – *more* than the multiple here. And, a multiple of 2.2 is well within the 4-to-1 ratio often cited as the line of constitutional impropriety.  Costco Br. 34.

---

[19]     In one of the more creative spins on the extensive evidence of Costco's copying of Tiffany's styles and products, Costco characterizes this as "Costco's failure to stop certain vendors from copying certain jewelry items sold by Plaintiffs."  Costco Br. 30.

To the extent that the Court must examine comparable civil penalties, Costco Br. 34-35, the statutory damages available under 15 U.S.C. § 1117(c) are such penalties.  *See Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 732 (S.D.N.Y. 2014), *aff'd in part, and vacated in part and rev'd in part on other grounds sub nom. EMI Christian Music Grp., Inc. v. MP3tunes LLC*, 844 F.3d 79 (2d Cir. 2016).   Since this provision allows for a maximum $2,000,000 penalty (and the jury has determined that Costco would be subject to this $2,000,000 penalty if Tiffany elects such recovery), the punitive award of a similar seven figure amount is comparable and appropriate.[20]

Finally, a defendant's net worth is to be considered in determining whether the amount of a punitive award is appropriate.  *See e.g.*, *Capitol Records*, 48 F. Supp. 3d at 728; *TVT Records v. Island Def Jam Music Grp.*, 257 F. Supp. 2d 737, 745 (S.D.N.Y. 2003) ("It is well-settled, in fact, that evidence of a defendant's net worth is properly considered given the goals of punishment and deterrence served by punitive damages.") (applying New York law); *see also Brink's, Inc. v. City of New York*, 546 F. Supp. 403, 413 (S.D.N.Y. 1982) ("If the damage award is to serve its intended objective of punishment for wrongful conduct and deterrence against repetition of a like offense, it must be sufficient to 'smart' the offender which permits a consideration of the wealth of the malefactor.") (applying New York law), *aff'd*, 717 F.2d 700 (2d Cir. 1983).  Costco fails to address this factor, for obvious reason.  A substantial punitive award is appropriate here, in order to ensure that this company with before-tax profit of *$3.6 billion* in the last fiscal year, Tr. 1354:23-1355:4, "smarts" as a result of the award.  The jury's punitive damages award of $8,250,000 is appropriate.

---

[20]     There is no reason to discuss whether the punitive award is duplicative of any punitive components of the statutory award unless and until Tiffany elects to accept the statutory award.

## CONCLUSION

For all of the reasons set forth above and in the Tiffany Brief, Tiffany respectfully submits that the jury verdicts should be adopted, the enhanced profits award of $5,500,000 should be trebled, a permanent injunction should be issued, and judgment should be entered accordingly, together with an award of Tiffany's attorneys' fees, interest and costs, and such other and further relief as the Court deems just and proper.

Dated:      New York, New York
            January 20, 2017                    Respectfully submitted,

                                                BROWNE GEORGE ROSS LLP


                                                By:    s/Jeffrey A. Mitchell
                                                       Jeffrey A. Mitchell
                                                       Judith R. Cohen
                                                       Brett D. Katz
                                                5 Penn Plaza, 24th Floor
                                                New York, New York 10001
                                                Telephone:  (212) 413-2600
                                                Facsimile:  (212) 413-2629
                                                jmitchell@bgrfirm.com
                                                jcohen@bgrfirm.com
                                                bkatz@bgrfirm.com
                                                Attorneys for Plaintiffs

718203                                  36